1

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)

2

HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202

3

Berkeley, CA  94710
Telephone: (510) 725-3000

4

Facsimile:  (510) 725-3001
reed@hbsslaw.com

5

lucasg@hbsslaw.com

6

*Attorneys for Lead Plaintiff*
*New Zealand Methodist Trust Association*

7

[Additional counsel on signature page]

8

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

CASEY ROBERTS, Individually and On
Behalf Of All Other Similarly Situated

No. 3:19-cv-03422-SI

12

Plaintiff,

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

13

v.

14

ZUORA, INC., TIEN TZUO, and TYLER
SLOAT,

Assigned to Hon. Susan Illston

15

16

Defendants.

17

18

19

20

21

22

23

24

25

26

27

28



**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ............................................................................................ 1

II.    JURISDICTION AND VENUE ...................................................................... 7

III.   PARTIES ......................................................................................................... 7

       A.   Lead Plaintiff ....................................................................................... 7

       B.   Corporate Defendant ........................................................................... 8

       C.   Executive Defendants .......................................................................... 8

IV.    SUMMARY OF THE FRAUD ..................................................................... 10

       A.   Zuora And The "Subscription Economy" ......................................... 10

       B.   Zuora Central And Its Flagship Products .......................................... 11

       C.   Zuora's Direct Sales Process And Defendants' Visibility Into The
            Sales And Implementation Information .............................................. 13

       D.   Zuora's Successful Initial Public Offering ........................................ 15

       E.   Defendants Concealed That Zuora's Solution Lacked Connectivity
            With RevPro ........................................................................................ 18

       F.   Defendants Knew Of The Integration Failure Before And Throughout
            The Class Period .................................................................................. 20

            1.   The Failed Zuora On Zuora ("ZoZ") Project ........................... 20

            2.   The Failed Keystone Integration Project ................................... 23

       G.   The Integration Failure Caused Sales Execution Problems And
            Reduced Demand For All Of Zuora's Products .................................. 25

            1.   Defendants' False Representations Led To Upset Customers ..... 25

            2.   Defendants Knew About The Failed RevPro Testing And Upset
                 Customers ................................................................................. 26

            3.   Defendants Knew About The Failed RevPro Testing And
                 Reducing Company Revenues ................................................... 27

            4.   Defendants Knew The Failed RevPro Testing Caused Sales
                 Execution Problems .................................................................. 28

       H.   Defendants Scrap The "Keystone" Integration Project Entirely For A
            New K-2 Project ................................................................................... 32



I.      Defendants Promoted The Functionality Of Its Solution While
        Concealing The Integration Failure.................................................................33

J.      Zuora Senior Executives Took Advantage Of The Company's Inflated
        Stock Price To Sell Their Own Shares For Over $28 Million .........................37

K.      The Truth Is Revealed .....................................................................................39

L.      Defendants' Post-Class Period Admissions Of Their Knowledge Of
        The Integration Issue .......................................................................................42

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
     OMISSIONS..................................................................................................................44

A.      Statements On Zuora's Website And Social Media Feeds.............................44

B.      Defendants' False Statements In Zuora's Product Press Releases and
        Form 8-Ks.......................................................................................................49

C.      The IPO Registration Statement .....................................................................53

D.      Statements In Zuora's Quarterly Reports .......................................................56

E.      Defendants' False Statements At The Q1 2019 Earnings Call.......................57

F.      Defendants' False Statements At The Q2 2019 Earnings Call.......................61

G.      Defendants' False Statements At The Q3 2019 Earnings Call.......................62

H.      Defendants' False Statements In December 1, 2018 TheStreet.com
        Article: "Zuora's CEO and CFO Talk to The Street About Their Firm's
        Growth Outlook and More"..............................................................................64

I.      Defendants' False Statements At The January 15, 2019 Needham
        Growth Conference ..........................................................................................65

J.      Defendants' False Statements At The February 13, 2019 Goldman
        Sachs Technology & Internet Conference........................................................68

K.      Defendants' False Statements At The February 26, 2019 Morgan
        Stanley Technology, Media & Telecom Conference .......................................70

L.      Defendants' False Statements At The Q4 2019 and Full FY 2019
        Earnings Call....................................................................................................72

M.      Defendants' False Statements In the April 18, 2019 Annual Report .............73

VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER....................................75

VII.  LOSS CAUSATION .....................................................................................................81

VIII. NO SAFE HARBOR ....................................................................................................82

IX.   THE PRESUMPTION OF RELIANCE ...........................................................................83



715 HEARST AVE., SUITE 202, BERKELEY, CA  94710
(510) 725-3000 • FAX (510) 725-3001

X.      CLASS ALLEGATIONS ...................................................................................83

XI.     CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(A) OF
        THE EXCHANGE ACT .................................................................................85

COUNT I FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT
        AND SEC RULE 10B-5 PROMULGATED THEREUNDER (AGAINST
        ALL DEFENDANTS)......................................................................................85

COUNT II FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
        (AGAINST DEFENDANTS TZUO AND SLOAT) .........................................87

XII.    PRAYER FOR RELIEF ................................................................................88

XIII.   JURY DEMAND............................................................................................88



715 HEARST AVE., SUITE 202, BERKELEY, CA  94710
(510) 725-3000 • FAX (510) 725-3001

Lead Plaintiff New Zealand Methodist Trust Association, by and through its undersigned counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Zuora, Inc. ("Zuora" or the "Company") during the period from April 12, 2018 to May 30, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class"). Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Zuora's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Zuora securities; (vii) consultation with experts; (viii) accounts from former Zuora employees; and (ix) additional materials and data concerning the Company and industry as identified herein.

## I.    INTRODUCTION

1.    This securities class action arises from Defendants' false and misleading statements and omissions about the functionality of Zuora's subscription order-to-cash platform, Zuora Central, and its flagship software application products, Zuora Billing and Zuora RevPro. Throughout the Class Period, Zuora represented Zuora Central acted as an intelligent subscription management hub that automated, integrated and orchestrated the entire subscription order-to-cash process, including billing through Zuora Billing, and revenue recognition through Zuora RevPro. Defendants, however, concealed the existence of significant technical challenges that prevented the successful integration of Zuora's two core products, ultimately resulting in reduced revenue growth, missed sales, and waning demand for Zuora's platform and applications. Defendants' misrepresentations about the functionality and configuration of Zuora's principal offerings inflated the price of Zuora's common stock until Defendants' disclosure of the integration failure resulted in sales execution issues and disappointing financial performance and outlook, causing the stock price to plummet.



2.      Zuora purportedly offers a multi-tenant Software as a Service (SaaS) solution that enables companies to automate and manage their existing subscription businesses, or create subscription business models, across pricing, billing, customer payment and collection, and revenue recognition. The Company has benefited from the explosive growth in what Zuora refers to as the "Subscription Economy," a term that the Company coined shortly after its founding in 2007 and trademarked in 2010. The Subscription Economy refers to the shift in both consumption and selling behavior over the last decade from a product or service centric approach to a subscription model centered around ongoing customer relationships.

3.      Zuora differentiates itself from competitors in this nascent and fast-growing market by purportedly offering a functionally robust, single system of record for subscription businesses to manage their monetization strategies, billing terms, customer payment and collection, and revenue recognition.

4.      Zuora's core product is called Zuora Billing, an application Zuora originally launched in 2008, which is designed specifically for subscription billing and used by nearly 90% of Zuora's customers. Another core module, RevPro, came to the Company via the acquisition of Leeyo Software, Inc. in May 2017. RevPro is a revenue recognition solution used by over 10% of Zuora's customers. Zuora refers to Billing and RevPro as its "flagship products," either of which can initiate a customer relationship. Sales of Zuora Central and its subscription-centric products have traditionally accounted for over 70% of the Company's total annual revenue.

5.      Unbeknownst to investors, throughout the Class Period, due to technical challenges, Zuora's customers using Billing and RevPro were unable to integrate and reconcile the data from both systems. According to well-placed, reliable former Zuora employees with personal knowledge of the subject matter, as well as Defendants' post-Class Period admissions, the technical issue caused so much friction and was so severe that customers either needed to export the data from Billing and import it into RevPro manually for revenue recognition, or invest a significant amount of time and resources to build their own customized integration that ingests the required data from Billing into RevPro.

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1        6.     Defendants knew both before and throughout the entirety of the Class Period of

2    Zuora's platform's inability to integrate RevPro successfully.  After acquiring Leeyo, Zuora

3    commenced a project in or around October 2017, codenamed "Zuora on Zuora" or "ZoZ," intended

4    to onboard RevPro internally at Zuora as a revenue recognition tool.  Zuora's most senior executives

5    were repeatedly apprised of the project's failure due to the inability to build an integration between

6    Billing and RevPro, including through contemporaneous reports and regular project meetings

7    attended by Defendant Sloat and other high ranking Zuora officials.  Indeed, the integration platform

8    used for the ZoZ project proved so unsuccessful that Zuora had to input Billing information

9    manually in order to even implement RevPro by April 2018.  Still yet, due to the manual

10    implementation, Zuora had to do a multi-year retest, which continued at Zuora into at least March

11    2019.  The ZoZ project proved to be such as fiasco that one former high-ranking Zuora executive

12    said it proved Zuora could not even drink its own wine.

13        7.     Not surprisingly, Zuora's subsequent efforts to deploy and configure a Billing-RevPro

14    integration for customers fared no better.  In early 2018, in the midst of the failed ZoZ project,

15    Defendants commenced a new project, codenamed "Keystone," intended to build an integration

16    solution for Zuora's existing customers.  The integration technology proved so unsuccessful on

17    customers' systems that the Company decided to scrap the technology entirely in April 2019.  Once

18    again, the Executive Defendants were informed of Keystone's failures through contemporaneous

19    Google document reports and regular project meetings.

20        8.     Further, Defendants knew that this fundamental technical flaw resulted in upset

21    customers, protracted installations, massive delays in customers going live on RevPro, and elongated

22    recognition of revenues. Defendants were also informed that once prospective customers caught

23    wind of the integration issue, it resulted in missed RevPro sales and even waning demand for Zuora's

24    platform and other homegrown product modules.  All of these client-based issues were documented

25    on Zuora's SalesForce database to which the Executive Defendants had access.  In addition, Zuora's

26    Sales Vice Presidents repeatedly informed Executive Defendants of these problems both through in-

27    person meetings and email communications.

28



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1       9.     Nevertheless, throughout the Class Period, Zuora and its executives concealed this integration failure, while repeatedly claiming that the customer could bill, recognize revenue, and automate the entire customer lifecycle from a single platform with ease. The Company represented that its "solution functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition," and "you can quote, order, bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform[.]" Rather than disclose the fundamental defect in its solution, Defendants touted that the Zuora platform could help "companies of all sizes launch, scale and transform into a subscription business," specifically by allowing customers to "successfully … [b]ill accurately with automated invoices that reflect everything from up-to-date proration and plan changes to usage-based billing," while concurrently, "[a]ccount for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time." Indeed, Defendants falsely claimed that Zuora could "deploy and configure our portfolio of order-to-cash products," including Zuora Billing and Zuora RevPro. Defendants further represented that Zuora's "solution enables businesses to easily change pricing and packaging for products and services to grow and scale, to efficiently comply with revenue recognition standards, and to build meaningful relationships with their subscribers." In the Defendants' own words, Zuora's value proposition was "more centered around automation and efficiencies versus simply compliance."

10.     During this same window, the Company was able to successfully complete its initial public offering in which Zuora sold 12.7 million shares of common stock to the public at a price of $14.00 per share, netting nearly $160 million in cash proceeds. Defendants' positive statements about the functionality of its solution garnered admiration from securities analysts and leading industry commentators, including Jim Cramer of Mad Money, who once exclaimed "Zuora: I love this company and the subscription economy." Defendants' representations allowed the Company's share price to steadily rise, reaching as high as $28 in June 2019 (or double its IPO price) and attain over $3 billion in market capitalization, making Zuora one of the 50 largest technology companies in the world at the time.



11.     Zuora's senior management were also able to cash in on the Company's stock price performance. During the Class Period, Defendant Sloat made $16.89 million in insider sales, including selling nearly half of his total holdings in Zuora on March 28, 2019, just a week after Zuora announced positive fourth quarter fiscal year 2019 and full fiscal year 2019 results, but one month before Zuora's disastrous first quarter 2020 would end. Another Zuora insider, Marc Diouane, who was relieved of his position as President and head of sales when Zuora disclosed significant issues involving sales execution and the integration of RevPro with Zuora Billing, earned approximately $11.13 million in insider sales. Notably, nearly half of Mr. Diouane's earnings from insider sales came in a single transaction on April 30, 2019, which was the final day of Zuora's first quarter fiscal year 2020, and only a month before Zuora announced Diouane's removal.

12.     The market learned the truth on May 30, 2019, when in connection with its first quarter fiscal year 2020 financial results, Zuora announced declining revenue growth and slashed its fiscal 2020 revenue guidance to a range of $268 million to $278 million, from prior guidance of $289 million to $293.5 million. The Company disclosed that the product integration for Billing and RevPro "is taking longer than expected" and that "the technical work to complete the integration is taking time as these are complex mission-critical systems." As a result of the product integration delay, the Company slowed down RevPro implementations. The Company also reported certain sales execution problems that slowed down its ability to cross-sell its products, which "resulted in lower professional services and subscription revenue in the quarter."

13.     On the conference call with analysts following the report, Defendant Tzuo came clean and admitted that Defendants had long known of the integration failure, stating, "honestly, we didn't really have time and the resource to focus on the integration between [Billing and RevPro] until after the [ASC] 606 [wave] was complete. So we didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction."

14.     Analysts were shocked by the Company's disclosures, including the revelation of the Billing-RevPro integration failure. One analyst at Jeffries asked Defendant Tzuo incredulously, "*I mean you bought [RevPro] 2 years ago. So like it's hard -- like how can it not be integrated?*"

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

15.     On this news, the Company's share price fell $5.91 per share, nearly 30%, to close at $13.99 per share on May 31, 2019, on unusually heavy trading volume, erasing nearly $520 million in market capitalization in a single trading day.



16.     In the aftermath, Defendants have made additional admissions of their knowledge of the integration failure. Indeed, Defendant Tzuo characterized the Company's original failed attempts to integrate the two systems as being "silly" and something "we probably could have caught [] a little bit earlier." Defendants have even gone so far as to issue a product overview acknowledging "the friction from reconciling two systems" and stating that where a client is "using both Zuora Billing and Zuora RevPro, the integration between two systems is likely to be a pain point to you." Defendants further admitted that before releasing a Zuora Billing – Zuora RevPro Integration product in limited availability in July 2019, a customer would need to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro. Yet, despite purportedly coming up with an integration fix, Zuora has continued to post disappointing financials and its share price has languished.



17. By this action, Lead Plaintiff seeks redress for losses it and other Zuora investors suffered after purchasing common stock during the Class Period at artificially inflated prices.

## II. JURISDICTION AND VENUE

18. This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

19. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). At all relevant times, Zuora conducted business in this District and maintained its headquarters in this District at 3050 South Delaware Street, Suite 301, San Mateo, California 94403. In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

## III. PARTIES

### A. Lead Plaintiff

22. Lead Plaintiff New Zealand Methodist Trust Association ("MTA" or "Lead Plaintiff") is a registered charitable trust under the provisions of New Zealand's Charitable Trust Act 1957. Established in 1978 and based in Christchurch, New Zealand, MTA receives and is entrusted with the investment of funds from organizations within the Methodist Church of New Zealand (the "Conference"). MTA's purpose is to provide income and capital yield on the available monies the Conference entrusts to MTA. As of June 30, 2018, MTA manages over NZ $300 million in assets for its beneficiaries. As set forth in the certification filed with this Court (ECF No. 26-3), MTA purchased Zuora common stock during the Class Period and was damaged by Defendants' conduct alleged herein.

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

**B.      Corporate Defendant**

23.      Defendant Zuora is a corporation organized under Delaware law and headquartered at 3050 South Delaware Street, Suite 301, San Mateo, California 94403. The Company also operates offices in Atlanta, Boston, Denver, San Francisco, London, Paris, Beijing, Sydney, Chennai and Tokyo. The Company has approximately 600 employees and 1,000 customers, including Caterpillar, The Financial Times, HBO, Ford and General Motors. Zuora's stock trades on the New York Stock Exchange ("NYSE"), which is an efficient market, under the symbol "ZUO." As of May 30, 2019, Zuora had approximately 88 million shares of stock outstanding, owned by at least hundreds or thousands of investors. Throughout the Class Period, Zuora disseminated SEC filings, press releases, investor presentations, marketing materials, product descriptions, and other reports containing material misrepresentations and omissions about the security and performance of its processors.

**C.      Executive Defendants**

24.      Defendant Tien Tzuo ("Tzuo') is, and was at all relevant times, the Chief Executive Officer and Chairman of the Board of Directors of Zuora, a company he co-founded in 2007. Before founding Zuora, Tzuo was one of the "original forces" at salesforce.com, joining as employee number 11.[1]  Defendant Tzuo built the billing system for salesforce.com and also launched the Salesforce AppExchange. Defendant Tzuo and other early Zuora employees are credited with building Zuora's platform and products "from the ground up as a single-instance, multi-tenant cloud-based offering." During the Class Period, Tzuo made materially false statements and omissions about the functionality of Zuora's platform and product modules in the Company's public filings, at investor presentations, and during conference calls. Tzuo also was present when other Defendants made statements or omissions on these subjects without correcting them. Tzuo executed certifications relating to Zuora's false and misleading reports filed with the SEC, including Zuora's IPO Prospectus filed on Form 424B4, quarterly reports for each quarter of fiscal year 2019 and the first quarter of fiscal year 2020 filed on Forms 10-Q, and the Annual Report for fiscal year 2019 filed on Form 10-K. Tzuo directly participated in the management and day-to-day operations of the

---

[1] https://www.zuora.com/people/tien-tzuo/

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 8
No. 3:19-cv-03422-SI


715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Tzuo also shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of this position of control and authority, his ability to exercise power and influence over Zuora's conduct, and his access to material inside information about Zuora during the Class Period, Tzuo, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

25. Defendant Tyler Sloat ("Sloat") is, and was at all relevant times, the Chief Financial Officer of the Company. Sloat joined Zuora's executive management team to serve as CFO in 2010. Sloat describes himself as the "Guardian of the Business Model" and has stated he is responsible for managing "Accounting, Finance, Legal, HR, Tech Ops, Comm Sales."[2] Other Zuora executives have publicly described Sloat as "wear[ing] a number of hats" at Zuora, and that he is the "right-hand person" of Defendant Tzuo.[3] During the Class Period, Sloat made materially false statements and omissions about the functionality of Zuora's platform and product modules in the Company's public filings, at investor presentations, and during conference calls. Sloat also was present when the other Defendants made statements or omissions on these subjects that he knew to be false and misleading, yet took no steps to correct those statements. Sloat executed certifications relating to Zuora's false and misleading reports filed with the SEC, including Zuora's IPO Prospectus filed on Form 424B4, Results of Operations and Financial Condition; Financial Statements and Exhibits for each quarter of fiscal year 2019 and the first quarter of fiscal year 2020 filed on Form 8-K, quarterly reports for each quarter of fiscal year 2019 and the first quarter of fiscal year 2020 filed on Form 10-Q and the Annual Report for fiscal year 2019 filed on Form 10-K. Sloat directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Sloat

---

[2] *See* https://www.linkedin.com/in/tylersloat/, as of November 1, 2019.

[3] Deutsche Bank Technology Conference (Sept. 10, 2019).



also shared primary responsibility for ensuring that the Company's SEC filings and other public

statements or releases were complete, accurate, and did not omit material information necessary

under the circumstances to make them not misleading. Sloat possessed the power and authority to

control, and approved of, the contents of the Company's press releases and investor and media

presentations at all relevant times. Because of this position of control and authority, his ability to

exercise power and influence over Zuora's conduct, and his access to material inside information

about Zuora during the Class Period, Sloat, at the time of the wrongs alleged herein, was a

controlling person within the meaning of Section 20(a) of the Exchange Act.

