1  Reed R. Kathrein (139304)
   Lucas E. Gilmore (250893)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone: (510) 725-3000
4  Facsimile: (510) 725-3001
   reed@hbsslaw.com
5  lucasg@hbsslaw.com

6  *Attorneys for Lead Plaintiff*
   *New Zealand Methodist Trust Association*
7  [Additional counsel on signature page]

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10  CASEY ROBERTS, Individually and On        No. 3:19-cv-03422-SI
    Behalf Of All Other Similarly Situated
11                                            **LEAD PLAINTIF NEW ZEALAND**
                            Plaintiff,        **METHODIST TRUST**
12                                            **ASSOCIATION'S OPPOSITION TO**
         v.                                   **DEFENDANTS' MOTION TO**
13                                            **DISMISS THE CONSOLIDATED**
    ZUORA, INC., TIEN TZUO, and TYLER         **AMENDED CLASS ACTION**
14  SLOAT,                                    **COMPLAINT**

15                          Defendants.       Hearing Date:   April 3, 2020
                                              Hearing Time:   10:00 a.m.
16                                            Courtroom:      1, 17th Floor
                                              Judge:          Hon. Susan Illston
17
                                              CLASS ACTION
18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................................1

II.   SUMMARY OF THE COMPLAINT ................................................................3

III.  ARGUMENT .......................................................................................................7

      A.   The Complaint Adequately Alleges Defendants' False and Misleading
           Statements and Omissions about the Functionality of Zuora's Solution ...................8

      B.   The Complaint Sufficiently Alleges Misleading Statements and Omissions
           Regarding Zuora's Ability And Success In Cross-Selling Its Flagship Products ...12

      C.   The Complaint Raises A Strong Inference Of Scienter............................................16

           1.   Defendants Were in Possession of Contemporaneous, Contradictory
                Information When They Made the False and Misleading Statements. .........16

           2.   Defendants' Private and Public Admissions Support a Strong Inference
                of Scienter..................................................................................................22

           3.   Zuora's Senior Executives' Insider Sales Were Unusual and Suspicious.....23

           4.   The Fact That the Integration Issue Affected Zuora's Core Operations
                Supports an Inference of Scienter................................................................24

IV.   CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*In re Accuracy, Inc. Sec. Litig.,*
    757 F. Supp. 2d 936 (N.D. Cal. 2010)...............................................................17, 21

*In re Adaptive Broadband Sec. Litig.,*
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002)..................................................................24

*Allison v. Brooktree Corp.,*
    999 F. Supp. 1342 (S.D. Cal. 1998) ...........................................................................20

*In re Apple Computer Inc.,*
    127 F. App'x 296 (9th Cir. 2005).................................................................................21

*Atlas v. Accredited Home Lenders Holding Co.,*
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) .......................................................................10

*In re Atossa Genetics Inc. Sec. Litig.,*
    868 F.3d 784 (9th Cir. 2017) .........................................................................................9

*Bao v. SolarCity Corp.,*
    2016 WL 54133 (N.D. Cal. Jan. 5, 2016).....................................................................21

*Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) ...............................................................................*passim*

*In re Cisco Sys. Inc. Sec. Litig.,*
    2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) .............................................................17

*Curry v. Hansen Med., Inc.,*
    2012 WL 3242447 (N.D. Cal. Aug. 10, 2012)..............................................................21

*In re Daou Sys., Inc., Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005).........................................................................................9

*In re DDi Corp. Sec. Litig.,*
    2005 WL 3090882 (C.D. Cal. July 21, 2005) ..............................................................10

*In re ESS Tech., Inc. Sec. Litig.,*
    2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) ...............................................................10

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995).........................................................................................23

*Garcia v. Gen. Motors LLC,*
    2019 WL 247227 (C.D. Cal. Jan. 17, 2019)................................................................12

*In re Gilead Sci. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) .................................................................7

*Hanon v. Dataproducts Corp.*,
 976 F.2d 497 (9th Cir. 1992) ..................................................................8

*Hatamian v. AMD, Inc.*,
 87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................21

*Hefler v. Wells Fargo & Co.*,
 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ......................................23

*Howard v. Everex Sys., Inc.*,
 228 F.3d 1057 (9th Cir. 2000) ................................................................7

*In re Immune Response Sec. Litig.*,
 375 F. Supp. 2d 983 (S.D. Cal. 2005) ..................................................15

*In re Impinj, Inc., Sec. Litig.*,
 2019 WL 4917101 (W.D. Wash. Oct. 4, 2019) ......................................9

*In re Intuitive Surgical Sec. Litig.*,
 65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................10

*Kelly v. Electronic Arts, Inc.*,
 2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) .......................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ............................................................8, 14

*Knapp v. Gomez*,
 1993 WL 305940 (S.D. Cal. May 5, 1993) ...........................................24

*In re Leapfrog Enter., Inc. Sec. Litig.*,
 200 F. Supp. 3d 987 (N.D. Cal. 2016) ..................................................21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
 416 F.3d 940 (9th Cir. 2005) ................................................................15

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016) ..............................................................20

*Makor Issues & Rights, Ltd. V. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) ................................................................15

*Mallen v. Alphatec Holdings, Inc.*
 861 F. Supp. 2d 1111 (S.D. Cal. 2012) ................................................15

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
 927 F. Supp. 1297 (C.D. Cal. 1996) .....................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...................................................................................... 7, 18

*McCasland v. FormFactor Inc.*,
   2009 WL 2086168 (N.D. Cal. July 14, 2009) ............................................... 17

*Monachelli v. Hortonworks, Inc.*,
   225 F. Supp. 3d 1045 (N.D. Cal. 2016) ........................................................ 21

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................. 10, 13, 25

*In re Nimble Storage, Inc. Sec. Litig.*,
   2016 WL 7209826 (N.D. Cal. Dec. 9, 2016) ................................................. 21

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................ 10, 23, 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...................................................... 7, 21, 22, 23

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ...................................................................... 25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ............................................................... 2, 10

*Padnes v. Scios Nova Inc.*,
   1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ............................................... 20

*Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*,
   2012 WL 1868874 (N.D. Cal. May 22, 2012) .............................................. 17

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ...................................................................... 12

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ................................................................ *passim*

*City of Miami Gen. Emps.' & Sanitation Emps. Ret. Trust v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) .................................................. 22, 25

*Robb v. Fitbit Inc.*,
   216 F. Supp. 3d 1017 (N.D. Cal. 2016) ........................................................ 19

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .............................................. 11

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................................ 20

*S. Ferry LP No. 2 v. Killinger,*
    399 F. Supp. 2d 1121 (W.D. Wash. 2005) ........................................................... 10

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ........................................................... 24

*Schueneman v. Arena Pharm., Inc.,*
    840 F.3d 698 (9th Cir. 2016) ........................................................... 8, 9, 16

*Shenwick v. Twitter,*
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................... 17

*In re Silicon Graphics Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ........................................................... 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ........................................................... 16

*In re UTStarcom, Inc. Sec. Litig.,*
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................... 24

*In re VeriFone Holdings, Inc. Sec. Litig.,*
    704 F.3d 694 (9th Cir. 2012) ........................................................... 16

*In re VistaCare, Inc. Securities Litig.,*
    2005 WL 8160681 (D. Ariz. Aug. 19, 2005) ........................................................... 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ........................................................... 14, 24

*Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.,*
    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ........................................................... 16

*Wozniak v. Align Tech., Inc.,*
    2011 WL 2269418 (N.D. Cal. June 8, 2011) ........................................................... 21

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ........................................................... 17

