1  SUSAN S. MUCK (CSB No. 126930)
   smuck@fenwick.com
2  CATHERINE KEVANE (CSB No. 215501)
   ckevane@fenwick.com
3  KATHERINE A. MARSHALL (CSB No. 327042)
   kmarshall@fenwick.com
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, CA 94104
   Telephone:    415.875.2300
6  Facsimile:    415.281.1350

7  Attorney for Defendants Zuora, Inc.,
   Tien Tzuo, and Tyler Sloat
8

9              UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12 | CASEY ROBERTS, Individually and on      | Case No.: 3:19-cv-03422-SI
     Behalf of All Others Similarly Situated,
13 |                                          | **DEFENDANTS' STATEMENT OF**
                  Plaintiff,                    **RECENT DECISION IN SUPPORT OF**
14 |                                          | **MOTION TO DISMISS**
          v.                                    **CONSOLIDATED AMENDED CLASS**
15 |                                          | **ACTION COMPLAINT**
     ZUORA, INC., TIEN TZUO, and
16   TYLER SLOAT,                              Hearing Date:  April 24, 2020
                                               Hearing Time:  10:00 a.m.
17 |              Defendants.                 | Dept.:         Courtroom 1, 17th Floor
                                               Judge:         Hon. Susan Illston
18
                                               Date Action Filed:  June 14, 2019
19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    Defendants Zuora, Inc., Tien Tzuo and Tyler Sloat ("Defendants") respectfully submit this

2    Statement of Recent Decision pursuant to Civil Local Rule 7-3(d)(2) in connection with their

3    Motion to Dismiss Consolidated Class Action Complaint (Dkt. No. 64). Attached as Exhibit 1 is

4    a true and correct copy of *Lopes, et al. v. FitBit, Inc., et al.*, No. 18-cv-06665-JST, 2020 WL

5    1465932 (N.D. Cal. Mar. 23, 2020). In this decision, which was issued after Defendants filed

6    their Reply in support of the Motion (Dkt. No. 68), District Court Judge Jon S. Tigar dismissed a

7    putative class action alleging securities fraud, including alleged violations of Section 10(b) of the

8    Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder,

9    as well as alleged violations of Section 20(a) of the Exchange Act.

        Defendants' Motion is scheduled for hearing on April 24, 2020 at 10:00 am.

Dated: March 30, 2020               FENWICK & WEST LLP

By: */s/ Katherine A. Marshall*
       Katherine A. Marshall

    Attorneys for Defendants Zuora, Inc.,
    Tien Tzuo, and Tyler Sloat

Exhibit 1

2020 WL 1465932
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

STEPHEN LOPES, et al., Plaintiffs,
v.
FITBIT, INC., et al., Defendants.

Case No. 18-cv-06665-JST
|
Filed 03/23/2020

Re: ECF No. 53

**ORDER GRANTING MOTION TO DISMISS**

JON S. TIGAR United States District Judge

**\*1** Before the Court is Defendants' motion to dismiss Plaintiffs' consolidated amended class action complaint. ECF No. 53. The Court will grant the motion.

**I. BACKGROUND**

**A. Factual Background**

Defendant Fitbit, Inc. ("Fitbit" or "Company") manufactures wearable fitness-tracking devices which "purport to monitor a user's fitness level by tracking daily activities, such as heart beat, steps taken, pace, distance traveled, calories burned, stars climbed, and time spent in sleep." ECF No. 51 ¶ 2. Defendant James Park co-founded Fitbit and is the Company's President, Chief Executive Officer, and Chairman of the Board of Directors. *Id.* ¶ 33. Defendant William Zerella was Fitbit's Chief Financial Officer during the putative class period. *Id.* ¶ 34.

**1. August 2, 2016 Guidance**

On August 2, 2016, the beginning of the putative class period, Fitbit announced earnings projections of "$2.5 to $2.6 billion revenue for fiscal [year] 2016." *Id.* ¶ 4. During an earnings call held that day, Defendant Zerella stated that Fitbit "expect[ed] to start refilling the channel in the latter part of Q3 2016 in connection with new products for the holidays." *Id.* ¶ 47. Zerella also noted that Fitbit "remain[ed] optimistic for the second half of the year" and "expect[ed] to enter the holiday

season with the most compelling lineup of new products than any previous holiday period." *Id.*

**2. Introduction of Flex 2 and Charge 2 Products**

On August 29, 2016, Fitbit introduced two new products targeted for the holiday season, Flex 2 and Charge 2. *Id.* ¶¶ 4-5. During a conference call held that day, Fitbit Director of Product Marketing Melanie Chase "touted the features and technical achievements of the Flex 2, including its long battery life, waterproof feature and slim design." *Id.* ¶ 5. Chase stated that the Flex 2 "represented a 'large core and category growth opportunity' because of its appeal to two new category [sic] of users: women due to its small size and swimmers due to its waterproof feature." *Id.* Thereafter, in a series of investor conferences in September, Fitbit's Vice President of Investor Relations Brad Samson allegedly "reaffirmed the Company's guidance provided on August 2, while touting the long battery life, accuracy, and new features of the Flex 2. *Id.*

