# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION. | Case No. 18-cv-04865-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO CONVERT OR, ALTERNATIVELY, TO STRIKE; GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE; AND DENYING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket Nos. 227, 233 |

This consolidated class action lawsuit arises from Elon Musk's Twitter and blog post(s) in which he openly discussed funding for a transaction to take Tesla, Inc. ("Tesla") from a publicly-traded company to a private company. Lead Plaintiff Glen Littleton is a shareholder—and seeks to represent a class of shareholders—who purchased or sold Tesla securities during the relevant time period. Plaintiff alleges that Mr. Musk's social-media posts contained false statements, which led to a trading frenzy that artificially drove up the value of Tesla's shares. Mr. Musk, Tesla, and Tesla directors[1] (collectively, "Defendants") are the named defendants in this lawsuit. Pending before the Court is Defendants' motion to dismiss the Consolidated Complaint. Docket No. 227 ("Mot."). Plaintiff opposes the motion to dismiss, but he also moves to convert Defendants' motion to a motion for summary judgment or, in the alternative, to strike the motion or portions thereof. Docket No. 233 ("MTC").

---

[1] Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice (the "Director Defendants").

# I.     PROCEDURAL BACKGROUND

This action is a consolidation of nine lawsuits.[2]  The Court granted Glen Littleton's motion to serve as Lead Plaintiff under 15 U.S.C. § 78u-4(3)(B)(ii).  Docket No. 152.  Mr. Littleton subsequently filed the Consolidated Complaint on behalf of himself and those similarly situated.  Docket No. 184 ("Compl.").  The Consolidated Complaint alleges Mr. Musk and Tesla violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j, and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.  *Id.* ¶ 1.  It further alleges that Tesla's Board of Directors violated Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t.  *Id.*  This action seeks to represent a class of shareholders who purchased and/or sold Tesla stock from August 7, 2018 to August 17, 2018 (the "Class Period").  *Id.*

# II.     FACTUAL BACKGROUND

The Court must assume all factual allegations[3] in the Consolidated Complaint as true, liberally construe them, and draw all reasonable inferences in Plaintiff's favor.  *In re Xytronyx Sec. Litig.*, 1992 WL 427475, at *2 (S.D. Cal. Oct. 14, 1992) (citing *Plaine v. McCabe*, 797 F.2d 713, 723 (9th Cir.1986)).  As discussed below, however, the pleadings are subject to the requirements of PLSRA and Federal Rule of Civil Procedure 9(b).  The Consolidated Complaint alleges the following:

A.     Tesla's Vehicle Production

Mr. Musk is the co-founder, former Chairman of the Board, and current Chief Executive Officer of Tesla, which "designs, develops, manufactures, and sells electronic vehicles."  Compl. ¶¶ 2, 38.  Tesla produces the Model S, the Model X, and the Model 3.  *Id.*  In 2012 and 2015, the

---

[2] Case Nos. 18-cv-04865-EMC; 18-cv-04876-EMC; 18-cv-04912-EMC; 18-cv-04939-EMC;18-cv-04948-EMC; 18-cv-05258-EMC; 18-cv-05463-EMC; 18-cv-05470-EMC; and 18-cv-05899-EMC.

[3] Some of the factual allegations derive from sources subject to judicial notice, such as the SEC Complaint filed on September 27, 2018.  Defendants consented to the settlements and entries of judgments.  This Court finds Plaintiff's reliance on allegations contained in the SEC Complaint permissible.  *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706–07 (9th Cir. 2012) [relying on allegations in an SEC complaint incorporated into the plaintiff's pleadings]; *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 (9th Cir. 2015) [relying on allegations in an FTC complaint and settlement]).

United States District Court
Northern District of California

Model S and Model X experienced production issues, so investors closely followed Tesla's 2017 rollout of the Model 3, which was anticipated to be built in large quantities due to it being a mass-market sedan. *Id.* ¶¶ 38, 39. From October 2017 through January 2018, Tesla experienced production problems for its Model 3 because of issues related to manufacturing lithium-ion battery cells. *Id.* ¶¶ 40, 44.

These production difficulties led numerous short-selling investors to target Tesla. *Id.* ¶ 45. As one example pled in the Consolidated Complaint, Stanphyl Capital pursued a significant short-term investment in Tesla; a CNBC report subsequently quoted this investor making the following statement:

> While I've no doubt that Tesla will eventually work out its Model 3 vehicle production problems, the base model will cost Tesla at least mid-$40,000s to build. The company will never deliver more than a token few for less than the current 400,000 a year. And even at those higher prices Tesla will never come anywhere close to its promised [profitability].

*Id.* (alteration in original). At the end of January 2018, Tesla's short interests were 30 million shares, which amounted to 18% of the company's outstanding shares. *Id.* ¶ 46.

On April 3, 2018, Tesla revealed in a press release that instead of producing 2,500 Model 3 vehicles per week as promised, it was producing slightly more than 2,000. *Id.* ¶ 47. Based on this shortcoming, the Wall Street Journal published an article describing Mr. Musk's reputation for setting "ambitious deadlines that he fail[ed] to meet on time." *Id.* The same day, Tesla's short interest grew to 32 million shares, representing 19% of its outstanding shares. *Id.* ¶ 48. A week later, on April 11, 2018, a CNBC article entitled "*Tesla is the biggest short in the US stock market*" reported that Tesla had $10.7 billion in short shares, which was more than 25% of Tesla's available stock. *Id.* ¶ 49.

B.    Mr. Musk's Public Animosity Towards Short-Selling Investors

According to the Consolidated Complaint, Mr. Musk publicly displayed his animosity to those who were short-selling Tesla stock. *Id.* ¶ 50. On May 2, 2018, Mr. Musk responded to analysts' questions about Tesla's first-quarter earnings by responding "Boring, bonehead questions are not cool, Next?" and "These questions are so dry. They're killing me." *Id.* On

Twitter, Mr. Musk defended his answers by posting "two sell-side analyst who were trying to justify their Tesla short thesis." *Id*. He further tweeted the following: "Oh and uh short burn of the century comin [sic] soon. Flamethrowers should arrive just in time." And immediately after, he posted "Looks like sooner than expected. The sheer magnitude of short carnage will be unreal. If you're short, I suggest tiptoeing quietly to the exit . . . ." *Id*. ¶ 52.

On May 7, 2018, Mr. Musk bought $9.85 million worth of Tesla shares to force a burst of the short-covering, which caused Tesla's stock price to increase from $297.50 to $302.77. *Id*. ¶ 53. Mr. Musk did this again on June 12, 2018 to maintain Tesla's stock price while Tesla laid off 46,000 employees (roughly 9% of the workforce). *Id*. ¶ 54. A few days later, Mr. Musk tweeted that "[the shorts] have about three weeks before their short position explodes." *Id*. ¶ 55 (alteration in original). By the end of July 2018, Tesla's short-stock interest was 35 million shares (20% of outstanding stock). *Id*. ¶ 62.

C.    Mr. Musk's Meeting with Saudi Arabia's Public Investment Fund

On July 31, 2018, Mr. Musk met with representatives from the Public Investment Fund ("PIF"), which expressed interest in taking Tesla private, if Tesla agreed to build a production facility in the Middle East. *Id*. ¶ 63. No decision resulted from this meeting. *Id*. ¶ 64. On August 2, 2018, Mr. Musk sent an e-mail to Tesla's Board of Directors, CFO, and General Counsel with a subject line reading "Offer to Take Tesla Private at $420" in which he explained the move would avoid the "constant defamatory attacks by the short-selling community" and requested the "matter be put to a shareholder vote at the earliest opportunity" because the "offer expires in 30 days." *Id*. ¶ 69.

In response to Mr. Musk's e-mail, the Board held a conference call on August 3, 2018, during which Mr. Musk revealed that PIF was interested in funding a transaction for Tesla to go private, conditioned on Tesla building a production facility in the Middle East. *Id*. ¶ 72. According to Paragraph 72 of the Consolidated Complaint, "On August 3, 2018, in response to Musk's email, the Board held a telephonic meeting at which time Musk informed the board that the Public Investment Fund was interested in funding a going-private transaction and that the fund

United States District Court
Northern District of California

was interested in having Tesla build a production facility in the Middle East."[4]  Some Board members considered the condition of having a Middle East production facility to be a "non-starter," and others described it as "really difficult for small investors" to retain shareholders.  *Id*. However, the Board authorized Mr. Musk to contact investors to gauge their interest in participating in such a transaction.  *Id*.  On August 6, 2018, Mr. Musk spoke with a private equity fund partner who described the structure of Tesla's contemplated move as "unprecedented" in his experience because Mr. Musk desired the number of shareholders in a private Tesla to be less than 300, but Tesla had over 800 institutional investors at the time.  *Id*. ¶ 73.

D.     Mr. Musk's August 7, 2018 Tweet And Subsequent Tweets/E-mails/Blog Posts

On August 7, 2018,[5] Mr. Musk posted the following message on his Twitter account:  "Am considering taking Tesla private at $420.  ***Funding secured.***"  *Id*. ¶ 74 (emphasis added). According to the Consolidated Complaint, this tweet resulted in the following exchange of text messages:

- Martin Viecha, Tesla's Senior Director of Investor Relations, sent a text message to Mr. Musk asking, "Was this text legit?"

- A Tesla investor texted Sam Teller (Tesla's Director, Office of the CEO) asking, "What's Elon's tweet about?  Can't make any sense of it.  Would be incredibly disappointing for shareholders that have stuck it out for so long."

- A reporter also texted Mr. Teller saying, "Quite a tweet! (Is it a joke?)."

