1
2
3                    UNITED STATES DISTRICT COURT
4                  NORTHERN DISTRICT OF CALIFORNIA
5

6    CASEY ROBERTS, *et al.*,                    Case No. 19-cv-03422-SI
7                 Plaintiffs,
8           v.                                   **ORDER DENYING DEFENDANTS'**
                                                 **MOTION TO DISMISS**
9    ZUORA, INC., *et al.*,                      Re: Dkt. No. 64
10               Defendants.
11

12           Now before the Court is defendants' motion to dismiss the consolidated amended complaint.

13   Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without

14   oral argument and hereby VACATES the hearing.  For the reasons set forth below, the Court

15   DENIES defendants' motion.

16

17                                **BACKGROUND**

18   **I.      Parties and Products**

19           This securities fraud case is brought by Lead Plaintiff New Zealand Methodist Trust

20   Association ("plaintiff") on behalf of itself and a class of those who purchased securities from Zuora,

21   Inc. ("Zuora") in the period from April 12, 2018 to May 30, 2019 (the "Class Period").  Consol.

22   Am. Class Action Compl. ¶¶ 22, 268 ("CACAC" or "Complaint") (Dkt. No. 60).

23           Defendant Zuora is an enterprise software company providing "subscription commerce,

24   billing and finance systems to its enterprise clients on a subscription basis." *Id*. ¶ 27.  Also named

25   as defendants are Chief Executive Officer and Chairman of the Board of Directors Tien Tzuo

26   ("Tzuo"), and Chief Financial Officer Tyler Sloat ("Sloat") (collectively, the "individual

27   defendants").  *Id*. ¶¶ 24-25.

28           Zuora coined the phrase "Subscription Economy" when it was founded in 2006,

United States District Court
Northern District of California

"predict[ing] a new business environment in which traditional product or service companies would shift toward subscription business models." *Id*. ¶ 29. The Zuora Central Platform offers five software products, including Zuora Billing ("Billing") which is the "primary and most widespread" of the products. *Id*. ¶¶ 32-34. Billing was launched in 2008 and "provides customers with the flexibility to bill in multiple ways, calculate proration when needed, group customers into batches for different billing and payment operations, set payment terms, consolidate invoicing across multiple subscriptions, and collect revenue." *Id*. ¶ 34.

The Zuora Central Platform also includes the software product RevPro, which Zuora acquired when it purchased another company, Leeyo Software, Inc., in May 2017. *Id*. ¶ 35. "Similar to what [Billing] does for managing subscription model processes, RevPro automates the range of internal, multi-departmental processes required to comply with the new Accounting Standard Codification 606/International Financial Reporting Standards 15 ['ASC 606']." *Id*. ASC 606 obligated companies to adopt new standards for allocating and recognizing revenue; public companies were required to adopt such standards by the start of their fiscal year beginning after December 15, 2017, and private companies were required to do so by the start of their fiscal year beginning after December 15, 2018. *Id*. ¶ 36. The individual defendants "consistently noted that companies would attempt to adopt ASC using traditional financial tools or internal systems, which likely would prove cumbersome," and so Zuora "immediately heralded the RevPro acquisition as creating a 'one-stop shop for automating financial operations.'" *Id*. ¶¶ 37-38.

## II.   Initial Public Offering

Plaintiff alleges that Zuora's acquisition of Leeyo "paved the way" for the company to go public. *Id*. ¶ 46. In preparation for an initial public offering ("IPO"), Zuora released an Investor Presentation in April 2018, which emphasized its "Cross-Sell Flagship Products," Billing and RevPro, *id*. ¶¶ 47-48, and a registration statement, prospectus, and prospectus supplement that became effective on April 12, 2018 (collectively the "Registration Statement"). *Id*. ¶ 49. As described in the Complaint, the Registration Statement "highlighted the functionality and integrated features of Zuora's solutions, stating 'our solution functions as an intelligent subscription

management hub that automates and orchestrates the entire subscription order-to-cash process[.]'" *Id*. ¶ 50. The Registration Statement also described Zuora's platform as "captur[ing] financial and operational data, enabling subscription businesses to have a single system of record rather than having to reconcile data from multiple systems." *Id*. ¶ 51; *see also id*. ¶¶ 52-56 (quoting other statements in Registration Statement about the platform and products). Plaintiff alleges that "[t]he Registration Statement's representations about Zuora's solution made the IPO a rousing success. On April 16, 2018, the Company announced that it had closed its IPO selling 12,650,000 shares of its common stock, including full allotment to underwriters . . . raising over $162.2 million in net proceeds." *Id*. ¶ 57.

