**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve Berman (admitted *Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Lead Plaintiff*
*New Zealand Methodist Trust Association*
[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASEY ROBERTS, Individually and On Behalf Of All Other Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>ZUORA, INC., TIEN TZUO, and TYLER SLOAT,<br><br>Defendants. | No. 3:19-cv-03422-SI<br><br>**LEAD PLAINTIFF NEW ZEALAND METHODIST TRUST ASSOCIATION'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:    March 26, 2021<br>Hearing Time:    10:00 a.m.<br>Courtroom:        1, 17th Floor<br>Judge:               Hon. Susan Illston<br><br>CLASS ACTION<br><br>Date Action Filed: June 14, 2019 |

1

**TABLE OF CONTENTS**

2

<u>Page</u>

3    I.    PRELIMINARY STATEMENT .................................................................................2

4    II.   BACKGROUND......................................................................................................4

5    III.  ARGUMENT ...........................................................................................................7

6          A.    The Proposed Class Satisfies Rules 23(a) ...............................................8

7                1.    Numerosity Is Established.............................................................8

8                2.    Multiple Common Questions Exist ...............................................9

9                3.    Lead Plaintiff's Claims Are Typical of the Proposed Class.........10

10               4.    Lead Plaintiff Will Adequately Protect the Proposed Class.........11

11         B.    The Proposed Class Satisfies Rule 23(b)(3)............................................13

12               1.    Common Questions Of Law And Fact Predominate....................13

13                     a.    The Fraud-on-the Market Presumption Applies...............15

14                     b.    *Affiliated Ute* Provides a Presumption of Reliance ...........21

15                     c.    Damages Can Be Calculated On a Class-Wide Basis .......22

16               2.    A Class Action Is Superior To Other Available Methods for
                        Resolving This Dispute ...............................................................23

17

18         C.    Hagens Berman Should Be Appointed Class Counsel............................24

19    IV.   CONCLUSION .....................................................................................................25

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adobe Sys., Inc. Sec. Litig.*,
  139 F.R.D. 150 (N.D. Cal. 1991) ...................................................................7

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ...................................................................15, 21, 22

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ...................................................................14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ...................................................................14, 15

*Angley v. UTi Worldwide Inc.*,
  311 F. Supp. 3d 1117 (C.D. Cal. 2018) ...................................................................19

*In re Applied Micro Circuits Corp. Sec. Litig.*,
  2003 WL 25419526 (S.D. Cal. Jul. 15, 2003) ...................................................................12

*In re Banc of California Sec. Litig.*,
  326 F.R.D. 640 (C.D. Cal. 2018) ...................................................................16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...................................................................3, 15

*Berner v. Lazzaro*,
  730 F.2d 1319 (9th Cir. 1984), *aff'd*, 472 U.S. 299 (1985) ...................................................................7

*Billhofer v. Flamel Techs.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................18

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ...................................................................23

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ................................................................... *passim*

*In re Charles Schwab Corp. Sec. Litig.*,
  2011 WL 1481424 (N.D. Cal. Apr. 19, 2011) ...................................................................24

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003) ...................................................................21

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013) ..................................................................................................22

*In re Connetics Corp. Sec. Litig.,*
   257 F.R.D. 572 (N.D. Cal. 2009) ................................................................... *passim*

*In re Cooper Cos. Inc. Sec. Litig.,*
   254 F.R.D. 628 (C.D. Cal. 2009) ..........................................................7, 9, 14

*In re Countrywide Fin. Corp. Sec. Litig.,*
   273 F.R.D. 586 (C.D. Cal. 2009) ...............................................................19, 23

*In re Diamond Foods, Inc., Sec. Litig.,*
   295 F.R.D. 240 (N.D. Cal. 2013) ...............................................................16, 22

*Edwards v. First Am. Corp.,*
   798 F.3d 1172 (9th Cir. 2015) ....................................................................13

*In re Emulex Corp. Sec. Litig.,*
   210 F.R.D. 717 (C.D. Cal. 2002) ...............................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.,*
   563 U.S. 804 (2011) ..................................................................................14

*In re Gaming Lottery Sec. Litig.,*
   2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) ...............................................20

*Halliburton Co. v. Erica P. John Fund, Inc.,*
   573 U.S. 258 (2014) .............................................................................15, 16

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ......................................................................9

*Hayes v. MagnaChip Semiconductor Corp.,*
   2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ...........................................20

*Hodges v. Akeena Solar, Inc.,*
   274 F.R.D. 259 (N.D. Cal. 2011) ...............................................................10

*Huberman v. Tag-It Pac. Inc.,*
   314 F. App'x 59 (9th Cir. 2009) .................................................................21

*In re Nature's Sunshine Prod.'s Inc. Sec. Litig.,*
   251 F.R.D. 656 (D. Utah 2008) ..................................................................17

*In re Intuitive Surgical Sec. Litig.,*
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .............................................9

*In re Juniper Networks, Inc. Sec. Litig.,*
   264 F.R.D. 584 (N.D. Cal. 2009) ...........................................................17, 24

*Karinski v. Stamps.com, Inc.*,
   2020 WL 6572660 (C.D. Cal. Nov. 9, 2020) ............................................................8

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001)...............................................................16, 19, 20, 21

*In re LDK Solar Sec. Litig.*,
   255 F.R.D. 519 (N.D. Cal. 2009) ...........................................................................10

*In re Lendingclub Sec. Litig.*,
   282 F. Supp. 3d 1171 (N.D. Cal. 2017)...................................................................8

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   762 F.3d 1248 (11th Cir. 2014) .............................................................................19

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) ...............................................................................12

*In re Mills Corp. Sec. Litig.*,
   257 F.R.D. 101 (E.D. Va. 2009)............................................................................17

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) .............................................. *passim*

*No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003)...................................................................................3

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014)..............................................................................9, 10

*Petrie v. Elec. Game Card, Inc.*,
   308 F.R.D. 336 (C.D. Cal. 2015)...........................................................................20

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015)..................................................................................22

*Rannis v. Recchia*,
   380 F. App'x 646 (9th Cir. 2010)............................................................................8

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
   270 F.R.D. 247 (S.D. Cal. 2010)......................................................................17, 18

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010)...................................................................................7

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
   571 F. Supp. 2d 1315 (N.D. Ga. 2007)..................................................................21

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020) ..........................................................................22

*Siemers v. Wells Fargo & Co.*,
  243 F.R.D. 369 (N.D. Cal. 2007) .......................................................................................24

*Tellabs, Inc., v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................................................7

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ..........................................................................................22

*In re VeriSign, Inc. Sec. Litig.*,
  2005 WL 7877645 (N.D. Cal. Jan. 13, 2005).......................................................9, 11, 12, 13

*In re Versata, Inc., Sec. Litig.*,
  2001 WL 34012374 (N.D. Cal. Aug. 20, 2001) .................................................................12

*Vinh Nguyen v. Radient Pharm. Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012)........................................................................18, 19, 21, 23

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ................................................................................................19

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005) .............................................................................................17

*In re Zillow Grp., Inc. Sec. Litig.*,
  2020 WL 6318692 (W.D. Wash. Oct. 28, 2020).................................................................8

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................................................14

### OTHER AUTHORITIES

Fed. R. Civ. P. 23 .................................................................................................... *passim*

H.R. CONF. REP. No. 104-369, at 32 (1995)......................................................................12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 26, 2021, at 10:00 a.m., before The Honorable Susan Illston, United States District Court for the Northern District of California, Courtroom 1, 17th Floor, 450 Golden Gate Avenue, San Francisco, Court-appointed Lead Plaintiff New Zealand Methodist Trust Association ("Lead Plaintiff" or "MTA") will, and hereby does, respectfully move this Court for an entry of an Order in the above-captioned action (the "Action"): (i) certifying pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure a Class (defined below) of all persons or entities who purchased or otherwise acquired publicly-traded common stock of Defendant Zuora, Inc. ("Zuora" or the "Company") during the period from April 12, 2018 to May 30, 2019, inclusive (the "Class Period"), and who were damaged thereby; (ii) appointing Lead Plaintiff as Class Representative; and (iii) appointing Court-appointed Lead Counsel Hagens Berman Sobol Shapiro LLP ("Hagens Berman") as Class Counsel. This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Steve Berman in Support of Lead Plaintiff's Motion for Class Certification (the "Berman Decl."), with exhibits, including the accompanying expert report of Tavy Ronen, Ph.D. (the "Ronen Report"), the papers and pleadings filed in this Action, and such further argument and matters as may be offered at the time of hearing on this Motion.

