SUSAN S. MUCK (SBN 126930)
susan.muck@wilmerhale.com
KEVIN P. MUCK (SBN 120918)
kevin.muck@wilmerhale.com
WILLIAM BRENC (SBN 318544)
william.brenc@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1002

JEREMY T. ADLER (admitted *pro hac vice*)
jeremy.adler@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 295-6417

MELINDA HAAG (SBN 132612)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
mhaag@paulweiss.com

KAREN L. DUNN (admitted *Pro Hac Vice*)
JUSTIN ANDERSON (admitted *Pro Hac Vice*)
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kdunn@paulweiss.com
janderson@paulweiss.com

AUDRA J. SOLOWAY (admitted *Pro Hac Vice*)
JONATHAN HURWITZ (admitted *Pro Hac Vice*)
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 6th Ave.
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
jhurwitz@paulweiss.com

*Attorneys for Defendants Zuora, Inc.,*
*Tien Tzuo, and Tyler Sloat*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CASEY ROBERTS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZUORA, INC., TIEN TZUO, and TYLER SLOAT,<br><br>Defendants. | Case No.: 3:19-cv-03422-SI<br><br>**DEFENDANTS ZUORA, INC., TIEN TZUO, AND TYLER SLOAT'S NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EVIDENCE, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      March 3, 2023<br>Time:      10:00 a.m.<br>Dept.:     Courtroom 1, 17th Floor<br>Judge:    Hon. Susan Illston<br>Date Action Filed:  June 14, 2019 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND TO
    EXCLUDE EVIDENCE ............................................................................................................1

STATEMENT OF RELIEF SOUGHT ..........................................................................................1

STATEMENT OF ISSUES TO BE DECIDED .............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................2

I.      INTRODUCTION ...............................................................................................................2

II.    STATEMENT OF UNDISPUTED FACTS .........................................................................5

      A.    Zuora's History .......................................................................................................5

      B.    Allegedly Misleading Statements ...........................................................................7

      C.    The Alleged Corrective Disclosure.........................................................................7

      D.    Analysts Attributed the Guidance Reduction to Two Discrete Issues ....................9

      F.    Plaintiffs' Own Witnesses Attribute the Stock Decline to Multiple Factors
          Impacting Earnings and Guidance .........................................................................12

      G.    Expert Testimony Regarding Loss Causation and Damages .................................13

III.   LEGAL STANDARD.........................................................................................................14

IV.   PLAINTIFFS CANNOT ESTABLISH A GENUINE ISSUE OF TRIABLE
      FACT WITH RESPECT TO LOSS CAUSATION .........................................................15

      A.    To Demonstrate Loss Causation, Plaintiffs Must Disaggregate the
          Declines in Zuora Stock Attributable to the Alleged Fraud from Non-
          Fraud-Related Factors............................................................................................15

      B.    Plaintiffs' Failure to Conduct This Critical Analysis Is Fatal to Their
          Claims ...................................................................................................................17

V.    THE EXPERT REPORTS AND TESTIMONY OF DR. RONEN AND MR.
      LUNDELIUS REGARDING LOSS CAUSATION AND DAMAGES SHOULD
      BE EXCLUDED.................................................................................................................20

VI.   CONCLUSION..................................................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alaska Rent-A-Car, Inc.* v. *Avis Budget Grp., Inc.*,

5
    738 F.3d 960 (9th Cir. 2013) .............................................................................................21

6

*Anderson* v. *Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................................14, 15

7

8

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston*,
    853 F. Supp. 2d 181 (D. Mass. 2012) ..............................................................18, 22

9

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec.(USA) LLC*,

10
    752 F.3d 82 (1st Cir. 2014)................................................................................................16

11

*City of Pomona* v. *SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .........................................................................................21

12

13

*Daubert* v. *Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).............................................................................................1, 21

14

15

*Davis* v. *Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013)..........................................................................21

16

*Dura Pharm. Inc.* v. *Broudo*,

17
    544 U.S. 336 (2005).......................................................................................15, 16

18

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).............................................................................................16

19

20

*Hayes* v. *MagnaChip SemiConductor Corp.*,
    2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) .............................................................16

21

*Hershey* v. *Pac. Inv. Mgmt. Co. LLC*,
    697 F. Supp. 2d 945 (N.D. Ill. 2010) ............................................................................21

22

23

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) ........................................................................16

24

*Lloyd* v. *CVB Fin. Corp.*,

25
    811 F.3d 1200 (9th Cir. 2016) ........................................................................................15

26

*Lust* v. *Merrell Dow Pharm., Inc.*,
    89 F.3d 594 (9th Cir. 1996) ............................................................................................21

27

*In re Moody's Corp. Sec. Litig.*,

28
    2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)................................................................16

*Nat. Res. Def. Council* v. *Pruitt*,
2017 WL 5900127 (N.D. Cal. Nov. 30, 2017) ...........................................................................15

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
2011 WL 1842819 (N.D. Cal. May 16, 2011) (Illston, J.)......................................4, 15, 18, 21

*Nuveen Mun. High Income Opp. Fund* v. *City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .....................................................................................4, 16, 19

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ...........................19

*In re Oracle Corp. Sec. Lit.*,
2009 WL 1709050 (N.D. Cal. June 19, 2009) (Illston, J.)......................................................15

*In re Oracle Corp. Sec. Lit.*,
627 F.3d at 395 (9th Cir. 2010).............................................................................................20

*In re Oracle Sec. Litig.*,
829 F. Supp. 1176 (N.D. Cal. 1993) ......................................................................................21

*Powell* v. *Anheuser-Busch, Inc.*,
2012 WL 12953439 (C.D. Cal. Sept. 24, 2012) .....................................................................21

*In re REMEC Inc. Sec. Lit.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................................................................19

*In re Sci. Atlanta, Inc. Sec. Litig.*,
754 F. Supp. 2d. 1339 (N.D. Ga. 2010) .................................................................................19

*Phillips* v. *Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012)................................................20

*Snyder* v. *Bank of Am., N.A.*,
2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) .........................................................................21

*In re Synergy Acceptance Corp.*,
2015 WL 6085304 (N.D. Cal. Oct. 16, 2015)........................................................................15

*Turocy* v. *El Pollo Loco Holdings, Inc.*,
2018 WL 3343493 (C.D. Cal. July 3, 2018)...........................................................................16

*Tyger Constr. Co. Inc.* v. *Pensacola Constr. Co.*,
29 F.3d 137 (4th Cir. 1994) ...................................................................................................21

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009)....................................................................................16

