# EXHIBIT 13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASEY ROBERTS, )
Individually and On ) Case No. 3:19-cv-03422-SI
Behalf Of All Other )
Similarly Situated, )
)
Plaintiff, )
)
vs. )
)
ZUORA, INC., TIEN TZUO,)
and TYLER SLOAT, )
)
Defendants. )
_____)

REMOTE DEPOSITION OF MARC DIOUANE

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(Via Zoom Videoconference)

Thursday, May 5, 2022

REPORTED BY:  Michelle Milan Fulmer

CSR No. 6942, RPR, CRR, CRC

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 31

flagship products; is that right?

A    Once again, what do you mean by "flagship"?

Q    By "flagship," I mean Zuora's two most prominent products that it focuses on when it's trying to get new business with customers.    09:38:16

A    I would say correct.

Q    Zuora Billing could be cross-sold with Zuora RevPro?

A    Billing, it's few cases like.

Maybe just stepping back here to explain a    09:38:35 bit more.

We acquired Leeyo in 2017.  The two organizations were operating separately around the integration phase from almost '17 to and early 2019. So I was not involved.  They were not reporting to    09:38:56 me.  I was mainly focused on Zuora Billing in early 2019.

Q    So I understand you were focused on Zuora Billing, but I just want to make sure I get a direct answer to my question.    09:39:16

Under Zuora's sales strategy, was it a strategy for Zuora to cross-sell Billing with RevPro?

MS. MUCK:  Object to form.

THE WITNESS:  Cross-sell, it's both ways.    09:39:32

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 32

I will say it long-term strategy for sure.

BY MR. SHAEFFER:

Q    So you say cross-sell both ways.  So are you saying that RevPro could be cross-sold with Billing?                                     09:39:47

A    Correct.

Q    And cross-selling Billing and RevPro is a long-term growth strategy for Zuora?

A    Well, when I was there, it was a long-term. It was not a big, big part of our total bookings in    09:40:07 revenue.

Q    Could Zuora Billing be up-sold with RevPro?

A    Very rare situations when I was there.

Q    What happened?

A    Very rare situation when I was there where    09:40:33 we had up-sold the customer with Billing.

Q    You said "up-sold the customer with Billing."  Did I hear that right?

A    That the RevPro customers was buying Billing solutions, very rare.  A few, few, few    09:40:47 cases.  I don't remember exactly how many, but few, few, few.

Q    Why was that a rare situation?

A    Purely because the core business was really centered around Billing and the growth strategy was    09:41:01

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 33

mainly around Billing and the long-term strategy is eventually to bundle the two products together or cross-sell, up-sell.  But, you know, as far as I remember when I was there, RevPro was a small portion of our total bookings.                                    09:41:19

Q    So you previously testified that when you were president of Zuora, you were in charge of the sales organization; is that right?

A    Correct.

Q    So you were in charge of the sales                 09:41:45
organization between the period of April 2018 to May 2019?

A    I was in charge of the core Zuora sales organization and go-to-market during that period, and I was not in charge of RevPro sales organization    09:42:01
from '18 to -- I will say from the acquisition, 2017 to the end of 2018.  Fiscal year ended end of January 2019, as I recall.

Q    Okay.  So between January 2019 and June 2019 when you left Zuora, did the RevPro sales            09:42:23
organization fall under your --

A    Yes.

Q    -- sales organization?

A    Yes.  Correct.

Q    Okay.  You said "core Zuora" in your prior        09:42:37

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 34

statement; is that right?

A     Yes.  Correct.  It's my terminology for the time.  That's what my work was (inaudible).

Q     Yeah.

So what do you mean by "core Zuora"?     09:42:50

A     It's outside -- anything outside Leeyo and RevPro.

Q     Okay.  I'd like to ask you a few specific questions about Zuora's sales organization.

A     Yeah.     09:43:03

Q     When you were at Zuora, did Zuora's sales organization include new business marketers?

MS. MUCK:  Object to form.

