# EXHIBIT 14

**CONFIDENTIAL**

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CASEY ROBERTS, Individually and On Behalf Of All Other Similarly Situated | : No. 3:19-cv-03422-SI |
| | : |
| | : |
| | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ZUORA, INC., TIEN TZUO, and TYLER SLOAT, | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |
| | : |

**EXPERT REPORT OF ALLEN FERRELL, PH.D.**

**August 5, 2022**

**CONFIDENTIAL**

## I.    QUALIFICATIONS

1.    I am an economist and the Greenfield Professor of Securities Law at Harvard Law School.  I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School.  My Ph.D. dissertation concerned the relationship between stock prices and financial disclosures.  After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.    I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, and a member of the editorial board of the Journal of Financial Perspectives.  I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.    I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the Structured Products Association, and the National Bureau of Economic Research.  I have published approximately 30 articles in leading law and finance journals.  I have also been an expert witness in a variety of securities matters. My testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.    I have been assisted by Compass Lexecon staff in this matter billing at their standard hourly rates.  My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report.  I am being compensated for my work on this matter at an hourly rate of $1,350, including for any testimony I may provide in this matter.  I receive other compensation from Compass Lexecon based on a portion of staff billings.  My compensation is not contingent upon my opinions and conclusions,

1

**CONFIDENTIAL**

or the outcome of this matter.

## II.     INTRODUCTION AND SUMMARY OF CONCLUSIONS

### A.  Background

5.      Zuora, Inc. ("Zuora" or the "Company") provides "cloud-based software on a subscription basis that enables any company in any industry to successfully launch, manage, and transform into a subscription business."[1]  Zuora's solution consists of three components:  the Zuora Central Platform, order-to-cash products (including Zuora Billing and Zuora RevPro), and an application marketplace.[2]  RevPro was acquired through Zuora's acquisition of Leeyo Software, Inc. ("Leeyo") in May 2017.[3]  Substantially all of Zuora's revenue and cash flows comes from sales of subscriptions and associated deployment of the Zuora Central Platform, and the Billing and RevPro products.[4]

6.      Zuora reports two types of revenues:  Subscription and Professional Services.[5] Subscription revenues are fees for access to and use of Zuora's products as well as customer support, while Professional Services revenues are fees for services related to helping customers deploy, configure, and optimize Zuora's solutions.[6]  In the fiscal year ended January 31, 2018, Zuora reported Subscription revenue of $120.4 million, of which RevPro accounted for $3.9 million (3.2%), and Professional Services revenue of $47.6 million, of which RevPro accounted for $18.4 million (38.7%).[7]

7.      In April 2018, Zuora had its initial public offering ("IPO") in which it sold 12.7

---

[1] Zuora, Inc. Form 424B4, April 11, 2018, ("Prospectus") p. 1.

[2] Prospectus pp. 107-108.

[3] Prospectus pp. 14 & 73.

[4] Prospectus p. 16

[5] Prospectus p. 74.

[6] Prospectus p. 74.

[7] Prospectus p. 78-79.

**CONFIDENTIAL**

million shares of Class A common stock at a price to the public of $14.00 per share.[8, 9]  The Company's Class A common stock began trading in the open market on April 12, 2018.[10]

8.    After the market closed on May 30, 2019, Zuora reported its financial results for the 2020 fiscal first quarter ended April 30, 2019.[11]  Among other things, the Company announced guidance for the fiscal year ending January 31, 2020 of $200.0 million to $206.0 million for subscription revenue and $268.0 million to $278.0 million for total revenue, which reflected reductions from the fiscal 2020 guidance Zuora provided on March 21, 2019 of $209.0 million to $211.5 million for subscription revenue and $289.0 million to $293.5 million for total revenue.[12]

9.    During a conference call with investors later on May 30, 2019, Zuora Chief Executive Officer ("CEO") Tien Tzuo discussed two "execution headwinds" that impacted Zuora's fiscal second quarter and full year outlook.[13]  First, Zuora faced "sales execution" issues following the expansion of its strategic sales teams and found that "the newer reps were less than half as productive than [Zuora's] more experienced reps."[14]  In response, Mr. Tzuo announced "meaningful" changes including "a change in our sales leadership" and that the Company expected it would "take a few quarters to realize the benefits of the changes to our sales

---

[8] Zuora, Inc. Form 10-K, January 31, 2019 at p. 37.  Zuora offered 11 million Class A shares in its IPO and granted the underwriters a 30-day option to purchase up to 1.65 million additional shares at the initial offering price less underwriting discounts.  "Zuora Announces Pricing of Initial Public Offering," *Business Wire*, April 11, 2018 (8:43 PM).

