# EXHIBIT 38

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

                     SAN FRANCISCO DIVISION




     CASEY ROBERTS, Individually )
     and on Behalf of All Others )
     Similarly Situated,          )
                                  )
                                  )
            Plaintiff,            ) Case No.: 3:19-cv-03422-SI
                                  )
         v.                       )
                                  )
     ZUORA, INC., TIEN TZUO, and )
     TYLER SLOAT,                 )
                                  )
              Defendants.         )
     _____)



     DEPOSITION OF:

                      CHARLES R. LUNDELIUS

                      WEDNESDAY, OCTOBER 19, 2022

                      11:34 A.M. (EDT)






     Reported by:   GINA M. CLOUD
                     CSR No. 6315

                                                    Page 1

A.   Yes, it is.

Q.   Does this report contain all the opinions that you have in this matter?

A.   Yes, it does.

Q.   Is there anything in this report that you now believe to be incorrect?          08:44:35

A.   No.

Q.   Does your report, Exhibit 46, contain the brain cease for all of your opinions that you have expressed in your report?          08:44:46

A.   Yes, it does.

Q.   Assuming liability is established, do you have an opinion on the amount of damages here?

A.   No.

Q.   Is your opinion limited solely to a critique of the Dages expert report?          08:45:02

A.   I can say for the most part it does. Certainly that was the focus of my engagement and the scope of my engagement.

Q.   For the most part and focus and stuff, so in my mind I hear that sort of leaves a little bit extra.          08:45:23

So what other than critiquing Dages' opinion does your opinion relate to?

MR. GILMORE:  Object to form.          08:45:37

Page 11

THE WITNESS:  It very well could lead to or have some impact on other aspects of the case, such as damages calculations or something like that.  But that would be really for other experts to deal with or take.

08:46:00

BY MR. CASAMASSIMA:

Q.  Can you explain what you mean by that?  I'm not sure I follow.

A.  For instance, if I say -- I am saying that Mr. Dages' use of a 15 percent quantum to allegedly reduce damages is not appropriate then obviously damages would be calculated at some other percentage, say 100 percent.

08:46:13

Q.  But you are not the person that's going to do that damages calculation, correct?

08:46:36

A.  That is correct.

Q.  Do you know who will?

A.  I believe Dr. Ronen will.

Q.  You did not attempt to disaggregate different potential causes of the decline of the price of Zuora stock on May 31, 2019, correct?

08:46:49

A.  I'm not quite sure what you mean by disaggregate, other than the context of Mr. Dages' work tried to identify the certain subset that was attributable to key stone integration issues.

08:47:12

Page 12

My answer to your question is, I've not done any work other than responding to Mr. Dages with regard to the attribution of the integration issues to damages.

Q.   Understood.  So for example, you don't have    08:47:42
a model that attempts to allocate the decline of the price of Zuora stock on May 31, 2019 among different causes, correct?

A.   That is correct.

Q.   Is it possible to attribute any portion of    08:47:54
the decline of the price of Zuora stock on May 31, 2019 to any particular cause?

MR. GILMORE:  Object to form.

THE WITNESS:  That's not something I was asked to do in this case.  So I don't have an opinion    08:48:08
on that.

BY MR. CASAMASSIMA:

Q.   So you don't know either way?

A.   Either way, correct.

Q.   And you've not tried to do that, right?    08:48:18

A.   That is correct.

Q.   Who drafted your report marked as Exhibit 46?

A.   I drafted it had along with help or assistance from my team.    08:48:32

Page 13

Q.   Can you describe how that worked in practice?

A.   Yes.  I identified key issues and elements that I wanted to include in the report and then drafted those out for the team and then assigned the team various projects to perform and they reported back to me and then I, taking their work product, entered that into the report and built the report out -- wrote the report out based off their findings and then asked them to sometimes summarize various topics that I would then put into the report and edit.  So it was more of a back and forth process.

Q.   Were these BRG employees that helped do you that?

A.   Yes.

Q.   What were their names?

A.   Their names are Jennifer Hall, Kristin Flinn, F-L-I-N-N and Beth Dallmeyer, D-A-L-L-M-E-Y-E-R, I believe.  She recently married so I'm trying to grapple with her new name.

