# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
-----------------------------------------------------------------x
                                                                 :
CASEY ROBERTS, Individually and On            :  Case No. 3:19-cv-03422-SI
Behalf of All Others Similarly Situated,      :
Plaintiff,                                    :
                                              :
                                              :
v.                                            :
                                              :
ZUORA, INC., TIEN TZUO, and TYLER             :
                                              :
SLOAT,                                        :
                                              :
Defendants.                                   :
-----------------------------------------------------------------x
```

# EXPERT REPORT

## of

## PROF. STEVEN DAVIDOFF SOLOMON

August 5, 2022

CONFIDENTIAL

# Table of Contents

I.    Introduction................................................................................................1

II.   Qualifications............................................................................................1

III.  Assignment ...............................................................................................4

IV.   Summary of Opinions................................................................................5

V.    Factual Background on Zuora, Inc..............................................................6

VI.   Disclosure Custom and Practices in Middle-Market Capitalization Companies.........10

    A.    Overview of Disclosure Requirements for Middle-Market Capitalization Companies...................................................................11

        1.   Registration Statement on Form S-1 and Other Forms S ...................12

        2.   Annual Report on Form 10-K.............................................................13

        3.   Quarterly Reports on Form 10-Q........................................................14

        4.   Current Reports on Form 8-K.............................................................14

        5.   Regulation S-K Disclosure Requirements ..........................................15

    B.    Custom and Practices of Middle-Market Capitalization Companies in Preparing Required Disclosure in SEC Filings and Other Disclosures.......................16

        1.   Process of IPO Disclosure in an Underwritten Offering ....................16

        2.   Process of Preparing Periodic SEC Filings.........................................17

        3.   Process of Preparing Voluntary Disclosures.......................................20

VII.  Opinion 1: Zuora's practices and processes for preparing disclosures were robust and well-designed, and comparable to custom and practices utilized by middle-market capitalization companies.  Such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to product development and usage. ...25

    A.    The Structure of Zuora's Disclosure Process....................................26

        1.   Board and Executive Oversight in Determining Zuora's Disclosures.26

        2.   The Committee Structure of Zuora's Disclosure Process....................28

        3.   Zuora's Other Disclosure Participants.................................................31

    B.    The Zuora Disclosure Process ..........................................................32

        1.   Zuora's IPO Disclosure Process .........................................................32

        2.   Periodic Disclosures...........................................................................34

        3.   Voluntary Disclosures.........................................................................35

    C.    First Opinion on Zuora's Disclosure Practices and Processes...........39

VIII. Opinion 2: Zuora's disclosures relating to products and product integration were generated through Zuora's disclosure practices and processes.  During the Class Period, Zuora relied on these disclosure practices and processes to regularly assess

CONFIDENTIAL

Zuora's disclosures relating to products and product integration.  Such practices and processes provided investors with a rich source of relevant information. ...................39

A.    Zuora's Disclosure Practices Relating to Factors Affecting Product Integration and Products .........................................................................................................40

1.    Zuora's Disclosures During the IPO Process Relating to Factors Affecting Products and Product Integration ..................................................41

2.    Zuora's Periodic Reports Relating to Factors Affecting Product Integration and Products ...................................................................................44

3.    Zuora's Voluntary Disclosures Relating to Factors Affecting Product Integration and Products ...................................................................................47

B.    Zuora's Disclosure Process Relating to Factors Affecting Products and Product Integration ................................................................................................55

1.    Process for IPO SEC Filings ................................................................56

2.    Process for Earnings Call Q1 2019, Q1 2019 Form 10-Q filing, Earnings Call Q2 2019, and Q2 2019 Form 10-Q filing ................................56

3.    Process for Earnings Call Q3 2019, and Q3 2019 Form 10-Q filing ...60

4.    Process for Earnings Call Q4 2019, and Fiscal Year 2019  Form 10-K Filing  61

5.    Process for Earnings Call Q1 2020 .......................................................71

C.    Second Opinion on Zuora's Disclosure Practices and Processes Relating to The Factors Affecting Product Integration and Products ...........................................72

IX.    Opinion 3: Zuora's practices and processes for updating of guidance, and preparation of earnings releases and related disclosures incorporated issues related to products and product integration, and were comparable to custom and practices utilized by middle-market capitalization companies.  Such practices and processes provided a sound basis for Zuora's executives to rely on the guidance, earnings releases, and related disclosures that Zuora then disclosed to investors. .....................................................72

A.    Zuora's Process for Preparation of Guidance and its Relation to Product Integration and Product and Quarterly Sales ................................................................73

1.    Fiscal Q1 2019 .....................................................................................75

2.    Fiscal Q2 2019 .....................................................................................76

3.    Fiscal Q3 2019 .....................................................................................77

4.    Fiscal Q4 2019 .....................................................................................78

5.    Fiscal Q1 2020 .....................................................................................82

B.    Zuora's Disclosures Related to Guidance, Including Products and Product Integration Information ................................................................................................84

1.    Fiscal Q1 2019 .....................................................................................86

2.    Fiscal Q2 2019 .....................................................................................86

3.    Fiscal Q3 2019 .....................................................................................87

4.    Fiscal Q4 2019 .....................................................................................89

CONFIDENTIAL

5.      Fiscal Q1 2020 ....................................................................................90

6.      Analyst Commentary on Q1 2020 Earnings Call Disclosures.............91

C.    Third Opinion.................................................................................................92

X.   Conclusions..........................................................................................................92

CONFIDENTIAL

## I.    Introduction

1.    I have been asked to prepare this report by Wilmer Cutler Pickering Hale and Dorr LLP, counsel for Zuora, Inc. ("Zuora," or the "Company"), Tien Tzuo, and Tyler Sloat ("Individual Defendants" and, collectively with Zuora, the "Defendants") for *Roberts v. Zuora, Inc., et al.*, 3:19-cv-03422-SI.[1]  In particular, I have been asked to (a) provide information and background on the disclosure custom and practices of middle-market capitalization companies;[2] and (b) review background information and offer my opinions related to Zuora's disclosure processes and practices as well the information environment related to Zuora's overall disclosure during the period from April 12, 2018 to May 30, 2019, inclusive (the "Class Period").[3]

## II.    Qualifications

2.    I am the Alexander F. and May T. Morrison Professor of Law at the University of California, Berkeley School of Law.  I graduated from University of Pennsylvania in 1992 with a Bachelor of Arts degree.  I received my J.D. from Columbia University School of Law in 1995, and a Masters of Finance from London Business School in 2005.  I have been admitted to the New York bar since 1996.

3.    I teach or have taught classes in Business Associations, Capital Markets, Contracts, Mergers & Acquisitions ("M&A"), Securities Regulation and Law, and Business & Accounting.  My academic research focuses on the intersection of law, economics, and finance with a particular focus on economic principles as applied to corporate law and governance, M&A, and capital markets.  I have written and been published extensively on these topics. Seven of my law review articles have been selected by scholars in the field as being among the "top ten" articles published in corporate and securities law in their respective years. Additionally, I have written for national publications, such as *The Atlantic*, testified before the U.S. Senate, and frequently been quoted in the national media on issues related to capital

---

[1]    Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *Casey Roberts, individually and on behalf of all other similarly situated v. Zuora, Inc., et al.*, Case No. 33:19-cv-03422-SI, November 8, 2019 ("Amended Complaint").

[2]    By using the term "middle-market capitalization companies" in the context of disclosure requirements and custom and practices, I mean publicly traded companies with a market capitalization of $1 billion to $10 billion.  This is in accordance with the definition utilized by the Ohio State University's National Center for the Middle Market.  "Mid-Year 2022 Middle Market Indicator," National Center for the Middle Market, 2022.  I am a member of the center and was an advisor to this center while I was a professor at Ohio State.  I have also received multiple grants from this center to study middle-market capitalization companies.

[3]    Amended Complaint, ¶ 2.

markets and disclosure. Starting from 2007, I have been the author of a regular column for *The New York Times* as the "Deal Professor," which primarily focuses on corporate issues.

4. Before becoming a law professor, I was a corporate attorney for almost a decade practicing at the law firm of Shearman & Sterling and the London law firm of Freshfields Bruckhaus Deringer. I practiced at Shearman & Sterling from 1995 to 2002 and at Freshfields Bruckhaus Deringer from 2002 to 2004. From 2000 to 2004, I practiced in London. In my practice, I regularly represented public companies, private companies, and other firms involved in a wide array of corporate matters. In all, I worked on over $100 billion worth of transactions. I also regularly advised corporate entities on issues associated with acquisitions, divestitures and asset transfers. I also regularly advised middle-market capitalization companies on issues associated with disclosure requirements. As part of my practice, I also regularly advised clients on securities law issues, including custom and practices related to disclosure of information by U.S. public companies.

5. Since becoming a law professor, I have regularly consulted and spoken on practical and theoretical issues involving corporate law, M&A, and securities regulation at law schools and practitioner-oriented events. For example, I have served as scholar in residence at Widener University School of Law in Wilmington, Delaware, where I spoke on corporate law with commentary from Chief Justice Leo E. Strine, Jr., formerly of the Delaware Supreme Court. I have three times been named one of the 100 most influential governance professionals and institutions in the country by the National Association of Corporate Directors. I was also named as one of the Top 10 Most-Cited Corporate & Securities Law Professors according to data prepared by Professor Brian Leiter of the University of Chicago Law School.[4] I am also one of the top ten most cited academics at the University of California, Berkeley School of Law.[5]

6. I regularly speak and lecture on matters associated with my research and experience. I also advised the American Bar Association Subcommittee on Public Company Acquisitions in the development of a model public company merger agreement and provided detailed commentary on their model agreement. My writings are regularly relied upon by courts to decide legal cases. For example, in *In re Trulia, Inc. Stockholder Litigation*,[6] the Delaware

---

[4] "20 Most-Cited Corporate & Securities Law Faculty in the U.S., 2016-2020," *Brian Leiter's Law School Reports*, October 20, 2021, https://leiterlawschool.typepad.com/leiter/2021/10/20-most-cited-corporate-securities-law-faculty-in-the-us-2016-2020.html.
[5] "Top 50 law faculties in scholarly impact, 2021," *Brian Leiter's Law School Reports*, August 24, 2021, https://leiterlawschool.typepad.com/leiter/2021/08/top-50-law-faculties-in-scholarly-impact-2021.html.
[6] *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884, Del. Ch. (Jan. 22, 2016).

Chancery Court held that it would not award a fee for a certain type of settlement in merger litigation known as "disclosure only" settlements. The court relied upon my article analyzing disclosure related to merger litigation, "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform,"[7] for this conclusion.

7.     In addition, I have advised the Securities and Exchange Commission (the "SEC") with respect to a charging decision involving disclosure and also served as an expert for the SEC on another matter.[8] I was also an expert in the Delaware Court of Chancery matter of *AB Stable VIII LLC v. MAPS Hotel and Resorts One LLC.*[9] This September–November 2020 case concerned a buyer attempting to renege on a purchase of a private company by claiming a material adverse change had occurred. In his *AB Stable* opinion, Vice Chancellor Laster relied on my extensive empirical and theoretical analysis of the purchase agreement's material adverse change clause to adopt my position that no MAE had occurred.

8.     In the course of my academic research, I have written extensively on corporate governance, securities regulation and M&A.[10] My book on corporate law entitled *Gods at War:*

---

[7]   Jill E. Fisch et al., "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform," *Texas Law Review* 93, no. 557, 2015, pp. 557–624.

[8] I filed an expert report on behalf of the SEC in *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D.N.Y.).

[9]   *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, CV 2020-0310-JTL, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020), p. 144.

[10]   Articles and book chapters I have written on corporate governance, securities regulation, capital markets, or M&A include: Steven Davidoff Solomon and Randall S. Thomas, "The Rise and Fall of Delaware's Takeover Standards," *European Corporate Governance Institute (ECGI) - Law Research Paper No. 329*, 2016; Steven Davidoff Solomon and Randall S. Thomas, "What Do We Know About Law Firm Quality in M&A Litigation?," in *Research Handbook On Representative Shareholder Litigation*, eds. Sean Griffith et al., (UK: Edward Elgar Publishing, 2018); Claire A. Hill et al., "Mergers and Acquisitions: A Cyclical and Legal Phenomenon," in *Research Handbook On The Economics Of Corporation Law*, ed. Claire Hill and Steven Davidoff Solomon, (UK: Edward Elgar Publishing, 2016); Steven Davidoff Solomon, "Takeover Theory and the Law and Economics Movement," in *Research Handbook On The Economics Of Corporation Law*, eds. Claire Hill et al. (UK: Edward Elgar Publishing, 2012); Steven Davidoff Solomon, "The Private Equity Contract," in *The Oxford Handbook Of Private Equity*, ed. Douglas Cumming, (Oxford, UK: Oxford University Press, 2012); Steven Davidoff Solomon et al., "Fairness Opinions in Mergers and Acquisitions," in *The Art Of Capital Restructuring  Creating Shareholder Value through Mergers and Acquisitions*, ed. H. Kent Baker and Halil Kimaz, (Hoboken, NJ: John Wiley & Sons, 2011); Steven Davidoff Solomon, "Fairness Opinions: Thoughts, Perspectives and Legal Doctrine," in *Fairness Opinions*, ed. Wolfgang Essler and Sebastian Lobe, (Stuttgart: Schäffer-Poeschel-Verlag, 2008); C.N.V. Krishnan, et al., "The Impact on Shareholder Value of Top Defense Counsel in Mergers and Acquisitions Litigation," Working Paper, 2017; Matthew Cain et al., "Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers," *Journal of Financial Economics* 124, no. 3, 2017, pp. 464–485; C.N.V. Krishnan et al., "Who are the Top Law Firms? Assessing the Value of Plaintiffs' Law Firms in Merger Litigation," *American Law And Economics Review* 18, no. 1, 2016, pp. 122–154; Matthew D. Cain and Steven M. Davidoff Solomon, "Delaware's Competitive Reach," *Journal of Empirical Legal Studies* 9, no. 1, 2012, pp. 92–128; Matthew D. Cain et al., "Does Revlon Matter: An Empirical and Theoretical Study," *California Law Review* 108, no. 6, 2020; Matthew D. Cain et al., "The Shifting Tides of Merger Litigation," *Vanderbilt Law Review* 71, no. 2, 2018, pp. 603–640; Jill E. Fisch et al., "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform," *Texas Law Review* 93, no. 557, 2015, pp. 557–624; Matthew D. Cain and Steven Davidoff Solomon, "A Great Game: The Dynamics of State Competition and Litigation," *Iowa Law Review* 100, no. 456, 2015, pp. 101–137; Matthew D. Cain et al., "Broken Promises: Private Equity Bid Failures and the Limits of Contract," *Journal of Corporate Law* 40, no. 3, 2015, pp. 565–598; Matthew D. Cain and Steven M. Davidoff, "Form Over Substance? The Value of Corporate Process and Management Buy-Outs," *Delaware Journal of Corporate Law*, no. 36, 2011; Steven M. Davidoff and David Zaring, "Regulation by Deal: The Government's Response to the Financial Crisis," *Administrative Law Review* 61, no. 3, 2009, pp. 463–541; Steven Davidoff Solomon, "The Failure of Private Equity," *Southern California Law Review* 82, 2009, pp. 481–546; Steven M. Davidoff, "The SEC and the Failure of Federal, Takeover Regulation," *Florida State University Law Review* 34, no. 2, 2007, pp. 211–269; Steven Davidoff Solomon, "Fairness Opinions," *American University Law Review* 55, 2006, pp. 1557–1625; Matthew D. Cain et al., "Mootness Fees," *Vanderbilt Law Review* 72,

*Shotgun Takeovers, Government by Deal and the Private Equity Implosion* (Wiley 2009) extensively addresses these issues in the context of the 2008 financial crisis.[11] I have also edited three scholarly books on corporate law. The first of these was the two-volume *Law & Economics of Mergers & Acquisitions*, the second is *The Research Handbook on Mergers & Acquisitions*, and the third is *The Corporate Contract in Changing Times: Is the Law Keeping Up?* I am a co-author of a casebook titled "Mergers and Acquisitions, Law, Theory, and Practice." The book aims to provide those involved in M&A (practitioners, and law students seeking to practice in the area) with knowledge regarding custom and practices within the transacting community, including merger litigation, deal documentation, structuring, appraisal rights and valuation, accounting, negotiations, and regulation.

9.    I am also a director of Social Capital Suvretta Holdings Corp. IV, a special purpose acquisition company ("SPAC") which is quoted on the Nasdaq stock exchange. I am a member of the SPAC's audit, nominating and governance committees. I am chairman of the company's audit committee.

10.    My further qualifications are detailed in my curriculum vitae, which is annexed hereto as **Appendix A**. A list of the matters in which I have submitted an expert report, or testified as an expert at trial or by deposition in the last four years is included in **Appendix B** to this report.

## III.    Assignment

11.    I understand that this class action involves allegations of violation of Section 10(b) and Rule 10b-5 of the Exchange Act against the Defendants, as well as allegations of violation of Section 20(a) of the Exchange Act of 1934 ("1934 Act") against the Individual Defendants. The action is brought on behalf of a proposed class that includes "all those who purchased or otherwise acquired the common stock of Zuora between April 12, 2018 and May 30, 2019, inclusive" and allegedly were damaged thereby.[12] In the Amended Complaint, Plaintiff alleges that, during the Class Period, the Defendants "deceive[d] the investing public, including Lead Plaintiff and the Class, regarding, among other things, the demand for Zuora's Billing and

---

2019, pp. 1777–1816; Steven M. Davidoff and Christina M. Sautter, "Lock-up Creep," *Journal of Corporate Law* 38, no. 4, 2013, pp. 681–731; Steven M. Davidoff, "A Case Study: Air Products v. Airgas and the Value of Strategic Decision-Making," *Columbia Business Law Review*, no. 2, 2012, pp. 508–552.

[11]   Steven Davidoff Solomon, *Gods at War  Shotgun Takeovers, Government by Deal and the Private Equity Implosion*, First Edition (NJ: John Wiley & Sons, Inc., 2009).

[12]   Amended Complaint, p. 1.

RevPro products, the integration of RevPro with Zuora's core business, and the Company's sales execution."[13]  Plaintiff further alleges that these matters were not adequately disclosed. The claims allege false and misleading statements and omissions in Zuora's disclosures regarding the integrations of these products and its subscription model business.  I understand that Defendants deny the allegations of wrongdoing.  **Exhibit 1** sets forth a chronology of certain events during the class period.

12.    I have been retained by Wilmer Cutler Pickering Hale and Dorr LLP on behalf of Defendants to perform services in connection with this matter.  I have been asked to (a) provide information and background on the disclosure custom and practices of middle-market capitalization companies and (b) review background information and offer my opinions related to Zuora's disclosure processes and practices as well the information environment related to Zuora's overall disclosure during the Class Period.

13.    In the course of my engagement, I have reviewed and considered the documents set forth in the list annexed hereto as **Appendix C**.[14]  In addition, I have relied upon my education and professional experience.  I reserve the right to update this report and any opinions contained herein to the extent new information comes to my attention or in response to any expert or other reports filed by Plaintiff.[15]

## IV.    Summary of Opinions

14.    Middle-market capitalization companies like Zuora are subject to a complex regulatory environment of periodic and current reporting obligations. These requirements include procedures for ongoing compliance assessments to ensure that information that is required to be disclosed in applicable jurisdictions is in fact disclosed, and that information is funneled to the appropriate sources for disclosure.  Investors also have expectations regarding the type of information that is to be disclosed.  Thus, middle-market capitalization companies often utilize standard custom and practices in compliance with disclosure regimes in order to meet investor expectations.

---

[13]  *Id.*, ¶ 278.

[14]  In preparation of my report, I also interviewed Mr. Sloat on July 20, 2022.  I did not interview any other persons for this matter.

[15]  I am being compensated at my customary rate of $1,300 per hour.  I have been assisted in this matter by Cornerstone Research staff who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  My compensation is neither contingent nor dependent on the opinions that I offer or on the outcome of this matter.

15. In this report, I provide information and background on the role of custom and practices in disclosure by middle-market capitalization companies, including the preparation of those disclosures. After taking into account these matters and reviewing the case record requested and made available to me, I provide the following opinions, which I summarize below. It is my opinion that:

    a. *Opinion 1*: Zuora's practices and processes for preparing disclosure were robust and well-designed, and comparable to custom and practices utilized by middle-market capitalization companies. Such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to product development and usage.

    b. *Opinion 2*: Zuora's disclosures relating to products and product integration were generated through Zuora's disclosure practices and processes. During the Class Period, Zuora's disclosures were regularly assessed for updating and revision through these practices and processes. Such practices and processes provided investors with a rich source of relevant information.

    c. *Opinion 3*: Zuora's practices and processes for updating guidance and preparing earnings releases and related disclosures incorporated issues related to products and product integration, and were comparable to custom and practices utilized by middle-market capitalization companies. Such practices and processes provided a sound basis for Zuora's executives to rely on the guidance, earnings releases, and related disclosures that Zuora then disclosed to investors.

16. In the sections that follow, I further delineate my opinions. I note that I address certain relevant factual and legal matters insofar as they are relevant to my report but I am not opining on such matters.

## V.　　Factual Background on Zuora, Inc.

17. Zuora provides a cloud-based subscription management platform to businesses across multiple industries. Founded by K.V. Rao, Cheng Zou, and Tien Tzuo, Zuora was incorporated

in Delaware in 2006 and began operations in 2007.[16]  Throughout the Class Period, Zuora's headquarters were in San Mateo, California.[17]  The Company was created based on an emerging trend identified in the global economy to "shift away from product-based business models, characterized by transactional one-time sales" and move "towards recurring subscription-based business models."[18]  In fact, the Company coined the term "Subscription Economy" to define that trend.[19]  **Exhibit 2** sets forth Zuora's select products during the Class Period.

18.    The Company's objectives include deploying the subscription business model to enable any company to launch, manage, and transform into a subscription business.[20]  With customers in over 30 countries, Zuora serves various industries including technology, manufacturing, media, and telecommunications.[21]  Zuora offers customers a cloud-based software solution that automates and orchestrates the subscription order-to-cash process, including billing and revenue recognition through the use of its platform, the Zuora Central Platform; Zuora offers two flagship products, namely, Zuora Billing and Zuora RevPro, and other add-on products including Zuora CPQ and Zuora Collect.[22]

19.    Zuora began as a subscription-as-a-service enterprise focused on providing an on-demand billing and subscription management service to clients.[23]  Its earliest product, called "Z-Billing Platform," allowed customers to outsource order tracking, invoicing, and payments to Zuora.[24]  Since its creation, Zuora has been competing against technology giants such as Oracle and SAP that also offer billing and revenue management solutions, as well as against companies that offer traditional order-to-revenue solutions that focus on specific elements of the subscription revenue process, telecommunications billing systems such as Amdocs Limited, and in-house custom built systems.[25]  However, while Oracle and SAP are geared

---

[16]   Zuora, Inc., Form 10-K for the fiscal year ended January 31, 2019, filed April 18, 2019 ("Zuora 2019 10-K"), p. 7; Zuora, Inc., Prospectus, dated April 11, 2018 ("April 2018 Prospectus"), p. 51.  Zuora's fiscal year ends on January 31 of each year.  *See* Zuora 2019 10-K, p. 7; April 2018 Prospectus, p. F-7.

[17]   Zuora 2019 10-K, p. 34.

[18]   Zuora 2019 10-K, p. 2.

[19]   April 2018 Prospectus, p. 51.

[20]   Zuora defines the subscription business model as an approach for companies to do business that is centered around providing services to clients through dynamic and recurring subscriptions, rather than one-time product sales.  As a result, a company pursuing this model would seek to maximize the lifetime value of each customer relationship over time, for example, by maximizing the length of subscriptions and the number of products each client subscribes to over time.  April 2018 Prospectus, pp. 51, 67–68.

[21]   Zuora 2019 10-K, pp. 3–4.

[22]   *Id*.

[23]   Erick Schonfeld, "Zuora Aims to Be Salesforce for Online Billing; Benioff Agrees," *TechCrunch*, May 20, 2008, https://techcrunch.com/2008/05/20/zuora-the-salesforce-for-online-billing-launches/, accessed August 5, 2022.

[24]   *Id*.

[25]   Serena Saitto, "Benchmark-Backed Zuora Eyes IPO in 2018," *The Information*, October 17, 2017, https://www.theinformation.com/articles/benchmark-backed-zuora-eyes-ipo-in-2018, accessed June 21, 2022; "Oracle Buys Portal Software," *Oracle*, April 12, 2006, https://www.oracle.com/corporate/pressrelease/oracle-buys-portal-041206.html,

towards larger Fortune 500 companies,[26] Zuora's customer base typically has been broader as the Company's mission seeks to "enable all companies in the Subscription Economy to become successful," particularly including companies of all sizes, ranging from "small businesses to some of the world's largest enterprises."[27] Consistent with this mission, Zuora trademarked the term "subscription economy" in 2010, and the Company celebrated its 50th consecutive product release in 2013.[28]

20.    The "subscription economy" industry had been gaining increasing popularity in the years leading up to Zuora's IPO, offering an expanding variety of products and services to customers through subscription models.[29] During 2018–2019, the industry continued to grow at an estimated 17.3% compound annual growth rate.[30] Zuora itself has played a central role in advancing the industry and, for example, since 2016 has published the "Subscription Economy Index" ("SEI"), a benchmarking tool that tracks subscription business growth globally.[31] Data from the SEI indicate that total amounts invoiced for subscription-based products and services through the Zuora Central Platform grew at an average annual rate of 17.6% during the period January 2012 to September 2017.[32] Similarly, in 2018 Mr. Tzuo, Zuora's CEO, published a book on the subscription-based business industry titled "Subscribed: Why the Subscription Model Will Be Your Company's Future - and What to Do About It."[33] In the book, Mr. Tzuo discussed the potential for existing companies to leverage the subscription model to transform their businesses.[34]

21.    Zuora has continued to build its capabilities and expand its product offering, such as through the launch of *Z-Insights* in 2015, which allowed Zuora's customers to use the data

---

accessed June 21, 2022; "SAP Billing and Revenue Innovation Management," *SAP*, https://www.sap.com/products/billing-revenue-innovation-management.html, accessed June 21, 2022; Zuora 2019 10-K, p. 5.

[26] "Benchmark and Benioff Put $6.5 Million Into Zuora to Create a Salesforce for Online Billing," *TechCrunch*, March 13, 2008, https://techcrunch.com/2008/03/13/benchmark-and-benioff-put-65-million-into-zuora-to-create-a-salesforce-for-online-billing/.

[27] Zuora 2019 10-K, p. 40.

[28] "The Zuora Timeline," *Zuora*, https://www.zuora.com/about/, accessed June 21, 2022.

[29] "Subscription Businesses Are Booming. Here's How to Value Them," *Harvard Business Review*, December 19, 2017, https://hbr.org/2017/12/subscription-businesses-are-booming-heres-how-to-value-them, accessed June 23, 2022 ("Previously dominated by the likes of newspapers, magazines, gyms, utilities, and telecommunications firms, more products and services are being offered to more people through subscriptions than ever before. Business-to-consumer subscription businesses have attracted more than 11 million U.S. subscribers in 2017, and the industry as a whole has been growing at 200% annually since 2011.").

[30] Subscription Trade Association, "2019 State of the Subscription Commerce Economy: Annual Report," 2019, https://subta.com/wp-content/uploads/2019/10/2019_SUBTA_Annual_Report.pdf.

[31] "The Zuora Timeline," *Zuora*, https://www.zuora.com/about/, accessed June 21, 2022; "The 2022 Subscription Economy in 5 Charts," *LinkedIn*, February 19, 2022, https://www.linkedin.com/pulse/2022-subscription-economy-5-charts-tien-tzuo, accessed June 21, 2022.

[32] April 2018 Prospectus, pp. 100–101.

[33] "The Zuora Timeline," *Zuora*, https://www.zuora.com/about/, accessed June 21, 2022.

[34] "Subscriptions: Lifeblood of the Access Economy," *Forbes*, September 21, 2018, https://www.forbes.com/sites/insights-intelai/2018/09/21/subscriptions-lifeblood-of-the-access-economy/, accessed June 23, 2022.

generated by their own subscribers to deepen their business relationships further and bring on more subscribers.[35]    In 2016, Zuora employed over 600 employees and was valued at approximately $1 billion based on venture funding.[36]

22.    In 2017, Zuora acquired Leeyo Software Inc. ("Leeyo"), which had developed a revenue recognition automation solution called Leeyo RevPro.[37]    At the time, Leeyo was seen as a strategic acquisition intended to complement Zuora's own product offerings with the ultimate goal of creating a "one-stop shop for automating financial operations."[38]    That same year, Zuora also launched *Zuora Central*, its cloud-based platform to automate subscription order-to-revenue operations.[39]

23.    By late 2017, Zuora had begun preparations for an initial public offering ("IPO"), which included changes to the composition of the Company's Board of Directors, including appointing independent directors to the Zuora board.[40]    On March 16, 2018, Zuora confidentially filed its initial registration statement on Form S-1 for the sale of 11 million Class A shares in an IPO.[41]    Zuora subsequently amended this registration statement twice after receiving SEC comments.  On April 12, 2018, Zuora conducted its IPO at $14 per share, after which its stock price rose 43% to close at $20 per share on the day of the IPO, implying a valuation of approximately $2 billion.[42]    On April 16, 2018, Zuora announced the closing of its IPO and the full exercise of the underwriters' option to purchase additional shares.[43]

24.    At the time of its IPO, Zuora employed over 900 employees and had a global reach with operations in North America, Europe, Asia, and Australia.[44]    Zuora served over 950 customers,

---

[35]  Amy Feldman, "Zuora's Tien Tzuo Had A Big Idea for Software to Drive the Subscription Economy – He Almost Blew It," *Forbes*, November 4, 2015, https://www.forbes.com/sites/amyfeldman/2015/11/04/zuoras-tien-tzuo-had-a-big-idea-for-software-to-drive-the-subscription-economy-he-almost-blew-it/, accessed June 23, 2022.

[36]  Bruce Rogers, "Tien Tzuo's Zuora Set to Capitalize on Subscription Economy It Helped Build," *Forbes*, August 23, 2016, https://www.forbes.com/sites/brucerogers/2016/08/23/tien-tzuos-zuora-set-to-capitalize-on-subscription-economy-it-helped-build/, accessed June 23, 2022.

[37]  Zuora, Inc. Press Release, "Zuora Acquires Leeyo, The Leading Provider of Revenue Recognition Software, to Ease the Burden of Imminent Accounting Standards," May 10, 2017, https://www.zuora.com/press-release/zuora-acquires-leeyo/, accessed June 21, 2022.

[38]  *Id.*

[39]  "The Zuora Timeline," *Zuora*, https://www.zuora.com/about/, accessed June 21, 2022.

[40]  Alisha Green, "Exclusive: Zuora adds Salesforce's first investor to its board as it moves toward going public," *San Francisco Business Times*, June 1, 2017, https://www.bizjournals.com/sanfrancisco/news/2017/06/01/zuora-salesforce-first-investor-board-going-public.html, accessed June 21, 2022; "Benchmark-Backed Zuora Eyes IPO in 2018," *The Information*, October 17, 2017, https://www.theinformation.com/articles/benchmark-backed-zuora-eyes-ipo-in-2018, accessed June 21, 2022.

[41]  Zuora, Inc., Prospectus dated March 16, 2018, p. 1.

[42]  Jordan Novet, "Zuora prices IPO at $14 per share — valuing the company at $1.44 billion," *CNBC*, April 11, 2018, https://www.cnbc.com/2018/04/11/zuora-prices-ipo-at-14-per-share--valuing-the-company-at-1-point-44-billion.html, accessed June 21, 2022; "Subscription Biller Zuora soars 43% following IPO," *TechCrunch*, April 12, 2018, https://techcrunch.com/2018/04/12/subscription-biller-zuora-soars-43-following-ipo/, accessed August 5, 2022.

[43]  "Zuora Announces Closing of Initial Public Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares," *Businesswire*, April 16, 2018, https://www.businesswire.com/news/home/20180416006126/en/.

[44]  April 2018 Prospectus, pp. 14, 24.

including 15 of the Fortune 100 companies, in 30 different countries.[45]  Further, immediately preceding its IPO, in fiscal year 2018, Zuora reported $167.9 million in revenue, while it made significant investments in sales and marketing, infrastructure, operations, and headcount.[46]  By the end of fiscal year 2019, Zuora employed over 1,200 employees with operations across North America, Europe, Asia and Australia.[47]  Similarly, by the end of that fiscal year Zuora reported $235.2 million in revenue, an increase of 41% year-over-year.[48]  Importantly, while being able to achieve substantial growth in its revenue and expand its customer base in the 2018–2019 period, Zuora continued to be an *emerging growth* company, as defined in the JOBS Act, during the Class Period.[49]

## VI.    Disclosure Custom and Practices in Middle-Market Capitalization Companies

25.    Below I review disclosure custom and practices in middle-market capitalization companies. In addition to my experience in disclosure processes and practices, my review includes an analysis of academic literature, practitioner publications and memoranda, and industry studies on the disclosure custom and practices of publicly traded companies. Later, I assess Zuora's disclosures in the context of the relevant market information environment as well as the custom and practices of middle-market capitalization companies.

26.    In this section, I present information about custom and practices of middle-market capitalization companies operating under the federal disclosure regime.[50]  These companies are subject to mandatory periodic disclosure requirements.  However, middle-market capitalization companies typically provide additional disclosures in quarterly earnings releases and earnings calls, in addition to the required disclosures in SEC filings.

---

[45]  *Id.*, p. 2.
[46]  *Id*.
[47]  Zuora 2019 10-K, pp. 6, 16.
[48]  *Id.*, p. 44.
[49]  Zuora qualified as an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, and elected to be treated as such.  Among other things, this implied certain reduced public company reporting requirements, as I discussed in more detail in section VI.A of my report.  April 2018 Prospectus, p. 7; Zuora 2019 10-K, pp. 7, 28.
[50]  Based on my experience, study and academic scholarship, it is my view that middle-market capitalization companies with securities traded on U.S. stock exchanges are the appropriate benchmark to assess Zuora's disclosure processes and practices against.

### A.    Overview of Disclosure Requirements for Middle-Market Capitalization Companies

27.    To provide context on the relevant disclosure custom and practices, it is useful to analyze the disclosure requirements of publicly traded U.S. middle-market capitalization companies.[51] The regulatory framework applicable to companies with securities registered with the SEC is complex and substantial.  The main statutes are the Exchange Act of 1934 (the "Exchange Act"),[52] which sets forth ongoing periodic disclosure requirements, and the Securities Act of 1933 (the "Securities Act"),[53] which sets forth disclosure requirements for offers and sales of securities in the U.S.  Each of these acts prohibits material misstatements and omissions.[54] These general disclosure requirements are further implemented by SEC rules promulgated under the two acts, most prominently through Regulation S-K and Regulation S-X.[55] While Regulation S-K sets forth disclosure requirements related to registration statements in public offerings and periodic reporting forms, Regulation S-X sets forth requirements related to the form and content of the financial statements included in a filing and requires that domestic companies' financial statements filed with the SEC be prepared in accordance with U.S. GAAP.[56]

28.    Pursuant to Regulations S-K and S-X, companies with securities registered under Sections 12 and 15(d) of the Exchange Act are subject to a skein of periodic and current reporting requirements that instruct companies to provide information in registration statements and periodic forms.[57] Among other things, companies are required to disclose material information related to their business.  Within this universe of so-called "corporate registrants" or simply "registrants," companies with aggregate worldwide market value of their

---

[51]   While my opinions address custom and practices, I also include references to legal requirements.  These references are offered not because I intend to render a legal opinion about these topics (which I do not), but to provide context for my report and opinions.

[52]   15 U.S.C. § 78a, 2018.

[53]   15 U.S.C. § 77a, 2012.

[54]   "U.S. Securities Laws: Overview," *Practical Law Corporate & Securities*, https://us.practicallaw.thomsonreuters.com/3-383-6798, accessed July 26, 2022.  Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  The SEC promulgated Rule 10b-5 thereunder which further states that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading…"  Section 20 of the Exchange Act states that "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  *See* 15 U.S.C. § 78j(b), 2012; 17 C.F.R. § 240.10b-5, 2013; 15 U.S.C. § 78t(a), 2010.

[55]   17 C.F.R. § 229, 1982 (Regulation S-K); 17 C.F.R. § 210, 1992 (Regulation S-X).

[56]   *Id*.

[57]   Securities Exchange Act of 1934, as Amended through P.L. 112-158, approved August 10, 2012, pp. 111–112, 172.

public float held by non-affiliates of at least $700 million and filed at least one annual report on Form 10-K are known as large accelerated filers or well-known seasoned issuers ("WKSI") in the context of disclosure requirements.[58]  These requirements include filing specific forms with respect to registration statements for the issuance of securities, annual reports, and current reporting.  While Zuora currently qualifies as a WKSI, during the majority of the Class Period Zuora did not because it had not yet filed its first annual report.[59]

29.    During the Class Period which begins at the time of its IPO, Zuora qualified as an *emerging growth company* and elected to be treated as such.[60]  Approximately 92% of companies in 2018 undertaking an IPO were emerging growth companies.[61]  Under the emerging growth company rules, companies are permitted:

- to include less extensive narrative disclosure than required of other reporting companies, particularly in the description of executive compensation;
- to provide audited financial statements for two fiscal years, in contrast to other reporting companies, which must provide audited financial statements for three fiscal years;
- not to provide an auditor attestation of internal control over financial reporting under Sarbanes-Oxley Act Section 404(b);[62]
- to defer complying with certain changes in accounting standards; and
- to use test-the-waters communications with qualified institutional buyers and institutional accredited investors.[63]

### 1.    Registration Statement on Form S-1 and Other Forms S

30.    Form S-1 is a registration form for companies to complete registration of securities offerings, including an IPO.[64]  This is the form Zuora filed in connection with its own IPO. Form S-1 registration filings typically include detailed "line item" information about the total number of shares offered and the price per share as well as detailed information offered to investors (*e.g.,* use of proceeds, determination of offering price, dilution, selling security

---

[58]  17 C.F.R. § 240.12b-2 (2).

[59]  17 C.F.R. § 240.12b-2 (2) (ii).