26.     Defendants Tzuo and Sloat are collectively referred to as the "Executive Defendants."

## IV.     SUMMARY OF THE FRAUD

### A.     Zuora And The "Subscription Economy"

27.     Zuora is an enterprise software company that designs and sells software-as-a-service

applications for companies. The Company provides subscription commerce, billing and finance

systems to its enterprise clients on a subscription basis, which enables companies in various

industries to launch, manage, and transform into a subscription business.

28.     The Company has two reporting segments: (1) Subscription, which consists of fees to

access and use Zuora's products, as well as customer support; and (2) Professional Services, which

consists of fees for helping deploy, configure, and optimize the use of Zuora's solutions.

Subscription has traditionally accounted for over 70% of the Company's total annual revenue. Zuora

only starts to recognize subscription revenue when the customer has access to the Zuora application.

29.     When the Company was founded in 2006, it coined the phrase "Subscription

Economy," as it predicted a new business environment in which traditional product or service

companies would shift toward subscription business models, where products and services can be

priced based on usage, consumption, and outcomes. Zuora purportedly saw an opportunity to

capitalize in this market since legacy Enterprise Resource Planning ("ERP") software systems were

built with the old product-based model in mind, working in a very liner fashion – (i.e., a customer

orders a product, is billed, payment is collected, and the revenue is recognized.) In contrast,

according to Zuora, the new subscription-based models do not operate like this, and the legacy

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

systems are incapable of handling the complexities associated with ongoing customer relationships, such as prorated billing, complex revenue recognition, and flexible plans.

30. While the notion of subscription payments was nothing new, as one market commentator noted, the secret to disrupting this model – much like Uber's secret to disrupting the taxi market – is in the technology operating behind the scenes.[4]

**B. Zuora Central And Its Flagship Products**

31. Zuora provides three separate categories of subscription-based offerings: (1) a platform; (2) SaaS products; and (3) third party applications.

32. The Zuora Central Platform is the core, or hub, of Zuora's subscription management solution and is purportedly composed of six core engines: pricing, subscription orders, rating, global payments, subscription metrics, and accounting.



Figure 2: Zuora Central Platform

Source: Company reports

---

[4]John Adams, *Fintechs watch Wall Street to determine subscription billing's future*, PaymentsSource (Apr. 18, 2018), https://tinyurl.com/y4sswuyq.



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

**Products**
**Figure 3: Portfolio of SaaS products**



Source: Company reports

33.     Zuora offers five SaaS products that purportedly leverage the power of the underlying Zuora Central Platform.

34.     Zuora's primary and most widespread product is Zuora Billing. Zuora Billing provides customers with the flexibility to bill in multiple ways, calculate proration when needed, group customers into batches for different billing and payment operations, set payment terms, consolidate invoicing across multiple subscriptions, and collect revenue. Zuora Billing was initially launched in 2008. Over 850 of Zuora's 971 customers used Zuora Billing as of the end of fiscal year 2018.

35.     In May 2017, Zuora acquired revenue recognition software provider Leeyo Software Inc., which allowed Zuora to add into its order-to-cash product portfolio Leeyo RevPro®, subsequently rebranded as Zuora RevPro. Similar to what Zuora Billing does for managing subscription model processes, RevPro automates the range of internal, multi-departmental processes required to comply with the new Accounting Standard Codification 606/International Financial Reporting Standards 15. Zuora has over 100 customers using RevPro.

36.     Under ASC 606, companies must allocate and recognize revenue based on the satisfaction of distinct performance obligations and according to standalone selling prices. In order to comply, companies must modify their accounting policies and business rules, as well as accurately identify and group transactions within revenue contracts. Public companies were obligated to adopt the new standard by the start of their fiscal year beginning after December 15, 2017. Private

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

companies were entitled to delay adoption until the start of their fiscal year beginning after December 15, 2018.

37.     Certain industries, such as aerospace, construction, telecom, and software, were impacted by the new ASC 606 standard more than others. Since Zuora has traditionally held a high customer concentration in the software and telecom industries for its Billing product, Defendants consistently promoted that these customers were prime targets for cross-selling. Defendants also assured investors that demand for RevPro would not drop off after the imposed ASC 606 implementation deadlines. Defendants consistently noted that companies would attempt to adopt ASC 606 using traditional financial tools or internal systems, which likely would prove cumbersome.

38.     The Company immediately heralded the RevPro acquisition as creating a "one-stop shop for automating financial operations, further increasing Zuora's dominance in the $102 billion market for Subscription Economy® tools."

39.     Analysts were also quick to laud the RevPro acquisition. For example, MGI Research Managing Director stated, "This is a smart move that unites the best of breed leader in revenue recognition with an Agile Billing leader. It's a win for Leeyo and Zuora customers, and adds breadth and depth to Zuora's play in delivering an Agile Monetization Platform."

40.     Defendants, however, recognized the need to immediately integrate RevPro into its solution. Indeed, Defendant Tzuo stated, "Because ASC 606 is happening now, it's not like we have two years to build this product." "For the last six months we said 'we have all these customers, they need ASC 606, they need it now.'"[5]

C.     **Zuora's Direct Sales Process And Defendants' Visibility Into The Sales And Implementation Information**

41.     Zuora sells its products to prospective customers primarily through a quota-bearing direct sales force, which is supported by pre-sales representatives and sales development representatives (i.e., inside sales focused on outbound prospecting), as well as by marketing,

---

[5] Denise Lugo, *Zuora Buys Leeyo Software to Tap Into Accounting Niche*, Bloomberg Law (Mar. 17, 2017), https://tinyurl.com/yyclhdlw.



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1   operations, and legal personnel. Zuora has customer success representatives that manage existing

2   accounts, and a small inside sales team focused on upsell.

3        42.     The direct sales force is separated into product franchise teams across the U.S.,

4   Europe, and Asia, and organized by customer size and industry verticals. The sales team consists of:

5   (1) Strategic account representatives that focus on the largest, named accounts; (2) Enterprise

6   account representatives that typically focus on deals that are approximately $100,000 or greater; and

7   (3) Commercial account representatives that focus on deals with between $50,000-$100,000 and

8   generally customers with under 250 employees.

9        43.     Zuora's internal professional services team is responsible for managing customer

10  deployments and configurations.

11       44.     Defendant Sloat emphasized the "visibility" its direct sales and professional services

12  model offers to Defendants during a conference call with investors on June 5, 2019:

13  > **[W]e break our business into franchises**. And franchise to us is really kind of a
    > segment of our go-to-market machine. That could be an enterprise West, enterprise

14  > East all the way through to our RevPro product. So it's bifurcated by the go-to-market
    > end customer, to some extent, where we have commercial groups servicing the small

15  > companies all the way up to strategic who are named accounts and it's also bifurcated
    > by products. **So we have our Billing product and our RevPro product today, and**

16  > **those are separate sales where we have dedicated reps in each side. What this**
    > **allows us to do is actually manage the -- and have visibility into the productivity**

17  > **down to the franchise level so that we can see how a franchise is doing. We can**
    > **feel -- not feel, but we know when to make investments and expand that**

18  > **franchise or to keep it stagnant for a little bit as they kind of absorb what we've -**
    > **and digest what we've already invested into it. We then have our implementation**

19  > **services, which is really our internal services, which is responsible for bringing**
    > **our customers live successfully on our software, on our platform**.

20

21       45.     Defendant Sloat has also written about how as CFO of Zuora he "owns the business

22  model" by employing an operational strategy that allows him and other Zuora executives to have

23  "full visibility" into the sales and deployment process:

24  > Let me illustrate with my own job – I approach it everyday through the lens of our
    > business model. **We run an operating model internally that we call PADRE –**

25  > **Pipeline, Acquire, Deploy, Run, Expand. Then we add PPM to the model which**
    > **is Product, People and Money. This is essentially the framework for our weekly**

26  > **report to a cross-functional team with representatives from each of those**
    > **elements.** We run a subscription business, meaning that every function essentially

27  > touches the customer and can have upstream and downstream impacts. **We want to**
    > **be able to analyze and report on any meaningful metric within each pillar of**

28  > **PADRE-PPM that would help us serve our customer base better, and in turn,**
    > **ultimately provide a better financial result for the company.**



1

**My team *has full visibility into this framework*, and we work closely with every single function on their metrics and their benchmarks. We collaborate on how they influence change within their departments not only to optimize for how their team is doing, but also for the upstream and downstream implications.** We tie it all together and stay focused on the larger picture. It's the CFO's job to provide that view and to then provide all the layers of data to guide the functional leads so that they can make educated decisions. (Emphasis in original).[6]

**D.      Zuora's Successful Initial Public Offering**

46.      Zuora's acquisition of Leeyo Software, Inc. paved the way for the Company to go public. On December 27, 2017, Zuora submitted to the SEC a draft registration statement on Form S-1 related to its proposed initial public offering ("IPO") of the Company's Class A common stock.

47.      In connection with the IPO, Zuora released an April 2018 Investor Presentation in which the Company prominently promoted its two flagship products, Zuora Billing and Zuora RevPro.



48.      The April 2018 Investor Presentation emphasized that Zuora's "customers grow with us over time," and highlighted that there were "multiple paths to expand," including through the "Cross-Sell Flagship Products."

---

[6] Tyler Sloat, *CFOs: It's Time to Own the Business Model*, Finance Digest (Apr. 8, 2016), https://tinyurl.com/yxutjfh7.


715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1

2

3

4

5

6

7

8

9

10



11    49.    The registration statement, prospectus, and prospectus supplement were subsequently

12    amended and became effective as of April 12, 2018 (the "Registration Statement").

13    50.    The Registration Statement highlighted the functionality and integrated features of

14    Zuora's solutions, stating "our solution functions as an intelligent subscription management hub that

15    automates and orchestrates the entire subscription order-to-cash process," and claimed the solution

16    "offer[ed] a flexible pricing model and automated billing, streamlined collection, and efficient

17    accounting features."

18    51.    The Registration Statement also promoted that Zuora's platform and products acted as

19    a "Single System of Record," which "captures financial and operational data, enabling subscription

20    businesses to have a single system of record rather than having to reconcile data from multiple

21    systems." The Registration Statement further stated that the solution was "architected specifically for

22    dynamic subscription business models" and included the following depiction of the solution's

23    integrated features.

24

25

26    

27

28



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

52.     The Registration Statement claimed that, "Our solution enables customers to successfully … Bill accurately with automated invoices that reflect everything from up-to-date proration and plan changes to usage-based billing," while concurrently "Account for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time."

53.     The Registration Statement also promoted Zuora's ability to deploy and configure its solution on its clients' internal systems, stating "We can deploy and configure our portfolio of order-to-cash products to meet a wide variety of use cases for subscription business models," including Zuora Billing and Zuora RevPro.

54.     The Registration Statement emphasized that its solution "Free[d] Up IT and Engineering Resources," and that with Zuora, "engineering and IT departments no longer need to build in-house custom systems or customizations for their ERP systems to keep up with market changes, ongoing customer demands, and new order-to-cash processes."

55.     The Registration Statement promoted Zuora's ability to generate future revenue growth, noting that "Once customers are operating on our solution, we have multiple ways to expand our footprint and drive revenue growth from these customers, which we refer to as upsell," including that "Customers that started with Zuora Billing or Zuora RevPro can also subscribe to the other flagship product."

56.     The Registration Statement also contained pages and pages of generalized possible "Risk Factors" that "may" occur and "if" they did "actually occur," "could" "materially and adversely affect[]" Zuora's business. For example, Zuora warned that it **_may_** be "unable to integrate acquired businesses and technologies successfully," which **_could_** "consume resources that are necessary to sustain [its] business."

57.     The Registration Statement's representations about Zuora's solution made the IPO a rousing success. On April 16, 2018, the Company announced that it had closed its IPO selling 12,650,000 shares of its common stock, including full allotment to underwriters, at a price to the public of $14.00 per share and raising over $162.2 million in net proceeds.

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

58.     Zuora's statements about its platform and products were well-received by securities analysts. For example, in initiating coverage, analysts at Morgan Stanley noted that Zuora could sustain competitive differentiation versus traditional enterprise resource planning vendors in the near term, as the platform has been built to handle the "complex and dynamic nature" of subscription billing. Similarly, in recommending Zuora as a "buy," Jefferies identified RevPro as a "New Beachhead with Significant Near-Term Revenue Opportunity," and cited the "significant cross-sell opportunity between over 850 Zuora Billing customers, many of which face ASC 606 compliance challenges, and over 100 RevPro customers at the end of fiscal 2018." Jeffries expressed confidence that RevPro would see continued demand even after the deadline for ASC 606 compliance, as "the automation of revenue recognition is a widespread and important business need." Similarly, in its initial report to investors, Canaccord Genuity observed that the "opportunity before Zuora is plentiful" and Zuora's "two beachhead products, Zuora Billing and Zuora RevPro" are addressing "two pain points in the Subscription Economy – the need for flexible billing and for revenue recognition automation."

**E.      Defendants Concealed That Zuora's Solution Lacked Connectivity With RevPro**

59.     Unbeknownst to investors, Defendants materially misrepresented the functionality of its solution in the Registration Statement and omitted to disclose a fundamental technical challenge adversely impacting its Central platform and related software application products. Specifically, customers using Zuora Billing and Zuora RevPro could not successfully integrate the data from both systems.

60.     Reliable former employees of Zuora provided firsthand accounts explaining this integration failure.  For example, a former Senior Manager Global Services / Principal Solution Architect and Zuora Integration Architect worked at Zuora from June 2017 to April 2019 ("CW-1"), at the former Leeyo office in San Jose, CA.  CW-1 reported to VP, Global Services Karthik Ramamoorthy, who is still employed at Zuora.  Mr. Ramamoorthy reports to the C-suite executives.

61.     CW-1 has extensive knowledge regarding the functionality and implementation of RevPro, as before Zuora acquired Leeyo Software, Inc., CW-1 was employed at Leeyo as a senior



software engineer from December 2014 to May 2017 and was responsible for providing product implementation and customization for RevPro.

62.     While employed at Zuora, CW-1 worked to assist Zuora's customers automate their revenue operations and functions with RevPro to comply with ASC 606 and IFRS 15. This included integrating Zuora RevPro with customer's ERP systems. CW-1 said the integration typically entailed sending customer information to the Zuora RevPro cloud using REST API (Representational state transfer application interface) and SFTP (SSH File Transfer Protocol).

63.     During CW-1's employment at Zuora, CW-1 said that for customers using Zuora Billing and Zuora RevPro there was a huge friction in reconciling the two systems. CW-1 said the integration failure stemmed from a source data problem arising from the design of Zuora Billing.

64.     CW-1 explained that the data within Zuora Billing was not very robust and had limitations. CW-1 explained that Billing could not provide ERP information or otherwise come up with the data points needed for proper revenue recognition in RevPro. CW-1 explained that Zuora needed to come up with a solution that could transport the Billing data into RevPro transaction lines.

65.     The incompatibility between Zuora's homegrown products and RevPro was further corroborated by a high-ranking project manager/subject matter expert at Zuora ("CW-2").  CW-2 worked at Zuora from October 2017 to September 2018 and reported directly to Zuora's C-suite executives, including Chief Information Officer Alvina Antar, who reported to Defendant Sloat. CW-2 became aware of the issue with reconciling Zuora Billing and Rev Pro immediately upon coming on board at Zuora, which was shortly after Zuora acquired Leeyo in Fall 2017.  CW-2 said that Zuora was attempting to integrate RevPro, characterizing it as a "huge integration." The problem with the RevPro integration was the data source, CW-2 said.  According to CW-2, Zuora was the source for the data and the Company was trying to take the Zuora data and create an order-to-revenue integrated data flow.  CW-2 said that the data within Zuora Billing was not very robust, "There were some limitations; the data was not structured enough and not uniform." CW-2 also said the "Zuora platform is very open for companies to decide how to structure their subscriptions; [but] they did not integrate an engine to extract data and load it into RevPro."

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1  **F.      Defendants Knew Of The Integration Failure Before And Throughout The Class Period**

2        66.      Reliable former employees have confirmed Defendants knew of the integration failure

3  between Zuora Billing and RevPro before and throughout the entirety of the Class Period, based on

4  their knowledge of failed internal and external implementation projects.

5        **1.      The Failed Zuora On Zuora ("ZoZ") Project**

6        67.      Defendants knew of the integration failure before and throughout the Class Period

7  based on Zuora's failure to effectively integrate and implement RevPro internally.  CW-1 stated that

8  after acquiring Leeyo and RevPro, Zuora began attempting to implement RevPro for its own internal

9  use in or around October 2017.  The internal implementation was part of a large project called

10  "Zuora on Zuora" or "ZoZ," which CW-1 had a principal role in working on.  ZoR, which tested

11  RevPro and Zuora's compatibility, was a further extension of the "Zuora on Zuora" or "ZoZ"

12  project.

13        68.      Zuora's internal implementation project was further substantiated by CW-2.

14  According to CW-2, it is an industry best practice to try to test your own "wine" (i.e., product) first,

15  "so you try to implement it internally before you actually take it out and sell to a customer."

16        69.      Zuora's C-suite executives were directly involved in the ZoZ internal implementation

17  project, including ZoR.  CW-1 worked under the direction of Zuora's CIO Antar, who was

18  responsible for the Company's internal business applications and infrastructure.  CIO Antar then

19  reported to Defendant Sloat on the "Zuora on Zuora" or "ZoZ" Project.

20        70.      CW-1 said the other executives involved in the "Zuora on Zuora" or "ZoZ" internal

21  implementation project included Revenue Senior Director Mike Quinn, who left sometime in 2018,

22  and Senior Director, Revenue Lauren Whelihan, who joined Zuora in November 2018. Zuora SVP of

23  Product Tom Krackeler and CIO Antar team's also worked on the project, according to CW-1.

24        71.      Zuora encountered significant integration challenges in doing the internal

25  implementation such that it could not connect its platform functions with RevPro.  CW-1 stated that

26  Zuora attempted to use an integration platform referred to as MuleSoft.  CW-1 further stated,

27  however, that the integration was "not sufficient."  CW-1 confirmed that despite extensive work,

28  Zuora was not able to successfully overcome the challenges.  CW-1 said that he knew that the

RevPro integration they were working on would not work as early as the end of 2017 or beginning of 2018.

72.     Zuora's failed internal integration and implementation of RevPro through the MuleSoft platform was further corroborated by CW-2.  CW-2 explained that MuleSoft was a confirmation layer that is used to connect two systems and transfer data from host to target.  CW-2 said that Zuora attempted to use MuleSoft for its internal implementation and had been working on it already when he came on board at the Company.  Specifically, when CW-2 joined in November 2017, Zuora already had the product purchased, licensed, on-boarded, implemented, operation licensed, and had built code for months, CW-2 said.  CW-2 confirmed that Zuora attempted to make their MuleSoft effort work from Fall 2017 until May 2018, but they could not accomplish what they needed to.  According to CW-2, MuleSoft itself was not the failure, per se.  CW-2 said that "MuleSoft is only a platform and it's used by thousands of companies successfully." CW-2 added that "MuleSoft can do what you ask it [to] do." Rather, Zuora was deficient in its use of the MuleSoft platform.  In particular, CW-2 attributed the problems Zuora experienced using MuleSoft to integrate RevPro to, "the operation, the business goals, the knowledge, the execution, the planning, and the hard thinking through of the product and the solution."

73.     Zuora's highest executives were informed of the integration failure occurring in the "Zuora on Zuora" or "ZoZ" project.  CW-1 confirmed that the results of the implementation were reported with regularity to CIO Antar, who headed the project.  Together with the project manager, CW-1 also spoke directly to SVP RevPro Product Jagan Reddy and Zuora VP Ramamoorthy multiple times about the integration failure.  In addition, CW-1 attended weekly "Zuora on Zuora" or "ZoZ" review meetings.   CW-1 stated that the weekly review meetings were attended by CIO Antar, SVP of Product Krackeler, and other internal implementation stakeholders.  CW-1 said that the ZoZ meetings were focused on the status of and progress of Zuora implementing RevPro internally as a tool for revenue recognition.

74.     The difficulties implementing RevPro internally reached the Executive Defendants before and throughout the Class Period.  In particular, CW-1 said that CIO Antar was aware of the difficulties implementing RevPro internally and that she reported them to CFO Sloat.  In addition,

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1   CW-1 stated that Defendant Sloat, together with SVP RevPro Product Reddy, participated in

2   monthly "Zuora on Zuora" or "ZoZ" project meetings where they were briefed on the progress of the

3   internal implementation and implementation failure was discussed.  CW-1 said Defendant Sloat had

4   "full visibility" on the project. Further, CW-1 recalled hearing of executive briefings on the internal

5   implementation status on two occasions.