**Federal Statutes**

15 U.S.C. § 78t(a) ........................................................... 7

15 U.S.C § 78u-4 ........................................................... 15, 24

15 U.S.C. § 78u-5(c)(B)(i) ........................................................... 16

**Other Authorities**

Fed. R. Civ. P. 15 ........................................................... 25

17 C.F.R. § 240.10b-5 ................................................................................................16

17 C.F.R. § 240.10b5-1 ..............................................................................................24

# TABLE OF ABBRIEVATIONS

| ABBREVIATION | DEFINITION |
|---|---|
| ¶_ or ¶¶_ | Paragraph/s of the Consolidated Amended Class Action Complaint, ECF No. 60 |
| Class Period | April 12, 2018 to May 30, 2019, inclusive |
| Complaint | Consolidated Amended Class Action Complaint, ECF No. 60 |
| CW | Confidential Witness |
| CW-1 | Zuora's former Senior Manager Global Services / Principal Solution Architect and Zuora Integration Architect who is more fully described at ¶60 of the Complaint |
| CW-2 | Zuora's former high-ranking project manager / subject matter expert who is more fully described at ¶65 of the Complaint |
| CW-3 | Zuora's former account executive, who is more fully described at ¶103 of the Complaint |
| CW-4 | Zuora's former Business Development: Strategic Accounts Group Member, who is more fully described at ¶110 of the Complaint |
| Defendants | Zuora, Inc. ("Zuora"), Tien Tzuo ("Tzuo") and Tyler Sloat ("Sloat") |
| ERP | Enterprise Resource Planning |
| Executive Defendants | Tzuo and Sloat |
| IPO | Initial Public Offering |
| Lead Plaintiff or Plaintiff | New Zealand Methodist Trust Association |
| Leeyo | Leeyo Software, Inc. |
| MTD or Motion | Defendants' Motion to Dismiss the Consolidated Class Action Complaint, ECF No. 64 |
| Registration Statement | Zuora's Registration Statement filed with the SEC on Form S-1 on April 12, 2018 at the start of the Class Period |

# I. INTRODUCTION

This case arises from Defendants' false and misleading statements about the integrated nature and functionality of Zuora's solution. In the Registration Statement used to take Zuora public, Defendants represented that Zuora's solution could "automate and orchestrate the entire subscription order-to-cash process," including "billing" through its Billing application, and "revenue recognition" through its RevPro application. The Company touted the purported "Zoura + RevPro integration" as a core capability of its solution and one of Zuora's competitive strengths. Defendants' IPO representations allowed Zuora – a company that had never turned a profit – to receive a $2 billion valuation; a value nearly 12 times the size of Zuora's annual revenues. Defendants' subsequent statements about Zuora's solution's "seamless order-to revenue process" caused Zuora's stock price to double in a matter of months.

The Complaint details how, in truth, no "Zuora +RevPro integration" existed. In turn, customers using Billing and RevPro were unable to orchestrate or automate the data from both systems. The integration failure was so severe that customers either needed to export the data from Billing and import it into RevPro manually, or develop their own integration at substantial expense. The Complaint features in depth accounts from former Zuora technology executives confirming Defendants knew of the integration failure when telling investors its solution allowed customers to "quote, order, bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform." Specifically, Defendants learned of the integration failure through secret technical projects the Executive Defendants sponsored codenamed "Zuora on Zuora" and "Keystone." Although the undisclosed projects failed to yield an integration solution for either Zuora's or its customers' systems, Defendants went to market as having a combined product. Defendants thereafter continued to deceive Zuora's clients and investors by claiming the purported "Zuora +RevPro integration" offered a "seamless order-to-revenue process."

The Complaint also includes accounts from former Zuora sales executives confirming Defendants knew that the Company's failure to deliver on its solution's promised connectivity caused serious sales execution issues. These challenges ultimately resulted in reputational damage

and reduced demand for all of Zuora's products. Nevertheless, Defendants concealed these severe sales execution problems, while promoting the Company's "upselling" of its two flagship products. Finally, the Complaint demonstrates that when the Company ultimately was forced to admit the integration failure, sales execution issues, and Zuora's dim prospects for growth, Zuora's stock price plummeted, causing investors to lose $520 million in shareholder value in a single trading day.

Faced with these detailed allegations establishing Defendants' falsity and scienter, Defendants' Motion raises specious arguments that either ignore or are completely belied by the Complaint. For example, Defendants dismiss their misrepresentations about the solution's functionality as mere puffery. But as recently affirmed in *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) – a Ninth Circuit opinion speaking directly to the issues raised in Defendants' Motion but conspicuously missing in their papers – "companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities." Similarly, here, once Defendants chose to falsely promote that Zuora Central "easily connects the various applications in your order-to-revenue ecosystem" and its ability "to bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform," they were obliged to disclose: (i) the lack of connectivity between Zuora Central and other of its applications with RevPro; and (ii) that reconciling its flagship Billing and RevPro products required either a laborious and inherently inaccurate manual implementation or investing in an entirely separate customized integration solution at the customers' substantial expense.

Similarly, Defendants argue their statements concerning Zuora's solution were factually accurate and that they somehow warned investors of the risks that materialized. Not so. Defendants repeatedly promoted a non-existent "Zuora +RevPro integration." For this reason, Zuora's own technology and sales executives found misleading the Company's representations about the solution's purported out-of-the-box integration. Moreover, Zuora's risk disclosures themselves were deceptive, as they only discussed the possibility of future problems arising from specific customer systems or preferences. Defendants did not warn investors that the Company lacked the promoted technology altogether, such that Zuora was unable to configure and deploy an integrated solution on its own systems, let alone on any of its customers.

Finally, Defendants attempt to refute scienter when, in reality, the allegations of Defendants' conscious misconduct can hardly be stronger. The Complaint includes particularized, firsthand accounts from reliable CWs demonstrating the Executive Defendants' knowledge of the falsity of their statements. The CWs identify specific meetings Tzuo and Sloat attended, articulate the contents of specific documents Tzuo and Sloat created or reviewed, and even provide direct quotes of statements they heard the Executives Defendants make acknowledging the integration failure and sales execution issues. As if this were not enough, the Complaint pleads that Sloat unloaded his personal holdings for over $16 million through unusual insider trading before the truth emerged. Further, the Complaint alleges Defendants' post-Class Period admissions that they knew of the integration failure all along. These facts, taken collectively, give rise to a strong inference of scienter.

## II.    SUMMARY OF THE COMPLAINT

Zuora offers a cloud-based subscription management solution for companies with a subscription business model. ¶27. Zuora's solution includes a platform called Zuora Central, together with applications. ¶¶31-33. The Company's primary product is Zuora Billing, a recurring billing system application. ¶34.

In May 2017, Zuora purchased Leeyo, adding RevPro to its product portfolio, an accounting application that enables customers to recognize revenue under new accounting standard ASC 606. ¶35. The Company promoted the RevPro grab as creating a "one-stop shop for automating financial operations" (¶38), and stated the acquisition provided "a path to expand," including through "cross-selling" or "upselling" its two flagship products, Billing and RevPro. ¶48. Having generated public excitement about the Company's growth potential with RevPro, Zuora announced its IPO in December 2017. ¶46.

In its IPO documents, Defendants emphasized the integrated functionality of Zuora's solution. ¶50. Defendants provided illustrations of Zuora's homegrown products' connectivity with RevPro (¶51), and emphasized the solution's "automated billing, streamlined collection, and efficient accounting features." ¶50. Defendants affirmed Zuora's ability to deploy and configure its solution on clients' internal systems. ¶53. In fact, Defendants touted that its solution "Free[d] Up IT and

Engineering Resources," and that with Zuora, "engineering and IT departments no longer need to build in-house custom systems or customizations." ¶54.