On September 28, 2016, Pacific Crest Analyst Brad Erickson "issued a note cutting its rating on Fitbit shares to Underweight from Sector Weight, after his channel checks showed that the Fitbit's Charge 2, which had started shipping mid-September 2016, had too much accumulated inventory." *Id.* ¶ 121. During an October 6, 2016 episode of the Mad Money cable new program, an interviewer asked Defendant Park, "Can I trust channel checks versus what ultimately the results will be?" *Id.* ¶ 123. Park responded, "You know, without knowing how that analyst did the channel checks I can't really say, but what I can say is: Look, we just started shipping the product. I mean Fitbit Charge 2 is the number one bestselling fitness tracker on Amazon." *Id.*

**3. November 2, 2016 Revised Guidance**

**\*2** On November 2, 2016, Fitbit lowered its full-year revenue guidance from between $2.5 billion and $2.6 billion to between $2.320 billion and $2.345 billion. *Id.* ¶ 131. Fitbit also lowered its fourth quarter guidance from the "$985 million guidance previously implied on August 2" to a range between $725 and $750 million. *Id.* ¶ 13. Following this news "Fitbit's common stock fell $4.30 per share, or 33.6%, to close on November 3, 2016 at $8.51 per share, on unusually heavy trading volume." *Id.* ¶ 14.

#### 4. January 30, 2017 Press Release

On January 30, 2017, Fitbit lowered its full-year 2016 guidance for revenue growth to "approximately 17% from the previous forecasted growth of 25% to 26%." *Id.* ¶ 20 (internal quotation marks omitted). The Company also "lowered its fourth quarter revenue guidance from $725-$750 to $572-$580 million." *Id.* (internal quotation marks omitted). "On this news, Fitbit's common stock declined by $1.15 per share, or 15.95%, to close on January 30, 2017 at $6.06 per share, on unusually heavy trading volume." *Id.* ¶ 21.

#### B. Procedural History

On November 1, 2018, Plaintiff Stephen Lopes brought this securities class action on behalf of a class consisting of all those who purchased Fitbit securities between August 2, 2016 and January 30, 2017 (the "Class Period"). ECF No. 1 ¶ 33; ECF No. 51 ¶ 1. On April 30, 2019, this action was consolidated with the substantially similar case *Patti v. Fitbit, Inc.*, No. 5:18-cv-06922-LHK (N.D. Cal.). ECF No. 50. Plaintiffs filed a consolidated amended class action complaint ("Complaint") on June 24, 2019. ECF No. 51. The Complaint seeks to recover damages caused by Defendants alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. ECF No. 51 ¶ 1.

On August 23, 2019, Defendants filed a motion to dismiss Plaintiffs' consolidated class action complaint. ECF No. 53. Plaintiffs filed an opposition on October 22, 2019. ECF No. 57. Defendants filed their reply on December 6, 2019. ECF No. 59.

#### II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

#### III. REQUEST FOR JUDICIAL NOTICE

In ruling on a 12(b)(6) motion to dismiss, the Court "must consider ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "On any motion to dismiss based [on the safe harbor of the PSLRA], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not

subject to material dispute, cited by the defendant." 15 U.S.C. § 78u–5(e). "If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim." *In re Silicon Storage Technology, Inc.*, No. C 05-0295 PJH, 2006 WL 648683, at *2 (N.D. Cal. March 10, 2006) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001)).

In addition, a Court may take judicial notice of matters in the public record. Federal Rule of Evidence 201(b) provides: a "judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

**\*3** Defendants ask the Court to take judicial notice of several categories of documents, most of which are SEC filings and transcripts of earnings calls and analyst reports on which Plaintiffs rely in the Complaint. ECF No. 54 at 2-6. Plaintiffs do not oppose Defendants' request for judicial notice. [1] Because the documents are matters of public record, documents on which the complaint necessarily relies, or capable of determination by sources whose accuracy may not reasonably be questioned, the Court grants Defendants' unopposed request for judicial notice.

[1]     Plaintiffs "do not oppose the request for judicial notice to the extent that the Court only takes notice that those documents exist and what those documents say, but not for the truth of the factual matters stated therein." ECF No. 57 at 10 n.1.

#### IV. LEGAL STANDARD

#### A. The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements ...." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and "a party must state with particularity the circumstances constituting fraud or mistake." 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b); *see also Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605. "In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

### B. Falsity and Materiality

The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). For statements to be actionable under the PSLRA, they must be both false or misleading and material. A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citation omitted).

**\*4** A false or misleading statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). To plead materiality, a complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (citation omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (internal quotation marks and citations omitted).

### C. Scienter

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976). In order to adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must undertake a two-step inquiry by first considering "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and "if no individual allegation is sufficient, ... conduct[ing] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate

recklessness." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citation omitted).