*Id*. ¶¶ 74–76.  Further, Mr. Musk responded to comments related to his tweet and posted new tweets:

- A Twitter user asked, "At what price?" and Mr. Musk responded "420."

- Mr. Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

---

[4] However, Plaintiff does not attribute how he knows this detail.  Instead, Plaintiff relies on the SEC Complaint, which discusses this Middle East facility as a condition for funding.

[5] Unless otherwise stated, all alleged messages and tweets in Subsection D occurred on August 7, 2018.

United States District Court
Northern District of California

- Mr. Musk then tweeted, "My hope is *all* current investors remain with Tesla even if we're private.  Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX."

- A Twitter user asked, "Could we still invest once private?" to which Mr. Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

- Another Twitter user posted, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company . . . ." Mr. Musk responded, "Absolutely.  Am super appreciative of Tesla shareholders.  Will ensure their prosperity in any scenario."[6]

- Mr. Musk then posted the following, "Shareholders could either to [sic] at 420 or hold shares & go private."

*Id.* ¶¶ 77–82.

Following this Twitter activity, a reporter e-mailed Mr. Musk with a subject line, "Are you just messing around?" in which the reporter wrote "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.  Is there an actual explanation coming?"  *Id.* ¶ 83.  The Consolidated Complaint does not allege that Mr. Musk responded to this e-mail, but it alleges that he went back on Twitter and responded further to comments.  Mr. Musk responded to a Twitter comment about a "forced buyout" with the following answer:  "Def. no forced sales.  Hope all shareholders remain.  Will be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  *Id.*

Mr. Musk e-mailed Tesla employees with a subject line entitled "Taking Tesla Private."  *Id.* ¶ 84.  This e-mail became publicly available on Tesla's blog, and read as follows:

---

[6] After this tweet, "HASDAQ halted trading in Tesla stock due to the increased volatility" for one and a half hours.  *Id.* ¶ 81.

***Taking Tesla Private***
August 7, 2018

The following email was sent to Tesla employees today:

> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.

> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

> I fundamentally believe that we are at our best when everyone is focused on executing, when we can remain focused on our long-term mission, and when there are not perverse incentives for people to try to harm what we're all trying to achieve.

> This is especially true for a company like Tesla that has a long-term, forward-looking mission. SpaceX is a perfect example: it is far more operationally efficient, and that is largely due to the fact that it is privately held. This is not to say that it will make sense for Tesla to be private over the long-term. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.

> Here's what I envision being private would mean for all shareholders, including all of our employees.

> First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

> Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

> Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in

7

many ways to the SpaceX structure:  external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself.  I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders if the process ends the way I expect it will, as private Tesla would ultimately be an enormous opportunity for all of us.  Either way, the future is very bright and we'll keep fighting to achieve our mission.

Thanks,
Elon

*Id.* ¶ 84.  Mr. Musk then tweeted:  "Investor support is confirmed.  ***Only reason why this is not certain is that it's contingent on a shareholder vote***."  *Id.* ¶ 85 (emphasis added).  On August 7, 2018, Tesla's stock closed with a 10% increase from its opening price—rising from $343.84 per share to $379.59 per share.  *Id.* ¶ 86

The Consolidated Complaint alleges Mr. Viecha (Tesla's Senior Director of Investor Relations) received three e-mails inquiring about Mr. Musk's tweets.  First, an analyst asked the following, "In the tweet, [Mr. Musk] said financing is secured but in the letter he doesn't address this.  Can you clarify?"  *Id.* ¶ 87.  Mr. Viecha responded saying "I can only say that the first Tweet clearly stated that '***financing is secured***.'  ***Yes, there is a firm offer***."  *Id.* (emphasis added).  Second, another analyst e-mailed Mr. Viecha and another Tesla investor-relations member and asked "Had some questions/clarifications on today's news and blog post.  Can either of you speak?"  Mr. Viecha responded that "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else.  I only want to stress that Elon's first tweet, which mentioned '***financing secured***' is correct."  *Id.* ¶ 88 (emphasis added).  Lastly, the following exchange occurred after Mr. Viecha asked if the analyst read Tesla's "official blog post on this topic[]":

- **Analyst:**  "I did.  Nothing on funding though?"  *Id.* ¶ 89.

- **Mr. Viecha**:  The very first tweet simply mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of who the buyer is."  *Id*.

- **Analyst**:  "Firm offer means there is a commitment letter or is this a verbal agreement?"  *Id*.

- **Mr. Viecha**:  "I actually don't know, but I would assume that given we went full-on public with this, ***the offer is as firm as it gets***."  *Id*. (emphasis added).

E.       The Stock Market's Reaction

The Consolidated Complaint alleges that various investors and analysts[7] reacted to Mr. Musk's August 7, 2018 tweet.  *See id*. ¶¶ 90–92.  The day following Mr. Musk's tweet, on August 8, 2018, Tesla issued a press release on its website and on *Globe Newswire*:

> Statement from the following members of Tesla's Board of Directors:  Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch.
>
> PALO ALTO, Calif., Aug. 08, 2018 (GLOBE NEWSWIRE) -- Last week, Elon openly discussed with the board about taking the company private.  This included discussions as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur.  The board has met several times over the last week and is taking the appropriate next steps to evaluate this.

*Id*. ¶ 93.  At the close of trading on August 8, 2018, Tesla's stock price dropped 2.5%—from $379.59 to $370.34 because "[c]ontrary to what Musk had said on August 7, 2018, the press release from Tesla's Board did not state that funding for a going-private transaction had been 'secured.'"  *Id*. ¶¶ 94, 191.  On August 9, 2018, Tesla's stock closed with a further drop from $370.34 to $352.45, which reflected a 5% decline, due to the Wall Street Journal's publication of an SEC investigation into the August 7, 2018 tweet.  *Id*. ¶¶ 99, 192.

On August 10, 2018, Mr. Musk posted the following tweet:  "Short shorts coming soon to Tesla merch[andise]."  *Id*. ¶ 100 (alteration in original).  A few days later, on August 13, 2018, Mr. Musk posted on Tesla's blog with the title reading "Update on Taking Tesla Private" and wrote the following:

---

[7] *E.g.*, RBC Capital Markets; Morningstar Equity Research; Jeffries; J.P. Morgan; Evercore; Phoenix Financial Services; CNBC; and Bloomberg, etc.

United States District Court
Northern District of California

As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy.  As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.

**What has happened so far?**

On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share.  This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st).  My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.

After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal), a full board meeting was held.  During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.

At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders.  Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me.  They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future.  I told the board that I would report back after I had these discussions.

**Why did I make a public announcement?**

The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private.  However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time.  As a result, it was clear to me that the right thing to do was announce my intentions publicly.  To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**

Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going

private transaction.  Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting.  That meeting took place on July 31st.  During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time.  I understood from him that no other decision makers were needed and that they were eager to proceed.

***I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving.  This is why I referred to "funding secured" in the August 7th announcement.***

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund.  He has expressed support for proceeding ***subject to financial and other due diligence and their internal review process for obtaining approvals***.  He has also ***asked for additional details*** on how the company would be taken private, including any required percentages and any regulatory requirements.

Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used.  However, it would be ***premature*** to do so now.  I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base.  ***It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.***

It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private.  I do not think it would be wise to burden Tesla with significantly increased debt.

Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed.  The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private.  My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.

**What are the next steps?**

As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time.  I will now continue to talk with investors, and I have engaged advisors to investigate a

range of potential structures and options.  Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected.  If the board process results in an approved plan, any required regulatory approvals  will  need  to be  obtained  and  the  plan  will  be  presented  to  Tesla shareholders for a vote.

*Id.* ¶ 103 (emphasis added in italics).  Mr. Musk then tweeted the following on August 13, 2018:

"***I'm excited to work with Silver Lake and Goldman Sachs as financial advisors***, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private." *Id.* ¶ 104 (emphasis added).  The next day, Tesla issued the following statement regarding Tesla's Board and the going-private transaction:

Tesla, Inc. (the "Company") announced today that its Board of Directors has formed a special committee comprised of three independent directors to act on behalf of the Company in connection with Elon Musk's previously announced consideration of a transaction to take the Company private (the "Going Private Transaction").  The special committee has not yet received a formal proposal from Mr. Musk regarding any Going Private Transaction nor has it reached any conclusion as to the advisability or feasibility of such a transaction.

The special committee is composed of Brad Buss, Robyn Denholm and Linda Johnson Rice.  The special committee has retained Latham & Watkins LLP as its legal counsel and intends to retain an independent financial advisor to assist in its review of a formal proposal once received.  The Company has separately retained Wilson Sonsini Goodrich & Rosati as its legal counsel in this matter.

The special committee has the full power and authority of the Board of Directors to take any and all actions on behalf of the Board of Directors as it deems necessary to evaluate and negotiate a potential Going Private Transaction and alternatives to any transaction proposed by Mr. Musk.  The special committee's grant of authority provides that no Going Private Transaction will be consummated without the approval of the special committee.  The special committee expects to provide a further update concerning the process associated with Mr. Musk's proposal as soon as practicable.

No assurances can be given regarding the likelihood, terms and details of any proposal or potential Going Private Transaction, that any proposal made by Mr. Musk regarding a potential Going Private Transaction will be accepted by the special  committee,  that definitive  documentation  relating  to  any  such  Going  Private Transaction will be executed or that such a transaction will be

completed.