The complaint alleges that throughout the class period, Zuora and the individual defendants made numerous false or misleading statements promoting the platform's functionality. For example, throughout the class period, Zuora's website claimed that with "Zuora's subscription management technology . . . you can quote, order, bill, recognize revenue, report, and automate the entire customer lifecycle from a single platform." *Id*. ¶ 160. "Similarly, throughout the Class Period, Zuora's website highlighted how Zuora Central is a 'single platform, for your order-to-revenue process and the connective tissue between your CRM and ERP.' Zuora stated that Central 'easily connects the various applications in your order-to-revenue ecosystem.'" *Id*. ¶ 162. The complaint also challenges a tweet from Zuora's Twitter account on June 5, 2018, which read: "Don't underestimate the complexity of revenue recognition. The deep dark depths are very, very complex! Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process! #Subscribed #revrec." *Id*. ¶ 164 (emphasis removed from all statements quoted in the CACAC, unless otherwise noted). The complaint quotes numerous similar statements from Zuora's website, Facebook page, product press releases, SEC filings, and earnings calls. *See id*. ¶¶ 159-240.

Plaintiff alleges that "Zuora's statements about its platform and products were well-received by securities analysts," with analysts noting, *inter alia* that RevPro was a "New Beachhead with Significant Near-Term Revenue Opportunity," and the "significant cross-sell opportunity between over 850 Zuora Billing customers, many of which face ASC 606 compliance challenges, and over 100 RevPro customers at the end of fiscal 2018." *Id*. ¶ 58; *see also id*. ¶¶ 127-30 (quoting positive

3

coverage about Zuora and its prospects for growth from financial press in June and August 2018).

### III.    Confidential Witnesses

Plaintiff alleges that defendants materially misrepresented the functionality of the platform and "omitted to disclose a fundamental technical challenge": that customers "could not successfully integrate the data from [Billing and RevPro]." *Id.* ¶ 59.  In support of this allegation, plaintiff relies primarily on statements by four confidential witnesses (the "CWs") about this challenge, customer responses, and Zuora's internal responses.

CW-1 worked at Zuora from June 2017 to April 2019 as "Senior Manager Global Services/Principal Solution Architect and Zuora Integration Architect," reporting to Vice President Ramamoorthy ("VP Ramamoorthy"), who in turn reported "to the C-suite executives."  *Id.* ¶¶ 60, 101.  The complaint alleges that CW-1 "has extensive knowledge regarding the functionality and implementation of RevPro, as before Zuora acquired Leeyo Software, Inc., CW-1 was employed at Leeyo as a senior software engineer from December 2014 to May 2017 and was responsible for providing product implementation and customization for RevPro."  *Id.* ¶ 61.  "While employed at Zuora, CW-1 worked to assist Zuora's customers automate their revenue operations and functions with RevPro to comply with ASC 606 and IFRS 15.  This included integrating Zuora RevPro with customers' ERP[1] systems."  *Id.* ¶ 62.

"CW-1 said that for customers using Zuora Billing and Zuora RevPro there was a huge friction in reconciling the two systems.  CW-1 said the integration failure stemmed from a source data problem arising from the design of Zuora Billing."  *Id.* ¶ 63.  "CW-1 explained that the data within Zuora was not very robust and had limitations.  CW-1 explained that Billing could not provide ERP information or otherwise come up with the data points needed for proper revenue recognition in RevPro.  CW-1 explained that Zuora needed to come up with a solution that could transport the Billing data into RevPro transaction lines."  *Id.* ¶ 64.

---

[1]  According to the complaint, "legacy Enterprise Resource Planning ('ERP') software systems were built with the old product-based model in mind, working in a very linear fashion—(i.e., a customer orders a product, is billed, payment is collected, and the revenue is recognized.)"  *Id.* ¶ 29.

United States District Court
Northern District of California

CW-2 worked at Zuora from October 2017 to September 2018 as a "high-ranking project manager/subject matter expert," and "reported directly to Zuora's C-suite executives, including Chief Information Officer Alvina Antar, who reported to Defendant Sloat." *Id*. ¶ 65. CW-2 "became aware of the issue with reconciling Zuora Billing and RevPro immediately upon coming on board at Zuora," and according to CW-2 "[t]he problem with the RevPro integration was the data source." *Id*. "CW-2 said the data within Zuora Billing was not very robust, and 'There were some limitations; the data was not structured enough and not uniform.'" *Id*. CW-2 also said that "'the Zuora platform is very open for companies to decide how to structure their subscriptions; [but] they did not integrate an engine to extract data and load it into RevPro.'" *Id.*

CW-3 worked at Zuora from June 2018 to July 2019 as an account executive, selling Billing to enterprise and existing customers on the West Coast. *Id*. ¶ 103. CW-3 worked in the San Mateo office and reported to a Vice President. *Id*. "CW-3 said that the lack of an integration solution and the fact that customers were unhappy that their products did not work together 'came up in team meetings all the time.' CW-3 and sales colleagues would inform their supervising Vice-Presidents of particular customers who were unhappy and needed a workable integration for Zuora Billing and RevPro." *Id.*

CW-4 worked at Zuora from May 2018 to January 2019 as a Business Development: Strategic Accounts Group Member, working on "large accounts, particularly Fortune 500 accounts." *Id*. ¶ 110. CW-4 was on the Zuora Central team, which was focused on selling the Company's subscription order-to-revenue platform to major companies. *Id.* CW-4 became familiar with the RevPro product particularly in August or September 2018 in connection with an upcoming DreamForce conference. *Id*. ¶ 111. "CW-4 explained that when the Zuora Central team began to cross-sell with the RevPro team, CW-4 began to have initial conversations about the products with potential customers and was constantly hearing customers were unhappy with RevPro. CW-4 said that the issue with selling RevPro was that it was not working with Zuora Central." *Id*. ¶ 112.