## STATEMENT OF THE ISSUES

The issues to be decided on this Motion are:

1.    Whether to certify the proposed Class (defined below) when it satisfies all of the requirements of Federal Rules 23(a) and 23(b)(3);

2.    Whether to appoint Lead Plaintiff as Class Representative; and

3.    Whether to appoint Hagens Berman as Class Counsel.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

Class treatment under Federal Rule 23 is appropriate for this securities action. The case arises from Defendants' common misrepresentations and omissions made to Zuora investors concerning the functionality of Zuora's platform and the integrated nature of its key software products, Zuora Billing and Zuora RevPro. The proposed Class Representative, Lead Plaintiff New Zealand Methodist Trust Association, is a sophisticated institutional investor, the precise investor that Congress intended to lead securities class actions, who was harmed by Defendants' common course of deceptive conduct, along with the other members of the proposed Class, and has been actively managing the prosecution of the case. Common questions of law and fact answerable by class-wide proof predominate. A class action is the superior method of resolving these issues. Given the work performed to date, together with its substantial experience and resources, Hagens Berman is ideally suited to serve as Class Counsel. The Motion should therefore be granted.

As detailed in the Complaint,[1] Defendants' fraud on investors was straightforward – they misrepresented the functionality of Zuora's platform and flagship products. Specifically, Defendants, including Tien Tzuo and Tyler Sloat (collectively, the "Executive Defendants"), repeatedly marketed Zuora's platform and applications as a functioning, combined solution. In truth, Billing and RevPro were not integrated and could only function as standalone products. The Company's failure to deliver on its solution's promised connectivity caused serious sales execution issues. Defendants' misleading statements artificially inflated the price of Zuora's common stock, until Defendants' disclosure of the Zuora Billing-Zuora RevPro integration failure, sales execution issues and disappointing financial performance and outlook, caused the stock price to plummet. Following disclosure of the truth on May 31, 2019, Zuora's share price fell nearly 30%, erasing more than $500

---

[1] Citations to "¶__" or to the "Complaint" refer to paragraphs in Lead Plaintiff's Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, dated November 8, 2019 (ECF No. 60) and to "Ex. _" refer to exhibits attached to the accompanying Berman Declaration. Unless otherwise noted herein, all capitalized terms shall have the same meaning ascribed to them in the Complaint. Internal citations and quotation marks are omitted and all emphasis is added.

1    million in market capitalization and damaging investors.

2          The Federal Rule 23 requirements are all met here. Numerosity and commonality are satisfied

3    because the putative Class is comprised of thousands of investors whose claims involve multiple

4    common questions capable of class wide proof, including whether Defendants made class-wide

5    misstatements and omissions. Typicality and adequacy are met because Lead Plaintiff: (i) asserts the

6    same claims based on Defendants' misconduct as other proposed Class members; (ii) is an

7    institutional investor that Congress deemed ideally suited to lead securities class actions; (iii) has

8    actively prosecuted this action, including prevailing in motion to dismiss briefing; and (iv) has no

9    conflicts with other Class members.

10         Common issues predominate because the litigation involves class-wide claims that are

11   capable of class-wide proof as they are based on Defendants' class-wide misconduct. Proof of

12   reliance is among these common issues. In accordance with *Basic Inc. v. Levinson*, 485 U.S. 224,

13   241-42, 244 (1988), Lead Plaintiff invokes the "fraud-on-the-market" theory, which "created a

14   rebuttable presumption of investor reliance based on the theory that investors presumably rely on the

15   market price, which typically reflects the misrepresentation or omission." *See No. 84 Emp.–Teamster*

16   *Joint Council Pension Tr. Fund v. Am. W. Holding Corp*., 320 F.3d 920, 934 n. 12 (9th Cir. 2003).

17   As demonstrated in the Expert Report of Tavy Ronen, Ph.D., the "fraud-on-the-market" theory

18   applies here because empirical and statistical evidence confirms Zuora common stock traded in an

19   efficient market throughout the Class Period.

20         Dr. Ronen's report similarly establishes that calculation of damages is also a common issue.

21   Damages suffered by class members will be calculated using the "out-of-pocket" method, which

22   measures damages suffered by Class members based on the investors' artificially inflated losses.

23   This methodology, which is routinely applied and is a virtual standard in federal securities litigation,

24   is consistent with Lead Plaintiff's theory of liability and can be calculated on a class-wide basis.

25         Finally, the Rule 23 class mechanism is the superior method of resolving these common

26   questions and the class is ascertainable because membership is based on the dates that investors

27   acquired Zuora's publicly traded common stock.

28         Accordingly, Lead Plaintiff respectfully requests that the Court certify a Class pursuant to

1   Federal Rules 23(a) and 23(b)(3) that consists of: **All persons or entities who purchased or**

2   **otherwise acquired publicly-traded Zuora common stock during the period from April 12,**

3   **2018 to May 30, 2019, inclusive, and who were damaged thereby (the "Class")**. Lead Plaintiff

4   also respectfully requests that it be appointed as Class Representative, and that Hagens Berman be

5   appointed as Class Counsel.

6   <center>**II.     BACKGROUND**</center>

7       Zuora offers a cloud-based subscription management solution for companies with a

8   subscription business model. ¶27; Berman Decl., Ex. B at 3-4, 9-10, 15. Zuora's solution includes a

9   platform called Zuora Central, together with applications. ¶¶31-33; Berman Decl., Ex. B at 15-17.

10  Zuora's primary product is Zuora Billing, a recurring billing system application. ¶34; Berman Decl.,

11  Ex. B at 16.

12      In May 2017, Zuora purchased Leeyo, and added RevPro to its product portfolio. ¶35.

13  RevPro is an accounting application that enables customers to recognize revenue under new

14  accounting standard ASC 606. *Id.* Zuora promoted the acquisition of RevPro as creating a "one-stop

15  shop for automating financial operations," and during the Class Period, claimed that the RevPro

16  acquisition gave Zuora a "path to expand" through "cross-selling" or "upselling" its two flagship

17  products, Billing and RevPro. ¶¶ 38, 48, 129, 186-187, 203, 215-216; Berman Decl., Ex. B at 23-27,

18  Ex. C at 2, Ex. D at 6, Ex. E at 5, 69-71, 106.

19      Having generated public excitement about the Company's growth potential with RevPro,

20  Zuora announced its IPO in December 2017. ¶46. Defendants' IPO documents emphasized the

21  integrated functionality of Zuora's platform. *See* Berman Decl., Ex. E at 2, 4-5, 103-05; ¶¶50, 178-

22  184.  Defendants provided illustrations of Zuora's homegrown products' connectivity with RevPro

23  (¶51), and emphasized the platform's "automated billing, streamlined collection, and efficient

24  accounting features." *See* Berman Decl., Ex. E at 4; ¶¶50, 179. Defendants touted Zuora's ability to

25  deploy and configure its solution on clients' internal systems, which would purportedly "Free Up IT

26  and Engineering Resources" as those departments would "no longer need to build in-house custom

27  systems or customizations." *See* Berman Decl., Ex. E at 4; ¶¶ 53-54, 184. Defendants' promotion of

28

1    Zuora's solution as a combined product worked, as the Company raised over $162 million through

2    the IPO. ¶57.