*In re Williams Sec. Litig.–WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ....................................................................................... *passim*

*In re Xcelera.com Sec. Litig.*,
  2008 WL 7084626 (D. Mass. Apr. 25, 2008) ...........................................................................22

**Statutes and Rules**

FED. R. CIV. P. 56(a) ...........................................................................................................1, 14

FED. R. EVID. 702 ...............................................................................................................20, 21

Securities Exchange Act of 1934 Sections 10(b) and 20(a) ...........................................................1

SEC Rule 10b-5 ...................................................................................................................1, 15

NOTICE OF MOTION AND

MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EVIDENCE

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on March 3, 2023 at 10:00 a.m., in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Susan Illston in Courtroom 1, 17th Floor, Defendants Zuora, Inc. ("Zuora"), Tien Tzuo, and Tyler Sloat (together, "Defendants") will and hereby do move for summary judgment on all claims asserted against them, and to exclude evidence.  Defendants' motion is made pursuant to Federal Rule of Civil Procedure 56 and *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declarations and exhibits cited therein, the pleadings and records on file in this matter, and other materials and arguments as may be presented.

STATEMENT OF RELIEF SOUGHT

Defendants seek an order granting summary judgment in their favor on all claims for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  Defendants also seek to exclude the expert reports and testimony of Dr. Tavy Ronen and Charles Lundelius pursuant to *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should grant summary judgment in favor of Defendants in light of Plaintiffs' failure to establish that Defendants' purportedly false or misleading statements during the Class Period caused Plaintiffs' alleged losses, as required to prove liability under Section 10(b) or Rule 10b-5.

2. Whether the Court should exclude the expert reports and testimony of Dr. Tavy Ronen and Charles Lundelius as insufficiently reliable and helpful to the jury.

1

MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3    In this securities action, Plaintiffs seek to recover damages that they allegedly incurred on

4  May 31, 2019, when Zuora's stock dropped after Defendants disclosed that its earnings and

5  guidance were negatively impacted by at least two problems: product integration delays (the

6  subject of the alleged fraud) and sales execution issues (unrelated to the alleged fraud).  It is

7  black-letter securities law that where, as here, the relevant stock drop occurred after the

8  simultaneous release of both fraud-related and confounding, non-fraud-related information,

9  Plaintiffs bear the burden of disaggregating fraud-related and non-fraud-related losses.  Absent

10  disaggregation, the required element of loss causation cannot be proven.

11    On the undisputed record, Plaintiffs have not performed the required disaggregation

12  analysis at all.  Rather, Plaintiffs instructed their experts to assume that the ***entirety*** of the stock

13  drop is attributable to the disclosure of product integration delays (the subject matter of the

14  alleged fraud), and not to analyze the impact of the confounding disclosure of sales execution

15  problems.  Plaintiffs' experts were thus instructed to ignore one of the fundamental tenets of a

16  defensible event study, which requires the examination of confounding information.  Because

17  Plaintiffs have entirely ignored the confounding disclosures wholly unrelated to the alleged

18  fraud, summary judgment is required.

19    The facts relevant to this motion are not subject to reasonable dispute.  Zuora offers a

20  software suite specifically tailored to the business needs of subscription companies.  Plaintiffs

21  allege that, beginning in April 2018, Defendants publicly misrepresented Zuora's progress in

22  developing software to "integrate" two of its products, Billing and RevPro, relevant in cases

23  where the products were in use by the same client.  Plaintiffs allege that these purported

24  misrepresentations were allegedly "corrected" during a quarterly earnings call on May 30, 2019,

25  in which Defendants disclosed below-expectations quarterly results and a reduction of previously

26  issued earnings guidance for the balance of the year.  Zuora's stock price declined after the

27  earnings call, and Plaintiffs seek per share damages calculated from the entirety of that decline.

28

But the negative information conveyed to the market on the May 30 earnings call indisputably conveyed *both* the alleged fraud-related *and* non-fraud-related information.  As the call transcript demonstrates—and as analysts immediately recognized—Zuora identified two distinct and independent reasons on the earnings call for the disappointing quarterly results and the reduction in earnings guidance:

*First*, Defendants disclosed on the call that Zuora's software development team had experienced challenges in creating software designed to streamline the integrated use of Billing and RevPro, which would result in short-term delays.  It is this disclosure that Plaintiffs contend "corrected" the alleged prior misrepresentations about the integrated use of the two products.[1]

*Second*, Defendants disclosed a second, independent business challenge on the earnings call.  Zuora's quarterly earnings and projected revenue had been impacted by unexpected difficulties in execution by the Company's sales team.  In particular, Defendants explained that the Company had hired a large number of new sales representatives, and those new representatives had proved to be substantially less productive than its more experienced sales people.  Defendants further disclosed that Zuora was replacing its head of sales and taking other significant steps to increase sales productivity—steps that had nothing to do with product integration or the software development team working on that project.  Zuora was therefore reducing its revenue guidance because management "expect[ed] it to take a few quarters to realize the benefits of the changes to our sales organization and processes."  Ex. 01 at 4.

There can be no question that Defendants' disclosures about sales execution challenges were confounding disclosures unrelated to any alleged fraud.  Plaintiffs do not allege any misrepresentations by Defendants at any time about Zuora's sales execution.  Yet, although Zuora disclosed sales execution challenges that would require multiple quarters to address, Plaintiffs have made no effort to disaggregate the alleged stock price impact of the Company's disclosures about sales execution from the impact of its allegedly false statements about product

---

[1]  To be clear, should this case proceed to trial, the evidence will show that there was no fraud about product integration whatsoever.  Defendants did not make any materially false statements about the integrated use of Billing and RevPro, and their statements at all times represented their good faith beliefs about the status of a technically complex software engineering project.  The Court need not, however, reach the elements of falsity, materiality, or scienter with respect to the present motion.

integration.  On the contrary, their experts were instructed by Plaintiffs simply to *assume* that *all* of the bad news conveyed on the May 30 earnings call was the result of Billing and RevPro integration challenges.

This instruction—accepted without investigation by Plaintiffs' experts—renders Plaintiffs' experts' causation and damages analyses unreliable, and is also belied by the undisputed evidentiary record.  The Company's own public disclosures and subsequent analyst coverage expressly describe the product integration and sales execution issues as separate challenges.  Likewise, the contemporaneous documents and unrebutted testimony of both Plaintiffs' and Zuora's witnesses demonstrate that the sales execution challenges that Defendants disclosed on the earnings call were in fact largely (if not entirely) independent of the product integration challenges.