THE WITNESS:  What do you mean by "marketers"?     09:43:19

BY MR. SHAEFFER:

Q     I guess I --

Were there people at Zuora whose responsibility in the sales organization was to try to generate demand for Zuora's products, whether it     09:43:29 was new customers or current customers?

A     It's the demand -- the BDR.  The demand is really two organizations.  The marketing organization reporting directly to the CEO; and the business development organization, the people     09:43:46

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 272

represents a severe risk not only to the RevPro

product line, but to Zuora's overall business.  You

don't agree with that statement; right?

MS. MUCK:  Object to form.

THE WITNESS:  What I said here is we are    05:43:58

talking about Zuora RevPro, and from a business

standpoint, at least bookings standpoint, what I'm

responsible for, this situation and what's clearly

stated here has been identified earlier and has been

a part of many risk upside and challenges that the    05:44:17

organization has to face to.

BY MR. SHAEFFER:

Q    So you were -- so you were in charge of the

Zuora Billing; is that right?

A    In terms of what?    05:44:37

Q    At this time in February of 2019.

A    In February 2019, I was responsible for

everything from the sales standpoint.

Q    Okay.  So if you want to go back up to the

Zuora Billing portion that we discussed, there    05:44:52

were -- this discusses the ███████████

████████████████████████████████████████

██████████████    ████████████

████████████████████████████████████████

Do you see that?    05:45:15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 273

A    I can see it, yes.

Q    And do you see that one of the points that are listed in this paragraph is ████████████

████████████████████████████████████

████████████████████████████████████    05:45:32

████ ?

Do you see that?

A    I see that, yeah.

Q    And you see the last bullet point in this paragraph says ████████████████    05:45:39

████████████████████████

████████

Do you see that?

A    I see it.  I see it, yeah.

Q    So Keystone presented a meaningful sales    05:45:48 headwind that the field needed to overcome?

MS. MUCK:  Is that a question?

MR. SHAEFFER:  Yes.

Q    Is that right?

A    Once again, the context is really, really    05:46:08 important.

We are talking about the board meeting, first board meeting for a new fiscal year where you are trying to bring everyone up to speed about what had happened last year, where we are at, problem,    05:46:19

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 274

challenges, upside, as I said before, and formulate it here.

I didn't, as you know, write this document and I am just trying to do my best here to tell you what I think about what they are trying to say here.    05:46:36 So for me it's not correct.

Q    So your testimony is that as of February 28th, 2019, Keystone did not -- Keystone was not a meaningful sales headwind that your sales organization needed to overcome?    05:46:58

A    Correct.

Q    Okay.  Did you review this document at all before it was presented to the board of directors?

A    Usually we are reading the document before the board meeting when Tien and Tyler are putting    05:47:11 the document together, yeah.  Usually the C-staff and me, being invited to the board only for the business portion, I have access to the document.

Q    So even if you had access to this document before it was given to the board of directors, you    05:47:33 didn't make any effort to change this statement about the meaningful sales headwind; is that right?

MS. MUCK:  Object to form.

THE WITNESS:  Not correct.  I'm saying that.    05:47:46

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 275

MR. SHAEFFER: Okay. I'd like to go off the record.

THE VIDEOGRAPHER: Are all counsel in agreement?

MS. MUCK: Of course. 05:48:00

THE VIDEOGRAPHER: We're going off the record. The time is 5:48 p.m.

(Recess taken.)

(Off the record at 5:48 p.m. Back on the record at 6:02 p.m.) 06:02:45

THE VIDEOGRAPHER: We are back on the record. The time is 6:02 p.m.

BY MR. SHAEFFER:

Q Mr. Diouane, do you understand that you're still under oath? 06:02:56

A Yes, I do.

Q Okay. I have already uploaded what's been marked as Exhibit Number 236 to your deposition.

Do you want to open up that?

A 236. Okay. 06:03:12

Q Yes.

A Yeah. I can see it.

Q Okay. This is an email that you sent on March 11th, 2019, to Tyler Sloat and Tien Tzuo.

Do you see that? 06:03:35