[9] Zuora has two classes of common stock, Class A and Class B.  Prospectus at cover.  Each Class A share is entitled to one vote per share and each Class B share is entitled to ten votes per share and is convertible into one share of Class A common stock.  *Id.*

[10] Bloomberg.

[11] "Zuora Reports First Quarter Fiscal 2020 Results," *Business Wire*, May 30, 2019 (4:14 PM).

[12] "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results," *Business Wire*, March 21, 2019 (4:10 PM); "Zuora Reports First Quarter Fiscal 2020 Results," *Business Wire*, May 30, 2019 (4:14 PM).

[13] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 4.

[14] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 4.

CONFIDENTIAL

organization."[15]  Second, the product integration of Billing and RevPro was "taking longer than expected."[16]  As a result, the Company "slowed-down" its cross-selling efforts resulting in "lower professional services and subscription revenue in the quarter as well as tempered expectations going forward."[17]  In response, Mr. Tzuo announced a "course correction in our approach" which was expected to be a "short-term delay" that would be "resolved by the end of Q3."[18]  When asked about the timing of the integration and cross-sell slow down given that Zuora purchased Leeyo two years earlier, Mr. Tzuo explained that "we didn't really start heavy work on the integration until early last summer, late spring, early last summer" and "we went down one direction that proved to be a dead end, a false direction."[19]  On May 31, 2019, the first trading day after Zuora's fiscal first quarter 2020 earnings release, its stock price declined 29.7%.[20]

B.  Plaintiff's Allegations

10.    Plaintiff brings this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and U.S. Securities and Exchange Commission Rule 10b-5 on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Zuora during the period from April 12, 2018 to May 30, 2019 inclusive (the "Class Period") and were damaged thereby (the "Class").[21, 22]

---

[15] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5, 8.

[16] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[17] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[18] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[19] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 10.

[20] Bloomberg.

[21] Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed November 8, 2019 ("Complaint") at 1.  Lead plaintiff is the New Zealand Methodist Trust Association ("Plaintiff").  *Id.*

[22] Defendants in this matter are Zuora, its CEO and Company Board Chairman Tien Tzuo, and its Chief Financial Officer Tyler Sloat.  Complaint ¶¶ 23-26.

**CONFIDENTIAL**

11.     Plaintiff alleges that Defendants "concealed the existence of significant technical challenges that prevented the successful integration of Zuora's two core products [Billing and RevPro], ultimately resulting in reduced revenue growth, missed sales, and waning demand for Zuora's platform and applications."[23]  Plaintiff claims that "Defendants' misrepresentations about the functionality and configuration of Zuora's principal offerings inflated the price of Zuora's common stock until Defendants' disclosure of the integration failure resulted in sales execution issues and disappointing financial performance and outlook, causing the stock price to plummet."[24]  Plaintiff further alleges that "Defendants knew both before and throughout the entirety of the Class Period of Zuora's platform's inability to integrate RevPro successfully."[25]  Plaintiff also alleges that "Defendants knew that this fundamental technical flaw resulted in upset customers, protracted installations, massive delays in customers going live on RevPro, and elongated recognition of revenues."[26]

12.     Plaintiff claims that "[t]he artificial inflation created by Defendants' alleged misrepresentations and omissions regarding the functionality of Zuora's solution and demand for the Company's solution was removed from Zuora's share price in direct response to information revealed in disclosures that took place on May 30, 2019" when "Defendants disclosed the integration failure and sales execution issues … [and] … further disclosed the diminished demand for its products by reporting a larger loss, reduced revenue growth, and reducing guided revenues for the entire fiscal year 2020."[27]  Plaintiff further claims that "[f]ollowing these revelations … Zuora's share price fell $5.91 per share, from $19.90 per share on May 30, 3019 to $13.99 per share on May 31, 2019, nearly 30%, on unusually heaving trading volume" and that "[t]he timing and magnitude of the declines in Zuora's share price negate any inference that Lead Plaintiff's losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct."[28]

---

[23] Complaint ¶ 1.

[24] Complaint ¶ 1.

[25] Complaint ¶ 6.

[26] Complaint ¶ 8.

[27] Complaint ¶¶ 258-59.