Q.   Let me try break that down.  Is it fair to say they prepared the first draft or no?

MR. GILMORE:  Objection to form.

THE WITNESS:  No, they did not.  It was a process by which I drafted some sections.  They

08:48:50

08:49:16

08:49:36

08:49:58

08:50:22

Page 14

Q.    Who bills at $325 and who bills at $810 and somewhere in between?

A.    A staff person, level person would bill at the $310 level.  The $810 is for Jennifer Hall.

Q.    So the other two would be cheaper than Jennifer?    09:17:53

A.    Their rates would be less.

Q.    Yes, that's what I meant.  That's a more elegant way of saying that, thank you.

Do you know how much BRG as has received to date in connection with this matter?    09:18:13

A.    I think it's around $100,000.

Q.    Do you know how much -- strike that.

How much do you expect BRG to receive in connection with this matter through the work that you will have done as of today, through your deposition?    09:18:30

A.    It's a little hard to estimate, but in the range of -- it would be more than 150,000, I think, it would be fair to say.

Q.    And you will be paid for your time for testifying at trial should you testify at trial in this matter, correct?    09:18:53

A.    Yes.

Q.    Would your rate be the same for testifying at trial as it is for, for example, testifying at    09:19:05

Page 29

your deposition today?

A.   Yes.

Q.   Your 1,250 rate for example, you don't charge a premium for trial testimony, do you?

A.   No.                                                      09:19:16

Q.   Do you expect your rate to go up in 2023?

A.   It may, but usually we lock that rate in at the time we're engaged so for this matter, it should remain at 1,250.

Q.   Now let's talk about your assumptions.  We   09:19:40 previously touched on that before and I just want to make sure it's clear.  I was looking at Paragraph 11 and you can look at that, I'm not trying to mischaracterize it.  I just want to understand it.

What I read it that you've:  "Been asked to   09:19:56 assume that all the sales execution issues mentioned by management on the earnings call were a result of the product integration failure alleged in the Complaint."  Is that right?

A.   That is correct.                                  09:20:13

Q.   How was that assumption communicated to you?

A.   Counsel told me.  Mr. Gilmore told me.

Q.   Did Hagens Berman ask you to make any other assumptions?

A.   No.                                                      09:20:36

Page 30

Q.    Are you expressing any opinion about whether the sales and execution issues were in fact caused by the integration issues?

A.    None, other than what I have here and I think I've got a footnote 19 that sets out some of the documents that I reviewed that support that position.                                          09:20:52

Q.    Okay.  But that position, what is "that position"?

A.    The position that the execution issues were the result of product integration failure.          09:21:13

Q.    Is that an opinion you're offering in this case?

MR. GILMORE:  Object to form.

THE WITNESS:  It's an assumption that I've been told to make and my finding is that it was a reasonable assumption based upon the documents that I saw in footnote 19 and also some other work that I did as I was going through the process of putting together the report.  I did not find, for instance, anything that indicated to me that the assumption was incorrect.                                          09:21:34 ... 09:21:53

BY MR. CASAMASSIMA:

Q.    Are you expressing an opinion that all of sales execution issues were, in fact, caused by the          09:22:11

Page 31

integration issues?

MR. GILMORE:  Object to form.

THE WITNESS:  No.  I'm not expressing an opinion on it.  As I said, I just had some findings that correlate with that.                          09:22:26

BY MR. CASAMASSIMA:

Q.   And you've not done any analysis that would allow you to conclude that every aspect of the Zuora sales execution headwind disclosed on May 30, 2019 was attributable to product integration delays,      09:22:39 correct?

A.   I have not been asked to do that analysis, no.

Q.   In Paragraph 11 of your report you say that Mr. Tzuo, T-z-u-o:  "Stated that there were "two    09:22:52 execution headwinds" that had resulted in tempered revenue expectations going forward."

That's what you wrote, correct?

A.   Yes.

Q.   And the next sentence says that Mr. Tzuo   09:23:05 said that:  "The first was sales execution issues, which had stemmed from "newer reps being less than half as productive as Zuora's more experienced reps."

Do you see that?