[60]  A company qualifies as an emerging growth company if it has total annual gross revenues of less than $1.07 billion during its most recently completed fiscal year and, as of December 8, 2011, had not sold common equity securities under a registration statement. A company continues to be an emerging growth company for the first five fiscal years after it completes an IPO, unless one of the following occurs: (a) its total annual gross revenues are $1.07 billion or more, (b) it has issued more than $1 billion in non-convertible debt in the past three years, or (c) it becomes a "large accelerated filer," as defined in Exchange Act Rule 12b-2. *See* 17 C.F.R. § 240.12b-2.

[61]  WilmerHale, "IPO Report," 2019, p. 2.

[62]  Sarbanes-Oxley Act of 2002, Section 404(b).

[63]  "Emerging Growth Companies," *U.S. Securities and Exchange Commission*, April 28, 2022, https://www.sec.gov/education/smallbusiness/goingpublic/EGC#, accessed July 26, 2022.

[64]  "Form S-1," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/forms-1.pdf ("SEC Form S-1").

holders, plan of distribution, etc.).[65]  In addition to the securities offering information, Form S-1 includes detailed disclosure on the business of the company offering securities. Such disclosure mirrors the "line item" information that a company is required to periodically disclose on its annual reports on Form 10-K after the registration is complete.[66]  Among the "line item" disclosures, a company must disclose: (a) a description of the company's business; (b) management's discussion and analysis of financial condition and results of operation ("MD&A"); and (c) risk factors related to the company's business and operations.[67]

31.    Relative to Form S-1, Form S-3 allows a simplified process to register and issue company securities.  It is a shelf registration statement that permits multiple offerings based on the same registration process, which is typically available to larger and more seasoned companies like WKSIs.[68]  Form S-3 is available only to companies that have been subject to Exchange Act reporting requirements for at least 12 months, have filed all required reports in a timely manner for at least the last 12 months, have filed at least one annual report on Form 10-K, have not defaulted on certain payment obligations, and have an aggregate public float of common stock of at least $75 million.[69]  Form S-3 allows a company to incorporate information by reference from other regulatory forms, easing SEC review and the overall securities registration process.  Again, while Zuora currently qualifies as a filer for S-3, Zuora did not during the majority of the Class Period because Zuora was within one year of going public.

### 2.    Annual Report on Form 10-K

32.    Form 10-K includes annual audited financial statements and footnotes of the company as well as the MD&A and other "line items" required by the SEC.[70]  Disclosure is provided about the financial results of operations, risk factors, legal proceedings, executive compensation, and other material information.[71]  Audited financial statements for the applicable year must be included with this report.  Although there is overlap in the requirements for the annual report on Form 10-K and the annual report to shareholders, Form 10-K includes

---

[65]  *Id.*, pp. 4–5.  "Line item" information are specific requirements in each SEC form to make disclosures on certain topics or areas.
[66]  *Id.*
[67]  *Id.*
[68]  "Form S-3," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/forms-3.pdf ("SEC Form S-3").
[69]  SEC Form S-3, pp. 2–3.
[70]  "Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934: General Instructions," *U.S. Securities and Exchange Commission*, https://www.sec.gov/about/forms/form10-k.pdf ("SEC Form 10-K General Instructions"), pp. 8–10.  Examples of other "line items" in Form 10-K are "Business, "Risk Factors," "Unresolved Staff Comments," "Properties," "Legal Proceedings," etc.
[71]  SEC Form 10-K General Instructions, pp. 8–10.

information in a SEC form structure, while the annual report to shareholders is typically a more visually appealing publication.[72] Many companies, including Zuora, elect to use their Form 10-K as an annual report to shareholders.[73] For companies who are not WKSIs, Forms 10-K are due within 90 days after the end of the company's fiscal year.[74] Form 10-K must be signed by the registrant, its principal executive officer(s), its principal financial officer(s), its controller or principal accounting officer, and at least a majority of the board of directors or persons performing similar functions.[75] Under Sections 302 and 404 of the Sarbanes-Oxley Act, in each annual report the CEO and CFO of the reporting company must certify the accuracy of certain information in the Form 10-K at the time of filing, and must provide an assessment of the effectiveness of the control structure.[76]

### 3. Quarterly Reports on Form 10-Q

33. Form 10-Q contains unaudited quarterly financial statements, the MD&A, which provides management's continuing view of the financial results of operations for the quarter, and other information such as risk factors and legal proceedings.[77] For companies who are not large accelerated filers, Forms 10-Q are due within 45 days after the end of the company's fiscal quarter.[78] As with Form 10-K, the CEO and CFO of the reporting company must certify the accuracy of certain information in the Form 10-Q.[79]

### 4. Current Reports on Form 8-K

34. Form 8-K includes disclosures triggered by certain events that a company may experience, such as bankruptcy, material impairments, completion of acquisition or disposition

---

[72] "How to Read a 10-K/10-Q," *U.S. Securities and Exchange Commission*, January 26, 2021, https://www.sec.gov/fast-answers/answersreada10khtm.html, accessed July 22, 2021.

[73] "Annual Report," *U.S. Securities and Exchange Commission*, https://www.sec.gov/fast-answers/answers-annrephtm.html, accessed July 14, 2021.

[74] 17 C.F.R. § 249.310, 2012 (Form 10-K, for annual and transition reports pursuant to Sections 13 or 15(d) of the Securities Exchange Act of 1934); SEC Form 10-K General Instructions, p. 1.

[75] SEC Form 10-K General Instructions, p. 2.

[76] 17 C.F.R. § 240.13a-14, 2018; "Certification of Disclosure in Companies' Quarterly and Annual Reports," Securities Act Release No. 33-8124, August 29, 2002, https://www.sec.gov/rules/final/33-8124.htm, accessed July 26, 2022 ("Securities Act Release No. 33-8124"). *See also* 15 U.S.C. § 7262, 2012; "Final Rule: Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Periods," Securities Act Release No. 33-8238, June 5, 2003, https://www.sec.gov/rules/final/33-8238.htm, accessed July 26, 2022 ("Securities Act Release No. 33-8238.")

[77] "Form 10-Q General Instructions," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/form10-q.pdf, pp. 5–7.

[78] 17 C.F.R. § 249.308a, 2012 (Form 10-Q, for quarterly and transition reports under Sections 13 or 15(d) of the Securities Exchange Act of 1934.).

[79] 17 C.F.R. § 240.13a-14, 2018.

of assets, or changes in control.[80]  These enumerated items are considered significant events that require disclosure within four business days after their occurrence, with some exceptions.[81] Form 8-K also may include any exhibits, such as financial statements, press releases, or other information referenced in the description of the event.  Disclosure pursuant to Regulation Fair Disclosure ("Regulation FD") occurs in Item 7 of Form 8-K.[82]  Under this Item, selectively disclosed material information must be furnished simultaneously with the release of the material to the public or "promptly" if the release was unintentional.[83]  Item 2.02(b) requires that earnings press releases be furnished before any earnings calls with analysts.

### 5.    Regulation S-K Disclosure Requirements

35.    Regulation S-K requires disclosures in specific "line items" in registration statements and periodic results on Forms 10-K and 10-Q:[84] Some items are common across companies (*e.g.,* description of the business, legal proceedings, risk factors, etc.),[85] while others are idiosyncratic (*e.g.,* mine safety disclosures).[86]  Each item establishes a different required area of disclosure.  Notably, many of these disclosures are required when information is deemed "material" to investors. This principles-based approach relies on a company's assessment of the significance of the information in the context of that company's facts and circumstances in order to determine whether disclosure is material and necessary.  In the absence of prescriptive thresholds or bright-line tests, principles-based disclosures of a registrant are often informed by SEC Staff guidance, form instructions, comment letters, and statements, as well as disclosure custom and practices with respect to each item.  Among these "line items" are MD&A (Item 303), business description (Item 101), and risk factors (Item 105).[87]

---

[80]  "Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/form8-k.pdf ("SEC Form 8-K"), pp. 6, 7, 12, 15.

[81]  17 C.F.R. § 249.308, 2012 (Form 8-K, for current reports); SEC Form 8-K, p. 2.

[82]  SEC Form 8-K, p. 21.

[83]  17 C.F.R. § 249.308, 1968; SEC Form 8-K, p. 2 ("The information in a report furnished pursuant to Item 2.02 (Results of Operations and Financial Condition) or Item 7.01 (Regulation FD Disclosure) shall not be deemed to be 'filed' for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section, unless the registrant specifically states that the information is to be considered 'filed' under the Exchange Act or incorporates it by reference into a filing under the Securities Act or the Exchange Act. If a report on Form 8-K contains disclosures under Item 2.02 or Item 7.01, whether or not the report contains disclosures regarding other items, all exhibits to such report relating to Item 2.02 or Item 7.01 will be deemed furnished, and not filed, unless the registrant specifies, under Item 9.01 (Financial Statements and Exhibits), which exhibits, or portions of exhibits, are intended to be deemed filed rather than furnished pursuant to this instruction."). *See also* 17 C.F.R. § 243.100(a), 2011.

[84]  17 C.F.R. § 229.10–915, 2020.

[85]  17 C.F.R. § 229.101, 103, 105, 2011.

[86]  17 C.F.R. § 229.104, 2011.

[87]  17 C.F.R. § 229.101; 17 C.F.R. § 229.105; 17 C.F.R. § 229.303.

B.      **Custom and Practices of Middle-Market Capitalization Companies in Preparing Required Disclosure in SEC Filings and Other Disclosures**

1.      **Process of IPO Disclosure in an Underwritten Offering**

36.    The IPO process in an underwritten offering is complex, involves many internal and external parties, and is designed to ensure appropriate disclosure in the S-1 Registration Statement. This process can take anywhere from three to six months on average for preparation of the appropriate documents, due diligence, SEC review, as well as the IPO sale itself. The IPO process involves:

- Due diligence on the issuer
- Initial preparation of the S-1 Registration Statement
- SEC review process
- Roadshow and analyst presentations
- IPO book-building

37.    This process is carefully coordinated. It starts initially with a kick-off meeting with the issuer, its investment banker, and counsel. Due diligence is then conducted by all parties and the information collected is then utilized to draft the Form S-1 Registration Statement. This is a careful process that involves months of meetings and further due diligence with all of the above parties as well as accountants and company representatives. Studies have shown that the information in the Registration Statement provides more accurate IPO pricing.[88]

38.    In preparing the registration statement the issuer will rely extensively on its internal resources. This can include the following individuals or entities:

- Board of Directors
- Audit Committee
- CEO and CFO
- Coordinating drafting employees, including in-house counsel
- Internal finance and accounting employees
- Operational employees
- Investor relations employees
- Public relations employees

39.    In addition, the issuer will also rely on its outside advisers who provide primary guidance and support. These advisers include:

- Issuer's counsel
- Investment bank underwriter
- Issuer's auditor

---

[88]   Kathleen W. Hanley and Gerard Hoberg, "The Information Content of IPO Prospectuses," *The Review of Financial Studies* 23, no. 7, June 2010, pp. 2821–2864 at p. 2821.

- Underwriter's counsel[89]

40.    Once the draft Registration Statement is complete it will be filed with the SEC.  As an emerging growth company, Zuora could and did elect to file this initial draft confidentially.  At least one academic study has found that the confidential review process creates value and more high value disclosure.[90]  The SEC will then review and comment on the draft, reviewing all sections for compliance with SEC rules and regulations.  A comment letter will be provided (which is also confidential) and the issuer and its advisers will respond with a revised filing.  This confidential review-revise-resubmit process repeats on average 2.6 rounds and lasts about 108 days.[91]  By comparison, Zuora's process was scheduled to include four rounds of comments over approximately 80 days.[92]  Once the SEC is satisfied that the issuer has adequately responded to its comments, the SEC will act to accelerate the effectiveness of the Registration Statement.

41.    Once the review is complete, the registration statement is filed publicly.  The issuer together with its bankers will conduct investor roadshow and analyst presentations, which involve presentation of an extensive slide deck.  At the roadshow and analyst presentations, the issuer and its bankers will present the investment thesis and respond to questions.   Investors and analysts will assess these responses and decide whether to invest.

42.    Once the investment bank is satisfied that there is enough interest, it will build its book of initial orders.  The issuer will then file a final prospectus.  Counsel for both the issuer and underwriter will also provide Rule 10b-5 opinions to assert that there is no material misstatement or omission in the registration statement.  The SEC will then grant effectiveness and the initial shares will be sold.  Trading of the issuer will commence the next day.

### 2.    Process of Preparing Periodic SEC Filings

43.    In my experience and study, the process of preparing disclosures in annual and quarterly reports involves a number of internal and external individuals and organizations, which are substantially similar to those outlined above in the discussion of disclosure in the IPO process.  While this process varies from company to company, the general goal is preparing disclosure

---

[89]  Latham and Watkins, "US IPO Guide," June 15, 2022, https://www.lw.com/admin/upload/SiteAttachments/US%20IPO%20Guide%202022.pdf, p. 4.
[90]  Mengnan Zhu, "Does the Confidential IPO Registration Process Create Value?" August 18, 2021.
[91]  *Id.*, p. 8.
[92]  Goldman Sachs & Co. LLC, "Discussion Materials for Project Zebra: Overview of Key Workstreams and Path to IPO," February 2018 ("Project Zebra Timeline Feb 2018"); Project Zebra Timeline.

based upon reasonable collection processes.  In this section, I review these general principles, noting that they may vary from company to company, and focus on the general aims and principles.

44.    In middle-market capitalization companies, the determination and preparation of disclosure is generally coordinated by dedicated employees, who prepare and organize the information necessary to disclose in SEC filings.  This can include the following individuals or entities:

- Board of Directors
- Audit Committee
- CEO and CFO
- Disclosure Committee (if it exists)
- Coordinating drafting employees, including in-house counsel
- Internal finance and accounting employees
- Operational employees
- Investor relations employees
- Public relations employees
- Outside auditors
- Outside counsel[93]

45.    Typically, the process of preparing annual reports will follow a set path of (1) information collection, (2) drafting, (3) internal circulation and revision, (4) external circulation and revision, (5) review by directors and officers, and (6) execution and filing.[94]

46.    The process of defining public disclosures often begins with finance and accounting, in-house counsel, investor relations ("IR"), or another relevant internal division or function typically acting as informal coordinator(s) and updating disclosures from prior years or quarters.  These coordinator(s) will retain information that remains unchanged and mark sections that need to be updated by the appropriate internal operational or financial employees.  These coordinator(s) will then circulate the document to these employees to collect information and flag any potential new material for disclosure.  In this process, in-house counsel is involved in drafting and is assisted by employees and managers in operational units.  Depending upon the type of disclosure to be prepared, employee involvement may vary.  For example, as the most extensive disclosure document, an annual report will typically require greater cross-functional involvement.

---

[93]   Practical Law Corporate & Securities, "Preparation of Management's Discussion and Analysis of Financial Condition and Results of Operations," 2022.
[94]   *Id*.

47.     Moreover, the initial language of the MD&A in annual reports can be drafted by finance, accounting, and IR employees with the assistance of in-house counsel, and reviewed and edited by the disclosure or audit committee as applicable (or individual members of such committee), if one has been created.[95]  The SEC and the federal securities laws do not require that companies establish a disclosure committee, and the decision to establish one is thus left to the company itself.[96]  While a formal committee with explicitly designated responsibilities may or may not be appropriate at a particular company, identifying the individuals who should play a role in the process is a crucial aspect of ensuring that adequate procedures are in place. Generally, such a team will be broad-based and include a company's senior officers and finance personnel, the heads of various operating functions, and the company's counsel.

48.     As information is returned to the coordinator(s), they will revise the document, add text or new information as appropriate, and recirculate a draft of the full document to senior operational employees, senior management, and in-house counsel for further review and comment.  Drafts of annual reports are also commonly reviewed by IR and public relations ("PR") personnel to ensure that they accurately reflect the company's positions on certain issues.[97]

49.     Outside advisers are also sometimes involved in the preparation of disclosures.  To ensure consistency with financial statements, independent auditors often review disclosures in annual reports that are not subject to audit.  One academic study has shown that MD&A disclosures in annual reports are more textually similar when firms share the same auditor, suggesting that auditors influence the text of the MD&A through their review.[98]  In addition, outside legal counsel is sometimes brought in to review draft disclosures and advise on certain issues, especially in the case of specific line items (*e.g.*, MD&A, business description, and risk factors) that have been recently subject to revision as a response to SEC rules and guidance. As part of the process for determining the scope of the disclosures, outside legal counsel and other parties involved in the process will review not only the applicable SEC rules and guidance

---

[95]  The disclosure committee can have a variety of similar names. Other names include the SEC reporting and technical accounting committee, SEC reporting and financial reporting committee, financial reporting committee, and similar variants.
[96]  Securities Act Release No. 33-8124 ("[W]e are not requiring any particular procedures for conducting the required review and evaluation. Instead, we expect each issuer to develop a process that is consistent with its business and internal management and supervisory practices. We do recommend, however, that, if it has not already done so, an issuer create a committee with responsibility for considering the materiality of information and determining disclosure obligations on a timely basis. As is implicit in Section 302(a)(4) of the Act, such a committee would report to senior management, including the principal executive and financial officers, who bear express responsibility for designing, establishing, maintaining, reviewing and evaluating the issuer's disclosure controls and procedures.").
[97]  *Id*.
[98]  Gus De Franco et al., "MD&A Textual Similarity and Auditors," *Working Paper*, pp. 1–54.

but also evolving disclosure custom and practices. MD&A disclosure is reassessed and revised from period to period to reflect the changing business environment and each company's more particular circumstances.

50.    Companies follow a similar (although shortened) process for preparing quarterly reports. Financial reporting personnel prepare a draft of quarterly results as promptly as practicable after financial information for the most recent fiscal quarter is available. The draft is typically reviewed by members of management and internal counsel, and subsequently distributed to independent accountants and outside counsel for their review and comment. A company's independent auditors are also involved in assisting with the preparation and review of unaudited quarterly results.[99] Although no auditor consent is required, issuers will not generally file their quarterly results until the accountants have signed off on the financial disclosure.

51.    Before filing with the SEC, drafts of annual and quarterly reports are reviewed by officers and directors, including the audit committee and the disclosure committee. Once the review and comment period is complete, the coordinator(s) will provide a final draft to those who are required to sign the Form 10-Q or 10-K. Once the Form is signed by the appropriate officers and directors, certified by the CEO and CFO under the Sarbanes-Oxley Act,[100] and the necessary authorizations for filing are obtained, the Form is filed with the SEC.

### 3.    Process of Preparing Voluntary Disclosures

52.    Voluntary disclosure by middle-market capitalization companies takes various forms that have become custom and practice. These forms include press releases, earnings calls, investor meetings, guidance on earnings or other metrics, field visits with existing and potential institutional investors, websites, and other corporate reports.[101] Below I discuss some of the major forms of communication that companies use to supplement the information contained in

---

[99] Regulation S-X requires that interim financial statements included in Form 10-Q must be reviewed by an auditor. *See* "AS 4105: Reviews of Interim Financial Information," *Public Company Accounting Oversight Board*, https://pcaobus.org/Standards/Auditing/Pages/AS4105.aspx, accessed July 26, 2022.

[100] A company's principal executive and financial officers are required to certify the financial and other information contained in the company's quarterly and annual reports under Section 302 of the Sarbanes-Oxley Act. Such certifications are filed as exhibits to Forms 10-K and 20-F. *See* 17 C.F.R. § 240.13a-14; 17 C.F.R. § 240.15d-14(a), 2018; Securities Act Release No. 33-8124.

[101] National Investor Relations Institute Analytics, "Standards of Practice for Investor Relations: Disclosure," updated September 2016, https://www.niri.org/NIRI/media/NIRI/Professinal%20Development/Seminars/niri_standardspractice_updated_lr.pdf, pp. 46–57.

their financial statements and other regulatory filings, including quarterly earnings releases and quarterly earnings calls with analysts and other investor presentations.

**a)      Earnings Releases**

53.    During the Class Period, Zuora issued quarterly earnings releases in the form of a press release.  These earnings releases also typically included Zuora's voluntary disclosure of certain financial guidance.[102]  Zuora issued an earnings release prior to the occurrence of any associated conference call with investors and analysts.[103]   Almost all middle-market capitalization companies like Zuora voluntarily communicate certain quarterly results through earnings releases.  The SEC does not regulate either the content or structure of the disclosure in such public announcements of earnings.  A company that elects to issue an earnings release for a completed fiscal period is required to furnish a copy of the release on Form 8-K, just as Zuora did.[104]  In a recent survey of more than 200 companies, the vast majority indicated that they issue quarterly earnings releases mostly to follow market practices and be responsive to investor and analyst demands.[105]

54.    A majority of companies provide earnings releases in advance of announcing their quarterly results on Form 10-Q (or 10-K for end of fiscal year, correspondingly).[106]  By issuing earning releases and hosting an earnings conference call before periodic filings, companies aim to meet investor expectations for timely and succinct information disseminated near the end of the quarter.  However, when a company releases earnings information prior to filing its Form 10-Q, it often has not yet completed drafting the entire Form 10-Q or completed the related review process, including the auditor's review.[107]

---

[102]  Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 21, 2019; Q1 2020 Earnings Release, May 30, 2019.

[103]  Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 21, 2019; Q1 2020 Earnings Release, May 30, 2019.

[104]  The SEC estimated that, among all Form 10-Qs filed in calendar year 2017 by companies in the S&P 500 index and S&P 1500 Super Composite, 97% and 98%, respectively, were accompanied by earnings releases furnished on Form 8-K.  *See* "Request for Comment on Earnings Releases and Quarterly Reports," Securities Act Release No. 33-10588, December 18, 2018, https://www.sec.gov/rules/other/2018/33-10588.pdf, p. 9, footnote 31.

[105]  Letter to Vanessa Countryman from James G. Martin, "Request for Comment on Earnings Releases and Quarterly Reports--File Number S7-26-18," April 19, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5412063-184508.pdf, p. 3.

[106]  National Investor Relations Institute Analytics, "NIRI Earnings Process Practices Research Report," 2016, https://www.niri.org/NIRI/media/Protected-Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf, p. 16.

[107]  Letter to the SEC from Grant Thornton LLP, "Re: File Number S7-26-18: Request for Comment on Earnings Releases and Quarterly Reports," March 15, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5134338-183346.pdf, p. 2.

### b)    Earnings Calls

55.   The process for the preparation of earnings calls at a middle-market capitalization company is similar to the preparation of SEC filings.  A slide deck is often created and a script of the presentation is typically drafted.[108]   The IR department typically takes the lead on earnings calls matters, working in collaboration with the CFO and the finance and accounting team.[109]   The central person coordinating this process will typically create the slide deck and draft a script to be reviewed internally.

56.   A public company will typically hold an earnings call immediately upon the release of quarterly or annual earnings and after the stock market has closed that day or prior to the market's open on the next day of trading.[110]   The typical earnings call follows a set format.[111]  The first part involves a scripted presentation by management.[112]   The CFO and CEO will typically lead the earnings call: the CFO will present the financial information, and the CEO will present operational and other related information.[113]   Depending upon the company and type of information being provided, other management personnel may speak.[114]

57.   The second part of the earnings call is a question-and-answer session with securities analysts and professional investors.[115]   While the earnings call is open to the public, only those invited by management can ask questions.  This portion of the call is designed to allow those with a professional background and interest in the company to further probe issues of relevance.[116]   In particular, the investment community will utilize this question-and-answer period to assess the quality of the earnings disclosure and the operations of the business, as

---

[108] National Investor Relations Institute Analytics, "NIRI Earnings Process Practices Research Report," 2016, https://www.niri.org/NIRI/media/Protected-Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf, p. 25 (stating that 35% of the surveyed companies do not use any supplemental materials during earnings calls). Of those that do use supplemental materials, the most common material utilized is a slide deck (35%), followed by other company specific materials (6%), and a fact book (5%).).  *See also*, Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," *Thomson Reuters Practical Law*, 2015, p. 2.
[109] Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," *Thomson Reuters Practical Law*, 2015, p. 4.
[110] *Id.*, p. 2 ("An earnings call is typically held immediately (within a few hours) after the earnings release is issued.").
[111] The CFA Institute and National Investor Relations Institute developed practice guidelines governing the relationships between analysts and corporate issuers to ensure the existence of good channels of communication.  *See* "Best Practice Guidelines Governing Analyst/Corporate Issuer Relations," *CFA Institute*, February 2005, https://www.cfainstitute.org/en/advocacy/policy-positions/best-practice-guidelines-governing-analyst, accessed July 26, 2022.
[112] Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," *Thomson Reuters Practical Law*, 2015, p. 2.
[113] *Id.*, p. 4 ("The CFO and CEO, and sometimes other senior executives, lead the earnings call and respond to analyst questions in the Q&A session.").
[114] *Id.*
[115] *Id.*, p. 2.
[116] Benjamin M. Blau et al., "Do Sophisticated Investors Interpret Earnings Conference Call Tone Differently than Investors at Large? Evidence from Short Sales," *Journal of Corporate Finance* 31, 2015, pp. 203–219 at p. 206.

well as to inquire about trends and growth in a manner that is not covered in the formal earnings release or management presentation.[117]

58.    Earnings calls are uniformly employed by companies as a significant part of their investor relations and disclosure strategy.  One survey has found that 97% of publicly-traded U.S. companies in 2016 had an earnings call.[118]  Earnings calls are not required by the SEC or any other rules or regulations but the practice has been spurred by a number of developments. These developments include (1) the greater interest of institutional investors in monitoring and questioning companies,[119] (2) the adoption of Regulation FD in 2000, which eliminated the ability of a company to disclose material, non-public information to securities analysts in a selective manner,[120] and (3) the growth in technology which makes it cheaper and easier to hold mass conference calls for information dissemination.[121]

59.    Because of the informal format and unscripted nature of the question and answer section, earnings calls can provide additional voluntary information.[122]  One academic paper has described earnings calls as "an information-rich disclosure medium," since they can provide significant color and perspective on the performance of the company as well as on the future prospects and trends affecting the company.[123]  Earnings calls thus provide additional information of a non-material nature, which shapes and adds to prior disclosures made by the company.  The formal presentation allows management to provide a narrative around the earnings, operations, and future of the company.  Earnings calls thus offer what is referred to as "soft information," which elaborates and adds to the financial information reported in the company's earnings release.[124]  Financial professionals and others on the call will assess the response and tone of management.[125]

---

[117] Francois Brochet et al., "Information Transfer and Conference Calls," *Working Paper*, September 2017, pp. 1–56.
[118] "NIRI Earnings Process Practices Research Report," *National Investor Relations Institute Analytics*, 2016, https://www.niri.org/NIRI/media/Protected-Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf, p. 19.
[119] Gregory L. Nagel et al., "Do Motivated Institutional Investors Monitor Firm Payout and Performance?" *Journal of Financial Research* 38, no. 3, 2015, pp. 349–377.
[120] Bok Baik and Hye-Jeong Nam, "The Effect of Regulation Fair Disclosure on Conference Calls: The Case of Earnings Surprises," *Asia-Pacific Journal of Financial Studies* 38, no. 6, 2009, pp. 801–829; Francois Brochet et al., "Information Transfer and Conference Calls," *Working Paper*, 2017, pp. 1–56.
[121] Francois Brochet et al., "Information Transfer and Conference Calls," *Working Paper*, September 2017, pp. 1–56.
[122] Richard Frankel et al., "An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium," *Journal of Accounting Research* 37, no. 1, 1999, pp. 133–150 at pp. 136, 149.
[123] Paul A. Borochin et al., "The Effects of Conference Call Tones on Market Perceptions of Value Uncertainty," *Journal of Financial Markets* 40, 2018, pp. 75–91 at pp. 77–78.
[124] Francois Brochet et al., "Information Transfer and Conference Calls," *Working Paper*, 2017, pp. 1–56.
[125] *Id*.

### c)    Social Media and Websites

60.    The growing use of social media has created practices and procedures for companies' use of social media for disclosure purposes.  The primary area of development in this area is related to Regulation FD.  Under Regulation FD, an issuer that discloses material nonpublic information to certain individuals (generally holders of the issuer's securities and securities market professionals) is required to make that information publicly available.  This can create particularly thorny issues of applicability to social media and company websites.

61.    In 2008, the SEC addressed this issue in an interpretive release providing guidance as to whether releasing information through a company's website would constitute sufficient public disclosure for Regulation FD purposes.  The SEC determined that a company should evaluate whether:

- a company website is a recognized channel of distribution;
- posting of information on a company website disseminates the information in a manner making it available to the securities marketplace in general; and
- there has been a reasonable waiting period for investors and the market to react to the posted information.[126]

62.    In determining whether a company's website is a recognized channel of distribution, the analysis focuses on what the company has done to notify investors and the market of its website and disclosure policy.  The SEC's guidance provided that in order for a company to establish its website as a recognized channel for disclosing information, a company should consider:

- listing the company's website address on periodic reports and press releases;
- establishing a pattern of posting important information on its website; and
- informing investors that they can find important information about the company on its website.[127]

63.    These principles apply not just to websites, but also to company Twitter feeds, Instagram and Facebook pages, and other social media sites.  Companies will thus publicly inform investors when they intend for a social media or website to be a source of investor disclosure.  In such a case, social media sites will then be utilized for disclosing investor disclosure as well as commercial information.  Otherwise, the intent of the Company is for the social media sites to be utilized for commercial usage and not for investor disclosures.

---

[126] "Commission Guidance on The Use of Company Web Sites," Securities Act Release No. 34-58288, August 1, 2008, https://www.sec.gov/rules/interp/2008/34-58288.pdf.
[127] *Id*.

### d)    Investor Conferences and Analyst-Investor Days

64.    Another area of voluntary disclosure is at investor conferences and company-specific gatherings known as analyst/investor days.  These are meetings where market participants are invited to spend time with management.  An investor presentation is made, which is prepared in a similar manner as other voluntary disclosures related to earnings calls.  At the conference, market participants can interact personally with management, and ask questions and obtain relevant information.  At least one study has shown that both investor conferences and analyst/investor day events provide relevant information to the market about the company thereby enhancing disclosure and understanding of the company.[128]

**VII.    Opinion 1: Zuora's practices and processes for preparing disclosures were robust and well-designed, and comparable to custom and practices utilized by middle-market capitalization companies.  Such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to product development and usage.**

65.    The Amended Complaint alleges that, during the Class Period, Zuora made misleading disclosures and omissions about the functionality of Zuora's subscription order-to-cash platform, Zuora Central, and its flagship software application products, Zuora Billing and Zuora RevPro.[129]  In particular, I understand that Plaintiff takes issue with the disclosures provided by the Company about the challenges Zuora faced before and during the Class Period of fully integrating the data between Zuora Billing and Zuora RevPro.[130]  The Amended Complaint also alleges that Defendants falsely represented Zuora's ability to cross-sell its flagship products, and that instead it failed to disclose sales execution problems and diminished demand for RevPro, allegedly the result of a failure to fully integrate Zuora Billing and Zuora RevPro.[131]

66.    I have considered Plaintiff's allegations in the Amended Complaint and reviewed the available record.  Below I provide an overview of Zuora's practices and processes for determining its disclosure, including the disclosures at issue in this matter, during the IPO

---

[128] Marcus P. Kirk and Stanimir Markov, "Come on Over: Analyst/Investor Days as a Disclosure Medium," *The Accounting Review* 91, no. 6, 2016, pp. 1725–1750.
[129] Amended Complaint, ¶ 1.
[130] *Id.*, ¶¶ 59, 66.
[131] *Id.*, ¶ 229.

process, thereafter in periodic and current disclosures as well as in earnings calls and presentations with analysts and institutional investors. Given the allegations in the Amended Complaint, I further examine Zuora's practices and processes for determining voluntary disclosures during the Class Period, including preparation for earnings calls and presentations with analysts and institutional investors.

67.     In section VII.A, I review the Zuora board and management oversight and involvement in the preparation of the Company's disclosures. In section VII.B.1, I review Zuora's practices and processes for preparing disclosure material required as part of the IPO process. In section VII.B.2, I examine practices and processes for preparing periodic and current disclosures. In section VII.B.3, I analyze Zuora's practices and processes for preparing voluntary disclosures, including earnings calls and presentations. I conclude in section VII.C by providing my first opinion as to Zuora's disclosure practices and processes.

### A.     The Structure of Zuora's Disclosure Process

#### 1.     Board and Executive Oversight in Determining Zuora's Disclosures

68.     The process of preparing Zuora's disclosure involved numerous stakeholders across different business units within Zuora. These parties provided input, drafted, and reviewed disclosures prior to being finalized and communicated to market participants. **Exhibit 3** sets forth a list of selected individuals at Zuora involved in this process; and **Exhibit 4** sets forth a list of selected entities at Zuora involved in this process. As I discuss below, during the Class Period, Zuora's disclosure process ultimately converged into the two main governing bodies at Zuora: the Board of Directors and executive officers.[132] This disclosure process was comparable to the custom and practices I discuss in section VI.B for middle-market capitalization companies.

69.     First, the Board of Directors, through the Audit Committee, oversaw the Company's overall disclosure strategy and implementation.[133] The Board also supervised Zuora's executive

---

[132] Zuora's executive officers included Mr. Tzuo and Mr. Sloat, who acted as CEO and CFO of Zuora, respectively. During the Class Period, Mr. Tzuo also acted as Chairman of the Board of Directors of Zuora, thus corresponding to the only member that overlapped between the Board of Directors and the executive officers. *See* April 2018 Prospectus, p. 119; Zuora 2019 10-K, p. 35.

[133] According to the Company's Corporate Governance Guidelines, the Board of Directors was responsible for managing all the business and affairs of Zuora. This included the continuous assessment of risks facing Zuora and the oversight of all efforts to maintain compliance with external and internal regulation, including those pertaining disclosure. It also included the election of corporate officers, and roles advising on management's decisions and monitoring Zuora's performance. *See* Zuora, Inc., "Corporate Governance Guidelines," March 6, 2018 ("Zuora Corporate Governance Guidelines"), p. 1.

officers in their decisions and operations.[134]  During the Class Period, the Board had seven members, all elected by shareholders, the majority of whom qualified as independent.[135]  During this time, Mr. Tzuo held dual positions within the Company, as Chief Executive Officer (since 2007) and as Chairman of the Board of Directors (since 2017).[136]  Similarly, according to the Company's Corporate Governance Guidelines, the Board established that Ms. Magdalena Yesil, one of its independent directors, would serve as Lead Independent Director of the Board.[137]  The Board established a minimum of four quarterly scheduled board meetings, held each year, plus special meetings as required by the needs of Zuora.[138]  Board members played distinct roles within the Board, as well as in the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee, which I describe in detail below.[139]

70.    Second, Zuora's executives were responsible for the day-to-day management and organization of the Company, as well as the allocation of resources, determination and implementation of strategies and policies, direction-setting, and ensuring timely reporting and provision of information to the Board and Zuora's stakeholders.[140]  Throughout the Class Period, Zuora had five executive officers: the CEO, the CFO, the President, the Senior VP of Technology and the General Counsel and Corporate Secretary.[141]

71.    The executive officers and other select management met as an executive committee (referred to internally as "EComm").[142]  EComm met on a periodic basis, generally weekly, as well as whenever business needs necessitated it.[143]

---

[134] *Id.*

[135] Under the NYSE Standards, listed companies must have at least a majority of independent directors and no director qualifies as "independent" unless the Zuora's Board of Directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company).  *See* NYSE, "Overview of NYSE Quantitative Initial Listing Standards," undated, https://www.nyse.com/publicdocs/nyse/listing/NYSE_Initial_Listing_Standards_Summary.pdf; April 2018 Prospectus, pp. 119–125; Zuora Corporate Governance Guidelines, p. 1.

[136] Zuora Corporate Governance Guidelines, p. 2; April 2018 Prospectus, p. 119.

[137] Among other things, the Lead Independent Director would preside over periodic meetings of the independent directors, serve as a liaison between the Chairman of the Board and the independent directors and perform any additional duties as determined by the Board.  *See* Zuora Corporate Governance Guidelines, p. 2; April 2018 Prospectus, p. 123.

[138] Zuora Corporate Governance Guidelines, p. 2.

[139] Zuora Corporate Governance Guidelines, p. 3; April 2018 Prospectus, pp. 123–125.

[140] 17 C F R  § 230 501(f) ("Executive officer shall mean the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer.").

[141] April 2018 Prospectus, p. 119; Zuora 2019 10-K, p. 35.

[142] Deposition of Robert Hildenbrand, March 22, 2022, p. 31 ("Q. Who -- who else is a member of the EComm team? MR. ADLER: Objection to form. THE WITNESS: Generally EComm is Tien Tzuo, our CEO, all of Tien's department lead direct reports. The only other notable exclusion that I'm making there is to say his administrative assistant. And then select other executives that may -- that would report to the president. So, for example, myself, or now in the case of Kyle Christensen, our CMO. But that would -- the composition of EComm changed as individuals left or joined the company, but that was generally the criteria that was -- that was followed."); "Minutes of a Meeting of the Board of Directors of Zuora, Inc.," February 28, 2019, ZUO_00001282–310 at 91.

[143] Deposition of Karthik Ramamoorthy, March 24, 2022, p. 29 ("Q. And during your time at -- excuse me -- the Zuora EComm, would Zuora's EComm have meetings? A. Yes, usually -- usually they meet weekly. Q. And that was the case

72.    As I discuss below, during the Class Period, both the executive officers and Audit Committee were active participants in the process of defining and determining Zuora's disclosures to be disseminated in periodic and current reports, earnings calls, and presentations. As expected of a middle-market capitalization company, some committees, offices, or positions at Zuora (*e.g.*, Disclosure Committee, IR, among others) also played a role in collecting, processing, drafting, and reviewing information across the Company. These committees then elevated the information, as needed, to the attention of the executive officers, Disclosure Committee, and the Audit Committee, who made decisions regarding disclosure at Zuora. This is comparable with the SEC's principles-based approach to disclosure, which relies on a company's management to assess the significance of the information in the context of that company's facts and circumstances.[144]

### 2.    The Committee Structure of Zuora's Disclosure Process

73.    As I discussed above, middle-market capitalization companies create an audit committee and sometimes a separate disclosure committee. An audit committee is typically responsible for the oversight of financial reports, internal controls, and compliance with internal and external regulatory requirements, including any regulation pertaining to disclosure. A disclosure committee is created specifically to supervise disclosure processes, and coordinate and review disclosures to ensure their accuracy, as well as to make recommendations to the Board of Directors and the executive officers on disclosure matters. As I describe below, Zuora used both committees; they played a central role in the generation and approval process of the disclosures made by the Company during the Class Period comparable to middle-market capitalization companies.