6          75.     The Executive Defendants acknowledged the integration failure in advance of Zuora

7   going public.  According to CW-1, on one occasion during a monthly "Zuora on Zuora" or "ZoZ"

8   project meeting in early 2018, Defendant Sloat spoke to the project team about how Zuora was

9   "going to market as a combined product for ASC 606." CW-1 said that Defendant Sloat told the

10  group that the market needed a seamless solution and that "***Zuora needed to get its act together with***

11  ***RevPro***."

12         76.     The Executive Defendants' knowledge of the failed internal integration and

13  implementation of RevPro was further confirmed by CW-2.  CW-2 confirmed that Zuora was not

14  successful in implementing RevPro internally over the course of its ZoR project, and that Defendants

15  Sloat and Tzuo knew of the failure internally, yet they continued to tell customers that Zuora Central

16  and RevPro were ready for use.  Specifically, CW-2 said that the ZoZ project was sponsored by

17  Defendant Sloat, who he described as the "public sponsor."  While CIO Antar led the regular

18  meetings about the ZoR project, the Company also had internal forums with the C-suite, and most

19  senior executives from each product group provided progress reports, CW-2 said.  CW-2 said

20  Defendant Sloat would attend these internal forums, and Defendant Sloat would hear about the

21  internal integration; "he was apprised week-over-week."

22         77.     The Executive Defendants were also aware of the failed internal integration and

23  implementation of RevPro through internal reports and email communications.  According to CW-2,

24  the Company maintained several Google documents and email threads tracking the project status and

25  circulating project status reports. According to CW-2, Defendant Sloat would either be copied on

26  these communication or be apprised by CIO Antar, whose role was to keep Defendant Sloat and the

27  Chief Accounting Officer [Paolo Battaglini] up to date.

28



78.     Although Zuora ultimately implemented RevPro internally, the implementation was incredibly laborious, time and resource intensive, and anything but ideal.  CW-1 explained that the MuleSoft integration relied on an Excel file with the information from Zuora Billing.  According to CW-1, the data in the file, "had to be touched up to make sure it was right for revenue recognition," and "***Zuora had to do the touch up work manually***."  According to CW-1, Zuora did not complete the manual internal implementation until April 2018.  However, due to the manual implementation, Zuora then had to do a two-year retest, which CW-1 said continued at Zuora into at least March 2019.

### 2.     The Failed Keystone Integration Project

79.     Beginning in early 2018, with the internal ZoZ project failing, several former Zuora employees stated that Zuora opened a new project internally referred to as the "Keystone Project," which was intended to build a connection between RevPro and Zuora Billing to apply to clients' systems.

80.     As explained by CW-2, "Keystone" was the internal name of the project to integrate the two products, Zuora Billing and RevPro.  Keystone did not use MuleSoft. CW-2 explained that there were "several tracks" moving forward with RevPro. There was the internal ZoR track, which was geared toward using RevPro via MuleSoft internally. That track was led by CIO Antar and the internal team.  Separately, Zuora's engineering and product teams were running Keystone as a separate project to integrate the two tools using a different engine.

81.     CW-1 worked on the initial stage of the "Keystone Project" and conferred with others working on it after he was reassigned.  CW-1 explained that in order to link the client's Billing and RevPro systems, Billing had to come up with orders to input in RevPro. In turn, CW-1 said Zuora came up with a solution called "OrderMetrics," which was to be used as the source for RevPro.  CW-1 said that for order-based revenue recognition to be an option, Zuora had to bring in something in terms of data, or it couldn't build the order system for clients.  CW-1 said that Zuora came up with OrderMetrics for the back end part of the operation. OrderMetrics was connected to RevPro to replicate an order in Zuora Billing, CW-1 said.



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

82.     However, CW-1 said OrderMetrics was not an ideal solution. In particular, the source data was not robust enough and not flexible enough, according to CW-1 . The OrderMetrics piece that was designed and put in place was not a full-blown order system, CW-1 said – it didn't have all the data points needed for RevPro.

83.     CW-1 indicated that OrderMetrics had to provide information in a format similar in appearance to the way ERP information was generated in order for RevPro to view the data and automate proper revenue recognition. CW-1 said OrderMetrics could not find the data for use in RevPro as the solution could not come up with the particular data points that RevPro needed.

84.     The "Keystone Project" integration failure was not customer specific, but rather was wide reaching and impacted virtually all of Zuora's customers that had adopted Billing and RevPro. According to CW-1, Keystone succeeded in helping two or three Zuora customers who "weren't using Zuora Billing's full functionality."  According to CW-1, "80 to 90 percent of customers would not be able to use the Keystone integration," as candidates for the "Keystone" integration would only be those limited customers who were not using many features.

85.     All level of Zuora executives were repeatedly informed of issues with "Keystone" and OrderMetrics.  CW-1 explained that when issues with OrderMetrics cropped up during the internal implementation, they went to Zuora Director of Product Chris Bruner, who was the product director who helped with the Zuora implementation challenges, and who reported to SVP of Product Krackeler.

86.     Zuora's executives had access to reports detailing the status of the "Keystone Project."  According to CW-1, reports were prepared and made available to executives detailing the total number of use cases, the type of use cases, and how they were progressing.  These reports were stored centrally where the C-suite executives could view and contribute to them, as they were "all Google docs."  According to CW-1, the reports, which were "generally available to all executives," would have shown the integration failing.

87.     Zuora executives were also apprised of the result of the "Keystone" failure in regular review meetings.  CW-1 said that review meetings were held once a week in connection with "Keystone." GM and VP - RevPro Product Line Monika Saha was the person from Zuora who had

HB HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

been assigned to the RevPro project, and the meetings were an opportunity for Ms. Saha to receive an update on its progress. Ms. Saha reported up to SVP RevPro Product Reddy, the former CEO of Leeyo, who reported to Defendant Tzuo.

**G.    The Integration Failure Caused Sales Execution Problems And Reduced Demand For All Of Zuora's Products**

88.    Reliable former Zuora employees have further confirmed that the "Keystone" integration failure on client systems demonstrated the falsity of Defendants' statements, caused serious sales execution problems, and ultimately resulted in reputational damage and reduced demand for all of Zuora's products, including its homegrown applications.

**1.    Defendants' False Representations Led To Upset Customers**

89.    Zuora was making promises to its customers it could not keep. As explained by CW-2, there were companies that acquired the two products – Zuora Billing and RevPro separately. These customers were told by Zuora that the products would be pre-integrated and supported by the team. CW-2 said there were a "lot of conversations, hype, and announcements, and the Subscribed conference," where the Company talked about the products and how customers could leverage the integrated products by a certain timeline. In particular, CW-2 said that he observed false claims about the purported out-of-the-box integration on the Subscribed conference website. CW-2 said that it was false to describe Zuora Billing-RevPro as a fully integrated platform, as the Company had only to look to its failure to implement the solution internally. CW-2 said that, "basically they were putting out information to customers or in forums before having [the integration] built." CW-2 said that "the integration wasn't built, it wasn't tested, and it wasn't working." Yet, the Company was putting claims about a seamless Zuora Billing and RevPro marriage out there to the market," according to CW-2.

90.    Zuora could not deliver on its promises to customers. CW-2 said there were "a ton" of challenges integrating RevPro for customers. CW-2 said he was aware of bad test results experienced by new accounts and potential Zuora clients before May 2018. CW-2 said that in addition to RevPro, the Zuora product also had limitations. For purposes of customer privacy, CW-2



said he could not provide names of the customers with the bad test results, but CW-2 said the customers were in the subscription businesses like newspapers.

91.     Zuora's clients testing Billing-RevPro provided Zuora with negative feedback.  CW-2 said that during networking and consulting check-ins, where the Company spoke with customers about the solutions they delivered, they frequently learned from customers that the Company had not been able to get the solution to work as advertised. "[Zuora] even lost a lot of business because based on what they had promised and what was not made," CW-2 said.  CW-2 stated, "If you seek a particular solution to do a certain job, then if a product doesn't do the job when you buy validation, you aren't going to get it.  You're going to go for an alternate solution."

### 2.     Defendants Knew About The Failed RevPro Testing And Upset Customers

92.     CW-2 said that senior management at Zuora, including the Executive Defendants, knew about the misrepresentations and customer reactions through a multitude of sources.

93.     *Group Forums*: Defendants Sloat, Tzuo and others would be apprised of the integration problem at group forum meetings.  CW-2 said that every group in the Company had a forum, including the product group, the engineering group, and the RevPro engineering group. According to CW-2, sales also had a forum program led by Zuora President and head of sales Marc Diouane. The purpose of the forum was to update management on the integration date, progress, and the weekly status report.   According to CW-2 , "A lot of groups have a forum meeting weekly." CW-2 said that the forum leaders like Diouane and CFO Defendant Sloat also attended each other's forums so that they were aware of what was happening across the Company.  CW-2 said that CFO Defendant Sloat participated in the forum meetings.   As for client-specific issues being discussed, CW-2 said "I'm sure if the client was generating a huge amount of revenue for that particular group, then it would be a top of mind discussion.  If [Defendant Sloat] [was] in the sales group forum, that was the only topic [Defendant Sloat] would care about because that would be his bread and butter."

94.     *Forum Meeting Minutes and Summary Reports*:  In connection with each forum, meeting minutes were prepared.  In addition, a forum report was prepared providing a combined summary of each of the meeting minutes which were "circulated for action," via email and Google docs, which CW-2 regularly received.  CW-2 said in the minutes CW-2 received, there were regular

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

references to the integration issues between RevPro and Zuora Billing. CW-2 said the meeting minutes would certainly have been seen by the CFO Defendant Sloat and CEO Defendant Tzuo, as the minutes were generated out of their discussions, and they certainly would have been, "in the loop for that."

95.     ***Quarterly Review Meetings***:  Defendants Sloat, Tzuo and others would be apprised of the integration problem at "quarterly review meetings," which CW-2 described as "all hands on deck" meetings conducted by the leadership team where they would talk about ongoing projects at the Company, including when the Billing-RevPro integration solution would available internally and "GA," i.e., when the integration solution would have general availability to customers.

96.     ***Customer Forums***:  CW-2 said Defendant Sloat knew these facts due to his participation and involvement in the customer forums.  CW-2 said, "Sloat was informed about internal projects and road maps - at the C-level they share all the information."

97.     ***Zuora Customer Focus Groups***:  CW-2 said that there were groups that were supposed to meet with Zuora customers involved in the Billing-RevPro implementation, and they were supposed to apprize Defendant Sloat and Tzuo of the customer feedback.

**3.     Defendants Knew About The Failed RevPro Testing And Reducing Company Revenues**

98.     The integration failure not only caused a business strain but reduced revenues from one of Zuora's most important customers, Zoom Video Communications.  According to CW-1, Zoom was one of Zuora's most important billing customers initially elected to purchase RevPro, but ultimately opted not to implement it fully due to the integration failure. CW-1 said that Zoom was testing it, but then they stopped the project in late 2018.  CW-1 explained that the Company had the billing information, but struggled to translate it into RevPro smoothly.

99.     Zoom's decision to stop the project was a major blow to Zuora's financials because the unsatisfied customer "stopped some payments as well," CW-1 said. CW-1 emphasized that the Zoom incident was such a significant hit to Zuora that "it was material enough to impact our bonus payments – our bonus was dependent on meeting our revenue target."


715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1

100.    Zoom was not the only Zuora customer who was put out by the serious issues it

2

experienced due to the lack of a proper RevPro integration.  According to CW-1, PTC, a software

3

company, which Zuora features on its website as a customer, was another frustrated Billing-RevPro

4

customer.

5

101.    CW-1 further confirmed Executive Defendants and other Zuora senior executives

6

were kept aware of the delays in integrating RevPro and its effect on clients at weekly executive

7

meetings.  According to CW-1, the Company's top executives, including Defendants Tzuo and Sloat,

8

participated in weekly calls with the Company's Vice Presidents in which they were briefed on the

9

latest news during weekly calls.  On the weekly calls, the Vice Presidents would present the

10

Executive Defendants with an update on the progress of the Company. CW-1 knew of these

11

meetings, because CW-1 gave reports on the latest events to his supervising VP Ramamoorthy, who

12

would then give the information to the executives.  CW-1 stated that when Zoom stopped paying

13

Zuora for RevPro, VP Ramamoorthy pulled CW-1 into a couple of executive meetings that VP

14

Ramamoorthy was having with Zuora's founders toward the end of 2018 to see if customizations

15

could help.

16

**4.      Defendants Knew The Failed RevPro Testing Caused Sales Execution Problems**

17

102.    The failed Billing-RevPro integration caused a multitude of sales execution issues

18

within Zuora's sales groups, including strained customer relationships and lost sales and revenues.

19

As explained below, these problems were ultimately passed on from sales personnel to their

20

supervising Vice Presidents and ultimately to the Executive Defendants.

21

103.    For example, CW-3 worked as an account executive at Zuora from June 2018 to July

22

2019, selling Zuora Billing to enterprise customers and existing customers on the West Coast of the

23

U.S.  CW-3 worked in the San Mateo office and reported to a Vice President.  CW-3 stated that

24

despite people at the Company working hard to get an integration working, it was obvious that there

25

was no connection between the two systems, Billing and RevPro.  CW-3 said, "The dream and vision

26

was for the two things to work together, but it hadn't been built . . . It was in the works, but took a

27

long time and wasn't done by the time I left."  CW-3 recalled hearing and Zuora talking about the

28



solution and products as one place where customers could go to do billing and revenue recognition, but that wouldn't be available until "Keystone" was completed.

104.    Some Billing customers who had been sold on RevPro were actually forced to spend heavily on customization to get two systems to work together.  CW-3 had a couple customers who ended up spending large sums of money to get Zuora to work with RevPro.  CW-3 said "[c]ustomers were spending over $1 million because they had both Zuora and RevPro . . . They spent that to get the two systems to work together."  CW-3 said that one customer in particular spent millions because they needed to make systems work in order to successfully go public.  CW-3 declined to name the customer who went public after spending more than $1 million to make the systems work together for customer privacy reasons.  But CW-3 identified the customer as a significant player in the web conferencing space.

105.    In addition, CW-3 said approximately five other major Zuora customers were upset about the delayed integration.  CW-3 said that each these customers were material to Zuora's financial health – they were some of the Company's biggest customers.

106.    CW-3 said that the lack of an integration solution and the fact that customers were unhappy that their products did not work together "came up in team meetings all the time." CW-3 and sales colleagues would inform their supervising Vice Presidents of particular customers who were unhappy and needed a workable integration for Zuora Billing and RevPro. According to CW-3, "[i]n team meetings we spoke about accounts and my colleagues would say [their customers] aren't happy because of Keystone." CW-3 said that integration was discussed at almost every sales team meeting he participated in. The sales team meetings were attended by the account managers who worked with the customers as well as their Vice Presidents and directors.

107.    The Vice Presidents and Directors who attended team meetings communicated what had been discussed at the team meetings to the Executive Defendants.  CW-3 said "[o]ur VP was in constant communication with the CEO [Defendant Tzuo] about customer feedback." CW-3 would hear about the VP's communications with Defendant Tzuo through the VP.  CW-3 said the VP would tell him that the VP's meetings with Defendant Tzuo were tough and that they would talk

H B   HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1    about "Keystone." CW-3 said that the VP informed Defendant Tzuo that clients were upset and

2    some were very unhappy.

3        108.    In addition to disgruntled customers, the integration failure adversely impacted

4    revenue.  According to CW-3, the prolonged integration impacted business for Zuora, as it impeded

5    the Company's ability to collect money as some customers withheld payment due to the failed

6    connectivity between Billing and RevPro.  CW-3 said that the same company that paid millions to go

7    public withheld payment to Zuora. In refusing to pay, CW-3 said the client noted that it "had to

8    spend $1 million outside of us because it didn't work."

9        109.    Defendant Tzuo was informed of the large client's refusal to pay for Zuora's

10   subscription products.  CW-3 said he communicated the collection issue to his VP.  Thereafter, CW-

11   3 observed an email thread that took place around November or December 2018, in which Defendant

12   Tzuo was made aware of the issue about the non-payment. CW-3 gathered from the email

13   conversation that Defendant Tzuo understood the customer's viewpoint and did not push back, but

14   that Defendant Tzuo also understood what the revenue recognition complications for the customer

15   would be.

16       110.    The failed RevPro-Billing integration ultimately resulted in reputational damage and

17   reduced demand for all of Zuora's products, including RevPro, the Central platform and other

18   homegrown Zuora products.  CW-4, a former Business Development: Strategic Accounts Group

19   Member who worked at Zuora from May 2018 to January 2019 out of the Company's main office in

20   San Mateo, California, recounted similar experiences at Zuora as CW-3. CW-4 was on the Zuora

21   Central team, which was focused on selling the Company's subscription order-to-revenue platform to

22   major companies. CW-4 worked on Zuora's large accounts, particularly Fortune 500 accounts,

23   including IBM. CW-4 reported directly to a Senior Vice President of Sales at Zuora.

24       111.    Zuora bought RevPro a year before CW-4 started, however, during CW-4's

25   employment, Zuora management started to make RevPro more visible and emphasized cross-selling

26   it with Zuora Central. Therefore, CW-4 became familiar with the RevPro product particularly in

27   August or September 2018 in connection with an upcoming DreamForce conference, an annual event

28   hosted by Salesforce.com. CW-4 stated that initially when the Company began ramping the RevPro

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1    purchase into the Company, there was talk of getting the new revenue accounting tool "into every

2    Fortune 500 account and vice versa."

3         112.    The heightened enthusiasm and lofty goals for cross-selling within Zuora's sales

4    department soon changed. CW-4 explained that when the Zuora Central team began to cross-sell

5    with the RevPro team, CW-4 started to have initial conversations about the products with potential

6    customers and was constantly hearing customers were unhappy with RevPro. CW-4 said that the

7    issue with selling RevPro was that it was not working with Zuora Central.

8         113.    CW-4 also recounted incidents of failed RevPro demonstrations for existing Billing

9    customers. CW-4's account executive handled the implementation stages for the demo, where the

10    account executive would take information and data from the client and input the information and

11    data into the Zuora website, so the client could see what Zuora's solution looks like with the client's

12    numbers. CW-4 said that during that step, the RevPro demo did not always go so well and questions

13    were asked of the engineers, so soon it became clear that it may be tough to marry the accounts.

14         114.    CW-4 explained that the undisclosed integration issue did not comport with

15    Defendants' public representations concerning the functionality of Zuora Central and its software

16    application products. CW-4 said, "[t]he idea of RevPro was that you could go in-house with Zuora

17    and use RevPro to take care of the backend accounting for complex accounting standards." CW-4

18    said Defendant Tzuo's vision had been that Zuora Central would be "plug and play." CW-4 said

19    RevPro therefore should have been an out-of-box migration from Zuora Central, and that Zuora

20    Central should have recognized RevPro automatically and done what it needed to do to operate. But

21    instead, the programs did not work together – they lacked the proper data points to seamlessly

22    transfer information and there was no native integration between Central and RevPro, according to

23    CW-4. CW-4 said, "*It was clear the two technologies were not as capable of working together as*

24    *the Company claimed*."

25         115.    RevPro sales suffered due to the RevPro integration issues. CW-4 said that the Zuora

26    Central team met with the RevPro team twice a week during the Class Period. At those meetings,

27    CW-4 observed that the RevPro team was falling short of their projected numbers and that it was

28



clear they were struggling.  CW-4 stated that the reason sales were short and the team was struggling was that there were the technical issues with integrating RevPro.

116.    Of even greater concern, CW-4 said the RevPro integration challenge was damaging Zuora's broader reputation for product quality and that Zuora was missing out on large enterprise sales for all of its products, including Zuora Central. CW-4 confirmed the RevPro technical issues were making it tougher to sell Zuora Central, stating "[i]t was very clear that there were concerns with companies who had Zuora Central who heard about difficulties." CW-4 said that the RevPro integration issue was a big issue with the Company structure, as bringing RevPro in had resulted in a lot of Zuora's consistent clients questioning if they wanted Zuora Central. CW-4 stated, "[t]his idea of a sticky sale, people are very aware of that in software – they pitch on a product that's hard to ditch, and you don't want to be stuck with Zuora Central if some product doesn't work."