Defendants' efforts to hype Zuora's solution as a combined product worked. ¶57. The Company raised over $162 million through the IPO. *Id.* Thereafter, Defendants continued to tout the "Zuora + RevPro integration (¶164)," claiming that customers could "bill, recognize revenue, and automate the entire customer lifecycle from a single platform with ease" (¶9), as well as "automate and orchestrate the entire subscription order-to-cash process, including billing and revenue recognition" (¶171). Analysts repeatedly cited the solution's purported combined capability and Zuora's upselling of Billing and RevPro as a catalyst for revenue growth. ¶¶58, 127-28. Zuora's stock price soared on the back of these reports, rising more than 139% in less than four months after the Company's IPO. ¶130.

Unfortunately for investors, Zuora's meteoric rise was fueled by misrepresentations. While the Company continually plugged the supposed "Zuora + RevPro integration (¶164)," Zuora, in truth, lacked the ability to deploy and configure the combined solution. ¶59. Customers using Billing and RevPro were unable to integrate and reconcile the data from both systems. *Id.* In particular, "Billing could not provide ERP information or otherwise come up with the data points needed for proper revenue recognition in RevPro" (¶64), and therefore the solution was unable to "transport the Billing data into RevPro transaction lines." *Id.* This technical issue caused so much friction that Zuora's customers either needed to export the data from Billing and import it into RevPro manually for revenue recognition, or develop their own customized integration that ingests the required data from Billing into RevPro. ¶158.

Former Zuora executives confirmed that Tzuo, Sloat and other of Zuora's most senior officers knew of the integration failure. In October 2017, Sloat sponsored a project codenamed "Zuora on Zuora" or "ZoZ" aimed to implement Zuora's solution internally. ¶¶67, 76. The Executive Defendants, who were directly involved in the ZoZ project, were repeatedly apprised in regular meetings, internal forums, written reports, google documents and emails of the Company's inability to build an integration between the Platform and RevPro. ¶74. Nevertheless, Sloat told Zuora engineers at an early 2018 monthly "ZoZ" project meeting that with the IPO, Zuora would be falsely

"going to market as a combined product for ASC 606." ¶75. Sloat rationalized that the market needed a seamless solution. *Id*. Since the Company's solution lacked connectivity with a flagship product, Sloat told ZoZ project team members that "Zuora needed to get its act together with RevPro." *Id*.

Former Zuora executives also confirmed that Tzuo, Sloat and other of Zuora's most senior officers knew Zuora could not configure and deploy its solution on clients' systems. ¶85. In early 2018, Defendants commenced a new project codenamed "Keystone" and ran by Zuora's engineering and product teams that intended to build a connection between RevPro and Zuora Billing to apply to Zuora's clients' systems. ¶79. But Zuora's integration technology solution, OrderMetrics, proved so unsuccessful on customers' systems that Tzuo decided to scrap the project entirely by April 2019. ¶¶81-82, 119. The Executive Defendants were informed regularly of Keystone's failures through Google document reports, regular project review meetings, and meeting summary reports. ¶¶85-87. In fact, a former Zuora executive confirmed that between early 2018 and March 2019 meeting minutes and summary reports were generated out of Sloat's and Tzuo's forum discussions and circulated for action, and the Zuora-RevPro integration problem was frequently referenced in the minutes. ¶94.

Defendants were also informed that the integration issue resulted in strained customer relationships and lost revenues. ¶¶93-97. CWs confirmed that one of Zuora's most important customers, Zoom Video Communications, initially elected to purchase RevPro, but ultimately decided by late 2018 not to implement it fully due to the integration failure. ¶98. Zoom's decision to stop the project was a major blow to Zuora's financials because the dissatisfied customer "stopped some payments as well," which resulted in the Company missing revenue targets. ¶99. Tzuo knew of the Zoom incident because CW-1 was called into a couple of weekly executive meetings by his supervisor attended by Zuora's founders to see if customizations could help. ¶101.

The failed RevPro testing eventually caused major sales execution problems, including missed RevPro sales, reduced revenue growth and even waning demand for Zuora's platform and other homegrown product modules. ¶¶102-06. All of these client-based issues were documented on Zuora's SalesForce database to which the Executive Defendants had access. ¶118. In addition,

Zuora's Sales Vice Presidents repeatedly informed the Executive Defendants of these problems through in-person meetings and email communications. ¶107. Indeed, one CW recounted conversations with his supervising Sales Vice President in which the VP confirmed communicating these customer issues directly to Tzuo, including that a major customer had withheld payment on its Zuora products because it had to spend $1 million of its own funds in an effort to develop an integration. ¶108. The witness also recalled observing a November or December 2018 email thread Tzuo received informing Tzuo of the customer's non-payment due to the integration failure. ¶109.

In early 2019, Zuora's executives acknowledged the Keystone Project's failure and decided to scrap it in favor of another approach internally called the "K-2" Project. ¶119. After completion of a "Proof of Concept" and analysis in March 2019, Tzuo issued a directive in April 2019 to start K-2. *Id*. Given these ongoing problems, multiple former Zuora executives concluded that Defendants' Class Period statements to investors about its solution's capabilities were false and misleading. ¶¶89, 114.

Zuora's inability to deliver its promised integrated solution and resulting sales execution issues eventually caught up with the Company. On May 30, 2019, Zuora announced disappointing first quarter fiscal year 2020 financial results, disclosing declining revenue growth and reduced fiscal 2020 revenue guidance. ¶¶143-145. The Company finally came clean and divulged that the product integration for RevPro is "taking longer than expected" and that "the technical work to complete the integration is taking time as these are complex mission-critical systems." ¶148. The Company also reported sales execution problems that slowed down its ability to cross-sell its products. ¶149.

On the earnings call, Tzuo admitted that Defendants had long known of the integration failure, stating, "honestly, we didn't really have time and the resource to focus on the integration between [Billing and RevPro] until after the [ASC] 606 [wave] was complete. So we didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction." ¶¶13, 151. Analysts were shocked by these disclosures, with one analyst at Jeffries asking Tzuo incredulously, "I mean you bought [RevPro] 2 years ago. So like it's hard – like how can it not be integrated?" ¶150. On this news, the Company's share price fell nearly 30%, erasing $520 million in market

capitalization. ¶153.

In the aftermath, Defendants issued a product overview acknowledging "the friction from reconciling two systems" and stating that where a client is "using both Zuora Billing and Zuora RevPro, the integration between two systems is likely to be a pain point to you." ¶158. Defendants further admitted that before releasing a Zuora Billing – Zuora RevPro Integration product in limited availability in July 2019, a customer would need to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro. ¶¶156-57. Yet, despite purportedly coming up with an integration fix, Zuora has continued to post declining revenue growth and its share price has languished. ¶¶15-16.

## III.  ARGUMENT

To state a claim under Section 10(b), a plaintiff must allege: (1) a material misrepresentation or omission (i.e., "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See, e.g., Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-39 (2011). Here, Defendants challenge only the Complaint's allegations of falsity and scienter, conceding Plaintiff has sufficiently alleged the other elements.[1]

In evaluating motions to dismiss, courts must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "A complaint should not be dismissed unless it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her to relief." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004). A district court ruling on a motion to dismiss is "not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th

---

[1] Because the Complaint adequately alleges a primary violation of Section 10(b) and the Executive Defendants undisputedly controlled the Company, Lead Plaintiff has also adequately alleged a Section 20(a) claim. *See* 15 U.S.C. § 78t(a); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Cir. 2008) (reversing dismissal).