In the Ninth Circuit, scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration and emphasis in original) (quoting *City of Dearborn Heights*, 856 F.3d at 619). Stated differently, deliberate recklessness requires that an actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

### D. Loss Causation

**\*5** Loss causation, "i.e., a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under Section 10(b) of the Exchange Act. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some other intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). In other words, plaintiffs alleging that they suffered a loss because they resold shares at a lower price must show that the price reflects "the earlier misrepresentation" rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharm.*, 544 U.S. at 343. The Ninth Circuit has held that, as with other elements of a securities fraud claim, plaintiffs must plead loss causation with the particularity required by Federal Rule of Civil Procedure 9(b). *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.

"The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.' " *Lloyd*, 811 F.3d at 1209 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014)); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) ("Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.' ") (quoting *McCage v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d. Cir. 2007)). However, "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Nuveen*, 730 F.3d at 1120. "The fundamental inquiry before the Court remains whether there is 'a causal connection between the material misrepresentation and the loss.' " *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (quoting *Dura Pharm.*, 544 U.S. at 342).

## V. DISCUSSION

Defendants move to dismiss the Complaint, arguing that Plaintiffs do not plead specific facts demonstrating either (1) a material misrepresentation or omission, (2) a strong inference of scienter, or (3) loss causation. ECF No. 53 at 7.

### A. Falsity and Materiality

Plaintiffs allege that Defendants made numerous false or misleading Class Period statements during conference calls, investor presentations, earnings calls, and interviews.

### 1. Statements Regarding Flex 2 Product Features

Plaintiffs allege that Defendants made materially false and misleading statements regarding Flex 2 product features and ability to compete in the relevant product marketplace. Plaintiffs take issue with statements made by Director of Product Marketing Melanie Chase and Vice President of Investor Relations Brad Samson during a conference call on August 29, 2016 and investor presentations in September 2016. ECF No. 51 ¶¶ 7, 100-101, 112-120. During the conference call, Chase discussed Flex 2's small size and "up to five days of battery life." *Id.* ¶¶ 100-101. During

the investor presentations, Samson described Flex 2 as a "waterproof product" with "at least four or five days of battery life." *Id.* ¶¶ 114-117. Plaintiffs argue that these statements were false and/or misleading because, as of August 29, 2016, "the Company had not found or procured a battery that was small enough to make these features work." *Id.* ¶ 99; *see also id.* ¶¶ 7, 102-106.

Plaintiffs have not adequately pleaded that these statements were false or misleading. The Complaint offers minimal evidence to support its allegations that Fitbit had not located a small enough battery by August 29, 2016. *See Bodri v. GoPro,* 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017) (finding statements non-actionable where "Plaintiff does not adequately allege that the statements [ ] were false"). Plaintiffs base their allegations solely on Defendant Park's statement during a November 2, 2016 earnings call that "it was incredibly difficult to find batteries that were small enough to fit in the [Flex 2] device." ECF No. 51 ¶ 106. This statement occurred during a discussion of the scrap charges resulting from Flex 2's automated production process. ECF No. 55-1 at 144. It provides no evidence that "a small enough battery was missing" and had not yet been sourced by August 29, 2019. ECF No. 51 ¶ 105-06.

### 2. Statement Regarding Charge 2 Product Features

 **\*6**  Plaintiffs allege that Defendants "misled investors about the features and prospects" of the Charge 2 device. ECF No. 51 ¶¶ 8, 59-61, 107-111. In particular, Plaintiffs take issue with statements made by Chase during a conference call on August 29, 2016 which touted the "all-day activity tracking" and "steps and distance tracking" features of the Charge 2. *Id.* ¶¶ 107-111. Plaintiffs argue that these statements were false and/or misleading because "the product was plagued with bugs and/or defects that caused statistics such as distance and pace tracking to be calculated inaccurately." *Id.* ¶¶ 8, 60-61, 110-11.

Plaintiffs have not adequately pleaded that these statements were false or misleading. Plaintiffs attempt to imply falsity by noting that, although Fitbit performs "internal studies to extensively test the accuracy of its products," it nevertheless "uncovered two software bugs" after the release of Charge 2, which "caused the tracker to occasionally calculate stats like pace and distance with less precision." ECF No. 51 ¶¶ 60-61. Plaintiffs claim that it is "reasonable to infer that Defendants learned about the bugs and/or defects of the

Charge 2 during the Company's extensive testing" and then touted the features of the Charge 2 "without disclosing these issues." *Id.* ¶ 61, 110-11. However, "[t]hat a new program has kinks does not make a positive statement about the program false." *In re Siebel Sys., Inc. Sec. Litig.,* No. C 04-0983, 2005 WL 3555718, at \*4 (N.D. Cal. Dec. 28, 2005); *see also Allison v. Brooktree Corp.,* 999 F. Supp. 1342, 1348 (S.D. Cal. 1998) ("In bringing any high-tech product to market, problems encountered in the early developmental stages are the norm, not the exception."). "If that were the case, the federal securities laws would prevent ... companies from making any positive statements about new software." *Siebel,* 2005 WL 3555718, at \*4.