*Id.* ¶ 106.  On the same day as Tesla's statement, "Bloomberg reported that neither Goldman Sachs nor Silver Lake were yet working with Musk pursuant to a signed agreement or in an official capacity."  *Id.* ¶ 107.  Similarly, the New York Times reported that Goldman Sachs and Silver Lake were only in talks with Tesla, but there was nothing finalized.  *Id.*

Tesla's stock price rose following Mr. Musk's August 13, 2018 blog post—from $356.41 to $361.13.  *Id.* ¶ 107.  *Id.* ¶ 193.  But on August 14, 2018, Tesla's stock closed at $347.64, which represented a 2.5% decline from $356.41 because of reports that Defendants did not retain the financial advisors mentioned in Mr. Musk's Twitter post.  *Id.* ¶¶ 108, 194.

F.      The SEC's Involvement

On August 15, 2018, the Wall Street Journal reported that the SEC formally subpoenaed Tesla regarding Mr. Musk's tweets.  *Id.* ¶ 109.  The same day, Tesla's stock fell from $346.64 to $338.69, a 2.5% decline.  *Id.* ¶ 110.  The next day, the Wall Street Journal published an article indicating that the SEC was investigating whether Mr. Musk misled investors intentionally with his tweet in order to hurt short-sellers.  *Id.* ¶ 111.

The New York Times published an article on August 17, 2018, summarizing a recent interview with Mr. Musk; the article reported that, during the interview, Mr. Musk revealed that no one reviewed his August 7, 2018 tweet before he posted it, he chose the $420 price per share because of "better karma," and the going-private transaction was far from secure because the PIF had not committed to financing it.  *Id.* ¶ 112.  At the close of trading on August 17, 2018, Tesla's stock price closed at $305.50, which was a 9% fall from the previous day at $335.45.  *Id.* ¶ 114.

The Consolidated Complaint alleges the stock price declines on August 15 and 17 were due to the SEC subpoena and the publication of Mr. Musk's interview, respectively.  *Id.* ¶¶ 195–96.  Ultimately, on August 24, 2018, Tesla published a blog post on its website entitled "Staying Public," which read as follows:

> Earlier this month, I announced that I was considering taking Tesla private.  As part of the process, it was important to understand whether our current investors believed this would be a good strategic move and whether they would want to participate in a private Tesla.

13

Our investors are extremely important to me.  Almost all have stuck with us from the time we went public in 2010 when we had no cars in production and only a vision of what we wanted to be.  They believe strongly in our mission to advance sustainable energy and care deeply about our success.

I worked with Silver Lake, Goldman Sachs and Morgan Stanley, who have world-class expertise in these matters, to consider the many factors that would come into play in taking Tesla private, and to process all the incoming interest that we received from investors to fund a go-private transaction.  I also spent considerable time listening to current shareholders, large and small, to understand what they think would be in the best long-term interests of Tesla.

Based on all the discussions that have taken place over the last couple of weeks and a thorough consideration of what is best for the company, a few things are clear to me:

- Given the feedback I've received, it's apparent that most of Tesla's existing shareholders believe we are better off as a public company.  Additionally, a number of institutional shareholders have explained that they have internal compliance issues that limit how much they can invest in a private company.  There is also no proven path for most retail investors to own shares if we were private.  Although the majority of shareholders I spoke to said they would remain with Tesla if we went private, the sentiment, in a nutshell, was "please don't do this."

- I knew the process of going private would be challenging, but it's clear that it would be even more time-consuming and distracting than initially anticipated.  This is a problem because we absolutely must stay focused on ramping Model 3 and becoming profitable.  We will not achieve our mission of advancing sustainable energy unless we are also financially sustainable.

- That said, my belief that there is more than enough funding to take Tesla private was reinforced during this process.

After considering all of these factors, ***I met with Tesla's Board of Directors yesterday and let them know that I believe the better path is for Tesla to remain public***.  The Board indicated that they agree.

Moving forward, we will continue to focus on what matters most: building products that people love and that make a difference to the shared future of life on Earth.  We've shown that we can make great sustainable energy products, and we now need to show that we can be sustainably profitable.  With all the progress we've made on Model 3, we're positioned to do this, and that's what the team and I are going to be putting all of our efforts toward.

Thank you to all of our investors, customers and employees for the support you've given our company.  I'm incredibly excited to continue leading Tesla as a public company.  It is a privilege.

14

*Id.* ¶ 115 (emphasis in original).

On September 27, 2018, the SEC filed a complaint against Mr. Musk alleging he violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. *Id.* ¶ 116. The SEC followed up with a second complaint against Tesla, alleging it violated Rule 13a-15. *Id.* Tesla and Mr. Musk consented to judgments, which ordered each to pay $20 million in penalties. A district judge from the Southern District of New York approved the settlements and judgments on October 16, 2018. *Id.*

### III.    LEGAL STANDARD

A.    Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).[8] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

---

[8] A court "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

1  possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

2  B.  Rule 9(b) and the Private Securities Litigation Reform Act ("PLSRA")

3      The PSLRA imposes additional pleading requirements.  *Ronconi v. Larkin*, 253 F.3d 423,

4  429 (9th Cir. 2001).  "In alleging fraud or mistake, a party must state with particularity the

5  circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In order to "properly allege

6  falsity, a securities fraud complaint must now 'specify each statement alleged to have been

7  misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

8  the statement or omission is made on information and belief, . . . state with particularity all facts

9  on which that belief is formed.'"  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876–77 (9th

10  Cir. 2012) (quoting 15 U.S.C. § 78u–4(b)(1)) (marks of omission in original).

11     Under the PSRLA, scienter must be pled with particularity.  For a private securities fraud

12  complaint to survive the pleadings stage, the complaint must raise a "strong inference" that

13  Defendants made misleading statements to investors knowingly or with deliberate recklessness.

14  *Ronconi*, 253 F.3d at 429.  In particular, a "plaintiff may recover money damages only on proof

15  that the defendant acted with a particular state of mind, the complaint shall, with respect to each

16  act or omission alleged to violate [section 10(b)], state with particularity facts giving rise to a

17  strong inference that the defendant acted with the required state of mind."  15 U.S.C.A. § 78u-4.  .

18  **IV.   PLAINTIFF'S MOTION TO CONVERT DEFENDANTS' MOTION TO DISMISS**

19       **TO A MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY,**

20             **TO STRIKE DEFENDANTS' MOTION TO DISMISS**

21     In response to Defendants' motion to dismiss and request for judicial notice, Plaintiff filed

22  a motion to convert Defendants' motion to a summary judgment motion under Rule 12(d) or,

23  alternatively, to strike it pursuant to Rule 12(f).  *See* MTC.  Plaintiff's motion is based on

24  Defendants' alleged reliance on matters outside of the Consolidated Complaint in an effort to

25  dismiss the pleading.  *See id.*

26     In resolving a motion to dismiss under Rule 12(b)(6), a court normally confines its review

27  to the complaint and does not consider extrinsic materials such as facts presented in briefs,

28  affidavits, or discovery materials.  *In re American Continental Corp./Lincoln Sav. & Loan*

United States District Court
Northern District of California

*Securities, Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996), *reversed on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  Under Rule 12(d), subject to two exceptions (*e.g.*, judicial notice and incorporation by reference), if "matters outside the pleadings are presented to and not excluded by the court," the Court must convert the motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56 and give "[a]ll parties … a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

However, under the doctrine of incorporation by reference, it is proper for a court to consider exhibits submitted with the complaint and documents whose contents are alleged in the complaint when their authenticity is not questioned.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308 (2007).  In addition, a court may take judicial notice under Federal Rule of Evidence 201 pertaining to "matters of public record" without converting a motion to dismiss to a motion for summary judgment.  *Lee*, 250 F.3d at 689.  But a court may not take judicial notice of a fact that is "subject to reasonable dispute."  *Id*.

Here, Plaintiff takes issue with Defendants' reliance on five publications (*e.g.*, three news stories and two scholarly articles[9]) that are allegedly outside of the Consolidated Complaint for their argument for dismissal.  *See* MTC at 3–6.  Plaintiff's motion relies almost exclusively on the Ninth Circuit's decision in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019), in arguing that Defendants' mentioning of articles beyond the Consolidated Complaint mandate conversion to a motion for summary judgment.  MTC at 1.

Defendants respond that their motion to dismiss is consistent with the spirit of *Khoja*, because the Ninth Circuit expressly recognized the application of the doctrine of incorporation by reference as well as judicial notice.  Opp. to MTC at 4.  Defendants request the Court consider these five publications by granting their request for judicial notice or through the incorporation-

---

[9] Exhibits B, W, X, Y, and Z.  Docket No. 229 ("RJN"); Docket No. 228 ("Bretan Decl.").

by-reference doctrine.

*Khoja* specifically held that "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment . . . . But a court cannot take judicial notice of disputed facts contained in such public records." *Id*. at 999. Plaintiff has not identified any facts in the publications that are in conflict with those pleaded in the Consolidated Complaint. Nor is there any dispute about the public nature of those documents, all of which are distinguishable from the documents considered in *Khoja* because those were in the "sole possession" of the defendants. *See Khoja*, 899 F.3d at 999. Defendants argue that such publicly available sources are worthy of consideration because the Consolidated Complaint represents that it is based, "without limitation," on "media reports," and "publicly available information." *See* Compl. at preamble. As demonstrated in greater detail below, this Court need not consider any content within the publications in such a way that would create a disputed fact. As explained below, the Court thus takes judicial notice of the documents and their public nature, but not to the accuracy of their contents. Plaintiff's motion to convert is therefore **DENIED**.