IV.   **Integration Failures**

The complaint alleges that "Defendants knew of the integration failure before and

5

throughout the Class Period based on Zuora's failure to effectively integrate and implement RevPro internally." *Id.* ¶ 67.  Zuora began "attempting to implement RevPro for its own internal use in or around October 2017" in a project called "'Zuora on Zuora' or 'ZoZ.'" *Id.* "ZoR, which tested RevPro and Zuora's compatibility, was a further extension of the 'Zuora on Zuora' or 'ZoZ' project." *Id.*

"Zuora encountered significant integration challenges in doing the internal implementation such that it could not connect its platform functions with RevPro." *Id.* ¶ 71.  The project "attempted to use an integration platform referred to as MuleSoft," which did not succeed.  *Id.*  "Zuora attempted to make the MuleSoft effort work from Fall 2017 until May 2018, but they could not accomplish what they needed to.  According to CW-2, MuleSoft itself was not the failure, per se. CW-2 said that 'MuleSoft is only a platform and it's used by thousands of companies successfully.' CW-2 added that 'MuleSoft can only do what you ask it [to] do.'  Rather, Zuora was deficient in its use of the MuleSoft platform.  In particular, CW-2 attributed the problems Zuora experienced using MuleSoft to integrate RevPro to, 'the operation, the business goals, the knowledge, the execution, the planning, and the hard thinking through of the product and the solution.'" *Id.* ¶ 72.

The complaint alleges that Zuora's highest executives were informed of the integration failure occurring on the ZoZ project.  *Id.* ¶ 73.  The project held weekly ZoZ review meetings which included CW-1 and CIO Antar.  *Id.*  According to CW-1, CIO Antar knew of implementation difficulties and reported these to defendant Sloat.  *Id.* ¶¶ 73-74.  CW-1 recalled hearing of executive briefings on the internal implementation status on two occasions."  *Id.* ¶ 74.  CW-2 described defendant Sloat as the "public sponsor" of the ZoZ project.  *Id.* ¶ 76.  At a project meeting in early 2018, defendant Sloat told the project team that "the market needed a seamless solution and that 'Zuora needed to get its act together with RevPro.'" *Id.* ¶ 75.  ZoZ's status was maintained in Google Documents and email threads; defendant Sloat "would either be copied on [these] . . . or be apprised by CIO Antar." *Id.* ¶ 77.

"Although Zuora ultimately implemented RevPro internally, the implementation was incredibly laborious, time and resource intensive, and anything but ideal," requiring manual touch-up work in an Excel data file.  *Id.* ¶ 78.  According to CW-1, Zuora did not complete manual internal

implementation until April 2018.  *Id.*  Zuora did a two-year retest that continued "into at least March 2019."  *Id.*

"Beginning in early 2018, with the internal ZoZ project failing . . . Zuora opened a new project internally referred to as the 'Keystone Project,' which was intended to build a connection between RevPro and Zuora Billing to apply to clients' systems."  *Id.* ¶ 79.  "Zuora's engineering and product teams were running Keystone as a separate project to integrate the two tools using a different engine" than the ZoZ project.  *Id.* ¶ 80.  The Keystone Project used another solution called OrderMetrics, but again "the source data was not robust enough and not flexible enough."  *Id.* ¶¶ 81-82.  CW-1 worked on the initial phase of the Keystone Project and conferred with others working on it after he was reassigned.  *Id.* ¶ 81.  "The 'Keystone Project' integration failure was not customer specific, but rather was wide reaching and impacted virtually all of Zuora's customers that had adopted Billing and RevPro.  According to CW-1, Keystone succeeded in helping two or three Zuora customers who 'weren't using [Billing]'s full functionality," however, "'80 to 90 percent of customers would not be able to use the Keystone integration,' as candidates for the 'Keystone' integration would only be those limited customers who were not using many features."  *Id.* ¶ 84.  Keystone Project reports were stored centrally as Google Documents "generally available to all executives."  *Id.* ¶ 86.

CW-1 "further confirmed Executive Defendants [Tzuo and Sloat] and other Zuora senior executives were kept aware of the delays in integrating RevPro and its effects on clients at weekly executive meetings."  *Id.* ¶ 101.  According to CW-1, "the Company's top executives, including Defendants Tzuo and Sloat, participated in weekly calls with the Company's Vice Presidents in which they were briefed on the latest news during weekly calls . . . CW-1 knew of these meetings, because CW-1 gave reports on the latest news to his supervising VP Ramamoorthy, who would then give the information to the executives."  *Id.*

In or about February or March 2019, "Zuora's executives acknowledged the failure of the 'Keystone Project' and decided to scrap it in favor of another approach internally called the K-2 Project."  *Id.* ¶ 119.  CW-1 was involved in the initial design of the K-2 project in late 2018 and "handed it over to start the build" before CW-1 left in April 2019.  *Id.*  CW-1 completed a "Proof