3          Following the IPO, Defendants continued to promote "Zuora + RevPro Integration", claiming

4    that customers could "automate and orchestrate the entire subscription order-to-cash process,

5    including billing and revenue recognition." *See, e.g.,* Berman Decl., Ex. F; ¶171. During this time,

6    analysts repeatedly cited the solution's purported combined capability and Zuora's upselling of

7    Billing and RevPro as a catalyst for revenue growth. Berman Decl., Ex. G at 8, 44, Ex. H at 8; ¶¶58,

8    127-28. Zuora's stock price soared on the back of these reports, rising more than 139% in less than

9    four months after the Company's IPO. ¶130.

10         Unfortunately for investors, the meteoric rise in Zuora's stock price was fueled by

11   misrepresentations. While the Company continued to plug the supposed "Zuora + RevPro

12   integration" (Berman Decl., Ex. I), in reality, Zuora lacked the ability to deploy and configure the

13   combined solution. ¶59. Customers using Billing and RevPro were unable to integrate and reconcile

14   the data from both systems. *Id.* This integration issue caused so much friction that Zuora's customers

15   either needed to export the data from Billing and import it into RevPro manually for revenue

16   recognition, or develop their own customized integration that ingests the required data from Billing

17   into RevPro. ¶158.

18         Former Zuora executives confirmed that the Executive Defendants and other of Zuora's most

19   senior officers knew of the integration failure. In October 2017, Defendant Sloat sponsored the

20   "Zuora on Zuora" or "ZoZ" project aimed to implement Zuora's solution internally. ¶¶ 67, 76. The

21   Executive Defendants, who were directly involved in the ZoZ project, were repeatedly apprised in

22   regular meetings, internal forums, written reports, Google documents and emails of the Company's

23   inability to build an integration between Zuora's platform and RevPro. ¶74. Recognizing that

24   Zuora's solution lacked connectivity with a flagship product, Defendant Sloat told the ZoZ project

25   team that "Zuora needed to get its act together with RevPro." ¶75.

26         Similarly, the Executive Defendants and other of Zuora's most senior officers knew Zuora

27   could not configure and deploy its solutions on clients' systems. ¶85. In early 2018, Defendants

28   commenced the "Keystone" project that intended to build a connection between RevPro and Zuora

Billing to apply to Zuora's clients' systems. ¶79. But Zuora's integration technology solutions, OrderMetrics, proved so unsuccessful on customers' systems that Defendant Tzuo decided to scrap the project entirely by April 2019. ¶¶ 81-82, 119. Like with the "ZoZ" project, the Executive Defendants were informed regularly of Keystone's failures through Google document reports, regular project review meetings, and meeting summary reports. ¶¶85-87, 94.  In early 2019, Zuora's executives acknowledged the Keystone Project's failure and decided to scrap it in favor of another approach, internally called the "K-2" Project. ¶119. After a completion of a "Proof of Concept" and analysis in March 2019, Defendant Tzuo issued a directive in April 2019 to start K-2. *Id.*

Defendants were also informed that the integration issues resulted in strained customer relationships and lost revenues. ¶¶93-97. More broadly, the integration issues caused major sales execution problems, including missed RevPro sales, reduced revenue growth, and even waning demand for Zuora's platform and other homegrown products. ¶¶102-06. All of these client-based issues were documented on Zuora's SalesForce database to which the Executive Defendants had access. ¶118. In addition, Zuora's Sales Vice Presidents repeatedly informed the Executive Defendants of these problems through in-person meetings and email communications. ¶¶107-09.

Zuora's inability to deliver its promised integrated solution and resulting sales execution issues eventually caught up with the Company. On May 30, 2019, Zuora announced disappointing first quarter fiscal year 2020 financial results, disclosing declining revenue growth and reduced fiscal 2020 revenue guidance. ¶¶143-145. The Company finally came clean and disclosed that the product integration for RevPro is "taking longer than expected" and that "the technical work to complete the integration is taking time as these are complex mission-critical systems." *See* Berman Decl., Ex. J at 2; ¶148. The Company also reported sales execution problems that slowed down its ability to cross-sell its products. *See* Berman Decl., Ex. J at 1-2; ¶149. On the earnings call, Defendant Tzuo admitted that Defendants had long known of the integration failure. *See* Berman Decl., Ex. J at 4; ¶¶13, 151. Analysts were shocked by these disclosures, with one analyst at Jeffries asking Defendant Tzuo incredulously, "I mean you bought [RevPro] 2 years ago. So like it's hard – like how can it not be integrated?" *See* Berman Decl., Ex. J at 4; ¶ 150. On this news the Company's share price fell nearly 30%, erasing $520 million in market capitalization. ¶153.

Based on the foregoing allegations, Lead Plaintiff claims that Defendants committed securities fraud by making materially false statements and omissions throughout the Class Period, and brought this Action under the Exchange Act. After full briefing, the Court denied Defendants' motion to dismiss on April 28, 2020. *See* ECF No. 75. In the April 28, 2020 Order, the Court found that Lead Plaintiff sufficiently alleged that Defendants made false and misleading statements regarding Zuora RevPro and Zuora Billing integration and opportunities for growth, and such statements were "contradicted by the failures of the ZoZ and Keystone Projects as well as the problems that Zuora's customers experienced when they tried to implement both products" and the "withholding of payment by some customers, reputational damage, reduced demand, and a pause on implementations to customers." *See id.* at 15-17. In addition, the Court found that Lead Plaintiff sufficiently alleged scienter through allegations that "defendants were in possession of contemporaneous, contradictory information when they made the false and misleading statements[.]" *See id.* at 19-20.

## III.    ARGUMENT

The Supreme Court and Ninth Circuit have repeatedly recognized that private securities class actions serve as important enforcement mechanisms and supplement governmental regulation of the securities markets. *See*, *e.g.*, *Tellabs, Inc.*, *v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions."); *Berner v. Lazzaro*, 730 F.2d 1319, 1322-23 (9th Cir. 1984) ("[P]rivate actions brought by investors have long been viewed as a necessary supplement to SEC enforcement actions."), *aff'd*, 472 U.S. 299 (1985). Indeed, "class actions commonly arise in securities fraud cases as the claims of separate investors are often too small to justify individual lawsuits, making class actions the only efficient deterrent against securities fraud." *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 152-53 (N.D. Cal. 1991); *see also In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009) (same). Accordingly, in securities actions like this one, "class certification is routine." *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).

To qualify for class certification, "the question is not whether the plaintiffs have stated a

1    cause of action or will prevail on the merits, but, rather, whether the requirements of Rule 23 are

2    met." *See In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 575 (N.D. Cal. 2009) (Illston, J.) (citing

3    *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)). Although the class certification analysis is

4    "rigorous," Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the

5    certification stage." *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *2 (N.D.

6    Cal. Apr. 21, 2016) (Illston, J.) (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455,

7    466 (2013)); *see also In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1178 (N.D. Cal. 2017).