That these two issues are distinct is hardly surprising: Very few Zuora customers (about 20 out of over 950) had purchased both RevPro and Billing, and the integration project was initially offered to an even smaller number of early access customers (5) on a limited availability basis.  Thus, the integration project delay necessarily affected only a small number of customers.  Moreover, RevPro, which was just one of Zuora's products, accounted for only about 13.2 percent of Zuora's revenue.  Yet, without any analysis or support, Plaintiffs' experts followed Plaintiffs' instruction to assume that the entirety of challenges announced on May 30 was due to short-term integration project delays relating to a product that most Zuora customers did not even use.

As this Court held in *In re Nuveen Funds/City of Alameda Securities Litigation*, defendants are entitled to summary judgment on securities fraud claims where the plaintiffs' damages expert fails to "analyze or attempt to calculate the loss in value, if any, of the [security] that was caused by non-fraudulent factors," and "simply assumes . . . that defendants' alleged fraud is responsible for 100% of plaintiffs' investment losses."  2011 WL 1842819, at *6, *8 (N.D. Cal. May 16, 2011) (Illston, J.), *aff'd*, 730 F.3d 1111 (9th Cir. 2013).  That conclusion applies with equal force here.  The undisputed evidence shows that there were multiple independent causes for the May 31 stock decline, but Plaintiffs have offered no expert testimony

or other evidence capable of reliably disaggregating these two factors.  Instead, they simply instructed their experts to "assume" that Defendants' alleged fraud caused all of Plaintiffs' losses.  As the Court held in *Nuveen*, that is insufficient to allow Plaintiffs to present their claims to a jury.

For substantially similar reasons, Defendants move to exclude the expert reports and testimony on loss causation and damages by Plaintiffs' purported experts, Dr. Tavy Ronen and Charles Lundelius.  Defendants raise this issue now, before the deadline for motions *in limine* including *Daubert* motions, because courts routinely address disaggregation issues under both the summary judgment and *Daubert* legal standards.  Plaintiffs' experts offer opinions premised upon the unsupported assumption, based upon an instruction from Plaintiffs, that *all* of Plaintiffs' stock drop losses, including all losses due to disclosure of Zuora's sales execution challenges, resulted from the product integration disclosure.  Any opinions by these experts resting on that false assumption—which Plaintiffs' experts neither tested nor sought to validate—are irrelevant to the case and of no assistance to the jury, and their opinions are accordingly inadmissible for this reason (as well as other reasons that Defendants will address at the appropriate time in their pre-trial submissions).

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Zuora's History

Zuora develops and sells cloud-based software solutions to address the business needs of subscription-based companies.  *See* Ex. 02 at 1.  Zuora offers five distinct products that allow businesses that utilize subscription-based service models to track their subscription payments, invoices, pricing, product categories, revenue, and billing needs.  *Id.* at 107–08.  These products include Zuora Billing and Zuora RevPro—which may be purchased together or independently as standalone products—as well as additional add-on products Zuora CPQ, Zuora Insights, and Zuora Collect.  *See id.* at 69–70, 107–08; Ex. 03 at 5; *see also* Ex. 04 ZUO_00289697 at -714–15; Ex. 05 Sloat Dep. 29:2-12.

Zuora Billing was the first of the Company's flagship products; it provides subscription-based companies with a recurring billing system.  Ex. 02 at 67–68; Ex. 06 Hildenbrand Dep.

38:8-22; Ex. 07 Ramamoorthy Dep. 58:4-5, 15-20.  Billing "allows [Zuora's] customers to bill in multiple ways, calculate prorations when subscriptions change, and to group customers into batches for different billing and payment operations[.]"  Ex. 02 at 107; *see also* Ex. 08 Krackeler Dep. 58:7–18; Ex. 09 ███ Dep. 38:12-15.  Billing also helps manage hierarchical billing relationships, and consolidate invoicing across multiple subscriptions.  Ex. 02 at 107.  Zuora began selling Billing in 2007, and it is Zuora's most popular product.  *Id.* at 67; Ex. 08 Krackeler Dep. 58:13-18; Ex. 07 Ramamoorthy Dep. 58:4-8.

It was not until May 2017 that Zuora acquired Leeyo, Inc., the company that developed RevPro.  Ex. 02 at 14; Ex. 10 at 1.  RevPro automates the process by which subscription-based companies recognize revenue.  Ex. 10 at 1–2.

RevPro is a separate product from Billing.  Ex. 02 at 68, 107–08; Ex. 11 Tzuo Dep. 112:15-21.  The vast majority of Zuora's RevPro customers did not use Zuora's Billing product; likewise, the vast majority of Billing customers did not use RevPro.  *See* Ex. 12 at 11 (noting a "less than 10% overlap [between RevPro and Billing Customers]."); Ex. 13 Diouane Dep. 32:3–33:5; *see also* Ex. 14 ¶ 22.  During the class period, only about 20 of Zuora's over 950 customers used both products.  *See* Ex. 06 Hildenbrand Dep. at 52:7-10; Ex. 15 ZUO_00405407 at -409; Ex. 16 ¶ 15.

RevPro also represented a small portion of Zuora's overall business during the class period.  For the fiscal year ending January 31, 2018, RevPro accounted for only 13.2 percent of Zuora's revenue.  *See* Ex. 02 at 78–79; Ex. 14 ¶ 6; Ex. 16 ¶ 3.  While the Company recognized the possibility that cross-selling Zuora Billing and RevPro could present a long-term opportunity, this was only one of many strategies and opportunities Zuora pursued during this period.  *See, e.g.*, Ex. 02 at 106; Ex. 04 ZUO_00289697 at -718–25 (providing an overview of Zuora's business strategy); Ex. 12 at 11 (stating "we've been very open about focusing not necessarily on [] cross-sell . . . but closing new deals").

Beginning shortly after the Leeyo acquisition, Zuora's software development team began developing a proprietary tool to transfer data from Billing to RevPro to facilitate the integrated use of both products, for customers who purchased both products.  Ex. 11 Tzuo Dep. 45:18–

46:3; Ex. 06 Hildenbrand Dep. 51:13-19, 53:12–54:6.  This project, called Keystone, was one of

many engineering initiatives implemented by Zuora management during the Class Period.  *See*

Ex. 17 ZUO_00431005 at -008; Ex. 18 ZUO_00430709 at -713–15.  During the class period, the

Keystone development team worked to develop the integration solution, implement it with five

early adopter customers who had agreed to work with Zuora to integrate the two products, and

revise the software with the help of customer feedback.  *Id.*; Ex. 17 ZUO_00431005 at -010–011.