[28] Complaint ¶ 261.

**CONFIDENTIAL**

13.    Plaintiff retained Tavy Ronen to opine on whether the market for Zuora Class A common stock was efficient during the Class Period and "whether the calculation of damages is subject to a common methodology for all Class members, consistent with Plaintiffs' liability case in connection with their claims."[29]  As part of her analysis of market efficiency, she conducted an "event study," which she explains is "widely used in academia and securities litigation matters to measure the effect on stock prices of disclosure of new information relevant to a company's stock valuation."[30]  Dr. Ronen concluded that the Company's common stock traded in an efficient market throughout the Class Period and that the calculation of alleged damages is subject to a common methodology that can be applied on a class-wide basis.[31]

C.    Assignment and Summary of Conclusions

14.    I was asked by counsel for Defendants to opine on economic issues that Plaintiff's damages expert faces in conducting a reliable analysis of alleged artificial inflation in this matter. The materials I have considered in preparing this report are listed in **Appendix B**.  I also was asked to review, analyze, and respond to Plaintiff's damages expert's opinions and analyses when they become available.

15.    Based on my review and analysis of these materials, as well as my general background and expertise, I have reached the following principal conclusions:

- To estimate alleged artificial inflation in Zuora's stock price throughout the Class Period, Plaintiff's damages expert must analyze the economic evidence and relate it to Plaintiff's claims.  To the extent that Plaintiff alleges that Defendants made alleged misstatements during the Class Period that constituted value-relevant information not previously known to the market, Plaintiff's damages expert must demonstrate that the information had a positive and statistically significant impact on Zuora's stock price to show that the new information was value-relevant and caused inflation to enter the Company's stock price.

- Plaintiff's damages expert also must, at a minimum, reliably analyze and account for the following issues in accordance with the relevant economic evidence:
    - To the extent that the information disclosed on May 30, 2019 about the productivity of Zuora's sales force is unrelated to the integration issue (commonly referred to as "confounding" information), the entire firm-

---

[29] Expert Report of Tavy Ronen, Ph.D., dated December 4, 2020 ("Ronen Report") ¶ 1.

[30] Ronen Report ¶ 70.

[31] Ronen Report ¶ 3.

**CONFIDENTIAL**

specific price decline on May 31, 2019 cannot be used to measure alleged artificial inflation.

- The reduction in fiscal year 2020 revenue guidance was negative information that caused Zuora's stock price to decline on May 31, 2019 as recognized by market participants.

- If any of the reduced revenue guidance is attributable to the sales force productivity issue independent of the integration issue, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information.

- To remove the portion of the price decline that is attributable to the sales force productivity issue, Plaintiff's damages expert needs to reliably determine the relative portions of the guidance reduction attributed to the integration issue on the one hand and to the sales force productivity issue on the other, and then consider whether and the extent to which the two portions may have affected Zuora's stock price differently. In particular, economic evidence indicates that the value relevance of the guidance reduction due to the integration issue was lower than that of the guidance reduction due to the sales productivity issue.

o Plaintiff claims that the results of internal tests that I understand were conducted at various times during the Class Period allegedly led the Defendants to become aware that Zuora's integration project could not deliver the represented RevPro functionality and that sales ultimately were affected. Accordingly, the allegedly corrective information that purportedly could have been disclosed during the Class Period varied across the time period; hence, the price impact of this information likely varied as well prior to the disclosure on May 30, 2019. Under this theory, Plaintiff's expert must consider those variances and assess their impact over time.

I elaborate upon and provide the bases for my conclusions in the remainder of this report.

## III. ECONOMIC ISSUES THAT PLAINTIFF'S DAMAGES EXPERT MUST RELIABLY ANALYZE

16. In opining that the calculation of alleged damages is subject to a common methodology that can be applied on a class-wide basis, Dr. Ronen explains how alleged inflation can be estimated:

> In general, losses that result from the revelation of the truth are manifested when the alleged wrongdoing is revealed through corrective disclosure(s) that eventually bring the alleged misrepresentations and omissions to light. An expert often begins with the same type of event study I used [] above to evaluate the

**CONFIDENTIAL**

direct price-related factors to isolate the portion of the change in a company's security price that can be attributed to the corrective information from the portion that is attributed to other factors such as the market, industry, or other unrelated (confounding) firm-specific information. While the market model [which underlies the event study[32]] removes the market and industry influences, there are many techniques that can be used to estimate the portion of the price reaction that is attributable to the revelation of the truth, i.e., parsing and separating the amount of the price movement due to the alleged fraud from the amount of the price movement due to nonfraudulent disclosures. These techniques include, among others, the analysis of intraday pricing (if disclosures are made at different times within the same day), analysis of analyst and other media commentary, analysis of accounting and other company information, such as a breakdown of revenues and earnings for different business segments, geographic locations, etc. In addition, materials produced in discovery and other expert testimony related to liability issues could also potentially provide a basis for parsing confounding information.