A.   I do.                                      09:23:23

Page 32

Q.   Do you have any basis to dispute Mr. Tzuo's statement that the first execution headwind that tempered revenue expectations was that new sales representatives were less than half as productive as the more experienced Zuora sales representatives?     09:23:37

MR. GILMORE:  Object to form.

THE WITNESS:  I don't have any information with regard to that one way or another other than that statement.

BY MR. CASAMASSIMA:     09:23:48

Q.   You were told to assume that Mr. Tzuo's statement, that the first execution headwind that tempered revenue expectations was that new sales representatives were less than half as productive as the more experienced Zuora sales representatives was     09:23:58 not true, right?

A.   No.

MR. GILMORE:  Objection to form.

THE WITNESS:  That's not what I was asked to assume.  I was asked to assume that the sales     09:24:08 execution issues were attributable to the product integration failure.

BY MR. CASAMASSIMA:

Q.   You can't say as a factual matter that newer Zuora sales representatives were just as effective as     09:24:26

Page 33

more experienced Zuora sales representatives, can you?

A.   I'm sorry, you're saying -- could you repeat the question?

Q.   Did you do any analysis of Zuora sales representatives productivity?          09:24:38

A.   No.

Q.   So you cannot say as a factual matter, that newer Zuora sales representatives were just as effective as more experienced Zuora sales representatives, correct?          09:24:52

A.   I cannot.

Q.   And it could be true that new sales representatives at Zuora were less than half as productive as the more experienced Zuora sales representatives, right?          09:25:01

A.   Could be.

Q.   And you've not undertaken any investigation to determine whether, in fact, new sales representatives were less than half as productive as the more experienced Zuora sales representatives, right?          09:25:13

A.   That's right.

Q.   And it could be true that to the extent that new Zuora sales representatives were less productive          09:25:24

Page 34

than more experienced Zuora sales representatives that at least part of the reason for the relative lack of productivity was unrelated to Keystone integration issues, right?

A.   I don't have an opinion on that one way or        09:25:44 the other.  I think the sales -- the sales force, as a sales force, was obviously an issue that they identified as a headwind, but the product integration issue is what I found was impacting both Billing as well as RevPro revenues when I looked at both the          09:26:18 statements that were made as well as other information that I have in my report, for instance I looked at the head count that's in the capacity models and the changes to head count and I found there that the Billing head count was being reduced,        09:26:36 as well as RevPro head count.

Well if you've got inexperienced salespeople that don't know why you've put a pause on hiring, which is why the head count is going down.  And so to me yes, certainly this statement could very well be         09:26:57 true that Mr. Tzuo says newer reps are less than half as productive as more experienced reps, but that particular issue in terms of impacting the guidance doesn't seem to be all that significant.

Q.   Fair enough.  My point is simply that you       09:27:20

Page 35

can't say every single aspect of the new sales representatives relative lack of productivity was due to the Keystone integrations, correct?

A.    If you're talking about sales representatives productivity, that may be the case.    09:27:39 I certainly can't say that their productivity necessarily was or was not -- whatever productivity was, it is what it was, but the point is what actually impacts the guidance is the separate issue.

Q.    But it's possible that newer sales    09:28:03 representatives were just simply not as effective at their jobs compared to more experienced sales representatives, regardless of what was happening with Keystone, right?

A.    That could very well be the case, yes.    09:28:13

Q.    In Paragraph 11 of your report you state that the documents you've reviewed in reaching your opinions which are cited through this report included in Appendix B are consistent with the assumptions that you've been asked to make.  And I didn't read    09:28:30 that verbatim, but I think this is what we were talking about before is that you said you look at stuff that's consistent with your opinion -- your assumption, right?

A.    Yes.    09:28:41

Page 36

Q.   And footnote 19, which you directed me to earlier, that cites to two specific documents, and the first one is the fiscal year 2020, 10-K?

A.   Yes.

Q.   Do you know when the fiscal year 2020, 10-K   09:28:57 was issued?

A.   After fiscal year 2020.  I don't know if they were an accelerated file at the time, but some time after FY 2020 ended.

Q.   So the document in footnote document that   09:29:11 the fiscal year 2020, 10-K, that was issued some point after May 31, 2019, correct?

MR. GILMORE:  Object to form.

THE WITNESS:  Yes.