74.    As of March 6, 2018, Zuora's Board adopted a Corporate Communications Policy for the Company.[145] Zuora's adoption of this policy was in-line with comparable middle-market capitalization companies which also customarily establish a formal policy governing corporate disclosures. Zuora's Communications Policy outlined the Company's process and responsibilities for reviewing disclosure drafts and assessing the materiality of information

---

when you were VP of Global Services, correct? A. Again, I would say usually, right, because I'm not in those meetings so I can't specifically say. Q. It's your understanding that during your time as VP of Global Services that the EComm would meet weekly, correct? A. That is my understanding."); Interview with Tyler Sloat, July 20, 2022.

[144] "Business and Financial Disclosure Required by Regulation S-K," *U.S. Securities and Exchange Commission*, Release No. 33–10064, April 13, 2016, https://www.sec.gov/rules/concept/2016/33-10064.pdf, pp. 34–35.

[145] ZUO_00448834–43.

affecting the Company's financial and operational performance.[146]  All members of the Board, officers, and employees were required to comply with this policy.[147]  Among other things, the policy specified Company spokespersons, who were the only individuals authorized to make public disclosures (or to delegate someone to do so).[148]  The policy also laid out control procedures that were applicable for different types of public and internal communications and the role that different authorities would play in each of those processes.[149]

75.    Consistent with common practice, Zuora's Audit Committee assisted the Board in fulfilling its oversight responsibilities relating to Zuora's financial accounting, reporting, compliance, and internal controls.[150]  It was charged with assisting in the Board's oversight of accounting and financial reporting processes, compliance with legal and regulatory requirements, qualifications, independence and performance of the independent auditors, and performance of the internal audit function.[151]  As part of its financial reporting and compliance responsibilities, the Audit Committee was in charge of reviewing quarterly and annual financial results and the related earnings press releases and earnings guidance to be distributed to the public.[152]  The Audit Committee's responsibilities also included reviewing significant issues and events faced by the Company and specific disclosures in SEC filings under "Management's Discussion and Analysis of Financial Condition and Results of Operations."[153]

76.    The Audit Committee was comprised of three independent directors of Zuora.  During the Class Period the directors taking those positions were Ken Goldman (Chairman of the Audit Committee), Peter Fenton, and Michelangelo Volpi.[154]  Each member of the Audit Committee was required to have the ability to read and understand financial statements, and at least one member of the Audit Committee was required to have prior experience in accounting, financial management, or financial oversight, and be an "audit committee financial expert."[155]  The Audit

---

[146]  The Company committed to a policy of "providing all legally required disclosure to stockholders, the public and regulatory agencies on a timely basis, and to a policy of voluntarily providing other meaningful and relevant information to stockholders, potential investors and securities market professionals (such as investment analysts), the press and the public generally in a responsible fashion."  ZUO_00448834–43 at 34.

[147]  *Id*.

[148]  *Id*.

[149]  *Id*.

[150]  Zuora, Inc., "Charter of the Audit Committee of the Board of Directors of Zuora, Inc.," March 6, 2018 ("Audit Committee Charter"), p. 1; "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," August 27, 2019, ZUO_00001268–81 at 72–77.

[151]  Audit Committee Charter, p. 1; Zuora's April 2018 Prospectus, p. 124; "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," August 27, 2019, ZUO_00001268–81 at 72–77.

[152]  Audit Committee Charter, pp. 2–6.

[153]  *Id.*, p. 3.

[154]  April 2018 Prospectus, p. 123; "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," June 11, 2018, ZUO_00448865-68.

[155]  Audit Committee Charter.

Committee was required to conduct meetings on at least a quarterly basis.[156]  As part of its responsibilities, throughout the Class Period, the Audit Committee held meetings with the CEO, CFO, external auditors, and others before its approval of disclosures such as those in SEC Forms 10-Q and 10-K.[157]

77.    Zuora's Disclosure Committee was responsible for reviewing information and recommending disclosures in Zuora's 10-K and 10-Q filings,[158] to ensure that they were "full, fair, accurate, timely, and understandable" to the public.[159]  Members of the Disclosure Committee included both officers and employees who were familiar with the critical operating aspects of the company and who had expertise to serve on the Committee.[160]  In line with these principles, the Committee included Zuora's CFO, General Counsel, Chief Accounting Officer, Head of IR, Head of Financial Planning & Analysis, Associate General Counsel of Securities and Corporate Governance, and other officers or employees of Zuora designated by either the CEO or CFO.[161]

78.    One objective of the Disclosure Committee was to assist Zuora's CEO and CFO in connection with their certification obligations under SEC rules.[162]  In addition, the Disclosure Committee was established to monitor and review information that could be subject to disclosure under U.S. federal securities laws, to consider the materiality of such information as well as other factors that could require the determination to disclose such information, and to make recommendations to upper management as to Zuora's disclosure.[163]  The Disclosure Committee would also periodically review and make any recommendations it determined appropriate regarding Zuora's disclosure controls and procedures to ensure the quality and timeliness of Zuora's disclosures.[164]

79.    In implementing its general objectives and acting as the coordinator of the disclosure process, the Disclosure Committee had four distinct responsibilities.  First, in anticipation of periodic disclosures (in Forms 10-K and 10-Q) and Form 8-K filings with earnings releases,

---

[156] *Id.*
[157] "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," June 11, 2018, ZUO_00448865-68; "Minutes of a Special Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," December 11, 2018, ZUO_00448871-72; "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," September 10, 2018, ZUO_00448869-71; "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," April 15, 2019, ZUO_00001204–5.
[158] ZUO_00448830–33 at 30.
[159] Zuora, Inc., "Global Code of Business Conduct and Ethics," March 6, 2018; ZUO_00448830–33 at 30.
[160] ZUO_00448830–3 at 30.
[161] *Id.*
[162] *Id.*
[163] *Id.*
[164] *Id.*

the Committee reviewed information, considered the materiality of such information for purposes of Zuora's disclosure obligations, and made recommendations to senior management regarding disclosure.[165]  Second, the Committee designated some of its members to approve other SEC filings or public disclosures by Zuora.[166]  Third, the Committee would periodically make recommendations to upper management about the design, adoption, documentation, implementation, and testing of appropriate procedures and policies to ensure that all parties involved in a disclosure had the chance to review, approve, and ultimately support the accuracy and timeliness of information gathering and preparation involved in those disclosures.[167] Lastly, the Committee would collect and use any information from internal reports generated by relevant business units or functional areas to identify potentially required disclosures; monitor the quality of the information collected; work with appropriate heads of areas in the preparation of draft filings and other disclosures; meet regularly (and exceptionally, as needed) to discuss potentially required disclosures; seek assistance from relevant experts within the Company to understand facts pertaining a potential disclosure; work with all entities involved to ensure the timely review and approval of SEC filings and public disclosures by upper management and independent auditors; and make reports as necessary to upper management on disclosure issues.[168]

80.    The Disclosure Committee typically met during each quarter as necessary to support Zuora's periodic filings, and as deemed necessary by the CEO and CFO more generally.  A quorum was required for the Committee to hold a meeting, but the Disclosure Committee could also act without a formal meeting.[169]  The General Counsel and the Associate General Counsel for Securities and Corporate Governance served as legal advisors to the Committee, including on matters related to disclosure obligations and U.S. federal securities law compliance.[170]

### 3.    Zuora's Other Disclosure Participants

81.    I understand that different areas in Zuora were responsible for drafting various disclosure materials, such as SEC filings.   These areas included Marketing, Finance,

---

[165] *Id.* at 32–33.
[166] At least one member had to be an attorney knowledgeable about SEC rules and regulations with respect to disclosure. *See Id.* at 32.
[167] *Id.* at 32–33.
[168] *Id*.
[169] *Id.* at 30–31.
[170] *Id.* at 31.

Accounting, IR, Public Relations, Corporate Legal Counsel, Financial Planning and Analysis ("FP&A"), among others.

82.    In particular, comparable to custom and practices in middle-market capitalization companies, Zuora's IR department was part of this disclosure process. Zuora's IR department would lead the preparation of earnings calls, as well as draft the script and prepare Q&A.[171]

83.    Based on my review discussed above, and on other materials referenced in this report, my opinion is that Zuora's structures were comparable with other middle-market capitalization companies, and provided a sound basis to review and process disclosure as well as make substantive decisions on disclosure issues. Below I provide specific details about the framework that the Company had in place to generate and approve different types of disclosures, based on my review of available documents. I start with the IPO process, then discuss periodic disclosure and voluntary disclosure. In each case Zuora implemented a customary and usual disclosure review process which further provided Zuora and its management with a sound basis to make disclosure.

### B.    The Zuora Disclosure Process

#### 1.    Zuora's IPO Disclosure Process

84.    The process for Zuora to become a publicly listed company in the U.S. lasted for over a year and began in mid-2017 when Mr. Sloat, as CFO of Zuora, presented the idea in a Board meeting and received approval to begin preparations for an IPO.[172] From there, the process Zuora followed was consistent with the standard framework I describe above in section VI for a middle-market capitalization company. Zuora prepared a presentation deck titled "Zuora Investor Presentation, April 2018," which was used during the road show stage of the IPO process.[173] As discussed above, the road show audience is typically institutional investors interested in learning about the company with the ultimate goal of determining if and how much capital to commit to invest in the company's stock at the IPO. Consequently, Zuora's presentation included information about the Company, trends in the market in which Zuora operated, financial performance over the 2016–2018 period, and forecasts for future years

---

[171] Interview with Tyler Sloat, July 20, 2022; Deposition of Tien Tzuo, April 27, 2022 ("Tzuo Deposition"), p. 258 ("Q: Is it accurate to say that this is a talking points memo of sorts provided to you and Mr. Sloat in advance of a Q4 2019 earnings call? The Witness: ... It's a long document. But this document is typical of what my IR team at the time would create in attempt to anticipate the type of questions that we would receive on an earnings call").

[172] Minutes of a Telephonic Meeting of the Board of Directors of Zuora, Inc., May 23, 2017, p. 6.

[173] Deposition of Tyler Sloat, April 22, 2022, pp. 51:7–52:6.

based on currently available information.[174]  The presentation included a cautionary disclaimer about forward looking statements and highlighted the risks that a company like Zuora would generally face.[175]

85.    The most important document that Zuora was required to prepare for the IPO was its Form S-1 Registration Statement, which included the Company's Prospectus.  The process to prepare that document involved input from multiple functional areas.  This process unfolded under the oversight of Mr. Sloat and with external assistance from legal and financial advisors and independent auditors.

86.    The path to finalize the Form S-1 involved three preliminary submissions with the SEC where revisions were requested by the Commission.[176]  All versions of the Form S-1 submitted with the SEC, including the finalized filing dated April 11, 2018, went through the review and approval of Legal and Finance, then the Audit Committee, followed by the Board, and finally Mr. Tzuo and Mr. Sloat. [177]  Specifically, the filings included signatures of members of the Board, Mr. Sloat, acting as CFO of Zuora, and Mr. Tzuo, in his capacity as both CEO and Chairman of the Board of Directors of Zuora.[178]

87.    The timeline for the SEC review process for Zuora extended for over 80 days, during which the SEC issued requests for information.[179]  Zuora responded to these requests for information throughout this period, thus addressing a total of at least 266 distinct inquiries from the SEC.[180]  These requests covered general information about the subscription economy, business performance, risk factors, Zuora's MD&A history, and additional information about capitalization.[181]  The SEC review process continued for several more weeks.  The SEC had no further comments after Zuora's response dated April 10, 2018.[182]

88.    During the review period, Zuora spent considerable efforts completing other due diligence, both internally and with the advice of investment banks Goldman Sachs and Morgan

---

[174]  Zuora, Inc., "Investor Presentation," April 2018.

[175]  *Id.*, p. 2.

[176]  Zuora, Inc., Form S-1 Registration Statement, filed March 16, 2018; Zuora, Inc., Amendment No. 1 to Form S-1 Registration Statement, filed April 2, 2018; Zuora, Inc., Amendment No. 2 to Form S-1 Registration Statement, filed April 10, 2018; April 2018 Prospectus.

[177]  Deposition of Tyler Sloat, April 22, 2022, pp. 72:11–73:6; Tzuo Deposition, pp. 53:16–53:24.

[178]  Deposition of Tyler Sloat, April 22, 2022, pp. 72:11–73:6; Tzuo Deposition, pp. 53:16–53:24; Zuora, Inc., Form S-1 Registration Statement, filed March 16, 2018; Zuora, Inc., Amendment No. 1 to Form S-1 Registration Statement, filed April 2, 2018; Zuora, Inc., Amendment No. 2 to Form S-1 Registration Statement, filed April 10, 2018; April 2018 Prospectus.

[179]  Project Zebra Timeline Feb 2018; Project Zebra Timeline.

[180]  ZUO_00448829.

[181]  *Id*.

[182]  Zuora, Inc., Amendment No. 2 to Form S-1 Registration Statement, filed April 10, 2018; April 2018 Prospectus.

Stanley.[183]  Throughout February and March 2018, Zuora's executives held weekly drafting sessions to work on materials related to the IPO, including responses to SEC letters, additional metrics that were requested, and the roadshow deck.[184]  They also tested and solicited feedback on forward-looking analyst models during this period, including from investment banks, and conducted additional financial diligence.[185]  Ultimately, it is my opinion that Zuora's process to prepare its Registration Statement and conduct its IPO process was comparable to custom and practices used by middle-market capitalization companies.

### 2.    Periodic Disclosures

89.    Once it became a publicly traded company, Zuora was legally required to file periodic disclosures with the SEC (Forms 10-Q and 10-K).  As I discussed in Section VI.B.2, the process of preparing periodic reports of a middle-market capitalization company customarily involves a number of internal and external functions.  Zuora had specific procedures in place to prepare, review, and approve periodic disclosures before they were filed, and which were in accord with these custom and practices.  More specifically, the process at Zuora for preparing periodic reports included several employees, internal committees, and external auditors was comparable to custom and practices for middle-market capitalization companies.[186]  **Exhibit 5** sets forth a summary of Zuora's disclosure process.

90.    Zuora structured its Forms 10-Q and 10-K into three main sections, risk factors, technical disclosures and metric disclosures.  Different departments would collaborate with information as needed, based on expertise.[187]  The Reporting and Technical Accounting Manager, Mr. Ron Siengo, along with the IR Department Head, Mr. Joon Huh, coordinated with these departments, including Legal, FP&A, and Accounting, for gathering information and drafting various legal and risk-related disclosures within the periodic disclosures.[188]

91.    I understand that in the normal course of business, Zuora maintained detailed records of the timeline and process for generating disclosures, including periodic disclosures, earnings announcements, and earnings calls.  This was in the form of an Excel spreadsheet containing

---

[183]  Project Zebra Timeline Feb 2018; Interview with Tyler Sloat, July 20, 2022.
[184]  ZUO_00448829; Project Zebra Timeline Feb 2018; Zuora, Inc., "Project Zebra: Next Steps and Week-by-Week Plan," undated; Project Zebra Timeline Feb 2018; Zuora, Inc., "Project Zebra Update and Approvals," March 6, 2018.
[185]  Project Zebra Timeline Feb 2018.
[186]  "Disclosure Committee Meeting: 2Q'19 Form 10-Q Review," September 7, 2018.
[187]  Interview with Tyler Sloat, July 20, 2022.
[188]  Interview with Tyler Sloat, July 20, 2022; ZUO_00000001–5 at 5; ZUO_00448828.

multiple tabs, each corresponding to the detailed schedule for the process of disclosures in each quarter, from Q2 2019 to Q4 2022.[189]

92.    The process to prepare periodic disclosures involved multiple teams at Zuora.  First the Quarterly Function Business Review, representing all business functions, undertook a comprehensive discussion of products and clients, strategic issues, and earnings.[190]  This was followed by preparation of a redline of the periodic disclosure against the previous quarter's version by the Accounting Department, while the earnings release and scripts for the earnings call were drafted in parallel.[191]  Once a draft of the periodic disclosure and accompanying earnings release was prepared, a sub-team of the Disclosure Committee would conduct its first earnings and disclosure prep meeting to review and revise the materials.  Then, the draft documents were distributed to the CEO, full Disclosure Committee, external counsel, and external auditor for their review.[192]  They reviewed the draft disclosure and signed-off on the earnings release.  The draft SEC filing would next be reviewed by the Audit Committee.[193] Following that review, the draft disclosure would once again be distributed to the CEO, CFO, Chief Accounting Officer, counsel and other as needed for a final review.[194]  In accordance with its charter, the Disclosure Committee would then hold its own review meeting and distribute the final draft disclosure to the Board of Directors, Audit Committee, CEO, CFO, external counsel, and external auditor.[195]  Finally, following the approval of the disclosure by the Audit Committee, both CEO and CFO of Zuora would certify the disclosure and the disclosure would be filed with the SEC.[196]

### 3.    Voluntary Disclosures

93.    Once it became a publicly traded company, Zuora also engaged in voluntary disclosure through earnings calls, investor conferences, and analyst presentations.  As I discussed in

---

[189] *See* ZUO_00448828.

[190] Interview with Tyler Sloat, July 20, 2022.

[191] *Id.*

[192] ZUO_00448828.

[193] ZUO_00448828; Interview with Tyler Sloat, July 20, 2022.

[194] ZUO_00448828.

[195] *Id*.  "In advance of filing Zuora's periodic reports on Form 10-K and Form 10-Q and Form 8-K filings related to earnings releases, the Committee shall review information, consider the materiality of such information for purposes of its disclosure obligations under U.S. federal securities laws as well as other factors that may require or bear on the determination to disclose such information, and make recommendations to senior management with respect to such matters." ZUO_00448830–33 at 32.

[196] ZUO_00448828; Interview with Tyler Sloat, July 20, 2022.  "Review and discuss the Independent Auditors and the Company's management the Company's quarterly and annual financial results and the related earnings press releases and earnings guidance to be distributed to the public, including to analysts and, if applicable, rating agencies." Audit Committee Charter, p. 3.

Section VI.B.3, the process of preparing voluntary disclosure for a middle-market capitalization company customarily involves a number of internal and external individuals and functions. As I discuss further below, the procedures followed at Zuora were comparable to these custom and practices.

94.    Under Zuora's Corporate Communications Policy, Zuora spokespersons would "endeavor to use an approved script for all public presentations designed or intended to disclose material information about Zuora's current or expected financial results (and all earnings releases will use an approved script)."[197]

### a)    Disclosure of Earnings

95.    For each fiscal quarter, Zuora had a predetermined timeline.[198] Around the end of the fiscal quarter, when Zuora would start preparing financial reports, IR led a meeting to kick-off the process of preparing earnings reporting, including financial guidance.[199] Typically, around the kick-off date, IR, Legal and PR would work to issue a press release with the announcement of the specific earnings date, when both the earnings call and release would be delivered to the public.[200]

96.    In each earnings reporting cycle, there were typically four earnings prep meetings to review and discuss earnings material such as quarterly results, guidance, the earnings release, scripts, and the Q&A preparation for the earnings call.[201] The first prep meeting usually took place days after kick-off, and attendants (Disclosure Committee, Finance, Legal, and others) discussed initial thoughts on internal financial figures and consensus, and the main items to consider for disclosure in the earnings release, which included guidance. Around a week after the first prep meeting, the second prep meeting was held with a first review of draft scripts for the earnings call, earnings release, and Q&A. At this time, a draft of the earnings release was created and passed to a sub-team of the Disclosure Committee for revision.

97.    The third prep meeting involved a review of the updated drafts of the earnings release, scripts of the earning call, and the Q&A session. The draft of the earnings release would be distributed to the external auditor for comments and approval before it was circulated to the

---

[197] Corporate Communications Policy, March 18, 2018, p. 3.
[198] ZUO_00448828.
[199] *Id*.
[200] *Id*.
[201] *Id*.

Audit Committee.[202]  The draft earnings release and scripts would then be distributed to the Audit Committee in advance of its meeting to review the earnings material.  This Audit Committee meeting was generally held several days before the earnings release.  A fourth prep meeting was normally held after receiving feedback from the Audit Committee, and another round of review of the drafts of scripts and the earnings release was performed.  The earnings release (and earnings call) would normally occur after the fourth prep meeting, on the previously announced date.

98.    During the Class Period, there were different instances where upper management (and directors) met within the regular time frame of these disclosure processes to discuss updates about the different components of the business.  For example, updates on performance, forecasts, and the status of internal projects were discussed from time-to-time in Board meetings and EComm meetings.  These all served as points where the potential impact of issues on Zuora's financial performance and Zuora's upcoming guidance were considered.[203]

### b)    Preparation and Updating of Internal Guidance

99.    Additionally, Zuora had a specific process to determine the guidance that was provided in earnings announcements and calls.  This process involved multiple teams, and resulted in guidance calculations with respect to four different key metrics: Subscription Revenues, Total Revenue, Non-GAAP Operating Loss, and Non-GAAP Earnings per Share.[204]  This process was overseen by Zuora's CFO, Mr. Sloat, with IR and FP&A collaborating on its execution.[205] FP&A was responsible for managing the model to estimate new guidance, run different scenarios, and keep track of guidance over time.[206]  IR mainly assisted with determining how the information (financial figures and underlying explanations of those numbers) would be communicated to the public.[207]  Ultimately, Mr. Sloat was responsible for delivering the information to the public during each earnings call.[208]

---

[202]  *Id.*
[203]  "Feb 2019 Zuora Board Meeting," undated, ZUO_00117568–72 at 69; ZUO_00446392–97.
[204]  Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 31, 2019; Q1 2020 Earnings Release, May 30, 2019.
[205]  Interview with Tyler Sloat, July 20, 2022.
[206]  Interview with Tyler Sloat, July 20, 2022.
[207]  Interview with Tyler Sloat, July 20, 2022.
[208]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018; "Q2 2019 Zuora Inc Earnings Call," August 30, 2018; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019; "Q1 2020 Zuora Inc Earnings Call," May 30, 2019.

### c)    Disclosure at Investor Conferences

100.    Zuora also provided additional voluntary information through mass investor-related conferences and endeavored to disseminate the information via various formats.[209]  Information such as guidance and responses to specific questions from analysts and institutional investors was disseminated through these conferences.[210]  Before presenting at investor conferences, Zuora prepared documents on date, location, session time, format, attendees, objectives, and schedule of the conference.[211]  Zuora also prepared scripts of responses to questions from investors and analysts in advance.[212]  As stated above, the documents and memos were drafted by the IR team, and reviewed by the Legal team, like the majority of other public disclosures. In addition, according to the Company's internal policies, any forward-looking statements made at these conferences had to be accompanied by cautionary language.[213]

### d)    Statements on Social Media

101.    Finally, consistent with comparable middle-market capitalization companies Zuora had procedures in place that governed use of social media, and the Company defined guidelines for use of social media by its employees and directors.[214]  The specific guidelines were established in the Corporate Communications Policy as well as the Global Code of Business Conduct and Ethics.[215]  Zuora's VP of Global Communications, Mark Heller, and Zuora's General Counsel, Jennifer Pileggi, were the contacts for related questions.  Zuora engaged with its audience through Twitter, although this medium was not considered a primary vehicle for customer engagement.[216]

---

[209]  ZUO_00448834–43 at 36 ("In connection with every financial results conference call, investment conference or other investment analyst conference call, Zuora will endeavor to make the same available to the public via a webcast or other similar means.").

[210]  *See, e.g.*, ZUO_00330041–47 at 42.

[211]  *See, e.g.*, *Id.* at 41.

[212]  *See, e.g.*, "Morgan Stanley TMT Conference Prep Doc," February 26, 2019, ZUO_00330041–47; "Fiscal Q4 2019 Q&A," undated, ZUO_00329659–70.

[213]  ZUO_00448834–43 at 37.

[214]  "Zuora Social Media Policy," undated, p. 1; ZUO_00448834–43 at 39–40.

[215]  Zuora, Inc., "Global Code of Business Conduct and Ethics," March 6, 2018, p. 13; ZUO_00448834–43 at 40.

[216]  Tzuo Deposition, pp. 70:23–71:17 ("Q.  Okay.  And why does Zuora, Inc., maintain a Twitter account? … The Witness: Why does Zuora have a Twitter account?  I mean, it's something that the Marketing Department owns and rather than somebody else having the Twitter account.  Q.  Would you agree that Zuora via Twitter, it's a way for Zuora to engage with its customer base?  A.  Twitter is not a primary vehicle for us to engage with our customer base. We have other ways of engaging with our customer base that are more direct.  Q.  Would you agree that it's a way in which to issue updates regarding Zuora's products?  The Witness:  It might have been used for that in the past, but it's not the primary way.  Our customer have, again, more direct channels of communication with our organization."); Deposition of Marc Diouane, May 5, 2022, p. 148:16–25 ("Q.  So is Twitter a – Would you consider Twitter a cost-effective way of engaging with Zuora's customer base? The Witness:  I would say not at all at Zuora, no.  Q.  It's not?  A.  It's not.  It's not cost – it's not the best media to communicate for the customer for sure.").

102. Product-related statements were occasionally made through Twitter by the Marketing Department.[217]   Since this channel was not a place for investor disclosure, the process of publishing from the Zuora Twitter account was also fundamentally different from other periodic and voluntary disclosures, without the involvement and approval of upper management parties across different business units within Zuora.[218]

103. To my knowledge, Zuora never stated that social media sites were a source of investor disclosure or could otherwise be utilized for Regulation FD purposes.   Moreover, the Company's Corporate Communications Policy specifically limited communications on social media sites.   The policy discusses various vehicles for disclosures such as earnings calls, investor conferences, and analyst meetings.  For online forums, the policy requests employees to refrain from engaging on social media sites "without the prior written approval of the Chief Financial Officer or Compliance Officer," or unless such engagement is specifically required by an employee's job description.[219]   Furthermore, Zuora's social media policy prohibits employees from disclosing any "confidential, proprietary or trade secret information" and instructs employees to not post such information if it is not their responsibility to make the information public.[220]

### C.   First Opinion on Zuora's Disclosure Practices and Processes

104. Zuora's practices and processes for preparing disclosure were robust and well-designed, and comparable to custom and practices utilized by middle-market capitalization companies. Such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to product development and usage.

**VIII.   Opinion 2: Zuora's disclosures relating to products and product integration were generated through Zuora's disclosure practices and processes.  During the Class Period, Zuora relied on these disclosure practices and processes to regularly assess**

---

[217] Tzuo Deposition, p.71:1–4 ("The Witness: Why does Zuora have a Twitter account? I mean, it's something that the Marketing Department owns and rather than somebody else having the Twitter account.").
[218] Interview with Tyler Sloat, July 20, 2022.
[219] Zuora, Inc., "Corporate Communications Policy," December 17, 2019.
[220] "Zuora Social Media Policy," undated.
.

**Zuora's disclosures relating to products and product integration.  Such practices and processes provided investors with a rich source of relevant information.**

105.    In this section, I analyze Zuora's disclosure practices and processes relating to factors affecting products and product integration.  In section VIII.A, I review Zuora's disclosure practices relating to factors affecting integration and products.  In particular, these disclosures included Zuora's IPO Registration Statement and Prospectus, periodic reports in SEC filings as required of middle-market capitalization companies in the U.S., and additional voluntary disclosures.  In section VIII.B, I examine the process that took place in the preparation of each relevant disclosure that the Company made during the Class Period.  I conclude in Section VIII.C by providing my second opinion as to the soundness of Zuora's disclosure practices and processes and the information environment it provided to Zuora's investors.

### A.    Zuora's Disclosure Practices Relating to Factors Affecting Product Integration and Products

106.    In this section, I analyze Zuora's disclosure practices relating to factors affecting product integration and products.  In Part 1, I review Zuora's disclosures resulting from its IPO process, namely the Form S-1 Registration Statement and Prospectus.  These filings contained detailed information about both the IPO process (*e.g.*, use of proceeds, determination of offering price, any potential dilution, and plan of distribution) and the Company.  The disclosures included "line items" required in all of its periodic disclosures in SEC filings, such as (a) Business Description, (b) MD&A, and (c) Risk Factors related to the company's business and operations.[221]  In Part 2, I examine required periodic disclosures filed with the SEC during the Class Period, which include quarterly disclosures in Form 10-Q and fiscal year end disclosures in Form 10-K.  In Part 3, I examine Zuora's voluntary disclosures and statements related to possible product integration issues and individual products that were included in earnings calls, press releases and Form 8-Ks, and I also examine communications made on social media.  **Exhibit 6** sets forth a timeline of selected meetings at Zuora of relevant entities during this time period.

107.    I find that Zuora provided detailed information concerning risks related to integration issues and the development and performance of its products in its risk factor disclosure.  Additionally, Zuora evaluated whether any issues that arose as part of the normal course of

---

[221] SEC Form S-1, pp. 4–5.  "Line item" information are specific requirements in each SEC form to make disclosure on certain topics or areas.

business, such as product performance and the progress of internal projects (*e.g.*, Keystone), would have been expected to have an impact on financial performance, and whether these were considerable enough to be included in specific disclosures. In preparing these disclosures, and consistent with its internal processes, Zuora management regularly evaluated available information and whether the associated risks were material. During the Class Period, Zuora disclosed different risk exposures related to integration and product issues, with consideration of multiple possible scenarios.[222] I also observe that Zuora engaged in a continued dialogue on these issues with analysts and institutional investors during earnings calls and other presentations. I conclude that Zuora's disclosures during the Class Period ultimately provided a rich source of relevant information to investors.

### 1. Zuora's Disclosures During the IPO Process Relating to Factors Affecting Products and Product Integration

108. Zuora's Form S-1 Registration statement included its Prospectus, in which the Company referred prospective investors in multiple places to its "Risk Factors" section, including the Prospectus cover page and the Prospectus Summary.[223] The Summary also disclosed all the relevant risks to which shares of Zuora's equity had been exposed, as estimated by the Company, and investors were advised to consider these risks in making a decision to invest in Zuora's stock.[224] One section of the Prospectus Summary titled "Selected Risks Associated with Our Business" summarized relevant risks, some of which were associated with possible product issues:[225]

- "If the shift by companies to subscription business models develops slower than we expect, our growth may slow or stall, and our operating results could be adversely affected;"
- "Our operating results may fluctuate from quarter to quarter, which makes our future results difficult to predict;"
- "A customer's failure to deploy our solution after it enters into a subscription agreement with us, or the incorrect or improper deployment or use of our solution, could result in customer dissatisfaction and negatively affect our business, operating results, financial condition, and growth prospects;"
- "If we are not able to develop and release new products and services, our business could be adversely affected;"

---

[222] April 2018 Prospectus, pp. 13–50.
[223] *Id.*, p. 1.
[224] *Id.*, pp. 6–7.
[225] *Id.*, pp. 6–7.

- "The market in which we participate is competitive, and if we do not compete effectively our operating results could be harmed;"

109.    The Risk Factors section of the Prospectus immediately followed the Prospectus Summary.  It provided detailed explanations of each risk factor (previously listed in the Summary), and the possible effects on the Company's business, financial condition, operating results, and future prospects and guidance.  In this more detailed analysis of risk factors, Zuora included possible product integration issues as well as possible issues with the still undergoing operational integration with Zuora RevPro since the acquisition of Leeyo in 2017.[226]

110.    One of the listed risk factors that Zuora directly linked to product integration stated: "If we are not able to develop and release new products and services, or successful enhancements, new features, and modifications to our existing products and services, our business could be adversely affected."[227]  In the explanation of that risk factor, Zuora noted that "[s]ubscription management products and services are inherently complex, and [it can take a services] [*sic*] depends on several factors, including timely completion, competitive pricing, adequate quality testing, integration with new and existing technologies and our solution, and overall market acceptance."[228]  The uncertainty associated with this particular issue, which included the impact of possible integration and product development issues, was further highlighted via language such as "[w]e cannot be sure that we will succeed in […]" or "the timetable … is difficult to predict."[229]

111.    The risk of integrating Zuora RevPro into the Company's business was also directly addressed under the risk factor stating:

> We may be unable to integrate acquired businesses and technologies successfully or to achieve the expected benefits of such acquisitions. We may acquire or invest in additional companies, which may divert our management's attention, result in additional dilution to our stockholders, and consume resources that are necessary to sustain our business.[230]

112.    In the more detailed explanation of this risk factor, Zuora noted that "[its] business strategy may, from time to time, include acquiring other complementary products, technologies, or businesses,"[231] and that, for example, in May 2017, it acquired Leeyo, and that

---

[226] *Id.*, pp. 13–50.
[227] *Id.*, p. 18.
[228] *Id.*, pp. 18–19.  *See also*, Zuora Q1 2019 10-Q, pp. 31–63.
[229] April 2018 Prospectus, p. 19.
[230] *Id.*, pp. 32–33.
[231] *Id.*, p. 32.

it was "still in the process of integrating Leeyo's operations into [their] business."  Further, among the details of possible difficulties that Zuora could face from acquisitions, and specifically with respect to the Leeyo acquisition, the Company noted:

> [W]e may encounter difficulties assimilating or integrating the businesses technologies, products, personnel, or operations of the acquired companies, including Leeyo, particularly if the key personnel of the acquired companies choose not to work for us, if an acquired company's software is not easily adapted to work with ours, or if we have difficulty retaining the customers of any acquired business due to changes in management or otherwise. Acquisitions may also disrupt our business, divert our resources, and require significant management attention that would otherwise be available for development of our business. Moreover, the anticipated benefits of any acquisition, investment, or business relationship may not be realized or we may be exposed to unknown liabilities.[232]

113.    Besides the two risk factors noted above, Zuora also considered other risks related to the Company's business and industry that depended on product development.  One was a risk factor noting that: "If the shift by companies to subscription business models develops slower than we expect, our growth may slow or stall, and our operating results could be adversely affected."[233]   In this risk factor, Zuora highlighted market acceptance of the Company's solution, such as: "Our ability to deploy upgrades and other changes to our solution without disruption to our customers."[234]   Relatedly, other risk factors also noted that "[Zuora] derive[s] substantially all of our revenue and cash flows from the sales of subscriptions and associated deployment of our Zuora Central Platform and our Zuora Billing and Zuora RevPro products. As such, the continued growth in market demand for these products is critical to our success."[235]

114.    Zuora also stated that "[its] operating results may fluctuate from quarter to quarter, which makes [its] future results difficult to predict."  Among unpredictable factors that may play a role, Zuora included the "costs related to the acquisition of businesses, talent, technologies, or intellectual property."[236]

115.    Zuora additionally included a risk factor related to customer dissatisfaction, one of the issues that I understand Plaintiff alleges was material during the Class Period.  Zuora disclosed:

---

[232] *Id.*, pp. 32–33.
[233] *Id.*, p. 6.
[234] *Id.*, pp. 13–14.
[235] *Id.*, p. 16.
[236] *Id.*, p. 17.

"A customer's failure to deploy our solution after it enters into a subscription agreement with us, or the incorrect or improper deployment or use of our solution, could result in customer dissatisfaction and negatively affect our business, operating results, financial condition, and growth prospects."[237]  With this risk factor, Zuora acknowledged the possible negative effect that a customer's failure to deploy the company's solution could have on its "business, operating results, financial condition, and growth prospects."[238]  The Company further noted that if it was "unable to deploy [its] solution successfully, or unable to do so in a timely manner and, as a result, customers do not utilize [its] solution, [it] would not be able to generate future revenue from such customers based on transaction or revenue volume and the upsell of additional products and services, and [its] future operating results could be adversely impacted."[239]

116.    Zuora also included a risk factor related to product integration and competition: "The market in which we participate is competitive, and if we do not compete effectively our operating results could be harmed."[240]  Specifically, Zuora noted that its ability to compete successfully depended on multiple factors, including the "ability to integrate with other technology infrastructures and third-party applications."[241]  In assessing the impact of a materialization of this type of risk, Zuora noted that any failure by the Company to compete successfully in any one of these or other areas "may reduce the demand for [its] solution, as well as adversely affect [its] business, operating results, and financial condition."[242]

### 2.    Zuora's Periodic Reports Relating to Factors Affecting Product Integration and Products

117.    In this subsection, I review disclosures that Zuora made in periodic reports throughout the Class Period.  During the Class Period, Zuora filed quarterly reports on Form 10-Q on June 13, 2018, September 13, 2018 and December 13, 2018, along with an annual report Form 10-K on April 18, 2019.  Similar to the IPO Registration Statement material, Zuora provided a section of Risk Factors in these periodic reports, in which Zuora emphasized risks related to the integration and performance of its products.  Analogous to the information included in the

---

[237] *Id.*, p. 18.
[238] *Id.*
[239] *Id.*
[240] *Id.*, p. 20.
[241] *Id.*, p. 21.
[242] *Id.*, pp. 20–21.

Company's Prospectus, and comparable to custom and practices at middle-market companies, the analysis of risk factors included consideration of the possible impact that a materialization of each risk could have on future growth.

118.    Zuora's Form 10-Q for the first quarter of its fiscal year 2019 was filed with the SEC on June 13, 2018.  In Part II, Item 1A of the Form 10-Q, Zuora included its Risk Factors section, as required by the SEC, in which it reiterated the risk factors (and corresponding detailed descriptions) that were highlighted in Zuora's Prospectus.  As with the Prospectus, the Company provided a detailed explanation of each risk exposure, possible effects on the company's business, financial condition, operating results, and future prospects.[243]  Zuora again included statements about potential product integration issues and the business-level integration with Zuora RevPro.  The Company also included language to highlight the uncertainty associated with product integration and product development.  For example, the Company stated that "[w]e cannot be sure that we will succeed in […]," "the timetable … is difficult to predict."[244]  Zuora continued to refer to the acquisition of Leeyo as part of the discussion about possible "integration" issues with targets (in an acquisition) as a risk factor.[245]

119.    Thus, the Company continued to discuss the integration and other product issues in the context of relevant risk factors in its periodic reports.  During this period, the Company reported that it was experiencing solid performance across multiple dimensions, and that prospects for the near future were also positive.[246]

120.    On September 13, 2018, Zuora filed its Form 10-Q, for the second quarter of the 2019 fiscal year.  In the filing, the Company continued to highlight similar risk factors as in previous SEC filings in Part II Item 1A.  Zuora again provided a detailed explanation of each risk, and possible effects on the company's business, financial condition, operating results, and future

---

[243]  Zuora, Inc., Form 10-Q for the quarterly period ended April 30, 2018, filed June 13, 2018 ("Zuora Q1 2019 10-Q"), pp. 31–64.