117.    CW-4 recalled an instance with a very large enterprise company who bought RevPro. CW-4 communicated with a finance professional at the very large enterprise company about the prospect of the customer adding Zuora Central. CW-4 said that the finance professional at the very large enterprise company stated, "[b]ecause of what we're hearing [about the RevPro integration issue] we're not going to do it."

118.    The Executive Defendants knew or had access to the sales execution issues described by CW-4.  Among other things, according to CW-3, executives could view the status of certain client sales through a proprietary Salesforce database.  CW-3 said that executives could look at accounts and through that "they'd know a good portion of how much a client was satisfied. If any information was missing, the executives would know from Salesforce who to go ask for any additional details. The executives would be able to see metrics like how much the customer was paying, any opportunities for new business within the account, and the nature and status of any support tickets. Any notations about specific issues related to the RevPro implementation would be viewable."

**H.    Defendants Scrap The "Keystone" Integration Project Entirely For A New K-2 Project**

119.    In or about February or March 2019, Zuora's executives acknowledged the failure of the "Keystone Project" and decided to scrap it in favor of another approach internally called the K-2 Project.  CW-1was involved in the initial design of the K-2 project in late 2018, and handed it over to

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

start the build before CW-1 left in April 2019.   CW-1worked together with the Director of Product

Management Sai Prasad Marri on the initial design after the debacle with Zuora's major customer,

Zoom (described above), and provided the information they assembled to SVP RevPro Product

Reddy.  CW-1completed a "Proof Of Concept" and analysis in March 2019.  After which, according

to CW-1, "[t]here was a directive that Tien [Tzuo] gave to Jagan [Reddy] to start K-2."  CW-1

added, "[w]e knew and Tien knew, that OrderMetrics wasn't working."

## I.     Defendants Promoted The Functionality Of Its Solution While Concealing The Integration Failure

120.    Notwithstanding their substantial knowledge of the RevPro-Billing integration failure

as described above, throughout the Class Period Zuora promoted the functionality of its Central

platform and application products in multiple contexts, including marketing materials, press releases,

quarterly and annual SEC filings, investor presentations, and conferences.

121.    For example, Zuora consistently maintained throughout the Class Period that through

"Zuora's subscription management technology … you can quote, order, bill recognize revenue,

report, and automate the entire customer lifecycle from a single platform[.]"

122.    Zuora also touted that the Zuora platform "was architected specifically for dynamic,

recurring subscription business models and acts as an intelligent subscription management hub that

automates and orchestrates the entire subscription order-to-cash process, including billing and

revenue recognition." Similarly, Zuora emphasized that it offered a "[c]omprehensive solution built

specifically to handle the complexities of subscription business models."

123.    During analyst calls and other conferences with investors, the Executive Defendants

would tout Zuora's ability to provide an integrated system for subscription businesses. For example,

Defendant Tzuo highlighted how Zuora was "the only complete subscription management solution,

100% focused on helping companies of all sizes launch, scale, and transform into a subscription

business." Defendant Sloat also focused on how customers turn to Zuora once they realize "that their

existing systems aren't allowing them to iterate and have the flexibility and a different charge

model" to allow them to compete as a subscription business.



124.     Zuora also posted social media and videos regarding the seamless and integrated nature of Zuora's subscription management services. A post on Twitter warned customers not to "underestimate the complexity of revenue recognition," but touted "Zuora + RevPro integration for a seamless order-to-revenue process." Zuora's Facebook page also included a post celebrating Zuora Central as the "#SubscriptionEconomy platform" that allowed a subscription business to run its "dynamic order-to-cash platform on one central platform."

125.     These statements were false, misleading and omitted material facts. In truth, as described above, Defendants knew that customers using Zuora Billing and Zuora RevPro, Zuora's flagship products, could not successfully integrate the data from both systems.

126.     Zuora also publicly promoted the functionality of its solution in multiple other contexts. For example, during a May 31, 2018 earnings call, Defendant Sloat described Zuora's business model as providing a "cloud-based software that enables any company in any industry to successfully launch, manage, and transform into a subscription business." During the same call, Defendant Tzuo compared Zuora's capabilities against "[l]egacy ERP system," which he described as being "not equipped to handle the dynamic requirements that subscription business models demand." Defendant Tzuo also emphasized Zuora was the "only company that provides a full solution, 100% focused on [the subscription] business."

127.     Defendants' representations were well received by investors. By June 5, 2018, Zuora shares had doubled their IPO price, rising from $14.00 to $28.02 in only two months. In the ensuing months, analysts commented on the strength of Zuora's business and products. In a note to his clients, a Needham analyst wrote that Zuora demand trends are "clearly healthy."[7]  Jefferies discussed how there would be "plenty of runway" for RevPro demand beyond ASC 606 compliance, as "both homegrown systems and most financial applications do not meet the current demands of existing models and regulations, let alone the complexities of new business models."

---

[7] Kristine Owram, *Zuora Can Generate Near-Term Revenue Growth of 30%, Needham Says*, Bloomberg (June 6, 2018).



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

128.     Zuora received further positive coverage from mainstream financial press, including Jim Cramer from "Mad Money." On June 14, 2018, Mr. Cramer interviewed Defendant Tzuo on his "Mad Money" television program on CNBC. In introducing the interview, Mr. Cramer described Zuora as "one of the best performers in the [IPO] class of 2018," and described Zuora's reported sixty percent revenue growth as "phenomenal."[8]  During the interview, Defendant Tzuo described how the "old systems of the past, these ERP systems and Oracle from SAP, they're simply not gonna work anymore," and Zuora provides a "pretty unique piece of technology [ ] that allows any business in any industry to really launch, scale, and grow and transform into subscription businesses." Mr. Cramer concluded the interview by calling Zuora "a remarkable company." Similarly, during a "Mad Money Lightening Round" in August 2018, Mr. Cramer said the following about Zuora: "I love this company and the subscription economy."[9]

129.     Later, at a Canaccord Genuity conference on August 8, 2018, Defendant Sloat noted that Zuora's software "from [the] beginning was built to handle the smallest to the largest company, built to handle a [sic] companies across every single vertical[.]"  Defendant Sloat observed that, in contrast, because "there is a series of events that you need to be able to manage," "traditional ERP systems" cannot "just bolt-on and just go-to-market to a customer and be successful[.]" Similarly, during an August 30, 2018 earnings call, Defendant Tzuo stated that "dynamic business models" would be a driver of demand for Zuora's products moving forward, as long-standing ERP systems were not built for "constant change contracts" and could not "model how [] new business models work."

130.     By August 30, 2018, Zuora's stock had risen 139% since its listing, the second-best debut among U.S. technology stocks with initial public offerings of at least $100 million.[10] Defendant Tzuo attributed Zuora's success to the advanced functionality of Zuora's solution,

---

[8] See https://www.zuora.com/2018/07/02/tien-tzuo-jim-cramers-mad-money/.

[9] Scott Rutt, *Viza, Zuora, CRISPR, Tractor Supply: 'Mad Money' Lightening Round*, The Street (Aug. 9, 2018), https://tinyurl.com/y6dchfd9.

[10] Kamaron Leach, *Zuora's Rally Will Be Tested as Time Runs Out on Share Lockup*, Bloomberg (Aug. 30, 2018).



1     claiming that Zuora's competitors, including Oracle and SAP, were "just not innovating, [but]

2     buckling under their own weight."

3          131.    Like Defendant Tzuo, analysts continued to tout Zuora's businesses. For example, in

4     an October 12, 2018 note to clients, a Morgan Stanley analyst identified the "very healthy underlying

5     demand for Zuora's billing platform" that should be "an important growth lever moving forward."[11]

6     Similarly, in initiating coverage, FBN securities analysts noted that Zuora was "one of the few pure

7     plays on the growth of the subscription economy,"[12] and listed the fact that "[c]ustomers that started

8     with Zuora Billing or Zuora RevPro can subscribe to the other flagship product" as a "lever to drive

9     additional growth going forward."[13]

10         132.    During a November 29, 2018 earnings call, Defendant Tzuo emphasized that Zuora's

11    success was made possible from its "technology" and that its "value proposition [was] now more

12    centered around automation and efficiencies versus simply [ASC 606] compliance." Defendant Tzuo

13    also touted Zuora's success "bringing customers live" on Zuora's platform, noting that Zuora

14    benefits from having "a very stick product, and when you look at our product, once it goes in … it's

15    sticky. It's running [the] company's core operations."

16         133.    During the January 15, 2019 Needham Growth Conference, Defendant Sloat echoed

17    previous comments about the limits of existing ERP systems to handle subscription businesses,

18    stating "these companies have come to a realization … that their existing systems aren't allowing

19    them to iterate and have the flexibility and a different charge model that they need to in order to

20    actually go have a dynamic pricing with their customer base." Defendant Sloat described this

21    situation as an "actual opportunity" for Zuora. A month later, Defendant Tzuo described Zuora's role

22    in the "digital transformation" of companies, which involve "true, true big, sticky implementations"

23    that previously carried Oracle and SAP through "decades," and could now do the same for Zuora.

24

25    _____

      [11] Shelly Hagan, *Zuora CEO Lauds Lack of Innovation From Rivals Oracle, SAP*, Bloomberg
      (Oct. 12, 2018), https://tinyurl.com/yxdsozld.

26    [12] *Zuora is 'Well-Positioned' for Subscription Economy Growth: FBN*, Bloomberg (Oct. 16,
      2018).

27    [13] Shebly Seyrafi, CFA, *Initiating Coverage of SaaS Enabler/Billing Company Zuora, Inc. (ZUO)*
28    *with an Outperform/$25 PT*, FBN Securities (Oct. 16, 2018).



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

134.    On March 21, 2019, Defendant Tzuo called Zuora the "only game in town if you're looking for a complete end-to-end subscription platform," and again noted how "companies are increasingly realizing … [that] ERP systems are simply not sufficient to deliver on [] growth strategies" for subscription businesses.

135.    Analysts provided positive coverage after the earnings announcement in March 2019. For example, analysts at Canaccord Genuity had no "problem, fear, or hesitation recommending [Zuora]."[14]  Jefferies also characterized Zuora's earnings as "sustainable, material growth." FBN Securities similarly noted that it remained "positive on the equity" and retained the "Outperform" rating.[15]

136.    Defendant Tzuo was again interviewed by Mr. Cramer during an April 24, 2019 episode of Mad Money. During the interview, Defendant Tzuo predicted that more and more companies will turn to the subscription economy: "They know how you use your product. They provide a service to you. What you're going to see is every physical product from appliances from Whirlpool cars from Ford, tractors from Caterpillar – they're all going to go through a transformation and become services." In response to this and other statements touting the emerging subscription economy, Mr. Cramer described Zuora as a "game breaker" and that in the "subscription business," Zuora had "as close to a monopoly as you've seen."[16]

**J.      Zuora Senior Executives Took Advantage Of The Company's Inflated Stock Price To Sell Their Own Shares For Over $28 Million**

137.    The Company's stated Insider Trading Policy provides that every Zuora employee, referred to as a ZEO, "is prohibited from using 'inside' or material nonpublic information about Zuora, or about companies with which Zuora does business, in connection with buying or selling Zuora's … securities … . ZEOs who have access to inside information are not permitted to use or

---

[14] Richard Davis, CFA, et al., *Thank you, after-hours sellers; now you can fill out your position*, Canaccord Genuity (Mar. 21, 2019).

[15] Shebly Seyrafi, CFA, *ZUO: Buy on Weakness as Guidance Adjusted for ASC 606 Is Fine, and Transaction Volume Growth of 56% Impresses*, FBN Securities (Mar. 22, 2019).

[16] Transcript, available at https://www.zuora.com/2019/04/26/ceo-cloud-company-zuora-manufacturers-must-adopt-subscription-model-order-grow/



share that inside information for stock trading purposes or for any other purpose except to conduct Zuora business."

138.    In violation of Zuora's stated policy and the securities laws, Zuora senior executives Defendant Sloat and Zuora President Marc Diouane unloaded their own shares for over $28 million in insider trades during the Class Period. In total, during the Class Period, Sloat made approximately $16.9 million in insider sales, and Diouane made approximately $11.1 million in insider sales. The sales made by Defendant Sloat and Diouane are illustrated in the following charts:

| Executive | Transaction Date | Shares Sold | Prices Per Share | Total Value |
|---|---|---|---|---|
| Sloat | 09-05-2018 | 344,009 | $25.81 | $8,878,997 |
| Sloat | 03-26-2019 | 364,528 | $20.04 | $7,305,870 |
| Sloat | 03-28-2019 | 35,472 | $20.00 | $709,440 |
| **Totals** | | **744,009** | | **$16,894,307** |

| Executive | Transaction Date | Shares Sold | Prices Per Share | Total Value |
|---|---|---|---|---|
| Diouane | 09-05-2018 | 34,200 | $25.90 | $885,663 |
| Diouane | 12-06-2018 | 130,500 | $18.03 | $2,352,393 |
| Diouane | 03-26-2019 | 130,000 | $19.76 | $2,568,391 |
| Diouane | 04-29-2019 | 240,000 | $22.19 | $5,326,680 |
| **Totals** | | **534,700** | | **$11,133,127** |

139.    These insider trades were both unusual and suspicious in terms of size, timing and trading pattern. In particular, Defendant Sloat sold nearly half of his then-total holdings in Zuora common stock in late March 2019, just a week after Zuora announced positive fourth quarter fiscal year 2019 and full fiscal year 2019 results, but just one month before Zuora's disastrous first quarter fiscal year 2020 would end.

140.    Similarly, Diouane dramatically increased the size of his sale transactions during the Class Period as the disclosure date approached, eventually unloading over a quarter of his then-total holdings in Zuora common stock on April 29, 2019, which was the final day of Zuora's

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

disappointing first quarter fiscal year 2020, and only a month before Zuora would announce the poor results, reduced guidance, and Diouane's ouster from his position as President and Head of Sales.

141.     Since making these trades in early 2019 up to the date of the filing of this complaint, neither Defendant Sloat nor Diouane have reported sales of any Zuora shares they owned or controlled.

142.     Although Defendant Sloat and Diouane enacted their trades pursuant to Rule 10b5-1 trading plans, Lead Plaintiff is informed and believes that they were adopted during the Class Period when they were already in possession of material, nonpublic information about the true functionality of Zuora's solution.

**K.     The Truth Is Revealed**

143.     Defendants' misrepresentations to investors were revealed on May 30, 2019, when Zuora announced its first quarter fiscal year 2020 financial results. As discussed in greater detail below, Defendants' May 30, 2019 disclosures revealed that Defendants had misrepresented and concealed the true functionality of Zuora's Platform and products and caused Zuora's stock price to drop precipitously.

144.     On May 30, 2019, after market hours, Zuora issued a press release announcing its first quarter fiscal year 2020 results. Zuora announced quarterly revenue growth of only 22%, a decline of over 18% from the prior quarter. The Company also disclosed a decline in large customer growth, adding only twenty customers with annual contract value equal to or greater than $100,000, the lowest over the past year since the Company had become public. Moreover, the Company disclosed that it had lost $20.6 million, a loss of 16% year-over-year.

145.     More disturbing, Defendants disclosed Zuora's future was far less bright than previously projected. Specifically, the Company slashed its fiscal year 2020 total revenue guidance to a range of $268 million to $278 million, from prior guidance of $289 million to $293.5 million. The Company projected subscription revenues of only $200-$206 million, below previous guidance of $209-$211.5 million. Moreover, according to analysts, the fiscal year 2020 guidance implied that Subscription Annual Contract Value ("ACV") would decline 12% for the year, which was shocking

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1  given that the Company reported Subscription ACV growth of 60% last year, 45% growth in the

2  prior year, and 30% growth in the year before that.

3      146.    Finally, the Company's press release announced that President and Head of Sales

4  Marc Diouane would be transitioning from his current role of President to advisor to Zuora's CEO

5  while Zuora would be conducting a search for Diouane's replacement.

6      147.    Later that same day, Zuora held an earnings call with investors to discuss its results

7  for the first quarter fiscal year 2020. On the call, Defendant Tzuo explained that the Company "did

8  have some challenges which are impacting our Q2 and our full year outlook." In particular,

9  Defendant Tzuo identified "two execution headwinds" that caused the poor financial results and

10  reduced guidance: Billing-RevPro integration challenges and sales execution problems.

11      148.    On the Billing-RevPro integration issue, Defendant Tzuo explained that the

12  Company's growth was conditioned on Zuora's ability to cross-sell its two flagship products: Billing

13  and RevPro. Defendant Tzuo disclosed, however, that the product integration for these two products

14  was "taking longer than expected." Defendant Tzuo disclosed that "the technical work to complete

15  the integration is taking time as these are complex mission-critical systems. And so for our existing

16  Billing customers, who have recently purchased RevPro, we slowed down the RevPro

17  implementations this past quarter given the product integration delay." Defendant Tzuo noted that

18  the integration challenge "has slowed down our cross-sell motion," and "resulted in lower

19  professional services and subscription revenue in the quarter as well as tempered expectations going

20  forward." Defendant Tzuo explained that the Company had made "a course correction in our

21  approach [with respect to integrating the two systems]." Defendant Tzuo reiterated that "the

22  integration of our 2 flagship products is critically important to us and our customers' success. So I'm

23  personally spending a lot of my time here to drive this to completion." Nevertheless, Defendant Tzuo

24  stated that the Company likely would not have the integration issue resolved until by the end of the

25  third quarter of fiscal year 2020.

26      149.    Defendant Tzuo also disclosed that the Company "need[ed] to improve our sales

27  execution," particularly with respect to newer sales representatives. Defendant Tzuo explained that

28  the Company was going to address this by making three structural changes: (i) realigning Zuora's

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1    strategic account organization by placing new sales representatives under more experienced

2    managers; (ii) revamping the pipeline process; and (iii) changing sales leadership by replacing

3    Diouane with a new head of sales.

4        150.    Analysts were blindsided by the Company's disclosures, including the revelation of

5    the Billing-RevPro integration failure. In fact, on the earnings call, a Jeffries analyst expressed

6    disbelief to Defendant Tzuo, stating, "I sort of get the integration of Billings and RevPro and how

7    that could sort of slow some things down. But I know I'm going to get this question tomorrow. *I*

8    *mean you bought Leeyo [RevPro] 2 years ago. So like it's hard -- like how can it not be*

9    *integrated?*"

10       151.    In responding to the question, Defendant Tzuo made telling admissions about

11   Defendants' knowledge about the integration failure during the Class Period. Defendant Tzuo stated

12   that the Company was previously focused on having new RevPro customers go live before the ASC

13   606 by the first and second quarter of last year, and that the Company "didn't really have time and

14   the resource to focus on the integration between the 2 until after the 606 [wave] was complete."

15   Defendant Tzuo further disclosed that "*we didn't really start heavy work on the integration until*

16   *early last summer, late spring, early last summer. And long story short, we went down one*

17   *direction that proved to be a dead end, a false direction*."

18       152.    After the earnings call, analysts expressed further surprise and disappointment in the

19   Company's disclosures. For example, in a May 30, 2019 report to investors entitled "Another drama-

20   filled quarter," a Canaccord Genuity analyst noted that "Zuora was a mess" and that it was

21   "executing far below potential." Among other things, the Canaccord Genuity analyst cited the

22   "Longer-than-anticipated progress to integrate modules of RevPro and Billing forced Zuora to

23   elongate deployment (and therefore, revenue recognition for those add-on sales." Likewise, it was

24   reported that Needham analyst Scott Berg called Zuora's stock "dead money for a quarter or two" as

25   it worked through these execution issues. Further, Motley Fool exclaimed, "I'll gladly watch this



sputtering growth engine from the sidelines until Zuora can prove that management's betterment plans are working."[17]

153.    On this news, Zuora's stock declined on heavy trading nearly 30%, from $19.90 per share on May 30, 2019, to $13.99 per share on May 31, 2019, representing the worst day of trading in Zuora stock history and erasing roughly $520 million of market capitalization.