## A. The Complaint Adequately Alleges Defendants' False and Misleading Statements and Omissions about the Functionality of Zuora's Solution

It is "unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1140. A statement is false or misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). "'Once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including by disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) quoting *Berson*, 572 F.3d at 987; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) (holding that defendant's statements "touting its SI 480 printer when it was aware the printer had severe technological problems" were misleading and actionable).

Here, Defendants represented in Zuora's IPO documents, SEC filings, press releases, and marketing materials that Zuora's solution had integrated RevPro (¶164), allowing its customers to "quote, order, bill, recognize revenue, report and automate the entire customer lifecycle from a single platform." ¶160. Defendants stated, "Don't underestimate the complexity of revenue recognition. . . . Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process!" ¶164. Defendants also repeatedly displayed images illustrating the integrated nature of its Central platform with its applications including Billing and RevPro. ¶¶160, 166. Similarly, in calls with investors, Defendants stressed that Zuora offered "the only complete subscription management solution" or "full solution," which "hits both your quote-to-cash solution as well as your revenue automation." ¶¶191, 194, 203.

These statements were false or, at a minimum, misleading, because customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems and

automate the subscription order-to-cash process, including subscription order and subscription accounting. Rather, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized integration that ingests the required data from Zuora Billing into Zuora RevPro. Accordingly, Zuora lacked the ability to "deploy and configure its portfolio of order-to-revenue products" on its clients internal systems. *See In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1020 (9th Cir. 2005) (falsity is met where complaint alleges discrepancy between defendants' positive statements and the internal truth); *In re Impinj, Inc., Sec. Litig.*, 2019 WL 4917101, at *2 (W.D. Wash. Oct. 4, 2019) (sustaining securities fraud claims predicated on company's false promotion that its platform was able to identify the unique location of tagged items when, in truth, the platform lacked this ability).

Moreover, once Defendants chose to tout "positive information to the market" about its solution's functional capabilities, they were duty-bound, but failed here, to disclose the "adverse information that cuts against the positive information" (*Schueneman*, 840 F.3d at 706), including: (i) Zuora failed to configure and deploy its solution internally; (ii) Zuora had failed to configure and deploy a Zuora-RevPro integration for test customers; and (iii) Zuora's own product engineers and sales personnel found misleading the Company's representations about its solution's capabilities. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-96 (9th Cir. 2017) (falsity is satisfied when defendant's statements contradict what defendant knew at that time).

Faced with these detailed allegations, Defendants first argue that all of the challenged statements about Zuora's solution's capabilities "are either inactionable puffery, too vague to be actionable, or both." MTD at 9. But there is nothing unclear or equivocal about Defendants' representations concerning the existence of a "Zuora + RevPro integration" (¶164), or Zuora's solution's purported capabilities. And, Defendants certainly never told investors that their repeated representations were too nebulous to be trusted. Indeed, Defendants made continuous and unqualified assurances that Zuora and RevPro were functionally connected such that customers could "quote, order, bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform" (¶160) – never once telling investors that the Company lacked a feasible software

integration for its two flagship products. *LifeLock, Inc.*, 780 F. App'x at 483 ("companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities").

That Defendants repeatedly emphasized the purported integrated functionality of Zuora's solution confirms that it was a material topic for the Company and investors. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014). Indeed, analysts following Zuora frequently commented on the represented performance features of Zuora's solution. *See, e.g.*, ¶58; *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008). And, the market had a strong and immediate reaction to Defendants' disclosure that Zuora's solution lacked its represented connectivity, including a declining stock price on heavy volume. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003). As such, these are not the types of "statements on the extreme edge of generality and vagueness" that trigger the "narrowly drawn" puffery "exception." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005). The statements address current facts, the "truth or falsity" of which "could be determined at the time they were made." *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, at *11 (N.D. Cal. Dec. 1, 2004).[2]

Defendants next claim they accurately represented Zuora's solution's functionality, even while concealing the integration failure. MTD at 10. The contention is wrong. Defendants' statements that there was a "Zuora + RevPro integration" (¶164), and that Zuora's solution allowed "automation and usability across Zuora Billing, Zuora Collect, and Zuora RevPro" (¶176) are demonstrably false. When making the statement, Defendants knew there was in fact no Zuora-RevPro integration. Moreover, the only way to remove the friction from reconciling the two systems would be for the client to either export the data from Zuora Billing and import it into Zuora RevPro manually for revenue recognition, or invest a significant amount of resources to build a customized

---

[2] Further, "the court need not determine at this stage whether . . . misstatements" are puffery, *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *15 (C.D. Cal. July 21, 2005), because it requires "fact-intensive" materiality inquiry. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

integration.[3] It is precisely for these reasons that Zuora's own executives, on both the sales and technology sides, found these same statements to be false and deceptive. ¶¶89, 114. Similarly, Zuora customers felt deceived, including Zoom and "newspaper" clients. ¶¶89-90.

In any case, the few truncated statements Defendants claim to be true (MTD at 10) have been plucked out of their context. When read fairly and in context, each is misleading because it "created an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9-10 (C.D. Cal. Feb. 27, 2015); namely, that customers using the Zuora Central Platform, together with Zuora Billing and Zuora RevPro, are able to integrate the data between two models [RevPro or Billing] through automation.

Equally without merit, Defendants contend that statements not including the words "integration" and "RevPro" are inactionable. MTD at 10-11. The argument casts Plaintiff's claims too narrowly. Defendants repeatedly marketed Zuora's platform and applications as a functioning, combined solution, when in truth, Billing and RevPro could function only as standalone products. Moreover, Defendants ignore that when speaking about Zuora's solution, they used terms synonymous with integration, or phrases and illustrations creating the false impression that Zuora's solution connected Billing and RevPro. Defendants claimed that Central "easily connects the various applications in your order-to-revenue ecosystem" (¶162), and that clients could "seamlessly manage the entire customer lifecycle, and automate revenue recognition, in a single solution." ¶174. Likewise, Defendants included depictions of its platform and applications, stating that that Zuora Billing and Zuora RevPro work together to "[c]apture orders, subscriptions, invoices, payments, and AR" and "[r]ecognize revenue." ¶166. Defendants emphasized the "automation and usability across Zuora Billing, Zuora Collect, and Zuora RevPro." ¶176. Defendants further affirmed Zuora's ability to "deploy and configure" the solution on clients' internal systems. ¶183. These statements are false and misleading, "no 'magic words' are necessary." *Garcia v. Gen. Motors LLC*, 2019 WL 247227, at

---

[3] Defendants are wrong in arguing that Lead Plaintiff has conceded the accuracy of Zuora's June 5, 2018 Tweet, "Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process!" Defendants' sole support for this contention is ¶35 of the Complaint, where Plaintiffs merely note that Zuora has implemented RevPro at 100 customers as a standalone product. ¶35.

*7 (C.D. Cal. Jan. 17, 2019).

Defendants are also wrong in contending that the purported warnings in the "Risk Factors" sections of its SEC filings "defeat any claim that Zuora conveyed a misleading impression" concerning the deployment and integration of Billing and RevPro. MTD at 11-12. The cited disclosures did not "counterbalance [the] misleading impression created by [the initial misrepresentations]." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (quotation marks omitted). Rather, Defendants' risk disclosures only discussed the possibility customers might not ultimately deploy Zuora's solution based on customers' internal systems or preferences. Notably, Defendants did not warn investors that Zuora lacked a Zuora-RevPro integration altogether such that virtually no customer could operate the combined product. Consequently, the cited warnings did not negate Defendants' earlier misstatements. *Berson*, 527 F.3d at 987 ("But learning that stop-work orders might be issued is quite different from knowing they were in fact issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently.").