### 3. Statements Expressing Optimism about Fitbit's New Product Lineup

Plaintiffs challenge various statements expressing optimism about Fitbit's product lineup and market prospects. Plaintiffs take issue with Chase's statements that "we believe" Flex 2 and Charge 2 present an "incredible opportunity for core and category growth." ECF No. 51 ¶¶ 59, 101, 109, 112. They also highlight Defendants' statements that they "remain[ed] optimistic for the second half of the year," *id.* ¶ 47, were "very optimistic looking forward," *id.* ¶ 114, and "expect[ed] to enter the holiday season with the most compelling lineup of new products than [sic] any previous holiday period." *Id.* ¶¶ 4, 47.

These statements are corporate puffery, not material misrepresentations. *See Fadia v. FireEye, Inc.,* Case No. 5:14-cv-05204-EJD, 2016 WL 6679806, at \*8 (N.D. Cal. Nov. 14, 2016) ("Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact."). "In the Ninth Circuit, 'vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws' because no reasonable investor would rely on such statements." *In re Fusion-io, Inc. Sec. Litig.,* No. 13-CV-05368-LHK, 2015 WL 661869, at \*14 (N.D. Cal. Feb. 12, 2015) (quoting *In re Impac Mortg. Holdings, Inc. Sec. Litig.,* 554 F.Supp.2d 1083, 1096 (C.D. Cal. 2008)).

### 4. Statements Regarding Revenue and Margin Guidance

Plaintiffs allege that Defendants issued false and/or misleading revenue and margin guidance on August 2, 2016

and then reaffirmed this guidance during a conference call on August 29, 2016 and investor presentations in September 2016. ECF No. 51 ¶ 4-7, 51-56, 81-97, 114-17. Fitbit's August 2, 2016 earnings call provided guidance that expected revenue for full-year 2016 would be between $2.5 and $2.6 billion. *Id.* ¶ 4. During an August 29 conference call, Defendant Zerella stated that Fitbit was "not providing any update to guidance," and that "everything is consistent with what we talked about on the last earnings call." *Id.* ¶¶ 92-93. During September investor presentations, Samson stated that "our guidance shows a very good holiday season this year" and "we're very optimistic looking forward." *Id.* ¶¶ 114-16. On November 2, 2016, however, the Company lowered its full-year revenue guidance to a range of $2.320 to $2.345 billion. *Id.* ¶ 12.

**\*7** Plaintiffs argue that Defendants knew the guidance lacked a reasonable basis when issued and reaffirmed because the guidance "was based, in part, on sales of Flex 2 that were at risk of not being materialized because Fitbit did not have a battery for the Flex 2." *Id.* ¶¶ 85, 94-95, 119. Defendants respond that, even if Fitbit's guidance was false and misleading, they are protected by the PSLRA safe harbor provision for forward-looking statements. ECF No. 53 at 14-20; *see* [15 U.S.C. § 78u-5(c)(1)](#). The Court finds that Defendants' revenue guidance statements are not actionable because they fall within the PSLRA safe harbor provision.

The PSLRA provides safe harbor for "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." [15 U.S.C. § 78u–5(i)(1)(A)](#). Earnings projections "fall within the safe harbor ... if they were identified as forward-looking statements and accompanied by meaningful cautionary language, under subsection (A)(i); or if the investors fail to prove the projections were made with *actual* knowledge that they were materially false or misleading, under subsection (B)." *Cutera*, [610 F.3d at 1111-12](#). "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *Id.* [at 1112](#). If a forward-looking statement lacks "sufficient cautionary language," it may still fall under the safe harbor "where the plaintiff fails to prove actual knowledge that the statement was false or misleading." *Id.* (citing [15 U.S.C. § 78u–5(c)(1)](#)); *see Bodri*, [252 F. Supp. 3d at 929](#).

### a. Forward-Looking Statements

Defendants' August 2, 2016 "earnings projections are by definition forward-looking statements." *Bodri*, [252 F. Supp. 3d at 929](#) (citing *Cutera*, [610 F.3d at 1111](#) ("The January 31 earnings projection is by definition a forward-looking statement.") (alternations and internal quotation marks omitted)). Plaintiffs argue that Fitbit's statements that it was "on track" to meet its earnings projections were representations of then-current facts, rather than forward-looking projections. ECF No. 57 at 19. Although Plaintiffs cite no statement in which Fitbit used the specific words "on track," some of its statements can be reasonably interpreted to send that message.[2]

[2]      Plaintiffs construe the following statements as affirmations that Defendants were "on track" to meet their guidance: "we are not providing any update to guidance," ECF No. 51 ¶ 93; "[t]here is no update to our guidance.... So, everything is consistent with what we talked about on the last earnings call," *id.* ¶ 92; "we are maintaining our full-year revenue and EPS guidance ranges," *id.* ¶ 83; "our guidance shows a very good holiday season this year. I don't think anything that's happened recently competitively changes any of that dynamic in any way," *id.* ¶ 116 (emphasis omitted); "we've guided to a very robust Christmas this year ... so we're very optimistic looking forward," *id.* ¶ 114 (emphasis omitted); etc. ECF No. 57 at 19-21.