Plaintiff's alternative request to strike is not discussed throughout his motion aside from a single sentence in the preamble: "Plaintiff's well-pleaded factual allegations are irreconcilable with the facts and conclusions asserted by Defendants in their motion. Defendants' decision to rely on—and, indeed, center their brief around—facts outside of the pleadings requires that this Court . . . strike substantial swaths of their motion papers." MTC at 1. Defendants' motion to dismiss, however, is not subject to a motion to strike because only pleadings can be stricken under Rule 12(f), and pleadings are defined as complaints, third-party complaints, answers, and replies to answers. *Sidney-Vinstein v. A.H. Robins Co*., 697 F.2d 880, 885 (9th Cir. 1983); *Peralta v. Countrywide Home Loans, Inc.*, 2009 WL 3837235, at *2, 6 (N. D. Cal. Nov. 16, 2009). Further, Plaintiff has not sufficiently demonstrated that the motion to dismiss is "redundant, immaterial, impertinent, or scandalous matter," as required to succeed on a Rule 12(f) motion to strike. *Id*. (citing Fed. R. Civ. P. 12(f)).

Accordingly, Plaintiff's motion to strike is **DENIED** because he has not met the requirements of Rule 12(f).

United States District Court
Northern District of California

## V.      DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

In support of their motion to dismiss, Defendants request the Court take judicial notice of Exhibits B–T and W–Z.  *See* RJN; *see also* Bretan Decl.  Additionally, they seek consideration of Exhibits A–K, M–O, and T under the doctrine of incorporation by reference.  *Id*.  All the exhibits before the Court are the tweets, e-mails, blog posts, and other public documents such as news publications, SEC filings, and scholarly articles.  *Id*.  Plaintiff only objects to the consideration of Exhibits B, W, X, Y, and Z because, according to him, these exhibits are only offered to rebut the Consolidated Complaint's well-pleaded facts.  As such, Defendants' request to incorporate Exhibits A, C–K, M–O, and T by reference is **GRANTED** because the Consolidated Complaint expressly relies on them; Plaintiff does not object.

This Court, however, does not consider any of the exhibits to which Plaintiff objects (*e.g.* B, W, X, Y, and Z) in such a way that contradicts factual allegations pled in the Consolidated Complaint.  Defendants request judicial notice of these exhibits, which are news reports, because they are documents that were publicly available.  Docket No. 239 ("Reply ISO RJN") at 1.  Plaintiff does not contend otherwise.  Because Plaintiff relies on the fraud-on-the-market doctrine, *see* Compl. ¶¶ 183–87, the Court may "take judicial notice that the market was aware of the information contained in news articles . . . ."  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 (9th Cir. 1999) (citing Fed. R. Evid. 201; *Basic Inc. v. Levinson*, 485 U.S. 224, 244–47 (1988)).

Accordingly, Defendants' request for judicial notice is **GRANTED** as to Exhibits B, W, X, Y, and Z to show that this information was available to the market.  *See Sgarlata v. PayPal, Inc.*, 2018 WL 6592771, at *6 (N.D. Cal. Dec. 13, 2018) (taking judicial notice of press releases not for the truth of the matters asserted, but to show what was reported publicly).  This Court does not consider Exhibits V or U, both of which are law review articles—thus, Defendants request as to these two exhibits are moot.

## VI.     DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Defendants make four arguments in support of their motion to dismiss:  (1) Mr. Musk's statements were not misrepresentations; (2) Tesla did not make any statement because the posts

came from Mr. Musk in his individual capacity as a potential bidder; (3) Plaintiff cannot plead loss

causation because Tesla's decline in stock price was from a corrective disclosure of facts; and (4)

Mr. Musk's tweets were not cleared by anyone at Tesla, so the Director Defendants cannot be

liable.  Mot. at 2–4.  Plaintiff responds that Mr. Musk and Tesla knowingly distributed false

information—namely, that they unconditionally secured funding for the going-private transaction

at $420 per share, and, as a result of the misrepresentation, investors lost billions of dollars by

relying on the false information.  Docket No. 231 ("Opp.") at 2.

"Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for 'any

person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on

a national securities exchange . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors." *Zucco Partners, LLC v.*

*Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (quoting 15

U.S.C. § 78j(b)) (internal quotation marks omitted) (alterations in original).  Rule 10b–5 states the

following:

> It shall be unlawful for any person, directly or indirectly, by the use
> of any means or instrumentality of interstate commerce, or of the
> mails or of any facility of any national securities exchange, (a) To
> employ any device, scheme, or artifice to defraud, (b) To make any
> untrue statement of a material fact or to omit to state a material fact
> necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or (c)
> To engage in any act, practice, or course of business which operates
> or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.  "The SEC promulgated Rule 10b–5 pursuant to authority granted under §

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  Although neither Rule 10b–5

nor § 10(b) expressly creates a private right of action, [the Supreme] Court has held that 'a private

right of action is implied under § 10(b).'"  *Janus Capital Grp., Inc. v. First Derivative Traders*,

564 U.S. 135, 141–42 (2011) (quoting *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty*

*Co.*, 404 U.S. 6, 13, n. 9 (1971)).

To succeed on a claim under Section 10(b) and Rule 10b–5, a plaintiff must prove the

United States District Court
Northern District of California

1    following:  "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between

2    the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic

3    loss; and (6) loss causation."  *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d

4    598, 603 (9th Cir. 2014) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S.

5    148, 157 (2008)).

6    A.    Whether Mr. Musk's Public Statements Qualify As Material Misrepresentations

7    In response to this Court's Standing Order pertaining to allegations of securities violations,

8    Plaintiff submitted a chart that lays out each alleged false or misleading statement or omission that

9    gives rise to this lawsuit.  Docket No. 224.  Plaintiff alleges the three false statements at issue are:

10   (1) the August 7, 2018 tweet (and follow-up tweets shortly thereafter); (2) the August 13, 2018

11   tweet; and (3) the August 13, 2018 blog post.  *Id.* at 1–9.

12        1.    August 7, 2018 Tweets

13   Plaintiff argues that Mr. Musk's August 7, 2018 tweet—"Am considering taking Tesla

14   private at $420.  Funding secured."—was false and materially misleading.  Opp. at 10.   Because

15   this statement is comprised of two sentences, Defendants begin by addressing each sentence

16   independently—they then contend that when read together, the statement is neither false nor

17   misleading.  Defendants claim that the latter part of the statement, *i.e.*, "funding secured,"

18   represented "funding would be no obstacle if [Mr. Musk] decided to proceed with a transaction."

19   Mot. at 10.  Defendants then argue that the first sentence cannot be false or a misrepresentation

20   because it uses the word "considering," which they contend was plainly aspirational.  *Id*.  Plaintiff

21   rejects Defendants' version of what this tweet actually meant, because "[a] statement is misleading

22   if it would mislead a reasonable investor . . . ."  Opp. at 10.

23   To plead falsity for the purposes of Section 10(b) and Rule 10b–5, a plaintiff must "specify

24   each statement alleged to have been misleading, [and] the reason or reasons why the statement is

25   misleading."  15 U.S.C. § 78u–4(b)(1).  Even a literally true statement "can be misleading and

26   thus actionable under the securities laws."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997,

27   1006 (9th Cir. 2002) (citing *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir. 1994)).

28   "Often, a statement will not mislead even if it is incomplete or does not include all relevant facts."

United States District Court
Northern District of California

1   *Id.* "To be actionable under the securities laws, an omission must be misleading; in other words, it

2   must affirmatively create an impression of a state of affairs that differs in a material way from the

3   one that actually exists." *Id.* (citing *McCormick v. The Fund American Cos.*, 26 F.3d 869, 880

4   (9th Cir. 1994)).

5   Plaintiff adequately pleads falsity in the August 7, 2018 tweets.  Plaintiff's claim is

6   directed at the phrase that funding was "secured" for a going-private transaction at $420 per share.

7   The statement could be read by a reasonable investor to mean complete funding for the transaction

8   was unconditionally secured.  So read, the statement is not true.  Plaintiff alleges that Mr. Musk

9   and Tesla had not, in fact, secured funding for the transaction to convert Tesla into a private

10   company at the time of this tweet (or ever).  In particular, the Consolidated Complaint alleges that

11   Mr. Musk never discussed the $420 price[10] with the PIF (Compl. ¶ 150).  Nor did Mr. Musk

12   finalize any of the basic terms of the agreement, which the Consolidated Complaint lays out:

13
14   (a) There was no agreement to fund a going-private transaction
     involving Tesla;

15   (b) Musk had not discussed the potential price of $420 with the
     Public Investment Fund or any other potential investor;

16   (c) Musk had not had any further substantive conversations with
17   the  Public Investment Fund since his meeting on July 31, 2018;

18   (d) Musk had not discussed interest in participating in the
     transaction with any potential strategic investors;

19   (e) Musk had not provided Tesla's Board with a specific proposal
20   to take the company private, only a tentative offer with "a lot of
     uncertainty" that Musk believed only had a 50% likelihood of
21   success;

22   (f) Musk had not contacted existing Tesla shareholders to assess
     their interest in participating in the transaction;

23   (g) Musk had not formally retained any legal or financial advisors to
24   assist with the transaction;

25   (h) Musk had not determined whether retail investors would be able
     to remain shareholders but had been advised that it would be

26

27   ————————————
     [10] Plaintiff alleges that the price reflected a 20% premium on top of the closing stock price on
     August 2, 2018, which was $349.54. Compl. ¶¶ 70, 150.  The added premium equated to $419.49,
28   but, according to the Consolidated Complaint, Mr. Musk rounded it up to $420 as a joke for his
     girlfriend because it symbolized a date on which people smoke marijuana.  *Id.*

United States District Court
Northern District of California

unlikely and "unprecedented";

(i) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(j) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(k) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

*Id.* ¶ 150.