Of Concept" in March 2019, "[a]fter which, according to CW-1, 'there was a directive that Tien [Tzuo] gave to [SVP RevPro Product] Jagan [Reddy] to start K-2.' CW-1 added, '[w]e knew and Tien knew, that OrderMetrics wasn't working." *Id.*

## V.   Customer Responses to Integration Challenges and Sales Execution Problems

CW-1 said that during CW-1's employment at Zuora, customers using both Billing and RevPro experienced "a huge friction in reconciling the two systems." *Id.* ¶ 63. There were "bad test results experienced by new accounts and potential Zuora clients before May 2018." *Id.* ¶ 90. "Zuora's clients testing Billing-RevPro provided Zuora with negative feedback." *Id.* ¶ 91. Many Zuora groups had weekly forum meetings, at least some in which defendant Sloat participated. *Id.* ¶ 93.[2] "As for client-specific issues being discussed, CW-2 said 'I'm sure if the client was generating a huge amount of revenue for that particular group, then it would be a top of mind discussion. If [Defendant Sloat] [was] in the sales group forum, that was the only topic [he] would care about because that would be his bread and butter.'" *Id.* ¶ 93. Minutes and summary reports from forum meetings were also "circulated for action" by email and as Google documents which, according to CW-2, "would certainly have been seen by [defendants Sloat and Tzuo] . . . and they certainly would have been, 'in the loop for that.'" *Id.*

One of Zuora's most important Billing customers, Zoom Video Communications, "initially elected to purchase RevPro, but ultimately opted not to implement it fully due to the integration failure." *Id.* ¶ 98. CW-1 said that Zoom was testing RevPro but then stopped the project in late 2018. *Id.* CW-1 explained that "the Company had the billing information, but struggled to translate it into RevPro smoothly." *Id.* "Zoom's decision to stop the project was a major blow to Zuora's financials because the unsatisfied customer 'stopped some payments as well,' CW-1 said. CW-1 emphasized that the Zoom incident was such a significant hit to Zuora that 'it was material enough to impact our bonus payments – our bonus was dependent on meeting our revenue target." *Id.* ¶ 99.

---

[2] "CW-2 said that every group in the Company had a forum, including the product group, the engineering group, and the RevPro engineering group." *Id.* Sales also had a forum, and "[t]he purpose of the forum was to update management on the integration date, progress, and the weekly status report." *Id.*

"CW-1 stated that when Zoom stopped paying Zuora for RevPro, VP Ramamoorthy pulled CW-1 into a couple of executive meetings that VP Ramamoorthy was having with Zuora's founders toward the end of 2018 to see if customizations could help." *Id.* ¶ 101.

"The failed Billing-RevPro integration caused a multitude of sales execution issues within Zuora's sales groups, including strained customer relationships and lost sales and revenues." *Id.* ¶ 102. "Some Billing customers who had been sold on RevPro were actually forced to spend heavily on customization to get two systems to work together. *Id*. ¶ 104. CW-3 said "'[c]ustomers were spending over $1 million . . . to get the two systems [Billing and RevPro] to work together" and "CW-3 said one customer in particular spent millions because they needed to make systems work in order to successfully go public." *Id*. In addition, CW-3 said approximately five other major Zuora customers who were material to Zuora's financial health were upset about the delayed integration. *Id*. ¶ 105.

"CW-3 said that the lack of an integration solution and the fact that customers were unhappy that their products did not work together 'came up in team meetings all the time.'" *Id.* ¶ 106. CW-3 and sales colleagues would inform their supervising Vice Presidents of particular customers who were unhappy and needed a workable integration for Zuora Billing and RevPro. *Id.* ¶ 107. According to CW-3, customers were not happy with Keystone and integration was discussed at almost every sales team meeting in which he participated. *Id.* "The Vice Presidents and Directors who attended team meetings communicated what had been discussed at the team meetings to the Executive Defendants." *Id.* CW-3 said "'[o]ur VP was in constant communication with the CEO [Defendant Tzuo] about customer feedback.' CW-3 would hear about the VP's communications with Defendant Tzuo through the VP. *Id*.

The integration failure adversely impacted revenue. According to CW-3, "some customers withheld payment due to the failed connectivity between Billing and RevPro." *Id.* ¶ 108. According to CW-3, the same company that paid millions to go public withheld payment to Zuora, and in refusing the pay, CW-3 said the client noted that it "'had to spend $1 million outside of us because it didn't work.'" *Id.* Defendant Tzuo was informed of the large client's refusal to pay for Zuora's subscription products. *Id.* ¶ 109. CW-3 communicated the collection issue to his VP. *Id.*

United States District Court
Northern District of California

"Thereafter, CW-3 observed an email thread that took place around November or December 2018, in which Defendant Tzuo was made aware of the issue about the non-payment. CW-3 gathered from the email conversation that Defendant Tzuo understood the customer's viewpoint and did not push back, but that Defendant Tzuo also understood what the revenue recognition complications for the customer would be." *Id.*