8    "Merits questions may be considered to the extent – but only to the extent – that they are relevant to

9    determining whether Rule 23 prerequisites for class certification are satisfied." *In re Montage*, 2016

10   WL 1598666, at *2 (citing *Amgen Inc.*, 568 U.S. at 466). As such, while it is appropriate to consider

11   whether a securities market was efficient to support a presumption of reliance, it is not appropriate to

12   delve into merits issues such as scienter, materiality, or loss causation.

13          As discussed below, the requirements of Federal Rule 23 are readily satisfied here.

14   **A.     The Proposed Class Satisfies Rules 23(a)**

15          For Lead Plaintiff's proposed Class to be certified under Rule 23(b)(3), the proposed Class

16   must satisfy the four elements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of

17   representation – as well as the predominance and superiority elements of Rule 23(b)(3). *See* Fed. R.

18   Civ. P. 23(a), (b)(3). As is often the case in securities class actions, the four elements of Rule 23(a)

19   are easily satisfied. *See, e.g., In re Montage*, 2016 WL 1598666; *In re Connetics Corp.*, 257 F.R.D.

20   572; *In re Zillow Grp., Inc. Sec. Litig.*, 2020 WL 6318692 (W.D. Wash. Oct. 28, 2020); *Karinski v.*

21   *Stamps.com, Inc.*, 2020 WL 6572660 (C.D. Cal. Nov. 9, 2020).

22          **1.     Numerosity Is Established**

23          Numerosity is satisfied if "the class is so numerous that joinder of all members is

24   impracticable." Fed. R. Civ. P. 23(a)(1). "No exact numerical cut-off is required." *See In re*

25   *Montage*, 2016 WL 1598666, at *3. "Joinder need not be impossible, as long as potential class

26   members would suffer a strong litigation hardship or inconvenience if joinder were required." *Rannis*

27   *v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010) (citing *Harris v. Palm Springs Alpine Estates,*

28

*Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)). "[C]ourts are quite willing to accept common sense assumptions in order to support a finding of numerosity, often looking at the number of shares traded or transactions completed rather than seeking to determine directly the number of potential class members involved." *See In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *4 (N.D. Cal. Jan. 13, 2005) (citation omitted).  Indeed, "[i]n cases involving securities traded on national stock exchanges, numerosity is practically a given." *Id.*

Here, the proposed Class includes many thousands of investors. Throughout the Class Period, Zuora shares were actively traded on the NYSE. ¶269. As of May 31, 2019, there were approximately 86.5 million shares of Zuora common stock outstanding. *See* Berman Decl., Ex. A, Ronen Report ¶28. Additionally, a total of 455.3 million shares of Zuora common stock were traded during the Class Period, at an average weekly trading volume of 7.6 million shares and an average (median) weekly turnover was 18.1% (11.4%). *See id.* ¶31. These numbers suggest that there may be thousands of class members, easily satisfying Rule 23(a) numerosity. *See In re Montage*, 2016 WL 1598666, at *3 (numerosity met where company had 26.5 million shares traded during class period); *In re Cooper*, 254 F.R.D. at 634 (numerosity met where company had 36 million shares outstanding during class period). And the number of institutional investors that owned Zuora stock—which totaled 271 – demonstrates numerosity is met. *See* Berman Decl., Ex. A, Ronen Report ¶49.

### 2.      Multiple Common Questions Exist

Commonality requires that there be "questions of law or fact common to the class." *See* Fed. R. Civ. P. 23(a)(2). Commonality is "construed permissively," and can be satisfied by "shared legal issues with divergent factual predicates" or "a common core of salient facts coupled with disparate legal remedies within the class." *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). In securities class actions, "commonality is often satisfied as a result of the inherent nature of such cases." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *4 (N.D. Cal. Dec. 22, 2016); *see also Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (noting that "[s]o long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)").

There are multiple common questions at issue in this action, which amply satisfies Rule 23's

commonality requirement, including, *inter alia*: (i) whether Defendants made materially false and misleading statements and omissions during the Class Period; (ii) whether Defendants acted with scienter; (iii) whether Defendants' misrepresentations and omissions were material; and (iv) whether Defendants' misconduct caused investors to suffer damages. Securities fraud actions alleging these common questions are ideally situated for class certification, because "for each member of the putative class, the core factual and legal issues are the same." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 266 (N.D. Cal. 2011). Thus, commonality is established. *See In re Montage*, 2016 WL 1598666, at *3 ("Since the complaint alleges a common course of conduct over the entire period directed against all investors, generally relied upon, and violating common statutory provisions, it sufficiently appears that the questions common to all investors will be relatively substantial.").

### 3.  Lead Plaintiff's Claims Are Typical of the Proposed Class

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under Rule 23(a)(3)'s "permissive standards" for typicality, "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685. The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *See In re Montage*, 2016 WL 1598666, at *4 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)). Accordingly, differences in the amount of damages, the timing, size or manner of purchase or holding, and the nature of the purchase or holding are insufficient to defeat class certification. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009) (certifying the class and holding that "potential complications regarding the computation of damages" do not defeat class certification); *In re Connetics Corp.*, 257 F.R.D. at 578 ("'Courts have . . . repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification.' ") (quoting *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008)).

Here, Lead Plaintiff's claims are typical of those of the Class, as they "arose from 'the same set of events and course of conduct' that gave rise to other class members' claims." *See In re Connetics Corp.*, 257 F.R.D. at 576 (quoting *In re Providian Fin. Corp. Sec. Litig.*, 2004 WL 5684494, at *5 (N.D. Cal. Jan. 15, 2004)). Moreover, like the other Class members, Lead Plaintiff purchased or acquired Zuora common stock during the Class Period at artificially inflated prices due to Defendants' fraud and was damaged when the truth emerged. Complaint, ¶¶258-262. Lead Plaintiff has no conflict with the Class. *See* Berman Decl., Ex. K, Declaration of Stephen Walker ("Walker Decl.") ¶7. Further, Lead Plaintiff is not subject to any unique or special defenses. The claims of both Lead Plaintiff and the Class concern the veracity of Defendants' class-wide statements and will rely on the same facts and legal theories to establish liability, and as such, Lead Plaintiff satisfies Rule 23(a)(3)'s typicality requirement. *See, e.g., In re Connetics Corp.*, 257 F.R.D. at 578 (N.D. Cal. 2009) (typicality met where lead plaintiff "share[s] class members' interest in proving that the stock price was artificially inflated as a result of defendants' misrepresentations throughout the class period").

### 4. Lead Plaintiff Will Adequately Protect the Proposed Class

Rule 23(a)(4) permits class certification only if the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class." *In re Montage*, 2016 WL 1598666, at *5 (citing *Staton*, 327 F.3d at 954).