Keystone, however, remained a niche "Early Access," "Limited Availability" offering targeted to

the small portion of Zuora customers that used both Billing and RevPro, and chose to participate.

Ex. 18 ZUO_00430709 at -713–15; Ex. 06 Hildenbrand Dep. 82:4–86:7; Ex. 19 Reddy Dep.

67:3–69:4.

### B.      Allegedly Misleading Statements

Plaintiffs allege that, beginning with Zuora's initial public offering on April 12, 2018, the

Company made a series of materially misleading statements and omissions regarding the state of

its efforts to integrate its billing and revenue recognition products.  Plaintiffs allege that Zuora's

statements that the company offered software solutions that covered "the entire subscription

order-to-cash process" were materially false.  *See, e.g.*, Ex. 20 Consol. Am. Compl. ¶¶ 179–80,

188, ECF No. 60.  Plaintiffs also challenge broad statements by Zuora regarding its intent to

pursue a strategy of cross-selling and up-selling its products.  *See, e.g.*, *id.*  ¶¶ 183, 186, 187,

198.  Plaintiffs allege that these statements were misleading because RevPro and Billing

purportedly were not yet fully integrated.

Plaintiffs do not allege that Zuora made any materially misleading statements or

omissions regarding its sales team, projected sales pipeline, or its ability to execute sales.  *See id*.

¶¶ 1–17; Ex. 21 at 13–26 (identifying the alleged misleading statements and omissions).

### C.      The Alleged Corrective Disclosure

Plaintiffs allege that the "truth" behind these purported misstatements involving the

Keystone product integration was revealed to the market on May 30, 2019, when Zuora

conducted an earnings call to announce the results of the first quarter of fiscal year 2020 ("Q1

2020").  Ex. 20 Consol. Am. Compl. ¶ 12, ECF. No. 60.  During this announcement, Zuora

management explained that it was facing two separate "headwinds": sales execution problems and a delay in the product integration project for Billing and RevPro.  Ex. 01 at 1.  These two factors caused Zuora's management to reduce by 6% its previously issued revenue guidance for fiscal year 2020, which had been released in March 2019, two months earlier.  *Compare* Ex. 01 at 4, *with* Ex. 22 at 10.  The day after the earnings call, on May 31, 2019, Zuora's stock declined from $19.90 per share to $13.99 per share.  Ex. 20 Consol. Am. Compl. ¶ 153, ECF. No. 60.

Tzuo explained that Zuora's outlook was impacted by two discrete issues, a delay in the product integration between Billing and RevPro, which the Company expected to be a "short term" issue, and problems with "sales execution," which it expected not to be fully resolved for "a few quarters."  Ex. 01 at 2, 4.  With respect to the Billing-RevPro integration project, Tzuo explained that "the technical work to complete the integration is taking time as these are complex mission-critical systems.  And so, for our existing Billing customers, who have recently purchased RevPro, we slowed down the RevPro implementations this past quarter given the product integration delay."  *Id.* at 2.  Tzuo stated that Zuora expected the product integration issues "to be a short-term delay and [they would] have this resolved by the end of Q3."  *Id.*

In addition to these Keystone delays, Tzuo explained on the May 30 call that the Company had also been facing "sales execution" difficulties.  *Id.* at 1–2.  Tzuo explained that "we've been expanding our strategic sales teams and have hired a number of talented salespeople over the past year.  What we see in Q1 is that the newer reps were less than half as productive [as] our more experienced reps."  *Id.*  Tzuo explained that a significant reason Zuora was reducing its guidance for the remainder of the year was because the Company "expect[ed] it to take a few quarters to realize the benefits of the changes to our sales organization and processes."  *Id.* at 4.  This was in stark contrast to the separate "short-term" integration delay.  *Id.* at 2.

The steps Zuora took to address the sales challenges make clear that the Company viewed these challenges as independent from the integration delays.  Tzuo announced the Company's plan to replace Marc Diouane as the head of sales.  *Id.*  The significant decision to replace Diouane was due to Tzuo's growing lack of confidence in Diouane's ability to successfully lead the sales team, and bore no connection to Keystone.  Ex. 23 ZUO_00004218 at -218 (█████

████████████████████████████████████).  Zuora also announced its

plan to "realign[] our strategic account organization" to ensure newer representatives would

work with more experienced managers.  Ex. 01 at 2.  As Tzuo explained, the Company was

"revamping our pipeline process," which required a shift in sales focus and hiring.  *Id.*  In

addition, he explained that Zuora was looking to "expand[] our strategic sales teams."  *Id.* at 1.

None of these changes relates to integration issues; indeed, each of these significant changes to

Zuora's sales structure would have been unnecessary had the sales issues stemmed only from

Keystone delays.

### D.      Analysts Attributed the Guidance Reduction to Two Discrete Issues

Analysts who covered Zuora understood that the two causes of this reduction in guidance

were discrete issues.  As this chart demonstrates, numerous analysts who covered Zuora

specifically commented on both drivers of the guidance reduction:

| | |
|---|---|
| **Canaccord Genuity** <br> *May 30, 2019* <br> Ex. 24 | The "[p]rimary culprits" were "1) New reps did not come up the productivity curve as fast as expected, 2) Longer-than-anticipated progress to integrate modules of RevPro and Billing forced Zuora to elongate deployment," and "3) realigned sales structure . . . [that] will be done under a new head of sales for which the search has begun." |
| **FBN Securities** <br> *May 31, 2019* <br> Ex. 25 | "The company noted two execution headwinds during the quarter – weaker than expected sales execution and longer than expected integration of Billing and RevPro." |
| **Goldman Sachs** <br> *May 31, 2019* <br> Ex. 26 | "The shortfall was mainly the result of sales challenges, particularly with new reps, and slower-than-expected implementations of RevPro, which is still not fully integrated with the core billings product, now two years after the original acquisition." |
| **Jefferies** <br> *May 31, 2019* <br> Ex. 27 | "ZUO highlighted two execution issues this quarter – sales execution and RevPro integration challenges." |
| **Morgan Stanley** <br> *May 31, 2019* <br> Ex. 28 | "[S]ales restructuring," "replacement search" for a new head of Global Field Operations, and "challenges integrating RevPro and core Billings" are "three events" that led to reduced guidance. |
| **Needham** <br> *May 31, 2019* <br> Ex. 29 | "Two significant issues look to limit near-term growth: Sales execution likely takes longer to rectify that [sic] product integration issue." |

Analysts also viewed the sales challenges as the more significant of the two headwinds. For example, Morgan Stanley concluded that "[i]mproving sales productivity as new sales hires ramp" would be a "Key Value Driver" for Zuora going forward.  Ex. 28 at 4.  The Morgan Stanley analysts did not identify Keystone as similarly crucial.  Likewise, Needham's analysts explained that they had adjusted their projections to "reflect concerns regarding the sales leadership changeover," *i.e.*, the replacement of the head of sales, not concerns over Keystone. Ex. 29 at 2; *see also* Ex. 11 Tzuo Dep. 276:15–277:14 ("The market was reacting to our guid[ance], and our guid[ance] was primarily tied to the sales team.").