Once the portion of the change in the company's stock price attributable to the corrective information is determined, artificial inflation can be estimated for each day during the class period. There are several methods for computing artificial inflation for the duration of the class period. Among the most commonly used methods are the "constant dollar" and the "constant percentage" methods. Artificial inflation can also be "scaled" over time if the impact of the alleged misrepresentations or omissions varies throughout the class period. The daily level of artificial inflation is represented as a series of artificial inflation in the security price over time and is commonly referred to as the "inflation ribbon" or the "inflation line."[33]

I discuss several issues that arise when applying Dr. Ronen's methodology to estimate alleged artificial inflation in this case below.

17.    As an initial matter, to estimate per-share damages in securities litigation cases, an economist must analyze the economic evidence and relate it to plaintiffs' allegations. Here, Plaintiff alleges that Defendants made materially false and misleading statements both in the IPO Registration Statement and throughout the Class Period.[34] In an efficient market – such as the one in which Dr. Ronen opines Zuora stock traded during the Class Period – disclosures of new information that are relevant to a company's value would be expected to cause a statistically significant reaction in the company's stock price; otherwise, the information is either already

---

[32] Ronen Report ¶ 71.

[33] Ronen Report ¶¶ 89-90.

[34] Complaint ¶¶ 160-240.

**CONFIDENTIAL**

reflected in the stock price (and therefore is not new) or it is not value-relevant. To the extent that Plaintiff alleges that Defendants made materially false or misleading statements during the Class Period that contained value-relevant information not previously reflected in Zuora's stock price, Plaintiff's expert must demonstrate that the statements had a positive and statistically significant impact on the Company's stock price to show that they were value-relevant and caused inflation to enter the stock price. For example, I understand that Plaintiff alleges that Defendants made materially false or misleading statements in a Twitter post on June 5, 2018.[35] If the information in that Twitter post was not previously reflected in Zuora's stock price, Plaintiff's expert would have to demonstrate that the Twitter post had a positive and statistically significant price impact to demonstrate that the statements in the Twitter post caused inflation to enter the Company's stock price.

18.    In addition, to use a price decline to estimate alleged artificial inflation in securities litigation as Dr. Ronen describes, it is crucial that the disclosure of allegedly corrective information actually corrects the alleged misstatement and does not reveal information that could not have been known and disclosed at the time of the misstatement. Otherwise, the price reaction to the disclosure does not measure the value of the misstatement because it measures the value of different information. This "equivalent disclosure" issue, which is well understood in the academic literature,[36] is a critical part of the analysis of price inflation that Dr. Ronen describes, and fundamentally sound and reliable methods to account for it must be employed. Equivalent disclosure issues in this matter are substantial.

19.    First, as Dr. Ronen acknowledges, Plaintiff's damages expert must reliably "pars[e] and separate[e] the amount of the price movement due to the alleged fraud from the amount of the price movement due to nonfraudulent disclosures"; such disclosures are commonly referred to as "confounding information."[37] The reduction in fiscal year 2020 revenue guidance was negative information that caused Zuora's stock price to decline on May

---

[35] Complaint ¶¶ 124, 164-65.

[36] *See*, e.g., B. Cornell & R.G. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA Law Review* (June 1990), 883-924 *and* A. Ferrell & A. Saha, "The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," 63 *Business Lawyer* (November 2007), 163-186.

[37] Ronen Report ¶ 89.