BY MR. CASAMASSIMA:                               09:29:24

Q.   That's after the class period in this case, right?

A.   Yes, but it covers the class period.

Q.   Do you know the document was from outside the class period when you cited it in your report?   09:29:36

A.   Yes.

Q.   In any event you quote the statement from the 10-K that says:  "Our future revenue growth also depends on expanding sales and renewals of subscriptions to our solution with existing   09:29:53

Page 37

customers.  If our existing customers do not expand

their use of our solution over time or do not renew

their subscriptions, our revenue may grow more slowly

than expected, may not grow at all or may decline.

Our success, in part, is dependent on our ability to          09:30:15

cross-sell Zuora RevPro products into our existing

Zuora Billing customers.  If we experience delays in

integration or implementation of these products,

revenue cross-selling may grow more slowly or may not

grow at all."                                                09:30:43

      Do you see that?

    A.    I do.

    Q.    So this statement attributes potential

revenue decline to, in part, cross-selling and says

that a delay in integration may impact cross-selling,        09:30:51

right?

    A.    Yes.

    Q.    Explicitly says, Zuora's success is only in

part due to its ability to cross-sell, right?

    A.    Yes.                                             09:31:05

    Q.    It doesn't say "entirely," it says "in

part," correct?

    A.    It does say in part, correct.

    Q.    So Zuora's success would only be in part

impacted by an integration delay, there would be            09:31:15

Veritext Legal Solutions
866 299-5127

other factors impacting Zuora's financial success for
fiscal year 2020 as well, right?

MR. GILMORE:  Object to form.

THE WITNESS:  Certainly there will be.

BY MR. CASAMASSIMA:                              09:31:29

Q.   And Zuora's entire business was not selling
Billing and RevPro.  They were the products, right?

A.   They were.

Q.   Do you know how much of Zuora's business in
May of 2019 was RevPro sales?                    09:31:39

A.   I could go back to the exhibits to find out,
if you're asking about FY 2020.

Q.   Right, FY 2020.  Do you know what percentage
of Zuora's sales were of RevPro?

A.   I don't recall off the top of my head.      09:32:00

Q.   That's nowhere in your report, correct?

A.   If it's for FY 2020, no.

Q.   So the actual amount of RevPro sales by
Zuora is not a basis on which you rely for your
opinion, correct?                                09:32:22

A.   In terms of percentage sales, no, it's not,
not in terms of the actuals.  No, we looked at
forecasts.

Q.   Do you know what other products Zuora sold
in addition to Billing and RevPro?              09:32:39

Page 39

A.   In addition to Billing and RevPro, is that what you're asking?

Q.   Yes.

A.   There were some additional products.  They are listed in the 10-K.  Off the top of my head, I don't recall what they are.  They obviously weren't significant enough to merit as much discussion as Billing and RevPro did, but there were other products.

Q.   Would it affect your analysis in this case if you knew RevPro was only 1 percent of Zuora's sales?

A.   It doesn't, because what we're talking about here is the impact on guidance.  So no, it's the actuals, if the actual turns out in 2020 to be 1 percentage or another, that's separate from what we're looking at here.

Q.   Do you think it would be reasonable to assume that all the sales execution issues referred to in the May 30 earnings call were related to Keystone integration, if only 10 percent of Zuora's sales were RevPro?

A.   It's -- the findings that I saw is that RevPro and product integration, Keystone product integration had an impact that management was

09:32:48

09:33:02

09:33:23

09:33:36

09:34:02

Page 40

reacting to in terms of adjusting the Billing head count and adjusting the RevPro head count and so those are all important factors that I considered.

I think what percentage RevPro had out of the total, probably is a function of the Keystone integration problems.  So it's not a very large percentage, then in all likelihood it's because of Keystone integration.

Q.   But you don't know for a fact, right, you didn't do that investigation, did you?

A.   I was not asked to look at how FY 2020 turned out.  I was asked to again, look at Mr. Dages report, and Mr. Dages deals with the guidance that was given in May of -- FY 2020.

Q.   But you did no work to assess when any particular percentage of Zuora's sales were attributable to RevPro because of the status of the integration, correct?

MR. GILMORE:  Object to form.