[244]  *Id.*, p. 36.

[245]  *Id.*, p. 49.

[246]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018, p. 3 ("[Tien Tzuo:] But because of this shift, we continued to see in this quarter great traction in the market globally for our solutions.  This is why our subscription revenues grew by 39% year over year. Our total revenues grew by 60% year over year."); "Q2 2019 Zuora Inc Earnings Call," August 30, 2018, pp. 5–6 ("Tien Tzuo: … the Subscription Economy is also behind our 47% year-over-year growth in total revenue or the 28% growth in customers spending over $100,000 with us annually.  And of course, you can also see even the growth of the transaction volume. … Processed invoice volume for Zuora billing grew 41% year-over-year to over $7.5 billion this quarter. Now all these numbers really point to a steady, remarkable growth of the Subscription Economy.").

prospects.[247]  In terms of the language used to explain each of the relevant risk factors, Zuora kept all statements almost identical to previous SEC filings with one exception.[248]

121.    Subsequently, on December 13, 2018, Zuora filed its Form 10-Q corresponding to third quarter fiscal year 2019.  Zuora continued to include similar risk factors as in its previous periodic SEC filings in Part II Item 1A of this Form 10-Q.[249]  The Company used identical language as in the immediately previous 10-Q filing to explain the details of each risk exposure, and its possible effects on the company's business, financial condition, operating results, and future prospects.

122.    On April 18, 2019, Zuora reported annual results for fiscal year 2019 in the corresponding Form 10-K filed with the SEC.  The information related to possible integration or product issues included in this disclosure was once again contained in Zuora's risk factors section.[250]  Prior to this filing, Zuora had undertaken an internal examination of the integration issues related to Zuora Billing and RevPro, including issues around  delays and customer complaints.[251]  As a result of this evaluation, Zuora took multiple measures to address the challenges associated with product integration, starting with the adoption of a new approach to integrate Zuora Billing and RevPro, termed "K2."[252]  Successfully developing the integration between the flagship products was a priority for Zuora during FY20.[253]  Thus, the relevance of this internally, and the uncertainties about the evolution of this project and how customers would react to the new strategy, made it a relatively more prominent risk for the Company.[254]  Consequently, Zuora updated the language in the risk factors section of its 10-K filing, to reflect the risks assessed with respect to this issue.[255]  First, the Company changed the order of the risks disclosed, moving the section regarding "[e]rrors, defects or disruptions in our solution" closer to the beginning of the list.[256]  Additionally, Zuora added language disclosing the risk of

---

[247] Zuora, Inc., Form 10-Q for the quarterly period ended July 31, 2018, filed September 13, 2018 ("Zuora Q2 2019 10-Q"), pp. 36–63.

[248] Zuora made an edit in the discussion of the risk factors pertaining to the potential inability to successfully integrate newly acquired companies.  In previous filings, Zuora mentioned that the Company was "still in the process of integrating Leeyo's operations into [its] business."  Starting from this filing, Zuora eliminated that sentence. Zuora Q2 2019 10-Q; Zuora, Inc., Form 10-Q for the quarterly period ended October 31, 2018, filed December 12, 2018 ("Zuora Q2 2019 10-Q"), pp. 50–51.

[249] Zuora Q3 2019 10-Q, pp. 31–64.

[250] Zuora 2019 10-K, pp. 7–34.

[251] Email chain from Ninni Sonberg to Marc Diouana et al., "Re:          " January 24, 2019, ZUO_00300588; ZUO_V_000039; Email chain from Alvina Antar to Tyler Sloat, "Re: 606 Status update - Close Process," February 6, 2019, ZUO_00003467–73; Email chain from Tom Krackeler to Tien Tzuo, "Re: Bruner," February 25, 2019, ZUO_00117646–47; ZUO_00000906–33; ZUO_00335717–37.

[252] ZUO_00378110–36; ZUO_00120448–49.

[253] "Zuora, Inc. Board of Directors Meeting," February 28, 2019, ZUO_00000906–33.

[254] "Feb 2019 Zuora Board Meeting," undated, ZUO_00117568–72.

[255] Redline - Zuora 2019 10-K V1, March 15, 2019, and as-filed Zuora 10-K, April 18, 2019, pp. 19–72.

[256] *Id.*, pp. 31–38.

not being able to resolve integration issues.  More specifically, the supplemented language in the 10-K stated:

> In addition, because our products and services are designed to interoperate with a variety of other internal or third-party software products and business systems applications, we will need to continuously modify and enhance our products and services to keep pace with changes in application programming interfaces (APIs), and other software and database technologies. We may not be successful in either developing these new products and services, modifications, and enhancements or in bringing them to market in a timely fashion. There is no assurance that we will successfully resolve such issues in a timely and cost-effective manner. Furthermore, modifications to existing platforms or technologies, including any APIs with which we interoperate, will increase our research and development expenses. Any failure of our products and services to operate effectively with each other or with other platforms and technologies could reduce the demand for our products and services, result in customer dissatisfaction, and adversely affect our business.[257]

123.    In my opinion this language was consistent with disclosure that integration issues could materially impact their financial performance if the Company was unable to resolve them quickly.

### 3.    Zuora's Voluntary Disclosures Relating to Factors Affecting Product Integration and Products

124.    Zuora had multiple types of voluntary disclosures during the Class Period, including earnings calls, press releases and Forms 8-K filed with the SEC.  Zuora also had a presence on social media and its own website.  In this section, I review Zuora's voluntary disclosures and social media communications concerning products and product integration.   In these disclosures, Zuora not only consistently described the same risk factors as those explained in the IPO Registration Statement and periodic reports, but on multiple occasions before the end of 2018 discussed Zuora Billing and Zuora RevPro as separate business segments.  It is my opinion that such processes and practices were comparable to middle-market capitalization companies and provided investors with a rich source of relevant information.

---

[257] *Id.*, p. 31.

### a)    Analyst Disclosure and Assessments

125.    Zuora typically evaluated its two flagship products, Zuora Billing and Zuora RevPro, separately and on an independent basis.  For example, the acquisition of RevPro was generally advertised with a focus on its capabilities for "Revenue Automation and ASC 606 Compliance," without mention of any interaction with Zuora Billing.[258]  Analyst reports also discussed the Leeyo acquisition and additional capabilities separately from Zuora Billing.  A report published in late 2017 described the acquisition as bringing on capabilities including "unbilled revenue accounting, backlog forecasts, Standalone Selling Price (SSP) analysis, automated recasting of historical contracts, and parallel viewing of contracts under both old and new guidelines."  The report described these as "key capabilities that will help companies make the transition to ASC 606," without any mention of integration with Zuora billing or other Zuora products.[259]  A May 2018 report similarly described RevPro as "currently in the sweet spot of customer demand," again with no mention of integration.[260]  In addition, when Zuora announced its 2019 Winter product release with "a focus on automation and usability across Zuora Billing, Zuora Collect, and Zuora RevPro," it discussed the new features of each product separately; there was no mention of integration across products.  Consistent with similar custom and practices for voluntary disclosure by companies in the industry, Zuora announced new product developments (add-ons) to consumers and the market, providing details about the type of solutions that were being added to its portfolio of products in a timely manner.

126.    My review of Zuora's voluntary disclosure finds that Zuora did not disclose (or represent) that its products were seamlessly connected to each other.  Rather, this disclosure shows that during this time period Zuora was continuously working to integrate Zuora RevPro with Zuora Billing.  As part of this monitoring, EComm and the Board continued to monitor the status of projects aimed at developing product compatibility,[261] and made disclosures consistent with its status.

---

[258]  Zuora, Inc. Press Release, "2018 Zuora Announces its Winter '19 Release," December 11, 2018, p. 3.
[259]  IDC, "IDC Marketscape: Worldwide Subscription Relationship Management 2017 Vendor Assessment," November 2017, pp. 13–14.
[260]  MGI Research, "360 Rating: Zuora," May 2, 2018.
[261]  *See, e.g.*, ZUO_00000854–905; ZUO_V_000059.

### b)      Quarterly Earnings Report

127.    During the Class Period, Zuora issued quarterly earnings releases via a press release. Zuora issued an earnings release prior to the occurrence of any associated earnings calls with investors and analysts,[262] and these earnings releases were filed in respective Form 8-Ks.  In line with other SEC filings containing financial information, Zuora consistently included a summarized section of certain risk factors.

128.    Each Form 8-K filing contained a section summarizing "Forward-Looking Statements," which included reference to multiple risk exposures faced by Zuora.  For example:

> This press release contains "forward-looking statements" that involve a number of risks and uncertainties, including but not limited to, statements regarding our GAAP and non-GAAP guidance for the [next] fiscal quarter and [corresponding] full fiscal 2019 and financial outlook and market positioning. Words such as "believes," "may," "will," "estimates," "potential," "continues," "anticipates," "intends," "expects," "could," "would," "projects," "plans," "targets," and variations of such words and similar expressions are intended to identify forward-looking statements. Forward looking statements are based on management's expectations as of the date of this filing and are subject to a number of risks, uncertainties and assumptions, many of which involve factors or circumstances that are beyond our control. Our actual results could differ materially from those stated or implied in forward-looking statements due to a number of factors, including but not limited to, risks detailed in our final prospectus related to our initial public offering filed with the Securities and Exchange Commission on April 12, 2018 as well as other documents that may be filed by us from time to time with the Securities and Exchange Commission. In particular, the following factors, among others, could cause results to differ materially from those expressed or implied by such forward looking statements: we have a history of net losses and may not achieve or sustain profitability; the shift by companies to subscription business models may develop slower than we expect; we may not be able to sustain or manage any future growth effectively; our security measures may be breached or our products may be perceived as not being secure; our products may fail to gain, or lose, market acceptance; we may be unable to attract new customers and expand sales to existing customers; customers may fail to deploy our solution after entering into a subscription agreement with us; customers may incorrectly or improperly deploy or use of our solution; we may not be able to develop and release new products and services; we may experience interruptions or performance problems, including a service outage, associated with our technology; we face

---

[262]  Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 31, 2019; Q1 2020 Earnings Release, May 30, 2019.

intense competition in our markets and may not be able to compete effectively; weakened global economic conditions may adversely affect our industry; the risk of loss of key employees; changes in foreign exchange rates; general political or destabilizing events, including war, conflict or acts of terrorism; and other risks and uncertainties. Past performance is not necessarily indicative of future results. The forward-looking statements included in this press release represent our views as of the date of this press release. We anticipate that subsequent events and developments will cause our views to change. We undertake no intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. These forward-looking statements should not be relied upon as representing our views as of any date subsequent to the date of this press release.[263]

129.    Here, Zuora used language such as "our ability to develop and release product and service enhancements and new products and services," or "our ability to compete effectively" in the description of risk factors, the same as it did in its IPO registration statement and periodic reports.  Other press releases also included a Forward-Looking Statements section with similar content to the one quoted above.[264]  This was another method that the Company used to alert investors about the potential risks and uncertainties affecting Zuora's stock price, comparable to customs and practices used by middle-market companies.

130.    Zuora also regularly held earnings calls in parallel with the issuance of earnings releases.  During 2018, Zuora described Zuora Billing and Zuora RevPro as separate business segments, and did not suggest that integration between the two flagship products was a key factor of growth for Zuora at that time.[265]  In these calls, Zuora discussed RevPro as a product with its own revenue and consumer growth targets, independent of other products, and highlighted that RevPro's strategic role within Zuora's product portfolio was to assist consumers in adapting to a (new) revenue recognition standard and dynamic business environment.[266]

---

[263]  Q1 2019 Earnings Release, May 31, 2018, p. 4.

[264]  Examples of such press releases include the following: "Zuora Delivers Strong First Quarter Fiscal 2019 Results" on May 31, 2018; "Tien Tzuo, CEO and founder of Zuora, launches SUBSCRIBED, the first book on the subscription economy" on June 5, 2018; "Zuora Central Upgrade Further Attacks the ERP Market" on June 5, 2018; "Zuora Announces its Spring '18 Release at Subscribed in San Francisco" on June 5, 2018; "Zuora reports record second quarter fiscal 2019 results" on August 30, 2018; "Zuora Hosts Subscribed New York Featuring Thought Leaders From Amazon, Fortune, NYSE and XO Group" on October 5, 2018; "Zuora Named Amazon Pay Premier Partner for Millions of Merchants Seeking to Capitalize on the Subscription Economy" on October 11, 2018; "Zuora Reports Record Third Quarter Fiscal 2019 Results" on November 29, 2018; "Zuora Announces its Winter '19 Release" on December 11, 2018; "The Subscription Economy Grows More Than 300% In The Last Seven Years" on March 21, 2019; and "Zuora Reports Fourth Quarter and Full Year Fiscal 2019 Results" on March 21, 2019.

[265]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018, p. 4.

[266]  *Id*.

131.    For example, on the May 31, 2018 earnings call reporting results for the first fiscal quarter of 2019, Mr. Tzuo talked about the Company's product line in detail.  When referring to RevPro, he noted "[…] you may know RevPro as the leading ASC 606 and IFRS 15-compliant revenue management solutions.  But the reason these standards now exist is because business models are only getting more and more complex."[267]  Separately, and consistent with Mr. Tzuo's view, when talking about the Company's business growth, Mr. Sloat described RevPro as an independent source of growth for the Company in the professional services segment and did not mention any goal pertaining to the integration of the different key products.[268]

132.    In Zuora's August 30, 2018 earnings call reporting results for Q2 of the 2019 fiscal year, Mr. Sloat highlighted the unilateral impact of RevPro on subscription billings.[269]  Moreover, when answering a question regarding the market forecast for RevPro, Mr. Tzuo indicated the possibility of separate paces and roles for Zuora Billing and Zuora RevPro: "Well, we obviously know it has legs, but what we like is the fact that we have 2 flagship products, right? And in any given point in time, right, you'll see one product surge ahead of the other. […] And that allows us to have 2 options to continue to maintain growth rate in the Subscription Economy."[270]  Mr. Tzuo also commented on the substantially low overlap of customers across products at a time when the Company was successful and the immediate future looked positive: "Less than 10% of our customers actually have both products."[271]

133.    In Zuora's November 29, 2018 earnings call reporting results for Q3 of the 2019 fiscal year, Mr. Sloat highlighted the underlying reason for the strong demand that RevPro was experiencing.  He stated that "a larger issue with many of these companies as the complexity of revenue recognition limits their ability to efficiently scale and meet their business goals. That's why we continue to see good demand for our RevPro product."[272]  In response to a question about consumer attraction, Mr. Tzuo again underscored that "[n]othing's changed in terms of the less than 10% overlap still, which we think in the long run, all of our customers

---

[267] *Id.*

[268] Mr. Sloat stated that "[t]he year-over-year growth in professional services was partly driven by contributions from the RevPro product, which was not in our prior-year comparison."  *Id.*, p. 7.

[269] For example, Mr. Sloat mentioned that "the year-over-year growth numbers are impacted by the inclusion of RevPro starting in Q2 of last year."  "Q2 2019 Zuora Inc Earnings Call," August 30, 2018, p. 11.

[270] *Id.*, p. 16.

[271] *Id.*, p. 17.

[272] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 5.

are going to need both of these products.  They're very, very synergistic, and we've been very open about focusing not necessarily on the cross-sell of that but closing new deals."[273]

134.    In Zuora's March 21, 2019 earnings call reporting results for Q4 of the 2019 fiscal year on March 21, 2019, Mr. Huh highlighted that Zuora's solution for adopting the new revenue recognition standard (ASC 606) was RevPro: "As of February 1, 2019, we adopted the new revenue recognition standard, ASC 606. And we're adopting it using the full retrospective method, and we're using our own RevPro product to do so."[274]  Consistent with a treatment of RevPro as a separate product from Billing for the purposes of measuring the performance of the Company, Mr. Sloat talked about the company's business progress explicitly excluding the impact of RevPro by, for example, stating that "[a]lthough [Zuora was] not planning to provide a lot of detail, [its] annual organic growth, excluding RevPro, was healthy and over 30%."[275]  Information along these lines was provided throughout the Class Period as a way of allowing investors to understand how the Company was performing independently of RevPro.

135.    Throughout 2018 and 2019, Zuora repeatedly disclosed information about the growth potential of RevPro and Zuora Billing, focusing on potential improvements to usability and customer experience with each product, and recognizing uncertainties about how these improvements would develop over time.[276]  As I discuss above,  Zuora announced its Winter 2019 product release on December 11, 2018 with a "focus on automation and usability across Zuora Billing, Zuora Collect, and Zuora RevPro."[277]  Although by this time the Company had launched an internal project (Keystone) with the goal of integrating Zuora Billing and RevPro, the company did not state that its different products were fully integrated.[278]  For example, in the Winter 2019 product release the Company discussed new products aimed at improving usability across Billing and RevPro but avoided using the word "integration" or any other language that could have implied that the products were integrated.[279]

136.    On March 22, 2019, Zuora commented on certain innovations to the firm's products: "Zuora's latest patents reflect the consistent execution of our technology team to continuously

---

[273] *Id.*, p. 10.

[274] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 2.

[275] *Id.*, p. 6.

[276] For example, Zuora's Form 10-K for fiscal year 2019 noted that "[i]f we are unable to meet customer demands in creating a flexible solution designed to address all these needs or otherwise achieve more widespread market acceptance of our solution, our business, operating results, financial condition, and growth prospects would be adversely affected." *See* Zuora 2019 10-K, p. 9.

[277] Zuora, Inc. Press Release, "2018 Zuora Announces its Winter '19 Release," December 11, 2018, p. 1.

[278] "FY'19Q4 Product Quarterly Review," undated, ZUO_00000854–905 at 860 ("The design and customer rollout problems for Order and Billing/RevPro data integration (Keystone) is a serious business risk and our top priority.").

[279] Zuora, Inc. Press Release, "2018 Zuora Announces its Winter '19 Release," December 11, 2018, pp. 1–3.

innovate our two flagship products—Zuora Billing and Zuora RevPro."[280]    Meanwhile, internally Zuora was engaged in developing software compatibility between the two products. During the last months of the Class Period, between January and May of 2019, both EComm and the Board were monitoring the integration efforts; the CEO, the Disclosure Committee, and the Audit Committee also considered Zuora's possible disclosures relating to the integration issues in connection with periodic SEC filings and public statements.[281]

137.    On May 30, 2019, Zuora held its earnings call to report results in Q1 of fiscal year 2020.[282]  To my knowledge, this was the first time during the Class Period that integration issues were publicly described as a potential problem.  At this time, there were multiple sources of uncertainty potentially affecting Zuora's near-term future.  Zuora's internal analysis pointed to a negative impact on Zuora's outlook for Q2 and the full fiscal year due to (1) a decline in the rate of new customer sign ups (i.e., bookings), (2) a slowing down in cross-selling of Zuora Billing and Zuora RevPro, (3) a weakening dollar-based retention (i.e., lower recurring revenue), and (4) a growth rate for professional services that was trending down.[283]

138.    With respect to integration, Mr. Tzuo highlighted a "course correction" of Zuora's strategy to focus on the integration of its two flagship products.  Mr. Tzuo discussed the integration issue, its impact on performance and expectations for the future as follows:

> [P]art of our ability to grow within our installed base has been predicated on our ability to cross-sell our 2 flagship products: Billing and RevPro. However, the product integration for these 2 products is taking longer than expected. While we're seeing strong demand from our Billing customers to implement RevPro, the technical work to complete the integration is taking time as these are complex mission-critical systems. And so for our existing Billing customers, who have recently purchased RevPro, we slowed down the RevPro implementations this past quarter given the product integration delay. We're continuing to acquire and deploy new customers for each product on a standalone basis, but naturally, this delay has slowed down our cross-sell motion. This resulted in lower professional services and subscription revenue in the quarter as well as tempered expectations going forward.[284]
>
> Second, on the product integration side, we made a course correction in our approach, and I'm confident that we're on the right track. The

---

[280]  Zuora, Inc. Press Release, "Zuora Adds Five New U.S. Patents to Accelerate Growth of the Subscription Economy," March 22, 2019, https://www.businesswire.com/news/home/20190322005008/en/.
[281]  "FY'19Q4 Product Quarterly Review," undated, ZUO_00000854–905; ZUO_00329659–70; ZUO_V_000059.
[282]  "Q1 2020 Zuora Inc Earnings Call," May 30, 2019.
[283]  *Id.*, pp. 3–5.
[284]  *Id.*, p. 3.

integration of our 2 flagship products is critically important to us and our customers' success.[285]

139.    Mr. Sloat also updated the market on business growth, as was typical for earnings calls, and noted the impact of product integration and other factors (such as a decline in the performance of Zuora's sales force) on some of Zuora's financials, and also provided substantive details about what could be expected in the next quarters:

> We ended the quarter with 546 customers over $100,000 ACV, representing 24% growth versus the prior year. We saw solid growth in this number, but the field execution hurdles that Tien mentioned earlier clearly impacted our rate in signing up new customers.[286]

> Another key metric, dollar-based retention, ended at 110%, which is at the midpoint of our long-term range that we talked about. While this is a healthy level for us, dollar-based retention was impacted by the product integration delay that slowed down the cross-sell motion in the quarter.[287]

> We saw healthy subscription revenue growth of 32% to $47.3 million in the quarter. Professional services grew 1%, and this was impacted by the new business and product integration challenges mentioned early in the call. Additionally, we had $1.4 million of professional services in Q1 over the last year related to customers upgrading from ASC 605 to ASC 606 compared to only $300,000 in Q1 of this year. This further impacted the year-over-year professional services growth rate. All of this led to total revenue of $64.1 million in Q1, in line with the midpoint of our guidance.[288]

140.    Additionally, in response to a question about integration, Mr. Tzuo delineated the timeline of the company's operation with respect to integration, starting from the acquisition of RevPro.

> We did acquire Leeyo a little less than 2 years ago, but I guess where you all coming on 2 years. The first year was really focused on ASC 606, and there was such a tight deadline to get the core set up, dozens -- close to 100 customers live on ASC 606. And so John, that was -- that took us all the way through when these adoption standards were, right? So I'd call out Q1, Q2 of last year. And so honestly, we didn't really

---

[285] *Id.*
[286] *Id.*, p. 4.
[287] *Id.*
[288] *Id.*, p. 5.

have time and the resource to focus on the integration between the 2 until after the 606 [wave] was complete. So we didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction. We course corrected. And now I'm absolutely confident in the path that we have right now.[289]

### B.    Zuora's Disclosure Process Relating to Factors Affecting Products and Product Integration

141.    In this section, I analyze Zuora's internal process to disclose relevant information concerning its products and product integration. Specifically, I describe the internal processes and procedures that took place in order to arrive at the disclosures discussed in the previous subsection. I do so in chronological order, which facilitates my description of how the information about Zuora's integration issues and products was evolving over time, and how it was considered for the purposes of disclosure together with the information about how the Company was performing. This section provides a general discussion about disclosures related to integration and product issues, while Section IX focuses on specific practices and processes for disclosing guidance.

142.    Zuora referenced information concerning products and product integration in email exchanges, internal meetings, and presentations. Zuora's executive officers and the Board were regularly involved in monitoring the process of product and technology development and, at the same time, in reviewing and approving Zuora's disclosures in periodic reports, earnings calls, and presentations. I observe that, comparable to customs and practices used by middle-market capitalization companies, during the Class Period, Zuora repeatedly made disclosures of risks related to product and product integration issues, describing their possible effect on performance (*e.g.*, sales growth).

143.    My analysis indicates that, consistent with what it disclosed during the Class Period, Zuora internally recognized that product integration was an increasing issue for consumers and an increasing risk for the company's growth. Throughout this period, Zuora's disclosure processes and procedures for assessing the impact of potential product integration issues were robust and well-designed, and were comparable to custom and practices utilized by middle-market capitalization companies. Further, Zuora's disclosures relating to these issues provided investors with a rich source of relevant information

---

[289] *Id.*, p. 7.

### 1.   Process for IPO SEC Filings

144.   Zuora's IPO process involved many internal and external parties and was designed to ensure appropriate disclosure in its S-1 Registration statement.  In connection with the IPO, Zuora released an investor presentation in April 2018 that was used in the company's roadshow with institutional investors.[290]  In the presentation, Zuora highlighted its two flagship products, Zuora Billing and Zuora RevPro, and presented them as independent business segments.[291]  For example, when it discussed the Company's growth prospects, Zuora provided separate pricing models (including a different methodology to calculate committed volume fees) for Zuora Billing and Zuora RevPro.[292]  Zuora also presented positive and steady customer growth over the previous two years independent of the Leeyo acquisition.[293]  Additionally, the Company showed increasing revenue and Annual Contract Value ("ACV") from its customer base.[294]  Integration of Zuora Billing and Zuora RevPro was a "future road map" or "a product vision for what [the Company] would like to build."[295]

145.   During the IPO process, Zuora identified product integration as a risk factor, but was also internally working on solutions to product integration issues through its Keystone project as such issues became apparent.  As Mr. Tzuo stated in his deposition, as of the time of the IPO, Zuora viewed Keystone as "a project the engineering team was working on, [but] it was still early in the project's existence."[296]  In line with this statement, Zuora disclosed multiple risk exposures related to product integration in the risk factor section of its IPO Prospectus, as I describe in section VIII.A.1.

### 2.   Process for Earnings Call Q1 2019, Q1 2019 Form 10-Q filing, Earnings Call Q2 2019, and Q2 2019 Form 10-Q filing

146.   The information that was ultimately delivered to investors about the performance of the Company during Q1 2019 was discussed in detail during the May 23, 2018 Board meeting.[297]  According to the minutes from that meeting, Mr. Tzuo presented a business review to the

---

[290] Zuora, Inc., "Investor Presentation," April 2018.
[291] *Id.*, p. 16.
[292] *Id.*, p. 22.
[293] *Id.*, p. 23.
[294] *Id.*, pp. 25–26.
[295] Tzuo Deposition, p. 106:17–18.
[296] *Id.*, p. 107:10–12.
[297] "Minutes of a Meeting of the Board of Directors of Zuora, Inc.," May 23, 2018, ZUO_00000253–58 ("ZUO_00000253–58").

Board, including Q1 2019 results and the outlook for the next quarter.[298]  Marc Diouane, Zuora's President, also presented information about Zuora's pipeline and sales productivity.[299] In addition, Mr. Sloat reviewed the guidance to be proposed in the upcoming earnings call, and Messrs. Tzuo and Sloat reviewed the proposed earnings release and call script.[300]  Ultimately, the Board considered and approved these disclosures.

147.    After its IPO closed, Zuora held its first earnings call for Q1 2019 on May 31, 2018, delivering the message of a strong quarter of results as a public company.[301]  Zuora achieved top-line growth in subscription revenues and total revenues in the first quarter of 2018.[302]  As discussed in disclosures pertaining to Q1 2019, the strong company performance in that quarter was observed across multiple relevant metrics.  In particular, the Company discussed robust demand for its entire product line, including RevPro, which was generally highlighted as the leading solution in the market for compliance with revenue recognition standards.[303]

148.    Market commentary from the first half of 2018 conveyed a positive outlook for Zuora and for the subscription billing market generally.  A May 2018 MGI report upgraded its rating of Zuora, and noted the Company's "steady improvement in execution, sales focus, and R&D discipline together with stronger cost controls and better customer feedback."[304]  MGI also noted that Zuora had "significant headroom for further growth."[305]

149.    Meanwhile, a few individuals within Zuora began learning of potential integration issues from customers who had deployed both RevPro and Billing.  Zuora's executives discussed potential integration issues in internal emails, these discussions were at a high level and in the context of operational and business integration related to its acquisition of Leeyo.[306] For example, an internal email exchange between Mr. Sloat and Mr. Tzuo on April 24, 2018 noted the "rough journey over the past six months" regarding issues with integration and concerns from clients such as ███████████[307]  The email discussed an upcoming update to the Board about RevPro integration and proposed next steps for the company to tackle these

---

[298] ZUO_00000253–58 at 56.
[299] ZUO_00000253–58 at 56; Zuora 2019 10-K, p. 35.
[300] ZUO_00000253–58 at 56.
[301] "Q1 2019 Zuora Inc Earnings Call," May 31, 2018, pp. 6–8.
[302] Id., p. 3 ("Our subscription revenues grew by 39% year over year. Our total revenues grew by 60% year over year.").
[303] See "Q1 2019 Zuora Inc Earnings Call," May 31, 2018, p. 4 ("In this quarter, we continue to see robust demand for our entire product line. You may remember that we have not one but two flagship products, billing and RevPro, and a growing family of add-on products"; "Now, you may know RevPro as the leading ASC 606 and IFRS 15-compliant revenue management solutions.").
[304] MGI Research, "360 Rating: Zuora," May 2, 2018, p. 1.
[305] Id.
[306] ZUO_00025597; ZUO_00002381–83.
[307] ZUO_00014597–98 at 97.

concerns, including an emphasis on "[having] a stronger operational fabric … [and a] need to mandate singular ownership and accountability which will lead to integration."[308]  Internal communications also suggested that Zuora executives began to have some concerns arising from complaints from some consumers who had experienced integration issues with Billing and RevPro, even though Zuora had yet to offer full integration of the two products to the market.  Through its Keystone project, Zuora was working to fulfill customers' requests with respect to more capabilities.[309]  For example, in a June 4, 2018 EComm meeting, Mr. Tzuo was updated about the deployment of RevPro to four customers (███████████████████),  the apparent dependencies between the success of those deployments and the progress that Zuora's engineering teams were being able to achieve on their projects related to RevPro capabilities.[310]

150.   Zuora filed its quarterly Form 10-Q for Q1 2019 on June 13, 2018.[311]  As was the case with Zuora's other quarterly reports during the Class Period, multiple parties reviewed and approved the content of this filing as part of the disclosure process.  On June 7, 2018, the Disclosure Committee discussed various disclosures, including financial footnotes, the MD&A overview, and risk factor changes.[312]  On June 11, 2018, the Audit Committee approved Form 10-Q, and the CEO and CFO approved and certified the Form 10-Q on June 12, 2018.[313]

151.   Zuora disclosed certain risk factors in its  Form 10-Q for Q1 2019.[314]  In particular, Zuora disclosed that it was potentially exposed to certain risks related to integration and product issues under multiple possible scenarios.[315]  Zuora also noted the possibility that these scenarios could impact the Company's future growth, communicated guidance based on these scenarios, and provided disaggregated information in order to facilitate investors' interpretation of this guidance.[316]

152.   In the second half of 2018, Zuora continued internal discussions about consumer issues related to product integration.  For example, in an August 7, 2018 email chain that included

---

[308] *Id*.

[309] Tzuo Deposition, p. 113:17–24 ("We had customers with RevPro. They were able to do that integration. One of their asks was, can we make that integration easier by producing more capabilities on our side, and we had a desire to – we had a project to fulfill that desire, and that project names was called Keystone. And at this point in time, Keystone was underway.").

[310] ZUO_V_000033 ("[T]here was some dependencies on those four deployments specifically and things that the engineering organization was in the process of building."). *See also*, Tzuo Deposition, p. 122.

[311] Zuora Q1 2019 10-Q.

[312] Minutes of a Meeting of the Disclosure Committee of Zuora, Inc., June 7, 2018, p. 1.

[313] ZUO_00448865-68 at 5–6.

[314] Zuora Q1 2019 10-Q.

[315] *Id*., pp. 40, 48.

[316] *Id*.

Mr. Tzuo and Mr. Diouane, the discussion was centered around certain complaints about Zuora's products (including integration) from one of its customers, ████ [317] The email noted a complaint received by a Zuora Board member from a ████ Board member regarding the "avers[ion] to paying for [a] Zuora upgrade" to an integrated solution.[318] ████ had been "provided [with] $100K+ in free services for RevPro/Keystone effort" because of running into "issues with early adoption of all of the Spring stack features."[319]

153.    At the same time, Zuora executives had notified the Board that some customers were experiencing integration challenges and consequently that resources had to be diverted to address these issues.  For example, in the September 2018 Board meeting, an update on Keystone noted that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ [320]

154.    On August 30, 2018, Zuora held its Earnings Call for Q2 2019 in which it announced that it had experienced substantial growth.[321]  In particular, Zuora achieved 47% year-over-year growth in total revenue and 28% growth in customer spending.[322]  There was also an apparent slowdown in year-over-year growth of revenue from professional services, which was explained by the fact that RevPro was included in the year-over-year comparison.[323]

155.    On September 4–5, 2018, the Board met and, among other things, was provided with a Keystone status report communicating that certain consumers would benefit from the delivery of the product integration capability, and that Zuora would need to redirect its focus and reprioritize its resources to support that effort.[324]

---

[317] ZUO_00103182–83 at 83.

[318] ZUO_00103182–83.

[319] *Id.*

[320] ZUO_00002740–92 at 62.

[321] "Q2 2019 Zuora Inc Earnings Call," August 30, 2018, p. 3.

[322] *Id.*, p. 5.

[323] *Id.*, p. 10.

[324]  ZUO_00002740–92 at 62.  *See also*, Tzuo Deposition, pp. 164:20–165:5 ("I think it says that this project there are a few customers that would benefit from the delivery of this capability and given that it's typical in this phase of an engineering deliverables that they're working out things that they see. We're making sure the board understands there's a linkage between a handful of customers, you know we saw the list—right? —and this project. There's a dependency between those two things. And then that's why it's also saying we're going to rep-prioritize to make sure we have enough resources and focus.").

156.    On September 7, 2018, the Disclosure Committee met and discussed the upcoming 10-Q filing.[325]  The Disclosure Committee reviewed financial footnote disclosures, the MD&A, and changes in risk factors since the Company's most recent 10-Q filing.[326]  After discussion of these items, the Disclosure Committee revised the language of certain risk factors, including those related to security breaches and the market demand for RevPro.[327]

157.    On September 13, 2018, Zuora filed its Form 10-Q for Q2 2019.[328]  Disclosures in this filing were considered and approved on September 10, 2018.[329]  As with its previous SEC filings, Zuora included risk factors related to product integration, and provided detailed explanations of each risk, as well as the potential effects these risks, if realized, could have on the company's business, financial condition, operating results, and future prospects and guidance.[330]

### 3.    Process for Earnings Call Q3 2019, and Q3 2019 Form 10-Q filing

158.    Following its September 13, 2018 Form 10-Q filing, Zuora received additional complaints from early adopters of RevPro (*e.g.*, ▮▮▮▮), including about issues with integration. These complaints were considered by Zuora's executives and directors in the process of determining upcoming disclosure.[331]  Upper management, including Mr. Tzuo, internally discussed concerns about the potential impact on Zuora's business of product integration issues relating to RevPro and Billing.[332]  For example, Mr. Tzuo led a discussion of the performance of Zuora's RevPro business unit from a sales and product perspective in a November 27, 2018 Board meeting.[333]  The Board also discussed a general update on business and financial results, including actual performance in the quarter as well as guidance,[334] and the Audit Committee approved the material that was included in the proposed script for the planned earnings call prepared by management.[335]

---

[325] Minutes of a Meeting of the Disclosure Committee of Zuora, Inc., September 7, 2018.
[326] *Id.*, p. 1.
[327] "Disclosure Committee Meeting 2Q'19 Form 10-Q Review," September 7, 2018, p. 5.
[328] Zuora Q2 2019 10-Q.
[329] ZUO_00448869-71.
[330] Zuora Q2 2019 10-Q, pp. 40, 43, 46, 49.
[331] ZUO_00028424–25; ZUO_00028744–48.
[332] ZUO_00003008–10; ZUO_00003083–92.
[333] ZUO_00000934–40 at 36.
[334] *Id.*
[335] ZUO_00000497–507.

159.    On November 29, 2018, Zuora held its Earnings Call for Q3 2019 in which it announced that it had achieved strong financial results for the quarter.[336]  In particular, Zuora grew subscription revenue by 43% year-over-year and grew total revenue by 33%.[337]  As in the earnings call for the prior quarter, Zuora noted that total revenue grew slower than subscription revenue, mainly due to the relatively lower growth rate of professional services revenue given that RevPro was now included in the analysis.[338]  The Company reported that RevPro maintained strong demand and presented a growth opportunity in revenue automation.[339]  Zuora also described RevPro as "the top-ranked solution for revenue recognition software" and forecasted "good demand for [its RevPro] product" independent of any cross-selling considerations.[340]

160.    Ahead of the upcoming 10-Q filing, Zuora's Disclosure Committee met on December 6, 2018.  Among other things, the Committee discussed risk factor changes since the previous filing.  They updated language for risk factors related to accounting standards (to reflect the anticipated effect of the adoption of ASC 606 standard) and Zuora's stock price.[341]

161.    On December 13, 2018, Zuora filed its Form 10-Q with the SEC.[342]  As was the case with prior SEC filings, this Form 10-Q was filed only after the material included in the filing was approved by Zuora's Board, Disclosure Committee, Audit Committee, CEO and CFO.[343]  The filing reiterated Zuora's explanations of each risk exposure, including potential effects on the Company's business, financial condition, operating results, and future prospects, comparable to custom and practices used by middle-market capitalization companies.

### 4.    Process for Earnings Call Q4 2019, and Fiscal Year 2019 Form 10-K Filing

162.    Beginning in January 2019, some product-related issues that consumers were reporting to Zuora became more focused on integration.  For example, ████, one of the early adopters of Zuora's two flagship products (i.e., RevPro and Billing) suspended its use of RevPro on

---

[336] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, pp. 2–3.
[337] *Id.*, p. 3.
[338] *Id.*
[339] *Id.*, p. 5.
[340] *Id*, p. 3.
[341] Zuora, Inc., "Disclosure Committee Meeting: 3Q'19, Form 10-Q Review," December 6, 2018, p. 5.
[342] Zuora Q3 2019 10-Q.
[343] ZUO_00448871-72; KPMG, "Zuora, Inc. Interim Review Status: Interim Financial Information for the quarter ended October 31, 2018," November 27, 2018; Zuora, Inc., "Disclosure Committee Meeting 3Q'19 Form 10-Q Review," December 6, 2018; ZUO_00000934–40.