## L.    Defendants' Post-Class Period Admissions Of Their Knowledge Of The Integration Issue

154.    After the Class Period, Defendants made additional public admissions of their knowledge of the integration issue while publicly touting the advanced functionality of Zuora's solution and the ability to cross-sell between RevPro and Billing customers.

155.    For example, during the June 5, 2019 Zuora Inc. Investor Session, Defendant Tzuo explained the genesis for the integration issues with RevPro and Zuora Billing, noting that "traditional ERP systems are order-based systems," but that Zuora's subscription management system was "very different" in that Zuora's solution converts the customers' usage and time on the system into an invoice. Defendant Tzuo explained that "RevPro is used to importing orders because it grabs an order from SAP, it grabs an order from Oracle because that's all it had." Defendant Tzuo stated that "the course correction" Zuora "took out of the gate is we tried to make our billing system produce an order that look like an ERP system." Defendant Tzuo reflected that this unsuccessful integration strategy was "silly" and the flaw in the approach "probably could have [been] caught [] a little bit earlier." While Defendant Tzuo expressed optimism about the new integration approach, he admitted that this new course correction was in its early stages, was only being tested on "about 4 customers," and no existing Billing-RevPro customers had gone live with the applications. Things had not improved by August 28, 2019, as Defendant Tzuo announced during the earnings call that although Zuora's engineering team had "completed and delivered" the integration technology, Zuora had only "restarted [] a number of previously paused implementations" and had not yet completed them.

---

[17] Anders Bylund, *Why Zuora's Stock Crashed Hard on Friday*, Motley Fool (May 31, 2019), https://tinyurl.com/y22jxkfr.



156.     In addition, during the September 10, 2019 Deutsche Bank Technology Conference, Joon Huh, Zuora's Vice President of Investor Relations explained that "*last year, we actually spent some time doing the integration. So making sure that people that have our Billing product could also buy RevPro and have a clean integration across it.*" Huh noted, however, that at that time, "*We had some challenges going through it we highlighted on the Q1 call.*" Huh explained that as a result of these "challenges," Zuora had to pause RevPro implementations with its Billing customers who had recently bought RevPro "until we got the integration work done." Huh explained that now that the Company has devised a new integration solution, it has restarted those implementations and that the Company hoped to have the customers go live on the product in the upcoming quarters.

157.     The revelations by Defendants were material to analysts covering Zuora. Canaccord Genuity reduced price the objective on the stock from $28.00 to $18.00. Needham downgraded Zuora from a "strong-buy" to a "buy" rating, and Jefferies cut their price target on Zuora from $35.00 to $29.00.[18] On the July 26, 2019 edition of "Mad Money," Mr. Cramer said he would not buy the stock based on its performance the prior quarter, and would wait to see if the Company could get it right.[19]

158.     Finally, on October 19, 2019, Zuora issued a blog entry on the "Knowledge Center" of the Company's website entitled "Zuora Billing - RevPro Integration overview: Zuora Billing – RevPro Integration is in Limited Availability."[20] The blog entry acknowledged the extreme challenges that customers who had purchased both Billing and RevPro faced in reconciling the data from the two systems prior to the release of the new Zuora Billing - RevPro Integration:

> If you are using both Zuora Billing and Zuora RevPro, the integration between two systems is likely to be a pain point to you. You need to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.

---

[18] *Zuora (ZUO) Downgraded to Buy at Canaccord Genuity*, Watchlist News (May 31, 2019).

[19] Craig Jones, *Jim Cramer Shares His Thoughts on Zuora, Lithia Motors, and More*, Benzinga (July 26, 2019), https://tinyurl.com/y2nnjxrr.

[20] https://knowledgecenter.zuora.com/Zuora_RevPro/Zuora_Billing_RevPro_Integration_Overview

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1   **V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

2   **A.      Statements On Zuora's Website And Social Media Feeds**

3          159.    Throughout the Class Period, Defendants published numerous false or misleading

4   statements on Zuora's website about how Zuora could offer a robust, single system of record for

5   subscription businesses to manage their monetization strategies, billing terms, customer payment and

6   collection, and revenue recognition.

7          160.    For example, throughout the Class Period, Zuora's website claimed that with "Zuora's

8   subscription management technology … *you can quote, order, bill, recognize revenue, report, and*

9   *automate the entire customer lifecycle from a single platform"*:

10

11   **ZUORA BRINGS FREEDOM TO THE**
     **SUBSCRIPTION ECONOMY**

12   Zuora's subscription management technology is designed to meet the needs of your modern subscription business. Now you
     can quote, order, bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform.

13

14

15   **ZUORA CENTRAL PLATFORM**                **ZUORA PRODUCTS**                       **ZUORA CONNECT**
                                                                                        **MARKETPLACE**
16   The only platform that orchestrates       Our leading portfolio of SaaS
     and automates your order-to-cash          applications designed to help your      Extend Zuora to perfectly fit your
17   process and serves as the connective      business succeed in the Subscription    business with pre-built apps and
     tissue between your CRM and ERP.          Economy.                                integrations to instantly tailor Zuora to
18                                                                                      the unique needs of your industry,
                                                                                        customers, and geography.
19   learn about central                       learn about products                    learn about connect

20          161.    These statements were false and misleading. In truth, as discussed above, Zuora's

21   subscription management technology was incapable of permitting a customer to bill and recognize

22   revenue concurrently from a single platform. Specifically, customers using the Zuora Central

23   Platform, together with Zuora Billing and Zuora RevPro, were unable to integrate the data between

24   two modules through automation. Rather, as corroborated by former Zuora employees and

25   Defendants themselves, the only way to remove the friction from reconciling the two systems and

26   recognize revenue would be for the client to either export the data from Zuora Billing and import it

27   into Zuora RevPro manually, or build a customized integration that could ingest the required data

28

HB   HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

from Zuora Billing into Zuora RevPro. Defendants' statements identified in paragraph 160 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro. Having spoken directly on the subject of Zuora's subscription management's functionality and ability to bill and recognize revenue from a single platform, Defendants were bound to provide these omitted facts to avoid misleading investors about the true capabilities of the Zuora Central Platform and its related products Zuora Billing and Zuora RevPro.

162. Similarly, throughout the Class Period, Zuora's website highlighted how Zuora Central is a "***single platform for your order-to-revenue process and the connective tissue between your CRM and ERP***." Zuora stated that Central "***easily connects the various applications in your order-to-revenue ecosystem***."



163. These statements were false and misleading. In truth, as discussed above, Zuora's subscription management technology was incapable of permitting a customer to bill and recognize revenue concurrently from a single platform. Specifically, customers using the Zuora Central Platform, together with Zuora Billing and Zuora RevPro, were unable to integrate the data between two modules through automation. Rather, as corroborated by former Zuora employees and Defendants themselves, the only way to remove the friction from reconciling the two systems and recognize revenue would be for the client to either export the data from Zuora Billing and import it

HB HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1  into Zuora RevPro manually, or build a customized integration that could ingest the required data

2  from Zuora Billing into Zuora RevPro.  Defendants' statements identified in paragraph 162 also

3  omitted material facts corroborated by former Zuora employees and of which Defendants were aware

4  and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration

5  projects and their customers' frustration over the failed integration between Zuora Billing and Zuora

6  RevPro.  Having spoken directly on the subject of Zuora's subscription management's functionality

7  and ability to bill and recognize revenue from a single platform, Defendants were bound to provide

8  these omitted facts to avoid misleading investors about the true capabilities of the Zuora Central

9  Platform and its related products Zuora Billing and Zuora RevPro.

10        164.    During the Class Period, Defendants also published false or misleading statements on

11 Zuora's Twitter account regarding a "***seamless order-to-revenue***" process:



Zuora ✔ @Zuora · Jun 5, 2018

Don't underestimate the complexity of revenue recognition. The deep dark depths are very, very complex! Thank goodness for Zuora + RevPro **integration** for a seamless order-to-revenue process! #Subscribed #revrec

17        165.    This statement was false and misleading. In truth, as discussed above, there was no

18 Zuora + RevPro integration let alone a solution Zuora offered "for a seamless order-to-revenue

19 process." To the contrary, customers using both Zuora Billing and Zuora RevPro were unable to

20 integrate the data between the two systems. Rather, as corroborated by former Zuora employees and

21 Defendants, the only way to remove the friction from reconciling the two systems would be for the

22 client to either export the data from Zuora Billing and import it into Zuora RevPro manually for

23 revenue recognition, or invest a significant amount of resources to build a customized integration

24 that ingests the required data from Zuora Billing into Zuora RevPro.  Defendants' statement

25 identified in paragraph 164 also omitted material facts corroborated by former Zuora employees and

26 of which Defendants were aware and had knowledge of, including the failure of the "Zuora on

27 Zuora" and "Keystone" integration projects and their customers' frustration over the failed

28 integration between Zuora Billing and Zuora RevPro.   Having spoken directly on the subject of



715 HEARST AVE., SUITE 202, BERKELEY, CA  94710
(510) 725-3000 • FAX (510) 725-3001

1    Zuora's subscription management's functionality and ability to bill and recognize revenue from a

2    single platform, Defendants were bound to provide these omitted facts to avoid misleading investors

3    about the true capabilities of Zuora Billing and Zuora RevPro.

4        166.    Throughout the Class Period, Zuora highlighted how an upgrade to Zuora Central

5    "***Further Attacks the #ERP Market,***" and displayed an image illustrating the integrated nature of its

6    Central platform with its products, including how Zuora Billing and Zuora RevPro work together to

7    "**[c]apture orders, subscriptions, invoices, payments, and *AR***" and "***[r]ecognize revenue.***"



18        167.    These statements were false and misleading. In truth, as discussed above, the Central

19    platform was not integrated such that it could work together with its products Zuora Billing and

20    Zuora RevPro to capture orders, subscriptions, invoices, payments, and AR and recognize revenue.

21    In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data

22    between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the

23    only way to remove the friction from reconciling the two systems would be for the client to either

24    export the data from Zuora Billing and import it into Zuora RevPro manually for revenue

25    recognition, or invest a significant amount of resources to build a customized integration that ingests

26    the required data from Zuora Billing into Zuora RevPro.  Defendants' statements identified in

27    paragraph 166 also omitted material facts corroborated by former Zuora employees and of which



1    Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and

2    "Keystone" integration projects and their customers' frustration over the failed integration between

3    Zuora Billing and Zuora RevPro.   Having spoken directly on the subject of Zuora's subscription

4    management's functionality and ability to bill and recognize revenue from a single platform,

5    Defendants were bound to provide these omitted facts to avoid misleading investors about the true

6    capabilities of the Zuora Central Platform and its related products Zuora Billing and Zuora RevPro.

7            168.    Throughout the Class Period, Zuora's Facebook page also emphasized how Zuora

8    Central was the **"#Subscription Economy platform"** or **"Subscription Order-to-Revenue Platform"**

9    that allowed a company to run its "dynamic order-to-cash platform on one central platform":



17           169.    These statements were false and misleading.  In truth, as discussed above, Zuora

18   Central was not a singular "Subscription Order-to-Revenue Platform." Rather, as corroborated by

19   former Zuora employees and Defendants, the only way to remove the friction from integrating Zuora

20   Billing and Zuora RevPro would be for the client to either export the data from Zuora Billing and

21   import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of

22   resources to build a customized integration that ingests the required data from Zuora Billing into

23   Zuora RevPro.  Defendants' statements identified in paragraph 168 omitted material facts

24   corroborated by former Zuora employees and of which Defendants were aware and had knowledge

25   of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their

26   customers' frustration over the failed integration between Zuora Billing and Zuora RevPro.   Having

27   spoken directly on the subject of Zuora Central's subscription order-to-revenue capabilities,

28



1    Defendants were bound to provide these omitted facts to avoid misleading investors about the true

2    capabilities of the Zuora Central Platform and its related products Zuora Billing and Zuora RevPro.

3    **B.      Defendants' False Statements In Zuora's Product Press Releases and Form 8-Ks**

4           170.    Throughout the Class Period, Defendants published numerous false or misleading

5    statements in their press releases about how Zuora could offer a robust, single system of record for

6    its  subscription businesses.

7           171.    For example, numerous Zuora press releases during the Class Period contained the

8    following description of Zuora and emphasized the integrated nature of Zuora's offerings:

9        Zuora® provides the leading cloud-based subscription management platform that
         functions as a system of record for subscription businesses across all industries.
10       Powering the Subscription Economy®, *the Zuora platform was architected*
         *specifically for dynamic, recurring subscription business models and acts as an*
11       *intelligent subscription management hub that automates and orchestrates the entire*
         *subscription order-to-cash process, including billing and revenue recognition …* .
12       To learn more about the Zuora platform, please visit www.zuora.com.

13   *See, e.g.*, "Zuora Announces Date for First Quarter Fiscal 2019 Earnings Conference Call" (May 4,

14   2018); "Zuora Delivers Strong First Quarter Fiscal 2019 Results" (May 31, 2018); "Merchant e-

15   Solutions Announces Sponsorship of Zuora's Subscribed 2018 User Conference" (May 31, 2018);

16   "Zuora Hosts Subscribed '18: The World's Premiere Conference for Leaders of the Subscription

17   Economy" (May 31, 2018); "Synthesis Unveils Their Subscription Monetization Accelerator Kit at

18   Zuora Subscribed 2018" (June 5, 2018); "Tien Tzuo, CEO and Founder of Zuora, Launches

19   SUBSCRIBED, the First Book on the Subscription Economy" (June 5, 2018); "Zuora Central

20   Upgrade Further Attacks the ERP Market" (June 5, 2018); "Zuora Announces its Spring '18 Release

21   at Subscribed in San Francisco" (June 5, 2018); "Zuora to Participate in the Canaccord Genuity 38th

22   Annual Growth Conference" (July 30, 2018); "Zuora Announces Date for Second Quarter Fiscal

23   2019 Earnings Conference Call" (August 1, 2018); "Zuora Reports Record Second Quarter Fiscal

24   2019 Results" (August 30, 2018); "Zuora Hosts Subscribed New York Featuring Thought Leaders

25   From Amazon, Fortune, NYSE and XO Group" (October 5, 2018); "Zuora Named Amazon Pay

26   Premier Partner for Millions of Merchants to Capitalize on the Subscription Economy" (October 11,

27   2018); "Zuora Announces Date for Third Quarter Fiscal 2019 Earnings Conference Call"

28   (November 1, 2018); "Zuora Reports Record Third Quarter Fiscal 2019 Results" (November 29,

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

2018); "Zuora Announces its Winder '19 Release" (December 11, 2018); "Zuora to Participate in the 21st Annual Needham Growth Conference" (January 08, 2019); "Zuora Helps Worthpoint Accelerate its Growth Annually and Get to Cash Flow Positive" (January 15, 2019); "Zuora is Essential to eMoney Advisor's Successful Transformation to the Subscription Model" (January 29, 2019); "Zuora Announces Date for Its Fourth Quarter and Full Year Fiscal 2019 Earnings Conference Call" (February 4, 2019); "Zuora to Participate in Upcoming Goldman Sachs, JMP Securities and Morgan Stanley Investor Conferences" (February 6, 2019); "Interbrand and Zuora Join Forces to Help Global Brands Succeed in the Subscription Economy" (February 13, 2019); "Zuora Announces its Call for Speakers for Subscribed 2019: The World's Premiere Conference for Leaders of the Subscription Economy" (February 19, 2019); "Zuora Outperforms ERP Vendors as the System of Record for the Subscription Economy" (February 20, 2019); "TerrAvion Goes Live on Zuora's Subscription Billing Platform in 39 Days" (March 6, 2019); "Ricoh Selects Zuora to Accelerate the Global Expansion of its New Digital Workplace Productivity Solutions" (March 8, 2019); "Zuora Helps Power Sports Streaming Service Kayo Sports" (March 13, 2019); "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results" (March 21, 2019); "The Subscription Economy Grows More than 300% In The Last Seven Years" (March 21, 2019); "Zuora Adds Five New U.S. Patents to Accelerate Growth of the Subscription Economy (March 22, 2019); "New International Survey Reports on The End of Ownership and The Rise of Subscriptions" (April 29, 2019); "Zuora Announces Date for its First Quarter Fiscal 2020 Earnings Conference Call" (May 3, 2019); and "Zuora Hosts Subscribed 2019 Featuring Behind-the-Scenes Conversations with WeWork, Pandora, Fender and More" (May 13, 2019).

172.    Defendants made identical statements throughout the Class Period in "Current Reports: Results of Operations and Financial Condition," filed with the SEC on Form 8-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, which were signed and approved by



Defendant Sloat or Jennifer Pileggi, Zuora's Senior Vice President, General Counsel and Corporate Secretary.[21]

173.    These statements were false and misleading. In truth, as discussed above, the Zuora platform could not automate and orchestrate the entire subscription order-to-cash process, including billing and revenue recognition. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from integrating Zuora Billing and Zuora RevPro would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Defendants' statements identified in paragraph 171 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro.   Having spoken directly on the subject of the Zuora platform's functionality, Defendants were bound to provide these omitted facts to avoid misleading investors about the true capabilities of the Zuora Central Platform and its related products Zuora Billing and Zuora RevPro.

174.    In addition, on June 5, 2018, Zuora issued a press release entitled "Zuora Central Upgrade Further Attaches the ERP Market," touting Zuora Central as being the "***first and only complete subscription order-to-revenue solution on the market.***" Zuora stated that through Zuora Central, "***[c]ompanies can rapidly acquire customers across multiple channels, seamlessly manage the entire customer lifecycle, and automate revenue recognition, in a single solution.***"

175.    These statements were false and misleading. In truth, as discussed above, Zuora Central was not a complete subscription order-to-revenue solution, and customers could not seamlessly manage the entire customer lifecycle and automate revenue recognition, with Zuora Central as a single solution.  Rather, as corroborated by former Zuora employees and Defendants, the

---

[21] *See* Current Reports: Results of Operations and Financial Condition, filed with the SEC on Form 8-K on May 31, 2018, August 30, 2018, November 29, 2018, and March 21, 2019.



only way to remove the friction from integrating Zuora Billing and Zuora RevPro would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Defendants' statements identified in paragraph 174 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro.  Having spoken directly on the subject of Zuora Central's functionality, Defendants were bound to provide these omitted facts to avoid misleading investors about the true capabilities of the Zuora Central Platform and its related products Zuora Billing and Zuora RevPro.

176.    On December 11, 2018, Zuora issued a press release entitled "Zuora Announces its Winter '19 Release," which emphasized the **"automation and usability across Zuora Billing, Zuora Collect, and Zuora RevPro."**[22]  Within its winter release, Zuora represented that its solution would **"help finance teams increase productivity,"** including:

> **Reduced time spent on billing tasks and complex account updates with automated workflows[.]**
>
> **Easier collaboration amongst collection teams to resolve unpaid invoices and at-risk accounts[.]**
>
> **More efficient month end close to meet ASC 606 revenue compliance through disclosure reporting and intelligent exception handling[.]**
>
> **Faster turnaround to create new automated processes, such as applying late fees, calculating usage, or previewing upcoming invoices, using the enhanced workflow user interface.**

177.    These statements were false and misleading. In truth, as discussed above, Zuora could not provide automation and usability across Zuora Billing and Zuora RevPro. Moreover, the Zuora platform itself could not concurrently provide the represented capabilities, including month end close to meet ASC 606 revenue compliance through disclosure reporting and intelligent exception

---

[22] Press Release, Zuora, Zuora Announces its Winter '19 Release (Dec. 11, 2018) (on file with author).



1    handling.  Rather, as corroborated by former Zuora employees and Defendants, the only way to

2    remove the friction from integrating Zuora Billing and Zuora RevPro would be for the client to either

3    export the data from Zuora Billing and import it into Zuora RevPro manually for revenue

4    recognition, or invest a significant amount of resources to build a customized integration that ingests

5    the required data from Zuora Billing into Zuora RevPro.  Defendants' statements identified in

6    paragraph 176 also omitted material facts corroborated by former Zuora employees and of which

7    Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and

8    "Keystone" integration projects and their customers' frustration over the failed integration between

9    Zuora Billing and Zuora RevPro.   Having spoken directly on the subject of Zuora Billing and Zuora

10   RevPro's functionality, Defendants were bound to provide these omitted facts to avoid misleading

11   investors about the true capabilities of the Zuora Billing and Zuora RevPro.