## B. The Complaint Sufficiently Alleges Misleading Statements and Omissions Regarding Zuora's Ability And Success In Cross-Selling Its Flagship Products

The Complaint also details how Defendants buttressed their false statements promoting the solution's functionality with further misrepresentations concerning Zuora's ability and success in cross-selling or upselling RevPro to customers that started with Zuora Billing or vice versa. In its Registration Statement, Defendants enticed investors with the Company's growth potential, repeatedly identifying the Company's ability to cross-sell or upsell its flagship products to customers. ¶187. Thereafter, Defendants portrayed the false impression that Zuora was successfully executing on this initiative. For example, Sloat told investors that as to the "upsell component . . . we do see a lot of traction." ¶215. Sloat also continuously stated there was "strong demand all the way around for both add-on products, both flagship products," "strong demand for both products across the board," as well as "'tailwinds' in the business." ¶¶196-98,

To support this false narrative, Tzuo repeatedly identified a handful of major Billing clients who had recently purchased RevPro, including Carbonite. ¶207. In the same breath, Tzuo highlighted the "true big, sticky implementations" the Company was performing and emphasized that the

Company "continue[s] to show improvements" in "bringing customers live" on its flagship products. ¶¶ 209, 220. In addition, Tzuo emphasized Zuora's superior sales execution, claiming the Company's "technology" gave Zuora's sale personnel a "competitive moat." ¶233.

These statements were materially false or, at minimum, misleading. Defendants knew that upselling of Billing and RevPro with existing customers was not a viable revenue strategy or "tailwind" since the Company had failed to develop a Zuora-RevPro integration. Accordingly, the Company could not and had no reasonable prospect for configuring and deploying the combined product on clients' systems. Likewise, Defendants knew Zuora was neither seeing traction on the upsell component, strong demand from its clients for adding on one of its flagship products, nor showing improvements in implementation and bringing customers live on RevPro. Nor was Zuora's technology providing the Company with a competitive moat in terms of sales execution. To the contrary, Defendants were repeatedly informed of "upsold" customer dissatisfaction given the prolonged integration testing and the Company's inability to deliver on the solution's promised connectivity. ¶108. Indeed, major Zuora clients were having to spend millions of their own dollars to establish a work-around, and due to their dissatisfaction were withholding payment. *Id*. The integration testings were such failures that by the end of the Class Period the Company had to pause the implementation of RevPro entirely at all "upsold" customers, including Carbonite. ¶155. Moreover, once prospective clients caught wind of the integration failure, this caused serious sales execution problems for Zuora, including reputational damage and reduced demand for all of Zuora's products, including its homegrown applications. ¶110.

Defendants try to waive away their representations about upselling as puffery. MTD at 12. But the argument cannot be reconciled with the Complaint's alleged facts, belies the context in which the statements were made, and ignores the "great caution" to be taken in considering puffery arguments at the pleading stage. *See Impax*, 36 F. Supp. 3d at 966 ("the Court may not assess the statements listed in the [complaint] in a vacuum, 'plucking the statements out of their context to determine whether the words, taken per se . . . constitute puffery'"). When considered in the relevant context, Defendants' statements regarding their ability to generate revenue growth through "upsells" are much more than "common, unremarkable statements." MTD at 12. Defendants told investors that

Zuora's core business strategy was boosting "upsells" – "Customers that started with Zuora Billing or Zuora RevPro can also subscribe to the other flagship product" (¶186) – and represented that its "technology" provided it with a concrete competitive advantage in this respect. ¶233. These claimed competitive advantages are not puffery—they are important facts regarding the cornerstone of Zuora's business strategy that investors and analysts considered to be important. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) (automobile maker's corporate goal of being "environmentally friendly" was not puffery since company focused on environmental friendliness as a core aspect of its business). Moreover, Defendants' reassuring of investors of the "underlying demand" from upsell clients and success in "bringing customers live" are verifiable statements of fact and therefore cannot simply be cast aside as "'feel good' optimistic statements." *Quality Sys.*, 865 F.3d at 1144 (statement that sales pipeline "was full and growing" was actionable and more than a "'feel good'" statement).

Defendants' argument that their upselling statements were actually true since Zuora signed a handful of Billing customers onto RevPro misses the point. MTD at 12-13. When promoting "upsells" as a "tailwind," Defendants knew that upselling was not a viable or sustainable method for revenue growth since the Company had failed to develop a clean technical integration. Moreover, Defendants knew that the failure to bring these customers operationally live using RevPro and Billing resulted in severe sales execution issues, including customers cancelling the implementation, withholding payment, and expressing decreased demand for Zuora Central and other homegrown products. ¶110.

Next, Defendants suggest, based on their own impermissible counter-narrative, that Zuora's sales execution issues were separate and distinct from and not adversely impacted by the integration failure. MTD at 13. Setting aside that the Court cannot credit Defendants' alternative story, *Orexigen Therapeutics, Inc*., 899 F.3d at 998, it is belied by the CWs' detailed accounts linking the two issues. Indeed, Tzuo himself connected the two "headwinds," when he stated the integration challenge "has slowed down our cross-sell motion," and "resulted in lower professional services and subscription

revenue in the quarter as well as tempered expectations going forward." ¶148.[4]

The PSLRA safe harbor does not immunize Defendants from liability (MTD at 14-15). ***First***, the PSLRA's safe harbor applies only to forward-looking statements accompanied by meaningful cautionary language and made without knowledge that they are false or misleading. It does not free Defendants from liability for their numerous omissions of material fact discussed above. *See Mallen v. Alphatec Holdings, Inc.* 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) ("to the extent Plaintiffs also challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply").

***Second***, Defendants' statements about their ability to and success in upselling were representations of current facts, not forward looking. *See, e.g., Makor Issues & Rights, Ltd. V. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (statement that sales were "still going strong" not forward looking because it conveyed "both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if [defendant] knew that its sales were about to collapse.").

***Third***, even if any of the upsell misstatements were forward looking, they were not accompanied by meaningful cautionary language. To be meaningful, cautionary language must address precisely the substance of the specific challenged statement and "discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1035 (S.D. Cal. 2005). Cautionary language is not meaningful if it fails to disclose known, material facts or states that risks may occur in the future that, in fact, have already transpired. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). Here, none of the cited disclosures warned investors that Zuora lacked a

---

[4] Defendants' motion also suggests that, in hindsight, Zuora's Billing-RevPro integration failure and poor sales execution were immaterial since the Company went on to post double digit revenue growth in subsequent quarters. But Zuora's dramatic stock price decline after the disclosures and Zuora's languishing share price performance in a bull market proves otherwise. Indeed, Zuora portrayed itself as a replacement for ERP monoliths Oracle and SAP. Yet, its annual revenues have barely cracked $230 million, with Zuora's annual revenue growth (21%) down 16% from its 3-year growth rate of 37%. MTD at 6; ECF No. 64-3.

technical integration such that no customer could operationally use RevPro and Billing, let alone the severe sales execution issues the Company was actually experiencing.