There is a split of authority on this issue. "Some courts have found statements regarding being 'on track' to meet financial goals are forward-looking statements, whereas other courts have found statements regarding being 'on track' and 'on plan' are not forward-looking because they reflect current (rather than future) business conditions." *Wyatt v. Mattel, Inc.*, [No. CV-19-1646-CBM-MAA(x), 2020 WL 364324, at \*5 (C.D. Cal. Jan. 21, 2020)](#) (collecting cases); *see also Rodriguez v. Gigamon Inc.*, [325 F. Supp. 3d 1041, 1051 (N.D. Cal. 2018)](#) (collecting cases). "[T]he phrase 'on track' does not change the fact that such a statement is forward-looking. This phrase indicates that at that time, based on the information available to the speaker, the goals were reasonable. This is implicit in any forward-looking statement." *M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, No. CV 17-1479 PA (MRWx), [2017 WL 5635424, at \*11 n.5 (C.D. Cal. Aug. 20, 2017)](#); *Pub. Employees Ret. Sys. of Mississippi v. Qualcomm, Inc.*, [773 F. App'x 987, 988 (9th](#)

Cir. 2019) ("We also conclude that the various 'on-track' and similar 'no delay' statements made between December 2014 and January 2015 are nonactionable.); *In re ECOtality, Inc. Securities Litig.*, No. 13-3791 SC, 2014 WL 4634280, at *5-7 (N.D. Cal. Sept. 16, 2014) ("[O]n track to begin delivery in the third quarter to satisfy our healthy pipeline of interest in [the Minit-Charger]" is forward-looking. On the facts here, the Court concludes that the challenged statements were forward-looking.

### b. Cautionary Language

**\*8** Plaintiffs also argue that safe harbor is inapplicable because Defendants' cautionary statements were not meaningful and warned of risks that had already transpired. ECF No. 57 at 18-19, 21-23. These arguments are unpersuasive.

First, Fitbit's cautionary language is substantially similar to risk disclosures found to be sufficient within this circuit. Each press release and call discussing Fitbit's guidance identified the projects as forward-looking and noted risks and uncertainties that could cause actual results to materially differ. *See* ECF No. 55-1 at 19, 29, 41, 123, 133, 146; *see, Cutera*, 610 F.3d at 1112 (Defendants began the conference call at issue "with a notice that 'these prepared remarks contain forward-looking statements concerning future financial performance and guidance,' ... and that factors like [Defendant's] 'ability to continue increasing sales performance worldwide' could cause variance in the results"); *Bodri*, 252 F. Supp. 3d at 930 (Defendant "provided cautionary language at the beginning of its [ ] earnings calls."). At the beginning of its earnings call, Defendants also pointed potential investors to its SEC filings and the specific risk factors contained therein.[3] *See Bodri*, 252 F. Supp. 3d at 931 (noting that, at the beginning of its earnings calls, Defendant "point[ed] potential investors to its Form 10-K ... and the specific risk factors contained therein"). The sufficiency of Defendants' cautionary language is not undermined "merely because Defendants utilized similar language in their cautionary disclosures throughout the Class Period." *Bodri*, 252 F. Supp. at 932 ("[C]autionary language is not rendered insufficient merely because Defendants utilized similar language in their cautionary disclosures throughout the Class Period.") (quoting *In re Quality Systems, Inc. Sec. Litig.*, 60 F.Supp.3d 1095, 1107 (C.D. Cal. 2015)).

[3] The risk factors contained within the SEC filings include the following: "If we are unable to successfully develop and timely introduce new products and services ... our business may be adversely affected;" "Given the complexity [of our products and services], we occasionally have experienced, and could experience in the future, delays in completing the development and introduction of new and enhanced products and services," "[I]n connection with new product introduction, we face challenges acquiring adequate and timely supplies of our products to satisfy the levels of demand, which we believe negatively affects our revenue. *See, e.g., Bodri*, 252 F. Supp. at 931 (finding substantially similar cautionary language sufficient); *In re Leapfrog Enter., Inc. Sec. Litig*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2017) (same).

Plaintiffs argue that Fitbit's cautionary statements are insufficient because they warned of risks that had already transpired. Plaintiffs contend that, by August 2016, "the Company lacked a working battery for Flex 2," which had already caused "production delays." ECF No. 57 at 18-19. However, the Complaint offers no evidence to support its allegation that Fitbit lacked a working battery at this time. As discussed above, Plaintiffs base these allegations solely on Defendant Park's statement during a November 2, 2016 earnings call that "it was incredibly difficult to find batteries that were small enough to fit in the [Flex 2] device." ECF No. 51 ¶ 106. This statement provides no indication that "a small enough battery was missing" and had not yet been sourced by August 2016. ECF No. 51 ¶ 105-06.