Internally, according to Plaintiff, the members of the Board signaled to Mr. Musk that the Middle East production facility was a "non-starter" and gaining investor support was "really difficult." *See* Compl. ¶ 72. Indeed, Defendants do not dispute that there was no agreement, formal or informal, regarding terms of the sale or its price at the time of this tweet. Mr. Musk's August 13, 2018 blog post on Tesla's website (discussed in greater detail *infra*) confirms this because it details how preliminary the discussions actually were, thus demonstrating the falsity of the August 7, 2018 tweet. Funding, according to the Consolidated Complaint, was not "secure."

Defendants argue that the tweet was neither false nor misleading because the ***only*** reasonable interpretation of the "funding secured" phrase was implicitly conditional: *e.g.*, it would be subject to Tesla's Board of Directors voting to proceed with the going-private transaction, and Mr. Musk's tweet started with his statement that he is merely "considering." But any implication that the decision to go forward had not been finally made does not condition the representation of "Funding secured." That funding was "secured" may reasonably be interpreted as a standalone representation; notably Mr. Musk used the past tense in this regard. The word "secured" implicitly negates any condition.

Moreover, even if the entire tweet is deemed an opinion about the future funding, that would not insulate the tweet from scrutiny under the PSLRA; a statement of opinion can be deemed misleading if it conveys facts, and this is especially so when the opinion contains highly specific facts—*e.g.*, here, the specific price of $420. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188, 190, n. 8 (2015) (". . . a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view.

And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."). As highlighted by the Supreme Court,

> a reasonable investor generally considers the specificity of an opinion statement in making inferences about its basis. Compare two new statements from our ever-voluble CEO. In the first, she says: "I believe we have 1.3 million TVs in our warehouse." In the second, she says: "I believe we have enough supply on hand to meet demand." All else equal, a reasonable person would think that a more detailed investigation lay behind the former statement.

*Id*. at 190, n. 8. So too here. Because Mr. Musk, the CEO of Tesla, included the highly-specific price of $420 at which shares would be bought for the going-private transaction, and because his tweet followed with "funding secured," a reasonable investor would have interpreted it as something more than a speculative amorphous opinion about future possibilities. Instead, it can be read as implying a more concrete state of affair.

Indeed, many investors and analysts—in fact—did ***not*** read the tweet as a speculative statement of opinion according to the Consolidated Complaint:

- Tesla's own Senior Director of Investor Relations informed analysts that Mr. Musk's tweet was correct, that there was a "firm offer" that was "as firm as it gets." Compl. ¶¶ 87–89;

- JP Morgan noted that the tweets are "declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured and Tesla's CEO says funding is secured." *Id*. ¶ 96; and

- The market reacted to the tweet with billions of dollars in trading on the stock market. *Id*. ¶¶ 189–92, 208–09.

These reactions from internal Tesla members, sophisticated analysts, and activity from the stock market tends to belie Defendants' asserted reading of the August 7, 2018 tweet.

Further, Mr. Musk's subsequent colloquy with Twitter users confirmed the definitiveness of his representation about the going-private decision being unimpeded by funding conditions. After the August 7 tweet, Mr. Musk continued to publicly engage in conversations by confirming (1) $420 was, indeed, the price; (2) investors could still invest once Tesla is private; (3) shareholders will have the autonomy to sell at $420 or hold shares to go private; and (4) that

United States District Court
Northern District of California

investor support is confirmed, subject to one shareholder vote.  Compl. ¶¶ 122, 124, 126, 128, and 130.  All of this assumed that funding was not a condition.

In sum, Plaintiff has pled that the statement was materially misleading:  a reasonable stock investor could believe that Tesla had secured funding for the going-private transaction at $420 per share.

### 2.    August 13, 2018 Tweet

Plaintiff also alleges that Mr. Musk's subsequent public statement on August 13, 2018, regarding his engagement of financial advisors (*e.g.*, Silver Lake and Goldman Sachs) was false and misleading because it "lent credibility to Musk's statement that a going-private transaction was still viable and imminent."  Opp. at 12.  Specifically, the tweet read as follows:  "***I'm excited to work with Silver Lake and Goldman Sachs as financial advisors***, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."  Compl. ¶ 104 (emphasis added).  The Consolidated Complaint alleges that both Silver Lake and Goldman Sachs subsequently denied any formal engagement by Mr. Musk.  Compl. ¶ 107.  Defendants do not dispute that Mr. Musk had not engaged Silver Lake or Goldman Sachs as the time of his twitter post.  Instead, Defendants argue that Mr. Musk was, again, merely sharing his aspirations.  For the same reasons that this Court concludes that Plaintiff adequately pleads the August 7, 2018 tweet as a false or misleading statement, that reasoning applies here.  Nothing in the statement suggested it was merely aspirational.  It appears factual, and according to the Consolidated Complaint, was not true.

### 3.    August 13, 2018 Blog Post

Moreover, Plaintiff alleges that the statement contained in Mr. Musk's August 13, 2018 blog post—". . . no question that a deal with the Saudi sovereign fund could be closed . . ."—was similarly false and misleading.  Compl. ¶ 136; Opp. at 12.  Again, Defendants frame Mr. Musk's statement as subjectively aspirational and optimistic in an attempt to stonewall from inferences that it could be false or misleading at the pleading stage.  The very same blog post, however, takes a completely different tone in the subsequent paragraph.  After claiming that there was "no question" that a deal could be closed with the PIF once he left the July 2018 meeting, Mr. Musk

then proceeds to identify significant hurdles that stand in the way of finalizing the transaction—namely, "financial and other due diligence" and an "internal review process" among other conditions.  Suffice it to say, Mr. Musk's optimism about closing the deal does not permeate into the latter half of this blog post.  While Mr. Musk's representation that he had "no question" a deal could be closed was arguably untrue, the second half of the same communication contains the truth—*i.e.*, it contains the true state of affairs that a going-private transaction was not as imminent as he previously represented.  The Court is therefore not convinced that a reasonable investor would read this August 13 blog post and take away an impression of a state of affairs that differs in a material way from the one that actually exists.

Accordingly, the Consolidated Complaint sufficiently pleads that the August 7, 2018 tweet was a false or misleading statement because funding was not secured.  Mr. Musk's tweet less than a week later (August 13, 2018) continued to send mixed, inaccurate signals to the public by claiming to have hired financial consultants when, in fact, he had not.  Both of these representations were false or misleading.  However, the blog post on August 13 is not independently actionable as a misleading statement because while it claimed on the one hand that the deal was viable and imminent, it eventually (and truthfully) revealed that the deal was subject to further scrutiny.

B.    Whether Mr. Musk's Tweet Is Attributable to (And Speaks for) Tesla

Defendants next argue that Mr. Musk's statements on August 7 and 13 are not actionable against Tesla as a matter of law because it did not have ultimate authority over the statement, its content, or how to communicate it.  Mot. at 19.  Defendants contend the statements exclusively came from Mr. Musk's personal Twitter account, and the e-mails and blog posts were written solely by Mr. Musk.  In response, Plaintiff contends Mr. Musk spoke for Tesla under the apparent-authority doctrine—*i.e.*, a corporation is liable for the misrepresentations of its CEO.  Opp. at 13.  Plaintiff also points to the previously-settled SEC filing in which "Tesla notified investors it would use Musk's Twitter account as a formal means of communication to convey 'additional information' about Tesla to investors."  *Id*. (citing Compl. ¶¶ 19, 218).

Defendants rely on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135,

141–42 (2011).  But *Janus* is inapposite.  In *Janus*, the Court decided whether Janus Capital Management LLC ("JCM"), the subsidiary of Janus Capital Group, Inc. ("JCG"), could be held liable for securities fraud for the statements made by JCG in a prospectus.  564 U.S. at 137.  JCG created the Janus Investment Fund, but the fund was a separate legal entity that was owned entirely by mutual-fund investors.  *Id*. at 138.  Janus Investment Fund issued prospectuses describing the investment strategy and operations of its mutual funds to investors.

> The prospectuses for several funds represented that the funds were not suitable for market timing and can be read to suggest that JCM would implement policies to curb the practice.  For example, the Janus Mercury Fund prospectus dated February 25, 2002, stated that the fund was "not intended for market timing or excessive trading" and represented that it "may reject any purchase request . . . if it believes that any combination of trading activity is attributable to market timing or is otherwise excessive or potentially disruptive to the Fund."

The State of New York filed a complaint against JCG and JCM alleging that JCG entered into secret arrangements to permit market timing in several funds run by JCM.  When the complaint became public, JCG's stock price fell nearly 25 percent.  *Id*. at 140.

A class of plaintiffs who owned JCG stock filed a complaint in federal court asserting claims against JCG and JCM for violations of Rule 10b–5 and Section 10(b).  *Id*.  They alleged that JCG and JCM "caused mutual fund prospectuses to be issued for Janus Mutual Funds and made them available to the investing public, which created the misleading impression that [JCG and JCM] would implement measures to curb market timing in the Janus [mutual Funds]."  *Id*. (alteration in original).  The district court dismissed the complaint for failure to state a claim.  *Id*. The Fourth Circuit reversed, holding that plaintiffs had sufficiently alleged that "JCG and JCM, by participating in the writing and dissemination of the prospectuses, made the misleading statements contained in the documents."  *Id*. at 141.  The Supreme Court disagreed, holding JCM cannot be held liable for false statements included in Janus Investment Fund's prospectuses.  *Id*. at 141.  The Court reasoned that JCM did not bear the statutory obligation to file the prospectuses with the SEC, and there was no allegation that JCM filed the prospectuses and falsely attributed them to Janus Investment Fund.  *Id*. at 147.