"The failed RevPro-Billing integration problems ultimately resulted in reputational damage and reduced demand for all of Zuora's products, including RevPro, the Central platform, and other homegrown Zuora products." *Id.* ¶ 110. CW-4, who worked on the Zuora Central team, "recounted incidents of failed RevPro demonstrations for existing Billing customers." *Id.* ¶ 113. RevPro sales suffered due to the integration issues. *Id.* ¶ 115. CW-4 said that the Zuora Central team met with the RevPro team twice a week during the Class Period. *Id.* "At those meetings, CW-4 observed that the RevPro team was falling short of their projected numbers . . . CW-4 stated that the reason sales were short and the team was struggling was that there were technical issues with integrating RevPro." *Id.*

In addition, "CW-4 said the RevPro integration challenges was damaging Zuora's broader reputation for product quality and that Zuora was missing out on large enterprise sales for all of its products, including Zuora Central." *Id.* ¶ 116. CW-4 "confirmed the RevPro technical issues were making it tougher to sell Zuora Central, stating '[i]t was very clear that there were concerns with companies who had Zuora Central who heard about difficulties.'" *Id.* "CW-4 said that the RevPro integration issue was a big issue with the Company structure, as bringing RevPro in had resulted in a lot of Zuora's consistent clients questioning if they wanted Zuora Central. CW-4 stated, '[t]his idea of a sticky sale, people are very aware of that in software – they pitch on a product that's hard to ditch, and you don't want to be stuck with Zuora Central if some other product doesn't work." *Id.* CW-4 recalled an instance of a very large enterprise company that bought RevPro and decided not to add Zuora Central because of the integration issues. *Id.* ¶ 117.

The individual defendants "could view the status of certain client sales through a proprietary Salesforce database," "could look at accounts," "would be able to see metrics like how much the customer was paying, any opportunities for new business within the account . . . [and] notations

1    about specific issues related to the RevPro implementation." *Id*. ¶ 118.

3    **VI.    Insider Sales, Disclosure of Challenges, and Decline in Share Price**

4    Defendant Sloat sold almost half of his then-total holdings in March of 2019. *Id*. ¶¶ 138-39.

5    He allegedly sold 344,009 shares on September 5, 2018; then another 364,528 shares on March 26,

6    2019; and finally another 35,472 shares on March 28, 2019, for a total value of approximately $17

7    million. *Id*. ¶ 138.   Former President and Head of Sales Marc Diouane ("Diouane"), who is not

8    named as a defendant, "eventually unload[ed] over a quarter of his then-total holdings." *Id*. ¶¶ 138-

9    39.   He allegedly sold 34,200 shares on September 5, 2018; then 130,500 shares on December 6,

10   2018; then 130,000 shares on March 26, 2019; and finally another 240,000 shares on April 29, 2019,

11   for a total value of approximately $11 million. *Id*.   Both sets of sales were made pursuant to Rule

12   10b5-1 trading plans. *Id*. ¶ 142.

13   On May 30, 2019, Zuora announced its Q1 2020 financial results, along with a press release

14   announcing a decline in large customer growth, a decline in quarterly revenue growth of 18%, and

15   a loss of $20.6 million, or 16% year-over-year. *Id*. ¶¶ 143-44.   The release also lowered Zuora's

16   fiscal year 2020 guidance: total revenue was cut from $289-293.5 to $268-278 million; subscription

17   revenues were cut from $209-211.5 to $200-206 million; and subscription annual contract value

18   would decline for 12% for the year, compared to growth of 60%, 45%, and 30% in each prior year

19   respectively. *Id*. ¶ 145.   The release further announced that Diouane would leave his role as

20   President while Zuora conducted a search for his replacement. *Id*. ¶ 146.   During an earnings call

21   with investors that same day, defendant Tzuo identified "'two execution headwinds' that caused the

22   poor financial results and reduced guidance: Billing-RevPro integration challenges and sales

23   execution problems." *Id*. ¶ 147.   He explained that Zuora's growth was conditioned on its ability to

24   cross-sell Billing and RevPro, but integration was "taking longer than expected." *Id*. ¶ 148.   He

25   noted that Zuora had made "a course correction in [its] approach," and the challenges had "slowed

26   down our cross-sell motion" and "resulted in lower professional services and subscription revenue

27   in the quarter as well as tempered expectations going forward." *Id*.   Tzuo said that because Zuora

28   was focused on getting new RevPro customers to go live before ASC 606 of the previous year,

United States District Court
Northern District of California

Zuora "didn't really have time and the resource [sic] to focus on the integration between the 2 until after the 606 [wave] was complete." *Id.* ¶ 151. This meant that "we didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction." *Id.*

Between May 30 and 31, 2019, Zuora share prices fell from $19.90 to $13.99 per share, a drop of $5.91 or nearly 30%, "on unusually heavy trading volume." *Id.* ¶ 261.