Here, both prongs are satisfied. As to the first prong, Lead Plaintiff has no conflict of interest with other Class members. *See* Berman Decl., Ex. K, Declaration of Stephen Walker ("Walker Decl.") ¶7. To the contrary, Lead Plaintiff's claims arise from the same set of facts as other members of the Class, and therefore its interests are well aligned with those of the Class in proving Defendants' liability and maximizing damages. In securities class actions, courts have consistently found that class representatives satisfy Rule 23(a)(4) when they assert claims based on facts similar to those of the absent class members. *See, e.g., In re VeriSign*, 2005 WL 7877645, at *8 ("The Lead Plaintiffs' claims and the unnamed class members' claims do not conflict. They all arise out of the same set of facts – Defendants' alleged misrepresentations during the Class Period."). Following this

1    standard, Lead Plaintiff is adequate to represent the Class, as Lead Plaintiff and members of the

2    Class sustained losses as a result of the same alleged material misrepresentations and omissions, and

3    Lead Plaintiff and class members share the same interest in obtaining the maximum possible

4    recovery from Defendants. *See In re VeriSign*, 2005 WL 7877645, at *8; *In re Applied Micro*

5    *Circuits Corp. Sec. Litig.*, 2003 WL 25419526, at *5 (S.D. Cal. Jul. 15, 2003) (finding adequacy

6    requirement met where the interests of the class representative are coextensive with the class because

7    they brought identical claims under federal securities laws). This is particularly true where, as is the

8    case here, Lead Plaintiff suffered a very large financial loss. *See* ECF No. 26 at 6 (noting that Lead

9    Plaintiff incurred losses of over $700,000).

10          Lead Plaintiff readily satisfies the second prong as well. As summarized in its declaration,

11   MTA has supervised and monitored the progress of this case and actively participated in the

12   litigation, by, among other things, reviewing pleadings and motions submitted in this case. *See*

13   Berman Decl., Ex. K (Walker Decl.) ¶5; *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las*

14   *Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("The record indicates clearly that [lead

15   plaintiff] understands his duties and is currently willing and able to perform them. The Rule does not

16   require more.").  Furthermore, Lead Plaintiff has vigorously pursued fact discovery, including

17   propounding document requests. *See* Berman Decl., Ex. K (Walker Decl.) ¶5. Lead Plaintiff will

18   continue to supervise, monitor and participate in the ongoing prosecution of this case and will

19   represent the interests of the Class. *Id.* ¶6. Moreover, as a sophisticated institutional investor with a

20   substantial amount of resources available to devote to this litigation (*Id.* ¶¶ 2, 6), Lead Plaintiff is

21   exactly the type of institutional investor Congress wanted to empower when passing the PSLRA.[2]

22          Finally, Lead Plaintiff has retained qualified and capable counsel in Hagens Berman. Hagens

23   _____

24        [2] Indeed, Congress enacted the PSLRA in large part to encourage sophisticated institutional
     investors to take control of securities class actions and "increase the likelihood that parties with

25   significant holdings in issuers, whose interests are more strongly aligned with the class of
     shareholders, will participate in the litigation and exercise control over the selection and actions of

26   plaintiff's counsel." *See* H.R. CONF. REP. No. 104-369, at 32 (1995); *see also In re Versata, Inc.,*
     *Sec. Litig.*, 2001 WL 34012374, at *6 (N.D. Cal. Aug. 20, 2001) ("Congress intended that the lead

27   plaintiff procedures under the PSLRA would 'encourage institutional investors to take a more active
     role in securities class action lawsuits.'")

28

1   Berman is one of the most experienced class action firms in the United States and has a proven track

2   record of success in complex securities cases such as this one. *See* Berman Decl., Ex. L. at 7, 31-32.

3   Moreover, Hagens Berman has vigorously prosecuted the proposed Class's claims to date by, *inter*

4   *alia*: investigating and researching the proposed Class's potential claims; filing an Amended

5   Complaint; successfully defeating Defendants' motion to dismiss; and propounding document

6   requests and participating in multiple meet and confers. Berman Decl., ¶3.

7        Accordingly, Lead Plaintiff satisfies the adequacy requirements of Rule 23(a)(4) and should

8   be appointed as Class Representative.

9   **B.       The Proposed Class Satisfies Rule 23(b)(3)**

10       Rule 23(b)(3) requires that common questions of law or fact predominate over any

11  individualized questions and that a class action is superior to other available methods of adjudication.

12  *See* Fed. R. Civ. P. Rule 23(b)(3). Like in most securities class actions, the proposed Class readily

13  satisfies Rule 23(b)(3)'s requirements. *See, e.g., In re VeriSign*, 2005 WL 7877645, at *9 ("Class

14  actions are particularly well-suited in the context of securities litigation, wherein geographically

15  dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging

16  wealthy corporate defendants.").

17       **1.       Common Questions Of Law And Fact Predominate**

18       The predominance analysis "'focuses on the relationship between the common and individual

19  issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication

20  by representation.'" *See In re Montage*, 2016 WL 1598666, at *6 (quoting *Wang v. Chinese Daily*

21  *News*, 737 F.3d 538, 545 (9th Cir. 2013). "Common issues predominate over individual issues when

22  the common issues 'represent a significant aspect of the case and they can be resolved for all

23  members of the class in a single adjudication.'" *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182

24  (9th Cir. 2015). "Considering whether 'questions of law or fact common to class members

25  predominate' begins, of course, with the elements of the underlying cause of action." *In re Montage*,

26  2016 WL 1598666, at *6 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809

27  (2011) ("*Halliburton I*"). Predominance is a test "readily met" in securities fraud cases like this one.

28

1    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

2         Lead Plaintiff brings claims under Sections 10(b) and 20(a) of the Exchange Act. ¶¶ 274-289.

3    Section 10(b) requires proof of: "(1) a material misrepresentation or omission by the defendant;

4    (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

5    security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

6    causation."[3] *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460-61 (2013). The

7    Supreme Court has ruled that loss causation and materiality need not be proven at the certification

8    stage. *See Halliburton I*, 563 U.S. at 813 (loss causation is not "a condition of obtaining class

9    certification"); *Amgen*, 568 U.S. at 470 (materiality need not be proven at class certification because

10   "the question of materiality is common to the class" and "a failure of proof on that issue would result

11   in questions 'affecting only individual members' predominating").

12        Furthermore, as discussed above, there are numerous questions common to the members of

13   the Class, including whether Defendants made materially misleading statements and omissions, with

14   scienter, that caused Class members to suffer damages. *See supra* at 9-11. Each of these common

15   questions will turn on class-wide proof concerning Defendants' common course of misconduct. *See,*

16   *e.g., Cooper Cos.*, 254 F.R.D. at 640 ("In summary, the critical questions of what Defendants said,

17   what they knew, what they may have withheld, and with what intent they acted, are central to all

18   class members' claims. Without favorable findings on these critical questions related to liability, no

19   member of the class can succeed."); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 721 (C.D. Cal.

20   2002) (finding "[t]he predominant questions of law or fact at issue in this case are the alleged

21   misrepresentation Defendants made during the Class Period and are common to the class").

22        The predominance inquiry, therefore, will turn on whether reliance can be established on a

23   common, class-wide basis. *See, e.g., Halliburton I*, 563 U.S. at 810 (noting that predominance "in a

24   securities fraud action often turns on the element of reliance"); *In re Montage*, 2016 WL 1598666, at

25   *6 ("[B]efore the Court can certify a class with respect to a particular security, the Court must be

26
27        [3] A claim under Section 20(a) requires a "primary violation of federal securities law" and that
     "the defendant exercised actual power or control over the primary violator." *See Zucco Partners,*
28   *LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted).

persuaded that plaintiffs are entitled to a presumption of class-wide reliance."). Lead Plaintiff can establish the presumption of class wide reliance pursuant to both the "fraud on the market" theory and the U.S. Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 154 (1972) ("*Affiliated Ute*").

### a.      The Fraud-on-the Market Presumption Applies

To establish a Section 10(b) claim, no proof of individual reliance is required because plaintiffs are entitled to a presumption of reliance in a securities class action alleging "fraud on the market." *Basic,* 485 U.S. at 247; *In re Connetics Corp.*, 257 F.R.D. at 577 ("Where, as in this case, an investor pursues a 'fraud on the market' theory of securities fraud, the investor is entitled to a presumption that it relied on any material misrepresentations by the defendant."). This "fraud-on-the-market" presumption of reliance depends on the theory that, in an efficient market, all information, including any misrepresentation, is incorporated into the value of a security, and investors rely on the integrity of the market for that security. *Basic*, 485 U.S. at 247; *see also Amgen*, 568 U.S. at 462 ("If a market is generally efficient in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular, public material misrepresentation will be reflected in the security's price."); *In re Montage*, 2016 WL 1598666, at *7 ("The majority of courts in this circuit agree that, for purposes of the fraud-on-the-market theory, market efficiency means that prices will reflect all relevant information[.]"). Therefore, "if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." *Amgen*, 568 U.S. at 462.