### E.        The Contemporaneous Internal Evidence Also Reflects Two Discrete Issues

Contemporaneous internal documents also confirm, consistent with the May 30 earnings call, that Zuora had identified and was addressing sales execution issues that were wholly separate from anything related to Keystone.  These internal documents flatly disprove any entirely conjectural theory by Plaintiffs that the sales execution issues described on the earnings call were somehow pretextual.  Moreover, Plaintiffs confirmed in their interrogatory responses that they do not allege that Defendants made false statements on the earnings call about sales execution problems. *See generally* Ex. 21 at 13–26 (identifying the alleged misleading statements and omissions).

Contemporaneous internal documents demonstrate that Zuora employees analyzed why the sales department had failed to meet expectations and that the reasons were unrelated to product integration delays.  Management's contemporaneous report to the Company's Board of Directors prior to the May 30 earnings call is illustrative, demonstrating that the Company's sales problems were largely or entirely unrelated to Keystone.  Management explained that Zuora's generation of new business decreased 29% from the prior year, a result management concluded was ███████████████████████████  Ex. 30 ZUO_00001166 at -176, *see also id.* at -166 (█████████████████████████████████████████████ ███████████); *see also id.* at -177 (explaining that Zuora's account executives were less productive in Q1 2020 as a ██████████████████████████████████████ ██████████████████████████████████████████████████).  Management also explained to

1   the Board that ████████████████████████████████████████████

2   ██████████████████████████████████████████████████████████

3   ███████ *Id.* at -176; *see also id.* at -166 (explaining that after conducting a ████████

4   analysis on the disappointing quarter, Zuora concluded that ██████████████████

5   ████████████████████████████████████████████████).  None of

6   these problems was attributed to delays in the Keystone project.

7          An internal post-mortem on the sales execution issues conducted after Q1 2020 reached

8   the same conclusions.  An analysis, contained in the files of CFO Sloat, identified significant

9   systemic factors causing sales execution problems that, again, were unrelated to Keystone.  Ex.

10  31 ZUO_00329160 at -160.  Zuora, like many fast growing companies, had been aggressively

11  expanding its sales force.  *See* Ex. 32 at 5, 15; Ex. 33 ZUO_00000906 at -931 (noting that Zuora

12  had hired 41 new sales account executives during fiscal year 2019).  As this internal post-mortem

13  concluded, in Q1 2020, sales representatives between zero and four months of experience were

14  approximately 40% less productive during the quarter than sales representatives with similar

15  experience had been in the first quarter of the prior year.  Ex. 31 ZUO_00329160 at -161.  These

16  challenges were heightened when "newly hired reps" were paired with "untested management."

17  *Id.*; *see also* Ex. 23 ZUO_00004218 at -218 (May 2, 2019 email from CEO Tzuo describing

18  sales team as being ██████████████████████████████████████████

19  ██████████████████████).  This experience mismatch was precisely what Tzuo

20  explained to investors on the May 30 earnings call.  Ex. 01 at 1–2 ("What we see in Q1 is that

21  the newer reps were less than half as productive [as] our more experienced reps.").  Again, this

22  document does not attribute these sales difficulties to Keystone.

23         These documents are also supported by the testimony.  As the (replaced) head of Zuora's

24  sales department, Marc Diouane, testified, Keystone did not present a "meaningful sales

25  headwind" for Zuora.  Ex. 13 Diouane Dep. 273:15–274:11.  Indeed, the guidance reduction

26  provided to shareholders on May 30, 2019 was significantly impacted by one failed deal, to sell

27  the Billing product to █████, which was not "related to Keystone."  *Id.* 138:4–139:4, 147:2-4.

28  Zuora had projected that the █████ deal would yield $1.6M, or 10% of the projected $15.5M in

---

Q1'20 bookings.  *See* Ex. 34 ZUO_00448808 at "Bkg Pipeline Data 4.22.19" sheet (noting expected contract value for ███ of $1.6M); Ex. 33 ZUO_00000906 at -916 (noting expected Q1'20 commit of $15.5M).  The missed ████ deal therefore represented 44% of Zuora's Q1 bookings target miss.  *See* Ex. 30 ZUO_00001166 at -166 (Zuora ███████████████████████ ███████████████████████████).  Thus, the challenges in execution faced by the sales department were largely independent of the Keystone challenges.

> ### F.   Plaintiffs' Own Witnesses Attribute the Stock Decline to Multiple Factors Impacting Earnings and Guidance

Plaintiffs' own witnesses acknowledge that the Company's stock dropped after the May 30 Announcement at least in part for reasons wholly unrelated to the alleged fraud.

███████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████

Plaintiffs' experts also acknowledged that the Company's problems with Keystone and sales execution were distinct.  Dr. Tavy Ronen, Plaintiffs' purported expert on loss causation and damages, opined that the "**two causes** of the reduced outlook were product integration issues and sales execution issues[.]"  Ex. 36 ¶ 78 (emphasis added).  She reiterated at her deposition that the May 30, 2019 earnings call provided "two reasons for the disappointing outlook," and she agreed that Tzuo "stated [that there] were two separate . . . reasons" for the reduced outlook.  Ex. 37 Ronen Dep. 62:5-18.  Similarly, when questioned on this topic, Plaintiffs' other purported

damages expert, Charles Lundelius, agreed that there were factors beyond the integration delay that would impact Zuora's financial success for fiscal year 2020.  Ex. 38 Lundelius Dep. 38:24–39:4.  In response to the question about whether it was "possible that newer sales representatives were just simply not as effective at their jobs compared to more experienced sales representatives, regardless of what was happening with Keystone," Mr. Lundelius agreed "[t]hat could very well be the case, yes."  *Id.* 36:10-15.

### G.   Expert Testimony Regarding Loss Causation and Damages

Despite the undisputed evidence showing that the stock drop after the May 30 earnings call resulted from multiple independent factors, Plaintiffs instructed both of their experts, Dr. Ronen and Mr. Lundelius, to assume that the entirety of the new information released on the May 30 earnings call related to product integration issues.