**CONFIDENTIAL**

31, 2019 as recognized by market participants.  For example, analysts at Needham & Company stated that "[w]e downgrade ZUO from our Top Pick and Strong Buy Rating to a Buy rating and $18 [Price Target] [from $30] after the company guides FY20 materially lower due to sales execution issues and product integration challenges,"[38] and *CNBC* reported that "[s]hares of Zuora plunged 29.7% after the cloud company gave weak guidance for current fiscal year."[39]

20.    As explained *supra* ¶ 9, Defendant Tzuo stated that there were two factors that led to Zuora's reduction in fiscal year 2020 revenue guidance, one of which is the productivity of the Company's sales force.  If any of the reduced revenue guidance is attributable to the sales force productivity issue independent of the integration issue, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information.[40]  Aside from potentially being an independent cause of the revenue guidance reduction and thus the stock price decline, the sales force productivity issue was a known risk because it was disclosed in the Prospectus[41] and market participants were aware of it.[42]  Consequently, to estimate alleged artificial inflation based on the May 31, 2019 decline in Zuora's stock price, Plaintiff's damages expert must reliably measure and remove the

---

[38] "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," Needham & Company, May 31, 2019; *see also* "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," Goldman Sachs ("While F1Q results were mostly in line with our expectations, Zuora's updated FY20 revenue guidance came in 6% below its prior outlook.").

[39] "Stocks making the biggest moves midday:  Constellation Brands, Gap, Tivo & more," *CNBC*, May 31, 2019 4:09 PM; *see also* "Zuora Shares Slide on Lower Annual Revenue Guidance," *Dow Jones Institutional News*, May 30, 2019 4:38 PM

[40] I understand that Defendants' expert Kevin F. Dages addresses the portion of the reduced revenue guidance that could be attributed to the integration issue.

[41] Prospectus at 23 ("Our revenue growth and ability to achieve and sustain profitability will depend, in part on being able to expand our direct sales force and increase the productivity of our sales force.  To date, most of our revenue has been attributable to the efforts of our direct sales force. … New sales personnel require significant training and can take a number of months to achieve full productivity.  Our recent hires and planned hires may not become productive as quickly as we expect and if our new sales employees do not become fully productive on the timelines that we have projected or at all, our revenue will not increase at anticipated levels and our ability to achieve long-term projections may be negatively impacted. … as we continue to grow, a larger percentage of our sales force will be new to our company and our solution, which may adversely affect our sales if we cannot train our sales force quickly or effectively.").

[42] *See*, e.g., "Powering the 'Subscription Economy' Isn't Cheap; Initiate at EW," Morgan Stanley, May 7, 2018 (stating that the "Risks to achieving Price Target" included "[i]nvestments in new sales hires fails to generate meaningful productivity.").

**CONFIDENTIAL**

portion of the decline that is attributable to the sales force productivity issue.

21.    To do so, Plaintiff's expert must consider how the portions of the guidance reduction related to each cause may have affected Zuora's stock price differently; in other words, a dollar of reduction due to one cause may have had a larger or smaller price impact than a dollar reduction of the other cause. For example, I have reviewed economic evidence indicating that the value relevance of the guidance reduction due to the integration issue was less than that of the guidance reduction due to the sales productivity issue. Specifically, the integration issue was expected to be resolved quickly while the sales productivity issue was expected to take more time. Defendant Tzuo stated that the company made three "key changes" to address the sales productivity issue, namely it "realigned" its strategic account organization, it "revamped" its pipeline process and it "announced a change in sales leadership."[43, 44] He further stated that "these changes in the sales organization are meaningful" and that "it will take time to become effective."[45] In contrast, regarding the Billing and RevPro integration issue, Mr. Tzuo stated that "[w]e expect this to be a short-term delay and to have this resolved by the end of Q3."[46] Market participants recognized this distinction. For example, analysts at Needham & Company commented: "We expect fixing the product issues is straightforward and will just require time, but we are more concerned with the sales issues that our experience says require changes in sales leadership and nearly 12 months to correct. We expect the stock to open significantly lower and be dead money for a quarter or two while the change in sales leadership takes hold."[47] Analysts at Morgan Stanley noted that "[t]hese kinds of [executive] searches can be lengthy, and bring

---

[43] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[44] Zuora announced that Marc Dionne would "transition" from his role as President and that the company was "conducting a search for his replacement." Zuora, Inc. Form 8-K, May 29, 2019.

[45] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[46] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[47] *See*, e.g. "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," Needham & Company, May 31, 2019.