THE WITNESS:  I'm sorry, what time frame are you talking about?  Are you talking about historically as of FY 2020 or where are you?

BY MR. CASAMASSIMA:

Q.   The relevant time period for the lawsuit, the class period.

Page 41

A.   The class period, okay.  Well, the issues that I was asked to look at during the class period was the guidance that Mr. Dages looks at and so to the extent that RevPro integration issues impact that guidance, that's what I was asked to look at.

09:35:58

Q.   Do you still think it would be reasonable to assume that all the sales execution issues referred to in the May 30 earnings column were related to Keystone integration, if only 1 percent of Zuora's sales were of RevPro?

09:36:15

A.   Yes, because you're equating some actual sales to where we actually have -- well we know there is an integration issue.  And so if RevPro sales are low, actual historical RevPro sales are low, we know why.  It's because there was an integration problem and it was not as successful, nearly as successful as what management hoped it would be.

09:36:37

Q.   You don't know that through your own work, do you?

A.   I know that RevPro was acquired with the understanding that it would be across sold to the Billing's customers initially and then used as a catalyst to go forward from there, so yes, that's in the strategic plans, it's in the minutes.  So yes, I know that.

09:36:53

09:37:15

Page 42

THE REPORTER:  Before you go on, a point of clarification, is Billings a product or are you talking about like billings?  I want to be clear on that.

MR. CASAMASSIMA:  Billings with a capital "B" is a product, and RevPro, like you said, capital "R" and capital "P."

THE REPORTER:  So Billings is a product.

BY MR. CASAMASSIMA:

Q.  You've done no analysis to assess the impact  09:37:40 of product integration delay on the overall sales of RevPro, correct?

A.  No.  I have done analysis, particularly with regard to the head count issue.  The head count in the past model, yes.  That all ties into professional  09:38:02 services sales.

Q.  But you haven't done -- you haven't developed any sort of a model that would calculate the correlation between integration delay and RevPro sales, right?  09:38:18

A.  A model that calculates the integration -- I'm sorry, what were you asking in terms of a model?

Q.  You don't have a model that would calculate the impact on RevPro sales from any purported integration delay, right?  09:38:39

Page 43

A.   I was not asked to prepare that type of model.  So no, I don't have a model that calculates that.  I just saw what Mr. Dages attempted.

Q.   You've looked at some Zuora documents in the Dages report and you can make some inferences from that about RevPro sales as it relates to integration, but you haven't done any actual work that would calculate the correlation between integration and the RevPro sales, right?          09:39:03

A.   I guess I'm confused as to what you mean by correlation.  Correlation is a statistical concept.  Are you asking if I've run a statistical calculation that correlates some type of a metric for integration issues with RevPro?          09:39:21

Q.   That's exactly what I'm asking, yes.          09:39:38

A.   I don't even know if that can be done, but no, I have not.

Q.   Let's look at the other documents that you cited in footnote 19.

MR. CASAMASSIMA:  Let's call that Exhibit 47, if you want to put that up, Noah.          09:39:56

(The document referred to was marked as Exhibit 47 for identification and is attached hereto.)

MR. GUINEY:  That should be in your folder          09:40:09

Page 44

now.

MR. CASAMASSIMA:  We'll go a few more minutes and then we'll take a morning break.

THE WITNESS:  I'm at footnote 19.

BY MR. CASAMASSIMA:                                    09:40:28

Q.   What's been labeled Exhibit 47, it's Bates numbers ZUO_00001166-1192 and I'm focusing your attention at pages 176-177.  That's where your quote is in footnote 19 of your report, right -- let me ask a better question.                                          09:40:59

You quote Exhibit 47 at pages 176-177 in the last sentence of your footnote 19, correct?

A.   I think so.  The last sentence of footnote 19?

Q.   Let me do it this way.  Footnote 19 reads,     09:41:35 first sentence, it says page 8 of your report:  "The documents I've reviewed in reaching my opinions, which are cited throughout this report and include Appendix B, are consistent with your assumption."

Do you see that?                                    09:41:51

A.   Yes.

Q.   And the last cite, you cite two documents, the second of which is ZUO_00001166-192 at 176-177.

Do you see that?

A.   I do.                                            09:42:09

Page 45