January 23, 2019, although it continued to use Zuora Billing.[344]   Mr. Sloat and Mr. Tzuo discussed and confirmed issues with the Keystone integration through internal emails, and focused on identifying a solution to the integration issue as well as considering what, if any, information should be disclosed to investors and when the disclosure should occur.[345]   On January 28, 2019, EComm met to discuss the implications of these issues.[346]   Mr. Tzuo expressed frustration with the approach the team had taken to sort the challenges they had been facing with this project, and emphasized the need for proactive contingency planning as he encouraged the team to take ownership of their specific roles and responsibilities.[347]   In his deposition, Mr. Tzuo explained that he used his frustration as a tool to emphasize the need to respond to a "small set of customers" in the "early access program."  He stated in his deposition:

> This is an engineering project that had gone awry.  We have lots of engineering projects. However, this one -- this one was important to the small set of customers that were in the early access program, all the customers we talked about.  And we had just seen one of the customers in the early access program, we failed them, and I was use strong words to get my -- to make sure that my leadership team internalized what we had done as a company.[348]

---

[344]  ZUO_00300615–16.

[345]  ZUO_00003341–42; ZUO_00175506–08; ZUO_V_000039.

[346]  ZUO_V_000039.

[347]  *Id.*  More specifically, Mr. Tzuo discussed Zuora's failure to deliver an integrated product to their client (███), expressed his disappointment and sought to hold the team accountable for the failure after ███ canceled their RevPro order and reverted to being a Billing client: "I'm not hearing anything change. I'm really not. The whole model is, 'you know what? We've been able to wing shit for our whole lives, let's just wing it, let's just get into it, we'll find all the use cases, bugs will come out … it's a crazy crazy world, it doesn't make sense. … we have no plan, no confidence, we're just going to wing it … that's what we did … nobody at this table had any personal confidence that [Keystone] was going to work … it's going to be a disaster … how can you possibly say that we're going to launch a product that we will have next year as a revenue source and have revenue dependencies as a public company and say I don't know whether the product is going to work or not." Mr. Tzuo also expressed frustration with the team at this meeting: "we are a fucking public company.  Right? Deliver the fucking numbers.  Stop, stop complaining about the fucking product.  We cannot link execution of a public company with the product."  In deposition, Mr. Tzuo noted that this was aimed at encouraging his team to be accountable. Consistently, during the same meeting Mr. Tzuo stated that "every time there's an execution miss we blame the product, instead of like figuring out what the hell we need to fix because if you want the product to change, it takes two years to change a product, it takes at least one year to change a product, what are we going to do in the meantime?").

[348]  Tzuo Deposition, p. 206:18–22 ("Clearly when you saw Marc Diouane's email and you saw Marc say 'I'm embarrassed,' I was making sure that my whole leadership team, especially Jagan, was internalizing what it means to have a customer abandon the project."), 207:8–14 ("I wanted the whole team, the whole EComm. When a customer – when we fail a customer like that, I need the whole team to understand the magnitude of what happened and to make them feel accountable and to make them internalize it so that we can course correct whatever issues there were and make sure it doesn't happen again."), 208:6–15.  *See also*, Tzuo Deposition, pp. 186:15–17 ("I was trying to get my leadership team to step up and be accountable to what we said we were going to do."), 186:23–187:2 ("I wanted to make sure that my CFO and my head of sales, who are the primary leaders responsible for … the next few quarters' financial numbers, are focused on it and not trying to find anything as an excuse."), 187:19–23 ("and to remind [Mr. Diouane] that he's also an executive that owns a set of numbers that he committed to, and he also has to make sure that he comes to what solutions in his ownership of that number.").

163.    Mr. Tzuo also explained to the team why there appeared to be a lack of ownership with regards to the challenges presented by Keystone.[349]  As he explained in his deposition, his speech created a turning point for the manner in which the team was approaching these challenges:

> We started getting more productive here. We started problem solving, and I think this was the turning point for this engineering project, this Keystone project. And after this we started finding -- we started problem solving and putting the project back on track. … What I was saying is your approach is wrong, and you need to get in touch with that.[350]

164.    In Zuora's February 2019 agenda for various key committee meetings, Keystone and its impact on customers was marked as a risk to be discussed in the upcoming Audit Committee Meeting.[351]  Also, as part of preparing materials for an upcoming Morgan Stanley Conference on February 26, 2019 Zuora's IR team, together with Mr. Sloat, prepared mock questions about integration that could come from analysts.[352]  Additionally, email exchanges among Zuora's executives showed that the Company had an increasing focus on the integration issue.  In particular, Mr. Tzuo defined the focus for 2019 on resolving initiatives like Keystone, rather than adding new clients.[353]

165.    In parallel, analyst commentary continued to be positive about growth in the subscription billing market and Zuora's position in that market.  A January 2019 MGI report stated that "subscription [billing] represents a very large market opportunity," and that "the need for modern billing engines and monetization capabilities will increase significantly."[354]  MGI raised its rating of Zuora, mentioning the rollout of Zuora Collect and the successful absorption of RevPro, and stating that Zuora still had significant growth potential.[355]

166.    At the Board meeting on February 28, 2019, Mr. Sloat provided an update of the business and company finances, including a review of Q4 2018 and fiscal year 2019 actual

---

[349] ZUO_V_000039. "A single owner would [say]… 'I'm really worried about this.  But here are three things.  Here's everything that's going well, I need to do these three things.  If I do these three things, everything else locks in place.  I don't know what these three things are, but I've eliminated these issues … now I want to set expectations that means I've got to scope the whole damn thing down to this, so you don't get pissed,' that person will be talking like that, that's not how you guys are talking.  You guys are talking like this is a $100 million project … with four work streams, and guess what?  Those things are always delayed, they're always over-budget, they never work.  Right?  They fail half the time.  And you guys have lulled yourself into a false sense [of] bullshit.  Honestly.  Well we got the team slide, check. … This is just more of the same.  You're propagating nonsense."

[350] Tzuo Deposition, pp. 219:23–220:3, 220:11–13.

[351] ZUO_00117568–72.

[352] ZUO_00330041–47 at 44.

[353] *Id.*

[354] MGI Research, "Agile Billing Solutions – A Buyer's Guide," January 9, 2019, p. 28.

[355] *Id.*, p. 75.

performance, and the current view on guidance for the next quarter and fiscal year.[356]  In addition, there was a detailed discussion about changes to Zuora's Sales division and an update about Keystone and its possible impact on customers.[357]  As noted in the slides provided to the Board for a quarterly update on the status of products, at that time, Keystone was increasingly perceived as a challenging project and a priority moving forward.[358,359]  Importantly, the same report to the Board reflected that the Product team had delivered "[a]ll the planned items [to be] delivered" with respect to the Keystone project in that quarter, but that the team had "found numerous missed use cases" (i.e., new data integration issues encountered in specific situations for each customer).[360]  Consistent with Keystone emerging as a top priority for Zuora and its Product team, Keystone was included at the top of the list in the Q1 Product Delivery Outlook list, and the top milestone associated with the project was "[r]un two parallel architecture[s] - Current Architecture and everything in RevPro architecture" (the latter architecture corresponding to what would become "K2").[361]  That same deck showed that Zuora Billing represented approximately 80% of Zuora's ARR during 2019 and that, as the core product of the Company, it continued to outperform forecasts in terms of bookings and ARR.[362]

---



[356]  ZUO_00000906–33 at 24, 26 ("

").  ZUO_00001282–310 at 295.

[357]  Id.; ZUO_00117568–72.

[358]  ZUO_00000854–905 at 860, 870, 873, 876.  Furthermore, the Board noted in the executive summary on February 28, 2019 that

See ZUO_00000906–33 at 27.

[359]  This is consistent with the language in scripts that were being prepared by Mr. Tzuo and Mr. Krackeler to deliver this product update to the board

").  ZUO_00003598–602 at 599.  See also, ZUO_00000906–33 at 24 ("

").

[360]  ZUO_00000854–905 at 876.  See also, ZUO_00000906–33 at 27 ("

").

[361]  ZUO_00000854–905 at 877.  ARR (Annualized Recurring Revenue) corresponds to one of the key measures of performance in the SaaS industry.  See "Annual Recurring Revenue (ARR)," CFI, January 15, 2022, https://corporatefinanceinstitute.com/resources/knowledge/ecommerce-saas/annual-recurring-revenue-arr/?nowprocket=1, accessed July 28, 2022.

[362]  ZUO_00000854–905 at 856–857.

167.    On the same day, February 28, 2019, the Audit Committee met and, as part of its accounting and financial update, management reported that Zuora had recorded reserves to cover possible expenses to support customer and product issues related to the Keystone project.[363]

168.    As part of the regular process for guidance and earnings disclosures, the team responsible for the earnings process (including members from IR, FP&A, Legal, and PR) held a second prep meeting on March 5, 2019.[364]  Mr. Huh led a review of draft scripts and the earnings release, as well as the preparation of a script for the analysts' Q&A session in the earnings call.[365]  The team drafting this script was preliminarily addressing one of the factors that ultimately led to a revision of the guidance that was disclosed at the earnings announcement.  A limited impact on revenue was expected from the change to reporting results under ASC 606 for the first time: Zuora estimated a negative $5.0 million (for the full fiscal year 2020) as the expected impact on subscription revenue associated with historical business practices from the Leeyo acquisition and re-allocation of subscription revenue.[366]

169.    Zuora continued to discuss Keystone's progress and its potential impact on financials and outlook internally in EComm meetings.  In the Keystone EComm Update meeting on March 4, 2019, management of Keystone customers, forward-looking plans for long term product architecture, and upcoming FY 2020 Keystone deals were presented.[367]  Customers were grouped into three sets based on the impact of the implementation delay.  Zuora then evaluated the revenue impact of pausing customers on RevPro.  Mr. Sloat requested more information about the impact of Keystone on Services revenue beyond what was revealed in the March 4, 2019 presentation.[368]  In a March 7, 2019 email exchange between Mr. Ramamoorthy (VP of Services), Parveen Nandal (VP FP&A) and Mr. Sloat, Mr. Nandal also suggested disclosing the impact from Keystone on financials as a downstream impact on upcoming guidance.[369]  Mr. Ramamoorthy provided an assessment of a $1.2 million revenue

---

[363]  ZUO_00446392–97 at 93 ("reserves being booked for fiscal 2019, including a reserve related to the Keystone product that integrates Zuora Billing with RevPro.").
[364]  ZUO_00448828.
[365]  *Id.*
[366]  ZUO_00329659–70 at 62.
[367]  ZUO_00335717–37 at 18.
[368]  ZUO_00204053–54; ZUO_00204087–88; ZUO_00120448–49; ZUO_00038966–67; ZUO_00178139–40.
[369]  ZUO_00204053–54 at 54.

impact from Keystone, and a list of customers that were to be put on hold.[370]  These customers were subsequently informed of the pause on RevPro.[371]

170.    In February 2019, Zuora engaged in delivering a new approach for Keystone.  Work had begun internally on a "Plan B" solution to the Keystone project, and by early March 2019 this solution had become known internally as "K2."[372]  K2 differed from Keystone in that it made RevPro "subscription aware," meaning that Zuora could now map incoming actions more easily between systems.[373]  K2 also simplified billing by allowing booking metrics to be stored differently.[374] This eliminated the need for customer pre-requisites and reduced the amount of middleware required to integrate the two systems.[375]  On March 10, 2019, Mr. Krackeler (Senior Vice President of Products) informed Mr. Tzuo that the product team had progressed with getting the official sign-off and a delivery plan in place for K2.[376]

171.    Mr. Tzuo reviewed the Keystone issue and suggested presenting RevPro and Billing to Zuora's sales force as separate products, highlighting key features that made each product unique in their specific market segments.  He also suggested recognizing that Keystone had been a challenging project, but at the same time describing the confidence that upper management had on the new path forward involving K2.[377]  Mr. Tzuo also planned on mapping out planned dates for deployments, deals in progress, and new deals.[378]  The EComm agenda and materials were drafted accordingly, focusing on Keystone and its financial impact on the Company.[379]  Zuora then delivered the proposed  new integration approach to all "Set 1" customers, which were the ones expected to receive support with product integration by Engineering teams.[380]  Subsequently, the Company analyzed the financial impact of launching K2 on Services revenue with the assumption of a June release of K2.[381]

172.    The EComm presentation took place on March 11, 2019, focusing on the discussion titled Keystone Financial Impact Analysis.[382]  The presentation included an assessment of the

---

[370]  *Id.* at 53.
[371]  *Id.*
[372]  ZUO_00378110–36 at 10.
[373]  *Id.* at 13.
[374]  *Id.* at 14.
[375]  *Id.* at 17–18.
[376]  ZUO_00120448–49 at 49.
[377]  *Id.* at 48.
[378]  *Id.* at 49.
[379]  ZUO_00038966–67 at 66.
[380]  ZUO_00178139–40 at 39.  "Set 1" customers were customers whose implementation date was supported by engineering, "Set 2" and "Set 3" customers whose implementations were either delayed or on hold depending on the project. *See* ZUO_00335717–37 at 25.
[381]  ZUO_00178139–40 at 39.
[382]  ZUO_00329887–99.

impact of the Keystone product strategy change on Subscription Revenue, Services Revenue, and customers, with the assumption that K2 was available at the start of Q3.[383] The list of total customers was further divided into "Set 1", "Potential Hold," "Hold" and "Continue."[384] The estimated financial impact on the 2020 FY Plan was $3.6 million in Global Services Revenue and $1.0 million in Subscription Revenue.[385] Keystone had an impact of $0.5 million on Subscription Revenue and $1.5 million on Total Revenue to Q1 2020, and $1.0 million on Subscription Revenue and $4.5 million on Total Revenue for FY 2020.[386] The presentation was backed up with a summary of "Set 1" customers' plans for Keystone implementations.[387]

173. On March 14, 2019, the draft earnings release was circulated to KPMG for its sign-off.[388] Mr. Sloat and Mr. Tzuo internally discussed the financial impact of a year concession to all Keystone customers, and Mr. Sloat briefed Board member and chair of the Audit Committee Kenneth Goldman on the Keystone issue.[389] In particular, Mr. Sloat discussed Zuora's new approach to integration, K2, the estimation of four to five months for deployment, and the detailed deployment plan for three sets of customers.[390] Mr. Sloat also presented an audit update of a $0.5 million reserve in Q4 2019 subscription revenue and $0.274 million in Q4 2019 professional services revenue, as well as guidance for FY 2020 under the assumption that RevPro subscription revenue would not be recognize for "Set 2" customers.[391] On March 15, 2019, the draft earnings release was distributed to the Audit Committee for review and comment.[392]

174. On March 19, 2019, the Audit Committee met and primarily discussed the Earnings Call for Q4 2019 and FY 2019.[393] Mr. Sloat provided an update regarding a reserve recorded against revenue related to potential claims and concessions related to customer issues linked to the Keystone deployments. Mr. Moore of KPMG also discussed the reserve related to Keystone and gave an audit update.[394] He confirmed that KPMG had not identified any matter

---

[383] *Id.* at 88.
[384] *Id.* at 89.
[385] *Id.* at 93.
[386] *Id.* at 95.
[387] *Id.* at 98–99.
[388] ZUO_00448828.
[389] ZUO_00178327; ZUO_00268993–94.
[390] *Id.* at 93.
[391] ZUO_00268993–94. Set 2 customers are ones whose implementations of Keystone had been put on hold due to integration issues.
[392] ZUO_00448828.
[393] ZUO_00001206–07.
[394] *Id.* at 07.

that would result in a material weakness.[395]  Mr. Tzuo and Mr. Sloat then referenced the draft earnings press release and script for Q4 2019 that had been circulated to the Committee in advance of the meeting, and the Committee members provided input on the draft script.[396]  The Committee also requested, and management agreed to circulate (to the full Board), an updated version of the script to reflect the Committee's input.[397]  Zuora internally updated Q1 2020 guidance based on other factors, as Mr. Nandal reported a $0.5 million increase in Q1 2020 revenue guidance based on a consideration of an upside from no material bad debt.[398]

175.    A final earnings prep meeting was held on March 20, 2019, with a review of the updated drafts of earnings guidance and other reports that incorporated the feedback received from the Audit Committee, among others.[399]  Zuora prepared for the upcoming investor call with a plan to explain the reasons for a new integration project and expected timeline,.[400]  Zuora circulated its earnings release corresponding to Q4 2019 and full fiscal year 2019 on March 21, 2019, and held an earnings call on the same day.[401]

176.    Internal discussions of the financial impact of Keystone continued leading up to the Q4 2019 earnings call and the SEC filing deadline.  EComm had several more meetings during this time period.  On March 4, 2019, EComm was presented with an update on the new approach to integration, an update on the nine current customers and their upcoming transition to K2, and the most up-to-date plan on how to handle FY 2020 Keystone deals.[402]  After this presentation, discussion continued throughout the week between members of EComm and the product team about the magnitude of the impact that integration issues would have on revenue.[403]

177.    EComm met again on March 11, 2019 and after covering their regular agenda items, discussed the financial impact of the Keystone project.  The presentation from this meeting described the status of each Keystone customer and whether their service would be disrupted.  Slides showed a projected $1.18 million impact on services revenue, and an additional $.40 million impact on subscription revenue for Q1 2020.[404]  EComm met again on March 25, 2019,

---

[395]  *Id.*
[396]  *Id.*
[397]  *Id.*
[398]  ZUO_00121424.
[399]  ZUO_00448828.
[400]  ZUO_00003709–13.
[401]  Zuora, Inc. Press Release, "Zuora Reports Record Fourth Quarter Fiscal 2019 Results," March 21, 2019.
[402]  ZUO_00335717–37 at 18.
[403]  ZUO_00204053–54.
[404]  ZUO_00329887–99 at 90–91.

and again discussed the impact of customer dissatisfaction on the business. Specifically, it discussed that multiple customers were not only refusing to expand or upgrade their business with Zuora, but that some were also considering refusing to pay for services currently provided.[405] At this point in time, the K2 project was progressing, but was still considered part of a broader set of issues that Zuora had identified internally that were affecting segments of its customers base, which in turn affected sales performance.[406] Mr. Tzuo was informed about the development of project K2 and the challenges that Zuora was experiencing during those days.[407] He noted in his deposition that the team had identified the dependencies (of multiple products and projects) with Orders, one of Zuora's other products, as an important source of the noise around the Company's situation:

> I was trying to summarize for my leadership team what I was hearing from the different parts of the organization. … K2 is one of the things that I mentioned on the call, on this conversation. … It turns out that the approach that the team was taking with Keystone once we were able to dive in was flawed, and so we identified it. Calvin, who you see referenced in some of the emails, was able to help us break through. And so we took a new approach, which the team nicknamed K2 for Keystone 2. … What I actually heard was K2 was a small part of the problem, that there were other product issues that actually have more an impact in terms of number of customers affected than K2. … Without getting too technical, it turns out that one of the flaws was Keystone was based on something called Order Metrics that I saw show up, and K2 was not. And that was one of the things that -- that helped us course correct the project. And so I don't remember exact dates, but if this was late March, by then we had eliminated the dependency between K2 and Orders.[408]

178. Given the impact of integration and consumer products and the risks involved, the Audit Committee approved a revision of company guidance with respect to the previous internal

---

[405] ZUO_V_000049.

[406] Tzuo Deposition. Mr. Tzuo stated in his deposition that K2 issues only affected a small number of customers. *See* Tzuo Deposition, p. 264:2–5 ("What I actually heard was K2 was a small part of the problem, that there were other product issues that actually have more an impact in terms of number of customers affected than K2.").

[407] ZUO_V_000049. "Let me start with this. There is a lot of thrashing going around with the customer base, and it's having an impact on sales. So … upwards of 40% of a sales manager's time is spent on escalations versus focusing on selling deals. We have a renewable number, upsell number, the customers are pushing back on giving us any more money or even … paying us. … I'm not saying there's no issues at all in the deployment cycle, but this is primarily in the customer base, right? Customers that are live and sometimes they've been live for a while. … I want to scope out the deployment cycle. Maybe there's some misconceptions there but I just want to pound the problem a little bit. I would say that … some of the root causes, you know, K2 is a big source of noise. But Orders, and all the ramifications of Orders, right? Because Orders has kind of grown into something that's a little bit bigger, with tentacles right? It grew into -- it has tentacles into K2. It has tentacles … I'm hearing a lot of noise about all this."

[408] Tzuo Deposition, pp. 262:15–17, 262:20–21, 262:24–263:5, 264:2–5.

forecasts for the upcoming quarter.  Consistent with previous discussions, Zuora factored in a $1.5 million negative impact of total revenues and a $0.5 million negative impact of subscription revenues.  Operating loss was similarly increased by $1.5 million, and loss per share was increased by $0.02.[409]

179.    During this time period the Disclosure and the Audit Committees continued the revision process on these issues, and made substantial updates between the initial and final draft of the 10-K.  The final Form 10-K's revised language on additional risks in light of these issues, including the addition of risks such as "our ability to deploy our products successfully within our customers' information technology ecosystems" and "increases or decreases in subscriptions to our platform."[410]  The Company also added detail about the operability of its products:

> In addition, because our products and services are designed to interoperate with a variety of other internal or third-party software products and business systems applications, we will need to continuously modify and enhance our products and services to keep pace with changes in application programming interfaces (APIs), and other software and database technologies. We may not be successful in either developing these new products and services, modifications, and enhancements or in bringing them to market in a timely fashion. There is no assurance that we will successfully resolve such issues in a timely and cost-effective manner. Furthermore, modifications to existing platforms or technologies, including any APIs with which we interoperate, will increase our research and development expenses. Any failure of our products and services to operate effectively with each other or with other platforms and technologies could reduce the demand for our products and services, result in customer dissatisfaction, and adversely affect our business.[411]

180.    The Disclosure Committee met again on April 4, 2019 ahead of the filing of the Form10-K.  In addition to the regular committee members, the Director of Internal Audit, a member of Technical Accounting, the Associate General Counsel, and the Senior Director of Revenue were also in attendance.[412]  The Committee Reviewed Zuora's disclosure controls and processes.[413]  Along with notable Form 10-K disclosures, including the adoption of ASC 606,

---

[409]  ZUO_00329887–99 at 95.
[410]  Redline - Zuora 2019 10-K V1, March 15, 2019, as-filed Zuora 10-K, April 18, 2019, p. 24.
[411]  Zuora 2019 10-K, p. 31.
[412]  "Minutes of a Meeting of the Disclosure Committee of Zuora, Inc.," April 4, 2019.
[413]  *Id*.

the stock performance graph, quarterly trends, MD&A, and financial notes.[414] The Committee also discussed the status of comments from Zuora's external auditor.[415]

181.    Zuora held its Earnings Call for Q4 2019 on March 21, 2019, and filed its annual report on Form 10-K on April 18, 2019, both of which presented a promising annual performance for fiscal year 2019, despite integration setbacks.[416] Zuora grew subscription revenues by over 35% year-over-year, and grew total revenue by 29% year-over-year to $64.1 million.[417] Transaction volume through billing systems grew 56% to $10.8 billion.[418] Zuora expressed confidence in future growth opportunities, stating that "the Subscription Economy will become the business model for all companies."[419] Zuora also provided a detailed explanation of each risk, as well as the possible effects on the company's business, financial condition, operating results, and future prospects and guidance, comparable to custom and practices at middle-market capitalization companies.[420]

### 5.    Process for Earnings Call Q1 2020

182.    On May 22, 2019, Zuora held a Board Meeting.[421] During the meeting, the Board discussed the Company's financial results for Q1 2020 and progress with regards to the integration issue.[422] Keystone was described as part of the headwind to bookings growth and expected revenue, together with a slowdown in bookings, especially in Zuora Billing.[423] Similarly, the broader outlook for Q1 and Q2 of the 2020 fiscal year, as well as Company guidance, was brought up during the meeting. Integration was again addressed as a top priority initiative, but Company executives expressed a positive attitude given potential solutions to the issue.[424]

---

[414] Id.
[415] Id.
[416] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019; Zuora 2019 10-K.
[417] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 3.
[418] Id.
[419] Id., p. 2.
[420] Zuora 2019 10-K, pp. 7–34.
[421] ZUO_00001230–48.
[422] Id. at 31.
[423] ZUO_00001166–92 at 66 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[424] Id. at 87 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

183.    In the May 29, 2019 Audit Committee Meeting, Mr. Sloat reviewed the Company's financial results and updated guidance, and asked for input from the Committee for the upcoming earnings call on May 30, 2019.[425]   In addition, Zuora's external auditor (KPMG) provided an update on the certification of Q1 2020 financial results.[426]   Mr. Sloat also asked for feedback about the draft earnings press release and the script for the earnings call.[427]

184.    As a result of Zuora's disclosure process, Zuora disclosed information about the integration issue on its May 30, 2019, Q1 2020 Earnings Call.[428]   In particular, Zuora stated that the integration issue was one of the two "execution headwinds that [it] saw in the quarter," and that it was expected to have a substantial impact on Q2 2020 and the full fiscal year, through a slowing of cross-selling of Zuora Billing and Zuora RevPro, a decline in the rate to sign up new customers, weakening dollar-based retention, and lowering professional services growth rate.[429]

### C.    Second Opinion on Zuora's Disclosure Practices and Processes Relating to The Factors Affecting Product Integration and Products

185.    Based on my review of the relevant disclosure practices and processes in this matter, it is my opinion is that Zuora's disclosures relating to products and product integration were generated through Zuora's disclosure practices and processes. During the Class Period, Zuora relied on these disclosure practices and processes to regularly assess Zuora's disclosures relating to products and product integration.  Such processes and practice provided investors with a rich source of relevant information.

### IX.    Opinion 3: Zuora's practices and processes for updating of guidance, and preparation of earnings releases and related disclosures incorporated issues related to products and product integration, and were comparable to custom and practices utilized by middle-market capitalization companies.  Such practices and processes provided a sound basis for Zuora's executives to rely on the guidance, earnings releases, and related disclosures that Zuora then disclosed to investors.

186.    The Amended Complaint alleges that, during the Class Period, Zuora made misleading disclosures and omissions about the functionality of Zuora's subscription order-to-cash

---

[425]  "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," May 29, 2019, p. 1.
[426]  *Id.*, pp. 1–2.
[427]  *Id.*
[428]  "Q1 2020 Zuora Inc Earnings Call," May 30, 2019, p. 3.
[429]  "Q1 2020 Zuora Inc Earnings Call," May 30, 2019, p. 2.

platform, Zuora Central, and its flagship software application products, Zuora Billing and Zuora RevPro.[430]  In particular, Plaintiff alleges that Defendants falsely represented Zuora's ability to cross-sell its flagship products, and that instead they failed to disclose the serious sales execution problems and diminished demand for RevPro as a result of the failure to fully integrate its main products.[431]

187.    During the Class Period, Zuora provided relevant and timely information about the expected impact on Zuora's finances of product and integration issues like the ones involved in this matter via voluntary periodic guidance to the market.  In this section, I examine Zuora's disclosure practices and processes for the preparation of periodic guidance and how they related to any product integration and product issues.  In particular, I review Zuora's disclosure process pertaining to preparation of financial guidance and how information about issues such as product integration would be incorporated throughout that process.  In addition, because it was noted as the primary cause of the guidance reduction that is the center of the Plaintiff's allegations, I also discuss Zuora's process for calculating guidance and incorporating disclosure with respect to quarterly sales in the 2020 Q1.  After such review, I find that such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to Zuora's guidance.

### A.    Zuora's Process for Preparation of Guidance and its Relation to Product Integration and Product and Quarterly Sales

188.    Zuora engaged in a continuous process of assessing its guidance to incorporate any applicable changes, including changes related to products, product integration, and sales.  More specifically, Zuora disclosed financial guidance on a quarterly basis during earnings calls and through an associated earnings release.[432]  As described in section VII.B.3, the process of estimating and approving financial guidance involved numerous parties and steps over a multi-month period.  This process was integral to the broader process of preparing earnings calls and

---

[430] Amended Complaint, ¶ 1.

[431] *Id.*, ¶ 229.

[432] "Q1 2019 Zuora Inc Earnings Call," May 31, 2018; "Q2 2019 Zuora Inc Earnings Call," August 30, 2018; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019; Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 21, 2019; Q1 2020 Earnings Release, May 30, 2019.

releases, and commenced at the end of the fiscal quarter.[433]  It culminated with Zuora's issuance of an earnings release and associated earnings call with investors and analysts.[434]

189.    The process of preparing the disclosure of guidance for any given quarter (and any possible revisions) involved multiple business units at Zuora, including IR, and FP&A.[435]  IR was led by Mr. Huh, who was also a member of the Disclosure Committee.[436]  IR led the majority of the regular meetings that were part of this process, and collaborated with other business units, such as Public Relations, Legal, and FP&A, in drafting all the materials for earnings disclosures.[437]  FP&A was responsible for managing the financial model used to prepare the guidance numbers.[438]  Other entities that played important roles in this process included Zuora's Corporate Legal Counsel, the Disclosure Committee, and the Audit Committee.  Pursuant to its charter, the Disclosure Committee was primarily responsible for reviewing and discussing earnings disclosures, including guidance.[439]  Prior to earnings announcements, the Audit Committee also reviewed and approved the majority of the communications regarding earnings, such as the earnings release and scripts for the earnings call.[440]  In my opinion such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to Zuora's guidance.

190.    In addition, I understand that Zuora regularly held EComm meetings (generally one per week).[441]  In these meetings, teams representing the different areas of Zuora's business gave presentations to upper management to update them on the status of internal projects and on the Company's performance.[442]  The comprehensive and sensitive nature of the information discussed in these meetings made them relevant to inform the process of preparing guidance, as I show below.[443]  In what follows, I examine the specific process underlying the disclosure

---

[433] ZUO_00448828.

[434] *Id*.

[435] I provide further details about the process of preparation of earnings announcements more generally, including guidance, in section VII.B.3.  *Id*.

[436] *See, e.g.*, Minutes of a Meeting of the Disclosure Committee of Zuora, Inc., September 7, 2018.

[437] ZUO_00448828.

[438] Interview with Tyler Sloat, July 20, 2022.

[439] "In advance of filing Zuora's periodic reports on Form 10-K and Form 10-Q and Form 8-K filings related to earnings releases, the Committee shall review information, consider the materiality of such information for purposes of its disclosure obligations under U.S. federal securities laws as well as other factors that may require or bear on the determination to disclose such information, and make recommendations to senior management with respect to such matters." ZUO_00448830–33 at 32.

[440] "Review and discuss the Independent Auditors and the Company's management the Company's quarterly and annual financial results and the related earnings press releases and earnings guidance to be distributed to the public, including to analysts and, if applicable, rating agencies."  Audit Committee Charter, p. 3.

[441] Interview with Tyler Sloat, July 20, 2022.

[442] ZUO_00335717–37; ZUO_00329887–99.

[443] ZUO_00335717–37; ZUO_00329887–99.

of guidance in each earnings cycle during the Class Period and the assessment of issues related to products, product integration, and sales.

### 1.    Fiscal Q1 2019

191.    The process for determining the guidance provided in reporting Q1 2019 earnings was different than in the rest of the Class Period, since Zuora was preparing to file IPO documents with the SEC during that fiscal quarter.[444]    As a result, there was overlap between the IPO process and Zuora's process to determine guidance.

192.    On April 9, 2018 (before fiscal quarter end), EComm held a meeting in the middle of a series of roadshows where multiple dimensions of the business were evaluated.[445]    In this meeting, Mr. Nandal discussed Zuora's Q1 2019 actual financial performance and presented a forecast of the Company's FY 2019 financial performance.[446]

193.    On May 23, 2018, the Board of Directors held a meeting where, among other things, the outlook and proposed guidance for Q2 2019 were presented.[447]    Mr. Tzuo presented a business review, including a summary of Zuora's Q1 2019 results.    This plan addressed actual and forecasted performance, and explained the reasons for any observed variations between the two.[448]    Subsequently, Mr. Sloat reviewed Zuora's proposed guidance for its Q1 2019 earnings release and call, and then Messrs. Tzuo and Sloat reviewed the proposed draft earnings release and call script.[449]    There was also a RevPro update during that meeting, where Messrs. Reddy and Ramamoorthy, and Ms. Monika Saha, reviewed financial performance, integration status, and current market dynamics impacting Zuora's RevPro business.[450]

194.    After this meeting, the draft earnings release was distributed to KPMG for auditor comments.    KPMG approved the earnings release, which was then circulated to the Audit Committee.[451]    On May 30, 2018, the Audit Committee held a meeting during which Mr. Sloat and Mr. Battaglini reported adjustments that were made to financials following the May 23,

---

[444] ZUO_V_000027.
[445] As shown by the recording of the EComm meeting held on April 9, 2018, during the meeting there was a discussion about relevant upcoming days during April, which included a range of dates when Zuora would be holding its roadshow ("Calendar of Upcoming Events").  ZUO_V_000027.
[446] *Id*.
[447] ZUO_00000253–58.
[448] *Id.* at 56.
[449] *Id*.
[450] *Id*.
[451] ZUO_00448828.

2018 Board meeting.[452]  The Audit Committee thereafter discussed the draft Q1 2019 earnings release.[453]  After receiving approval from all parties involved in the process, including the CEO, CFO, Board, and the Audit Committee, the earnings call was held on May 31, 2018, and the company issued a press release titled "Zuora Delivers Strong First Quarter Fiscal 2019 Results."[454]

### 2. Fiscal Q2 2019

195.    In preparing for its Q2 2019 earnings call, Mr. Huh led an earnings prep kick off meeting on July 31, 2018 (fiscal quarter end), and provided a press release announcing the earnings date on August 1, 2018.[455]  As I described above, the internal preparation of each earnings disclosure involved several prep meetings that were attended by multiple business units, including members of the Disclosure Committee, IR, FP&A, and Legal.[456]

196.    The first prep meeting was held on August 10, 2018, with Mr. Huh leading a discussion about performance figures, finalization of a press release announcement and a discussion of the upcoming earnings release.[457]  The second prep meeting took place on August 16, 2018 when, under Mr. Huh's leadership, the group reviewed the draft of earnings release and scripts, and proposed answers to potential questions for the earnings call Q&A session.[458]  The draft of the earnings release was then passed to a sub-team of the Disclosure Committee (including IR, Legal, and the Chief Accounting Officer), which worked on updating the drafts of earnings material before a third prep meeting was held on August 23, 2018.[459]

197.    After a review of the updated drafts by that sub-group of the Disclosure Committee, the material was distributed on August 24, 2018 to the Audit Committee in advance of its upcoming meeting to review and discuss the approval of the documents on August 28, 2018.[460]  For that Audit Committee meeting, which was led by Mr. Sloat and Ms. Pileggi, KPMG submitted the results of its review of the consolidated interim financial information of Zuora, which were

---

[452]  "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," May 30, 2018, p. 2 ("Mr. Sloat and Mr. Battaglini described certain adjustments made to the Q1'19 financials that management had presented to the Board at the Board meeting on May 23, 2018").
[453]  *Id.* ("The Committee thereafter discussed the draft Q1'19 earnings release that had previously been circulated to the Committee.").
[454]  Zuora, Inc. Press Release, "Zuora Delivers Strong First Quarter Fiscal 2019 Results," May 31, 2018, https://www.businesswire.com/news/home/20180531006444/en/.
[455]  ZUO_00448828.
[456]  Interview with Tyler Sloat, July 20, 2022.
[457]  ZUO_00448828.
[458]  *Id.*
[459]  *Id.*
[460]  *Id.*

considered in the Committee's discussion of earnings material.[461]  After holding a fourth prep meeting on August 29, 2018, the team led by Mr. Huh and Ms. Sylvia Lexington (Associate General Counsel) finalized the earnings documents.[462]  The next day, Zuora issued a press release titled "Zuora Reports Record Second Quarter Fiscal 2019 Results" and held its Q2 2019 earnings call.[463]

### 3.    Fiscal Q3 2019

198.    The regular process to determine guidance disclosures as part of the reporting of earnings for Q3 2019 formally began on October 29, 2018.[464]  Prior to this, at the Board meeting on September 4 and 5, 2018, the Board and upper management discussed Zuora's current view of third quarter and full-year guidance and the outlook for the next fiscal year.[465]  In addition, Mr. Tzuo provided an update on product and technology.  In my opinion, this demonstrates that the Board was regularly being informed about both Company performance and consequent guidance for upcoming periods, and had opportunities to make informed contributions in the disclosure process.

199.    The first activity in the regular process to prepare the earnings disclosure for Q3 2019 was the issuance of a press release on the first day of November 2018, announcing the upcoming earnings date.[466]  The first prep meeting, led by Mr. Huh, took place on November 5, 2018.[467]  In that meeting, attendees conducted an initial review of performance numbers, and discussed details to be considered for the preparation of the respective earnings release.[468]

200.    A second prep meeting followed on November 12, 2018, with a review of a draft script for the earnings call and a draft of the earnings release, and preparation of a Q&A session for the upcoming earnings call.[469]  After the second meeting, KPMG started an on-site audit of the Company, and the draft of the earnings release was distributed to KPMG for its review and sign-off.[470]

---

[461] ZUO_00000175–91; ZUO_00448828.

[462] ZUO_00448828; "Minutes of a Meeting of the Disclosure Committee of Zuora, Inc.," September 7, 2018.

[463] Zuora, Inc. Press Release, "Zuora reports record second quarter fiscal 2019 results," August 30, 2018; "Q2 2019 Zuora Inc Earnings Call," August 30, 2018; "Minutes of the Disclosure Committee," April 4, 2019.

[464] ZUO_00448828.

[465] "Minutes of a Meeting of the Board of Directors of Zuora, Inc.," September 4-5, 2018, p. 3.

[466] Zuora, Inc. Press Release, "Zuora Announces Date for Third Quarter Fiscal 2019 Earnings Call," November 1, 2018, https://www.businesswire.com/news/home/20180531006444/en/.

[467] ZUO_00448828.