12   **C.      The IPO Registration Statement**

13          178.    On April 11-12, 2018, Defendants filed Zuora's IPO Registration Statement, signed

14   and approved by Defendants Tzuo and Sloat, wherein Defendants emphasized that Zuora was "well-

15   positioned to capitalize" on the shift to the Subscription Economy based on its solution's ability to

16   "orchestrate the entire subscription order-to-cash process, including billing and revenue recognition."

17   In particular, Defendants stated that Zuora's solution was:

18          ***Architected specifically for dynamic, recurring subscription business models, our
            solution functions as an intelligent subscription management hub that automates
19          and orchestrates the entire subscription order-to-cash process, including billing and
            revenue recognition.*** Our cloud-based software solution is the new system of record
20          for subscription businesses.

21          179.    In the Registration Statement, Defendants also claimed that Zuora's platform offered

22   customers "***a flexible pricing model and automated billing, streamlined collection, and efficient***

23   ***accounting features.***"

24          180.    Similarly, Defendants identified Zuora's "***[c]omprehensive solution built specifically***

25   ***to handle the complexities of subscription business models***" as "Competitive Strengths."

26   Specifically, Defendants stated that Zuora's solution "***functions as an intelligent subscription***

27   ***management hub that automates and orchestrates the entire subscription order-to-cash process***

28   ***and is architected specifically for dynamic subscription business models.***" This statement was

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 53
No. 3:19-cv-03422-SI



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

followed by the following image illustrating Zuora's connected "*intelligent subscription management hub*":



181.   Defendants added that "*[u]nlike many legacy ERP systems, Zuora was built specifically to handle the complexities of subscription business models from customer acquisition to financial records close, and it has become the system of record for managing subscriptions for our customers.*"

182.   Defendants further claimed that Zuora's "*solution enables customers to successfully … [b]ill accurately with automated invoices that reflect everything from up-to-date proration and plan changes to usage-based billing,*" while concurrently "*[a]ccount for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time.*"

183.   The Registration Statement also promoted Zuora's ability to deploy and configure its solution on its clients' internal systems: "*We can deploy and configure our portfolio of order-to-cash products to meet a wide variety of use cases for subscription business models,*" including Zuora Billing and Zuora RevPro.

184.   The Registration Statement emphasized that Zuora's solution "Free[d] Up IT and Engineering Resources," and that with Zuora, "*engineering and IT departments no longer need to build in-house custom systems or customizations for their ERP systems to keep up with market changes, ongoing customer demands, and new order-to-cash processes.*"

HB HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA  94710
(510) 725-3000 • FAX (510) 725-3001

185.     The statements in the Registration Statement as alleged in paragraphs 178-184 above were false and misleading.  In truth, as described above, Zuora's solution (i) could not automate and orchestrate the entire subscription order-to-cash process, including billing and revenue recognition; (ii) did not concurrently offer automated billing and efficient accounting features; (iii) did not connect or integrate the represented billing and revenue recognition functions; (iii) could not singularly handle the customer acquisition to financial records close process; (iv) could not enable customers to successfully bill accurately with automated invoices while concurrently account for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time; (v) could not be deployed and configured to concurrently operate Zuora Billing and Zuora RevPro at its intended use; and (vi) did not obviate the need for customers' engineering and IT departments to build in-house custom systems or customizations for their ERP systems to address subscription order-to-cash processes. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Defendants' statements identified in paragraphs 178-184 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro.  Having spoken directly on the subject of Zuora's solution's functionality, Defendants were bound to provide these omitted facts to avoid misleading investors about the true capabilities of the Zuora's platform and its related products Zuora Billing and Zuora RevPro.

186.     In addition, the Registration Statement falsely promoted Zuora's ability to generate future revenue growth, noting that "***Once customers are operating on our solution, we have multiple ways to expand our footprint and drive revenue growth from these customers, which we***



1   *refer to as upsell*," including that "*Customers that started with Zuora Billing or Zuora RevPro can*

2   *also subscribe to the other flagship product.*"

3        187.   Defendants also identified a "*key element*" of its growth strategy as being "*Expand*

4   *Relationships with Existing Customers*" by "*increasing transaction volume and upsells and cross-*

5   *sells with additional products.*" Zuora detailed "*multiple ways*" to "*expand [its] footprint*" and

6   "*drive revenue growth*" from existing customers (i.e., "upsell"), including "*[c]ustomers that started*

7   *with Zuora Billing or Zuora RevPro can also subscribe to the other flagship product[.]*" Zuora also

8   said it would "*focus on acquiring new customers through [its] flagship products, Zuora Billing*

9   *and Zuora RevPro.*" As Zuora noted, it expected future growth opportunities for RevPro because as

10   "*many industries transition[] to subscription business models,*" those businesses will "*increasingly*

11   *realize that their existing systems are insufficient.*"

12        188.   The statements in the Registration Statement as alleged in paragraphs 186-187 above

13   were false and misleading.  In truth, as described above, and as corroborated by reliable former

14   Zuora employees, and by Defendants themselves after the Class Period, the integration failure

15   between Zuora's flagship products was resulting in severe sales execution issues, reduced upsell

16   opportunities, and diminished demand for Zuora Central and other homegrown products such that the

17   described method for revenue growth was not viable or sustainable.  Defendants' statements

18   identified in paragraphs 186-187 also omitted material facts corroborated by former Zuora

19   employees and of which Defendants were aware and had knowledge of, including that the failed

20   integration reduced revenues and caused sales execution problems.  Having spoken directly on the

21   issue of customer demand and cross-selling or upselling opportunities with Zuora Billing and Zuora

22   RevPro, Defendants were bound to provide these omitted facts to avoid misleading investors.

23   **D.**     **Statements In Zuora's Quarterly Reports**

24        189.   During the Class Period, Zuora filed quarterly reports with the SEC pursuant to

25   Section 13 or 15(d) of the Securities Exchange Act of 1934 filings on June 13, 2018, September 12,

26   2018 and December 13, 2018. These Quarterly Reports, which were signed and approved by

27   Defendants Tzuo and Sloat, contained similar false statements regarding Zuora's offering of a fully-

28

integrated, single system of record for subscription businesses. Specifically, these Quarterly Reports contained the following statements:

> We provide cloud-based software on a subscription basis that enables any company in any industry to successfully launch, manage, and transform into a subscription business. ***Architected specifically for dynamic, recurring subscription business models, our solution functions as an intelligent subscription management hub that automates and orchestrates the subscription order-to-cash process, including quoting, billing, collections, analytics, and revenue recognition. We offer businesses the ability to meet the constantly-evolving needs of their subscribers, capitalize on new revenue opportunities, and accelerate business growth***.

190.    The statements in the Quarterly Reports as alleged above were false and misleading. In truth, as described above, Zuora's solution could not automate and orchestrate the subscription order-to-cash process, including billing and revenue recognition. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Defendants' statements identified in paragraph 189 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro.  Having spoken directly on the subject of Zuora's solution's functionality, Defendants were bound to provide these omitted facts to avoid misleading investors about the true capabilities of the Zuora's platform and its related products Zuora Billing and Zuora RevPro.

**E.      Defendants' False Statements At The Q1 2019 Earnings Call**

191.    On May 31, 2018, Zuora held an earnings conference call with investors to report its fiscal year 2019 first quarter results. In his opening comments, Defendant Tzuo highlighted Zuora's offering of a "complete subscription management solution":

> ***[W]e continue to offer the only complete subscription management solution, 100% focused on helping companies of all sizes launch, scale, and transform into a subscription business.*** Third, we continue to believe that the changing expectations around IT architectures are creating a once-in-a-generation opportunity for us to build



1    an enduring enterprise software company. And lastly, for investors, for you, we
2    continue to see an investment in Zuora as a portfolio play on this entire subscription
     economy.

3        192.    Defendant Sloat similarly described Zuora's business model as providing "cloud-

4    based software that enables any company in any industry to successfully launch, manage, and

5    transform into a subscription business."

6        193.     Defendant Tzuo also offered the following description of Zuora Central, emphasizing

7    the platform's ability to "orchestrate and automate the entire subscription order-to-cash process:"

8        Now, all of our products are underpinned, of course, by our Zuora Central Platform.
         *It's a dynamic hub designed specifically to orchestrate and automate the entire*
9        *subscription order-to-cash process. This is done through our six core engines,*
         *including our pricing engine, subscription order, rating, global payments,*
10       *subscription metrics, and subscription accounting. All contributing to make our*
         *solution the system of record around the transactional data for the customer.*

11       Now why is this important? Because when you look at our customers and you see
12       how they are standardizing on a CRM system, plus Zuora Central, *plus an*
         *accounting system all in the cloud, you could see an emerging three-cloud*
13       *architecture that modern companies are using to run these modern business*
         *models.*

14
15       194.    In response to an analyst question about Zuora's annual revenue and subscription

16   guidance being "materially above . . . the [s]treet," Defendant Tzuo again emphasized the strength of

17   Zuora's "full" solution:

         We're betting on a big trend of the shift of the subscription-based business model.
18       *And as the only company that provides a full solution, 100% focused on this*
         *business, we're kind of a portfolio play on the subscription economy.*

19
20       195.    Defendants also commented on the strength of demand for RevPro. In response to an

21   analyst question about the demand for RevPro with ASC 606 going into effect, Defendant Tzuo

22   stated that although ASC 606 was a "fantastic catalyst," there remained a "big tail" and "long-term

23   demand" for "sophisticated revenue recognition solutions" like RevPro:

24       ASC 606 was certainly a fantastic catalyst. *It really put the spotlight on why revenue*
         *recognition is complex.*

25       *We're still seeing a big tail for that, but I think what really excites us about the*
26       *market opportunity for revenue recognition is that the overall trend is not going*
         *away.* What's happening in the marketplace is when you use to sell products on a
         transaction basis, revenue recognition was pretty simple.

27
28       But more and more, that's not how businesses work. They've got these dynamic
         business models based around subscriptions, based around customers, based around

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 58
No. 3:19-cv-03422-SI


715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

services. ***And we see really long-term demand for more sophisticated revenue recognition solutions. And as a leading player of the market, we are truly excited.***

196.     In response to the same analyst question, Defendant Sloat reiterated the "continued demand" for RevPro and that Zuora saw "a lot of tailwinds" in the business:

> Yes, I'll take the financial result. We're not breaking out the RevPro-specific billings and revenue. ***However, we do see a lot of tailwinds in the business***. The deferred revenue hasn't come all the way through from what we purchased, but we are now looking at a lot of customers that have continued demand for both of our flagship products.
>
> We did talk about the professional services and I gave you those numbers because I do think that's important to see the trail-off of the 605 to 606 customers that are upgrading. Because we look at that as one-time as opposed to attached to a new business. ***But in general, we saw a strong demand for both products across the board.***

197.     One analyst noted the 112% retention reported in the earnings report was "quite strong," and asked how much of the retention was "upsell from transaction volume versus add-on adoption." Defendant Tzuo replied that Zuora' s strategy was based on the Company's ability to "not only attract brand new logos, companies that are entering the subscription economy, but also continue to drive growth within our installed base." Defendant Tzuo further stated that Zuora has:

> [C]reated really a multipronged strategy to do that. ***We have our add-on products certainly; we can cross-sell our two flagship products where you can start with billing and we can come back and sell you RevPro or vice versa.*** And we have a set of add-on products.

198.     In response to a follow-up question regarding net-revenue retention, Defendant Sloat reemphasized the "strong demand" for both Zuora Billing and RevPro, Zuora's two "flagship" products:

> But it feels really good. There was no meaningful change either in terms of the mix of the upsell and where it was coming from. ***There's just strong demand all the way around for both add-on products, both flagship products, and then volume. I mean, you can see the volume increase that we talked about: over $7 billion of process volume in Q1. These are all positives across the board.***

199.     Analysts reacted positively to the earnings results. A Jefferies analyst observed that the "strong top-line performance was driven by continued traction of Zuora's flagship billing product and RevPro." Jefferies also emphasized that the "RevPro Opportunity Has Legs" as "the complexities of revenue recognition for dynamic recurring revenue business models warrant the need for automating the related processes" and that "RevPro is both a cross-sell opportunity to existing

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

customers and upsell opportunity[.]"Jefferies further confirmed that management's statements about ERP vendors being "inadequate to meet the complexities of dynamic subscription business models" was "consistent with our customer due diligence." A Canaccord Genuity analyst said there were "clear signs Zuora's assertion that the subscription economy is upon us is coming true." Notably, Canaccord Genuity expressed confidence in Zuora's strong guidance because "we have known CFO Tyler Sloat for half a decade," and could "attest that he is about as far from a gunslinger as you can get, so this guide is almost certainly a signal that business trends are quite good."

200.    Defendants' statements at the May 31, 2018 Q1 2019 earnings call alleged in paragraphs 191-198 above were false and misleading. In truth, as discussed above, Zuora did not manage a complete subscription management solution and its platform and related products could not orchestrate and automate the entire subscription order-to-cash process, including both billing and revenue recognition. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Moreover, as corroborated by reliable former Zuora employees, and by Defendants themselves after the Class Period, the integration failure between Zuora's flagship products was resulting in severe sales execution issues, reduced upsell opportunities, and diminished demand for RevPro and other homegrown products.  Defendants' statements identified in paragraphs 191-198 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems.  Having spoken directly on the issue of Zuora's solution's functionality as well as customer demand and cross-selling or upselling opportunities with Zuora Billing and Zuora RevPro, Defendants were bound to provide these omitted facts to avoid misleading investors.



1    **F.    Defendants' False Statements At The Q2 2019 Earnings Call**

2         201.    On August 30, 2018, Zuora hosted an earnings conference call to report its FY 2019

3    second quarter results.

4         202.    During the call, Defendant Sloat summarized Defendant Tzuo's "vision for Zuora":

5        If you think back 5 months ago, and you're at our road show, you basically laid out
         our vision for Zuora. And it really boiled down to 3 things: first, that the shift to
6        Subscription Economy is a global trend and it's happening across all industries and all
         geographies; ***second, Zuora has built the only complete subscription management***
7        ***solution focused 100% on helping companies of all sizes, launch, scale and***
         ***transform into a subscription business***; and finally, as a result, we are the portfolio at
8        play across the entire Subscription Economy. And as a result of that, we have a
         unique opportunity to deliver sustainable long-term growth and build a great business.
9        So question, if we were doing a road show presentation today, would you be saying
         the same exact things?
10
11        203.    In response to an analyst question, Defendant Sloat offered further explanation for

12   why RevPro offered Zuora a "longer-term opportunity," specifically that the complexities of

13   subscription businesses require a program like RevPro to automate the process of revenue

14   recognition:

15       I think we're seeing 2 things. One, ASC 606 and IFRS 15 is a good driver for
         customers kind of last year when we talk about 605, 606 upgrade, but what we're
16       seeing is that companies had a time line. They had to get compliant and a lot of them
         chose to do that through kind of some manual band aid process, what we call. So
17       we're seeing those guys now. They've gone through their first integration. ***But they***
         ***know it's not sustainable, and they're going to need the revenue automation***
18       ***solution for 606 going forward. So those customers are still out there. But on top of***
         ***that, it's all about -- the reason we did the acquisition was not 606. It is about***
19       ***business model complexity that hits both your quote-to-cash solution as well as your***
         ***revenue automation.*** And that's really what we're seeing right now and the Hitachi
20       example of that Tien touched on that, that's all about just complexity and manual
         processes. ***And they wake up -- a customer wakes up, and they realize they've***
21       ***outsourced all revenue to some other place, and they've got tens and tens of bodies***
         ***doing this all manually. And that's not sustainable. And so that's where I think that***
22       ***the long kind of like tailwinds are going to be for 606 -- for RevPro.***

23        204.    Defendant Tzuo also touted Zuora's experience with ASC 606 implementation as an

24   "asset," and described Zuora's "expertise" with RevPro for revenue recognition:

25       Again, we feel good. I mean -- so when we look at this year, the company has grown
         significantly as an independent company, and they have never raised a venture
26       amount and so have limited ability to invest, and we've been able to invest in that
         business. ***And so -- look, when we pull back and you ask yourselves which company***
27       ***out there really has the most 606 experience, and I would bet that it's this team.***
         ***They've done, I mean, dozens or scores of 606 implementations. Ask around for all***
28       ***the tech companies that you guys cover. Chances are they're using RevPro for***



*revenue recognition. And so that expertise is an asset, especially when we can apply more distribution capability against their products.*

205.     Defendants' statements at the August 30, 2018 Q2 2019 earnings call alleged in paragraphs 201-204 were false and misleading.  In truth, as discussed above, Zuora had not built the complete subscription management solution it previously represented it had. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Moreover, as corroborated by reliable former Zuora employees, and by Defendants themselves after the Class Period, the integration failure between Zuora's flagship products was resulting in severe sales execution issues, reduced upsell opportunities, and diminished demand for RevPro and other homegrown products.   Defendants' statements identified in paragraphs 201-204 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems.   Having spoken directly on the issue of Zuora's solution's functionality, customer demand and cross-selling or upselling opportunities with Zuora Billing and Zuora RevPro, and sales execution and expertise, Defendants were bound to provide these omitted facts to avoid misleading investors.

**G.     Defendants' False Statements At The Q3 2019 Earnings Call**

206.     On November 29, 2018, Zuora held an earnings call to report its fiscal year 2019 third quarter results.

207.     During the call, Defendant Tzuo described how Zuora Billing and RevPro were based on a "simple concept to automate the financial complexities generated by subscription models." He



also described how Zuora's "value proposition [was] now more centered around automation and

efficiencies versus simply compliance":

> [Billing and RevPro are] ***both based on a simple concept to automate the financial complexities generated by subscription models that are highly, highly differentiated and mission-critical for our customers.***
>
> …
>
> So what we're finding is that many public companies rush to get compliance, but a lot of them did so manually with spreadsheets, and they found this to be a short-term Band-Aid solution. These companies are realizing that the real problem with never ASC 606. The bigger, more systemic trend is that these companies were struggling to scale their revenue operations because of all these new flexible-consumption recurring models that the companies were launching, and they couldn't do it with a manual Excel-based approach. ASC 606 was the thing that only highlighted the problem.
>
> …
>
> ***So you can see that the underlying demand hasn't gone away, but our value proposition is now more centered around automation and efficiencies versus simply compliance. [It's nice to see] this quarter, we also signed on other public companies like Carbonite and Pivotal who both chose RevPro all because we got the best revenue automation platform on the market, and there's a big, big difference between being compliant and being competitive.***

208.    Defendant Sloat echoed Defendant Tzuo's comment regarding why Zuora views its

value proposition as being more than helping companies become compliant:

> And that was the reason to bring on the RevPro product in the first place. ***The need for revenue automation is not just driven by ASC 606 compliant. It's a larger issue with many of these companies as the complexity of revenue recognition limits their ability to efficiently scale and meet their business goals. That's why we continue to see good demand for our RevPro product.***

209.    In response to an analyst question regarding gross retentions, Defendant Tzuo

emphasized Zuora's success "bringing customers live" on Zuora's platform:

> So you obviously understand SaaS companies with subscription model, churn is going to have a big swing effect. So it's something that I wouldn't say there's anything that we put in place in the last 90 days, but it's obviously a huge focus of ours, and we hope to continue to show continuous improvements year-over-year on these numbers. ***And so we feel really good. I think we benefited from the fact that we have a very sticky product, and when you look at our product, once it goes in, whether it's on billing on the revenue recognition side, right, it's sticky. It's running company's core operations. It's the heart of the businesses. And so the 2 factors for us that influence churn are, one, how are well are we doing bringing customers live, and that's where we continue to show improvements year-over-year.***

210.    Defendants' statements at the November 29, 2018 Q3 2019 earnings call alleged in

paragraphs 206-209 were false and misleading.  In truth, as discussed above, RevPro could not

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

automate the financial complexities generated by subscription models and Zuora's "value proposition" was not "more centered around automation and efficiencies versus simply compliance." In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro. For example, this integration defect led to Zuora pausing the implementation of RevPro at Carbonite, a company Defendants identified as a new RevPro customer during the November 29, 2018 earnings call. In addition, contrary to Defendants' statements regarding their "very sticky product", and as corroborated by reliable former Zuora employees, the integration defect caused serious sales execution problems, reduced upsell opportunities, and diminished demand for RevPro. Defendants' statements identified in paragraphs 206-209 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems. Having spoken directly on the issue of RevPro's ability to automate financial complexities generated by subscription models and customer demand and cross-selling or upselling opportunities, Defendants were bound to provide these omitted facts to avoid misleading investors.