**Finally**, the safe harbor also does not protect forward-looking statements if the defendant had actual knowledge of the statements' falsity. *See* 15 U.S.C. § 78u-5(c)(B)(i); *see also Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012) ("The safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized."). As discussed below, Defendants actually knew at the time that Zuora's technical integration efforts had proven unsuccessful thwarting upselling efforts.[5]

## C.      The Complaint Raises A Strong Inference Of Scienter

The Complaint pleads facts that collectively give rise to a "strong inference" of scienter. Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Schueneman v. Arena Pharm, Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). In this Circuit, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). The inference of scienter "need not be irrefutable . . . or even the 'most plausible.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Nor must the scienter inference be "of the 'smoking-gun' genre." *Id.* Rather, the inference of scienter must be one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In evaluating the scienter allegations, the "inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*at 310 (emphasis in original). "[A] holistic review" is required. *VeriFone*, 704 F.3d at 703. Here, numerous well-pled facts demonstrate a "strong inference" of each Defendant's scienter.

### 1.      Defendants Were in Possession of Contemporaneous, Contradictory Information When They Made the False and Misleading Statements.

Despite Defendants' best efforts to characterize the CWs' accounts as "vague and

---

[5] Defendants' knowledge also refutes their contention that any statements of opinion are not actionable because Lead Plaintiff has alleged sufficiently that Defendants disbelieved their statements. MTD at 13, n.9.

speculative" and lacking "personal knowledge" (MTD at 18), these reliable former employees confirm the Executive Defendants knew of the Zuora-RevPro integration failure before and throughout the Class Period and its effect on sales execution and customer demand.[6]

**_First_**, Defendants knew of the Zuora-RevPro integration failure based on the failed "ZoZ" project. According to CW-2, a high ranking project manager/subject matter expert who worked at Zuora from October 2017 to September 2018 and reported to Chief Information Officer Alvina Antar (who led the regular meetings about the "ZoZ" integration project and reported directly to Sloat), it is an industry best practice to try to test your own product and to implement it internally before you actually take it out and sell it to a customer.[7] ¶¶65, 68. Despite working diligently on the "ZoZ" project, Defendants failed to connect RevPro internally through an automated solution, and encountered the same integration failure customers experienced in implementing RevPro on their systems. ¶¶76-78. In fact, Defendants only brought RevPro live on Zuora's systems in April 2018 by conducting time and labor-intensive manual input of Billing data into RevPro's system subject to a two-year retesting. ¶78. Given that Zuora failed to successfully configure and deploy RevPro internally, "it would be 'absurd to suggest' that top management was unaware of [integration failure]." _Berson,_ 527 F.3d at 987-89.

---

[6] Defendants' reliance (_see_ MTD at 18-19) on _Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc._, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012), _Zucco Partners, LLC v. Digimarc Corp._, 552 F.3d 981 (9th Cir. 2009), _In re Accuracy, Inc. Sec. Litig._, 757 F. Supp. 2d 936 (N.D. Cal. 2010), _In re Cisco Sys. Inc. Sec. Litig._, 2013 WL 1402788, at *11 (N.D. Cal. Mar. 29, 2013), and _McCasland v. FormFactor Inc._, 2009 WL 2086168 (N.D. Cal. July 14, 2009) (Illston, J.) is misplaced. Lead Plaintiff alleges direct contact between the CWs and the Executive Defendants. _See_, _e.g._, ¶¶75, 76, 101. Likewise, the Complaint identifies specific records created by or sent directly to the Executives Defendants pertaining to the fraud. _See, e.g._, ¶109 (noting that Defendant Tzuo received email indicating that a client was refusing to pay for Zuora's services).

[7] Defendants' attempt to discredit Zuora former employees based on their dates of employment is without merit. _See_ MTD at 18 and 18 n6. Employment during the Class Period, let alone the entirety of the Class Period, is neither required nor indicative of the relevance of the account. _Quality Sys._, 865 F.3d at 1145 ("Although CW6 was not at QSI during the Class Period, CW6 had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales."); _Shenwick v. Twitter_, 282 F. Supp. 3d 1115, 1126 n.8 (N.D. Cal. 2017) ("[T]he timeframe of CW–9's employment has little bearing on whether he can provide relevant testimony about [company's business practices] as a general matter."). Here, all of the former employees were employed by Zuora at one point during the Class Period. ¶¶60, 65, 103, 110.

**Second**, Defendants knew of the Zuora-RevPro integration failure based on the failed "Keystone" project. At the same time Defendants promoted the "Zuora + RevPro integration" as providing users with "seamless order-to-revenue process," the Company secretly worked for years to develop a Zuora-RevPro integration solution for its clients. ¶79. Beginning in early 2018 through March 2019, Defendants worked on a project codenamed "Keystone" intended to build a connection between RevPro and Billing on clients' systems. ¶¶80-87. But after more than a year of failed tests, Defendants determined that "Keystone" could not deliver the represented functionality for RevPro (¶119), as the "OrderMetrics" solution Zuora utilized did not have all the data points needed for RevPro (¶84). As a result, 80-90% of Zuora's customers would not be able to use "Keystone" integration. *Id.* In early 2019, Tzuo and other Zuora's senior executives acknowledged the Keystone project's failure and decided to abandon it in favor of a separate technological approach, internally called the "K-2 Project," which remains ongoing. ¶119. Zuora's internal responses to undisclosed problems concerning the RevPro integration raise a strong inference of scienter. *See Matrixx*, 563 U.S. at 49-50 (company's undisclosed retention of consultant to review and conduct secret tests on drug after learning of side-effect was probative of scienter).

**Third**, Defendants attended meetings, as well as received, reviewed and had access to reports and data, which undermined their representations to investors about the functionality and associated demand of Zuora's solution. According to CW-1, Zuora's most senior executives, including the Executive Defendants, were directly involved in the "ZoR" project – an offshoot of the "ZoZ" project – which tested RevPro and Zuora's compatibility. ¶¶67-78. Specifically, Sloat, and other high-ranking Zuora officials participated in regular "ZoZ" project meetings led by CIO Antar. ¶74. Similarly, CW-2 stated that Zuora had internal forums with the C-suite regarding the "ZoR" project, and that Sloat was "apprised week-over-week" regarding the internal integration and that he was the project's "public sponsor."[8] ¶76.

---

[8]According to CW-2, CIO Antar's role was to keep Sloat up-to-date on the "Zuora on Zuora" project. ¶72. Allegations from CWs that their supervisors informed Tzuo and Sloat of the integration and sales execution issues supports a finding of scienter. This Court has found that when a CW has personal knowledge of the subjects at issue and reports directly to an executive, like CW-2, who reported directly to CIO Antar, who, in turn, reported to Defendant Sloat on the "Zuora on Zuora"

In addition, the Executive Defendants were also aware of the integration failure through internal contemporaneous reports and email communications about the status of the ZoZ project. ¶66. In particular, Sloat received Google documents and email threads tracking the project's status and circulating project status reports. ¶77. Zuora's executives also had access to reports concerning the "Keystone" project, which detailed the total number of use cases, the type of use cases, and how they were progressing, and were stored centrally where the C-suite executive could view and contribute to them. ¶86. Executives were also apprised of developments in the "Keystone" project in weekly review meetings. ¶73.

*Fourth*, the Executive Defendants also knew that the integration failure caused sales execution problems and reduced demand for Zuora's products. ¶¶89-101. Sloat and Tzuo were apprised of the integration problem at group forum meetings, and the forum meetings generated meeting minutes and a forum report that would be "circulated for action" via email and Google docs, which CW-2 regularly received. ¶93. In the minutes CW-2 received, there were regular references to the integration issues between RevPro and Zuora Billing, and these minutes would have certainly been seen by Tzuo and Sloat. ¶94. Tzuo and Sloat were also apprised of the integration failure at "quarterly review meetings," (i.e., "all hands on deck" meetings conducted by the leadership teams), and informed of customer feedback learned during Zuora customer focus groups. ¶95. The Executive Defendants also had access to Zuora's SalesForce database that identified these and other client-specific issues, including "metrics like how much the customer was paying, any opportunities for new business within the account, and the nature and status of any support tickets." ¶118.