### c. Actual Knowledge

**\*9** Even if the cautionary language were insufficient, Defendants would nevertheless be immunized by PSLRA's safe harbor provision because Plaintiffs provide little evidence that Defendants' revenue guidance was *knowingly* false. *See Cutera*, 610 F.3d at 1111-12 (A forward-looking statement that lacks "sufficient cautionary language," may still fall under the safe harbor "where the plaintiff fails to prove actual knowledge that the statement was false or misleading."). As discussed above, Plaintiffs fail to provide evidence that the Flex 2 lacked a working battery in August 2016. Accordingly, Plaintiffs also fail to establish that Defendants had knowledge that projected sales "were at risk of not being materialized because Fitbit did not have a battery for the Flex 2." ECF No. 51 ¶ 85.

### 5. Statements Regarding Charge 2 Demand

Plaintiffs allege that Defendants "recklessly disregarded that demand for the Charge 2 had flattened" by October 2016. ECF No. 121-30. On September 28, 2016, Pacific Crest Analyst Brad Erickson "issued a note cutting its rating on Fitbit shares to Underweight from Sector Weight, after his channel checks showed that the Fitbit's Charge 2, which had started shipping mid-September 2016, had too much accumulated inventory." ECF No. 51 ¶ 121. During an October 6, 2016 episode of the Mad Money cable news program, an interviewer asked Defendant Park, "Can I trust channel checks versus what ultimately the results will be?" *Id.* ¶ 123. Park responded, "You know, without knowing how that analyst did the channel checks I can't really say, but what I can say is: Look, we just started shipping the product. I mean Fitbit Charge 2 is the number one bestselling fitness tracker on Amazon." *Id.* On November 2, 2016, Fitbit "lowered its full-year earnings guidance" and noted that this "shortfall" was driven by a few factors, including "softness in overall demand." *Id.* ¶¶ 69, 131.

Plaintiffs allege that Park's statements during the Mad Money interview "denied the Pacific Crest Report's findings" and "misled the market into believing that the channel checks were not a reliable indicator of the [Charge 2's] success." ECF No. 57 at 23-25; ECF No. 51 ¶¶ 64, 123, 127. These allegations, however, mischaracterize Park's statements. Park explicitly refrained from taking a position on the reliability of the Pacific Crest channel checks. ECF No. 51 ¶ 123 (noting that, "without knowing how that analyst did the channel checks, I can't really say" whether one can "trust channel checks versus what ultimately the results will be"). Parks statements that Fitbit "just started shipping" Charge 2 and that "Charge 2 is the number one bestselling fitness tracker on Amazon" neither negate Park's prior statement nor suggest a denial of the Pacific Crest Report's findings. *See Leapfrog,* 200 F. Supp. 3d at 1003-04 (finding that other statements made by defendant "put the alleged misleading statements ... in context" and "substantially mitigate[d] the potentially misleading nature of the challenged statements."); *Bodri,* 252 F. Supp. 3d at 927 ("Fairly presented, the second statement does not make the first one false and does not support an actionable claim."). Therefore, Plaintiffs have not adequately pleaded that Park's statements were materially false or misleading.

### 6. Statements Regarding Revised Revenue Guidance

Plaintiffs allege that, in December 2016, Defendants "recklessly disregarded that demand for [Fitbit] products had been lower than expected and the revised guidance was yet again overstated." *Id.* ¶¶ 131-37. On November 2, 2016, Fitbit revised its full-year revenue guidance from between $2.5 billion and $2.6 billion to between $2.320 billion and $2.345 billion. ECF No. 51 ¶ 131. In a December 16, 2016 presentation, Defendant Zerella stated that Fitbit "started seeing in Q3 and a continuation in October [ ] some flattening of demand." *Id.* ¶ 134. Zerella also noted that "we have yet to see how that will play out for the holidays" and "we still have a few more pretty big weeks between now and the end of the year." *Id.* On January 30, 2017, Fitbit lowered its full-year 2016 guidance for revenue growth "approximately 17% from the previously forecasted growth of 25% to 26%" and "lowered its fourth quarter revenue guidance from $725-$750 to $572-$580 million." *Id.* ¶¶ 20, 166.

**\*10** Defendants' November 2, 2016 "earnings projections are by definition forward-looking statements." *Bodri,* 252 F. Supp. 3d at 929 (citing *Cutera,* 610 F.3d at 1111 ("The January 31 earnings projection is by definition a forward-looking statement.") (alternations and internal quotation marks omitted). These earnings projections were accompanied by substantially similar cautionary language to that discussed above in regard to the August 2, 2016 guidance. *See* ECF No. 55-1 at 133, 146. Therefore, the revised revenue guidance statements fall within the PSLRA safe harbor provision and are not actionable. *See Bodri,* 252 F. Supp. 3d at 929-931.

The Court is unconvinced by Plaintiffs' attempt to characterize Zerella's statements as representations of then-current facts and affirmations that Fitbit was "on track" to meet its revised guidance. ECF No. 57 at 26-27. Zerella's statements provided no indication as to whether Fitbit was on track to meet its revised guidance. Instead, they recognized that Fitbit experienced "some flattening of demand" and expressed uncertainty regarding whether this was a "temporary pause." ECF No. 51 at 134 ("[W]e have seen some flattening and the question gets to be is this a temporary pause or is this something that indicates, at least in the U.S., some maturation in terms of penetration models.... So we have yet to see how that will play out for the holidays."). "A reasonable investor, reading the statement[s] fairly and in context" would not interpret these statements

as an affirmation of Fitbit's revised guidance or a statement that Fitbit was "on track" to meet its earnings projections. *See Bodri*, 252 F. Supp. 3d at 924 ("A statement is misleading only if a reasonable investor, reading the statement fairly and in context, would be misled.").