Unlike *Janus*, which concerned liability of a separate but affiliated legal entity, the issue

United States District Court
Northern District of California

1    here is whether liability attaches to a company for statements made by its own CEO.  It is beyond

2    dispute that a corporation can be liable for the fraud committed by its officers, so long as the

3    officer commits it within the scope of his or her employment.  *Janus* did not change that.  *See*

4    *Janus*, 564, U.S. at 142–43.  In *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir.

5    2015), decided after *Janus*, the Ninth Circuit held shareholders adequately pled a securities

6    violation against a company for the CEO's statements that represented the company's good health

7    and stability, notwithstanding the company's knowledge that the CEO "looted the company's

8    coffers, including proceeds from the U.S. stock offerings."  *Id*. at 473.

9          Defendants argue that Mr. Musk spoke as a potential bidder and not as the CEO of Tesla

10   (Reply at 12–13) at the time of the August 7, 2018 tweet, but Plaintiff adequately pleads that Mr.

11   Musk was in fact speaking as the CEO of Tesla within the scope of his authority.  The

12   Consolidated Complaint provides context:  it specifically alleges that Mr. Musk co-founded Tesla,

13   joined Tesla's Board of Directors as its Chairman, and became its CEO and spokesperson.

14   Compl. ¶ 17.  It further alleges Mr. Musk created this Twitter account in 2009.  *Id*. ¶ 18.  Perhaps

15   most importantly, Plaintiff alleges that

16            ***In November 2013, Tesla formally notified investors that it would***
             ***use Musk's Twitter account as a formal means of communication***
17            ***to convey "additional information" about the company to***
             ***investors***.  In a current report on Form 8-K dated November 5, 2013,
18            Tesla stated, in pertinent part, as follows: "Tesla investors and
             others should note that we announce material information to the
19            public about our company, products and services and other issues
             through a variety of means, including Tesla's website, press
20            releases, SEC filings, blogs and social media, in order to achieve
             broad, non-exclusionary distribution of information to the public . . .
21            . ***For additional information, please follow Elon Musk's and***
             ***Tesla's Twitter accounts: twitter.com/elonmusk and***
22            ***twitter.com/TeslaMotors***."

23   *Id*. ¶ 19 (emphasis added).  While Mr. Musk claimed (after the fact) that he never cleared the tweet

24   with anyone at Tesla and that he spoke on behalf of himself as a potential bidder, Defendants do

25   not otherwise dispute that Mr. Musk and Tesla ***did*** have some form of practice and custom of

26   using Mr. Musk's Twitter account to communicate to Tesla's investors in his scope of

27   employment as the CEO.

28          Moreover, according to the Consolidated Complaint, Tesla affirmatively adopted Mr.

United States District Court
Northern District of California

28

Musk's statement.  Following Mr. Musk's tweet, Mr. Viecha (Tesla's Senior Director of Investor Relations) confirmed three times to analysts that funding was secured.  Opp. at 15.  Plaintiff further contends that Tesla's subsequent statements on its website and its blog do not retract from Mr. Musk's August 7, 2018 tweet; instead, according to Plaintiff, it bolstered and buttressed the misrepresentation.  *Id*.

Plaintiff has sufficiently alleged, for purposes of the motion to dismiss, that Mr. Musk's statements are actionable against Tesla.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) ("Nothing in *Janus* undid the long-standing rule that 'a corporation is liable for statements by employees who have apparent authority to make them.'") (citation omitted); *Guevoura Fund v. Sillerman,* 2016 WL 4939372, at *11 (S.D.N.Y. Sept. 12, 2016) (company's primary liability sufficiently established where CEO allegedly fraudulently announced offer to take company private because "allegations suggest that the line between Sillerman's role as CEO of the Company and potential buyer is murky at best").

## C.    Whether Plaintiff Has Pled Scienter with Particularity

As noted at the outset, scienter must also be pled with particularity.  For a private securities fraud complaint to survive a Rule 12(b)(6) motion to dismiss under the PSLRA, pleadings must raise a "strong inference" that Defendants made misleading statements to investors knowingly or with deliberate recklessness.  *Ronconi*, 253 F.3d at 429.  In particular, a "plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate [Section 10(b)], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.A. § 78u-4.  Scienter, for the purposes of Section 10(b), "refers to a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  A plaintiff must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC*, 552 F.3d at 990.  Plaintiff's assertion of a strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 551 U.S. at 314.  When evaluating scienter, a court must

"engage in a comparative evaluation," and must consider "not only inferences urged by the plaintiff," but the court must also consider "competing inferences rationally drawn from the facts alleged." *Id. See Tellabs, Inc.,* 551 U.S. at 314.

Defendants contend that Plaintiff has failed to satisfy the pleading requirements demonstrating scienter because: (1) Mr. Musk's public statements were consistent with his private statements; (2) there were indicia of good faith surrounding Mr. Musk's tweets; and (3) Mr. Musk stood to gain nothing from misleading shareholders. Mot. at 16. Plaintiff responds that he has adequately pled scienter because the Consolidated Complaint shows, with specificity, that Mr. Musk knew the statement was false at the time he posted it on Twitter, and was motivated by his targeting of short investors—he wanted to "burn" the shorts. Compl. ¶ 153.

1.    Mr. Musk's Knowledge of Funding As of August 7, 2018

Plaintiff contends that Mr. Musk, acting on behalf of Tesla in his role as CEO, purposefully (or at least with deliberate recklessness) released false or misleading information in order to impede short-sellers' agenda of betting against the company. Defendants contend Mr. Musk acted in good faith—Mr. Musk had, in the past, openly discussed taking Tesla private, and his tweets were consistent with his continued consideration of taking Tesla private, funding of which was no real obstacle.

Defendants point to an August 2, 2018 e-mail (*see* Bretan Decl., Ex. A) from Mr. Musk to the Tesla Board entitled "Offer to Take Tesla Private at $420" in which he advocated for a private Tesla. According to Defendants, this inquiry led Mr. Musk to hire financial advisors, and Tesla's Board responded by forming a special committee and hiring its own advisors—all of which demonstrate good faith, not scienter. Mot. at 16–17. Defendants argue that the August 7, 2018 tweet was a good-faith effort by Mr. Musk to inform shareholders of the transaction Mr. Musk was considering because he believed there was a media leak of Mr. Musk's July 2018 talks with the PIF, based on the Financial Times reporting PIF's recent 5% ownership stake in Tesla, and the tweeted disclosure was compelled by this leak. *Id.*

Regarding Defendants' argument that Mr. Musk was simply proactively dealing with a leak, the Financial Times article does not clearly support Defendants' suspicion of a leak. Indeed,

30

1    there is no mention of a "leak" in subsequent clarifying statements from Mr. Musk or Tesla.

2    Further, the Financial Times article on which Defendants rely also states that Tencent (a Chinese

3    company) took a 5% interest in Tesla the year prior—yet Mr. Musk did not, at the time, feel

4    pressured to inform the public of that investment.

5         More centrally, the Consolidated Complaint contains numerous detailed factual allegations

6    showing that Mr. Musk knew or should have known the funding was ***not*** secured when he made

7    his public statements on August 7 and 13, 2018.  Mr. Musk's August 2 e-mail to the Board does

8    ***not*** represent that any funding was secured—instead, it confirms there was only a conditional offer

9    that expired in thirty days.  According to the Consolidated Complaint, the following day's

10   telephonic Board meeting also does not support Defendants' theory; during this call, Board

11   members reacted negatively to the PIF's condition that Tesla would have to build a production

12   facility in the Middle East (Compl. ¶ 72) in order to fund a going-private transaction for Tesla; it

13   was called a "non-starter," and the Board considered keeping small investors in this going-private

14   transaction "really difficult . . . ."  Compl. ¶ 72.  Notwithstanding the fact that he allegedly knew

15   of these hurdles, Mr. Musk still sent the August 7, 2018 tweet.

16        Not only did Mr. Musk send the tweet indicating that funding was secured, he continued to

17   reinforce the notion that funding was secured in follow-up conversations on Twitter—this time,

18   without aspirational undertones.  Mr. Musk responded—publicly and with confidence—to a

19   Twitter user's question about the price per share in this funded transaction:  "$420."  Compl. ¶ 77.

20   He then represented highly-specific details of this going-private transaction as though the terms of

21   the deal were complete—*e.g.*, investors could still invest into a private Tesla, and Tesla will have a

22   provision allowing retail investors who invested before December 31, 2016, to convert their shares

23   into private shares in the company.  *Id*. ¶ 79–80.  The Consolidated Complaint alleges that Mr.

24   Musk had knowledge that these representations were not true (or, at the very least, highly

25   uncertain) at the time he made these guarantees to the public.

26        As discussed in the preceding section herein, Mr. Musk was privy to meetings with the

27   PIF, and the Tesla Board meeting thereafter, where he had high-level discussions about the

28   possibility of a transaction and its funding.  Thus, according to the Consolidated Complaint, he

had direct knowledge of the status of a going-private transaction, the status of which was not congruent with the representations he made to the public via Twitter.  Plaintiff supports his theory of scienter (*i.e.*, that Mr. Musk knew the true, materially-different status surrounding the financials of the transaction) by citing to the August 13, 2018 blog post that confirms—by Mr. Musk himself—the transaction was in preliminary stages, subject to due diligence and review before obtaining multiple levels of approval.  This is made most apparent, as alleged by Plaintiff, by Mr. Musk's interview with the New York Times where he acknowledged that the $420 price was chosen for "better karma," and the article noted (after summarizing the one-on-one interview) that the going-private transaction was "far from secure" because the PIF "had not committed to provide any cash."  Compl. ¶ 112.