At a later Investor Session on June 5, defendant Tzuo explained that "the course correction [Zuora] took out of the gate is we tried to make our billing system produce an order that look[s] like an ERP [or traditional order-based] system," and the flaw in the approach "probably could have [been] caught [] a little bit earlier." *Id.* ¶ 155. At a technology conference on September 10, 2019, Zuora's Vice President of Investor Relations further confirmed that "last year, we actually spent some time doing the integration" and "had some challenges going through it we highlighted on the [May 30] call." *Id.* ¶ 156. As a result of these challenges, "Zuora had to pause RevPro implementations with its Billing customers." *Id.*

Claiming that defendants committed fraud by making materially false statements and omissions throughout the Class Period, plaintiff brings this securities fraud claim pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 of the Securities Exchange Commission ("SEC"). Defendants move to dismiss for failure to state a claim.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, a district court is not required to accept as

1    true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

2    inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

3        As a general rule, courts may not consider materials beyond the pleadings when ruling on a

4    Rule 12(b)(6) motion.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  However,

5    the incorporation-by-reference doctrine "permit[s] district courts to consider material outside a

6    complaint" in order to "prevent plaintiffs from selecting only portions of documents that support

7    their claims, while omitting portions of those very documents that weaken—or doom—their

8    claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002 (9th Cir. 2018).  There are

9    also instances, albeit rare, where assessing the sufficiency of a claim at the pleading stage requires

10   review of a document.  *Id.* at 1002 (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)

11   (affirming the incorporation of materials that the complaint did not reference at all because the claim

12   "necessarily depended on them").

13

14                                        **DISCUSSION**

15       Section 10(b) of the Exchange Act prohibits the use or employment, "in connection with the

16   purchase or sale of any security registered on a national securities exchange . . . any manipulative

17   or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may

18   prescribe." 15 U.S.C. § 78j(b).  One such rule promulgated by the Exchange Act is SEC Rule 10b-

19   5, which prohibits "engag[ing] in any act, practice, or course of business which operates or would

20   operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

21   17 C.F.R. § 240.10b-5(c).  A claim under Section 10(b) or Rule 10b–5 must adequately allege six

22   elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

23   connection between the misrepresentation or omission and the purchase or sale of a security; (4)

24   reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

25   *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citation

26   omitted); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).  The Private

27   Securities Litigation Reform Act of 1995 (the "PSLRA") further requires that a Section 10(b)

28   complaint plead both falsity and scienter with particularity.  15 U.S.C. § 78u-4(b)(2)(A); Fed. R.

United States District Court
Northern District of California

13

Civ. P. 9(b); *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted).

A claim under Section 20(a), which provides for control person liability, "must demonstrate: (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator." *Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (internal quotation marks and citation omitted).

In the analysis that follows, the Court discusses only the disputed elements of Section 10(b): material misrepresentation or omission, and scienter.

## I.       Material Misrepresentation or Omission

A pleading must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1); *In re Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). For a statement or omission to be misleading, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (internal quotation marks and citation omitted).

Defendants contend that all of the statements that plaintiff identifies as misleading are either inactionable statements of corporate optimism or forward-looking statements protected from liability by the "safe harbor" or bespeaks caution doctrine. For example, defendants argue that statements such as the May 4, 2018 press release that "the Zuora platform was architected specifically for dynamic, recurring subscription models and acts as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition . . ." are simply high-level descriptions of the company's products and strategy. Defendants make similar arguments about the other challenged statements

United States District Court
Northern District of California

about Billing-RevPro functionality and prospects for upselling, cross-selling and growth.

Defendants also contend that plaintiff does not plead any contemporaneous facts showing that any of the actual statements were false or misleading at the time that they were made. Defendants argue that "[p]laintiff does not dispute, for example, that customers *can* "automate the entire customer lifecycle from a single platform," that Zuora offered products that covered the entire subscription order-to-revenue process, or that Zuora's growth strategy was not viable or sustainable. Defendants also assert that nothing in the challenged statements speaks to the company's ability to integrate Billing and RevPro, and defendants argue that plaintiff "tries to manufacture a securities fraud claim out of Zuora marketing slogans, catchphrases and promotional tweets in an effort to portray Zuora as having promised that its two flagship products could be effortlessly integrated – a representation that appears nowhere in Zuora's public statements." Mtn. at 2 (Dkt. No. 64). Defendants further argue that plaintiff has "created out of whole cloth" the allegation that the Billing-RevPro integration failure led to sales problems and diminished demand for Zuora's products, and defendants emphasize that Zuora described the sales execution issue as a distinct "headwind."

Defendants also contend that Zuora expressly advised investors of the risks that plaintiff claims were concealed, such as that deploying Zuora products was complex and lengthy, that customers might "not ultimately deploy our solution" because of "unexpected complexities or delays associated with deployment" and that "incorrect or improper deployment or use of our solution could result in customer dissatisfaction," and that deployment failures could negatively impact the ability to generate revenue from "the upsell of additional products and services."