To invoke this presumption at class certification, Lead Plaintiff must show that (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the security traded in an efficient market, and (4) "the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). Defendants may rebut the presumption with evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248; *Halliburton II*, 573 U.S. at 280-83. Here, the alleged misrepresentations and omissions were publicly known, as

Defendants made them in SEC filings, press releases, public presentations, and conference calls with investors. Complaint, ¶¶159-240. In addition, by definition, all members of the proposed Class "traded the stock between the time the misrepresentations were made and when the truth was revealed." *See Halliburton II*, 573 U.S. at 268.

Therefore, the only remaining question is whether Zuora's publicly traded common stock traded in an efficient market. To start, Zuora's publicly traded common stock trades on the NYSE, a factor that weighs in favor of finding an efficient market. *See, e.g., In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 648-49 (C.D. Cal. 2018) ("The report thus demonstrates that many signs of an 'efficient market' are present here. For one thing, throughout the proposed class period Banc stock was traded on the New York Stock Exchange . . . which is the largest secondary trading market in the world."); *see also In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) ("Nor has defendant identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market.").

Further, courts in this Circuit, including this Court, look to the *Cammer* factors to assess market efficiency. *In re Montage*, 2016 WL 1598666, at *8 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). The *Cammer* factors include: "(1) the trading volume of the security during the relevant period; (2) the number of analysts following the issuer of the security; (3) the ability of the issuer to file SEC Form S-3; (4) the existence of market makers and arbitrageurs; and (5) empirical evidence suggesting a causal connection between new information and stock price movements." *Id.* (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009); *Cammer*, 711 F. Supp. at 1286-87. In addition, courts in this circuit have considered the factors detailed in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), which include: (1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float, the stock's trading volume without counting insider-owned stock. *See In re Montage*, 2016 WL 1598666, at *12 (citing cases).

Based on a thorough analysis of these well-established factors, Plaintiff's market efficiency expert, Dr. Ronen, opined that the market for Zuora's common stock traded in an open, developed and efficient market during the Class Period. *See* Berman Decl., Ex. A., Ronen Report ¶¶30-86. Dr.

1  Ronen's findings on each market efficiency factor are summarized below.

2       **Cammer I – Weekly Trading Volume**: As the court stated in *Cammer*, "[t]urnover measured

3  by average weekly trading of two percent or more of the outstanding shares would justify a strong

4  presumption that the market for the security is an efficient one; one percent would justify a

5  substantial presumption." *Cammer*, 711 F. Supp. at 1286. Zuora shares had an average weekly

6  turnover of 18.1%, which is significantly above *Cammer*'s 2% threshold.[4] *See* Berman Decl., Ex. A.,

7  Ronen Report ¶31. This ratio supports a "strong presumption" that the market for Zuora common

8  stock was efficient. *See id.*; *see also City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270

9  F.R.D. 247, 256 (S.D. Cal. 2010) (finding a stock with a weekly trading volume of 2.61% to have

10  traded in an efficient market); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107 (E.D. Va. 2009)

11  (finding an average weekly trading volume of 2-3.5% indicative of market efficiency).

12       **Cammer II – Analyst Coverage**: During the Class Period, there were nine (9) different

13  securities analysts reporting on Zuora.[5] *See* Berman Decl., Ex. A., Ronen Report ¶37. These analysts

14  issued sixty-six (66) reports during this time. *Id.* This is more than sufficient to satisfy *Cammer*. *See,*

15  *e.g.*, *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) (four analysts

16  sufficient); *In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008)

17  (same); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (one analyst sufficient).

18       Other evidence supports a finding that information on Zuora was broadly available to the

19  market during the Class Period. For example, Zuora's analyst coverage during the Class Period

20  would place it between the 25th and 50th percentiles of all NYSE and Nasdaq stocks. *See* Berman

21  Decl., Ex. A., Ronen Report ¶40. In addition to the analyst reports, there were a total of 660 articles

22

23      [4]In fact, based on average daily turnover during 2016-2018, Zuora's average daily turnover
during the Class Period is over the 95th percentile of NYSE and Nasdaq stocks. *See* Berman Decl.,

24  Ex. A., Ronen Report ¶32.

25      [5] There were between four (4) and seven (7) research analysts making buy/hold/sell
recommendations for the Company during the Class Period. Berman Decl., Ex. A., Ronen Report ¶36.

26  Further, there were between three (3) and seven (7) research analysts that were part of the Thomson
Reuters I/B/E/S/ consensus EPS estimate for the current fiscal year. *Id.* ¶36. In addition, firms such as

27  Canaccord Genuity, FBN Securities, Jefferies and Morgan Stanley provided detailed research coverage
of Zuora, along with five (5) technical or quantitative firms that covered the Company. *Id.* ¶37.

28

about Zuora published during the Class Period. *Id.* ¶41. This broad dissemination of information about Zuora lends further support to the conclusion that Zuora common stock traded in an efficient market during the Class Period.

*Cammer* **III – Market Makers & Arbitrageurs:** Market makers and arbitrageurs, as stated by the *Cammer* court, help ensure that news and reported financial results are reflected in the price of a company's stock. *See Cammer*, 711 F. Supp. at 1286-87. Zuora is traded on the NYSE, where each security is assigned a single Designated Market Maker. *See* Berman Decl., Ex. A., Ronen Report ¶44. Since a Designated Market Maker perform the role in the NYSE as multiple market-makers perform in other markets, such a fact supports a finding of market efficiency. *See, e.g., Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 572-73 n.7 (C.D. Cal. 2012) ("[T]his factor favors Plaintiffs, and the mere number of market-makers is not a good metric when a stock is assigned one market-maker by an exchange.").

Courts have also considered the level of institutional ownership as a factor in the assessment of market efficiency. *See, e.g., City of Ann Arbor Emps.' Ret. Sys.*, 270 F.R.D. at 251; *Billhofer v. Flamel Techs.*, 281 F.R.D. 150, 153 (S.D.N.Y. 2012). During the Class Period, 271 institutions disclosed their ownership positions of Zuora common stock through SEC filings. *See* Berman Decl., Ex. A., Ronen Report ¶49. These institutions held between 44.7% and 67.6% of Zuora's outstanding shares during this time. *Id*.

*Cammer* Factor III also addresses the existence of arbitrageurs, generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies. Short selling enables market participants to trade on perceived mispricing even if they do not hold a long position in the security. *See id.* ¶52. The amount of short interest in Zuora common stock during the Class Period ranged between 0.3 million and 6.8 million shares, with an average short interest of 3.6 million shares. *See id.* ¶54. As a percentage of shares outstanding, short interest ranged from 2.4% to 20.8%, with an average of 6.9%. *Id.* This variation in short interest suggests that arbitrageurs and traders with negative views on Zuora were able to remain active, which further supports the conclusion that Zuora common stock traded in an efficient market throughout the Class Period. *Id.*

*Cammer* **IV – Form S-3 Eligibility**: To be eligible on Form S-3, an issuer must (a) be

current in its SEC filings for at least 12 months; and (b) have a public float of $75 million. *See In re Countrywide*, 273 F.R.D. at 613 (citing *Cammer*, 711 F. Supp. at 1284).