Dr. Ronen stated that she was instructed by Plaintiffs' counsel "to assume that all the sales execution issues mentioned by management on the earnings call on May 30, 2019 were a result of the product integration failure alleged in the Complaint."  Ex. 36 ¶ 39.  Dr. Ronen made no effort to test this assumption.  Ex. 37 Ronen Dep. 59:7–60:3; 96:10-23.  Dr. Ronen could not even express an opinion on whether that assumption was reasonable.  *Id.* 59:21–60:3.  In reliance on that assumption, she opined that "[b]ecause the Company attributed both the lower outlook and the lower reported revenue in the quarter to the product integration and sales execution issues, neither is confounding information."  Ex. 36 ¶ 82.  But that is a non sequitur, because, as discussed above, and as she herself acknowledged, the two factors were distinct.  Indeed, Dr. Ronen appears to have been confused as to the scope of Plaintiffs' theory entirely, as in the same report she also stated that "the two causes of the reduced outlook were product integration issues and sales execution issues **both of which** are alleged to have been mispresented [*sic*]."  Ex. 36 ¶ 78 (emphasis added).  Plaintiffs actually make no such allegation.  *See supra*, Part II.B.

Mr. Lundelius similarly stated that he was instructed by Plaintiffs' counsel "to assume that all the sales execution issues mentioned by management on the earnings call were a result of the product integration failure alleged in the Complaint."  Ex. 39 ¶ 11; *see also* Ex. 38 Lundelius Dep. 30:10-22.  Mr. Lundelius conceded that he did not conduct an analysis that "would allow

[him] to conclude that every aspect of the Zuora sales execution headwind disclosed on May 30, 2019 was attributable to product integration delays." *Id.* 31:24–32:13.  He conducted no analysis of the productivity of Zuora's sales team. *Id.* 34:5-7.  And he conducted no analysis of the impact Keystone delays would have had on Zuora's sales of RevPro. *Id.* 43:23–44:3; *see also id*. 13:5-9 ("Q. . . . [Y]ou don't have a model that attempts to allocate the decline of the price of Zuora stock on May 31, 2019 among different causes, correct? A.  That is correct.").  In sum, Mr. Lundelius stated he could not opine on any "issues relating to loss causation or damages," beyond identifying supposed errors in the methodology of Defendant's expert. Ex. 39 ¶¶ 18, 29; *see also* Ex. 38 Lundelius Dep. 12:19–13:4 ("I've not done any work other than responding to Mr. Dages with regard to the attribution of the integration issues to damages.").

In contrast, Defendants' expert witness, Kevin Dages, did address this issue, and developed a strategy for disaggregating the alleged stock drop damages.  Mr. Dages was asked by Defendants to "provide [an] opinion on what portion of the decline in Zuora's FY 2020 revenue guidance could be attributable to the Keystone Integration issues." Ex. 16 ¶ 12.  In conducting this analysis, Mr. Dages reviewed publicly available information on Zuora, Zuora internal materials documenting the reasons for its revenue guidance, and deposition testimony of relevant witnesses. Ex. 16 Appendix B.  Ultimately, Mr. Dages concluded that, at most, approximately 15% of the downward guidance revision could be attributed to delays with Keystone. Ex. 16 ¶ 13.  While Plaintiffs may disagree with Mr. Dages's calculations or his reasoning, that debate is beyond the scope of this motion; Plaintiffs chose not to perform their own disaggregation analysis at all, and thus have adduced no reliable methodology for presenting the jury with damages caused by the alleged fraud.

### III.   LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is material only when it "might affect the outcome of the suit under the governing law," and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" based upon it. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

court's role is not to evaluate the evidence to "determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Id.* at 249.

Because Defendants do not bear the burden of proof at trial, summary judgment should be granted if Defendants either "negat[e] an essential element" of Plaintiffs' claims or show that Plaintiffs "do[] not have enough evidence of an essential element" of their claims. *Nat. Res. Def. Council* v. *Pruitt*, 2017 WL 5900127, at *2 (N.D. Cal. Nov. 30, 2017) (citing *Nissan Fire & Marine Ins. Co.* v. *Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). Loss causation is, of course, an element of Plaintiffs' claims under Section 10(b) and Rule 10b-5. *See In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *4 (Illston, J.). Plaintiffs must do more than sow doubt as to whether there are material facts in dispute and instead must "designate specific facts showing that there is a genuine issue for trial." *In re Synergy Acceptance Corp.*, 2015 WL 6085304, at *6 (N.D. Cal. Oct. 16, 2015) (quoting *Celotex Corp* v. *Catrett*, 477 U.S. 317, 324 (1986)).

## IV.   PLAINTIFFS CANNOT ESTABLISH A GENUINE ISSUE OF TRIABLE FACT WITH RESPECT TO LOSS CAUSATION

### A.   To Demonstrate Loss Causation, Plaintiffs Must Disaggregate the Declines in Zuora Stock Attributable to the Alleged Fraud from Non-Fraud-Related Factors

To establish loss causation, Plaintiffs must "demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (citing *Dura Pharm. Inc.* v. *Broudo*, 544 U.S. 336, 343–44 (2005)). It is the Plaintiffs' burden to demonstrate that the purported fraud caused their alleged losses, rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharm.*, 544 U.S. at 343; *see also In re Oracle Corp. Sec. Lit.*, 2009 WL 1709050, at *17 (N.D. Cal. June 19, 2009) (Illston, J.) (granting summary judgment for defendants where "plaintiffs have not identified evidence that could lead a juror to conclude that defendants' alleged

misrepresentations about [the product at issue, rather than an earnings miss] were a 'substantial cause' of the decline in value of Oracle's stock"), *aff'd*, 627 F.3d 376 (9th Cir. 2010).

To satisfy this burden at the summary judgment stage, Plaintiffs must provide evidence that "reasonably distinguish[es] the impacts" of the fraud from potentially confounding factors. *Nuveen Mun. High Income Opp. Fund* v. *City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013); *see also Dura Pharm.*, 544 U.S. at 343 (stating that "[g]iven the tangle of factors affecting price," plaintiffs must draw a causal connection between the alleged fraud and their losses); *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec.(USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014); *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009); *In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009).  In doing so, Plaintiffs must provide a "reliable means of addressing [potentially confounding factors]." *Bricklayers*, 752 F.3d at 95.