**CONFIDENTIAL**

with them additional sales disruptions, which could ripple through the next 2-3 quarters."[48]

22.   Based on my review of the economic evidence, market participants also were aware prior to May 30, 2019 that Zuora had not focused on cross-selling RevPro and Billing, and that only a small portion of Zuora's customers had subscribed to both products.[49]  Defendant Tzuo stated on November 29, 2018 that "[n]othing's changed in terms of the less than 10% overlap [for RevPro customers that are also Billing customers] still … we've been very open about focusing not necessarily on the cross-sell of that but closing new deals."[50]  Goldman Sachs analysts opined on February 1, 2019 that:  "New products have become a source of expansion over the last few years; however, cross-sell is not yet big enough to assuage our concerns over transaction volume.  …  According to management, the overlap between RevPro and Billings [*sic*] customers is still less than 10%.  While Zuora maintains that all of its customers will eventually need both, we don't see this as a near-term catalyst, although it could provide an uplift to expansion rates over time."[51]

23.   Plaintiff's damages expert has to reconcile the above economic evidence with the estimated amount of alleged artificial inflation because it does not make economic sense to, for example, use the entire -27.8% excess stock return on May 31, 2019 that Dr. Ronen estimates[52] – more than a quarter of the value of the entire Company – to measure the price impact of the allegedly corrective information about the Billing and RevPro integration issue that affected relatively few customers and was seen as a comparatively short-term, fixable issue.

24.   Second, to use a portion of the price decline on May 31, 2019 to estimate alleged

---

[48] "1Q20 Results:  A Bump on the Road to Subscription Economy," Morgan Stanley Research, May 31, 2019.

[49] Zuora also disclosed that in fiscal 2018, RevPro accounted for only 3.2% of the Company's Subscription revenue but 38.7% of its Professional Services revenue, indicating that market participants were aware that customers required substantially more services related to helping them deploy, configure, and optimize RevPro than Billing.  *See supra* ¶ 6.

[50] Zuora, Inc. NYSE: ZUO FQ3 2019 Earnings Call Transcripts, Thursday, November 29, 2018 5:00 PM EST at 14.

[51] "Americas Emerging Software: Resuming coverage with an Attractive view; Buy GWRE (on CL) and COUP," Goldman Sachs, February 1, 2019.

[52] Ronen Report ¶ 83.  The excess return is the Company-specific portion of a price movement after removing market- and industry-wide influences on Zuora's stock price.  *Id.*

12

**CONFIDENTIAL**

inflation throughout the Class Period, Plaintiff's damages expert also must reconcile the fact that under Plaintiff's own claims, the Defendants became aware of the extent of the Billing and RevPro integration issue and its consequences during the Class Period (as opposed to before the Class Period or at the outset of the Class Period). I understand that when Mr. Tzuo stated on May 31, 2019 that "we went down one direction that proved to be a dead end, a false direction," he was referencing the integration project known as "Keystone."[53] Plaintiff alleges that "after failed internal tests on customers, … Defendants determined that Keystone could not deliver the represented functionality for RevPro" and that "[i]n or about February or March 2019, Zuora's executives acknowledged the failure of the Keystone project and decided to abandon the project in favor of a separate technological approach internally called the K-2 Project."[54] I understand that the tests Plaintiff references were conducted at various times during the Class Period and thus the certainty of their results could not have been disclosed at the start of the Class Period; therefore, under Plaintiff's own theory, at most what could have been disclosed at the beginning of the Class Period regarding the outcome of the Keystone tests was that there was a risk that they would fail. Similarly, Plaintiff also claims that the integration issue "ultimately result[ed] in reduced revenue growth, missed sales, and waning demand for Zuora's platform and applications;"[55] consequently, to the extent that the "ultimate[]" occurrence of these purported consequences was during the Class Period, at most the risk of their occurrence could have been disclosed at the beginning of the Class Period under Plaintiff's own theory.

25.    The price impact of the disclosure of a risk of an adverse outcome occurring is necessarily less than the price impact of the certainty of that risk occurring because prior to its occurrence, by definition, there was a chance that the adverse outcome would not happen.[56] As Dr. Ronen acknowledges, "[a]rtificial inflation can also be 'scaled' over time if the impact of the alleged misrepresentations or omissions varies throughout the class period."[57] Because the price

---

[53] *See supra* ¶ 9.

[54] Lead Plaintiff New Zealand Methodist Trust Association's Responses and Objections to Defendants' Second Set of Interrogatories at 34.

[55] *See supra* ¶ 11.

[56] Any claim by Plaintiff or its expert that the Defendants somehow knew at the beginning of the Class Period that the subsequent adverse outcomes would occur with certainty would defy economic logic because it does not make economic sense to spend resources on testing a project that is known to be futile.

[57] Ronen Report ¶ 90.