[468] *Id.*

[469] *Id.*

[470] *Id.*

201.    The draft earnings release was then distributed to the Disclosure Committee in anticipation of the Committee's approval of the earnings material at a third prep meeting that took place on November 20, 2018.[471]  That third prep meeting served to review and revise drafts of the earnings call script, the earnings release, and the proposed script for the Q&A session.[472] The resulting draft of the earnings release was then distributed for review to the Audit Committee in advance of the Audit Committee meeting held on November 27, 2018.[473]  During that meeting, Zuora's executive officers addressed the Audit Committee's comments regarding the Q3 2019 earnings-related materials.[474]  On the same day that the Audit Committee met to analyze and approve the material concerning earnings announcements, there was also a Board meeting.[475]  During this meeting Mr. Tzuo along with Mr. Sloat and Mr. Diouane provided management's current view of fourth quarter guidance and the outlook for fiscal year 2020.[476] Mr. Tzuo also led a discussion of the performance of Zuora's RevPro business unit from a sales and product perspective.[477]

202.    A final prep meeting was held on November 28, 2018.[478]  During this meeting, attendees (including IR, Accounting, and Legal) incorporated a final round of feedback and performed a final review of the updated drafts.[479]  Zuora issued its Q3 2019 earnings release on November 29, 2018 and held a conference call with investors that same day.[480]

### 4.    Fiscal Q4 2019

203.    Preparation of Zuora's Q4 2019 earnings announcements followed a similar process as in previous quarters.  During this period there were increased concerns about the impact of Keystone and potential customer satisfaction issues on the financial outlook of Zuora, so there was more focus on the impact that product integration issues would have on the Company's outlook.[481]

---

[471]  *Id.*
[472]  *Id.*
[473]  *Id.*
[474]  Minutes of a Meeting of the Audit Committee of the Board of Directors of Zuora, Inc., November 27, 2018, p. 1.
[475]  ZUO_00000934–40.
[476]  *Id.* at 36.
[477]  *Id.*
[478]  ZUO_00448828.
[479]  *Id.*
[480]  Zuora, Inc. Press Release, "Zuora Reports Record Third Quarter Fiscal 2019 Results," November 29, 2018; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018.
[481]  "Feb 2019 Zuora Board Meeting," undated, ZUO_00117568–72; Email chain from Tom Krackeler to Tien Tzuo, "Re: Revised structure for Board Level 1 doc," February 24, 2019, ZUO_00003598–602; "Minutes of a Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," February 28, 2019, ZUO_00446392–97.

204.    As previously mentioned, on January 24, 2019, one of Zuora's early access customers, Zoom, notified the Company that it would no longer be using RevPro, and moving forward would only use Billing.[482]  Internal emails show that upper management, including Mr. Tzuo and Mr. Sloat, were actively discussing issues with Keystone.[483]  This issue was one of the main topics for the January 28, 2019 EComm meeting, where Mr. Tzuo expressed his frustration with how the relevant teams had been approaching the Keystone project.[484]

205.    On February 28, 2019, the Board held a regularly scheduled meeting.[485]  The material from this meeting shows that, Zuora's executives continued to develop an understanding of the issues that affected Keystone's performance.[486]  Mr. Sloat provided an update regarding the business and company finances, including a review of Q4 and fiscal year 2019 actual performance, and the current view on guidance for the next quarter and fiscal year.  The Board also discussed changes in sales and an update about Keystone and its possible impact on customers.[487]  Despite challenges with Keystone, the presentation notes that Zuora Billing represented approximately 80% of Zuora's Annual Recurring Revenue ("ARR") during 2019 and that, as the Company's core product, it continued to outperform forecasts in terms of bookings and ARR.[488]

206.    On February 28, 2019, the Audit Committee met to review financials for fiscal 2019, and, in particular, highlighted adjustments due to Zuora's transition to ASC 606 and a $0.5 million reserve recorded related to Keystone.[489]

207.    In the EComm meeting on March 4, 2019, there were presentations about the management of Keystone customers, forward-looking plans for long term product architecture, and upcoming fiscal 2020 Keystone deals.  The presentation for this session covered the proposed architecture for the new Keystone design.  It also discussed the impact on customers, grouping them into three categories depending on the severity of their implementation delays due to Keystone delays.[490]

---

[482]  Email chain from Brent Cromley to Tom Krackeler, "Re: ▮▮▮," January 24, 2019, ZUO_00300615–16; Email chain from Paolo Battaglini to Tyler Sloat, "Fwd: Zuora," September 22, 2018, ZUO_00028424–25 at 24.
[483]  See "3 main areas of concern … 2) Keystone not GA - hearing noise from other customers on issues w/keystone integration and lack of confidence on whether keystone currently supports their use cases (ramp)."  ZUO_00003341–42; ZUO_V_000039.
[484]  ZUO_V_000039.
[485]  ZUO_00448828.
[486]  ZUO_00000906–33.
[487]  ZUO_00001282–310; ZUO_00117568–72.
[488]  ZUO_00000854–905 at 856–857.
[489]  ZUO_00446392–97; ZUO_00214503–05 at 05.
[490]  "Keystone EComm Update," March 4, 2019.

208.    As part of the regular process for guidance and earnings disclosures, the team responsible for reviewing and drafting the earnings report held a second prep meeting on March 5, 2019.[491]    Mr. Huh reviewed draft scripts and the earnings release, and also discussed preparation of the script for an analysts Q&A session during the earnings call.[492]    Further, the team drafting the Q&A script preliminarily addressed one of the factors that ultimately led to a revision of the guidance that was disclosed at the earnings announcement.[493]    Specifically, the change in reporting results under ASC 606 was expected to have a limited impact on revenue.[494] At the time, Zuora estimated a negative $5 million impact (for the full fiscal year 2020) on subscription revenue.[495]

209.    In the days that followed, management began assessing the revenue impact of pausing the Keystone customers' deployment of RevPro on Q1 2020 and Q2 2020 as well as the full fiscal year, as Mr. Sloat expressed concerns about not having seen the impact of Keystone on the Services revenue in the March 4, 2019 presentation.[496]    In an update to Mr. Sloat and other executives, Mr. Ramamoorthy provided an assessment that the impact on revenue would be $1.2 million.[497]    In an email exchange between Mr. Ramamoorthy, Mr. Nandal, and Mr. Sloat on March 7, 2019, Mr. Nandal suggested disclosing the impact from Keystone on financials as a downstream impact on upcoming guidance.[498]

210.    At the same time, Zuora engaged in delivering a new approach for Keystone. Throughout March, the team had discussions to map out dates for deployments, deals in progress, and new deals.[499]    Agenda and materials for an upcoming EComm meeting were drafted accordingly, focusing on a Keystone discussion and the financial impact.[500]    Zuora delivered the proposal of the new integration approach to all set 1 customers, and their go-live dates were pushed.[501]    The Company made an impact analysis to Services Revenue with the assumption of a June release for K2.[502]

---

[491]  ZUO_00448828.
[492]  *Id*.
[493]  ZUO_00329659–70 at 62.
[494]  *Id*.
[495]  *Id*.
[496]  ZUO_00204053–4; ZUO_00204087–88; ZUO_00120448–9.
[497]  ZUO_00204053–4.
[498]  *Id*.
[499]  ZUO_00120448–9.
[500]  ZUO_00038966–7.
[501]  ZUO_00178139–40.
[502]  *Id*.

211.    The next EComm presentation took place on March 11, 2019, with a main subject of the meeting being the Keystone Financial Impact Analysis.[503]   The presentation included services revenue impact, customers impact, and subscription revenue impact due to the change in Keystone product strategy (to K2), and under the assumption that K2 would be available at the beginning of Q3 2019.[504]   The list of affected customers was further divided into "SET 1," "Potential Hold / Move to K2 (TBD)," "HOLD - Communicated," "HOLD," and "CONTINUE."[505]   The reported financial impact of Keystone to FY 2020 Plan was $3.5 million in Professional Services Revenue and $1.0 million in Subscription Revenue.[506]   Similarly, there was a forecasted Keystone impact of $0.50 million on Subscription Revenue and $1.5 million on Total Revenue for Q1 2020.[507]   Consistent with these forecasts, the estimated impact of the change in Keystone implementation strategy on financial guidance for Q1 2020 was of $0.50 million on Subscription Revenue and $1.5 million on Total Revenue for Q1 2020, and $1.0 million on Subscription Revenue and $4.5 million on Total Revenue for full FY 2020.   The impact on guidance of the switch to reporting standards under ASC 606 was also included in that analysis, with the impact of this on guidance for the fiscal year being generally larger than the Keystone impact.[508]

212.    On March 12, 2019, the Finance and Legal teams met to discuss the earnings figures in further detail.[509]   The next day, the broader group working on earnings and guidance material had a third prep meeting.[510]   The purpose of the meeting was to review updated drafts of scripts, the earnings release, and a draft Q&A session.[511]   At that time, Mr. Sloat gave an internal update to Mr. Goldman (Chair of the Audit Committee) about the evolution of the Keystone issue which been discussed in Board and Audit Committee meetings towards the end of February, 2019.[512]   Among other things, the update informed Mr. Goldman about the officially adopted new approach to the integration ("K2").[513]   Mr. Sloat also shared specific concerns about the uncertainty that came with a new approach, particularly with respect to expected frustration

---

[503]  ZUO_00329887–99.
[504]  *Id.* at 88.
[505]  *Id.* at 89.
[506]  *Id.* at 93.
[507]  *Id.* at 94–95.
[508]  *Id.* at 95; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 7; ZUO_00326338.
[509]  ZUO_00448828.
[510]  *Id.*
[511]  *Id.*
[512]  ZUO_00268993–94.
[513]  *Id.* at 93.

from some customers whose integration projects would be put on hold.[514]  Mr. Sloat also discussed the methodology that Zuora was using to assess the financial impact from customer dissatisfaction with the proposed solution, and noted that a $0.5 million reserve had been booked to cover possible concessions that the Company might need to make.[515]  The steps taken in the accounting analysis were outlined in the Q4 2019 reserve memo.[516]  Mr. Sloat also noted that the guidance assumed that Zuora would not be recognizing revenue on the Subscription Revenue RevPro component from the group of customers ("Set 2") most likely to grow frustrated with the new strategy.[517]

213.    On March 14, 2019, the draft earnings release was circulated to KPMG for its sign-off.[518]  Mr. Sloat and Mr. Tzuo internally discussed the financial impact of a year's concession to all Keystone customers, and Mr. Sloat briefed Mr. Goldman, Chair of the Audit Committee, on the audit as well as the Keystone issue.[519]  Mr. Goldman was informed of the new approach, K2, the estimation of four to five months for deployment, and a detailed deployment plan for three sets of customers.[520]  Mr. Sloat also presented an audit-related update of a $0.5 million reserve in Q4 2019 Subscription Revenue and $0.274 million reserve in Q4 2019 Professional Services projects using Keystone.[521]

### 5.    Fiscal Q1 2020

214.    The Disclosure Committee began the process of preparing earnings updates for fiscal Q1 2020 with the earnings prep kick off meeting held on April 29, 2019, followed by Zuora's announcement of the earnings call date for Q1 2020 through a press release issued on May 1, 2019.[522]

215.    On May 2, 2019, Mr. Tzuo communicated with executives about what he viewed as concerning preliminary results for Q1 2020 that were prepared in anticipation of an upcoming EComm meeting.[523]    ███████████████████████████████

---

[514] *Id.*.

[515] *Id.*.

[516] ZUO_00214503–5.

[517] "For FY20, we have put together our guidance under the assumption that we will not be recognizing revenue on the subscription revenue RevPro component of the Set 2 customers."  ZUO_00268993–94 at 94.

[518] ZUO_00448828.

[519] ZUO_00178327; ZUO_00268993–94.

[520] ZUO_00268993–94.

[521] *Id.* at 93.

[522] ZUO_00448828.

[523] ZUO_00004218–22.



216.    On May 10, 2019 the Disclosure Committee held the first prep meeting on financial metrics and a discussion of the earnings release.[528]  The second prep meeting was held on May 14, 2019, in which Mr. Huh led a review of the draft earnings call script, the earnings release, and the script for the Q&A session.[529]  KPMG officially began its on-site audit on May 15, 2019.[530]  The third disclosure prep meeting was held on May 21, 2019.[531]  The Board met on May 22, 2019.[532]  During the meeting, Mr. Sloat provided business and financial updates, with input from Messrs. Tzuo, Battaglini, Huh, and Nandal, "including a review of Q1 performance, the current view of Q2 guidance, and the outlook for bookings and revenue for FY 2020."[533]  Mr. Sloat reviewed a range of guidance scenarios which would be dependent on Zuora's Q2 2020 bookings performance, as well as the progress of Zuora's K2 initiative.[534]  The revenue outlook was adjusted down for both Billing and RevPro to reflect the reduction in bookings.[535]

217.    Relatedly, Zuora booked a subscription revenue reserve of $313,000 in Q1 2020, which was explained in a reserve memo.[536]  In the executive summary of that document, Zuora acknowledged obstacles from the restart of project Keystone and the impact of slower bookings

---

[524] *Id.* at 18.
[525] *Id.* at 18.
[526] *See* ZUO_00004218–22 at 18 ( ██████████████████████████ ).
[527] ZUO_00004218–22 at 20.
[528] ZUO_00448828.
[529] *Id.*
[530] *Id.*
[531] *Id.*
[532] *Id.*
[533] ZUO_00001230–48 at 31.
[534] *Id.*
[535] ZUO_00001166–92 at 80.
[536] ZUO_00249589–91.

growth in the second half of FY 2019, and confirmed the focus on stabilization of the Billing/RevPro integration.[537]

218.    On May 23, 2019, the earnings release was distributed to the Audit Committee for review in advance of its scheduled May 29, 2019 meeting.[538]  KPMG approved the earnings release the next day.[539]  The fourth prep meeting for the earnings release took place in the morning of May 29, 2019, wherein Mr. Huh led a review of the updated drafts of scripts, earnings, and Q&A, followed by the Audit Committee meeting later that same day.[540]  The main subject of the meeting was to obtain the Committee's input for the earnings call for Q1 2020.[541]  Mr. Sloat reviewed the financial results for Q1 2020 and described the estimated revised guidance for Q2 2020 and full fiscal year 2020.[542]  He solicited the Audit Committee's feedback on the draft earnings press release and script, and received input from the Committee members.[543]  Zuora thereafter published its earnings release on May 30, 2019, and scheduled its Earnings Call for Q1 2020 later in the day.[544]

219.    Based on the foregoing, I conclude that Zuora's processes for preparation of guidance incorporated issues related to product integration and products, and that its disclosure practices incorporated such processes.  I also conclude that such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to product development and usage.

B.    **Zuora's Disclosures Related to Guidance, Including Products and Product Integration Information**

220.    During the Class Period, Zuora voluntarily provided both quarterly and yearly financial guidance in its earnings calls and other public disclosures.  Guidance usually included a range of expectations for revenue as well as subscription revenue.  It also included non-GAAP operating profit or loss, and non-GAAP net loss or profit per share.  In addition, financial guidance generally included commentary on major upcoming expenses, risks and challenges, and Zuora's view of the outlook for the subscription economy market.  Zuora's disclosures

---

[537]  ZUO_00001166–97 at 66.
[538]  ZUO_00448828; "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," May 29, 2019.
[539]  ZUO_00448828.
[540]  *Id.*
[541]  "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," May 29, 2019.
[542]  *Id.*, p. 2.
[543]  *Id.*.
[544]  Q1 2020 Earnings Release, May 30, 2019; "Q1 2020 Zuora Inc Earnings Call," May 30, 2019.

related to guidance, including products and product integration information, were premised on Zuora's disclosure practices and processes generally and with respect to guidance in particular, and provided investors with a rich source of relevant information.

221. Throughout the Class Period, Zuora's guidance disclosure was accompanied by a disclosure of risks that could negatively impact guidance. In every earnings call, the following language was included: "Some of our discussion and responses to your questions may contain forward-looking statements. These statements are subject to risks, uncertainties, and assumptions that could cause actual results to differ materially from those projected in the forward-looking statements."[545] Zuora also pointed to its SEC filings for a more specific discussion of risks. As I described above, the risks that were listed and discussed in detail since Q1 2019 were, among others:

- increasing operating expenses prohibiting reaching profitability
- failure to manage growth effectively
- breaches in data security
- failure of products to gain market acceptance
- inability to gain new customers
- customer dissatisfaction
- inability to develop and release new products
- failure to achieve adoption rates for Zuora RevPro
- failure to grow sales channels
- risks associated with international expansion
- failure to offer quality customer support
- a disruption in service to third-party data centers
- errors or defects in solutions
- failure to integrate acquired technologies successfully
- failure to satisfy regulations governing data protection requirements, anti-corruption, and export
- issues with privacy concerns
- economic downturns
- inability to acquire capital at favorable terms.[546]

222. During this period, Zuora routinely met the goals disclosed in its guidance, as can be observed in **Exhibit 7**.

---

[545] "Q1 2019 Zuora Inc Earnings Call," May 31, 2018; "Q2 2019 Zuora Inc Earnings Call," August 30, 2018; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019; "Q1 2020 Zuora Inc Earnings Call," May 30, 2019.
[546] Zuora Q1 2019 10-Q.

### 1.    Fiscal Q1 2019

223.    Zuora's Q1 2019 earnings call on May 31, 2018 was its first earnings call as a public company.[547]  Zuora reported total revenue of $51.7 million for the quarter with a year-over-year increase of roughly 60%.  Subscription revenue accounted for about 70% of total.[548]  It also reported a year-over-year increase of 39%, to $36.1 million.[549]  Zuora additionally reported non-GAAP loss from operations of $13.6 million as it continued to make investments in growth and scale.[550]

224.    During this same earnings call, Zuora also reported guidance for Q2 2019 and for the fiscal year.  It reported an expectation that "revenue [would] be in the range of $53.5 million to $54.5 million, with subscription revenue being in the range of $38 million to $38.5 million."[551]  This guidance represented an expectation of 3.5% and 5.4% in total revenue growth, and between 5.3% and 6.6% in subscription revenue growth.  Zuora also projected an operating loss of $16 million to $15 million with net loss per share expected to be in the range of $0.16 to $0.15, driven partially by a $15 million payment due during the quarter for RevPro.[552]  It also projected an increase in overall expenses due to increased spending on sales and marketing.[553]

### 2.    Fiscal Q2 2019

225.    Zuora's Q2 guidance proved to be close to target when compared to actuals.  In its Q2 2019 earnings release, Zuora reported total revenue of $57.8 million and subscription revenue of $41.5 million, both above target.[554]  Zuora reported GAAP losses from operations of $18.2 million, slightly higher than the projection of $15 to $16 million.[555]  It also reported a non-GAAP net loss per share of $0.13 compared to projections between $0.16 and $0.15.[556]  Finally, the Company recorded $7.5 billion in transaction volume, a 41% increase year over year.[557]

---

[547]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018.
[548]  *Id.*, p. 6.
[549]  *Id.*
[550]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018; Q1 2019 Earnings Release, May 31, 2018.
[551]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018; Q1 2019 Earnings Release, May 31, 2018.
[552]  "Q1 2019 Zuora Inc Earnings Call," May 31, 2018, p. 8.
[553]  *Id.*
[554]  Q2 2019 Earnings Release, August 30, 2018.
[555]  Q2 2019 Earnings Release, August 30, 2018; "Q1 2019 Zuora Inc Earnings Call," May 31, 2018, p. 8.
[556]  Q2 2019 Earnings Release, August 30, 2018.
[557]  *Id.*

226.    In its Q2 2019 earnings call, Zuora also included commentary on business highlights with specific details about its two flagship products, Zuora Billing and Zuora RevPro.[558] The Company announced product updates coming in the spring, including an upgrade to the Zuora Central Platform in the form of Order Management in the Q2 2019 Earnings Release.[559] Zuora announced the general availability of Zuora Collect.[560] Zuora also discussed the performance of Zuora Billing, including an example of implementation for eMoney Advisers, where the product took over "subscription management needs, pricing, rating, billing, [and] invoicing."[561] The Company also discussed its other flagship product, RevPro, giving examples of implementations of revenue recognition for a client that had previously employed 50 to 60 revenue accountants to do the same job, and was having trouble keeping up with the required timeline in the face of new regulations.[562] Mr. Sloat commented that "the business model complexity leads to a need for kind of a new 'cash subscription management system' as well as revenue automation systems. And that's really why … we think [these products] are so synergistic."[563]

227.    In Q2 2019, Zuora disclosed guidance for Q3 2019, projecting total revenues of between $58.3 million and $59.3 million.[564] The Company projected subscription revenues of $42 million to $42.5 million, and a non-GAAP operating loss of $12.5 million to $13.5 million because of some expenses that would occur during the second half of the year.[565] Zuora additionally expected a non-GAAP net loss per share of $0.13 to $0.14.[566] In addition to the standard disclosures, Zuora included some additional commentary on the likelihood of these projections materializing.[567]

### 3.    Fiscal Q3 2019

228.    In Q3 2019, Zuora's results again exceeded guidance.[568] During the earnings call, Mr. Tzuo described the company's performance, stating that "[the Company] continued to deliver

---

[558] *Id.*, pp. 6–7.
[559] *Id.*
[560] *Id.*
[561] "Q2 2019 Zuora Inc Earnings Call," August 30, 2018, p. 6.
[562] *Id.*, p. 6.
[563] *Id.*, p. 7.
[564] *Id.*, p. 12.
[565] *Id.*
[566] *Id.*
[567] "Q2 2019 Zuora Inc Earnings Release," August 30, 2018.
[568] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 2.

very strong financial results… [g]rowth continue[d] to be strong."[569]   For the quarter, subscription revenue grew to $44.5 million compared to guidance of $42 million to $42.5 million.  Total revenue was $61.6 million compared to a projected range of $58.3 million to $59.3 million.[570]  Zuora also outperformed guidance for non-GAAP net earnings per share, coming in at loss of $0.10 and beating projections of a loss between $0.14 and $0.13, as well as non-GAAP operating loss, which was reported at $10.6 million, a $1.7 million improvement compared to the previous quarter, and markedly better than its projection of $12.5 to $13.5 million in losses.[571]  The Company also reported $8.6 billion in transaction volume, up 37% year over year.[572]

229.    During Q3 2019, Zuora also offered commentary on its flagship products.[573]   It discussed the continued demand for RevPro coming from companies that recently became compliant with ASC 606 through "manual operations," and were now looking to replace "band-aid solution[s]."[574]  Zuora mentioned that the value of RevPro was centered on automation and efficiencies, as companies struggled with being limited in their ability to scale the "complexity of revenue recognition."[575]   Zuora also discussed the set of clients utilizing both flagship products, noting that the Company at the time had "less than 10% overlap" between customers that used both products, but that it believed that "in the long-run customers [were] going to need both of these products.  They're very, very synergistic."[576]

230.    During its Q3 2019 Earnings call, Zuora also disclosed guidance for Q4 2019.[577]  It projected total revenues between $62.3 million and $63.3 million, with subscription revenue between $45 million and $45.5 million.[578]  Expectations for non-GAAP operating loss were between $12.5 million and $11.5 million as investments were made in new office space and other expenses that were pushed to the latter half of the year.[579]  Non-GAAP net loss per share was projected between $0.12 and $0.11.[580]  The Company mentioned during the earnings call

---

[569] *Id.*
[570] *Id.*, p. 3.
[571] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 3; "Q2 2019 Zuora Inc Earnings Call," August 30, 2018, p. 12.
[572] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 6.
[573] *Id.*, p. 5.
[574] *Id.*
[575] *Id.*
[576] *Id.*, p. 10.
[577] *Id.*, p. 7.
[578] *Id.*
[579] *Id.*
[580] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018.

its standard risk disclosures and pointed analysts to the Form 10-Q filing for more specific disclosures of risks.[581]

### 4.    Fiscal Q4 2019

231.    In Q4 2019 Zuora again met or exceeded its guidance targets provided during the Q3 2019 earnings call.[582]    In terms of revenue, Zuora reported total revenue of $64.1 million, exceeding the target of $62.3 million to $63.3 million, and reported subscription revenue of $46.7 million compared to a target ranging from $45 to $45.5 million.[583]    Mr. Sloat also noted during the Q4 2019 earnings call that the Company's large deals were increasing, with over 30 new deals over $250,000 over the past year.[584]    Zuora reported its non-GAAP operating loss as $11.6 million and non-GAAP net loss per share of $0.11.[585]    This earnings call marked three consecutive quarters (all quarters in Zuora's history as a public company) where Zuora met or exceeded its quarterly guidance.[586]

232.    During the call, Zuora also provided comments on a new product that had launched, Collect, which helped companies recover lost revenue from credit card declines.    Zuora disclosed that it had had a successful launch, with over 50 clients using it.    Zuora noted that it had added several new major customers over the quarter, including Shutterstock, Fiat Chrysler, and Canon.    Mr. Tzuo noted that "[Zuora was] the only game in town if you're looking for a complete end-to-end subscription platform, including billing and revenue recognition."[587]

233.    During the Q4 2019 Earnings call, Zuora also disclosed guidance for Q1 2020.[588]    For these financial results, Zuora reported under revenue recognition standard ASC 606 rather than the former ASC 605 standard, but noted that it did not consider that change to have a meaningful impact.[589]    It projected Q1 2020 revenues of $63.5 million to $64.5 million, with subscription revenue of $46 million to $46.5 million.[590]    Non-GAAP operating loss was projected between $15 million to $14 million, with non-GAAP net loss per share projected

---

[581] *Id.*, p. 2.
[582] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 3; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 7.
[583] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 3; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 7.
[584] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 3.
[585] *Id.*
[586] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018; "Q2 2019 Zuora Inc Earnings Call," August 30, 2018; Q1 2019 Zuora Inc Earnings Call," May 31, 2018
[587] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 4.
[588] *Id.*, p. 7.
[589] *Id.*, p. 6.
[590] *Id.*

between $0.14 and $0.13.  The Company also included its standard statement of disclosures of risk.[591]

### 5.    Fiscal Q1 2020

234.    Zuora held its Q1 2020 earnings call on May 30, 2019.[592]  During this call, Zuora reported total revenues for the quarter of $64.1 million, slightly below the higher end of guidance.[593] It also reported subscription revenue of $47.3 million, slightly above a guidance range of $46 to $46.5 million.[594]  The Company reported non-GAAP loss from operations of $12.5 million, exceeding expectations.[595]  It also reported a GAAP net loss per share of $0.19, below expectations.[596]

235.    I understand that the guidance revision delivered in the Q1 2020 earnings announcement was mainly based on the effect of bookings being substantially lower than planned in Q1 2020.[597]  Guidance for the next quarter (and the rest of the fiscal year) was mechanically calculated with a focus on currently observed bookings, which was used as a basis to predict the stream of future recurring revenue.[598]  As a result, the substantial miss in bookings in Q1 2020 had a direct impact on the revision.  For example, guidance for subscription revenue in full FY 2020 went from $209.0 to $211.5 million as announced the previous quarter, to a range of $200.0 million to $206.0 million in the Q1 2020 earnings call.[599] Similarly, guidance for total revenue in full FY 2020 went from $289.0 to $293.5 million as announced the previous quarter, to a range of $268.0 million to $278.0 million in the Q1 2020 earnings call.[600]

236.    During this call, Zuora also gave updates on challenges related to integration between Zuora Billing and RevPro.  Mr. Tzuo noted two major headwinds: sales execution and product integration.[601]  With respect to sales execution, Zuora reported that new sales representatives were not efficient, and that the Company was observing that it needed to improve training and

---

[591] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019.
[592] "Q1 2020 Zuora Inc Earnings Call," May 30, 2019.
[593] *Id.*, p. 2; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 7.
[594] "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 5; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 7.
[595] "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 6; "Q3 2019 Zuora Inc Earnings Call," November 29, 2018, p. 7.
[596] Q1 2020 Earnings Release, May 30, 2019.
[597] ZUO_00001166–97 at 70.
[598] Interview with Tyler Sloat, July 20, 2022.
[599] "Q1 2020 Zuora Inc Earnings Call," May 30, 2019, p. 6; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019, p. 7.
[600] ZUO_00326338.
[601] "Q1 2020 Zuora Inc Earnings Call," May 30, 2019, p. 6.

support.[602]  Second, Zuora reported technical issues and delays with product integration, which had not only slowed down implementations of RevPro as the Company devoted resources to the issue, but had also changed the attainability of cross-sales goals.[603]

237.    It is my opinion that Zuora's practices and processes for updating guidance and preparing earnings releases were comparable to custom and practices utilized by middle-market capitalization companies.

### 6.    Analyst Commentary on Q1 2020 Earnings Call Disclosures

238.    After Zuora revised its guidance for the rest of 2020, analysts discussed impacts in the short and long term, focusing particularly on the execution problems within sales and the delays with integration.  Based on my review of these reports, I conclude that analyst commentary describes integration issues as a short-term problem.  A Morgan Stanley report from May 31, 2019, stated that "integration efforts [then] appear[ed] to be moving in the right direction and should be completed in Q3."[604]  Another report published by Jefferies on the same day noted that despite the revised guidance, the "most important headline metrics (subscription, billings, cash flow) were solid" and that it believed "[l]ong-term growth of 25-35% [was] feasible."[605] A report from Arete several weeks later on June 13, 2019, echoed the same sentiments, stating "Recent issues [would] be short-term, in our view, as feedback suggests Zuora ha[d] a good product, there [were] no obvious competitive impediments, and this market should evolve over time, catalysing subscription growth to reaccelerate."[606]

239.    I have also reviewed analyst reports for discussion of the failure to meet guidance (and lowered) guidance due to the failure to meet sales targets.  Analysts were less optimistic about how quickly Zuora would be able to resolve the problem, with much discussion following the announcement of revised guidance focusing heavily on the change in strategy and leadership. A May 31, 2019, Goldman Sachs report noted that "[w]e are hopeful that a change in leadership can cause a recovery in sales rep productivity, though we have some concerns that the slowdown may in part be a reflection of the demand environment."[607]  On the same day, a Needham report dismissed the integration issues, stating that it "expect[ed] fixing the product

---

[602]  "Q1 2020 Zuora Inc Earnings Call," May 30, 2019, p. 3.
[603]  Q1 2020 Earnings Release, May 30, 2019.
[604]  "1Q20 Results: A bump on the Road to Subscription Economy," *Morgan Stanley*, May 31, 2019, p. 2.
[605]  "F1Q20: Shy Guide," *Jefferies*, May 31, 2019, pp. 1, 5.
[606]  "Zuora: You Can Make It If You Try," *Arete*, June 13, 2019, p. 3.
[607]  "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," *Goldman Sachs*, May 31, 2019, p. 3.

issues [would be] straightforward and [would] just require time" but noted of the sales issues that they "[were] more concerned with the sales issues that [their] experience [said] require[d] changes in sales leadership and nearly 12 months to correct." Needham also noted that it "expect[ed] the stock to open significantly lower."[608]

### C.    Third Opinion

240.    Zuora's practices and processes for updating guidance and preparing earnings releases and related disclosures incorporated issues related to products and product integration, and were comparable to custom and practices utilized by middle-market capitalization companies. Such practices and processes provided a sound basis for Zuora's executives to rely on the guidance, earnings releases, and related disclosures that Zuora then disclosed to investors.

## X.    Conclusions

241.    In this report I have provided information and background on the disclosure custom and practices utilized by middle-market capitalization companies. I have also provided extensive and relevant background information and opinions related to Zuora's disclosure processes and practices during the Class Period and their comparability with such custom and practices. I have reached the following opinions:

- *Opinion 1*: Zuora's practices and processes for preparing disclosure were robust and well-designed, and comparable to custom and practices utilized by middle-market capitalization companies. Such practices and processes provided a sound basis for Zuora's executives to rely on the information that was generated internally and that Zuora then disclosed to investors with respect to product development and usage.

- *Opinion 2*: Zuora's disclosures relating to products and product integration were generated through Zuora's disclosure practices and processes. During the Class Period, Zuora's disclosures were regularly assessed for updating and revision through these practices and processes. Such practices and processes provided investors with a rich source of relevant information.

---

[608] "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," *Needham*, May 31, 2019.

- *Opinion 3*: Zuora's practices and processes for updating guidance and preparing earnings releases and related disclosures incorporated issues related to products and product integration, and were comparable to custom and practices utilized by middle-market capitalization companies. Such practices and processes provided a sound basis for Zuora's executives to rely on the guidance, earnings releases, and related disclosures that Zuora then disclosed to investors.

Executed this 5th day of August, 2022

_Steven Davidoff Solomon_

Steven Davidoff Solomon

# Appendix A

## Steven Davidoff Solomon

**Dated July, 2022**

### *Academic Appointment/Work*

**University of California, Berkeley School of Law**      2014-
Alexander F. and May T. Morrison Professor of Law
- Teach Business Associations, Mergers & Acquisitions, and Law, Accounting/Economics and Business Workshop (have also taught Contracts & Securities Regulation)
- Co-taught with Erwin Chemerinsky Civil Liberties in a Pandemic
- Co-teach with Professor Mark Brilliant From Wall Street to Main Street, an undergraduate U.C. Berkeley class
- Faculty Co-Director, Berkeley Center for Law & Business (through 2022)
  - During my tenure, the Center had ten employees, conducted over 50 programs and conferences a year and operated the executive education program for the law school. In my five-year tenure as co-director I grew revenues from 300K a year to approximately $4 million per year (and from two employees to ten).
- Named three times one of the 100 most influential governance professionals in the country by the National Association of Corporate Directors
- Seven articles selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors
- Top 10 Most-Cited Corporate & Securities Law Professors 2013-2017; 2016-2020 (per Sisk report)
- Top 10 Most-Cited U.C. Berkeley, School of Law Professors 2013-2017; 2016-2020 (per Sisk report)
- Member American Law Institute, European Corporate Governance Initiative, Academic Freedom Alliance
- Co-Director Berkeley Antisemitism Initiative

**Social Capital Suvretta Holdings Corp. IV**      2021-
Director, Member of Audit, Compensation and Nominating Committees

**The New York Times**      2007-
"Deal Professor" Columnist for N.Y. Times DealBook
- Weekly print columnist for The New York Times
- On-line columnist for N.Y. Times DealBook

### *Other Academic Appointments*

**The Ohio State University Michael E. Moritz College of Law**      2011-2014
**Fisher College of Business (By Courtesy)**
Professor of Law

**University of Connecticut School of Law**      2008-2011
Professor of Law

**Wayne State University School of Law**      2006-2008
Assistant Professor of Law

CONFIDENTIAL

Appendix A

*Scholarship*

    *Casebooks*

        MERGERS & ACQUISITIONS: LAW, THEORY & PRACTICE (1ST ED. WEST 2016) (2ND ED. WEST 2019) (with Claire Hill and Brian Quinn) (also first edition)

    *Books*

        THE CORPORATE CONTRACT IN CHANGING TIMES: IS THE LAW KEEPING UP? (UNIV. CHICAGO 2019) (Edited volume) (with Randall Thomas)

        RESEARCH HANDBOOK ON MERGERS AND ACQUISITIONS (Elgar 2016) (Edited volume) (with Claire Hill)

        THE LAW AND ECONOMICS OF MERGERS AND ACQUISITIONS (Elgar 2013) (Edited volume) (with Claire Hill)

        GODS AT WAR: SHOTGUN TAKEOVERS, GOVERNMENT BY DEAL, AND THE PRIVATE EQUITY IMPLOSION (John Wiley & Sons, Inc. 2009)

    *Book Chapters*

        *The Rise and Fall of Delaware's Takeover Standards* (with Randall Thomas) in STEVEN DAVIDOFF SOLOMON & RANDALL THOMAS (EDS.), THE CORPORATE CONTRACT IN CHANGING TIMES: IS THE LAW KEEPING UP? (Univ. Chicago 2019)

        *What Do We Know About Law Firm Quality in M&A Litigation?* (with Randall Thomas) in JESSICA ERICKSON, ET AL. (EDS.), RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION (Elgar 2018)

        *Mergers & Acquisitions: A Cyclical and Legal Phenomenon* (with B. Quinn and C. Hill) in CLAIRE HILL & STEVEN DAVIDOFF SOLOMON (EDS.), RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar 2016)

        *Takeover Theory and the Law and Economics Movement,* in CLAIRE HILL & BRETT MCDONNELL (EDS.), RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar Press 2012)

        *The Private Equity Contract*, in DOUGLAS CUMMING (ED.), THE OXFORD HANDBOOK OF PRIVATE EQUITY (Oxford University Press 2012)

        *Fairness Opinions in Mergers and Acquisitions*, in H. KENT BAKER (ED.), THE ART OF CAPITAL RESTRUCTURING (John Wiley & Sons 2011) (with Anil K. Makhija and Rajesh P. Narayanan)

        *Fairness Opinions: Thoughts, Perspectives and Legal Doctrine,* in WOLFGANG ESSLER & SEBASTIAN LOBE (EDS.), FAIRNESS OPINIONS (2008)

    *Working Articles*

        *As California goes, so goes the nation? Gender quotas and the legislation of non-economic values* (with Felix von Meyerinck, Alexandra Niessen-Ruenzi and Markus Schmid), revise and resubmit *Journal of Accounting and Economics*

        *Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions*, (with Adam Badawi and Matt Cain), revise and resubmit *Journal of Law and Economics*

        *Identifying Corporate Governance Effects: The Case of Universal Demand Laws* (with Byung Hyun Ahn and Panos Patatoukas), revise and resubmit *Critical Finance Review*

CONFIDENTIAL

Appendix A

**Peer Reviewed Articles**

*How Do Representations and Warranties Matter? Risk Allocation in Acquisition Agreements* (with Omri Even-Tov & James Ryans), forthcoming REVIEW OF ACCOUNTING STUDIES

*Placement Agents and Private Equity: Information Production or Influence Peddling?*, 55(4) J. FIN. & QUANT. ANAL. 1095 (2020) (with Matt Cain and Stephen McKeon)

*An Empirical Study of Special Litigation Committees*, 60 J. CORP. FIN. 101543 (2020) (with CV Krishnan and Randall Thomas)

*The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers*, 74 THE BUSINESS LAWYER 967 (2019) (with Robert Bartlett, Matt Cain, and Jill Fisch)

*What Happened in 1998? The Demise of the Small IPO and the Investing Preferences of Mutual Funds*, 47 J. CORP. FIN. 151 (2017) (with Robert Bartlett and Paul Rose)

*Top Defense Counsel in Mergers & Acquisitions*, 45 J. CORP. FIN. 480 (2017) (with CV Krishnan and Randall Thomas)

*Do Takeover Laws Matter? Evidence from 50 Years of Hostile Takeovers*, 124(3) J. FIN. ECON. 464 (2017) (with Matt Cain and Stephen McKeon)

*Who are the Top Law Firms? Assessing the Value of Plaintiffs' Law Firms in Merger Litigation*, 18(1) AM. LAW AND ECON. REV. 122 (2016) (with Randall Thomas and CNV Krishnan)

*Delaware's Competitive Reach*, 9(1) JOURNAL EMP. LEG. STUD. 92 (2012) (with Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

**Law Review Articles**

*Do Social Movements Spur Corporate Change? The Rise of "MeToo Termination Rights" in CEO Contracts*, INDIANA L. J. (forthcoming 2022) (with Rachel S. Arnow-Richman and James Hicks)

*The Future or Fancy? An Empirical Study of Public Benefit Corporations*, 11 HARV. BUS L. REV. 114 (2021) (with Michael B. Dorff and James Hicks)

*Does Revlon Matter: An Empirical and Theoretical Analysis*, 108 CALIFORNIA L. REV. 1683 (2020) (with Matt D. Cain, Sean Griffith and Robert Jackson, Jr.) (winner of the John L. Weinberg/IRRCI Research Award Competition) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*The New Titans of Wall Street: A Theoretical Framework for Passive Investors*, 168 U. PENN. L. REV. 17 (2019) (with Jill Fisch & Assaf Hamdani) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Is Say on Pay All About Pay? The Impact of Firm Performance*, 8 HARV. BUS. L. REV. 101 (2018) (with Jill Fisch and Darius Palia)

*Settling the Staggered Board Debate*, 166 U. PENN. L. REV. 1475 (2018) (with Yakov Amihud & Markus Schmid) reprinted in 30 J. APP. CORP. FIN. 61 (2018) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Transactional Administration*, 106 GEORGETOWN L. REV. 1097 (2018) (with David Zaring)

*The Shifting Tides of Merger Litigation*, 71 VAND. L. REV. 603 (2018) (with Matt Cain, Jill Fisch and Randall Thomas)

*How Corporate Governance is Made:  The Case of the Golden Leash*, 164 U. PENN. L. REV. 649 (2016) (with Matt Cain, Jill Fisch and Sean Griffith) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*The Disappearing IPO and the Lifecycle of Small Firms*, 6 HARV. BUS. L. REV. 83 (2016) (with Paul Rose)

# Appendix A

*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV.557 (2015) (with Sean Griffith and Jill Fisch) (selected for reprint in 57 Corp. Practice Comm. 493 (2015)) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*A Great Game: The Dynamics of State Competition and Litigation*, 100 IOWA L. REV. 165 (2015) (with Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*After the Deal: Fannie, Freddie and the Financial Crisis*, 95 BOSTON U. L. REV. 371 (2015) (with David Zaring)

*Broken Promises: Private Equity Bid Failures and the Limits of Contract*, 40 J. CORP. LAW 565 (2015) (with Matt Cain and Antonio Macias) (selected as best paper from over 80 submissions at the George Washington C-LEAF Business and Financial Law Junior Faculty Workshop; selected to be presented at American Finance Association 2012 meeting)

*Do Outside Directors Face Labor Market Consequences?  A Natural Experiment from the Financial Crisis*, 4 HARV. BUS. L. REV. 53 (2014) (with Andrew Lund and Robert Schonlau)

*Computerization and the ABACUS: Reputation, Trust, and Fiduciary Duties in Investment Banking*, 37(3) J. CORP. LAW 101 (2012) (with Alan D. Morrison and William J. Wilhelm)

*Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, 36 DEL. J. CORP. L. 849 (2011) (with Matt Cain) (Symposium organized around article) (selected for reprint in 54 Corp. Practice Comm. 793 (2012-13))

*Regulation by Deal: The Government's Response to the Financial Crisis*, 61 ADMIN. L. REV. 463 (2009) (with David Zaring)

*The Failure of Private Equity*, 82 S. CAL. L. REV. 481 (2009)

*Regulating Listings in a Global Market*, 86 N.C. L. REV. 101 (2007) (selected for reprint in 50 Corp. Practice Comm. 959 (2009))

*Black Market Capital*, 2008 COLUM. BUS. L. REV. 172

*The SEC and the Failure of Federal Takeover Regulation*, 34 FLA. ST. U. L. REV. 211 (2007)

*Fairness Opinions*, 55 AM. U.L.REV. 1557 (2006) (cited in HA Liquidating Trust v. Credit Suisse Securities LLC, -- F.3d. -- (7th Cir. 2008) (Easterbrook, J.))