**H.    Defendants' False Statements In December 1, 2018 TheStreet.com Article: "Zuora's CEO and CFO Talk to The Street About Their Firm's Growth Outlook and More"**

211.    In a December 1, 2018 article on TheStreet.com, Defendant Tzuo discussed how subscription business models are "wreaking havoc" on billing and revenue recognition, which presented an opportunity for Zuora:

> When asked about Billing and RevPro cross-selling, Tzuo indicated that the percentage of clients using both solutions (said to be below 10% three months ago) is still low. But he added that the company did successfully cross-sell RevPro to some major clients last quarter, such as Pivotal Software and Carbonite, and argued that the challenges involved financially managing subscription businesses will drive additional traction.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 64
No. 3:19-cv-03422-SI


715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

*"I think the broader message is, companies are realizing [that] these new business models...are just wreaking havoc in their financial operations," he said. "And the two key areas that [they're] wreaking havoc on is billing and revenue recognition."*

212.    Defendant Tzuo's statements in the December 1, 2018 TheStreet.com article were false and misleading. In truth, as discussed above, Zuora Billing and Zuora RevPro could not handle the "havoc" in billing and revenue recognition caused by subscription business models. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro. For example, this integration defect led to Zuora pausing the implementation of RevPro at Carbonite, a company identified as a "successful cross-sell" in the December 1, 2018 TheStreet.com article.  In addition, contrary to Defendant Tzuo's statements regarding Zuora's ability to cross-sell, and as corroborated by reliable former Zuora employees, the integration defect caused serious sales execution problems, reduced upsell opportunities, and diminished demand for RevPro.   Defendant Tzuo's statements also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems.  Having spoken directly on the issue of RevPro's ability to handle the "havoc" generated by subscription models and customer demand and cross-selling or upselling opportunities, Defendants were bound to provide these omitted facts to avoid misleading investors.

## I.    Defendants' False Statements At The January 15, 2019 Needham Growth Conference

213.    On January 15, 2019, Defendant Sloat attended the Needham Growth Conference and participated in a Q&A session.

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

214.    To begin the discussion, Defendant Sloat offered the following description of Zuora and its business model, again emphasizing Zuora's ability to successfully allow companies to "launch, manage and grow their subscription base":

> Sure. So, if you're not familiar with Zuora and what we do, because the name explains everything, obviously. *We are really the only public company focused on subscription management. So, what do we mean by subscription management? We are a software company. Our platform allows our customers to launch, manage and grow their subscription base.* That gets reflected often times in the word Billing because it happened to be a very complex transaction set that comes out of it. And that's one of our two flagship products. Our other flagship product is Revenue Recognition.

215.    Thereafter, Defendant Sloat highlighted Zuora's cross-selling and up-selling of its core products to customers stating, "***But on the upsell component, it is a mix of companies buying other products where you could be a billing customer and you're buying RevPro or vice versa. We still have less than 10% overlap of our customer base using both of our flagship products, but we do see a lot of traction starting there***."

216.    At the conference, in response to a question asking Defendant Sloat to speak to the functionality of RevPro, Defendant Sloat emphasized the demand Zuora was receiving for the product from existing Billing customers, how Zuora's acquisition of RevPro resolved the complexities customers faced with revenue recognition while operating a subscription-based model, and that RevPro obviated the need for "manual processes":

> We bought the Leeyo business; we brought on the RevPro product not because of ASC 606, even though there is a great tailwind behind that. We brought it on because we know that there's a lot of complexity that's driven from subscription business models and it breaks your downstream revenue, and we were seeing as for our customer base. In fact, our customer base is coming to us and say, hey, if you can't solve this for us, we're going to have to go figure out how to solve it ourselves. We had always had billing-based revenue recognition, but ASC 606 demands bookings-based revenue recognition, and that is what the RevPro product does. We knew all the players in that market and we had partnered with a lot of them, Leeyo was already a partner and we brought them on board. In our last call, we highlighted a couple of companies – a couple of existing billing customers that brought us on for RevPro. But we also highlighted public companies like Veeva who had already gotten ASC 606 compliant but then brought us on for RevPro because to point [out] a lot of companies are actually putting band-aids on this solution, they're using Excel to get compliant, and again to the first audit, but they realize that is not a sustainable solution, and *that there's a ton of manual processes and those manual processes inevitably will force companies to bring in an actual software solution to manage those for them*.



217.    Defendant Sloat expressed confidence that Zuora could handle the "complexities" of revenue recognition:

> Yeah. Yeah, the revenue recognition – the complexity is coming around the different charge models that they have and the different – the way the company will sell, right. And then now, with ASC 606, you got have to be able to quantify everything and come off the SSP for every single product that you sell and then you have to be able to kind of itemize them out so when you bring it into the system, they could actually look at the whole order and then what the potential incremental buys of the customer might make against that order. ***What we find is that companies, if they think it's very simple as you dig through and you look historically how the way they sell and you actually kind of itemize every single, what we call charge model, that's where the complexities come in. We can still to handle them; you've just got to be able to actually document them all.***

218.   The statements made during the January 15, 2019 Needham Growth Conference as alleged in paragraphs 213-217 were false and misleading. In truth, as discussed above, Zuora's platform could not allow its "customers to launch, manage and grow their subscription base," Zuora RevPro could not resolve the complexities faced with revenue recognition while operating a subscription business, and Zuora RevPro did not obviate the need for manual processes. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  In addition, contrary to Defendant Sloat's statements regarding Zuora's ability to cross-sell, and as corroborated by reliable former Zuora employees, the integration defect caused serious sales execution problems, reduced upsell opportunities, and diminished demand for RevPro.   The statements also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems . Having spoken directly on the issue of RevPro's ability to handle the complexities of revenue recognition for subscription businesses and customer



1    demand and cross-selling or upselling opportunities, Defendants were bound to provide these

2    omitted facts to avoid misleading investors.

3    **J.    Defendants' False Statements At The February 13, 2019 Goldman Sachs Technology &**
     **Internet Conference**

4
5    219.    On February 13, 2019, Defendant Tzuo attended the Goldman Sachs Technology &

     Internet Conference and participated in a Q&A session.

6
7    220.    During the conference, Defendant Tzuo described Zuora's role in the "digital

     transformation" of companies, which involve "true, true big, sticky implementations" that previously

8    carried Oracle and SAP through "decades," and could now do the same for Zuora:

9
             So it's -- the SIs are really, really important for what we do, right. ***If you look at what***
10           ***we did, it's digital transformation, in these companies. And so yes, there's a billing***
             ***revenue recognition subscription management engine, but there's a broader***
11           ***business model transformation, there's a broader process transformation.***

12           …

13           ***But from a long-term perspective, it is these big implementations where you go into***
             ***a company and you transform what the company does, and you're running the***
14           ***company's business. These are the true, true big, sticky implementations that***
             ***carried Oracle through, right, decades, it's carried SAP through decades. And***
15           ***that's our world.*** And the SIs are definitely a big, big part of that world. And so we
             started talking about that, right, a couple of quarters ago on an earnings call,
16           highlighting projects and accounts where we're working together, and we've signaled
             that you're going to see that trend continue to increase, right, just on a natural basis
17
18   221.    During the conference, the Goldman Sachs representative asked Defendant Tzuo

     specifically about the cross-selling opportunities the RevPro acquisition presented among Zuora's

19
20   existing clients:

21           From a product perspective, you got your core billing product, and through an
             acquisition, you added RevPro, which helps companies gets ASC 606 compliant. I
22           think the attach rate for RevPro is about 10% today, but given the importance of
             companies becoming compliant with 606, can you talk about the path of that, that
23           attach improving over time?

24   222.    In response, Defendant Tzuo emphasized that the subscription economy's complexity

     was "destroying -- Oracle, SAP, it's destroying all the traditional accounting systems. And we can

25
26   see this. We can see this because every SaaS company is wrestling with this." By contrast, at Zuora,

     Defendant Tzuo stated,

27
28           *[W]e understand how to do this on the billing side. At a high level, it's the same*
             *idea on the revenue recognition side, but it was complex enough, we said, look, we -*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 68
No. 3:19-cv-03422-SI



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

*- we get this great partner that our customers are using, and we wound up acquiring these guys*. But if you think about the level of billing complexity that we absorb -- revenue complexity is probably like another order of magnitude higher. And it's not going away, right? It's not going away. So people think okay, well this is just a compliance thing, right? So like the old GRC thing, where there's a period in time or a SOX thing, where you have to put in ASC 606 compliant solution, and you put it in, and you're done. No it's not ASC 606, it's the complexities of all these new business models that are destroying the finance department.

223.    Defendant Tzuo's statements made during the February 13, 2019 Goldman Sachs Technology & Internet Conference as alleged in paragraphs 219-222 were false and misleading. In truth, as discussed above, Zuora could not adequately perform for its customers "true big, sticky implementations" resulting in a "broader process transformation," and Zuora did not "understand" how to do billing for subscription businesses. In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  In addition, contrary to Defendant Tzuo's statements regarding Zuora's ability to cross-sell, and as corroborated by reliable former Zuora employees, the integration defect caused serious sales execution problems, reduced upsell opportunities, and diminished demand for RevPro.  Defendant Tzuo's statements identified in paragraphs 219-222  also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems.  Having spoken directly on the issue of RevPro's ability to handle the complexities of billing and revenue recognition for subscription businesses and customer demand and cross-selling or upselling opportunities, Defendants were bound to provide these omitted facts to avoid misleading investors.



1

**K.      Defendants' False Statements At The February 26, 2019 Morgan Stanley Technology, Media & Telecom Conference**

2

224.    On February 26, 2019, Defendant Sloat attended the Morgan Stanley Technology,

3

Media & Telecom Conference and participated in a Q&A session.

4

225.    In the beginning of the session, Defendant Sloat reiterated that Zuora was the "*only*

5

*pure play business doing what we do, which is essentially enabling our customers to launch,*

6

*manage, transform [and] account for their subscription business*."

7

226.    Defendant Sloat also discussed how Zuora's solution was "*designed to think about*

8

*[Zuora's] customer and the entire transaction set around the customer,*" which requires a

9

"*complete re-architecture*" of a company's prior system.

10

227.    During the session, Defendant Sloat repeated Zuora's view that companies looked to

11

Zuora to not just become compliant, but to transform their business model. Therefore, as noted by

12

Defendant Sloat, Zuora operates under a premise that "every billing customer will eventually need a

13

revenue automation solution":

14

> Yeah. So there are still different buyers, like the RevPro sales got a technical
> accounting, so we're selling to a controller ahead of revenue or something like that
> and trying to solve a specific problem. *That specific problem is revenue automation.*
> *Now, the reason we did that is our customers were actually telling us, hey, we need*
> *your help in solving our revenue problem, and with ASC 606 revenue problem*
> *much more complex, but the reality is the long game is that in business model*
> *transformation in a subscription model,* and I should clarify, subscription, we're
> talking, $10 a month, $120 a year, we are talking about a customer centric model that
> can have any kind of charge model that's surrounding it that you want, it could be
> premium all the way to pure usage. *And the simple subscription is part of it clearly,*
> *but that complexity that that happens here breaks a lot of downstream things. And*
> *one of those things is revenue. And so the premise is that every billing customer will*
> *eventually need a revenue automation solution.*

15
16
17
18
19
20

21

228.    Defendant Sloat was also asked for his thoughts on RevPro on a "going forward

22

basis." Like with other statements during the Class Period, Defendant Sloat emphasized that Zuora's

23

customers were not only looking to become compliant, but were addressing complexities resulting

24

from recognizing revenue in a subscription business. Defendant Sloat also said Zuora felt "pretty

25

good" about its ability to offer a solution for companies dealing with the complexities resulting from

26

revenue recognition:

27

> *So I think it still holds that the complexity will break your revenue automation*
> *regardless of ASC 606 or not. I don't think the tail end of ASC 606 is done.* We

28



1    highlighted a company on our Q3 call that it gotten ASC 606 compliant through
     spreadsheets, which a lot did because they ran out of time. Yet, the ASC 606 is not
2    like socks where you kind of get [indiscernible] (00:22:56) doing some ongoing
     validation. ASC 606 you actually have to get audited every single year and things like
3    SSPs and things like that can change. ***And so you actually have to have a solution
     that can spit out a number. Ironically, I think it's going to be like a lot of work for a***
4    ***lot of companies to get to that auditable solution, yet still may not change the***
     ***numbers. But you have to go through the work to prove it. So we feel pretty good***
5    ***about it.***

6         229.    The statements made during the February 26, 2019 Goldman Sachs Technology &

7    Internet Conference as alleged in paragraphs 224-228 were false and misleading. In truth, as

8    discussed above, Zuora's platform could not "enabl[e] [its] customers to launch, manage, transform

9    [and] account for their subscription business," Zuora could not actually offer "every billing

10   customer" a "revenue automation solution," and Zuora had no basis to "feel good" about its ability to

11   address the complexities resulting from recognizing revenue in a subscription business.  In particular,

12   customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the

13   two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to

14   remove the friction from reconciling the two systems would be for the client to either export the data

15   from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a

16   significant amount of resources to build a customized integration that ingests the required data from

17   Zuora Billing into Zuora RevPro.  In addition, contrary to Defendant Sloat's statements regarding

18   Zuora's ability to cross-sell, and as corroborated by reliable former Zuora employees the integration

19   defect caused serious sales execution problems, reduced upsell opportunities, and diminished

20   demand for RevPro.  Defendant Sloat's statements identified in paragraphs 224-228 also omitted

21   material facts corroborated by former Zuora employees and of which Defendants were aware and

22   had knowledge of, including (i) the failure of the "Zuora on Zuora" and "Keystone" integration

23   projects and their customers' frustration over the failed integration between Zuora Billing and Zuora

24   RevPro; and (ii) the failed integration reduced revenues and caused sales execution problems.

25   Having spoken directly on the issue of Zuora's platform's functionality, RevPro's ability to handle

26   the complexities of billing and revenue recognition for subscription businesses and customer demand

27   and cross-selling or upselling opportunities, Defendants were bound to provide these omitted facts to

28   avoid misleading investors.

HB HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

**L.     Defendants' False Statements At The Q4 2019 and Full FY 2019 Earnings Call**

230.     On March 21, 2019, Zuora held an analyst conference call to report its FY 2019 fourth quarter and full year results.

231.     At the start of the call, Defendant Tzuo proclaimed that Zuora was the "***only game in town if you're looking for a complete end-to-end subscription platform, including billing and revenue recognition.***" Similarly, Defendant Tzuo stated that Zuora was the "***only choice when it comes to putting the platform to drive [] growth" for subscription businesses.*** Further, Defendant Tzuo proclaimed, "***We're scaling our business and getting more efficient while we're doing it***."

232.     After delivering their prepared remarks, the Defendants fielded questions from analysts, including Hamza Fodderwala of Morgan Stanley, who asked Defendant Tzuo a series of questions about Zuora sales execution. In particular, Fodderwala asked, "[W]here do you feel you are in terms of from a sales execution standpoint? What's left as far as sales hiring? Where are you hiring? And particularly, around aligning the existing RevPro sales force and the Zuora billing sales force, where are you there as well?"

233.     In response, Defendant Tzuo stated:

> "We feel really good. I mean we have a whole team in place now that's taking our learnings of how to make this business model work. ***And we have 2 big competitive moats. One is obviously the technology***, and the other one, we believe that's just as important is our go-to-market expertise of how to engage with companies and how to help them understand what are the elements … . But we think we got knowledge. We've got a whole team that knows how to find the right folks, bring them onboard. We're doing a good job of hiring. We're doing a good job at enablement. We scaled this worldwide already. It was important for us to break through the international learnings actually before we went public, and so you're seeing our international business growing really, really well. But we feel good about where it is."

234.     The statements made during the March 21, 2019 Q4 and FY 2019 earnings call as alleged in paragraphs 230-233 were false and misleading. In truth, as discussed above, Zuora could not offer an "end-to-end subscription platform, including billing and revenue recognition," and Zuora's technology, in reality, did not offer a "competitive moat." In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems. Rather, as corroborated by former Zuora employees and Defendants, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro.  Defendant Tzuo's statements identified in paragraphs 230-233 also omitted material facts corroborated by former Zuora employees and of which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora" and "Keystone" integration projects and their customers' frustration over the failed integration between Zuora Billing and Zuora RevPro. Having spoken directly on the issue of Zuora's platform's functionality, Defendants were bound to provide these omitted facts to avoid misleading investors.

**M.     Defendants' False Statements In the April 18, 2019 Annual Report**

235.     On April 18, 2019, Zuora filed its Annual Report with the SEC on Form 10-K, which was signed by Defendants' Tzuo and Sloat. The 10-K echoed previous statements regarding the integrated nature of Zuora's "order-to-revenue process":

> Zuora is a leading cloud-based subscription management platform. ***We provide software that enables companies across multiple industries and geographies to launch, manage or transform to a subscription business model. Architected specifically for dynamic, recurring subscription business models, our cloud-based software functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-revenue process, including billing and revenue recognition.*** Our solution enables businesses to easily change pricing and packaging for products and services to grow and scale, to efficiently comply with revenue recognition standards, and to build meaningful relationships with their subscribers.

236.     In contrast, the Zuora 10-K described how "[***m]any of today's enterprise software systems that businesses use to manage their order-to-revenue process were built for a product driven economy, and are extremely difficult to reconfigure for the dynamic, ongoing nature of subscription services.***"

237.     Like with its Registration Statement, Zuora identified its **"[c]omprehensive solution built specifically to handle the complexities of subscription business models"** as a "Competitive Strength." Specifically, Zuora stated that its solution "***functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-revenue process," and is "[a]rchitected specifically for dynamic subscription business models.***"



1    238.    The 10-K also promoted Zuora's ability to deploy and configure its solution on its

2    clients internal systems: "***We can deploy and configure our portfolio of order-to-revenue products***

3    ***to meet a wide variety of use cases for subscription business models,***" including Zuora Billing and

4    Zuora RevPro.

5    239.    The 10-K also emphasized that Zuora's solution "Free[d] Up IT and Engineering

6    Resources," and that with Zuora, "***engineering and IT departments no longer need to build in-***

7    ***house custom systems or customizations for their Enterprise Resource Planning (ERP) systems to***

8    ***keep up with market changes, ongoing customer demands, and new order-to-cash processes.***"

9    240.    The statements in the 10-K as alleged in paragraphs 235-239 above were false and

10    misleading. In truth, as discussed above, Zuora's solution (i) could not automate and orchestrate the

11    entire subscription order-to-cash process, including billing and revenue recognition; (ii) could not be

12    deployed and configured to concurrently operate Zuora Billing and Zuora RevPro at its intended use;

13    and (iii) did not obviate the need for customers' engineering and IT departments to build in-house

14    custom systems or customizations for their ERP systems to address subscription order-to-cash

15    processes. In particular, customers using both Zuora Billing and Zuora RevPro were unable to

16    integrate the data between the two systems. Rather, as corroborated by former Zuora employees and

17    Defendants, the only way to remove the friction from reconciling the two systems would be for the

18    client to either export the data from Zuora Billing and import it into Zuora RevPro manually for

19    revenue recognition, or invest a significant amount of resources to build a customized integration

20    that ingests the required data from Zuora Billing into Zuora RevPro.  The statements identified in

21    paragraphs 235-239 also omitted material facts corroborated by former Zuora employees and of

22    which Defendants were aware and had knowledge of, including the failure of the "Zuora on Zuora"

23    and "Keystone" integration projects and their customers' frustration over the failed integration

24    between Zuora Billing and Zuora RevPro.  Having spoken directly on the subject of Zuora's

25    solution's functionality, Defendants were bound to provide these omitted facts to avoid misleading

26    investors about the true capabilities of the Zuora's platform and its related products Zuora Billing

27    and Zuora RevPro.