CW-1 further confirmed that Zuora's top executives, including Tzuo and Sloat, participated in weekly calls with the Company's VPs in which they were briefed on the latest news regarding delays in integrating RevPro and its effect on clients. CW-1 knew of these meetings because he gave reports on the latest events to his supervising VP. ¶101. In fact, when Zoom, a major Zuora client, stopped paying Zuora for RevPro, CW-1 was pulled into a couple of executive meetings with

project (¶¶65, 76), such a scenario "indicat[es] scienter by [] executives." *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (Illston, J).

Zuora's founders toward the end of 2018 to see if customizations could help. *Id.*

**Finally**, Defendants, including Sloat, attended customer forums where he and other Zuora executives received negative feedback from customers, informing them that Zuora had not been able to get the solutions to work as advertised on their systems. ¶¶96-97. Specifically, CW-2 said that Sloat was informed about "internal projects and roadmaps" during these customer forums. ¶96.

Furthermore, CW-3 heard from his supervising VP that the supervising VP regularly informed Tzuo that clients were upset and some were "very unhappy" as a result of the integration failure. ¶107.[9] CW-3 also observed a November or December 2018 email thread informing Tzuo of a large client's refusal to pay for Zuora's subscription products based on the failed integration. ¶109.[10]

Defendants are wrong in arguing that the CWs lack personal knowledge regarding the integration failure. *See* MTD at 19-20.[11] CW-1 worked directly with customers to automate their revenue operations and functions with RevPro (¶60), and said for customers using Zuora Billing and RevPro, there was a "huge friction in reconciling the two systems." ¶63. CW-1 also worked on the failed "Keystone" project and provided percipient facts regarding the failed Billing-RevPro integration, as well as the impact on customers. ¶¶81-87. CW-2 likewise provided a first-hand account of the "data source" problem with the RevPro integration (¶65), and additional corroboration

---

[9] Defendants' hearsay objections are without merit (*see* MTD at 19 n. 17). "[T]he fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus." *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016). So long as the hearsay reports are "sufficiently reliable, plausible, or coherent" – which they are here – such statements from CWs are sufficiently reliable for pleading purposes. *Id.*

[10] As addressed above, Defendants' risk disclosures provide no shelter. *See* MTD at 20 and 20 n.18. Defendants' reliance on *Padnes v. Scios Nova Inc.,* 1996 WL 539711, at *9 (N.D. Cal. Sept. 18, 1996) is also misplaced, as the "known contemporaneous countervailing statement" in that case was a statement of fact regarding the nature of the medical study at issue, not a disclosure regarding *potential* issues of implementation or the *possibility* that a customer may fail to pay. *See* MTD at 20 and 20 n. 18.

[11] Contrary to Defendants' contentions (MTD at 20), the integration issues are directly relevant to scienter as they concern the subject matter of Defendants' false statements. Defendants' cited authorities on this point are inapposite, as the alleged false statements at issue in the cases did not concern the functionality of products, but rather inactionable statements regarding increased earnings (*Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)), or a product still in developmental stages (*Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1348 (S.D. Cal. 1998)).

of Zuora's failed integration and implementation of RevPro through the MuleSoft platform. ¶72.[12]

Contrary to Defendants' characterizations, these are not "hypothetical" or "speculative" CW allegations (*see* MTD at 18). Instead, the CWs here provide detailed accounts of actual meetings and forums that Tzuo and Sloat attended where the integration failure and sales execution issues were discussed, which supports a strong inference of scienter. *See Curry v. Hansen Med., Inc.,* 2012 WL 3242447, at *9 (N.D. Cal. Aug. 10, 2012) (noting that CWs attended weekly meetings with defendants where subject of alleged misstatements was discussed, and therefore "their accounts . . . of what occurred at the staff meetings are relevant to scienter"); *Hatamian v. AMD, Inc.,* 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (allegations that "certain of the defendants . . . had attended or been informed of the substance of *weekly* meetings" at which the subject of the misstatement had been discussed "support a strong inference" of scienter). Furthermore, allegations that "contemporaneous reports or data, [are] available to the party, [and] contradict" the allegedly misleading statements are "[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false."[13] *Oracle Corp.*, 380 F.3d at 1230.[14]

The Complaint does allege facts showing Zuora's lost customers, sales execution issues, and reduced demand. *Cf.* MTD at 20-21. To start, Defendants ignore detailed allegations regarding

---

[12] The Complaint's fulsome CW accounts provide much more detail than those in the cases Defendants cite (*see* MTD at 19-20). *See, e.g., Accuray*, 757 F. Supp. 2d at 949 (noting that "Plaintiffs do not allege any particular facts about the preparation of the corporate-level revenue forecast and whether the sales targets were incorporated into the forecast"); *In re Nimble Storage, Inc. Sec. Litig.*, 2016 WL 7209826, at *10 (N.D. Cal. Dec. 9, 2016) ("Except for one client CW 8 alleges would not have been classified as an enterprise client by other vendors, plaintiff includes no other specific allegations of improper classifications.").

[13] The CWs provide the exact details Defendants claim their accounts lack (*see* MTD at 19). The CWs identify specific meetings (*e.g.*, ¶75), what was discussed at the meetings (*e.g.*, ¶101), and what data and reports showed (*e.g.*, ¶118). No further detail is required.

[14] Defendants cited cases (*see* MTD at 19 and 19 n.7), *In re Apple Computer Inc.,* 127 F. App'x 296 (9th Cir. 2005), *Bao v. SolarCity Corp.*, 2016 WL 54133 (N.D. Cal. Jan. 5, 2016), *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418 (N.D. Cal. June 8, 2011), and *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987 (N.D. Cal. 2016), are inapposite. All involved CW allegations lacking the specific details offered by Plaintiff's CWs here, including what Tzuo and Sloat knew and when they knew it. Similarly, unlike *Monachelli v. Hortonworks, Inc.,* 225 F. Supp. 3d 1045 (N.D. Cal. 2016), the CWs here held positions directly related to product integration and sales execution (i.e., the subject areas of the false statements and misrepresentations). ¶¶60, 65, 103, 110.

Zoom, including that Zuora had Zoom's "billing information, but struggled to translate it into RevPro smoothly" and that CW-1 had direct contact with Zuora's founders in late 2018 on Zoom's decision to stop payments and whether customizations would help Zoom. ¶¶98-101. In addition, CW-3, who worked as an account executive at Zuora from June 2018 to July 2019 in the San Mateo office, provided "particularized facts" regarding issues Zuora's customers were experiencing with the integration, including that "[c]ustomers were spending over $1 million . . . to get [Zuora and RevPro] to work together." ¶104. CW-3 also provided information about another customer (a "significant player in the web conferencing space"), which spent "millions" to make Zuora Billing and RevPro work together in advance of the company going public. *Id.*[15] Collectively, these allegations contribute to a strong inference of scienter. *See, e.g., City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust v. RH, Inc.*, 302 F. Supp. 3d 1028, 1043-44 (N.D. Cal. 2018) ("testimony of CWs who indicate that [the executive defendants] had access to and reviewed reports which described the RH Modern inventory shortage and customer complaints" demonstrated scienter).