**B. Scienter**

The Complaint also fails because Plaintiffs' allegations are not sufficient to establish the "strong inference of scienter" required by the PSLRA. *Tellabs*, 551 U.S. at 324.

**1. Admissions**

Plaintiffs purport to raise an inference of scienter based on Defendants' alleged admissions that: (1) they "lacked a battery" for the Flex 2, ECF No. 51 ¶¶ 86, 95-97, 104, 106, 120, 129(a); (2) they "knew about the [Charge 2] defects," *id.* ¶¶ 60-61, 110-111, 119, 120(d), 129(b); and (3) they "knew that inventory was accumulating and that demand for the product had plummeted," *id.* ¶¶ 62-67, 70, 121-128, 132, 134, 136(b), 160. However, Plaintiffs fail to cite any statements or evidence to demonstrate Defendants' alleged "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *See City of Dearborn Heights*, 856 F.3d at 619 (Scienter is a "mental state that ... covers intent to deceive, manipulate, or defraud" and "deliberate recklessness.").

First, Defendant Park's November 2, 2016 statement that "it was incredibly difficult to find batteries that were small enough to fit in the [Flex 2] device," does nothing to suggest that the Flex 2 lacked a battery in August 2016. Therefore, it does not constitute an admission that Defendants knew about or recklessly disregarded this allegedly missing battery.

Second, as previously noted, "[t]hat a new program has kinks does not make a positive statement about the program false." *Siebel*, 2005 WL 3555718, at *4; *see also Allison v. Brooktree Corp.*, 999 F. Supp. at 1348 ("In bringing any high-tech product to market, problems encountered in the early developmental stages are the norm, not the exception."). Therefore, Fitbits' release of software updates to fix issues with the Charge 2 do not establish that Defendants' knowingly or recklessly "misled investors about the features and prospects" of the Charge 2 device. ECF No. 51 ¶¶ 8, 59-61, 107-111.

**\*11** Third, Defendants' February 22, 2017 discussion of "demand less that forecast" and "subsequent dampening of revenue growth" is not an admission that Defendants previously "knew or recklessly disregarded that demand for its products had been lower than expected." ECF No. 51 ¶ 136. An after-the-fact statement does not constitute an admission unless it contradicts the substance of an earlier statement and essentially states "I knew it all along." *Browning v. Amyris, Inc.*, No. 13-cv-02209-WHO, 2014 WL 1285175, at *20 (N.D. Cal. Mar. 24, 2014) (quoting *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999). Acknowledging that Fitbit had less demand and lower re-order rates than anticipated does not show that Defendants "always knew that the projections were unattainable or that they acted with scienter because 'it is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.' " *Id.* (quoting *Yourish*, 191 F.3d at 997).

**2. Core Operations Doctrine**

"The core operations theory posits that 'facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.' " *Knox v. Yingli Green Energy Holding Co. Ltd.*, No. 2:15-CV-04003 ODWMRWX, 242 F. Supp. 3d 950, 966, 2017 WL 1013293, at *10 (C.D. Cal. Mar. 15, 2017) (quoting *S. Ferry LP*, 542 F.3d at 783 (9th Cir. 2008)); *see also In re Read–Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003). Under this doctrine, allegations regarding management's role in a company may help to satisfy the PSLRA scienter requirement in three circumstances: "First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations." *S. Ferry LP*, 542 F.3d at 785 (internal quotation marks and citation omitted). "Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *Id.* Third, "such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter. *Id.* (internal quotation marks and citation omitted).

Plaintiffs argue that "given the central importance of new products to Fitbit's financial success, it may be inferred that the Individual Defendants were contemporaneously aware of the particulars and status of the production, sales and inventory of the new products on which the Company's success relied." ECF No. 51 ¶ 144. Plaintiffs also contend that, "[i]f Fitbit had performed the research and development, internal studies and testing that it claimed to have done, then the Company and its executives would have been aware of the technological issues with its products in real time." *Id.* ¶ 146. These "generalities about management's access to data" are insufficient to establish scienter. *Bodri,* 252 F. Supp. 3d at 932-33. In order to demonstrate scienter under the core operations doctrine, Plaintiffs must assert "particularized allegations" about "the who, what, where, when, and how regarding each Defendant's access to the relevant information that belies fraudulent intent." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* No. 10-CV-03451-LHK, 2012 WL 1868874, at *19 (N.D. Cal. May 22, 2012),* aff'd, 759 F.3d 1051 (9th Cir. 2014). In the absence of such particularized allegations, the Court "cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge" of alleged issues regarding the software, production, sales, and inventory of the Flex 2 and Charge 2 devices. *Id.* (citation and internal quotation omitted).