Accordingly, the allegations in the Consolidated Complaint are sufficient to plead scienter. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (for the representation "that this cash had already been received[,]" the court held that if the defendants wanted to inform potential investors that the memorandum was not up to date regarding the initial $25 million investment, they "could have conveyed this warning in a much clearer way."); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)("[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").

2.    Mr. Musk's Motive And The Prior SEC lawsuit

Plaintiff makes two additional arguments that alone would not be enough to adequately plead scienter, but which support the inference of scienter:  (1) Defendants had the motive to disrupt short-sellers on the stock market; and (2) Defendants' quick settlement with the SEC is probative of scienter.  Motive can provide circumstantial evidence of scienter.  *See Livid*, 416 F.3d at 949 ("[while] allegations of a motive to mislead, standing alone, cannot satisfy the heightened scienter standard, we are not precluded from considering allegations of motive in combination with other allegations of . . . intent to mislead or deliberate recklessness.").  On the other hand, Defendants argue that Mr. Musk had nothing to gain from misleading the market, and it would be

United States District Court
Northern District of California

1    improper to rely on the SEC settlement because consent settlements are not admissions.  Reply at

2    8–10.

3          Regarding Mr. Musk's motive to harm short-sellers, Defendants do not offer a persuasive

4    response.  They simply claim that "[m]any companies, executives and shareholders take a

5    similarly dim view of short-selling . . ." and that ultimately abandoning the going-private

6    transaction benefitted the short-sellers.  *See* Mot. at 18–19; *see also* Reply at 11.  Even if Mr.

7    Musk stood to gain no direct financial benefit from the false statement, he stood to gain

8    satisfaction from watching the short-sellers lose on their investments, sellers against whom he

9    allegedly harbored animosity.

10          As to the SEC settlement, Plaintiff is not using the settlement as an admission—he is

11    offering the temporal proximity between the SEC Complaint and the settlement as probative of

12    scienter.  Specifically, Plaintiff alleges that Defendants "quickly settled the allegations against

13    them," and the speed at which Defendants settled "strongly support[s] Plaintiff's allegations."

14    Opp. at 20.  *See McKesson Corp.*, 411 F. Supp. 3d at 593 (allegations in an SEC complaint

15    incorporated into the plaintiff's pleadings]; *In re Musical Instruments and Equip. Antitrust Litig.*,

16    798 F.3d at 1199 (relying on allegations in an FTC complaint and settlement).  The "existence of

17    an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit"

18    may be one factor in evaluating scienter.  *City of Monroe Employees Ret. Sys. v. Bridgestone*

19    *Corp.*, 399 F.3d 651, 683 (6th Cir. 2005).  Plaintiff has alleged such temporal proximity here:  the

20    timeframe between the SEC Complaints against Defendants and their settlement was within a

21    matter of a few days.  Compl. ¶ 168–172.  Thus, Mr. Musk's settlement provides some support for

22    Plaintiff's allegation of scienter.

23          Further, as Plaintiff contends more specifically, the August 2, 2018 e-mail suggests a

24    motive to target short-sellers, perhaps by making misleading statements.  The first item listed in

25    support of Mr. Musk's proposal to the Board to take Tesla private specifically identifies short-

26    sellers.  *See* Bretan Decl., Ex A. (maintaining the company as a publicly-traded company

27    "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great

28    harm to our valuable brand.").  As discussed above, motive may support an inference of scienter.

1    *See Livid*, 416 F.3d at 949

2        Accordingly, this Court finds that Plaintiff's Consolidated Complaint adequately pleads

3    scienter.  Plaintiff has demonstrated with particularity that Mr. Musk was in a position, as the CEO

4    of Tesla, to know that the statements he made were not true.  The Consolidated Complaint also

5    lays out, in detail, Mr. Musk's motive for misleading the market.

6    D.    Whether Loss Causation And Economic Loss Are Shown by Stock-Price Declines

7        As to loss causation, Plaintiff alleges that "[i]nvestors [were] excited over the prospect of

8    owning part of the private company," and there were also investors "looking simply to profit by

9    tendering their shares at $420 per share . . . ."  Compl. ¶ 197.  Defendants argue that Plaintiff has

10   not pled facts demonstrating that the declines on August 8, 9, 14, 15, and 17 were related to the

11   August 7 and 13 statements.  On August 7, 2018, following Mr. Musk's Twitter activity, Tesla's

12   stock closed up by 10%, rising from $343.84 per share to $379.59 per share (the daily high was

13   $387.46).  Compl. ¶¶ 86, 190.  The stock-price declines during the Class Period were as follows:

14       • August 8, 2018:  Tesla's stock price dropped from $379.59 to $370.34 (2.5% drop).

15         *Id*. ¶ 94.

16       • August 9, 2018:  Tesla's stock price dropped from $370.34 to $352.45 (5% drop).

17         *Id*. ¶ 99.

18       • August 14, 2018:  Tesla's stock price dropped from $361.13 to $347.64 (2.5%

19         drop).  *Id*. ¶ 108.

20       • August 15, 2018:  Tesla's stock price dropped from $346.64 to $338.69 (2.6%

21         drop).  *Id*. ¶ 110.

22       • August 17, 2018:  Tesla's stock price dropped from $335.45 to $305.50 (9% drop).

23         *Id*. ¶ 114.

24       Defendants argue that neither of these price drops are tied to a corrective disclosure vis-a-

25   vis a misrepresentation.  Mot. at 22.  As to the August 8 declines, Plaintiff pleads that Tesla's

26   press release following Mr. Must's August 7, 2018 tweet failed to mention that funding was

27   secured, which contradicted Mr. Musk's representation to the public.  Compl. ¶ 191.  Regarding

28   the August 9 drop, the Consolidated Complaint attributes it to the announcement of the SEC

United States District Court
Northern District of California

1    investigation of Mr. Musk and Tesla.  *Id.* ¶ 192.  The August 14 closing price is alleged to be the

2    result of a news report that Defendants' representation on August 13 that he engaged financial

3    advisors was false.  *Id.* ¶ 193.  Plaintiff ties the August 15 stock-price fall to the SEC issuing

4    formal subpoenas to Mr. Musk and Tesla.  Lastly, the final price decrease during the Class Period

5    is alleged to be linked to a New York Times article that described a recent interview with Mr.

6    Musk, wherein he admitted that "there was no definitive agreement to take Tesla private in place,

7    or even close to being finalized."  *Id.* ¶ 196.

8            In sum, Plaintiff alleges that each of these stock-price declines are attributable to partially

9    corrective disclosures (*e.g.*, August 9, 2018 SEC investigation, Tesla public statements, and the

10   August 17, 2018 New York Times article).  In order to plead loss causation,

11               [A] securities fraud plaintiff must prove that the defendant's
                 misrepresentation was a substantial cause of his or her financial loss.
12               At the pleading stage, however, the plaintiff need only allege that
                 the decline in the defendant's stock price was proximately caused by
13               a revelation of fraudulent activity rather than by changing market
                 conditions, changing investor expectations, or other unrelated
14               factors.  In other words, the plaintiff must plausibly allege that the
                 defendant's fraud was revealed to the market and caused the
15               resulting losses.

16   *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), as amended (Sept. 11, 2014) (internal

17   citations and quotations omitted).  The issue here, at the pleading stage, is whether the

18   Consolidated Complaint sufficiently pleads that the August 7 or August 13 statements were the

19   proximate cause of the stock-price declines.  Plaintiff's showing of loss causation is predicated on

20   two theories:  (1) short-selling investors were forced to prematurely cover their bets because of the

21   artificially inflated prices; and (2) long investors bought at artificially high prices and ultimately

22   suffered losses when the prices declined (as the truth regarding the lack of secured funding

23   became known).

24           The Supreme Court addressed the sufficiency of pleading[11] loss causation in *Dura*

25   *Pharmacy, Inc. v. Broudo*, 544 U.S. 336 (2005).  In *Dura*, the Supreme Court reversed a Ninth

26

27   [11] The Supreme Court has not weighed in on whether loss causation must be pled with specificity
     under Rule 9(b) or the PLSRA.  However, the Ninth Circuit has held that "Rule 9(b) applies to all
28   elements of a securities fraud action, ***including loss causation***."  *Apollo Grp. Inc.*, 774 F.3d at
     605 (emphasis added).

Circuit decision that held a complaint adequately alleges loss causation simply by pleading that the price on the date of purchase was inflated because of the misrepresentation. *Id*. at 340. In other words, a plaintiff "who has suffered an economic loss [must] provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 347. More specifically, the Court reasoned that,

> . . . at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. ***When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.*** (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.
>
> Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss. But, even if that is so, it is insufficient. To "touch upon" a loss is not to cause a loss, and it is the latter that the law requires.

*Id*. at 342–43 (emphasis added) (internal citations removed). Relying on this, Defendants argue that Plaintiff does not tie the stock-price declines to a corrective disclosure, thereby foreclosing the Consolidated Complaint's ability to sufficiently plead, with particularity, loss causation. Mot. at 22.