The Court finds that plaintiff has adequately alleged that defendants' statements "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). The complaint sufficiently alleges that throughout the class period, defendants repeatedly marketed Zuora's platform and applications as a functioning, combined solution when in fact Billing and RevPro only could function as standalone products. *See, e.g.*, CACAC ¶ 164 (June 5, 2018 tweet by Zuora: "Don't underestimate the complexity of revenue recognition. The deep dark depths are

very, very complex! Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process! #Subscribed #revrec."); *Id*. ¶ 166 (image on Zuora website illustrating the flow from Billing to the Zuora Central Platform to RevPro); *Id*. ¶ 162 ((Zuora's website stating that Zuora Central "is a single platform for your order-to-revenue process and the connective tissue between your CRM and ERP" and that Zuora Central "easily connects the various applications in your order-to-revenue ecosystem"); *Id*. ¶ 176 (December 2018 press release emphasizing the "automation and usability across Zuora Billing, Zuora Collect, and Zuora RevPro"); *Id*. ¶¶ 190, 194 (Zuora's Q1 2019 earnings call, during which defendant Tzuo stated, "[W]e continue to offer the only complete subscription management solution," and "[Zuora is] the only company that provides a full solution"); *Id*. ¶ 203 (on Zuora's Q2 2019 earnings call, defendant Sloat stated that Zuora acquired RevPro because of "business model complexity that hits both your quote-to-cash solution as well as your revenue automation."

Plaintiff alleges that these statements were materially false or misleading because Billing and RevPro were not integrated, meaning clients had "to either export the data from [Billing] and import it into [RevPro] manually, or build a customized integration that could ingest the required data from [Billing] into [RevPro]." *Id*. ¶¶ 160, 200, 205. Plaintiff alleges with particularity that the statements are contradicted by the failures of the ZoZ and Keystone Projects as well as the problems that Zuora's customers experienced when they tried to implement both products, including significant issues with major customers refusing to pay Zuora due to integrations problems. *Id*.

The complaint also links defendants' representations about the functionality and integration of its products with the statements relating to growth and growth strategy. The Registration Statement identifies as a "key element" of Zuora's growth strategy "increasing transaction volume and upsells and cross-sells with additional products," including a "focus on acquiring new customers through [its] flagship products, [Billing] and [RevPro]." *Id*. ¶ 187. In the Q1 2019 earnings call, defendant Tzuo noted, "[W]e do see a lot of tailwinds in the business . . . in general, we saw a strong demand for both products across the board." *Id*. ¶ 196. Defendant Sloat echoed that "[t]here's just strong demand all the way around for both add-on products, both flagship products." *Id*. ¶ 198. In an article from December of 2018, defendant Sloat stated, "We still have less than 10% overlap of

16

our customer base using both of our flagship products, but we do see a lot of traction starting there."
*Id*. ¶ 215.  In the Q3 2019 earnings call, defendant Tzuo noted that "we also signed on other public companies like Carbonite and Pivotal who both chose RevPro all because we got the best revenue automation platform on the market," and "we have a very sticky product . . . the 2 factors for us that influence churn are, one, how are [sic] well are we doing bringing customers live, and that's where we continue to show improvements year-over-year."  *Id*. ¶¶ 207, 209.  The complaint alleges that these statements were materially false or misleading because the integration failures had resulted in the withholding of payment by some customers, reputational damage, reduced demand, and a pause on implementations to customers.  *Id*. ¶¶ 108, 110, 155.

For the same reasons, the Court cannot conclude that the challenged statements are inactionable as a matter of law.  "[P]rojections and general expressions of optimism may be actionable under the federal securities laws."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992); *see also Virginia Bankshares Inc. v. Sandberg*, 501 U.S. 1083, 1088-98 (1991) (holding knowingly false or misleading statements of opinion or belief, even though conclusory in form, may be actionable as misstatements of material fact).  "In this circuit, a projection or statement of belief may be actionable to the extent that one of three implied factual assertions is inaccurate: '(1) that the statement is genuinely believed, (2) that there is a reasonable basis for the belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.'"  *Hanon*, 976 F.2d at 501 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1112 (9th Cir. 1989)).

Here, although defendants characterize all of the challenged statements as vague, high-level statements of corporate optimism or forward looking, plaintiff alleges that defendants did not have a reasonable basis to believe that the Billing and RevPro products were integrated or would work "seamlessly" or "easily" with each other because they were aware of undisclosed facts such as the failed Zoz and Keystone projects and customer integration issues.  Similarly, for the same reasons the challenged statements about growth and cross-selling and upselling, which were predicated on the successful integration and implementation of RevPro, are actionable.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.    Scienter

To establish scienter at the pleading stage, a complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness.  15 U.S.C. § 78u–4(b)(2); *Daou Sys.*, 411 F.3d at 1015.  "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 324 (2007).  Moreover, a complaint depending on confidential witness statements must overcome two hurdles: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge . . . Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995 (citations omitted).

The Supreme Court has explained that the scienter inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  In the Ninth Circuit, this "does not materially alter the particularity requirements for scienter claims . . . but instead only adds an additional 'holistic' component to those requirements." *Zucco*, 552 F.3d at 987.  "Even if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Id*. at 1006.  Scienter is "a mental state that not only covers 'intent to deceive, manipulate or defraud,' but also 'deliberate recklessness.'" *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016).  "Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).

Plaintiff bases scienter primarily on the statements of the four CWs.[3]  Defendants challenge the CW statements because the CWs were not employed throughout the Class Period, and

---

[3]  Plaintiff also contends that scienter is shown through defendants' stock sales, post-class period "admissions," and under the theories of corporate scienter and core operations.  Because the Court concludes that the CW allegations are sufficient, the Court does not address the parties' other arguments.

defendants contend that the CWs lacked personal knowledge or direct contact with the defendants, and do not indicate scienter with sufficient particularity in their statements.