At all times during the Class Period, Zuora easily met the public float requirement. Indeed, on average, Zuora common stock's public float was more than 16 times the required threshold. *See* Berman Decl., Ex. A., Ronen Report ¶57. Zuora was not eligible to file on Form S-3 for the first 12 months of the Class Period because the start of the Class Period coincides with Zuora's IPO and the Company did not have 12 months of current SEC filings. *Id.* ¶58.

The *Cammer* court, however, noted that the "public float" aspect of the Form S-3 requirements "calls into play the efficient market hypothesis." *See Cammer*, 711 F. Supp. at 1285 n.33. The court further noted that if a company was ineligible for a Form S-3, "it would be helpful to allege . . . such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." *Id.* at 1287. In Zuora's case, while it easily meets the "public float" requirement, it was not eligible for a Form S-3 because of timing factors. *See* Berman Decl., Ex. A., Ronen Report ¶58. These circumstances support a finding that Zuora's common stock traded in an efficient market during the Class Period. *Id.*

***Cammer* V – Price Impact of Corporate Statements**[6]: "A causal connection between new information and price movement is 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *See In re Montage*, 2016 WL 1598666, at *8 (citing *In re Countrywide*, 273 F.R.D. at 614); *Cammer,* 711 F.Supp. at 1287. This *Cammer* factor requires "empirical facts

---

[6] Courts, including several in this Circuit, have found that the fifth *Cammer* factor is not required where the other *Cammer* and *Krogman* factors weigh in favor of market efficiency. *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) ("Because there is no evidence disputing the first four *Cammer* factors and the *Krogman* factors weigh in favor of market efficiency, the Court finds Plaintiff has met its burden of showing market efficiency."); *Radient Pharm. Corp.*, 287 F.R.D. at 574 ("This Court recognizes that *Cammer* factors are 'an analytical tool, not a checklist' of requirements."); *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 (2d Cir. 2017) (holding the district court acted within its discretion in finding an efficient market based on the first four *Cammer* factors and the three *Krogman* factors where those seven factors were not challenged by defendants, and finding the district court was not required to reach a conclusion concerning the fifth *Cammer* factor); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. 2014) (rejecting argument that "a finding of market efficiency always requires proof that the alleged misrepresentations had an immediate effect on the stock price").

1    showing a cause and effect relationship between unexpected corporate events or financial releases

2    and an immediate response in the stock price." *Hayes v. MagnaChip Semiconductor Corp*., 2016 WL

3    7406418, at *6 (N.D. Cal. Dec. 22, 2016).

4          Dr. Ronen employed an event study and concluded that Zuora common stock exhibits the

5    type of cause and effect relationship described in *Cammer. See Petrie v. Elec. Game Card, Inc.*, 308

6    F.R.D. 336, 352 (C.D. Cal. 2015) ("Event studies are by far the most common test for a causal

7    connection."). As detailed in her report, Dr. Ronen concluded that the price of Zuora common stock

8    reacted swiftly to the release of important, unanticipated information. *See* Berman Decl., Ex. A.,

9    Ronen Report ¶¶69-86. Specifically, Dr. Ronen analyzed the relationship between Zuora common

10    stock returns on days when it announced earnings or guidance updates versus trading days with no

11    such company announcements. *Id.* ¶72; *see also In re Montage*, 2016 WL 1598666, at *10 (finding

12    expert's "Earnings Test" admissible). Dr. Ronen found a clear cause and effect relationship: on each

13    of the five days where Zuora announced earnings or provided guidance updates, Zuora stock had

14    statistically significant excess returns at a 95% confidence level.[7] *Id.* ¶77, Appendix D. This finding

15    allowed Dr. Ronen to conclude that large price movements on earnings/guidance days could not be

16    attributed to random volatility, or to market or industry factors, further confirming that Zuora

17    common stock traded in an efficient market throughout the Class Period. *Id.* ¶78.[8]

18          ***Krogman* 1 – Market Capitalization:** The *Krogman* court reasoned that higher market

19    capitalization is indicative of market efficiency because "there is a greater incentive for stock

20    purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. During

21    

22        [7] Dr. Ronen further found that the price reaction on May 31, 2019 (the date of the alleged

23    corrective disclosure made after the close of market on May 30, 2019) was swift and statistically
significant. *See* Berman Decl., Ex. A., Ronen Report ¶78 n.102.

24        [8] Dr. Ronen further tested this cause-and-effect relationship by employing a statistical analysis for
autocorrelation, which concerns whether tomorrow's stock-price movement can be predicted with a

25    reasonable degree of statistical confidence based solely on the price movement today. *See* Berman
Decl., Ex. A., Ronen Report ¶79. Dr. Ronen determined that there was no systematic and persistent

26    statistically significant autocorrelation of Zuora's excess returns. *Id.* ¶80. Importantly, the lack of
autocorrelation is consistent with the conclusion that Zuora common stock reacts quickly to news and

27    trades in an efficient market. *See In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y.
Mar. 1, 2001) (market efficiency supported by the fact that the stock "did not exhibit autocorrelation").

28

1    the Class Period, Zuora's market capitalization averaged approximately $1.2 billion, placing it

2    between the 50th and 75th percentiles of NYSE and Nasdaq stocks. *See* Berman Decl., Ex. A., Ronen

3    Report ¶¶60, 62. This factor is therefore satisfied. *See id.* ¶61 n.84 (listing cases).

4         *Krogman* **2 – Bid-Ask Spread:** "A large bid-ask spread is indicative of an inefficient market,

5    because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. The

6    average percent bid-ask spread for Zuora common stock during the Class Period was 0.08%. *See*

7    Berman Decl., Ex. A., Ronen Report ¶66. This spread compares favorably to cases where courts

8    have concluded that common stocks traded in efficient markets. *See, e.g.*, *Radient Pharm. Corp.*, 287

9    F.R.D. at 574 (bid-ask spread of 0.58 percent supported market efficiency); *In re Sci.-Atlanta, Inc.*

10   *Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (bid-ask spread that "never exceeded 1.9%"

11   weighed heavily in favor of market efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501

12   (S.D. Fla. 2003) (average daily relative bid-ask spread of 2.44% weighed in favor of market

13   efficiency).

14        *Krogman* **3 – Public Float of Zuora Stock**: A large public float is further evidence of market

15   efficiency, as it indicates that a large proportion of shares are available to non-insiders, who can trade

16   without restrictions and enhance the efficiency of the marketplace. *See* Berman Decl., Ex. A., Ronen

17   Report ¶63. Zuora's public float was approximately all of its shares outstanding during the Class

18   Period, which supports a finding that Zuora common stock traded in an efficient market. *Id.* ¶64.

19        As the foregoing demonstrates, Zuora's common stock satisfied the *Cammer* and *Krogman*

20   factors during the Class Period. Satisfaction of these factors provides strong evidence that Zuora

21   common stock traded in an efficient market. Given the efficient market for Zuora common stock, a

22   presumption of reliance applies and common issues predominate over individual issues. *See, e.g.*,

23   *Huberman v. Tag-It Pac. Inc.*, 314 F. App'x 59, 63 (9th Cir. 2009); *In re Connetics Corp.*, 257

24   F.R.D. at 579; *In re Montage*, 2016 WL 1598666, at *12.

25              **b.    *Affiliated Ute* Provides a Presumption of Reliance**

26        The proposed Class is also entitled to the presumption of reliance under *Affiliated Ute*, as

27   Lead Plaintiff "advances a securities fraud claim based on a defendant's failure to disclose material

28   information." *See In re Montage*, 2016 WL 1598666, at *6 (citing *Affiliated Ute*, 406 U.S. at 153-

54). The Court sustained Lead Plaintiff's claims that Defendants failed to disclose the integration issues involving Zuora Billing and RevPro, and these omissions are a main focus of the Complaint. *See* ECF No. 75 at 15-17. The Court also expressly found that Defendants' omissions were material. *See id.* Accordingly, regardless of market efficiency, the presumption of reliance under *Affiliated Ute* applies in this case. *See Affiliated Ute*, 406 U.S. at 153-54 (holding that to establish the presumption, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision [to purchase securities]").