This analysis requires expert testimony to determine "which declines were caused by such extraneous factors and which were caused by [the alleged fraud]."  *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (citing *Robbins* v. *Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)).  That is because "absent an event study or similar analysis," Plaintiffs cannot demonstrate that their losses were connected to the alleged fraud.  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003); *see also Turocy* v. *El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *19 (C.D. Cal. July 3, 2018) (explaining that proving "loss causation is often highly contentious, necessitating expert testimony" (quoting MICHAEL J. KAUFMAN 26 SEC. LITIG.: DAMAGES § 3:12.30)); *Hayes* v. *MagnaChip SemiConductor Corp.*, 2016 WL 6902856, at *5 (N.D. Cal. Nov. 21, 2016) (similar); *In re Vivendi*, 634 F. Supp. at 364 (explaining that such an analysis is "almost obligatory" to establish loss causation).  Merely making a "judgment call as to the confounding information without any methodological underpinning" is insufficient to survive summary judgment.  *Bricklayers*, 752 F.3d at 95; *see also In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013) (granting summary judgment for defendants on loss

causation where plaintiff's theory rested on "factually unsupported assumption" that entirety of stock drop related to the alleged fraud).

Plaintiffs' own expert Dr. Ronen recognized that disaggregating confounding variables is **required** to present a reliable event study and establish loss causation. As Dr. Ronen stated in her report, in order to conduct a proper event study an expert must separate the "portion of the excess price decline related to the confounding information . . . from the portion of the price decline caused by the disclosure of corrective information." Ex. 36 ¶ 79; *see also* Ex. 14 ¶ 19. She agreed with Defendants' expert that "material, confounding information should be removed" from the calculation, in order to properly determine how much of the alleged damages relate to the alleged fraud. Ex. 40 ¶ 28; *see also* Ex. 37 Ronen Dep. 139:22-24 (stating that if "there was confounding information that I did not take into account that I should have, then my damages estimation would be altered").

## B.     Plaintiffs' Failure to Conduct This Critical Analysis Is Fatal to Their Claims

The failure to disaggregate confounding variables is a "fatal flaw," mandating summary judgment for Defendants. *In re Williams*, 558 F.3d at 1143. Plaintiffs here have not provided **any** means to disaggregate the impact of the alleged fraud from the other confounding information on the May 30 earnings call.

As discussed above, Dr. Ronen—the only expert Plaintiffs have proffered on loss causation—concededly did not even try to address this critical issue. Dr. Ronen's testimony was based on an event study purporting to establish loss causation. Ex. 36 ¶ 55 ("My event study analysis [] establishes the causal link between the alleged misstatements and omissions and the resulting economic loss . . . ."). But her event study simply assumed, as instructed by Plaintiffs' counsel, that there was no confounding information to disaggregate. Ex. 36 ¶¶ 83–84. Dr. Ronen simply followed the direction of Plaintiffs' counsel to assume that "all the sales execution issues mentioned by management on the earnings call on May 30, 2019 were a result of the product integration failure alleged in the Complaint." Ex. 36 ¶ 39; *see also id.* ¶ 83. Dr. Ronen concededly did not test this assumption or provide any evidence to support it. Ex. 37 Ronen Dep. 59:7–60:3. In other words, as Defendants' expert Dr. Ferrell explained, Dr. Ronen

"assumed away the confounding information" and thus "assumed away basically the very assignment she was asked to do." Ex. 41 Ferrell Dep. 141:17-19; *see also id.* 103:9-13 ("The problem . . . is [Dr. Ronen] assumes away the very inquiry that she's purportedly analyzing, and that is the value of the information that could and should have been disclosed earlier to create an inflation band.").

An event study such as Dr. Ronen's that fails to conduct the crucial disaggregation analysis cannot establish loss causation.  *See Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190–95 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014).  In *Bricklayers*, for example, the court concluded that plaintiffs failed to demonstrate a triable issue of fact regarding loss causation because the plaintiffs' expert conducted an event study that "fail[ed] to disaggregate the effects of confounding factors" reported to the market the same day as the alleged corrective disclosures.  853 F. Supp. 2d at 190.  This "failure to isolate the effect of defendants' alleged fraud from other industry- and company-specific news reported on event days confound[ed] [the] event study and render[ed] it unreliable."  *Id.* at 191.  Granting summary judgment for the defendants, the court observed that "[t]he same deficiencies . . . also prevent[ed] the study from raising a triable issue of fact on loss causation."  *Id.* at 191–92; *see also id.* at 195 (expert's "partial disaggregation of confounding factors is insufficient to establish that the alleged misrepresentations actually caused plaintiffs' loss").

This Court applied similar reasoning in granting summary judgment for the defendants in *In re Nuveen Funds*, 2011 WL 1842819.  The Court explained that the plaintiffs' damages expert in that case failed to "analyze or attempt to calculate the loss in value, if any, of the [security] that was caused by non-fraudulent factors." *In re Nuveen Funds*, 2011 WL 1842819, at *8.  Instead, the expert "simply assum[ed]" that "defendants' alleged fraud [was] responsible for 100% of plaintiffs' investment losses," without attempting to account for other factors that could have caused the decline in the security's value.  *Id.* at *7–11.  In view of the plaintiffs' failure to account for these other potential causes, the Court concluded that "Plaintiffs have not submitted any evidence linking their losses . . . to the allegedly fraudulent [statements]," and granted summary judgment for the defendants.  *Id.* at *12.  The Ninth Circuit affirmed, ruling that, in the

absence of expert testimony disaggregating fraud-related losses from losses due to confounding

factors, "the critical link" between the allegedly misleading statements and the plaintiffs'

economic loss was missing. *Nuveen Mun. High Income Opp. Fund*, 730 F.3d at 1121. The court

emphasized that the plaintiffs' obligation to disaggregate potentially confounding causes "cannot

now be bridged by conjecture" and mere assumptions. *Id.* at 1122.

Courts around the country have repeatedly applied the same principles. In *In re REMEC

Inc. Securities Litigation*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010), the plaintiffs' expert identified

multiple alleged corrective disclosures, each of which "contained multiple pieces of company

specific information, some negative, some positive, some allegedly fraud related, and some not."

*Id.* at 1274. Like Dr. Ronen, the plaintiffs' expert assumed that "isolating the effects of multiple

pieces of information [was] unnecessary . . . because 'all of the new, material information . . .

was related to REMEC's [alleged misstatements].'" *Id.* The court granted summary judgment

for the defendants, concluding that the experts' reliance on this unproven assumption

"demonstrate[d] that his methodology [was] flawed to the point of being unreliable." *Id.* at

1274; *see also In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d. 1339, 1376–80 (N.D. Ga.