13

**CONFIDENTIAL**

impact of the alleged misrepresentations or omissions regarding the results of the internal tests through which "Defendants determined that Keystone could not deliver the represented functionality for RevPro," as well as any negative consequences on Zuora's sales, did vary throughout the Class Period under Plaintiff's claims, Plaintiff's expert must incorporate this variation when estimating the "inflation ribbon" over the Class Period.



Allen Ferrell

August 5, 2022

14

**CONFIDENTIAL**

August, 2022

## Appendix A

## Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

### CURRENT POSITIONS

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Member of Editorial Board,* Journal of Financial Perspectives

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

### EDUCATION

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

### PREVIOUS POSITIONS

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

**CONFIDENTIAL**

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

### COURSES TAUGHT

*Contracts*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*

### REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

### CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

### Papers

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, Working Paper (2021)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

2

**CONFIDENTIAL**

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

3

**CONFIDENTIAL**

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with

4

**CONFIDENTIAL**

Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)


TESTIMONY LAST FOUR YEARS

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019 and trial testimony June 7, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert report and deposition on August 26, 2021

*Pearlstein et al. v. Blackberry Limited*, Case No. 1:13-cv-7060-CM, Expert report and deposition on November 3, 2020

*In re Grupo Televisa Securities Litigation*, Case No. 1:18-cv-01979-LLS, Expert report and deposition on February 21, 2020

*In re Snap Securities Litigation,* Case No. 2:17-cv-03679-SVW-AGR, Expert report and deposition on December 16, 2019

*People of the State of New York v. Exxon Mobil Corporation,* Index No. 452044/2018, Expert report and deposition on July 23, 2019 and trial testimony on November 6, 2019

**CONFIDENTIAL**

*In re Signet Jewelers Limited Securities Litigation*, Case No. 1:16-cv-06728-CM, Expert report and deposition on May 14, 2019

*Trustees of DALI et al. v. Barrick Gold Corporation,* Case No. CV-14-502316-00CP, Ontario Superior Court of Justice, Expert reports and deposition on April 16, 2019

*CC IMA v. IMA Pizza*, JAMS Ref No. 1425026556, Testimony on September 13, 2018

6

CONFIDENTIAL

## Appendix B

### Materials Considered

**Case-Related Documents**

1. Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed November 8, 2019.
2. Lead Plaintiff New Zealand Methodist Trust Association's Responses and Objections to Defendants' Second Set of Interrogatories, April 4, 2022.
3. Expert Report of Tavy Ronen, Ph.D., dated December 4, 2020.

**Securities and Exchange Commission Filings**

1. Zuora, Inc. Form 424B4, April 11, 2018.
2. Zuora, Inc. Form 10-K, January 31, 2019.
3. Zuora, Inc. Form 8-K, May 29, 2019.

**Conference Call Transcripts**

1. Zuora, Inc. NYSE: ZUO FQ3 2019 Earnings Call Transcripts, Thursday November 29, 2018 5:00 PM EST.
2. Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST.

**Analyst Reports**

1. "Powering the 'Subscription Economy' Isn't Cheap; Initiate at EW," Morgan Stanley, May 7, 2018.
2. "Americas Emerging Software: Resuming coverage with an Attractive view; Buy GWRE (on CL) and COUP," Goldman Sachs, February 1, 2019.
3. "1Q20 Results:  A Bump on the Road to Subscription Economy," Morgan Stanley Research, May 31, 2019.
4. "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," Needham & Company, May 31, 2019.
5. "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," Goldman Sachs, May 31, 2019.

**Academic Literature**

1. B. Cornell & R.G. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA Law Review* (June 1990), 883-924.
2. Ferrell & A. Saha, "The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," 63 *Business Lawyer* (November 2007), 163-186.

1

**CONFIDENTIAL**

**News Articles**

1. "Zuora Announces Pricing of Initial Public Offering," *Business Wire*, April 11, 2018 (8:43 PM).
2. "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results," *Business Wire*, March 21, 2019 (4:10 PM).
3. "Zuora Reports First Quarter Fiscal 2020 Results," *Business Wire*, May 30, 2019 (4:14 PM).
4. "Zuora Shares Slide on Lower Annual Revenue Guidance," *Dow Jones Institutional News*, May 30, 2019 4:38 PM.
5. "Stocks making the biggest moves midday: Constellation Brands, Gap, Tivo & more," *CNBC*, May 31, 2019 4:09 PM.


**Data Sources**

1. Bloomberg.