*Getting U.S. Security Holders to the Party:  The SEC's Cross-Border Release Five Years On*, 12 U. PENN J. INT'L ECON. L. 455 (2005) (with Brett Carron)

## Symposium Articles (Includes Full Length Law Review Articles Placed as Symposium Pieces)

*Synthetic Governance* (forthcoming COLUM. BUS. L. REV.) (with Jill Fisch, Panos N. Patatoukas and Byung Hyun Ahn)

*Should Corporations Have a Purpose?*, 99 TEX. L. REV 1311 (2021) (with Jill Fisch)

*Centros, California's "Women on Boards" Statute and the Scope of the Internal Affairs Doctrine*, 20 EUR. BUS. ORG. L. REV. 493 (2020) (with Jill Fisch)

*Mootness Fees*, 72 VAND. L. REV. 1777 (2019) (with Matt Cain Jill Fisch, Randall Thomas)

*The Problem of Sunsets*, 99 B.U. LAW REV. 1057 (2019) (with Jill Fisch)

*Lock-up Creep*, 38 J. CORP. L.  681 (2013) (with Christina Sautter)

*Limits of Disclosure*, 36 SEATTLE U. L. REV. 599 (2013) (with Claire Hill)

CONFIDENTIAL

Appendix A

*Airgas and the Value of Strategic Decision-Making*, 2012 COLUM. BUS. L. REV. 502

*Uncomfortable Embrace: Federal Corporate Ownership Amidst the Financial Crisis*, 95 MINN. L. REV. 1733 (2011)

*Rhetoric and Reality: A Historical Perspective on the SEC's Regulation of Foreign Private Issuers*, 79 CINC. L. REV. 619 (2010)

*Paradigm Shift:  Securities Regulation in the New Millennium*, 2 BROOK. J. CORP. FIN. & COM. L. 340 (2008) (included as a paper presented at the AALS annual meeting of the securities regulation section and selected for inclusion in the Securities Law Review 2009 as one of the top papers in the field of securities regulation in 2008)

## *Selected Other Writings*

*Is The Staggered Board Debate Really Settled?: A Coda*, 168 U. PA. L. REV. ONLINE 113 (2020), http://www.pennlawreview.com/online/168-UPa-L-Rev-Online-113.pdf (with Yakov Amihud, Markus Schmid)

*What CEOs Get Wrong About Activist Investors*, HARVARD BUSINESS REVIEW (May 2018) (with Frank Partnoy)

*Frank & Steve's Excellent Corporate Raiding Adventure*, THE ATLANTIC MONTHLY (May 2017) (with Frank Partnoy)

*Tenure Voting and the U.S. Public Company*, 72(2) THE BUSINESS LAWYER 295 (2017) (with David Berger & Aaron Benjamin)

*Yearly Takeover Litigation Reports* (2011-2015), available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=576465#reg

*Section 632:  An Expanded Basis of Federal Jurisdiction for National Banks*, 123 BANKING L.J. 687 (2006)

*A Comparative Study of the Jewish and the United States Constitutional Law of Capital Punishment*, 3 ILSA J. INT'L & COMP. L. 93 (Fall 1996)

## *Education*

**London Business School**
Masters in Finance, Sept 2005

**Columbia University School of Law**
*Juris Doctor*, May 1995, Harlan Fiske Stone Scholar

**University of Pennsylvania**
Bachelor of Arts, History, *Cum Laude* with Distinction, May 1992
Honors Thesis:  *Raphael Lemkin and the Conceptual Evolution of Genocide*

## *Other Work Experience*

**Freshfields Bruckhaus Deringer**                                         2002-2004
Senior Associate, U.S. Corporate Group (London)

CONFIDENTIAL

Appendix A

**Shearman & Sterling**
Senior Associate, Mergers and Acquisitions Department (New York/London)        1995-2002

*Testimony, Presentations, Conferences and Panels*

*Testimony*

*Filling Gaps and Black Holes: Restructuring the Financial Regulatory Apparatus for the Next Crisis*, Testimony before the U.S. Senate Committee on Homeland Security and Governmental Affairs, Where Were the Watchdogs? The Financial Crisis and the Breakdown of Financial Governance (January 2009)

*Presentations*

*Identifying Corporate Governance Effects: The Case of Universal Demand Laws*, ECGI & Bar Ilan University (June 2022)

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A*, American Law and Economics Associations Annual Meeting (Oct 2021)

*Should Corporations Have a Purpose?*, Duke Law School Faculty Workshop (Nov. 2020); Harvard Law and Economics Workshop (Oct. 2020); Stanford Law and Economics Workshop (Oct. 2020); Duke Law and Economics Workshop (Apr. 2020)

*Does Revlon Matter*, Corporate Law Academic Workshop (Jun. 2020); Harvard Law School Law and Economics Workshop (Nov. 2019); London School of Economics (Oct. 2019); University of California, Los Angeles (Sept. 2019); National Business Law Scholars Conference (Jun. 2019); BYU Winter Deals Conference (Feb. 2019)

*As California goes, so goes the nation? Gender quotas and the legislation of non-economic values*, American Law and Economics Associations Annual Meeting (May 2019)

*The Problem of Sunsets,* U. Penn. Law and Economics Roundtable (May 2019), Boston University School of Law (Nov. 2018)

*Mootness Fees*, Institute for Law and Economic Policy, San Juan, Puerto Rico (Apr. 2019)

*The Myth of Morrison*, University of Texas, Austin School of Law (Oct. 2018)

*The New Titans of Wall Street*, Vanderbilt Law School (Jan. 2018); Boston University School of Law (Nov. 2018); Northwestern Law School (Oct. 2018); University of Wisconsin Law School (Oct. 2018); U. Penn. Law and Economics Roundtable (May 2018); NYU Law and Economics Roundtable (Apr. 2018)

*Settling the Staggered Board Debate*, Penn/NYU Conference on Law and Finance (Apr. 2018)

*An Empirical Study of Special Litigation Committees*, American Law and Economics Associations Annual Meeting (May 2018); University of California Los Angeles (Oct. 2017).

*Does the Staggered Board Affect Firm Value?*, Hebrew University, Jerusalem School of Law (May 2017); 2017 GSU CEAR-Finance Conference (May 2017)

*Top Defense Counsel in Mergers & Acquisitions*, American Law and Economics Association Annual Meeting (May 2017), Chicago Kent School of Law (2016)

*How Corporate Governance is Made:  The Case of the Golden Leash*, University of Pennsylvania School of Law, Law and Economics Roundtable (Dec. 2015); Willamette Law School (Sept. 2015); Southwestern Law School (Oct. 2015); American Law and Economics Association Annual Meeting (May 2015); Tel Aviv University School of Law, Law and Economics Workshop (Mar. 2015)

*After the Deal: Fannie, Freddie and the Financial Crisis*, University of San Diego School of Law (Nov. 2014)

CONFIDENTIAL

Appendix A

*Fairness Opinions as Magic Pieces of Paper*, American Society of Appraisers-CICBV Business Valuation Conference (Oct. 2014)

*Do Takeover Laws Matter? Evidence from 45 Years of Hostile Takeovers*, University of Southern California (Sept. 2016); University of California Los Angeles (Oct. 2015); American Law and Economics Association Annual Meeting (May 2014)

*Placement Agents and Private Equity: Information Production or Influence Peddling?*, American Law and Economics Association Annual Meeting (May 2014)

*The Disappearing IPO and the Lifecycle of Small Firms*, U.C. Irvine, School of Law (Jan. 2015); Conference of Empirical Legal Studies (Nov. 2014); Fordham University Law School (Nov. 2013)

*Deficits of Disclosure*, USC Law and Economics Workshop (Nov. 2012)

*A Great Game: The Dynamics of State Competition and Litigation*, University of Pennsylvania, Institute for Law & Economics Roundtable (Apr. 2013); University of California, Berkeley School of Law (2013); Minnesota Law School (Jan. 2012); American Law and Economics Association Annual Meeting (May 2012); University of Virginia School of Law (Dec. 2011); Vanderbilt Law School (Nov. 2011)

*Broken Promises:  Private Equity Bid Failures and the Limits of Contract*, Minnesota Law School (Mar. 2012); George Washington C-LEAF Business and Financial Law Junior Faculty Workshop (Feb. 2012); Suffolk Law School (Sept 2011); Midwest Corporate Legal Scholars Conference (Jun. 2011); Denver Law School (Jan. 2011); Argentum Conference, Stockholm, Sweden (Oct. 2010); Fordham Law School (Apr. 2010)

*Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, Widener Law School (Apr. 2011); Conf. Emp. Legal Studies (Nov. 2010); SEALS (Aug. 2010); Midwest Corporate Law Colloquium (Jun. 2010); Delaware Bar Association CLE (May 2010)

*Delaware's Competitive Reach: An Empirical Analysis of Public Company Merger Agreements*, University of Pennsylvania Law School (Feb. 2012); Stanford Law School (Oct. 2009)

*Regulation by Deal:  The Government's Response to the Financial Crisis,* University of Pennsylvania, Institute for Law & Economics Roundtable (May 2009)

*Private Equity: Past, Present and Future*, Keynote Presentation, Private Equity M&A Section, ABA Business Section Annual Meeting in Vancouver (Apr. 2009)

*The Failure of Private Equity*, Illinois Corporate Law Colloquium, University of Illinois School of Law (Nov. 2008); Widener University School of Law, 2008 Widener Scholar in Residence in Corporate Law (Oct. 2008); The James E. Rogers College of Law at The University of Arizona (Fall 2008)

*Paradigm Shift:  Securities Regulation in the New Millennium*, AALS Annual Meeting, Securities Regulation Section (Jan. 2008)

*Regulating Listings in a Global Market*, University of Connecticut Law School Faculty Workshop (Dec. 2007)

*Black Market Capital*, Brooklyn Law School Faculty Workshop (Sept. 2007)

**Academic Conferences and Symposiums**

Commentator, Conference on Empirical Legal Studies, Claremont-McKenna (Nov. 2019)

Commentator, *Centros and European Company Law: Twenty Years of Living Dangerously*, 3rd Annual Oxford Business Law Blog Conference, Oxford University (Mar. 2019)

Commentator, NYU / Penn Conference on Law & Finance (Feb. 2019)

CONFIDENTIAL

Appendix A

Presenter, Institutional Investor Activism in the Trump Era: Responses to a Changing Landscape, Boston University School of Law (Nov. 2018)

Co-Founder and Organizing Committee, National Business Law Scholars Conference (2008-2018)

Organizer, *Corporate Law Symposium at U.C. Berkeley* (2016 & 2018)

*IP & Dealmaking*, Art & Science of the IP Deal, University of Washington School of Law (Apr. 2017) (Keynote Speech)

*The Rise and Fall of Delaware's Takeover Standards*, Can Delaware Be Dethroned? Evaluating Delaware's Dominance of Corporate Law, UCLA Law School (Feb. 2017)

*The Dealmaking State:  Executive Power in the Trump Administration*, Financial Regulation Roundtable, George Mason Law School (Aug & Dec. 2016)

Presenter, *Fairness Opinions as Magic Pieces of Paper*, ASA-CICBV Business Valuation Conference (Nov. 2014)

Panel Participant, *Texas Tech Conference on Multi-Jurisdiction Deal Litigation* (Apr. 2014)

Panel Participant, University of Virginia Law & Business Law Review Symposium on Corporate Governance (Feb. 2014)

Presenter, *University of San Diego-Oxford Media and Markets Conference*, Proliferation of Stakeholders and Audiences (Jan. 2014)

*Does Plaintiffs' Law Firm Market Share reflect Performance?,* Corporate and Securities Litigation Workshop (Nov. 2013)

*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform,* Corporate and Securities Litigation Workshop (Nov. 2013)

*Do Outside Directors Face Labor Market Consequences?  A Natural Experiment from the Financial Crisis,* American Law and Economics Association Annual Meeting (May 2013)

*Lock-up Creep, Ten Years After Omnicare: The Evolving Market for Deal Protection* Devices, University of Iowa College of Law (Feb. 2013)

*Deficits of Disclosure*, Berle IV, *The Future of Financial/Securities Markets*, Seattle University School of Law (Jun. 2012)

Presenter, *Airgas and the Value of Strategic Decision-Making*, The Delaware Court of Chancery: Change and Continuity, Columbia University School of Law (Nov. 2011)

Symposium Organizer, *Irreconcilable Differences: Director, Manager and Shareholder Conflicts in Takeovers*, Widener Law School (Apr. 2011).

Presenter, *The Social Dimension of Regulatory Capture*, Fordham Journal of Corporate & Financial Law Symposium, Regulatory Capture (Feb. 2010)

Presenter, *Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, Yale University School of Law, Conference of Empirical Legal Studies (Nov. 2010)

Presenter, *Uncomfortable Embrace: Federal Corporate Ownership Amidst the Financial Crisis*, University of Minnesota Law School, Government Ethics & Bailouts: The Past, Present, & Future (Oct. 2010)

Presenter, *Rhetoric and Reality: A Historical Perspective on the SEC's Regulation of Foreign Private Issuers*, University of Cincinnati Law School, Globalization of Securities Regulation Symposium (Feb. 2010)

Commentator, *Conference on Executive Compensation*, Vanderbilt Law School (Feb. 2010)

Presenter, *Fear, Fraud and the Future of Financial Regulation*, New York Law School (Apr.2009)

CONFIDENTIAL

# Appendix A

Presenter, *Private Equity: Past, Present and Future*, The Rise (and Fall?) of the New Shareholder: Sovereign Wealth Funds, Hedge Funds, and Private Equity, Villanova University School of Law (Mar. 2009)

Moderator, *The Subprime Crisis: Going Forward,* Commentator, Containing Global Contagion and Systemic Risk, University of Connecticut School of Law (November 2008)

Panelist, *The State of the Global Mergers & Acquisitions (M&A) Marketplace*, The History and Future of U.S. and Global Takeover Regulation: The Williams Act 40 Years On, Georgetown Law School (May 2008)

Discussant, *Securities Regulation, Corporate Governance, and Corporate Finance: Global Markets, Law, and Culture*, International Conference on Law and Society in the 21st Century: Joint Annual Meetings of LSA and the Research Committee on Sociology of Law (July 25, 2007)

Moderator and Organizer, *How Much is Enough?  U.S. Securities Regulation in the Face of Global Capital Markets*, ABILA International Law Weekend 2006 (Oct 27, 2006)

Presenter, *Oh, The Places You'll Go!  European Takeover Law*, ABILA International Law Weekend 2006 (Oct 27, 2006)

## *Panels and Roundtables and Practitioner Conferences*

Organizer, Annual Symposium on Corporate Governance (2016-2018)

Organizer, Annual M&A and Antitrust Litigation Conference with Cleary Gottleib (2015-2018)

Organizer, Yearly M&A Roundtable with Kirkland & Ellis (2012-2018)

Panelist, M&A Law, Hebrew University, Jerusalem (April 2017)

Commenter, *The Eclipse of the Shareholder Paradigm*, U. Penn Law and Economics Corporate Roundtable (Apr. 2015)

Panelist, *Innovation in State Securities Regulation*, NASAA Public Policy Conference (Apr. 2015)

Panelist, Honoring Chief Justices Strine & Steele at NYU School of Law (May 2014)

Panelist, *NACD Leading Minds of Governance* (Dec. 2013)

Moderator, *Hedge Fund Activism Panel*, Second Annual DealBook Conference, (Nov. 2013)

Panelist, *Securities Litigation Update*, 2013 Ohio Securities Conference (Oct. 2013)

Panelist, *Business Litigation and the Supreme Court*, Institute for Law and Economic Policy, (Apr. 2013)

Panelist, *The JOBS Act, and the Future of Small Business Finance and the U.S. Equity Markets*, AALS (Jan. 2013)

Panelist, *Securities Litigation Update*, 2012 Ohio Securities Conference (Oct. 2012)

Panelist, *The JOBS Act*, Council of Institutional Investors Fall Conference, (Oct. 2012)

Panelist, *Good, Bad or Stupid? Debating the STOCK and JOBS Act at the National Business Law Scholars Conference*, National Business Law Scholars Conference, (Jun. 2012)

Panelist, *Selling the Deal*, Tulane 24th Corporate Law Institute (Mar. 2012)

Panelist, *The New Internationalism: Regulatory Practices and Global Private Equity Opportunities*, Columbia Business School Private Equity & Venture Capital Conference (Jan. 2010)

Panelist, *Revisiting the Conventional Wisdom of Poison Pills and other Anti-Takeover Defenses*, Forum for Institutional Investors (Oct. 2009)

CONFIDENTIAL

Appendix A

Participant, *Proxy Access Roundtable, Harvard Law School*, Harvard Law School Program on Corporate Governance (Oct. 2009)

Participant, *The Research Roundtable on Corporate Governance*, Searle Center on Law, Regulation, and Economic Growth at Northwestern University School of Law (April 2009).

Panelist, *Delaware Law Developments and Issues*, 27th Annual Federal Securities Institute (Feb. 2009) (with Justice Jack B. Jacobs and Vice Chancellor Donald F. Parsons)

Panelist, *Broken Deals: Who's to Blame?*, Mergers, Acquisitions and Split-offs class, taught by Prof. Robert C. Clark and Vice Chancellor Leo E. Strine, Jr., Harvard Law School (November 2008)

### Significant University Service

Merit review advisory committee; strategic committee (chair); hiring committee; other committee service available upon request
Chair, U.C. Berkeley Chancellor's Committee on Jewish Life
Referee: Journal of Law, Economics & Organizations, Journal of Empirical Legal Studies, Review of Financial Studies. Confidential reviews also provided to California, Harvard, Stanford and Yale law reviews.
Area Coordinator (Corporate Governance): American Law and Economics Annual Meeting (2017, 2019).

### PhD/JSD Committees

Ogi Radic, Sociology (Member)
Huanting Wu, J.S.D. (Chair)
Amit Elazari, J.S.D. (Chair)
Tristan Fitzgerald, Finance Haas (Member)
Margaret Fong, Accounting Haas (Member)
Lukasz Langer, Accounting Haas (Member)
Alvaro Pereira, J.S.D. (Chair)
James P. Ryans, Accounting Haas (Member), Assistant Professor of Accounting, London Business School
Samuel Tan, Accounting Haas (Member), Assistant Professor, Singapore Management University
Cait Unkovic, J.S.P. Program (Chair)

### Outside Service

Member of Review Committee, The University of Auckland,
the Department of Commercial Law (2020)
Member, Board of Directors, Israel Institute
Member, Board of Directors, Academic Engagement Network

### Bar Admissions

New York State
U.S. District Court:  Southern District of New York

CONFIDENTIAL

Appendix B

Cases where expert deposition taken, testimony given or expert report filed (in last five years):

1. The Successor Agency to the Former Emeryville Redevelopment Agency and the City of Emeryville v. Swagelok Company, et al. (Case No. 3:17-cv-00308-WHO, N.D. Cal.)
2. Dyal Capital Partners, L.P. et al. v. JANA Partners, LLC, Index No. 650630/2020 (Supreme Court of the State of New York, County of New York)
3. Xerox Corporation v. Travelers Casualty and Surety Company of America, Index No. 653549/2019) (Supreme Court of the State of New York, County of New York)
4. Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic and YPF S.A., 1:15-cv-02739-LAP and Eton Park Capital Management L.P., Eton Park Master Fund, Ltd., Eton Park Fund, L.P. v. Argentine Republic, and YPF S.A. 1:16-cv-08569-LAP (S.D.N.Y.)
5. Securities and Exchange Commission v. Anatoly Hurgin, et al., Case No. 1:19-cv-05705  (S.D.N.Y.)
6. Cypress Partners, LLC v. Philip R. Shawe, et al.. No. 654101/2018 (N.Y. Sup. Ct.)
7. In re Teva Securities Litigation, 3:17-cv-00558-SRU (D. Conn.)
8. Casey M. Frank v. John v. Arabia, et al., Case No. 24-C-19-5518 (Baltimore City, MD)
9. The Boeing Company, et al. v. Embraer S.A., Yaborã Indústria Aeronáutica S.A., et al. (arbitration)
10. Ulisses Cardinot v. Arco Platform Limited, et al. (arbitration)
11. Caruso v. Modany, Case No. 1:18-cv-02182-JPH-TAB (D. Indiana)
12. In re WeWork Litigation, C.A. 2020-0258-JTL (Del. Ch.)
13. Hope Solo v. United States Soccer Federation, Inc. (United States Olympic and Paralympic Committee arbitration)
14. HC2 Holdings Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison LLP,
15. JAMS Ref No. 1425032485  (arbitration)
16. In re Novo Nordisk Securities Litigation, No. 3:17-cv-00209 (D.N.J.)
17. Hussein v. Razin, et al. (Sup. Ct. Cal. Orange Cty. No. 30-2013-00679600-CU-NP-CJC)
18. PersonalizationMall.com, LLC v. Tolaney (DuPage Cty. Ill, No. 2015 MR 1726/2017 MR 381)
19. AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, et al. (Del. Ch., C.A. 2020-0310-JTL)
20. Joy Global Inc. v. Columbia Casualty Company, et al., Case No. 18-cv-2034 (E.D. Wis.)
21. Starz Acquisition, LLC, et al. v. Allied World Assurance Company. (U.S.) Inc., et al., Case No. 18STCV04283 (Sup. Ct. Cal., Los Angeles)
22. McLaren Holdings Limited v (1) US Bank Trustees Limited and (2) Mr Simon Gaul (In the High Court of Justice Business and Property Courts of England and Wales Financial List)
23. Alex Spizz, as Chapter 7 Trustee for Ampal-American Israel Corp. v. Irit Eluz, Case No. 14-02110 (S.D.N.Y.)
24. Cypress Partners Investments, LLC v. Philip R. Shawe, et al. (arbitration proceeding)
25. Walworth Investments LG, LLC v. Mu Sigma, Inc. and Dhiraj C. Rajaram, Case No. 2016-L-002470 (Cook Cty. Ill)
26. ITV Gurney Holding Inc., et al. v. Scott Gurney, et al. (Sup Ct. California, Los Angeles)
27. Knurr v. Orbital ATK, No. 1:16-cv-1031 (Eastern District of Virginia)
28. McWhinney Holding Company, LLLP v. Poag & McEwen Lifestyle Centers- Centerra, LLC, et al., No. 11CV1104 (CO District Ct. Larimer Cty.)
29. Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., et al., CIV 538248 (Sup. Ct. California, San Mateo)
30. Wynn Resorts, Limited v. Kazuo Okada, et al., A-12-656710-B (Nev. Dis. Ct. Clark Cty.)
31. Leneul v. Teva Pharmaceutical Industries Ltd., Derivative Action 2453-03-17 (Tel Aviv District Court)
32. North American Soccer League, LLC v. United States Soccer Federation, Inc., C.A. No. 1:17-cv-05495-MKB-ST (Eastern District of New York)

CONFIDENTIAL

Appendix C

# Documents Considered

## Academic Articles

- Benjamin M. Blau et al., "Do Sophisticated Investors Interpret Earnings Conference Call Tone Differently than Investors at Large? Evidence from Short Sales," *Journal of Corporate Finance* 31, 2015, pp. 203–219

- Bok Baik and Hye-Jeong Nam, "The Effect of Regulation Fair Disclosure on Conference Calls: The Case of Earnings Surprises," *Asia-Pacific Journal of Financial Studies* 38, no. 6, 2009, pp. 801–829

- Francois Brochet et al., "Information Transfer and Conference Calls," *Working Paper*, September 2017, pp. 1–56

- Gregory L. Nagel et al., "Do Motivated Institutional Investors Monitor Firm Payout and Performance?" *Journal of Financial Research* 38, no. 3, 2015, pp. 349–377

- Gus De Franco et al., "MD&A Textual Similarity and Auditors," *Working Paper*, pp. 1–54

- Kathleen W. Hanley and Gerard Hoberg, "The Information Content of IPO Prospectuses," *The Review of Financial Studies* 23, no. 7, June 2010, pp. 2821–2864

- Marcus P. Kirk and Stanimir Markov, "Come on Over: Analyst/Investor Days as a Disclosure Medium," *The Accounting Review* 91, no. 6, 2016, pp. 1725–1750

- Mengnan Zhu, "Does the Confidential IPO Registration Process Create Value?" August 18, 2021

- Paul A. Borochin et al., "The Effects of Conference Call Tones on Market Perceptions of Value Uncertainty," *Journal of Financial Markets* 40, 2018, pp. 75–91

- Richard Frankel et al., "An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium," *Journal of Accounting Research* 37, no. 1, 1999, pp. 133–150

## Analyst/Industry Reports

- Arete, "Zuora: You Can Make It If You Try," June 13, 2019

- Brian Leiter's Law School Reports, "20 Most-Cited Corporate & Securities Law Faculty in the U.S., 2016-2020," October 20, 2021, https://leiterlawschool.typepad.com/leiter/2021/10/20-most-cited-corporate-securities-law-faculty-in-the-us-2016-2020.html

- Brian Leiter's Law School Reports, "Top 50 law faculties in scholarly impact, 2021," August 24, 2021, https://leiterlawschool.typepad.com/leiter/2021/08/top-50-law-faculties-in-scholarly-impact-2021.html

Appendix C

- Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," Thomson Reuters Practical Law, 2015

- Forrester, "The Forester Wave: Subscription Billing Platforms," Q4 2015, November 11, 2015

- Forrester, "The Forester Wave: Recurring Customer and Billing Management," Q3 2017, July 31, 2017

- Forrester, "The Forrester Wave: SaaS Billing Solutions," Q4 2019, November 18, 2019

- Forrester, "SaaS Billing: The Sleeper Agent for Business Agility," December 16, 2019

- Gartner, "Magic Quadrant for Configure, Price and Quote Application Suites," November 5, 2018

- Gartner, "Magic Quadrant for Configure, Price and Quote Application Suites," October 28, 2018

- Goldman Sachs & Co. LLC, "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," May 31, 2019

- IDC, "IDC Marketscape: Worldwide Subscription Relationship Management 2017 Vendor Assessment," November 2017

- IDC, "IDC MarketScape: Worldwide Subscription Relationship Management Applications 2019-2020 Vendor Assessment"

- Jefferies, "F1Q20: Shy Guide," May 31, 2019

- Latham and Watkins, "US IPO Guide," June 15, 2022, https://www.lw.com/admin/upload/SiteAttachments/US%20IPO%20Guide%202022.pdf

- MGI Research, "360 Rating: Zuora," May 2, 2018

- MGI Research, "Agile Billing Solutions – A Buyer's Guide," January 9, 2019

- MGI Research, "MGI Research – Agile Monetization, Zuora AMPs Up – Acquires Leeyo for Revenue Recognition Leadership," May 10, 2017

- MGI Research, "MGI Research – Billing Management," May 2, 2018

- MGI Research, "MGI 360 Ratings – Zuora RevPro in Automated Revenue Management," October 28, 2019

- Morgan Stanley, "1Q20 Results: A bump on the Road to Subscription Economy," May 31, 2019

- National Center for the Middle Market, "Mid-Year 2022 Middle Market Indicator," 2022

- National Investor Relations Institute Analytics, "NIRI Earnings Process Practices Research Report," 2016, https://www.niri.org/NIRI/media/Protected-

Appendix C

Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf

- National Investor Relations Institute Analytics, "Standards of Practice for Investor Relations: Disclosure," updated September 2016, https://www.niri.org/NIRI/media/NIRI/Professinal%20Development/Seminars/niri_standardspractice_updated_lr.pdf

- Needham, "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," May 31, 2019

- Practical Law Corporate & Securities, "Preparation of Management's Discussion and Analysis of Financial Condition and Results of Operations," 2022

- Subscription Trade Association, "2019 State of the Subscription Commerce Economy: Annual Report," 2019, https://subta.com/wp-content/uploads/2019/10/2019_SUBTA_Annual_Report.pdf

- Ventana Research Analyst Perspectives, "Zuora Acquires Leeyo for Revenue Recognition," My 22, 2017

- Ventana Research Analyst Perspectives, "Zuora RevPro Addresses Revenue Recognition Compliance," August 24, 2017

- WilmerHale, "IPO Report," 2019

**Depositions and Interviews**

- Deposition of Karthik Ramamoorthy, March 24, 2022

- Deposition of Marc Diouane, May 5, 2022

- Deposition of Robert Hildenbrand, March 22, 2022

- Deposition of Tien Tzuo, April 27, 2022

- Deposition of Tyler Sloat, April 22, 2022

- Interview with Tyler Sloat, July 20, 2022

**Earnings Calls and Releases**

- "Q1 2019 Zuora Inc Earnings Call," May 31, 2018

- "Q2 2019 Zuora Inc Earnings Call," August 30, 2018

- "Q3 2019 Zuora Inc Earnings Call," November 29, 2018

- "Q4 2019 Zuora Inc Earnings Call," March 21, 2019

- "Q1 2020 Zuora Inc Earnings Call," May 30, 2019

- Q1 2019 Earnings Release, May 31, 2018

CONFIDENTIAL

Appendix C

- Q2 2019 Earnings Release, August 30, 2018

- Q3 2019 Earnings Release, November 29, 2018

- Q4 2019 Earnings Release, March 21, 2019

- Q1 2020 Earnings Release, May 30, 2019

## Internal Zuora, Inc. Documents

- Goldman Sachs & Co. LLC, "Discussion Materials for Project Zebra: Overview of Key Workstreams and Path to IPO," February 2018

- Project Zebra Timeline

- Zuora, Inc., "Disclosure Committee Meeting: 2Q'19 Form 10-Q Review," September 7, 2018

- Zuora, Inc., "Disclosure Committee Meeting: 3Q'19, Form 10-Q Review," December 6, 2018

- Zuora, Inc., "Global Code of Business Conduct and Ethics," March 6, 2018

- Zuora, Inc., "Project Zebra Update and Approvals," March 6, 2018

- Zuora, Inc., "Project Zebra: Next Steps and Week-by-Week Plan," undated

- Zuora, Inc., "Zuora, Inc. Interim Review Status: Interim Financial Information for the quarter ended October 31, 2018," November 27, 2018

- Zuora, Inc., "Zuora Social Media Policy," undated

## Legal Documents

- *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, CV 2020-0310-JTL, 2020 WL 7024929, Del. Ch. (Nov. 30, 2020)

- Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *Casey Roberts, individually and on behalf of all other similarly situated v. Zuora, Inc., et al.*, Case No. 33:19-cv-03422-SI (November 8, 2019)

- *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884, Del. Ch. (January 22, 2016)

- Securities and Exchange Commission v. Anatoly Hurgin, et al., Case No. 1:19-cv-05705 (September 4, 2020)

## Meeting Minutes

- "Minutes of a Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," November 27, 2018

- "Minutes of a Meeting of the Disclosure Committee of Zuora, Inc.," September 7, 2018

CONFIDENTIAL

Appendix C

- "Minutes of a Meeting of the Disclosure Committee of Zuora, Inc.," April 4, 2019

- "Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Zuora, Inc.," May 29, 2019

**Other Public Documents**

- "Charter of the Compensation Committee of the Board of Directors of Zuora, Inc.," Zuora, Inc., March 8, 2021, https://investor.zuora.com/Environmental-Social-Governance/governance-documents/default.aspx

- "Charter of the Nominating and Corporate Governance Committee of the Board of Directors of Zuora, Inc.," Zuora, Inc., December 7, 2021, https://investor.zuora.com/Environmental-Social-Governance/governance-documents/default.aspx

- "Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934: General Instructions," *U.S. Securities and Exchange Commission*, https://www.sec.gov/about/forms/form10-k.pdf

- "Form 10-Q General Instructions," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/form10-q.pdf

- "Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/form8-k.pdf

- "Form S-1," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/forms-1.pdf

- "Form S-3," *U.S. Securities and Exchange Commission*, https://www.sec.gov/files/forms-3.pdf

- "Investor Presentation," Zuora, Inc., April 2018, https://s201.q4cdn.com/780506941/files/doc_presentations/Zuora-Investor-Presentation-April-2018-for-Upload.pdf

- "Overview of NYSE Quantitative Initial Listing Standards," *NYSE*, undated, https://www.nyse.com/publicdocs/nyse/listing/NYSE_Initial_Listing_Standards_Summary.pdf

- Sarbanes-Oxley Act of 2002, Section 404

- Securities Exchange Act of 1934, as Amended through P.L. 112-158, approved August 10, 2012

**Press Releases and Social Media Posts**

- @Zuora Facebook Post, "Zuora Central is \*the\* #SubscriptionEconomy platform. Run your dynamic order-to-cash platform on one central platform. Learn more or take it for a

CONFIDENTIAL

Appendix C

test drive #O2C http://bit.ly/2Hebs93," April 12, 2018, https://www.facebook.com/zuora/posts/pfbid02SQTKcZzAz2FWbco4RSPtL437FMiBW uX8SZLomfK75DGFgzaNVid8jdaaPhjSbrqQl

- @Zuora Twitter Post, "Don't underestimate the complexity of revenue recognition. The deep dark depths are very, very complex! Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process! #Subscribed #revrec," June 5, 2018, https://twitter.com/Zuora/status/1004098631626977280

- Oracle Press Release, "Oracle Buys Portal Software," April 12, 2006, https://www.oracle.com/corporate/pressrelease/oracle-buys-portal-041206.html, accessed June 21, 2022

- Zuora, Inc. Press Release, "The Subscription Economy Grows More Than 300% In The Last Seven Years," March 21, 2019

- Zuora, Inc. Press Release, "Tien Tzuo, CEO and founder of Zuora, launches SUBSCRIBED, the first book on the subscription economy," June 5, 2018

- Zuora, Inc. Press Release, "Zuora Acquires Leeyo, The Leading Provider of Revenue Recognition Software, to Ease the Burden of Imminent Accounting Standards," May 10, 2017, https://www.zuora.com/press-release/zuora-acquires-leeyo/, accessed June 21, 2022

- Zuora, Inc. Press Release, "Zuora Adds Five New U.S. Patents to Accelerate Growth of the Subscription Economy," March 22, 2019, https://www.businesswire.com/news/home/20190322005008/en/

- Zuora, Inc. Press Release, "Zuora Announces Date for Third Quarter Fiscal 2019 Earnings Call," November 1, 2018, https://www.businesswire.com/news/home/20180531006444/en/

- Zuora, Inc. Press Release, "Zuora Announces its Spring '18 Release at Subscribed in San Francisco," June 5, 2018

- Zuora, Inc. Press Release, "Zuora Announces its Winter '19 Release," December 11, 2018

- Zuora, Inc. Press Release, "Zuora Central Upgrade Further Attacks the ERP Market," June 5, 2018, https://www.businesswire.com/news/home/20180605006064/en/

- Zuora, Inc. Press Release, "Zuora Delivers Strong First Quarter Fiscal 2019 Results," May 31, 2018, https://www.businesswire.com/news/home/20180531006444/en/

- Zuora, Inc. Press Release, "Zuora Hosts Subscribed New York Featuring Thought Leaders from Amazon, Fortune, NYSE and XO Group," October 5, 2018

- Zuora, Inc. Press Release, "Zuora Named Amazon Pay Premier Partner for Millions of Merchants Seeking to Capitalize on the Subscription Economy," October 11, 2018

Appendix C

- Zuora, Inc. Press Release, "Zuora Reports Fourth Quarter and Full Year Fiscal 2019 Results," March 21, 2019

- Zuora, Inc. Press Release, "Zuora Reports Record Second Quarter Fiscal 2019 Results," August 30, 2018

- Zuora, Inc. Press Release, "Zuora Reports Record Third Quarter Fiscal 2019 Results," November 29, 2018

- Zuora, Inc. Press Release, "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results," March 21, 2019

**Public Press**

- "Benchmark and Benioff Put $6.5 Million Into Zuora to Create a Salesforce for Online Billing," *TechCrunch*, March 13, 2008, https://techcrunch.com/2008/03/13/benchmark-and-benioff-put-65-million-into-zuora-to-create-a-salesforce-for-online-billing/

- "Benchmark-Backed Zuora Eyes IPO in 2018," *The Information*, October 17, 2017, https://www.theinformation.com/articles/benchmark-backed-zuora-eyes-ipo-in-2018, accessed June 21, 2022

- "Exclusive: Zuora adds Salesforce's first investor to its board as it moves toward going public," *San Francisco Business Times*, June 1, 2017, https://www.bizjournals.com/sanfrancisco/news/2017/06/01/zuora-salesforce-first-investor-board-going-public.html, accessed June 21, 2022

- "Subscription Biller Zuora soars 43% following IPO," *TechCrunch*, April 12, 2018, https://techcrunch.com/2018/04/12/subscription-biller-zuora-soars-43-following-ipo/, accessed August 5, 2022

- "Subscription Businesses Are Booming. Here's How to Value Them," *Harvard Business Review*, December 19, 2017, https://hbr.org/2017/12/subscription-businesses-are-booming-heres-how-to-value-them, accessed June 23, 2022

- "Subscriptions:  Lifeblood of the Access Economy," *Forbes*, September 21, 2018, https://www.forbes.com/sites/insights-intelai/2018/09/21/subscriptions-lifeblood-of-the-access-economy/, accessed June 23, 2022