28

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

## VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

241.    Numerous facts in addition to those set forth above give rise to a strong inference that Defendants knew, or were deliberately reckless in not knowing, that their statements about the functionality of Zuora's Platform and software application products were false and misleading or omitted material facts necessary to make them not misleading when made.

242.    ***Defendants were unsuccessful in integrating and implementing RevPro within Zuora internally***.  Defendants knew of the Billing-RevPro integration failure before and throughout the entirety of the Class Period based on Zuora's failure to effectively integrate and implement RevPro internally.  According to former Zuora executive, it is an industry best practice to try to test your own product and to implement it internally before you actually take it out and sell it to a customer(¶68).   Despite working diligently on the "Zuora on Zuora" or "ZoZ" project, together with the ZoR extension of the project, Defendants failed to successfully connect RevPro internally through an automated solution (¶¶76-78).  In particular, Zuora encountered the same integration failure customers experienced in performing an implementation of RevPro on its internal systems. *Id*. Indeed, the only way for Defendants to get RevPro online on Zuora's systems by April 2018 was after conducting a time and labor-intensive manual input of Billing data into the RevPro's system (¶78).  However, due to the manual implementation, Zuora then had to do a two-year retest, which CW-1 said continued at Zuora into at least March 2019. *Id*.  Given that Zuora failed to successfully configure and deploy RevPro internally, it is not plausible that Defendants did not know about the integration failure when making their misstatements and omissions.

243.    ***Defendants took undisclosed steps that show their knowledge of the significant technical challenges to integrating RevPro and Billing***. According to former Zuora employees, at the same time Defendants were promoting the superior functionality and configuration of its solution on customers' systems, the Company secretly worked for years to develop a solution for the Billing-RevPro integration failure.  Specifically, according to former Zuora employees, beginning in early 2018 through March 2019, Defendants worked on an unsuccessful integration technology project codenamed "Keystone" (¶¶79-84).  However, after failed internal tests and tests on customers, reflecting that the Keystone technology and related OrderMetrics solution, Defendants determined

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

that Keystone could not deliver the represented functionality for RevPro (¶119), as it did not have all

the data points needed for RevPro (¶83), as 80 to 90 percent of Zuora's customers would not be able

to use the Keystone integration.  (¶84).  In or about February or March 2019, Zuora's executives

acknowledged the failure of the Keystone project and decided to abandon the project in favor of a

separate technological approach internally called the K-2 Project, which project remains ongoing

(¶119).

244.    ***Defendants' direct and extensive involvement in developing and marketing Zuora's platform and products, acquiring and integrating Leeyo, and leading the Billing-RevPro integration efforts***.  Defendant Tzuo is a co-founder of the Company, has been with the Company since its inception, and was its CEO during the entirety of the Class Period.  He has publicly touted his knowledge of the Zuora solution and involvement in the integration of Leeyo and its RevPro product.  Defendant Tzuo signed and certified the Company's SEC filings during the Class Period, as well as regularly spoke to investors about Zuora's solution's capabilities.  Similarly, Defendant Sloat was the Company's long-time CFO including throughout the Class Period.  Defendant Sloat has promoted his "owning of the business" model and he also led the internal Zuora on Zuora implementation project as well as technical Billing-RevPro integration projects.

245.    ***Defendants were informed at internal meetings and had access to internal contemporaneous reports and data contradicting their statements to investors***. Defendants attended meetings, as well as received, reviewed and had access to reports and data, which undermined their representations to investors about the functionality and the associated demand of Zuora's solution.  For example, the Executive Defendants received testing reports and participated in monthly "Zuora on Zuora" or "ZoZ" project meetings where they were briefed on the progress of the internal implementation and implementation failure was discussed (¶¶85-87).  Similarly, Zuora's executives had access to reports detailing the status of the Keystone Project and were also apprised of the result of the Keystone failure through a multitude of internal meetings.  In addition, senior management at Zuora, including the Executive Defendants, knew about customer dissatisfaction with the Keystone integration through a multitude of sources, including group forums, meeting minutes and global summaries of all the forums, quarterly review meetings, and customer focus groups all detailing the



1    Keystone Project's failure and the integration failure with respect to customers (¶¶93-97).  In

2    addition, the Executive Defendants were informed of the results of sales team meetings identifying

3    customers that were upset with the integration and lost sales opportunities.  The Executive

4    Defendants further had access to the Company's SalesForce database that identified these and other

5    client-specific issues (¶¶107, 109).

6    246.    ***Defendants were informed directly by their customers with information***

7    ***contradicting their statements to investors***. Defendants, including Defendant Sloat attended client

8    forums where he other Zuora executives received negative feedback from customers informing him

9    and other executives that Zuora had not been able to get the solution to work as advertised on their

10    systems.  In addition, Defendant Tzuo was informed through, among other things, email chains that a

11    major customer of Zuora, Zoom, was so dissatisfied with the solution that it spent substantial sums of

12    its own money to come up with an integration fix and withheld payment to Zuora (¶¶96, 107).

13    247.    ***Defendants' admissions to their colleagues support of a strong inference of***

14    ***scienter***.  The Executive Defendants acknowledged the integration failure in advance of Zuora going

15    public.  During a monthly "Zuora on Zuora" or "ZoZ" project meeting in early 2018, Defendant

16    Sloat told the project team about how Zuora was "going to market as a combined product for ASC

17    606," that the market needed a seamless solution and that "***Zuora needed to get its act together with***

18    ***RevPro*** (¶75).  Further, in late 2018, Tien Tzuo gave Jagan Reddy and other executives a directive to

19    start K2, acknowledging that Keystone/OrderMetrics wasn't working (¶119).

20    248.    ***Zuora's Senior Executives' insider sales during the Class Period were unusual and***

21    ***suspicious in both timing and amount***. During the Class Period, Defendant Sloat made $16.89

22    million insider sales. The first significant sale occurred on September 7, 2018, after Defendants

23    admit they knew of the integration issue, and earned Defendant Sloat approximately $8.8 million.

24    The second significant sale occurred on March 28, 2019, just a week after Zuora announced positive

25    fourth quarter fiscal year 2019 and full fiscal year 2019 results, but just one month before Zuora's

26    disastrous first quarter fiscal year 2020 ended. Another Zuora insider, Marc Diouane, who was

27    relieved of his position as President and head of sales when Zuora disclosed significant issues

28    involving sales execution and the integration of RevPro with Zuora billing, earned approximately

HAGENS BERMAN
715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1   $11.13 million in insider sales. Notably, nearly half of Mr. Diouane earnings from insider sales came

2   in a transaction on April 30, 2019, which was the final day of Zuora's first quarter fiscal year 2020,

3   and only a month before Zuora announced his removal. Both Defendant Sloat and Mr. Diouane

4   would have made substantially less had the stock price not been artificially inflated.

5          249.    These sales are further suspicious in terms of amount and timing when compared with

6   sales during a period of similar length. Indeed, after the close of the Class Period up to the filing of

7   this complaint, neither Defendant Sloat nor Diouane have sold any shares they owned or controlled.

8   Moreover, while certain of these sales were made pursuant to 10b5-1 plans, Defendants entered into

9   those plans during the Class Period while they were in possession of material non-public

10  information.

11         250.    ***Defendants' post-Class Period admissions that they knew of the integration failure***

12  ***and began work to address it in late spring 2018 or early summer 2018, yet failed to disclose such***

13  ***information while continuing to promote the functionality of Zuora's solution***. At the May 30,

14  2019 earnings call, in responding to an analyst's question as to why the two systems had not been

15  integrated given that Zuora had acquired Leeyo two years ago in 2017, Defendant Tzuo stated that

16  the Company had been focused on getting RevPro customers live prior to the ASC 606 deadline and

17  "didn't really have time and the resource to focus on the integration between [Billing and RevPro]

18  until after the 606 [wave] was complete." Defendant Tzuo admitted that the Company started "heavy

19  work on the integration [] early last summer, late spring, early last summer. And long story short, we

20  went down one direction that proved to be a dead end, a false direction." Moreover, post-Class

21  Period, Defendants admitted that, unbeknownst to investors, for the past year Company had been

22  making extraordinary efforts to technically integrate the two products to make sure "that people that

23  have our Billing product could also buy RevPro and have a clean integration across it." However,

24  these efforts were unsuccessful, and as a result, the Company had to pause implementations that

25  Zuora had with Billing customers who had recently bought RevPro until the integration work was

26  completed. Defendants also admitted that these paused implementations delayed cross-selling efforts

27  with other customers.

28

HB HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

251.   ***It is absurd to suggest that Defendants were not aware of the Billing-RevPro Integration because the integration issue affected Zuora's core operations***. Virtually all of Zuora's revenues come directly or indirectly from its sale and implementation of its platform and related software application products that are impacted by this integration issue. Thus, the problem that the RevPro-Billing integration failure presented was so prominent it is not plausible that Tzuo, Sloat and other Zuora senior management, including Diouane, did not know about those problems when making false statements about the functionality of Zuora's solution.

252.   ***The temporal proximity between Defendants' false statements and omissions and revelations of the truth supports an inference of scienter***. On April 18, 2019, Zuora filed with the SEC its Annual Report for fiscal year 2019 on Form 10-K. This filing contained false and misleading statements concerning the Company's ability to concurrently deploy its two flagship products, Zuora RevPro and Zuora Billing. Just a little over a month later, on May 31, 2019, Zuora disclosed significant technical issues in integrating Zuora RevPro with Zuora Billing, that the technical issues adversely impacted revenue in both the first quarter but also for the entire fiscal year 2020, and that the work necessary to complete the integration would not occur until at least the end of the third quarter of fiscal year 2020. The close temporal proximity between the April 18, 2019 false statements and the May 10, 2018 disclosure supports a strong inference of Defendants' scienter.

253.   ***Defendants implemented significant management and operational changes after the end of the Class Period***. As discussed above, on May 30, 2019, the Company announced a change in sales leadership, disclosing that Marc Diouane would be immediately leaving his role as President and Head of Sales and would only be staying with the Company as advisor during the transition phase in securing new leadership. Defendants also announced realignment in the Company's entire sales structure, placing sales representatives under experienced managers. The Company further announced a change in its sales strategy, moving from a broad brushed "build the market" to executing on the pipeline, which would be done under a new head of sales.

254.   ***The Executive Defendants held themselves out as knowledgeable about and highly involved in the integration of RevPro and Billing***. The Executive Defendants held themselves out in their public statements as personally familiar with the Company's sales and



1    implementation process, including integration of RevPro with Billing. Indeed, Defendants repeatedly

2    touted their "full visibility" full visibility" into sales and deployment process. In addition, during the

3    Class Period, including at the May 31, 2018, August 31, 2018 and November 29, 2018 earnings calls,

4    Defendant Tzuo regularly spoke to investors and securities analysts regarding, among other topics,

5    the functionality of and demand for Zuora's RevPro product, and cross-selling opportunities RevPro

6    provided, including customer-specific examples. Similarly, Defendant Sloat held himself out as

7    personally knowledgeable about the impact RevPro was having on Zuora's reported financials,

8    including its revenue contributions. Finally, after the Class Period, on June 6, 2019, given the

9    importance of integrating the two flagship products, Defendant Tzuo stated he personally would be

10   leading the charge to drive product innovation and completion of the integration project.

11        255.   ***Defendants' misrepresentations were necessary to go public***. Defendants made many

12   of their misrepresentations and omissions while soliciting funds from investors in their initial public

13   offering, with their misstatements allowing the Company to complete their long-desired IPO. Once

14   public, Zuora executives and insiders, including Defendant Sloat and Diouane, sold substantial

15   amounts of personal shares in Zuora, which they otherwise could not have accomplished without

16   becoming a public company.

17        256.   ***Defendants repeatedly spoke on the subject matters misrepresented***.  The Executive

18   Defendants made repeated statements to investors about the functionality of Zuora's solution

19   throughout the Class Period in a multitude of press releases, social media messages, quarterly and

20   annual reports filed with the SEC and signed by and/or approved by the Executive Defendants, and

21   earnings calls.  Having spoken on these subjects so many times, the Executive Defendants knew, or

22   were deliberately reckless in not knowing, that the statements about the functionality of Zuora's

23   solution were false and misleading and omitted material information.

24

25        257.   The foregoing facts, particularly when considered collectively, support a strong

26   inference of Defendants' scienter.

27

28



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

## VII.   LOSS CAUSATION

258.   The artificial inflation created by Defendants' alleged misrepresentations and omissions regarding the functionality of Zuora's solution and demand for the Company's solution was removed from Zuora's share price in direct response to information revealed in disclosures that took place on May 30, 2019.  As set forth below, these disclosures divulged information that corrected Defendants' prior misrepresentations and omissions of material fact and/or disclosed facts Defendants misrepresented and omitted that were a substantial factor in causing investors' economic loss.

259.   On May 30, 2019, after the NYSE closed for trading, Defendants disclosed the integration failure and sales execution issues. The Company further disclosed the diminished demand for its products by reporting a larger loss, reduced revenue growth, and reducing guided revenues for the entire fiscal year 2020.

260.   Analysts were shocked by the Company's disclosures, including the revelation of the Billing-RevPro integration failure and sales execution problems. For example, One analyst at Jeffries asked Defendant Tzuo at the May 30, 2019 earnings call, "I mean you bought [RevPro] 2 years ago. So like it's hard -- like how can it not be integrated?"  In addition, analysts connected the disclosure of the integration failure with the weaker than projected revenue for the year.  For example, Canaccord lowered Zuora's target price, citing "Longer-than-anticipated progress to integrate modules of RevPro and Billing forced Zuora to elongate deployment (and therefore, revenue recognition for those add-on sales)."  Similarly, FBN Securities lowered its target price of Zuora, citing "weaker than expected sales execution and longer than expected integration of Billing and RevPro."

261.   Following these revelations, the price of Zuora common stock declined. On May 31, 2019, Zuora's share price fell $5.91 per share, from $19.90 per share on May 30, 3019 to $13.99 per share on May 31, 2019, nearly 30%, on unusually heaving trading volume.  The timing and magnitude of the declines in Zuora's share price negate any inference that Lead Plaintiff's losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

262. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class Member. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Zuora's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Zuora securities and the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misrepresentations and omissions would cause the price of Zuora securities to decline.

## VIII. NO SAFE HARBOR

263. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Zuora's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

264. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Zuora's financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Zuora were insufficient to insulate Defendants from liability for their materially false and misleading statements.



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1

## IX.     THE PRESUMPTION OF RELIANCE

2        265.    At all relevant times, the market for Zuora's common stock was efficient for the

3    following reasons, among others:

4        (a)     Zuora's stock met the requirements for listing, and was listed and actively traded on

5                the NYSE, a highly efficient and automated market;

6        (b)     As a regulated issuer, Zuora filed periodic reports with the SEC and the NYSE;

7        (c)     Zuora regularly communicated with public investors via established market

8                communication mechanisms, including through regular dissemination of press

9                releases on the national circuits of major newswire services and through other wide

10                ranging public disclosures, such as communications with the financial press and other

11                similar reporting services; and

12        (d)     Zuora was followed by numerous securities analysts employed by major brokerage

13                firms who wrote reports which were distributed to those brokerage firms' sales force

14                and certain customers. Each of these reports was publicly available and entered the

15                public market place.

16        266.    As a result of the foregoing, the market for Zuora's common stock reasonably

17    promptly digested current information regarding Zuora from all publicly available sources and

18    reflected such information in the price of Zuora's common stock. All purchasers of Zuora common

19    stock during the Class Period suffered similar injury through their purchase of Zuora common stock

20    at artificially inflated prices, and a presumption of reliance applies.

21        267.    A class-wide presumption of reliance is also appropriate in this action under the

22    United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

23    128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of

24    material fact for which there is a duty to disclose.

25

## X.     CLASS ALLEGATIONS

26        268.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

27    Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise

28    acquired the common stock of Zuora between April 12, 2018 and May 30, 2019, inclusive, and who



were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Zuora; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Zuora; (viii) all Zuora plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

269.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Zuora shares were actively traded on the NYSE. As of October 15, 2019, there were approximately 88 million shares of Zuora common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the Class. Class members who purchased Zuora common stock may be identified from records maintained by Zuora or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

270.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

271.    Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

272.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are whether:

(a)    the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c)    Defendants acted with scienter; and

(d)    Class members suffered compensable damages



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

273.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XI.     CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(A) OF THE EXCHANGE ACT

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

274.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

275.     This Count is asserted on behalf of all members of the Class against Defendants Zuora, Tzuo and Sloat, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

276.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

277.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Zuora common stock during the Class Period.

278.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

1   necessary in order to make the statements made, in light of the circumstances under which they were

2   made, not misleading; made the above statements intentionally or with a deliberately reckless

3   disregard for the truth; and employed devices and artifices to defraud in connection with the

4   purchase and sale of Zuora common stock, which were intended to, and did: (a) deceive the investing

5   public, including Lead Plaintiff and the Class, regarding, among other things, the demand for Zuora's

6   Billing and RevPro products, the integration of RevPro with Zuora's core business, and the

7   Company's sales execution; (b) artificially inflate and maintain the market price of Zuora common

8   stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Zuora common stock

9   at artificially inflated prices and suffer losses when the true facts became known.

10          279.    Defendant Zuora is liable for all materially false and misleading statements made

11   during the Class Period, as alleged above. Defendants Tzuo and Sloat, as top executive officers of

12   the Company during their respective tenures, are liable as direct participants in the wrongs

13   complained of herein. Defendants Tzuo and Sloat are liable for the false and misleading statements

14   they personally made and/or signed, as alleged above.

15          280.    As described above, Defendants acted with scienter throughout the Class Period, in

16   that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness.

17   The misrepresentations and omissions of material facts set forth herein, which presented a danger of

18   misleading buyers or sellers of Zuora stock, were either known to the Defendants or were so obvious

19   that the Defendants should have been aware of them.

20          281.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity

21   of the market, they paid artificially inflated prices for Zuora common stock, which inflation was

22   removed from its price when the true facts became known. Lead Plaintiff and the Class would not

23   have purchased Zuora common stock at the prices they paid, or at all, if they had been aware that the

24   market price had been artificially and falsely inflated by these Defendants' misleading statements.

25          282.    As a direct and proximate result of these Defendants' wrongful conduct, Lead

26   Plaintiff and the other members of the Class suffered damages attributable to the material

27   misstatements and omissions alleged herein in connection with their purchases of Zuora common

28   stock during the Class Period.



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

**COUNT II**
**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendants Tzuo and Sloat)**

283.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

284.    This Count is asserted on behalf of all members of the Class against Defendants Tzuo and Sloat, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

285.    During their tenures as officers and/or directors of Zuora, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. See ¶¶24-25. By reason of their positions of control and authority as officers and/or directors of Zuora, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Zuora during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

286.    In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶24-25, Defendants Tzuo and Sloat had direct involvement in the day-to-day operations of the Company. Defendants Tzuo and Sloat signed certain of the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by Zuora during the Class Period. As a result of the foregoing, Defendants Tzuo and Sloat, as a group and individually, were controlling persons of Zuora within the meaning of Section 20(a) of the Exchange Act.

287.    As set forth above, Zuora violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

288.    By virtue of their positions as controlling persons of Zuora and as a result of their own aforementioned conduct, Defendants Tzuo and Sloat are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the

HAGENS BERMAN

715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001

other members of the Class who purchased or otherwise acquired Zuora common stock. As detailed

above, during the respective times these Defendants served as officers and/or directors of Zuora,

each of these Defendants was culpable for the material misstatements and omissions made by Zuora.

289.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the

other members of the Class suffered damages in connection with their purchase or acquisition of

Zuora common stock.

## XII.    PRAYER FOR RELIEF

290.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies available under the Exchange Act in favor

of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial,

including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

291.    Lead Plaintiff demands a trial by jury.



715 HEARST AVE., SUITE 202, BERKELEY, CA  94710
(510) 725-3000 • FAX (510) 725-3001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated: November 8, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By:____/s/ Reed R. Kathrein_____
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
Karl Barth
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

Peter A. Schaeffer
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N Cityfront Plaza Dr. Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile:  (708) 628-4950
petersh@hbsslaw.com

*Attorneys for Lead Plaintiff*
*New Zealand Methodist Trust Association*



715 HEARST AVE., SUITE 202, BERKELEY, CA 94710
(510) 725-3000 • FAX (510) 725-3001