### 2. Defendants' Private and Public Admissions Support a Strong Inference of Scienter

Sloat privately acknowledged the integration failure to colleagues in advance of Zuora's IPO. During a monthly "ZoZ" project meeting in early 2018, Defendant Sloat told the project team about how Zuora was "going to market as a combined product for ASC 606," that the market needed a seamless solution, and that "Zuora needed to get its act together with RevPro." ¶75. Similarly, Tzuo privately admitted the integration failure to colleagues. According to CW-1, after completion of a proof of concept for the K-2 project in early 2019, "[t]here was a directive that Tien [Tzuo] gave

---

[15] Defendants' credibility challenges to CW-4 are unconvincing. *See* MTD at 20-21. CW-4 identified the problem with RevPro integration (i.e., that RevPro and Central did not "work together" as they "lacked the proper data points to seamlessly transfer information and there was no integration between Central and RevPro). ¶114. CW-4 explains how this integration failure contradicted Defendants' public statements regarding the "plug and play" nature of Zuora Central. *Id.* CW-4 also worked on Zuora's large accounts, including Fortune 500 companies, and described the reputational hit Zuora took from its integration issues: a large enterprise company would not add Central because of what they had been hearing about the RevPro integration issues. ¶¶110, 117.

Jagan [Reddy] to start K-2," a direct acknowledgment that the Keystone/OrderMetrics solution was not working. ¶119. These private admissions support a strong inference of scienter. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) (citing management's admissions in finding strong evidence of scienter). [16]

Defendants' public admissions further contribute to a strong inference of scienter. *See Oracle Corp.*, 380 F.3d at 1230. At the May 30, 2019 earnings call, Tzuo admitted that Zuora "start[ed] heavy work on the integration[] early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction." ¶151. Moreover, post-Class Period, Zuora's VP of Investor Relations Joon Huh explained that for the past year Zuora had been making extraordinary efforts to technically integrate the two products to make sure "that people that have our Billing product could also buy RevPro and have a clean integration across it." ¶156. Mr. Huh also explained that as a result of these "challenges," Zuora had to pause the RevPro implementation with its Billing customers who had bought RevPro "until we got the integration work done." *Id.* Courts have found similar post-class period admissions probative of scienter. *See, e.g.*, *In re VistaCare, Inc. Securities Litig.*, 2005 WL 8160681, at *2 (D. Ariz. Aug. 19, 2005) (denying motion to dismiss, noting that "Plaintiffs point to post-class period admissions that Defendants had implemented aggressive corrective action to remedy Medicare Cap problems as further evidence that VistaCare had knowledge of the falsity of their financial reports").[17]

### 3. Zuora's Senior Executives' Insider Sales Were Unusual and Suspicious

Allegations of "unusual" or "suspicious" stock sales by corporate insiders are relevant to the scienter inquiry. *Am. W. Holding Corp.*, 320 F.3d at 938-40. "To evaluate suspiciousness of stock sales, we consider, *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Quality Sys.*, 865 F.3d at 1146. Here, the

---

[16] In addition, the close proximity between the April 18, 2019 false statements and the May 31, 2019 disclosure also supports a strong inference of Defendants' scienter. *See Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995).

[17] *Kelly v. Electronic Arts, Inc.*, 2015 WL 1967233, at *9-10 (N.D. Cal. Apr. 30, 2015), is inapt. There, the alleged "admission" was a statement not referring to the product in question. Here, Tzuo's admissions unquestionably dealt with the Zuora-RevPro integration. ¶¶155-58.

Complaint pleads facts showing the magnitude, timing, and suspicious nature of the Defendant Sloat's and Diouane's stock sales. ¶¶138-42.[18] Sloat pocketed $16 million in insider sales. ¶138. Sloat sold nearly half of his Zuora common stock holdings in late March 2019, just a week after Zuora announced positive 2019 results, but just one month before the end of Zuora's 1Q 2020. ¶139.[19] It is also proper to consider Diouane's stock sales, as "'unusual or suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter." *See In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). Diouane dramatically increased the size of his sale transactions during the Class Period, eventually unloading over a quarter of his Zuora common stock on April 29, 2019, which was the final day of Zuora's disappointing 1Q 2020, and only a month before Zuora would announce the poor results, reduced guidance, and Diouane's resignation.[20] ¶¶138, 140. Sloat's and Diouane's sales are further suspicious in terms of amount and timing since after the close of the Class Period up to the filing of the Complaint, neither Sloat nor Mr. Diouane have sold any shares they owned or controlled. ¶141.[21]

### 4. The Fact That the Integration Issue Affected Zuora's Core Operations Supports an Inference of both the Executive Defendants' and Zuora's Scienter

The Ninth Circuit has held that in "some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA." *S. Ferry LP, No. 2*

---

[18] Relatedly, that Zuora was preparing to go public further contributes to a strong inference of scienter, particularly when coupled with the suspicious insider sales. *See, e.g.*, *Knapp v. Gomez*, 1993 WL 305940, at *5 (S.D. Cal. May 5, 1993).

[19] That Sloat retained nearly half of his Zuora common stock holdings by no means "establishes that his sales were not suspicious." *See* MTD at 23. Courts have found scienter where insiders sold a much lower percentage of their personal holdings. *See, e.g.*, *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (insider sold 20% of personal holdings).

[20] The suspicious timing and circumstances of Diouane's departure and realignment of the Company's sales structure and sales strategy (¶¶46, 253) further supports and inference of scienter. *See In re Volkswagen "Clean Diesel"*, 2017 WL 66281, at *14; *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (noting that "[c]orporate reshuffling" supports scienter).

[21] Sales pursuant to 10b5-1 plans do not immunize insiders' unusual and suspicious sales. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n. 16 (N.D. Cal. 2009). Similarly, the lack of alleged insider sales by Tzuo does not create an inference in Defendants' favor. *See* MTD at 22-23; *see also Am. W. Holding Corp.*, 320 F.3d at 935.

*v. Killinger,* 542 F.3d 776, 785 (9th Cir. 2008). This is one of those cases, as virtually all of Zuora's revenues come directly or indirectly from its sale and implementation of its platform and related software application products that were impacted by the integration issue. ¶4. Thus, the problems that the Zuora Billing-RevPro integration failure presented were so prominent that it is implausible that Tzuo and Sloat did not know about these problems. *See, e.g., Mulligan v. Impax Labs., Inc.*, 36 F. Supp.3d 942, (N.D. Cal. 2014). Indeed, the Executive Defendants repeatedly held themselves out in their public statements as familiar with and directly involved in the Company's sales and implementation process, including the Zuora-RevPro integration. *RH, Inc.*, 302 F.Supp.3d at 1043-44 (finding allegations the CEO was "highly involved in the RH Modern launch" was probative of scienter).

Finally, even apart from the Executive Defendants' scienter, the Complaint pleads "collective" or "corporate" scienter. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) ("[T]he collective scienter (or corporate scienter) doctrine recognizes that it is possible to raise the inference of scienter without doing so for a specific individual."). This is a case where the statements "were so important" and "so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Id.* The alleged misstatements were important to shareholders because they related to Zuora's solution and flagship products — the very heart of Zuora's business. And the statements were "dramatically false," as Defendants boasted of a "Zuora + RevPro integration," when none existed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. If, however, the Court dismisses the Complaint in whole or in part, Lead Plaintiff requests leave to amend pursuant to Federal Rule of Civil Procedure 15.

Dated: February 19, 2020             Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Lucas E. Gilmore*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202

Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Lead Plaintiff*
*New Zealand Methodist Trust Association*