### 3. Holistic Review

**\*12** Viewing the scienter allegations holistically, Plaintiffs' allegations do not support a strong inference of scienter. *See Zucco Partners,* 552 F.3d at 1007 (affirming dismissal where scienter allegations, viewed holistically, were "not as cogent or compelling" as plausible non-fraudulent alternative). Defendants' alleged motives, to introduce new products and grow the business, are "ordinary and appropriate corporate objectives" that, "without more, cannot normally be alleged to be motivations for fraud." *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir. 2002). Moreover, "there is no allegation of improper stock sales by any individual defendant during the class period." *Bodri,* 252 F. Supp. 3d at 933. "While 'the absence of a motive allegation is not fatal,' it may significantly undermine a plaintiff's theory of fraud." *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.,* No. 11-01016 SC, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012) (quoting *Tellabs,* 551 U.S. at 325). When considered holistically, "Plaintiffs allegations do not overcome the competing inference that Defendants simply miscalculated the demand for a new product." *Fialkov v.*

*Microsoft Corp.,* 72 F. Supp. 3d 1220, 1234 (W.D. Wash. 2014).

### C. Loss Causation

Plaintiffs cite a series of negative disclosures regarding Fitbit's financial health, each of which was followed by a drop in Fitbit's stock price. The Court finds, however, that Plaintiffs fail to plausibly allege "a causal connection between the deceptive acts that form the basis for the claim[s] of securities fraud and the injury suffered by the Plaintiffs." *See Oregon Pub. Employees Ret. Fund v. Apollo Group Inc.,* 774 F.3d 598, 608 (9th Cir. 2014) (internal quotations and citations omitted).

First, on November 2, 2016, Fitbit lowered its financial guidance for the rest of the year from $2.5-$2.6 billion to $2.320-$2.345 billion. ECF No. 51 ¶¶ 155-161. Shortly thereafter, Fitbit held an earnings call during which Defendant Park allegedly "admitted that the decrease in guidance was due to the fact that Fitbit did not have batteries ... for the Flex 2." *Id.* ¶ 156. Because Plaintiffs have not established that Fitbit lacked batteries for the Flex 2, the Court also finds that release of Fitbit's revised guidance does not reveal any fraud, misrepresentation, or falsity to the market. "In the absence of a false representation, there can be no revelation of falsity to the market." *Curry v. Yelp Inc.,* No. 14-cv-03547-JST, 2015 WL 1849037, at *10 (N.D. Cal. April 21, 2015).

Next, on January 10, 2017, "analyst Ben Bollin of Cleveland Research issued a note on Fitbit, citing subdued sell-through and heightened inventory as risk contributors for Q4 2016." ECF No. 51 ¶¶ 162-165. This alleged corrective disclosure cannot serve as a basis for loss causation because it offered "no new information" to the market. *Rok v. Identiv, Inc.,* No. 15-cv-5775-CRB, 2017 WL 35496, at *18 ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time" (quoting *Meyer v. Greene,* 710 F.3d 1189, 1197-98 (11th Cir. 2013)); *see Bonnano v. Cellular Biomedicine Grp., Inc.,* No. 15-cv-1795-WHO, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) ("New information is critical to demonstrating loss causation."). In its earnings calls on November 2, 2016 and December 6, 2016, Fitbit disclosed that it had made significant shipments of Charge 2 into the channel, was seeing flattening of demand in the fourth quarter, and was unsure as to whether demand would recover in the remaining weeks of the holiday season. ECF No. 55-1 at 139-40, 142-43, 150. Therefore, the "subdued sell-through" and "heightened

inventory" discussed in the January note were not new information.

Finally, on January 30, 2017, Fitbit issued a press release which lowered its full-year 2016 guidance for revenue growth "approximately 17% from the previously forecasted growth of 25% to 26%" and "lowered its fourth quarter revenue guidance from $725-$750 to $572-$580 million." ECF No. 51 ¶¶ 20, 166. This press release revealed that Fitbit's sales had suffered "as a result of weaker than expected demand" and "higher than expected inventory levels." *Id.* ¶ 168. The only new information that this press release included were results which did not live up to Fitbit's revised guidance. Because Defendants had already disclosed the flattening demand which served as the basis for these results, the press release "added no new information" to the market which was "publicly revealed for the first time." *See Rok*, 2017 WL 35495, at *18.

### D. Section 20(a) Control Person Liability

**\*13** Section 20(a) of the Exchange Act, which forms the basis of Plaintiffs' second cause of action, extends liability to persons who directly or indirectly control a violation of the securities laws. 15 U.S.C. § 78t(a). Under Section 20(a), "a defendant employee of a corporation who has violated

the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *City of Dearborn Heights*, 856 F.3d at 623 (quoting *Zucco Partners*, 552 F.3d at 990).

A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights*, 856 F.3d at 623. Because the Court dismisses Plaintiffs' Section 10(b) claim, Plaintiffs' second cause of action must also be dismissed.

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss without prejudice. Plaintiffs may file an amended complaint within 21 days.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2020 WL 1465932

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.