    1.   <u>Loss Causation for Short-selling Investors</u>

As to Plaintiff's loss causation theory against short-selling investors, the Consolidated Complaint alleges that "an investor who was betting against Tesla and was 'short' its stock before

United States District Court
Northern District of California

United States District Court
Northern District of California

1   August 7, 2018 [] sustained losses in connection with Musk's and Tesla's false and misleading

2   statements." *Id*. ¶ 199.  Plaintiff  alleges that "[m]any short investors were required to 'cover'

3   their short positions when Musk tweeted that he had 'secured' funding to take Tesla private at

4   $420 per share.  Any short investor that 'covered' in the wake of Mr. Musk's tweet suffered

5   significant damages as a result of having to purchase shares at artificially inflated prices."  *Id*. ¶

6   202.  Plaintiff relies on one out-of-district case for the proposition that in the short-selling context,

7   he can demonstrate loss causation by alleging that false statements forced investors to cover

8   transactions at a significant loss.  *See Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod.*

9   *N.V.*, 2005 WL 1366025, at *7 (D.N.J. June 8, 2005).  Defendant argues that *Rocker* is

10  inconsistent with *Dura*, and that *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d

11  744, 755 (S.D.N.Y. 2011) is more on point.

12       Both *Rocker* and *Take-Two* are instructive for this Court's determination of loss causation.

13  These two decisions confirm that a plaintiff can plead loss causation on a short-selling theory.

14  *Take-Two*, 818 F. Supp. 2d at 753 ( "[c]onsistent with *Dura*, there is no question that a short seller

15  can allege an actionable economic loss by making covering purchases following a corrective

16  disclosure"); *Rocker*, 2005 WL 1366025, at *10 (same).  The timing of the false statements (and

17  the corrective disclosures) in relation to the alleged trading can support an inference of loss

18  causation.  *Compare Rocker*, 2005 WL 1366025, at *7 ("[r]ead in the light most favorable to

19  short-selling [p]laintiffs, the inference to be drawn from the allegations of the [complaint] is that

20  the false financial statements artificially inflated [defendant's] stock, which, in turn, forced

21  [p]laintiffs to make cover transactions and incur significant losses."); *with Take-Two*, 818 F. Supp.

22  2d at 758 ("unlike the short sellers in *Rocker*, [p]laintiff began his short sales well after the prices

23  were already inflated, and makes no allegations of a subsequent scheme by Take–Two to

24  manipulate prices in order to force short sellers like him to prematurely cover.").

25       Plaintiff has adequately pled that the stock price increases and decreases were related to

26  Defendants' false statements and corrective (or partially corrective) statements.  The Consolidated

27  Complaint pleads factual allegations that, if accepted as true, demonstrate that the stock price rose

28  when Mr. Musk indicated the going-private share price would be $420, which was above the

current share price.  Compl. ¶ 197.  Because of this allegedly artificial rise in price, short sellers betting against Tesla were forced to sell their stocks to prevent further loss.  Additionally, as more fully discussed in the section that follows, Plaintiff has pled the stock prices went down as Defendants subsequently released partial corrective disclosures (*e.g.*, clarification of the preliminary nature of the funding, revelation of the SEC investigation, and the New York Times interview).  The rise and fall of Tesla's stock prices corroborated with the timing of the alleged false and misleading statements, all of which occurred within a less-than-two-week period, and which suggests Mr. Musk's false statements were the proximate cause.

### 2.    Loss Causation for Long-selling Investors

Regarding the long investors, Defendants contend, relying on *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), that the SEC investigation, alone, is insufficient to constitute a corrective disclosure for loss causation under a fraud-on-the-market theory.  In *Loos*, the Ninth Circuit held that "the announcement of an SEC investigation, 'standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'  [Citations.]  To the extent an announcement contains an express disclosure of actual wrongdoing, the announcement alone might suffice."  *Loos*, 762 F.3d at 890 n. 3 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1201 n. 13 (11th Cir.2013)).

But as Plaintiff correctly points out, the Ninth Circuit in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209–10 (9th Cir. 2016) recognized that *Loos* "left open whether the announcement of an investigation can 'form the basis for a viable loss causation theory' if the complaint also alleges a subsequent corrective disclosure by the defendant.  The *Lloyd* court then answered that question in the affirmative.  *Id*. at 1210 ("*Loos* made clear that the announcement of a government investigation, without more, cannot meet the loss causation requirement, ***but much more is alleged here*.") (emphasis added).  Indeed, as the Ninth Circuit explained, "any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false."  *Id*. at 1210.

United States District Court
Northern District of California

1    This Court finds *Lloyd* applicable here because much more than an SEC investigation is

2  alleged.  Like the plaintiff in *Lloyd*, Plaintiff here does not solely rely on SEC

3  investigations/subpoenas as his corrective disclosure—his pleaded theory involves follow-up

4  statements from Mr. Musk and Director Defendants that came in the form of tweets, blog-

5  postings, and official Tesla statements that allegedly walked back or minimized the magnitude of

6  the August 7, 2018 tweet.  More centrally, as noted above, the Consolidated Complaint

7  sufficiently alleges that the stock dropped on several occasions keyed to the SEC investigation,

8  partial disclosures, and the New York Times interview.  According to Plaintiff's allegations, each

9  price decline following the August 7, 2018 price increase was correlated with some partial

10  disclosure.  Thus, Plaintiff has sufficiently pled a series of disclosing events—each one having a

11  causal relationship with the decline of stock price that ties back to the "funding secured" false

12  statement—that permits a reasonable inference sufficient to survive a motion to dismiss.

13    Defendants argue that the August 17, 2018 New York Times article[12] cannot be the

14  subsequent corrective statement because (1) the article contained the writer's opinion, not a

15  statement from Mr. Musk on behalf of Tesla and (2) the article revealed nothing new to the

16  market.  In support of this position, Defendants directed this Court's attention to two cases from

17  this District:  (1) *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483 (N.D. Cal. May

18  20, 2016); and (2) *In re Intrexon Corp. Sec. Litigation.*, 2017 WL 732952 (N.D. Cal. Feb. 24,

19  2017).  These authorities support Defendants' argument that a corrective disclosure must inject

20  new information into the market.  However, the August 17, 2018 article ***did*** contain new

21  information surrounding the misleading statement on August 7—it revealed that (1) Mr. Musk

22  posted the tweet while driving himself to the airport; (2) he had been under a lot of work-related

23  stress; (3) the PIF did not commit any cash; (4) funding was far from secure; and (5) people were

24  concerned about his drug use at the time.  While Defendants may be correct that this New York

25

26  ─────────────────

27  [12] The August 17, 2018 New York Times article is not an exhibit to the Consolidated Complaint, nor is it the subject of Defendants' request for judicial notice (though it is an exhibit to Defendants' reply brief).  Because it is referenced and relied upon throughout the Consolidated Complaint, this Court *sua sponte* incorporates it by reference and, therefore, considers it in deciding Defendants' motion to dismiss.

28

Times article contained opinions from and/or summations by the reporter—it also contained many direct quotes from Mr. Musk. Indeed, the sole topic of this publication was to report on the "hourlong interview" with Mr. Musk, in which he, the CEO of Tesla, "provided a detailed timeline of events leading up to the Twitter posting on Aug. 7" to a reporter for a national newspaper. Reply, Ex. 1. The Court finds that this publication can constitute a corrective disclosure for the purposes of pleading loss causation. Whether or not this publication will become admissible at trial (and, thus, overcome hearsay objections) for proving loss causation, this Court reserves that determination for another day.

At this stage, Plaintiff has pled sufficient factual allegations that Mr. Musk's August 7, 2018 statement was the proximate cause to the decline in Tesla stock prices. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate. This is not 'a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation.") (quoting *Twombly*, 127 S.Ct. at 1965.) As with the plaintiff in *Lloyd*, whether Plaintiff here can actually establish loss causation on the merits is another question. *See Lloyd*, 811 F.3d at 1211.

As a result, Plaintiff has adequately pled that Mr. Musk made false or materially misleading statements in the scope of his role as CEO of Tesla, with knowledge of the inaccuracies of his statements—or was, at minimum, deliberately reckless when making such public disclosures. The Consolidated Complaint sufficiently alleges that the market relied on these public statements, and Tesla's stock price declined as a proximate result. Accordingly, Defendants' motion to dismiss the Consolidated Complaint is **DENIED**.

E.     Whether The Director Defendants Are Liable Under Section 20(a)

For a Section 20(a) claim, Plaintiff "must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners, LLC*, 552 F.3d at 990. Plaintiff's Section 20(a) claim relies on the viability of a Section

United States District Court
Northern District of California

10(b) claim.

Plaintiff attributes liability to the Director Defendants by alleging that they (1) "identified Musk's Twitter account as an official channel of communication for Tesla [], the Board had authority over and controlled Mr. Musk's statements regarding Tesla thereon," and (2) "actively involved [themselves] in the potential going-private transaction" by forming a special committee and trickling out corrective disclosures following Mr. Musk's August 7, 2018 tweet.  Opp. at 25. Defendants respond that the Consolidated Complaint specifically alleges that Mr. Musk did not clear the August 7, 2018 tweet with anyone at Tesla, so this defeats control.  Reply at 15.

As explained in Section B, *supra*, Plaintiff has pled in detail how the Director Defendants were involved in the aftermath of the August 7, 2018 tweet, and arguably adopted the false and misleading representations.  Director Defendants' motion to dismiss the Section 20(a) claim is **DENIED**.

## VII.    CONCLUSION

In sum, the Court **DENIES** Plaintiff's motion to convert the motion to dismiss into a motion for summary judgment or, alternatively, to strike the motion to dismiss; **GRANTS** Defendants' request for judicial notice; and **DENIES** Defendants' motion to dismiss the Consolidated Complaint.  Plaintiff has adequately pled with particularity his theory that Defendants violated the securities laws.  Defendants' arguments regarding falsity, scienter, loss causation, and control more appropriately go to the merits.

This order disposes of Docket Nos. 227 and 233.


**IT IS SO ORDERED**.


Dated: April 15, 2020



_____
EDWARD M. CHEN
United States District Judge