The Court concludes that plaintiff has sufficiently alleged scienter through the CW allegations. As an initial matter, the Court is not persuaded by defendants' assertion that the CW allegations are deficient because the CWs did not work at Zuora for the entire class period. CW-1 left Zuora in April of 2019, one month before the end of the thirteen-month Class Period; CW-2 left in September of 2018, five months into the Class Period; CW-3 joined in June of 2018, two months into the Class Period; and CW-4 left in January of 2019, eight months into the Class Period. CACAC ¶¶ 60, 65, 103, 110. That none of the CWs was employed at Zuora during the *entire* Class Period does not in itself render their statements unreliable as a matter of law. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (accepting statements by CW who was not employed at company during Class Period but had personal knowledge of defendants' real-time access to reports).

Moreover, the CWs' personal knowledge of integration projects and customer feedback comes as a direct result of their positions in Zuora. For instance, as Senior Manager Global Services/Principal Solution Architect, CW-1 "worked to assist Zuora's customers to automate their revenue operations and functions with RevPro." CACAC ¶¶ 60, 62. CW-1 was also directly involved in the ZoZ and Keystone Projects. *Id.* ¶¶ 60, 81-87. CW-2 was a project manager and subject matter expert in a position to comment on the use of MuleSoft to implement and integrate RevPro, even though Zuora had already "purchased, licensed, on-boarded, implemented, operation licensed, and had built code" for MuleSoft by the time CW-2 joined. *Id*. ¶¶ 65, 72. CW-3 was an account executive who worked directly with enterprise customers. *Id.* ¶ 103. And CW-4 was a member of the Business Development: Strategic Accounts Group who "worked on Zuora's large accounts, particularly Fortune 500 accounts," at the time when Zuora "started to make RevPro more visible and emphasized cross-selling it." *Id*. ¶¶ 110-11.

The complaint also alleges with particularity that defendants were in possession of contemporaneous, contradictory information when they made the false and misleading statements, giving rise to a strong inference of scienter. Plaintiff alleges through the CW statements that

defendants knew Zuora's internal ZoZ integration project had failed, knew Keystone failed, that customers had experienced failed integrations (leading in some instances to major customers refusing to make payments), were present at meetings reporting on the progress of these integrations, and had access to minutes, documents, and emails evidencing negative customer feedback due to integration failures. *See generally* CACAC ¶¶ 60-119.

For example, CW-1 confirmed that CIO Antar headed the ZoZ project, that CIO Antar was aware of the difficulties implementing RevPro internally, that CIO Antar reported those difficulties to defendant Sloat, and that at a monthly ZoZ project meeting in early 2018, defendant Sloat told the project team that "Zuora needed to get its act together with RevPro." *Id.* ¶¶ 73-75; *see also id.* ¶¶ 93-94 (Sloat and Tzuo attended group forum meetings; minutes from those meetings referenced RevPro-Billing integration issues). According to the complaint, defendants only implemented RevPro on Zuora's systems by April 2018 after undertaking time and labor-intensive manual input of Zuora's Billing data into RevPro's system. *Id.* ¶¶ 76-78. As another example, the complaint alleges with particularity that when a large client refused to pay for Zuora's subscription products due to failed connectivity between RevPro and Billing, CW-3 communicated that issue to his VP, and thereafter observed an email thread that took place around November or December 2018 in which defendant Tzuo was made aware of the issue of non-payment. *Id.* ¶¶ 107-09. Similarly, the complaint contains detailed allegations about how another major client, Zoom, initially elected to purchase RevPro but ultimately opted not to implement it due to the integration failure. *Id.* ¶¶ 98-101. The complaint alleges that CW-1 stated that Zoom's decision to stop the project was a major financial blow that "was material enough to impact our bonus payments," and that when Zoom stopped payment, CW-1 was pulled into a couple of executive meetings with Zuora's founders[4] toward the end of 2018 to see if customizations could help. *Id.* ¶¶ 99, 101. These allegations, taken together with all of the other numerous detailed CW allegations in the complaint, contribute to a strong inference of scienter. *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1043-44 (N.D. Cal. 2018).

---

[4] Defendant Tzuo is one of the Zuora's founders. *Id.* ¶ 24.

United States District Court
Northern District of California

1
2
**III.     Section 20(a)**
3
        A control person claim under Section 20(a) requires a predicate primary violation, *see Webb*,
4
884 F.3d at 858.  Because the Court has found that plaintiff has stated a  Section 10(b) claim, the
5
Court further finds that plaintiff has stated a claim under Section 20(a).
6
7
                                    **CONCLUSION**
8
        For the foregoing reasons, the Court hereby DENIES defendants' motion to dismiss the
9
complaint for failure to state a claim.
10
11
        **IT IS SO ORDERED**.
12
13
Dated: April 28, 2020                    _____
14
                                         SUSAN ILLSTON
                                         United States District Judge
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21