### c.   Damages Can Be Calculated On a Class-Wide Basis

Lead Plaintiff can prove damages on a class-wide basis under a methodology that is consistent with Lead Plaintiff and the Class's theory of liability – that they paid artificially inflated prices for Zuora common stock due to Defendants' fraud and were damaged thereby. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). As Dr. Ronen's report explains, per share damages for all Class members are readily calculable using the standard "out-of-pocket" methodology, which is based on the inflation in the price of Zuora's stock caused by Defendants' alleged misrepresentations and omissions. *See* Berman Decl., Ex. A, Ronen Report ¶¶87-91; *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) ("Plaintiff's proposed 'out of pocket' damages methodology, which uses an event study to determine the price inflation attributable to the alleged fraud, is widely accepted for calculating damages of a class of stockholders.").

The Ninth Circuit has repeatedly held that "the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.,* 824 F.3d 1150, 1155 (9th Cir. 2016); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-88 (9th Cir. 2015) (holding that district court erred in denying class certification based on a misreading of *Comcast* and confirming that individualized "damage calculations alone cannot defeat class certification"). While individual damages for each Class member will be calculable based on when each member purchased the stock, once liability is established, "the process of computing individual damages will be virtually a mechanical task." *In re Diamond Foods*, 295 F.R.D. at 252; *see also* Berman Decl., Ex. A, Ronen Report ¶91 (describing steps for calculating damages for each Class member). Dr. Ronen's damages methodology is sufficient to show that "damages can be proven on a

class-wide basis, such that individual damage analyses will not engulf questions common to the class as a whole." *In re Montage*, 2016 WL 1598666, at *13.

In sum, common questions capable of class wide proof predominate this action, which supports certification of the proposed Class.

### 2. A Class Action Is Superior To Other Available Methods for Resolving This Dispute

Rule 23(b)(3) requires that the class action device be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority inquiry "calls for a comparative assessment of the costs and benefits of class adjudication, including the availability of 'other methods' for resolving the controversy." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). Class actions are a "superior way to litigate a case alleging violations of securities fraud" where the case is "united by a common core of facts, and a presumption of reliance on an efficient market[.]" *Radient Pharm. Corp.*, 287 F.R.D. at 575; *see also In re Countrywide*, 273 F.R.D. at 623-24 (finding superiority where parties "need only establish what happened within Countrywide, when, and who knew (or should have known)").

Courts consider four factors to determine superiority: "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *See In re Montage*, 2016 WL 1598666, at *13.

Here, the superiority of class treatment is evident upon consideration of these four factors. First, the number of class members is too numerous, and the typical claim is too small, for each individual class member to maintain a separate action. *See id.* ("Class treatment would increase the class members' access to redress by unifying what otherwise may be multiple small claims."). Regarding the second factor, Lead Plaintiff is unaware of any other class action brought on behalf of Zuora common stock investors that seeks recovery under Sections 10(b) and 20(a) of the Exchange Act for the damages caused by Defendants' misconduct. *See* ECF No. 85 at 6. As a result, there is not an issue of multiplicity of suits or a risk of inconsistent adjudications. *See id.* (finding superiority

1  where "to the Court's knowledge, there is no other pending litigation involving these claims"). As to

2  the third factor, "it seems undisputed that this venue, being the home of [Zuora], is a desirable and

3  convenient place to concentrate the litigation, no other venue having been suggested." *See Siemers v.*

4  *Wells Fargo & Co.*, 243 F.R.D. 369, 376 (N.D. Cal. 2007). Finally, on the fourth factor, this case,

5  like other securities actions, presents no management difficulties that would preclude it from being

6  maintained as a class action. The proposed Class can be ascertained because membership is based on

7  an identifiable criteria – the dates that investors purchased or otherwise acquired Zuora common

8  stock. Putative Class members can be easily identified through stock holder records.

9      Simply put, any "complexities of class action treatment," which are few in this case, "do not

10  outweigh the benefits of considering common issues in one trial." *See In re Montage*, 2016 WL

11  1598666, at *13. The superiority requirement is met here. *See, e.g., Juniper Networks*, 264 F.R.D. at

12  592 ("Where thousands of identical complaints would have to be filed, it is superior to concentrate

13  claims through a class action in a single forum.").

14  **C.    Hagens Berman Should Be Appointed Class Counsel**

15      Lead Plaintiff also respectfully requests that the Court appoint Hagens Berman as Class

16  Counsel. In appointing class counsel, the Court must take into account: (i) the work counsel has done;

17  (ii) counsel's experience in handling class actions and the types of claims asserted; (iii) counsel's

18  knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the

19  class. *See* Fed. R. Civ. P. 23(g)(1)(A). Here, these considerations weigh heavily in favor of appointing

20  Hagens Berman as Class Counsel. The firm is among the leading class action firms in the nation, and

21  has prosecuted numerous successful securities class actions, including in this District. *See* Berman

22  Decl., Ex. L at 31-32; *see also In re Charles Schwab Corp. Sec. Litig.*, 2011 WL 1481424 (N.D. Cal.

23  Apr. 19, 2011) (firm secured securities class action settlements totaling $235 million on behalf of its

24  clients). Under Lead Plaintiff's supervision and direction, Hagens Berman has already undertaken a

25  vigorous prosecution of this case, including thoroughly analyzing, researching and investigating the

26  securities law claims at issue; drafting a detailed complaint; opposing Defendants' motions to dismiss;

27  pursuing discovery from Defendants; and retaining a market efficiency expert, Dr. Ronen, whose

28

expert report is submitted with this Motion. *See* Berman Decl. ¶5. Finally, Hagens Berman will

commit the necessary resources to achieve a successful recovery for investors. *Id.* ¶4.

### IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests entry of an order certifying this

action as a class action pursuant to Federal Rule 23, appointing Lead Plaintiff as Class

Representative, and appointing Hagens Berman as Class Counsel.

Dated: December 4, 2020                         Respectfully submitted,

                                                HAGENS BERMAN SOBOL SHAPIRO LLP

                                                By:    */s/ Steve W. Berman*
                                                Steve Berman (admitted *Pro Hac Vice*)
                                                1301 Second Avenue, Suite 2000
                                                Seattle, WA 98101
                                                Telephone: (206) 623-7292
                                                Facsimile:  (206) 623-0594
                                                steve@hbsslaw.com

                                                Reed R. Kathrein (139304)
                                                Lucas E. Gilmore (250893)
                                                715 Hearst Avenue, Suite 202
                                                Berkeley, CA 94710
                                                Telephone: (510) 725-3000
                                                Facsimile:  (510) 725-3001
                                                reed@hbsslaw.com
                                                lucasg@hbsslaw.com

                                                Peter A. Shaeffer (admitted *Pro Hac Vice*)
                                                455 North Cityfront Plaza Drive, Suite 2410
                                                Chicago, IL 60611
                                                Telephone: (708) 628-4949
                                                Facsimile:  (708) 628-4950
                                                petersh@hbsslaw.com

                                                *Counsel for Lead Plaintiff*
                                                *New Zealand Methodist Trust Association*