2010) (similar), *aff'd sub nom.*, *Phillips* v. *Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012);

*In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) ("Because the

law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot

suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss."), *aff'd*,

597 F.3d 501 (2d Cir. 2010).

The Tenth Circuit's decision in *In re Williams Securities Litigation–WCG Subclass*, 558

F.3d 1130 (10th Cir. 2009) (favorably cited and relied upon by this Court in *Nuveen*), is similarly

on point. In *Williams*, the expert witness simply "label[ed] any negative information about [the

defendant] a corrective disclosure and attribute[d] all resulting losses to the revelation of fraud

rather than other possible factors." *Id.* at 1140. For example, the expert stated that a particular

press release was a corrective disclosure. *Id.* at 1142. But, like this case, the press release

contained two announcements—one related to the alleged fraud and one that was not related. *Id.*

And like Dr. Ronen, the expert "offered no explanation for why one would allot all of the

[ensuing stock] decline to the revelation of fraud and not to another significant piece of negative information that was released that day." *Id.* The Tenth Circuit found that this "render[ed] his methodology unreliable," *id.*, and affirmed the district court's grant of summary judgment for the defendants on the ground that plaintiffs had failed to meet their burden of establishing loss causation, *id.* at 1143.

Nor can Plaintiffs avoid summary judgment by asserting, as Dr. Ronen does, that "[t]he ultimate determination of whether any of the price decline is unrelated to the allegations will be made by the finder of fact." Ex. 40 ¶ 36. Plaintiffs are required to provide the jury with a reliable method to allocate the alleged loss among the multiple potential causes. Absent evidence providing a means to disaggregate different causes of Plaintiffs' losses, "there is 'simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss." *In re Williams*, 558 F.3d at 1143 (quoting *In re Omnicom*, 541 F. Supp. 2d at 553); *see also Phillips*, 489 Fed. App'x. at 343 (affirming grant of summary judgment where the "evidence provide[d] no method" for jury to allocate loss to alleged fraud).

Accordingly, Plaintiffs fail to raise a triable issue of fact as to loss causation, and summary judgment should be granted.[2]

## V.     THE EXPERT REPORTS AND TESTIMONY OF DR. RONEN AND MR. LUNDELIUS REGARDING LOSS CAUSATION AND DAMAGES SHOULD BE EXCLUDED

Because courts often address disaggregation issues in the context of the admissibility of expert testimony, Defendants also move to exclude the expert reports and testimony of Dr. Ronen and Mr. Lundelius on this basis (and reserve all other arguments until such time as *Daubert* motions are submitted).

Expert testimony is only admissible if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the

---

[2] Because Defendants are entitled to judgment on the Section 10(b) claim, the Section 20(a) claim fails as well. *See, e.g.*, *In re Oracle Corp. Sec. Lit.*, 627 F.3d at 395.

principles and methods to the facts of the case." FED. R. EVID. 702.  "[T]he trial judge must

ensure that any and all scientific testimony or evidence is not only relevant, but reliable."

*Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The district court must

evaluate whether the expert's testimony "has substance such that it would be helpful to a jury."

*Alaska Rent-A-Car, Inc.* v. *Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013).  The

proponent of the expert testimony bears the burden of proving its admissibility.  *Lust* v. *Merrell

Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Because the opinions of Dr. Ronen and Mr. Lundelius rest on an unfounded assumption

provided by counsel (which is also contrary to the record), their reports and testimony are neither

reliable nor helpful for the jury.  For an expert opinion to be reliable and admissible, an expert

must "justify a foundational assumption or refute contrary record evidence."  *City of Pomona* v.

*SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014); *see also Snyder* v. *Bank of Am., N.A.*,

2020 WL 6462400, at *8 (N.D. Cal. Nov. 3, 2020) (excluding expert testimony as unhelpful to

the jury when expert's methodology was "based on faulty assumptions"); *Powell* v. *Anheuser-

Busch, Inc.*, 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012); *Tyger Constr. Co. Inc.* v.

*Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be

excluded when it is based on assumptions which are speculative and not supported by the

record.").  Plaintiffs' experts freely admitted that they did not conduct this crucial analysis.  *See*

Ex. 37 Ronen Dep. 59:7–60:3; Ex. 38 Lundelius Dep. 31:24–32:13; 34:5-7; 43:23–44:3.[3]

In addition, as numerous courts have held, opinions of damages experts should be

excluded where the experts "fail[] to distinguish between the fraud-related and non-fraud related

influences on the stock's price behavior."  *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181

(N.D. Cal. 1993); *see also In re Williams*, 558 F.3d at 1142 (excluding an expert's testimony

where the expert "offered no explanation for why one would allot all of the [alleged damages] to

the revelation of fraud and not to another significant piece of negative information that was

---

[3] This is not a matter of weight or credibility that can be addressed through cross examination at trial.  If the core of
the expert's opinion relies on an assumption that is contrary to the record, it must be excluded.  *See In re Nuveen
Funds*, 2011 WL 1842819, at *26 (excluding expert report because expert "simply assumed" the entire loss was due
to the alleged fraud); *Davis* v. *Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) ("Where an appraisal or other
expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial
selection of relevant facts, it must be excluded under Rule 702.").

released that day"); *Hershey* v. *Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 955 (N.D. Ill. 2010) (explaining that, for an expert to testify reliably about damages, the expert must "separate the alleged unlawful conduct from other possible significant causes"); *In re Xcelera.com Sec. Litig.*, 2008 WL 7084626, at *2 (D. Mass. Apr. 25, 2008) (excluding expert report conducting an event study which failed to consider potentially confounding information).  In particular, an event study that "fails to disaggregate the effects of confounding factors" is unhelpful to the jury and must be excluded "because it misleadingly suggests to the jury that a sophisticated statistical analysis proves the impact of defendants' alleged fraud on a stock's price when, in fact, the movement could very well have been caused by other information released to the market on the same date."  *Bricklayers*, 853 F. Supp. 2d at 190; *see also* Ex. 42 ¶ 89.  The failure of Plaintiffs' experts to provide this analysis renders their opinions unreliable and unhelpful.  Accordingly, the reports and testimony of Plaintiffs' experts should be excluded.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and to exclude the expert reports and testimony of Dr. Ronen and Mr. Lundelius.

Dated:    December 9, 2022

By:  _/s/ Melinda Haag_
Melinda Haag

*Attorneys for Defendants Zuora, Inc., Tien Tzuo and Tyler Sloat*