- "The 2022 Subscription Economy in 5 Charts," *LinkedIn*, February 19, 2022, https://www.linkedin.com/pulse/2022-subscription-economy-5-charts-tien-tzuo, accessed June 21, 2022

- "Tien Tzuo's Zuora Set to Capitalize on Subscription Economy It Helped Build," *Forbes*, August 23, 2016, https://www.forbes.com/sites/brucerogers/2016/08/23/tien-tzuos-zuora-set-to-capitalize-on-subscription-economy-it-helped-build/, accessed June 23, 2022

CONFIDENTIAL

Appendix C

- "Zuora Aims to Be Salesforce for Online Billing; Benioff Agrees," *TechCrunch*, May 20, 2008, https://techcrunch.com/2008/05/20/zuora-the-salesforce-for-online-billing-launches/, accessed August 5, 2022

- "Zuora Announces Closing of Initial Public Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares," *Businesswire*, April 16, 2018, https://www.businesswire.com/news/home/20180416006126/en/

- "Zuora prices IPO at $14 per share — valuing the company at $1.44 billion," *CNBC*, April 11, 2018, https://www.cnbc.com/2018/04/11/zuora-prices-ipo-at-14-per-share--valuing-the-company-at-1-point-44-billion.html, accessed June 21, 2022

- "Zuora's Tien Tzuo Had A Big Idea for Software to Drive the Subscription Economy – He Almost Blew It," *Forbes*, November 4, 2015, https://www.forbes.com/sites/amyfeldman/2015/11/04/zuoras-tien-tzuo-had-a-big-idea-for-software-to-drive-the-subscription-economy-he-almost-blew-it/, accessed June 23, 2022

**SEC Filings**

- Zuora, Inc., Form DEF 14A, filed May 8, 2019

- Zuora, Inc., Form DEF 14A, filed May 12, 2020

- Zuora, Inc., Form DEF 14A, filed May 11, 2021

- Zuora, Inc., Form DEF 14A, filed May 11, 2022

- Zuora, Inc., Form S-1 Registration Statement, filed March 16, 2018

- Zuora, Inc., Prospectus, dated March 12, 2018

- Zuora, Inc., Amendment No. 1 to Form S-1 Registration Statement, filed April 2, 2018

- Zuora, Inc., Amendment No. 2 to Form S-1 Registration Statement, filed April 10, 2018

- Zuora, Inc., Prospectus, dated April 11, 2018

- Zuora, Inc., Form 10-K for the fiscal year ended January 31, 2019, filed April 18, 2019

- Zuora, Inc., Form 10-Q for the quarterly period ended April 30, 2018, filed June 13, 2018

- Zuora, Inc., Form 10-Q for the quarterly period ended July 31, 2018, filed September 13, 2018

- Zuora, Inc., Form 10-Q for the quarterly period ended October 31, 2018, filed December 12, 2018

- Zuora, Inc., Form 10-Q for the quarterly period ended April 30, 2019, filed June 11, 2019

Appendix C

**SEC Announcements and Releases**

- "Business and Financial Disclosure Required by Regulation S-K," U.S. Securities and Exchange Commission, Release No. 33-10064, April 13, 2016, https://www.sec.gov/rules/concept/2016/33-10064.pdf

- "Certification of Disclosure in Companies' Quarterly and Annual Reports," Securities Act Release No. 33-8124, August 29, 2002, https://www.sec.gov/rules/final/33-8124.htm, accessed July 26, 2022

- "Commission Guidance on The Use of Company Web Sites," Securities Act Release No. 34-58288, August 1, 2008, https://www.sec.gov/rules/interp/2008/34-58288.pdf

- "Final Rule: Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Periods," Securities Act Release No. 33-8238, June 5, 2003, https://www.sec.gov/rules/final/33-8238.htm, accessed July 26, 2022

- "Request for Comment on Earnings Releases and Quarterly Reports," Securities Act Release No. 33-10588, December 18, 2018, https://www.sec.gov/rules/other/2018/33-10588.pdf

- Letter to the SEC from Grant Thornton LLP, "Re: File Number S7-26-18: Request for Comment on Earnings Releases and Quarterly Reports," March 15, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5134338-183346.pdf

- Letter to Vanessa Countryman from James G. Martin, "Request for Comment on Earnings Releases and Quarterly Reports--File Number S7-26-18," April 19, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5412063-184508.pdf

**U.S. Code**

- 15 U.S.C. § 7262, 2012

- 15 U.S.C. § 77a, 2012

- 15 U.S.C. § 78a, 2018

- 15 U.S.C. § 78j(b), 2012

- 15 U.S.C. § 78t(a), 2010

- 17 C.F.R. § 210, 1992 (Regulation S-X)

- 17 C.F.R. § 229, 1982 (Regulation S-K)

- 17 C.F.R. § 229.101

- 17 C.F.R. § 229.103, 2011

- 17 C.F.R. § 229.104, 2011

CONFIDENTIAL

Appendix C

- 17 C.F.R. § 229.105

- 17 C.F.R. § 229.10–915, 2020

- 17 C.F.R. § 229.303

- 17 C.F.R. § 230.501(f)

- 17 C.F.R. § 240.10b-5, 2013

- 17 C.F.R. § 240.13a-14, 2018

- 17 C.F.R. § 240.15d-14(a), 2018

- 17 C.F.R. § 243.100(a), 2011

- 17 C.F.R. § 249.308, 1968

- 17 C.F.R. § 249.308, 2012

- 17 C.F.R. § 249.310, 2012

- 17 C.F.R. § 240.12b-2

- 17 C.F.R. § 240.12b-2 (2) (i)

- 17 C.F.R. § 240.12b-2 (2) (iii)

**Websites**

- "Annual Recurring Revenue (ARR)," *CFI*, January 15, 2022, https://corporatefinanceinstitute.com/resources/knowledge/ecommerce-saas/annual-recurring-revenue-arr/?nowprocket=1, accessed July 28, 2022

- "AS 4105: Reviews of Interim Financial Information," *Public Company Accounting Oversight Board*, https://pcaobus.org/Standards/Auditing/Pages/AS4105.aspx, accessed July 26, 2022

- "Best Practice Guidelines Governing Analyst/Corporate Issuer Relations," *CFA Institute*, February 2005, https://www.cfainstitute.org/en/advocacy/policy-positions/best-practice-guidelines-governing-analyst, accessed July 26, 2022

- "Brent R. Cromley, Jr," *LinkedIn*, https://www.linkedin.com/in/brentlyjr, accessed July 7, 2022

- "Emerging Growth Companies," *U.S. Securities and Exchange Commission*, April 28, 2022, https://www.sec.gov/education/smallbusiness/goingpublic/EGC, accessed July 26, 2022

- "How to Read a 10-K/10-Q," *U.S. Securities and Exchange Commission*, January 26, 2021, https://www.sec.gov/fast-answers/answersreada10khtm.html, accessed July 22, 2021

CONFIDENTIAL

Appendix C

- "Jason Pressman," *LinkedIn*, https://www.linkedin.com/in/jasonpressman, accessed July 7, 2022

- "Jennifer W. Pileggi," *LinkedIn*, https://www.linkedin.com/in/jenniferpileggi, accessed July 7, 2022

- "Kenneth A. Goldman," *LinkedIn*, https://www.linkedin.com/in/ken-goldman-552a472, accessed July 7, 2022

- "Magdalena Yesil," *LinkedIn*, https://www.linkedin.com/in/magdalena-yesil, accessed July 7, 2022

- "Marc Diouane," *LinkedIn*, https://www.linkedin.com/in/marc-diouane-15b65, accessed July 7, 2022

- "Michelangelo Volpi," *LinkedIn*, https://www.linkedin.com/in/mavolpi, accessed July 7, 2022

- "Peter Fenton," *LinkedIn*, https://www.linkedin.com/in/peter-fenton-0b117, accessed July 7, 2022

- "Timothy Haley," *LinkedIn*, https://www.linkedin.com/in/tihaley, accessed July 7, 2022

- "SAP Billing and Revenue Innovation Management," *SAP*, https://www.sap.com/products/billing-revenue-innovation-management.html, accessed June 21, 2022

- "The Zuora Timeline," *Zuora*, https://www.zuora.com/about/, accessed June 21, 2022

- "U.S. Securities Laws: Overview," *Practical Law Corporate & Securities*, https://us.practicallaw.thomsonreuters.com/3-383-6798, accessed July 26, 2022

**Bates Stamped Documents**

- ZUO_V_000004–16
- ZUO_V_000028–33
- ZUO_V_000035–70
- ZUO_V_000027
- ZUO_V_000033
- ZUO_V_000039
- ZUO_V_000049
- ZUO_V_000059
- ZUO_00000001–5
- ZUO_00000175–91

CONFIDENTIAL

Appendix C

- ZUO_00000497–507
- ZUO_00000508–11
- ZUO_00000512–7
- ZUO_00000854–905
- ZUO_00000906–33
- ZUO_00000934–40
- ZUO_00000941–6
- ZUO_00001166–92
- ZUO_00001204–5
- ZUO_00001206–7
- ZUO_00001230–48
- ZUO_00001268–81
- ZUO_00001282–310
- ZUO_00002381–3
- ZUO_00002740–92
- ZUO_00003083–92
- ZUO_00003341–2
- ZUO_00003467–73
- ZUO_00003598–602
- ZUO_00003709–13
- ZUO_00004218–22
- ZUO_00014597–8
- ZUO_00025597
- ZUO_00028424–5
- ZUO_00028744–8
- ZUO_00038966–7
- ZUO_00103182–3
- ZUO_00000253–8

CONFIDENTIAL

Appendix C

- ZUO_00117568–72
- ZUO_00117646–7
- ZUO_00120448–9
- ZUO_00121424
- ZUO_00178139–40
- ZUO_00178327
- ZUO_00204053–4
- ZUO_00204087–8
- ZUO_00214503–5
- ZUO_00249589–91
- ZUO_00268993–4
- ZUO_00300588
- ZUO_00300615–6
- ZUO_00326338
- ZUO_00329659–70
- ZUO_00329887–99
- ZUO_00330041–7
- ZUO_00335717–37
- ZUO_00378110–36
- ZUO_00446392–7
- ZUO_00448828
- ZUO_00448829
- ZUO_00448830–33
- ZUO_00448834–43
- ZUO_00448850
- ZUO_00448882
- ZUO_00449224–30
- ZUO_00448865–8

CONFIDENTIAL

# Appendix C

- ZUO_00448869–71

- ZUO_00448871–2

- ZUO_00003008–10

*And all other documents cited in my report, appendices, and exhibits.*

CONFIDENTIAL

**EXHIBIT 1**

# Chronology of Select Events at Zuora
# Before and During the Class Period



Source: Zuora, Inc., Prospectus, dated April 11, 2018; Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 21, 2019; Q1 2020 Earnings Release, May 30, 2019; ZUO_00300615–6; Zuora, Inc., Form 10-K for the fiscal year ended January 31, 2019, filed April 18, 2019; ZUO_00004218–22; ZUO_00326338

Note: Zuora revised its guidance for both Q4 2019 and Q1 2020 and revised the risk factors section of its Form 10-K for FY 2019 as compared to previous SEC filings.

**EXHIBIT 2**

# Select Products at Zuora During the Class Period
## Class Period:  4/12/18 – 5/30/19

| | |
|---|---|
| **Zuora Central Platform** | **The Zuora Central Platform acted as an intelligent subscription management hub, allowing Zuora's customers to orient Order-to-Revenue operations around it to create a dynamic order-to-revenue process designed specifically for subscription business models.** |
| *Pricing Engine* | *The Pricing Engine allowed customers to price and package in minutes without having to recode or re-engineer back-office systems.  This included mixing and matching one-time, recurring, or usage pricing models in order to design strategic and tailored pricing plans.* |
| *Subscription Orders Engine* | *The Subscription Orders Engine automated the subscription management lifecycle and recalculated billing, payments, and revenue for events during the subscriber lifecycle.* |
| *Rating Engine* | *The Rating Engine enabled Zuora's customers to meter and rate any monetization or account model so their customers are charged accurately.* |
| *Global Payments Engine* | *The Global Payments Engine enabled Zuora's customers to charge using over 30 pre-built payment gateways, over 150 supported currencies, and over 20 supported payment methods.* |
| *Subscription Metrics Engine* | *The Subscription Metrics Engine provided reporting and insight into metrics required to run a subscription business.* |
| *Subscription Accounting Engine* | *The Subscription Accounting Engine helped Zuora's customers close their books with audit-ready, automated financial operations.* |
| | |
| **Order-to-Revenue Products** | **Zuora could deploy and configure their portfolio of Order-to-Revenue products to meet a wide variety of use cases for subscription business models.** |
| *Zuora Billing* | *Designed specifically for subscription billing, Zuora Billing allowed Zuora's customers to bill in multiple ways, calculate prorations when subscriptions change, and to group customers into batches for different billing and payment operations.  The product also helped Zuora's customers set payment terms, manage hierarchical billing relationships, consolidate invoicing across multiple subscriptions, and collect revenue using a global network of payment gateways.* |
| *Zuora RevPro* | *Zuora RevPro was a revenue recognition automation solution that enabled Zuora's customers to group transactions of goods and services into revenue contracts and performance obligations in accordance with the new ASC 606 / IFRS 15 revenue standards.  Zuora RevPro helped Zuora's customers automate revenue and deferred revenue management in accordance with their accounting policies, business rules, and pricing models.* |
| *Zuora CPQ* | *Designed for configuring deals, pricing, and quoting in a subscription business, Zuora CPQ allowed Zuora's customers to configure any type of deal, such as multi-year subscriptions, and price ramp deals and use the rules engine and guided selling workflows to scale their sales team.* |
| *Zuora Collect* | *Specifically designed to handle the complicated function of collections associated with dynamic subscription-based businesses, Zuora Collect helped Zuora's customers streamline their collections processes by configuring their own automated dunning workflow, orchestrating various retry rules for electronic payments, and targeting the root cause of a payment decline.* |
| | |
| **Application Marketplace** | **The Zuora Marketplace offered industry-specific tools and third-party applications for Zuora's customers.  The Zuora Marketplace had dozens of applications and features from over 50 partners.  Applications included a broad range of applications needed by subscription businesses, such as pre-built general ledger connectors, pre-built tax connectors, pre-built payment gateways connectors, pre-built lockbox connectors, developer applications, and collections applications.** |

Source:  Zuora, Inc., Form 10-K for the fiscal year ended January 31, 2019, filed April 18, 2019

CONFIDENTIAL

**EXHIBIT 3**

# Select Persons at Zuora During the Class Period
## Class Period:  4/12/18 – 5/30/19

| Name | Position at Zuora | Tenure | Background and Relevant Experience |
|---|---|---|---|
| Tien Tzuo | Chairman of the Board of Directors<br><br>Chief Executive Officer | Dec 2017 - Present<br><br>Nov 2007 - Present | Tien Tzuo has served on Zuora's Board of Directors and as Chief Executive Officer ("CEO") since November 2007, and as the Chairman of Zuora's Board of Directors since December 2017.  As the CEO, Mr. Tzuo is also a primary spokesperson of Zuora.  Prior to Zuora, Mr. Tzuo served as Chief Strategy Officer at Salesforce, Inc., a provider of customer relationship management software, from 2005 to 2008, and as Chief Marketing Officer from 2003 to 2005.  Mr. Tzuo holds a B.S. in electrical engineering from Cornell University and an M.B.A. from Stanford University. |
| Tyler Sloat | Chief Financial Officer | Sep 2010 - Apr 2020 | Tyler Sloat served as Chief Financial Officer (CFO) at Zuora from September 2010 to April 2020.  As the CFO, Mr. Sloat was also a primary spokesperson of Zuora, and a member of the Disclosure Committee at Zuora.  Prior to this, Mr. Sloat served as Vice President of Finance and CFO of Obopay, Inc., a mobile payments technology company, from 2007 to 2010.  From 2005 to 2007, Mr. Sloat served as the Controller of the Emerging Products Group at Network Appliance, Inc., a provider of networked storage solutions.  Mr. Sloat is a Certified Public Accountant (inactive) and holds a B.A. in economics from Boston College and an M.B.A. from Stanford University. |
| Marc Diouane | President<br><br>Executive Vice President, Field Operations | Feb 2015 - May 2019<br><br>Mar 2014 - Feb 2015 | Marc Diouane served as President of Zuora from February 2015 to May 2019.  He also served as a spokesperson designee of Zuora.  Prior to this, Mr. Diouane served as Executive Vice President, Field Operations from March 2014 to February 2015.  Prior to joining Zuora, he served as Executive Vice President, Global Services & Partners at PTC Inc., a product development software company, from October 2010 to March 2014, and as Senior Divisional Vice President—Europe, Middle East, Africa and Asia, from 2005 to 2010.  Mr. Diouane holds a Masters from Bordeaux Business School. |
| Brent R. Cromley, Jr. | Senior Vice President, Technology | Sep 2015 - May 2021 | Brent R. Cromley, Jr. served as Senior Vice President of Engineering at Zuora from September 2015 to May 2021.  He also served as a spokesperson designee of Zuora.  Prior to joining Zuora, Mr. Cromley served as Chief Technology Officer at Zappos.com, Inc., an online retailer that was acquired by Amazon.com, Inc., from November 2013 to June 2015, as Vice President of Technology from October 2011 to November 2013, and as Senior Director of Engineering from January 2007 to October 2011.  Mr. Cromley holds a B.A. in computer science from Dartmouth College. |
| Jennifer W. Pileggi | Senior Vice President, General Counsel<br><br>Corporate Secretary | Jun 2015 - Feb 2022 | Jennifer W. Pileggi served as Senior Vice President, General Counsel, and Corporate Secretary at Zuora from June 2015 to February 2022.  As General Counsel, she was also the Compliance Officer, a spokesperson designee, and a member of the Disclosure Committee at Zuora.  Prior to joining Zuora, Ms. Pileggi served as Senior Vice President, General Counsel, Chief Compliance Officer, and Corporate Secretary at Silicon Graphics International Corp., a high performance computing server manufacturer, from September 2011 to May 2015.  From 2004 to 2011, Ms. Pileggi served as Executive Vice President, General Counsel, Chief Privacy Officer, and Corporate Secretary at Con-way Inc., a transportation and supply chain solutions company, and from 1996 to 2004, as Vice President and Corporate Counsel for Menlo Worldwide, Con-way's logistics division.  Ms. Pileggi was previously a corporate associate at the law firms of Marron, Reid & Sheehy and Heller Ehrman LLP.  Ms. Pileggi holds a B.A. in art history from Yale University and a J.D. from New York University. |
| Joon Huh | Vice President, Investor Relations | 2018 - 2020 | Joon Huh served as Vice President, Investor Relations at Zuora from 2018 to 2020.  As part of this role, he was also a primary spokesperson of Zuora, and a member of the Disclosure Committee at Zuora.  Prior to joining Zuora in 2018, he was Vice President of Investor Relations at Visa.  Before joining Visa, Mr. Huh held various financial leadership positions over nine years at Yahoo, including Investor Relations and Corporate Finance.  Prior to Yahoo, he spent several years in financial services at Mesirow Financial, Deloitte and Bear Stearns.  Mr. Huh began his career as an engineer at General Electric.  Mr. Huh holds a BAS in engineering from the University of Washington and an MBA from the University of Chicago, Booth School of Business. |

CONFIDENTIAL

H

**EXHIBIT 3**

# Select Persons at Zuora During the Class Period
## Class Period:  4/12/18 – 5/30/19

| Name | Position at Zuora | Tenure | Background and Relevant Experience |
|---|---|---|---|
| Peter Fenton | Director | Dec 2007 - Jun 2021 | Peter Fenton served as a member of Zuora's Board of Directors from December 2007 to June 2021.  Mr. Fenton also served on the Audit Committee of Zuora's Board of Directors.  Since 2006, Mr. Fenton has served as a General Partner of Benchmark Capital Partners, a venture capital firm.  From 1999 to 2006, Mr. Fenton served as a Managing Partner at Accel Partners, a venture capital firm.  Mr. Fenton has served on the Boards of Directors of Hortonworks, Inc., New Relic, Inc., Yelp Inc., and several private companies.  Mr. Fenton served on the Board of Directors of Twitter, Inc. from February 2009 to May 2017.  Mr. Fenton holds a B.A. in philosophy and an M.B.A. from Stanford University. |
| Kenneth A. Goldman | Director | Feb 2016 - Present | Kenneth A. Goldman has served as a member of Zuora's Board of Directors since February 2016.  Mr. Goldman serves as Chair of the Audit Committee of Zuora's Board of Directors.  Mr. Goldman has served as the President of Hillspire LLC, a family office management company, since September 2017.  From October 2012 to June 2017, Mr. Goldman served as the Chief Financial Officer (CFO) of Yahoo! Inc.  Prior to this, Mr. Goldman was the Senior Vice President and CFO of Fortinet, Inc., a provider of threat management technologies, from 2007 to 2012.  From 2006 to 2007, Mr. Goldman served as Executive Vice President and CFO of Dexterra, Inc., a mobile enterprise software company.  From 2000 until 2006, Mr. Goldman served as Senior Vice President of Finance and Administration and CFO of Siebel Systems, Inc.  From January 2015 to December 2017, Mr. Goldman served as a member of the PCAOB, Standing Advisory Group.  Mr. Goldman currently serves on the Board of Directors of Fortinet, Inc., GoPro, Inc., and RingCentral, Inc.  Previously, Mr. Goldman served on the Board of Directors of Gigamon Inc., Infinera Corporation, TriNet Group, Inc., and NXP Semiconductors N.V.  Mr. Goldman is also a Trustee Emeritus on the board of trustees of Cornell University.  Mr. Goldman holds a B.S. in electrical engineering from Cornell University and an M.B.A. from Harvard Business School. |
| Timothy Haley | Director | Oct 2010 - Present | Timothy Haley has served as a member of Zuora's Board of Directors since October 2010.  Mr. Haley serves as Chair of the Compensation Committee of Zuora's Board of Directors, and is also a member of the Nominating and Governance Committee.  Mr. Haley is a Managing Director at Redpoint Ventures, a venture capital firm, which he co-founded in 1999.  Mr. Haley has served as a Managing Director of Institutional Venture Partners, a venture capital firm, since 1998.  From 1986 to 1998, Mr. Haley was the President of Haley Associates, an executive recruiting firm in the high technology industry.  Mr. Haley currently serves on the Board of Directors of Netflix, Inc., 2U, Inc., thredUP Inc., and several private companies.  Mr. Haley is also on the Board of Trustees of Santa Clara University. Mr. Haley holds a B.A. in philosophy from Santa Clara University. |
| Jason Pressman | Director | Sep 2008 - Present | Jason Pressman has served as a member of Zuora's Board of Directors since September 2008.  Mr. Pressman serves on the Audit Committee and the Compensation Committee of Zuora's Board of Directors.  Mr. Pressman is a Managing Director at Shasta Ventures, a venture capital firm, where he has worked since 2005.  Prior to Shasta Ventures, Mr. Pressman served as a Vice President of Strategy and Operations at Walmart.com, a subsidiary of Wal-Mart Stores, Inc., a worldwide retailer, from 2000 to 2004.  Mr. Pressman currently serves on the Boards of Directors of Nextdoor, Inc., and a number of private companies.  Mr. Pressman holds a B.S. in finance from the University of Maryland, College Park and an M.B.A. from Stanford University. |
| Michelangelo Volpi | Director | Nov 2011 - Jun 2020 | Michelangelo Volpi served as a member of Zuora's Board of Directors from November 2011 to June 2020.  Mr. Volpi also served on the Audit Committee of the Board of Directors at Zuora.  He is a Partner at Index Ventures, a venture capital firm, where he has worked since 2009.  From 2007 to 2009, Mr. Volpi served as Chief Executive Officer of Joost N.V., an internet video services company.  From 1994 to 2007, he served in various executive roles at Cisco Systems, Inc., a technology company, including as Senior Vice President and General Manager, Routing and Service Provider Group and as Chief Strategy Officer.  Mr. Volpi currently serves on the Board of Directors of several private companies.  He has previously served on the Board of Directors of Pure Storage, Inc., Hortonworks, Inc., Exor N.V., Fiat Chrysler Automobiles N.V., and Telefonaktiebolaget L. M. Ericsson.  Mr. Volpi earned a B.S. in mechanical engineering, an M.S. in manufacturing systems engineering, and an M.B.A. from Stanford University. |

CONFIDENTIAL

**EXHIBIT 3**

## Select Persons at Zuora During the Class Period
### Class Period:  4/12/18 – 5/30/19

| Name | Position at Zuora | Tenure | Background and Relevant Experience |
|---|---|---|---|
| Magdalena Yesil | Director | May 2017 - Present | Magdalena Yesil has served as a member of Zuora's Board of Directors since May 2017.  Ms. Yesil is the Chair of the Nominating and Governance Committee of Zuora's Board of Directors.  She is the Executive Chair of Informed, Inc., an artificial intelligence software company serving the financial services industry, since April 2016.  In 2010, Ms. Yesil co-founded Broadway Angels, an angel investment group.  Ms. Yesil was also an early investor in Salesforce, Inc., and was a founding member of that company's Board of Directors, where she served for more than five years.  She was a General Partner at U.S. Venture Partners, a venture capital firm, from 1998 to 2006.  Ms. Yesil founded MarketPayAssociates, L.L.C., a software company, and served as its Chief Executive Officer and President from 1996 to 1997.  She also co-founded and served as Vice President of Marketing and Technology of CYCH, Inc. (f/k/a CyberCash, Inc.), a secure electronic payment company.  Ms. Yesil currently serves on the Board of Directors of Smartsheet Inc., SoFi Social Finance Inc., and other private and non-profit entities.  Ms. Yesil holds a B.S. in Industrial Engineering and Management Science and an M.S. in Electrical Engineering from Stanford University. |

Source:  ZUO_00448834; ZUO_00448830; Zuora, Inc., Form DEF14A, filed May 8, 2019; Zuora, Inc., Form DEF14A, filed May 12, 2020; Zuora, Inc., Form DEF14A, filed May 11, 2021; Zuora, Inc., Form DEF14A, filed May 11, 2022; "Marc Diouane," Linkedin, https://www.linkedin.com/in/marc-diouane-15b65, accessed July 7, 2022; "Brent R. Cromley, Jr," Linkedin, https://www.linkedin.com/in/brentlyjr, accessed July 7, 2022; "Jennifer W. Pileggi," Linkedin, https://www.linkedin.com/in/jenniferpileggi, accessed July 7, 2022; "Peter Fenton," Linkedin, https://www.linkedin.com/in/peter-fenton-0b117, accessed July 7, 2022; "Kenneth A. Goldman," Linkedin, https://www.linkedin.com/in/ken-goldman-552a472, accessed July 7, 2022; "Timothy Haley," Linkedin, https://www.linkedin.com/in/tihaley, accessed July 7, 2022; "Jason Pressman," Linkedin, https://www.linkedin.com/in/jasonpressman, accessed July 7, 2022; "Michelangelo Volpi," Linkedin, https://www.linkedin.com/in/mavolpi, accessed July 7, 2022; "Magdalena Yesil," Linkedin, https://www.linkedin.com/in/magdalena-yesil, accessed July 7, 2022

**EXHIBIT 4**

# Select Entities at Zuora During the Class Period
## Class Period:  4/12/18 – 5/30/19

| Name | Description |
|---|---|
| Board of Directors of Zuora | The business and affairs of Zuora, Inc. were managed under the direction of the Board of Directors ("Board").  The Board would elect corporate officers, act as the management team's advisor and monitor the performance of Zuora (in relation to its financial objectives, major goals, strategies and competitors).  The Board's role included regularly reviewing with management Zuora's long-term strategic business plans and other pertinent matters affecting the business of Zuora; assessing risks facing Zuora and management's approach to addressing such risks; overseeing Zuora's program to prevent and detect violations of law, regulation or company policies and procedures; and reviewing and, if appropriate, approving significant transactions that are not in the ordinary course of business. |
| Audit Committee of the Board of Directors of Zuora | The purpose of the Audit Committee of the Board of Directors ("Board") of Zuora, Inc. was to assist the Board in fulfilling its oversight responsibilities relating to Zuora's financial accounting, reporting, compliance and internal controls.  The Audit Committee's principal functions were to assist the Board in its oversight of Zuora's accounting and financial reporting processes, including its audits and the integrity of its financial statements; Zuora's compliance with legal and regulatory requirements; the qualifications, independence and performance of Zuora's independent auditors; and the performance of Zuora's internal audit function. |
| Compensation Committee of the Board of Directors of Zuora | The Compensation Committee of the Board of Directors ("Board") of Zuora, Inc. oversaw Zuora's policies with respect to the compensation of its Board members, persons determined by the Board to be "officers" as defined under Section 16 of the Securities and Exchange Act of 1934 including the Company's Chief Executive Officer (collectively, the "Executive Officers"), and other members of Zuora's executive management team who report directly to the CEO.  This included overall responsibility for establishing, evaluating, and approving Zuora's compensation arrangements, plans, policies, and programs, administering its executive bonus program and equity-based compensation plans, and, where required or appropriate, referring these matters to the independent members of the Board for approval or ratification.  The Compensation Committee could also make recommendations to the Board regarding any other Board responsibilities relating to executive compensation. |
| Nominating and Governance Committee of the Board of Directors of Zuora | The purpose of the Nominating and Corporate Governance Committee of the Board of Directors ("Board") of Zuora, Inc. was to identify, consider and recommend candidates for membership on the Board, consistent with criteria approved by the Board; develop and recommend corporate governance guidelines and policies for Zuora; oversee the evaluation of the Board and each committee of the Board; advise the Board on other corporate governance matters and any related matters required by federal securities laws; and such other responsibilities as may be delegated to it in the future by the Board. |
| Disclosure Committee | The Disclosure Committee of Zuora, Inc. was designed to assist Zuora's Chief Executive Officer and Chief Financial Officer (collectively, the "Senior Officers") in connection with their certification obligations under SEC rules.  In furtherance of that objective, the Disclosure Committee would review information that may be subject to disclosure under U.S. federal securities laws, to consider the materiality of such information as well as other factors that may require or bear on the determination to disclose such information, and to make recommendations to senior management as to Zuora's disclosure obligations with respect to such matters.  The Disclosure Committee would also periodically review and make recommendations it determined to be appropriate regarding Zuora's disclosure controls and procedures, to the Senior Officers in order to address the quality and timeliness of Zuora's disclosures. |

Source:  ZUO_00448850; "Charter of the Compensation Committee of the Board of Directors of Zuora, Inc.," Zuora, Inc., March 8, 2021, https://investor.zuora.com/Environmental-Social-Governance/governance-documents/default.aspx; ZUO_00448830; "Charter of the Nominating and Corporate Governance Committee of the Board of Directors of Zuora, Inc.," Zuora, Inc., December 7, 2021, https://investor.zuora.com/Environmental-Social-Governance/governance-documents/default.aspx; ZUO_00448882

EXHIBIT 5

# Elements of Zuora Disclosure Process

| | |
|---|---|
| **Quarterly Function Business Review** | • All business functions represented.<br>• Discuss new products and clients, issues and earnings. |
| **Accounting** | • Creates first draft of 10-K or 10-Q, using previous filing as a framework. |
| **Corporate Legal** | • Requests sub-certification of select employees.<br>• Advises on updates to disclosures in draft.<br>• Reviews and provides input on earnings scripts. |
| **Investor Relations** | • Coordinates earnings process and drafts earnings script with marketing.<br>• Works with finance and accounting to prepare potential Q&A lists for calls with analysts and investors. |
| **Marketing** | • Drafts CEO's scripts for earnings calls.<br>• Uses inputs from product team and works with IR to draft/update business highlights sections. |
| **FP&A** | • Updates financial metrics and disclosures in the draft.<br>• Works with CFO to draft CFO earnings call scripts, and with finance to prepare potential Q&A from earnings calls. |
| **Disclosure Committee** | • Holds quarterly disclosure meeting representing all stakeholders.<br>• Reviews materiality of information in drafts as per federal and other disclosure obligations, and makes recommendations with respect to these matters. |
| **CEO & CFO** | • Meets regularly to discuss business updates and quarterly forecasts.<br>• CEO is responsible for final sign off. |
| **Audit Committee** | • Meets twice per quarter. Discusses disclosures including targeted focus on accuracy of financial metrics & disclosures, and detailed page-by-page examination for informational and textual accuracy.<br>• Required to approve SEC filings before they can be submitted. |
| **Board of Directors** | • Oversees, evaluates and assists with draft creation, focusing on sections including earnings, guidance, legal content, risk, etc.<br>• Provides feedback on drafts. |

External Auditor

External Legal

Source: Interview with Tyler Sloat, July 20, 2022; ZUO_00448828

Note: External audit is conducted by KPMG and its sign-off is required before drafts are sent out for the Audit Committee meeting. "External Legal" refers to Fenwick & West LLP, who

CONFIDENTIAL

7

# Select Timeline of Zuora Disclosures and Related Meetings

Source: Deposition of Tien Tzuo, April 27, 2022; Deposition of Tyler Sloat, April 22, 2022; ZUO_V_000004–16; ZUO_V_000028–33; ZUO_V_000035–70; Zuora, Inc., Form 10-Q for the quarterly period ended April 30, 2018, filed June 13, 2018; Zuora, Inc., Form 10-Q for the quarterly period ended July 31, 2018, filed September 13, 2018; Zuora, Inc., Form 10-Q for the quarterly period ended October 31, 2018, filed December 12, 2018; Zuora, Inc., Form 10-Q for the quarterly period ended April 30, 2019, filed June 11, 2019; Zuora, Inc., Form 10-K for the fiscal year ended January 31, 2019, filed April 18, 2019; Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q4 2019 Earnings Release, March 21, 2019; Q1 2020 Earnings Release, May 30, 2019; ZUO_00448828; ZUO_00449224-30; ZUO_00001282–310; ZUO_00000175–91; ZUO_00002740–92; ZUO_00000934–40; ZUO 00000512–7; ZUO 00000906–33; ZUO_00000941–6; ZUO 00001166–92

Note: Zuora's Disclosure Committee meetings on 6/7/2018, 9/7/2018, 12/6/2018, 4/4/2019, and 6/3/2019 were held to finalize details of the draft Forms 10-Q and 10-K as mentioned above.

CONFIDENTIAL

8

**EXHIBIT 7**



## Zuora's Quarterly Guidance and Actual Revenue During the Class Period
### 4/12/18 – 5/30/19

Source:  Q1 2019 Earnings Release, May 31, 2018; Q2 2019 Earnings Release, August 30, 2018; Q3 2019 Earnings Release, November 29, 2018; Q1 2020 Earnings Release, May 30, 2019; Q2 2020 Earnings Release, August 28, 2019; "Q4 2019 Zuora Inc Earnings Call," March 21, 2019

Note:  Range of Quarterly Guidance for each quarter was announced in the previous quarter, while the Actual Quarterly Revenue represents the actual earnings for that quarter.  There is no guidance for Q1 2019 because Zuora officially filed its IPO and became a public company on April 12, 2018.

CONFIDENTIAL