# Exhibit H

Steve Berman (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Lead Plaintiff*
*New Zealand Methodist Trust Association*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CASEY ROBERTS, individually and on behalf of all other similarly situated,<br><br>                                    Plaintiff,<br><br>        v.<br><br>ZUORA, INC., TIEN TZUO, and TYLER SLOAT,<br><br>                                    Defendants. | No. 3:19-cv-03422-SI<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF KEVIN DAGES; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:            Hon. Susan Illston<br>Hearing Date:   March 3, 2023<br>Hearing Time:   10:00 a.m.<br>Dept:             Courtroom 1, 17th Floor |

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   FACTUAL BACKGROUND ......................................................................................4

III.  DAGES' REPORT AND PROPOSED TESTIMONY ...............................................6

      A.   Dages's Assignment, Assumptions, and Opinions...........................................6

      B.   Dages's Reliance on Five Unauthenticated Spreadsheets as Source
           Materials ..........................................................................................................7

IV.   LEGAL STANDARD ..............................................................................................10

V.    ARGUMENT ...........................................................................................................10

      A.   Dages' Opinions Should Be Excluded Because He Made No Effort to
           Independently Verify the Data Upon Which His Opinions Are Based.............10

           1.   Dages Did Not Communicate with Any Individuals
                Knowledgeable About Zuora's FY 2020 Guidance. ..............................11

           2.   Dages Conducted No Independent Investigation to Ensure the
                Spreadsheets' Accuracy.........................................................................12

                a.   ZUO_00448803: Portions of Document Indicate It Is a
                     "DRAFT" ...................................................................................12

                b.   ZUO_00448808: Metadata Conflicts with Contents........................13

                c.   ZUO_00327212: Unknown Modifications Made Post-
                     Litigation ....................................................................................14

                d.   ZUO_00448805 and ZUO_00448806: Dages Has No
                     Knowledge Regarding the FY 2020 Plans' Origins .........................15

           3.   AICPA Guidelines Underscore the Inadmissibility of Dages'
                Opinions ...............................................................................................16

      B.   Dages' Report Is an Inadmissible Narrative Summation ...............................16

           1.   Dages' Report and Opinions Usurp the Role of the Jury ...........................17

           2.   Dages' Lay Conclusions Are Unreliable.................................................19

                a.   Several of Dages' Inferences Are Speculative of
                     Management's Intent....................................................................19

                b.   Dages' Fundamental Assumptions Are Contradicted by
                     the Record....................................................................................21

C.    Dages' Opinions Do Not "Fit" the Case, and Therefore Must Be
Excluded ...........................................................................................................22

1.    Dages' Opinions Are Irrelevant to Loss Causation and
Damages .................................................................................................22

2.    Dages' Opinions Clash with the Law, Damages Experts'
Opinions, and Reality ...........................................................................24

VI.    CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
2014 WL 794328 (N.D. Cal. Feb. 25, 2014)........................................................................16

*Baker v. SeaWorld Entm't, Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ............................................................................3, 19

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) .....................................................................19

*Base v. FCA US LLC*,
2019 WL 1117532 (N.D. Cal. Mar. 11, 2019) ....................................................................22

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015) ...........................................................................................3

*Coffey v. Dowley Mfg., Inc.*,
187 F. Supp. 2d 958 (M.D. Tenn. 2002) ..............................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ...............................................................................................22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......................................................................................................2, 22

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010) .................................................................................22

*Fujifilm Corp. v. Motorola Mobility LLC*,
2015 WL 757575 (N.D. Cal. Feb. 20, 2015)........................................................................17

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ............................................................................................................10

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
Scotland Grp., PLC*,
783 F.3d 383 (2d Cir. 2015) ................................................................................................25

*Jones v. United States*,
933 F. Supp. 894 (N.D. Cal. 1996).......................................................................................22

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)..............................................................................................23

*Lyman v. St. Jude Med. S.C., Inc.*,
     580 F. Supp. 2d 719 (E.D. Wis. 2008) ...................................................................................10

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
     643 F. Supp. 2d 482 (S.D.N.Y. 2009) ...................................................................................17

*Mineworkers' Pension Scheme v. First Solar Inc.*,
     881 F.3d 750 (9th Cir. 2018) ...................................................................................................4

*In re Novatel Wireless Sec. Litig.*,
     846 F. Supp. 2d 1104 (S.D. Cal. 2012) .............................................................................4, 23

*In re Novatel*,
     2011 WL 5827198 ............................................................................................................17, 18

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
     730 F.3d 1111 (9th Cir. 2013) ...............................................................................................22

*Ollier v. Sweetwater Union High Sch. Dist.*,
     768 F.3d 843 (9th Cir. 2014) .................................................................................................10

*Oracle Am., Inc. v. Google Inc.*,
     798 F. Supp. 2d 1111 (N.D. Cal. 2011)..............................................................................2, 10

*In re Oracle Corp. Sec. Litig.*,
     627 F.3d 376 (9th Cir. 2010) .................................................................................................24

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
     2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) ....................................................................10

*State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*,
     980 F. Supp. 2d 1031 (N.D. Ind. 2012)..................................................................................10

*In re Tesla, Inc. Sec. Litig.*,
     2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) .......................................................................22

*United States v. Vance*,
     2011 WL 2633842 (N.D. Ill. July 5, 2011) ......................................................................16, 18

*Waymo LLC v. Uber Techs., Inc.*,
     2017 WL 6887043 (N.D. Cal. Nov. 14, 2017).......................................................................18

*Waymo LLC v. Uber Techs., Inc.*,
     2017 WL 5148390 (N.D. Cal. Nov. 6, 2017)....................................................................18, 21

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 3, 2023, at 10:00 a.m., via videoconference, the Honorable Susan Illston presiding, Lead Plaintiff New Zealand Methodist Trust Association will and hereby does move this Court to preclude the testimony of Kevin Dages ("Dages") and any testimony or evidence relying thereon. This motion is made pursuant to Federal Rules of Evidence 401 to 403 and 702 on the grounds that Dages' opinions are unreliable, would serve to mislead and confuse the jury, waste the Court's time, and will not assist the trier of fact to understand the evidence or determine a fact at issue. This motion is based upon this notice, the following memorandum of points and authorities, the pleadings and records on file herein, and such further evidence and argument as may be presented to the Court.

## RELIEF REQUESTED

Plaintiffs seek an order excluding all expert testimony from Kevin Dages and any testimony or evidence relying thereon.

## I.    PRELIMINARY STATEMENT

This securities fraud action arises from Zuora's misrepresentations concerning the integrated nature of its flagship software applications, Zuora Billing and Zuora RevPro, and false promotion of the Company's ability to cross-sell and upsell these products to customers. No "Zuora +RevPro integration" existed, and the lack of integration caused serious sales execution issues rendering Zuora's cross-sale/upsell strategy unviable. On May 30, 2019, with customer credits mounting, the Company's cross-sale/upsell motion impaired, and quarterly sales volume (*i.e.*, bookings) falling short of projections, Defendants came clean. In announcing its Q1 FY 2020 results, the Company slashed its revenue guidance for the full fiscal year of 2020, which it had provided just two months earlier on March 30, 2019. Later that same day on an earnings call, Zuora's CEO Defendant Tien Tzuo identified two reasons for the disappointing outlook: (1) sales execution issues and (2) the lack of integration between Billing and RevPro. On this news, Zuora's stock price plummeted nearly 30%, erasing $520 million in shareholder value in a single trading day.

Plaintiffs submit that all of the sales execution issues Tzuo described on the earnings call were the direct and foreseeable result of the Billing-RevPro integration failure. Defendants dispute this claim. They contend the sales execution headwind Tzuo articulated is wholly unrelated to the fraud, and therefore Defendants are not liable for any investor losses caused thereby. In support of this loss causation and damages defense, Defendants proffer the opinions of Kevin Dages, a Certified Public Accountant. *See* Ex. 1 (Dages Expert Report).[1] Specifically, Dages endeavors to determine the portion of the decline in Zuora's FY 2020 revised revenue guidance attributable to the "Keystone Integration Issues."[2] Dages ultimately attributes only 15% of the decrease to FY 2020 revenue guidance to the product integration issues. *Id.*, ¶ 13. Based on Dages' findings, Defendants' damages expert, Allen Ferrell, Ph.D., suggests the jury should award the Class damages of no more than 15% of the adverse stock price reaction on May 31, 2019. Ex. 2, ¶ 27. As discussed herein, Dages' opinions are inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), for at least three reasons.

***First, Dages bases his opinions on insufficient facts and data***. *See, e.g.*, *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1114 (N.D. Cal. 2011) (*Daubert* requires that an expert witness base opinion testimony "upon sufficient facts or data"). Dages can point to no document or testimony reflecting Zuora management's apportionment of the downward revision to FY 2020 revenue guidance to the Keystone Integration Issues versus the sales execution headwind Tzuo described. Instead, Dages divines Zuora executives' rationale by interpreting five, never-authenticated, internal Zuora spreadsheets Defendants' counsel handpicked. Dages, however, failed to conduct any investigation to ensure that these spreadsheets are final, complete documents that Zuora management used in developing the Company's FY 2020 guidance. *See, e.g.*, Ex. 3, Dages Dep., at 193:5-196:1. Dages does not know the basic details concerning these records, such as who prepared them, how

---

[1] All exhibits referenced herein are to the Declaration of Steve W. Berman in Support of Lead Plaintiff's Motion to Exclude Expert Testimony of Kevin Dages, filed concurrently herewith, unless otherwise indicated.

[2] *Id.*, ¶ 12. Throughout the Report, Dages refers to the Billing-RevPro integration failure as the "Keystone Integration Issues," based on the internal Zuora project launched in early 2018 intended to build an integration solution for Zuora's customers. *Id.*

they were prepared, when, and who saw them. *Id.* at 175:7-176:6. Apart from the spreadsheets' content, their metadata cast serious doubts about their legitimacy. A portion of one of the spreadsheets prominently notes the document is a "**DRAFT**." Ex. 4 (ZUO_00448803 metadata). For another of the spreadsheets, Defendant Sloat apparently *modified its contents four months after this litigation commenced* (Ex. 5 (ZUO_00327212 metadata)); Dages, however, does not know what modifications Sloat made. Ex. 3 at 186:18-188:2. Further, two documents Dages relies on do not include a discussion or data on the guidance given; instead, they are internal Zuora Fiscal Year Plans that bear no apparent relationship to Zuora's revenue guidance. Ex. 6 (ZUO_00448805); Ex. 7 (ZUO_00448806). In sum, Dages' wholesale reliance on the five unauthenticated spreadsheets without verifying their accuracy renders his opinions unreliable. *See, e.g.*, *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa. 2015) (excluding expert report because "the expert must conduct some sort of independent investigation or verification to ensure that the data he or she plans to use is both accurate and helpful to the court in light of the disputed issues").

        *Second, Dages' Report consists of improper summary testimony regarding the contents of documents that require no expertise to interpret*. Dages performs no expert analysis or generally accepted accounting principle in his summary of these spreadsheets, which were intended for a lay audience—Zuora's management and Board of Directors. Instead, he draws inferences and conclusions from a cumulative, subjective assessment of the evidence that usurps the role of the fact-finder. *See, e.g.*, *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 912 (S.D. Cal. 2019) (excluding expert's testimony summarizing internal management documents, since they could come into evidence through corporate executives and expert testimony risked unduly influencing jurors).

        *Third, Dages' opinions are inadmissible because they fail Daubert's "fit" requirement*. Expert testimony that answers a factually or legally irrelevant question is inadmissible under both Rule 702 and Rule 403 because it is unhelpful and risks misleading the fact-finder. Dages' use of questionable March 2019 sales pipeline data (*i.e.*, when Zuora had essentially paused all cross-sells) to conclude that forecasted FY 2020 cross-sells changed very little between March and April/May 2019 is irrelevant to loss causation and damages; the salient standard is whether the revelation of the alleged misrepresentations and omissions was a substantial factor in causing a decline in the

security's price. *See, e.g.*, *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (excluding defendants' expert's testimony who employed incorrect loss causation standard). Here, Dages admits that Zuora's scrapping of the failed Keystone project in favor of developing the new K2 approach prevented sales personnel from cross-selling to new customers, as well as upselling to Zuora's 20 Keystone customers. Ex. 3 at 72:14-20, 83:3-15, 121:4-9. Dages did not determine the value of this significant lost bookings and revenue stream. *Id.* at 112:8-19. Dages also does not genuinely dispute that had Zuora possessed the ability to cross-sell/upsell this customer group, Zuora would have met or exceeded the bookings target underlying its FY 2020 revenue guidance. *Id.* at 117:4-118:9. Nor can he. In internal communications, Zuora executives identified the Keystone Integration issues as the reason for the bookings shortfall in Q1 FY 2020, which ultimately led to the downward guidance reduction. *See, e.g.*, Ex. 8 at ZUO_00003940. This admissible evidence conclusively shows that the mispresented and omitted facts (*i.e.*, the integration failure and the corresponding sales execution issues) proximately caused the dismal outlook and Zuora's stock price decline. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (the test for loss causation "requires no more than the familiar test for proximate cause").

## II.    FACTUAL BACKGROUND

Dages' testimony centers on Zuora management's process and rationale for Zuora's FY 2020 revenue guidance and its subsequent revision, which came in the wake of the failed Keystone project. Ex. 1, ¶¶ 15-18. Keystone was an internal Zuora engineering project designed to integrate the functionality between the Company's billing platform (Zuora Billing) and its acquired revenue recognition solution (RevPro). *Id.*, ¶¶ 15-16. The project involved a limited availability integration solution Zuora was beta-testing on a select set of 20 RevPro–Billing cross-sold customers. *Id.*, ¶ 15, n.40. While the Keystone customer represented just 2% of Zuora's total customer base (*id.*), these entities were Global 2000 companies, prized early adopters of Zuora, and an important source of

existing and future revenue. Ex. 9 (Zuora Keystone Discussion Paper, Q4 Fiscal 2019); Ex. 3 at 117:13-19.[3]

Although technical issues plagued Keystone from the beginning, Keystone's last straw occurred in Q4 FY 2019, when the solution failed user acceptance testing on Keystone customers. Ex. 1, ¶ 18. In late February or early March 2019, Zuora ditched Keystone in favor of developing a new technical approach codenamed "K2." Ex. 10 (Mar. 1, 2019 email); Ex. 11 (Mar. 6, 2019 email). K2 would not be available to customers until the end of Q3 FY 2020, at the earliest. Ex. 12 (Earnings Call Tr.) at 5. In light of the shift from Keystone to K2, Zuora paused implementation work on the Keystone customers. Ex. 1, ¶ 18. As Dages admits, Zuora's lack of an integration solution similarly prevented sales personnel from (i) cross selling new customers and (ii) generating upsells from the Keystone customers. Ex. 1, ¶ 19; Ex. 3 at 72:14-20, 83:3-15, 121:4-9.

On March 21, 2019, Zuora reported its Q4 FY 2019 and FY 2019 financial results, together with a financial outlook for Zuora's projected FY 2020 revenue. Ex. 1, ¶ 5. Zuora announced that it expected subscription revenue for FY 2020 to be between $209.0 million to $211.5 million, and total revenue to be between $289.0 million and $293.5 million. *Id.*

On May 30, 2019, after the close of the market, Zuora downwardly revised its FY 2020 revenue guidance when it reported its Q1 FY 2020 financial results. Ex. 1, ¶ 6. In summary, Zuora's FY 2020 guidance changed as follows:

| FY 2020 Metric | March 21, 2019 | May 30, 2019 | *Change* |
|---|---|---|---|
| Sub. Rev. Range | $209.0M – $211.5M | $200.0M – $206.0M | *($9.0M) – ($5.5M)* |
| Sub. Rev. Mid-Point | $210.25M | $203.0M | *($7.25M)* |
| Total Rev. Range | $289.0M – $293.5M | $268.0M – $278.0M | *($21.0M) – ($15.5M)* |
| Total Rev. Mid-Point | $291.25M | $273.0M | *($18.25M)[4]* |

---

[3] During the Class Period, Zuora reported two types of revenue: (i) **Subscription Revenue**, which consisted of "fees for access to and use of Zuora's products as well as customer support," and (ii) **Professional Services Revenue**, which consisted of "fees for services related to helping [Zuora's] customers deploy, configure, and optimize [the use of] Zuora's solutions." Ex. 1, ¶ 3, n.6. Together, subscription revenue and professional services revenue comprised Zuora's total reported revenue. *Id.*

[4] The difference between the mid-point change in total revenue of $18.25M and the mid-point change in subscription revenue of $7.25M is attributed to a decline in professional services revenue of $11.0M.

During its quarterly earnings conference call later that day, Defendant Tzuo discussed two "execution headwinds" that the Company expected to impact Zuora's fiscal second quarter and full year outlook. Ex. 12 (Earnings Call Tr.) at 4. First, Zuora faced "sales execution" issues following the expansion of its strategic sales teams and found that "the newer reps were less than half as productive than [Zuora's] more experienced reps." *Id.* In response, Tzuo announced "meaningful changes" including "a change in our sales leadership," including the replacement of its head of sales (President Marc Diouane), and that the Company expected it would "take a few quarters to realize the benefits of the changes to our sales organization." *Id.* at 5, 8. Second, the product integration of Billings and RevPro for customers that had purchased both products was "taking longer than expected." *Id.* at 5. Tzuo noted that while the Company was "continuing to acquire and deploy new customers for each product on a standalone basis, … this delay has slowed down our cross-sell motion," resulting in "lower professional services and subscription revenue in the quarter as well as tempered expectations going forward." *Id.* In response, Tzuo announced a "course correction in our approach," which he expected would be "resolved by the end of Q3." *Id.*

The day after Zuora's earnings call, May 31, 2019, Zuora's stock price fell from $19.90 to $13.99, a decline of nearly 30%. Ex. 1, ¶ 5. The Class claims damages due to Zuora's alleged artificially inflated stock price prior to May 31, 2019. *Id.*, ¶¶ 9-11.

### III.     DAGES' REPORT AND PROPOSED TESTIMONY

#### A.     Dages's Assignment, Assumptions, and Opinions

Defendants proffer Dages as an expert to review the record evidence and opine on the portion of the decline in Zuora's FY 2020 revenue guidance attributable to the Keystone Integration Issues. Ex. 1, ¶ 11. In conducting his analysis, Dages assumes that contrary to Plaintiffs' allegations, the Keystone Integration Issues did not cause the sales execution issues discussed in Zuora's May 30, 2019 earnings call. *Id.* Dages also assumes that the Keystone Integration Issues impaired Zuora's ability to "up-sell" products to Keystone customers, and cross-sale new customers. *Id.*, ¶ 19; Ex. 3 at 72:14-20, 83:3-15, 121:4-9. Nevertheless, Dages claims, "[t]he documents that I have reviewed are consistent with the assumption that the Keystone Integration Issues would not have affected Zuora's

ability to attract new customers, or to retain or 'up-sell' product to existing customers that were interested only in its Billing or RevPro products." Ex. 1, ¶¶ 12 n.37, 19.

Dages first opines that only $0.7 million, or 9% of the midpoint ($7.25 million) of the $5.5 million, $9.0 million downward revision in the guidance for FY 2020 subscription revenue that Zuora provided in its May 30, 2019 earnings call was attributable to the Keystone Integration Issues. *Id.*, ¶ 13.

Next, Dages opines that only $2.7 million, or 15% of the midpoint ($18.25 million) of the $15.5 million–$21.0 million downward revision in the guidance for FY 2020 total revenue that Zuora provided in its May 30, 2019 earnings call was attributable to the Keystone Integration Issue. *Id.*

Finally, given the above findings, Dages opines that any estimate of the damages "attributable to Zuora's alleged failure to timely disclose the Keystone Integration Issues should take into account my estimate that those issues represented only 15% of Zuora's revision to its revenue guidance on the alleged corrective disclosure date." *Id.* Based on Dages' work, Defendants' damages expert, Dr. Ferrell, suggests that the jury should award the Class damages of no more than 15% of the adverse stock price reaction on May 31, 2019. Ex. 2, ¶ 27.

**B.    Dages's Reliance on Five Unauthenticated Spreadsheets as Source Materials**

In reaching these opinions, Dages principally relies on five internal Zuora spreadsheets provided to him by Defendants' counsel; three of which purportedly pertain to Zuora's subscription revenue guidance and the remaining two relate to professional service revenue guidance.

| Subscription Revenue Guidance Documents | Professional Services Revenue Guidance Documents |
|---|---|
| • **ZUO_00327212**: Revenue scenarios spreadsheet (specifically, tab "Sub Revenues")<br><br>• **ZUO_00448803**: CTTP recon spreadsheet (primarily tab "RevPro (315)"<br><br>• **ZUO_00448808**: Pipeline and closed deals spreadsheet (specifically, tab "Q1 Closed Deals") | • **ZUO_00448805**: March 2019 FY 2020 Plan spreadsheet (specifically, tab "FY20 Plan Summary")<br><br>• **ZUO_00448806**: April/May 2019 FY 2020 Plan spreadsheet (specifically, tab "FY20 Plan Summary") |

For his opinion that Keystone contributed to $0.7 million, or 9% of the downward revision to FY 2020 subscription revenue, Dages first analyzes ZUO_00327212, a "Revenue Scenarios" worksheet (specifically, the tab entitled "Sub Revenues"), which he presumes Zuora management used to formulate the downward revision of its entire FY 2020 revenue guidance. Ex. 1, ¶ 39 and Dages Ex. 3. Dages claims the Revenue Scenarios spreadsheet reveals that subscription revenue for Q1 FY 2020 (*i.e.*, February 1 to April 30, 2019), primarily decreased based on data showing that actual bookings in Q1 FY 2020 missed forecasted bookings in Q1 FY 2020 by 23%. *Id.*

Dages then attempts to isolate the portion of the 23% bookings miss attributable to RevPro-Billings cross-sales. He does so by reviewing ZUO_00327212, a CTTP (*i.e.*, "Closest to The Pin") recon spreadsheet (primarily the tab entitled "RevPro (315)), which he presumes to be Zuora's March 15, 2019 sales pipeline and bookings estimate for Q1 FY 2020). Ex. 1, ¶¶ 48-49. From this review, Dages identifies only five relevant customers ("Cross-Sales Customers"), for whom Zuora sales representatives purportedly estimated as of March 15, 2019, would generate a total of $521,000 in bookings by close of Q1 FY 2020. *Id.* ¶ 49. Essentially, Dages starts with identifying the customers on the spreadsheet's "RevPro (315)" tab, and then looks elsewhere in the spreadsheet to determine which of these customers are cross-sales. *Id.*

Next, Dages reviews and analyzes ZUO_00448808 (specifically, the tab entitled "Q1 Closed Deals"), which he believes reflects the deals that actually closed by the end of Q1 FY 2020 and reveals that the Cross Sales Customers realized only $230,000 in bookings, producing a Q1 FY 2020 bookings miss of $291,000. Ex. 1, ¶ 49. Finally, Dages inputs the $291,000 bookings miss for the Cross-Sales Customers into the formula set forth under "Scenario D" of the "Sub Revenues" tab of the Revenue scenarios spreadsheet (ZUO_00327212) to conclude that approximately $700,000 (9%) of the downward revision in the FY 2020 guidance for subscription revenue was attributable to Keystone. Ex. 1, ¶ 54 and Dages Ex. 11.

For Dages' opinion that Keystone Integration Issues contributed to $2.1 million of the downward revision to professional services revenue, Dages follows a four-step analysis. First, Dages compares ZUO_00448805, a March 2019 FY 2020 Plan spreadsheet (specifically, tab "FY20 Plan Summary") containing an internal Zuora revenue forecast purportedly prepared in March 2019, with

ZUO_00448806, an April/May 2019 FY 2020 Plan spreadsheet (specifically, tab "FY20 Plan Summary"), containing an internal Zuora revenue forecast purportedly prepared by Zuora in April/May 2019. Ex. 1, ¶¶ 48-49. Dages determines that the estimated Keystone impact (*i.e.*, reduction to revenue with the label "Keystone") increased by $221,000 from March 2019 to April/May 2019. Ex. 1, ¶ 56 and Dages Ex. 5.

Second, the Zuora revenue forecast prepared in April/May 2019 (ZUO_00448806) also contained a $2,727,000 reduction to RevPro revenue, which reduction to forecasted RevPro revenue was listed after a $7,200,000 reduction to forecasted Billing revenue. Ex. 1, at Dages Ex. 5. Dages attributes 55% of RevPro revenue reduction to the Keystone Integration Issues because he uses the sales pipeline to conclude that 55% of the Q1 FY 2020 RevPro bookings missed were related to the five Cross-Sales Customers. *Id.*, ¶¶ 48-49, 57, & Dages Exs. 5, 8. Dages then calculates the professional services impacted by Keystone as $2,727,000 x 0.55 = $1,500,000. *Id.* at Dages Ex. 8.[5]

Third, the Zuora revenue forecast for professional services prepared in April/May 2019 (ZUO_00448806) was $9,233,000 less than the Zuora revenue forecast prepared in March 2019. *See* Ex. 1 at Dages Ex. 5. The amounts in steps (1) and (2) above equal $221,000 + $1,500,000 = $1,721,000, which comprises 19% of that change ($1,721,000 is 19% of $9,233,000). *Id.*

Fourth, Dages multiplies the decline in professional services revenue guidance of $11.0 million by 19% to conclude that $2,100,000 of the downward revision in the guidance for professional services revenue was attributable to Keystone. Ex. 1, ¶ 59.[6]

---

[5] Exhibit 8 to the Dages Report shows that Zuora's RevPro sales representatives estimated Q1 FY 2020 bookings of $1.878 million and actually realized $1.351 million in Q1 FY 2020 bookings, for a miss of $527,000. The Cross-Sales Customers comprised $291,000 (55%) of the RevPro bookings miss. *See* Ex. 1 at Dages Ex. 8.

[6] As discussed further herein, Zuora's changes to the FY 2020 Plan's forecasted revenue were not equivalent to the changes in its revenue guidance. As noted in Steps 3 and 4, professional services revenue in the FY 2020 Plan declined by $9,233,000 from March to April/May 2019, whereas professional services revenue in the guidance declined by $11.0 million. *See* ZUO_00448805; ZUO_00448806; March 21, 2019 Zuora Form 8-K; May 30, 2019 Zuora Form 8-K. Dages' Report fails to address this incongruity.

## IV.    LEGAL STANDARD

As courts in this District recognize, an expert witness may provide opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Oracle*, 798 F. Supp. 2d at 1114. District courts are thus charged with a gatekeeping role and should exclude evidence that is "based on mere 'subjective belief or unsupported speculation'" or is "inherently unreliable and unsupported by the facts." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (citation omitted). Further, courts should exclude testimony if "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## V.    ARGUMENT

### A.    Dages' Opinions Should Be Excluded Because He Made No Effort to Independently Verify the Data Upon Which His Opinions Are Based

"[W]hen an expert relies upon information given to him by a party or counsel, [he] must independently verify that information before utilizing it in [his] calculations." *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2012). As explained below, Dages' testimony is unreliable since he failed to verify the accuracy of the source materials undergirding his opinions. Instead, Dages accepted without question that the five spreadsheets provided to him by Defendants' counsel were final and complete versions actually relied on by Zuora management in finalizing the Company's original and revised FY 2020 guidance. *See, e.g.*, Ex. 3 at 176:23-177:5 ("Q. Well, you didn't hear any testimony on this document; right? … A. Well, it was clear from our interactions and back and forth with counsel that this is what we were using it for. So if there was a problem or an issue, I would have expected to have heard."). Consequently, the Court should exclude Dages from testifying. *See, e.g.*, *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (excluding expert testimony where expert failed to verify the reliability of data given to him by counsel); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) ("[A]ny expert should be aware

that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.").

### 1.    Dages Did Not Communicate with Any Individuals Knowledgeable About Zuora's FY 2020 Guidance.

While Dages opines on Zuora's process for preparing its original FY 2020 revenue guidance published in March 2019 and rationale for the downward revision in May 2019, Dages admittedly did not speak with or otherwise communicate with any Zuora executive involved in preparing Zuora's FY 2020 revenue guidance. For example, Dages did not communicate with Zuora's CEO and Founder Defendant Tzuo, CFO Sloat, Head of Sales Marc Diouane, Chief Accounting Officer Paolo Battaglini, anyone in the finance, accounting, auditing, controller, investor relations departments, or on the Board of Directors. Ex. 3 at 34:1-9, 40:17-41:19, 43:6-16.

In fact, prior to completing his report, the only individual at Zuora Dages spoke with substantively was Robert Hildenbrand, a Senior Vice President of Zuora's Global Services—the department responsible helping customers deploy, configure, and optimize Zuora's solutions. *Id.* at 18:10-14; Ex. 1, ¶ 26, n.54.[7] Dages' conference call with Hildenbrand in which Defendants' counsel participated lasted just 30 minutes (Ex. 3 at 28:4-8), and took place on August 4, 2022, the eve of his report's deadline. *Id.* at 36:10-17. By this time, Dages had already drafted his report and the sole purpose of the call was for somebody at Zuora to confirm the accuracy of certain discrete portions of his already drafted report, and Dages "left it up to [Defendants' counsel] to decide who the best person is to have a call with." *Id.* at 37:19-38:15. During the call, Dages believed that Hildenbrand had input in the development of Zuora's fiscal year 2020 guidance and therefore he used Hildenbrand to confirm certain facts with respect to Zuora's management's decisions concerning the downward revisions. *Id.* at 202:10-15, 28:9-21. But Hildenbrand's deposition testimony—which Dages claims in Appendix B to have considered in connection with his report—makes clear he was not a reliable confirmatory source for this information. Ex. 13 at 242:10-14. When asked about

---

[7] Dages testified that there may have been another Zuora representative on the call; however, he did not know that individual's role at Zuora, could not recall what exactly she said, and stated that confirming with Mr. Hildenbrand was the primary point of the call. Ex. 3 at 27:11-30:2.

Zuora's practices for developing its guidance, Hildenbrand testified that he is not involved in developing guidance and therefore could not respond to how Zuora's guidance was formulated:

> Q. When Zuora is developing in its guidance, do you know if it accounts or builds in the customer investment work into that guidance?
>
> A. *I'm not involved in developing the guidance, so I wouldn't have an answer to your question*.

*Id.* (emphasis added).

### 2. Dages Conducted No Independent Investigation to Ensure the Spreadsheets' Accuracy.

Likewise, Dages made no effort to determine if the internal documents Dages relied upon were final and complete versions of documents Zuora management actually relied on in establishing its FY 2020 guidance. Instead, he assumed that the documents were accurate and reliable because they were provided to him by Defendants' counsel and expected that if there was an issue with any of the documents, he would hear back from Defendants' counsel. *See*, *e.g.*, Ex. 3 at 176:23-177:5, 173:7-19 ("It was clear in the draft of our report where we were sourcing our data from. So if there had been an issue, I would have expected to hear about it."). But as explained below, apart from their content, the metadata for these documents also present serious questions concerning their accuracy and reliability.

### a. ZUO_00448803: Portions of Document Indicate It Is a "DRAFT"

For example, ZUO_00448803, which Dages assumes is the actual March 15, 2019 sales pipeline data that Zuora management used to forecast new bookings for Q1 FY 2020 and in turn set the Company FY 2020 guidance published on March 21, 2019 (Ex. 1, ¶ 28, n.58, Dages Ex. 8; Ex. 3 at 153:19:154:7), Dages does not know when this document was created, or who at Zuora generated this document. Ex. 3 at 167:10-24. Dages similarly does not know whether a single individual generated this document, or whether multiple individuals contributed to its creation. *Id.* at 149:22-152:2. Dages further does not know who or what team at Zuora prepared sales pipeline logs generally during the Class Period, how often they were generated during each quarter, or where and how they are maintained by Zuora. *Id.* at 152:4-153:9. In turn, Dages admits he does not know

whether ZUO_00448803 is a final and complete document, or if it is one or multiple drafts of the CTTP recon spreadsheet. *Id.* at 163:22-164:13.

Contents of ZUO_00448803 undermine its reliability. On to the CTTP tab of the spreadsheet, it prominently states in red bold letters the document is a "**DRAFT**":



Ex. 14 (ZUO_00448803) at CTTP tab; *see also* Ex. 3 at 165:3-13. The metadata for ZUO_00448803 further undermines its reliability. Ex. 4 (ZUO_00448803 metadata). There is no date associated with this document. *Id.* The custodian listed is "Zuora, Inc.," as opposed to any individual or department involved in the sales pipeline, finance or guidance process. *Id.* Consequently, Dages admits he cannot tell who at Zuora saw this document, let alone relied on it in developing FY 2020 guidance. Ex. 3 at 167:10-24, 168:5-21. This concession is significant, as Dages used ZUO_00448803 to identify the five Cross-Sell Customers. Ex. 1 at Dages Ex. 8; Ex. 3 at 154:23-155:2.

### b. ZUO_00448808: Metadata Conflicts with Contents

Dages provided identical testimony for ZUO_00448808: the FY'20Q Pipeline vs. Close.xlsx spreadsheet that Dages uses to identify the actual amount the 5 Cross-Sale Customers booked by close of Q1 FY 2020. Ex. 3 at 173:25-175:5. Dages does not know who prepared this document, whether there was one author or multiple authors, how often pipeline versus closed documents were prepared at Zuora, or whether there are multiple versions of ZUO_00448808. *Id.* at 175:7-176:6. Similarly, he does not know when this document was created, whose files it was produced from or who saw it. *Id.* at 179:7-180:1. A portion of the spreadsheet states Boris Goldenberg generated the spreadsheet on May 1, 2019:

Ex. 15 (ZUO_00448808). But the metadata for ZUO_00448808 identifies "Zuora, Inc." as the custodian (Ex. 16); not Goldenberg, who appears to have been a lower-level financial planning and analysis manager at Zuora during the Class Period, and who Dages never spoke with. Ex. 3 at 179:21-22; Ex. 17 (Goldenberg LinkedIn profile). Similarly, there is no date associated with the creation of this document. Ex. 16.

### c.     ZUO_00327212: Unknown Modifications Made Post-Litigation

Dages similarly made no effort to verify the accuracy of ZUO_00327212, the revenue scenarios spreadsheet Dages Zuora used to revise its entire FY 2020 guidance. Ex. 1, ¶¶ 27, 39, n.72. Dages does not know who saw this or relied upon it, whether revenue scenario spreadsheets are commonly generated by Zuora, where they are maintained, or whether there was only one version or multiple versions of this document. Ex. 3 at 181:25-183:2. Dages concedes he does not know if this was the actual spreadsheet that Zuora used to revise its FY 2020 guidance. *Id.* at 185:5-12, 186:4-7.

Similarly, portions of ZUO_00327212 suggest it is a draft superseded by another document. Ex. 18 (ZUO_00327212) at Whiteboard tab. For example, Dages contends that Zuora management ultimately selected Scenario D in the "Sub Revenues" tab to develop its revenue guidance. Ex. 1, ¶ 44. But the Whiteboard tab of the spreadsheet indicates that management was leaning toward Scenario C at the time the document was drafted, stating "***Right now we're looking at Scenario C.***"

|  | Q1'20 | | Q2'20 | | FY'20 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Sub Rev | Total Rev | Sub Rev | Total Rev | Sub Rev | Total Rev | | |
| Prior Guidance | 46 | 64 | 51 | 70 | 210 | 291 | | |
| YoY Growth | 28% | 22% | 24% | 20% | 27% | 23% | | |
| Forecast | 47 | 64 | 51 | 70 | 209 | 286 | Scenario C | Note: Under Scena |
| YoY Growth | 30% | 22% | 24% | 20% | 26% | 21% | | |
| Guidance | - | - | 50.5 | 69 | 206 | 282 | | |
| YoY Growth | - | - | 23% | 19% | 24% | 20% | | |

Q2 We are already expecting to do less than what Consensus is
The guidance we provide will be a reduction

FY The FY is a little less unknown
Right now we're looking at Scenario C
If we do C, there will be a FY reduction of $3M in Sub Rev and $8M in Total Rev
If we guide to that, then it's implied we will accelerate a bit

Ex. 18 at Whiteboard tab. Dages does not know who wrote this commentary. Ex. 3 at 198:23-199:21. Similarly, Dages cites to no internal Zuora record memorializing Zuora's executives' decision to select Scenario D. Rather, he claims he confirmed this fact on his brief call with Hildenbrand. *Id.* at

201:15-202:8. But as discussed above, Hildenbrand testified that he had no involvement in developing guidance. Ex. 13 at 242:10-14.

The metadata associated with ZUO_00327212, which Dages did not investigate (Ex. 3 at 186:9-12), casts further doubt on its reliability. Ex. 5 (ZUO_00327212 metadata). While the document was purportedly created on May 1, 2019, and produced from Defendant Sloat's custodial files, the metadata indicates that the document was modified on August 13, 2019, *nearly four months after this action was filed on June 14, 2019*.

### Metadata

| All Custodians | Sloat, Tyler; |
| --- | --- |
| Begin Family | ZUO_00327212 |
| Date Created | 2019/05/01 |
| Date Modified | 2019/08/13 |

*Id.* Significantly, Dages does not know who modified the document, or what modifications were made to the document. Ex. 3 at 186:18-188:2. The questionable accuracy of ZUO_00327212 is significant, as Dages uses the embedded formula for "Scenario D" in the revenue tab to calculate the portion of the reduction in FY 2020 subscription revenue attributable to Keystone. *Id.* at 183:4-184:4.

**d.      ZUO_00448805 and ZUO_00448806: Dages Has No Knowledge Regarding the FY 2020 Plans' Origins**

Finally, as with the other spreadsheets, Dages did not verify the accuracy of the FY 2020 Plans (ZUO_00448805 and ZUO_00448806) he relied on in determining Keystone's impact on projected professional service revenue. That is, Dages does not know who generated these documents, whether there were multiple versions, and did not confirm this document was the final and complete version on which management relied. Ex. 3 at 191:8-192:20. Dages merely suspects they are final documents because he asked Defendants' counsel for the documents that Zuora utilized for pulling together the forecasts and relied on counsel providing him with the actual documents, not drafts. *Id.* at 193:5-194:1.

More problematic, Dages fails to explain the relationship, if any, between Zuora's internal Fiscal Year 2020 Plan and the revenue guidance Zuora provides to investors. As illustrated in Dages' Report, changes to Zuora's Fiscal Year Plan are not at all equivalent to changes in Zuora's guidance.

For example, professional services revenue in the FY 2020 Plan declined by approximately $9 million from March to April/May 2019, whereas professional services revenue in the guidance declined by $11 million. Dages acknowledges but fails to address this discrepancy. *Id.* at 209:13-19 ("Q. Changes to the fiscal year 2020 plan and forecasted revenue were not equivalent to changes in revenue guidance; correct? … A. If your question was, did they match dollar for dollar, I think it's fair to say the answer to that is no.").

### 3.    AICPA Guidelines Underscore the Inadmissibility of Dages' Opinions

Dages, a CPA, admits that for the purposes of his report he was providing forensic services. Ex. 3 at 194:19-25. The American Institute of Certified Public Accountants ("AICPA")'s Code of Professional Conduct ("CPC") provides guidelines for professionals when conducting forensic services. Ex. 19 (AICPA SSFS). Dages agrees the AICPA are the generally accepted standards that professionals like himself are supposed to adhere to when performing forensic services. Ex. 3 at 195:2-9. The AICPA General Standards provide, in pertinent part, that professionals "shall ... [o]btain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." Ex. 19, ¶ 6. Here, Dages failed to comply with AICPA's published standards because he made no attempt to critically analyze records Defendants' counsel provided to him or verify that data was sufficient to provide a reasonable basis for his conclusions. Dages' failure to comply AICPA standards further highlights the unreliability of his opinions. *See, e.g.*, *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 978 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (excluding expert engineer's testimony that failed to comply with American Society for Testing and Materials (ASTM) standards, reasoning that "[a]n expert must not compromise his or her own professional standards when acting as an 'expert' in a court of law").

### B.    Dages' Report Is an Inadmissible Narrative Summation

Courts recognize that allowing an expert to provide testimony "based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself." *United States v. Vance*, 2011 WL 2633842, at *5 (N.D. Ill. July 5, 2011); *see also Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328, at *9 (N.D. Cal. Feb. 25, 2014) ("Juries are likelier to credit experts, who are

perceived to possess special relevant knowledge and are expected to help the jury reach the right conclusion, more than simple documentary evidence."). Dages' summaries of the spreadsheets in question do not involve any actual expert analysis or application of any generally accepted accounting principle, but instead "invade[] the authority of the trier of fact to determine for itself the plain meaning of the facts and the documents." *In re Novatel*, 2011 WL 5827198, at *5.

### 1.     Dages' Report and Opinions Usurp the Role of the Jury

Dages' Report consists of argumentative narrative summaries of documentary evidence, which Dages uses to draw inferences in Defendants' favor. In fact, Dages' description of his assignment—"to review the record evidence and provide my opinion on what portion of the decline in Zuora's FY 2020 revenue guidance could be attributable to the Keystone Integration Issues"— almost precisely describes the fact-finder's task of reaching a conclusion regarding a particular issue of fact based on the weight of the evidence marshalled in favor of the parties' positions. Ex. 1, ¶ 12. Yet, "[a]lthough a party might prefer to introduce a substantial body of documentary evidence through the direct testimony of a friendly expert, when those documents can be understood by a layman, they may be organized and summarized only during summation." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 499 (S.D.N.Y. 2009).

Dages' narrative descriptions of Zuora management's analysis of Keystone's financial impact, which comprise the bulk of his report, fare no better. Dages does no more than present, in a light favorable to Defendants, the documentary and testimonial evidence Dages considered, and draw simple inferences from these records. For example, in § IV.A. of the report, Dages describes the background and import of Zuora's internal Keystone Integration by summarizing portions of Hildenbrand's deposition testimony and the contents of various Zuora business records and executive and Board presentations. Ex. 1, ¶¶ 15-18. Based on his review of these documents, Dages deduces that Keystone Issues were of minimal economic consequence to Zuora—a disputed fact that the jury will decide after a full presentation of the evidence (*id.*, ¶ 19). *See, e.g.*, *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) (striking testimony "replete with observations and inferences that jurors are perfectly capable of making for themselves without [expert] assistance").

Next, in § IV.B. of the report, Dages discusses Zuora's assessment of the impact of the Keystone Integration Issues on the Company's ability to collect amounts recorded as revenues in FY 2019 for Keystone customers and on its Fiscal Year 2020 Plan and Forecasts. Ex. 1, ¶¶ 20-24. But in interpreting these lay documents, Dages does not rely on or apply any recognized principles in his field. Dages does nothing more than block quote portions of Zuora's Q4 2019 Reserve Memo and summarize Zuora Keystone Discussion papers and Keystone Financial Impact analyses. *Id.* The jury is equally capable of reading these documents and drawing their own inferences. *See Vance*, 2011 WL 2633842, at *5 (testimony "based on nothing more than [expert's] review of certain discovery materials" is inadmissible).

Finally, in § V. of the report, Dages discusses how Zuora management used its internal forecasts to provide external guidance on its FY 2020 subscription revenues and total revenues on March 21, 2019, and May 30, 2019, by reviewing and analyzing the five internal Zuora spreadsheets discussed above. Ex. 1, ¶¶ 25-61. None of this is proper expert testimony. Assuming the spreadsheets are final and complete documents actually relied on by Zuora management in developing FY 2020 subscription revenues and total revenues, "[t]he documents cited by" Dages "can independently come into evidence and counsel can make the argument as well as" Dages. *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 6887043, at *6 (N.D. Cal. Nov. 14, 2017). Indeed, at his deposition, Dages conceded that, rather than him, "the people who prepared [the spreadsheets]" would be the best source for telling the jury how these documents were actually used. Ex. 3 at 177:18-178:1. Under these circumstances, Dages' testimony would not only fail to improve on the probative value of the evidence he interprets, but also "muddy the uncomplicated facts with his facade of expertise." *Waymo*, 2017 WL 6887043, at *6. This is all the more true since the spreadsheets were intended for a lay audience—Zuora's management and Board of Directors—and questions of their state of mind or the reasonableness of their actions are classic jury issues. *See also, e.g.*, *In re Novatel*, 2011 WL 5827198, at *4 ("[The expert] quotes selectively from e-mails and prior sworn testimony …. [N]o specialized or technical knowhow is required to read and draw conclusions from the internal documents and testimony cited by [the expert].").

*Baker v. SeaWorld Entertainment, Inc.*, 423 F. Supp. 3d 878 (S.D. Cal. 2019), is instructive. There, plaintiffs hired an expert in analyzing empirical data to provide testimony on whether SeaWorld's data and analyses supported Defendants' public statements. *Id.* Rather than conduct any empirical review, the expert reviewed defendants' statements made during the class period, deposition transcripts, and documents produced in discovery. *Id.* The court excluded the expert's testimony as unreliable since the expert performed no empirical and technical analysis, but examined records that "do[] not require an expert's interpretation." *Id.* at 911. The court further deemed the testimony not sound, reasoning that the expert usurped the role the jury since the documents were intended for a lay audience (SeaWorld's management and board of directors) and could come into evidence independently and counsel could make the argument as well as the expert. *Id.* at 913.

Here, the Court should similarly exclude Dages' testimony because, just as in *SeaWorld*, Dages fails to employ any methodology or accounting principle, but uses narrative summations of documents and testimony in reaching his conclusions.

## 2. Dages' Lay Conclusions Are Unreliable

To make matters worse, many of Dages' lay conclusions are at best unsupported by, and at worst contradicted by, the evidence. These errors underscore the impropriety of Dages testifying on lay matters—there is no reason to believe he is better suited to speak as to Zuora's management's decisions than Zuora's executives themselves, and then interpret the evidence better than the jury. *See, e.g.*, *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011) (excluding expert opinion "based on factual assumptions that are entirely unsupported in the record").

### a. Several of Dages' Inferences Are Speculative of Management's Intent

In his review of the spreadsheets, Dages encounters several instances in which management failed to document its reasoning for making adjustments to its revenue guidance, forcing Dages to speculate as to management's rationale and decisions. For example, in the "Sub Revenues" tab of ZUO_00327212, the revenue scenarios Excel spreadsheet, the spreadsheet includes Q1–Q2 FY 2020 and FY 2020 revenue guidance. Ex. 18 (ZUO_00327212) at "Sub Revenues" tab. The guidance shown in cell M53, which appears to be the mid-point under Scenario D, reports FY 2020

subscription revenue of $203.0. *Id.* But the range of $200.0 to $206.0 appears to be in cells M65 and N65, the FY 2020 subscription revenue guidance Zuora actually published on May 30, 2019. *Id.* These formulas appear to take the $203.0 million mid-point and add or subtract 3 million, to arrive at the $200.0 million for the low end and $206.0 million for high end of the range. *Id.* But there are no labels in the spreadsheet for the $200.0 million or $206.0 million. *Id.* Further, there is no discussion or labels explaining the "3" added and subtracted to the $203.0 mid-point:

| | FY'19 | @ Q4 Earnings | A | B | C | D | |
|---|---|---|---|---|---|---|---|
| **Subscription Revenues** | | | | | | | |
| Q1 | $35.9 | $47.1 | $47.3 | $47.3 | $47.3 | $47.3 | 47.3 |
| Q2 | $40.9 | $51.9 | $50.9 | $50.8 | $50.7 | $50.6 | 49.25 |
| Q3 | $43.1 | $55.2 | $54.1 | $53.6 | $53.3 | $52.4 | 52.1 |
| Q4 | $45.0 | $60.3 | $59.2 | $58.1 | $57.5 | $55.4 | 54.6 |
| Total | $164.805 | $214.5 | $211.5 | $209.7 | $208.8 | $205.7 | |
| **Beat / Buffer** | | | | | | | |
| Q1 | | | $0.0 | $0.0 | $0.0 | $0.0 | |
| Q2 | | | ($0.7) | ($0.7) | ($0.7) | ($1.3) | |
| Q3 | | | ($1.3) | ($1.3) | ($1.3) | ($0.4) | |
| Q4 | | | ($1.5) | ($1.5) | ($1.5) | ($1.0) | |
| Total | | | ($3.5) | ($3.5) | ($3.5) | ($2.7) | |
| **Guidance** | | | | | | | |
| Q1 | $35.9 | $46.3 | $47.3 | $47.3 | $47.3 | $47.3 | |
| Q2 | $40.9 | $51.2 | $50.2 | $50.1 | $50.0 | $49.3 | 49.25 |
| Q3 | $43.1 | $54.1 | $52.9 | $52.3 | $52.0 | $52.0 | 52.1 |
| Q4 | $45.0 | $58.8 | $57.7 | $56.6 | $56.0 | $54.4 | 54.6 |
| Total | $164.8 | $210.3 | $208.1 | $206.3 | $205.4 | $203.0 | |
| **Guidance Change** | | | ($2.2) | ($4.0) | ($4.9) | ($7.3) | |
| Q1 | | | $1.1 | $1.1 | $1.1 | $1.1 | |
| Q2 | | | ($1.0) | ($1.1) | ($1.1) | ($1.9) | |
| Q3 | | | ($1.2) | ($1.7) | ($2.0) | ($2.0) | |
| Q4 | | | ($1.1) | ($2.2) | ($2.8) | ($4.4) | |
| Total | | | ($2.2) | ($4.0) | ($4.9) | ($7.3) | |
| Q2'Q4 Change | | | ($3.2) | ($5.0) | ($5.9) | ($8.3) | |
| | | | $203.4 | $207.4 | | $200.0 | $206.0 |

*Id.* Despite this gap, Dages speculates that Zuora management used the "3" figure as a "buffer of 2.7" rounded to 3. Ex. 1, ¶ 44. While Dages claims he confirmed this fact in his brief conversation with Hildenbrand (Ex. 3 at 202:17-204:11), Hildenbrand previously testified as having no involvement in the guidance process. Ex. 13 at 242:10-14. And Dages testified he still does not know the origin or management's reasoning for the "3" buffer. Ex. 3 at 204:7-22.

Similarly, in his report, Dages cites ZUO_00407064 at -66, a FY'20 GS Plan Comparison, dated May 20, 2019, for the proposition that as of May 20, 2019, Zuora management was proposing "Street Guidance" of $70 to $72 million for professional services revenues based on the May 2019 FY 2020 Forecast of $74.1 million. Ex. 1, ¶ 44, n.80. But ten days later, on May 30, 2019, Zuora management forecasted professional services revenue to be $68 to $72 million on May 30, 2019. *Id.* Dages admits he has no idea why management reduced its guidance between $2-4 million within this 10-day window. *Id.*; Ex. 3 at 208:2-17 ("Q. But you agree that management narrative could have

explained why the revenue guidance range differed from 70 to 72 million on May 20th, 2019, to 68 to 72 million on May 30th; right? … A. That's probably true….”). These two examples illustrate the need for management narrative to explain these documents.

### b.    Dages' Fundamental Assumptions Are Contradicted by the Record

Dages relies on numerous unreliable internal Zuora documents that have no clear relationship to revenue guidance, such as Zuora's FY Plans. But Zuora's Board of Director materials (*i.e.*, the most relevant internal documents to review to determine why Zuora decided to decreased guidance) undermine Dages' most central assumptions and conclusions. As noted above, in isolating his Keystone impact to only 15% of Zuora's guidance downgrade, Dages relied upon the cross-sales projected for only five Zuora customers. In doing so, Dages assumed that "the Keystone Integration Issues would not have affected Zuora's ability to attract new customers, or to retain or 'up-sell' product to existing customers that were interested only in its Billing or RevPro products." Ex. 1, ¶ 19. That assumption drove Dages to assume "that the Keystone Integration Issues affected only the small subset of Zuora's customer base." *Id*. But the May 22, 2019 Board of Director agenda undermines Dages' assumption that the product integration failure had no affect on Zuora's ability to retain or "up-sell" product:



Ex. 20 at ZUO_00001174. The May 22, 2019 Board of Director agenda reflects Zuora's governing body's admission that because the ███████████████████████ ██████ Keystone impaired Zuora's upselling to existing customers, which directly contradicts Dages' assumption. *Id.* At his deposition, Dages had no cogent response to this contradiction. Ex. 3 at 220:2-223:2.

It is clear Dages engaged in what courts refer to as "cherry picking," which renders his opinions unreliable. *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *4-5 (N.D. Cal. Nov. 6, 2017) (discussing cherry-picking and the impropriety of selective reliance on data). Doing so

"provid[es] the court with [a] strong reason to conclude that [the expert] utilized an unreliable methodology." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010).

### C.    Dages' Opinions Do Not "Fit" the Case, and Therefore Must Be Excluded

Dages' opinions are also inadmissible because they fail *Daubert's* "fit" requirement. *See Daubert*, 509 U.S. at 591. Expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). This requirement is more stringent than the relevancy requirement of Rule 402, reflecting "the special dangers inherent in scientific expert testimony," which "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997). "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Base v. FCA US LLC*, 2019 WL 1117532, at *5 (N.D. Cal. Mar. 11, 2019).

### 1.    Dages' Opinions Are Irrelevant to Loss Causation and Damages

Defendants offer Dages' opinions in an effort to reduce Plaintiffs' recoverable damages. As recently affirmed in *In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936 (N.D. Cal. Oct. 13, 2022), "[c]ausation is fundamental to recoverability …. And the Ninth Circuit has made clear that the touchstone for loss causation is proximate cause." *Id.* at 1 (citing 15 U.S.C. § 78u-4(b)(4) and *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 751-52 (9th Cir. 2018)). To prove loss causation, "[a] plaintiff is not required to show that a misrepresentation was the ***sole reason*** for the investment's decline." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (emphasis in original). Instead, "to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a ***substantial factor*** in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* (emphasis added).

Here, Dages' report and testimony in no way impacts loss causation and damages. Dages admits that Zuora's abandonment of the Keystone project in favor of developing the new K2 approach prevented sales personnel from cross-selling to new customers, as well as upselling to

Zuora's 20 Keystone customers. Ex. 3 at 72:14-20, 83:3-15, 121:4-9. Dages, however, did not determine the value of this lost bookings and revenue stream. *Id.* at 112:8-19. Nevertheless, Dages does not genuinely dispute that had Zuora possessed the ability to cross-sell/upsell this customer group, as they led investors to believe, Zuora would have met or exceeded the bookings target underlying its FY 2020 revenue guidance. *Id.* at 117:4-118:9. Nor can he. In an April 9, 2019 email to other Zuora executives, Defendant Tzuo identified the Keystone Integration failure and the resulting sales execution issues as the sole "reason" for the bookings shortfall in Q1 FY 2020, which ultimately led to the downward guidance reduction. *See* Ex. 8 at ZUO_00003940 ("The headline here is this is a tough bookings quarter. Marc took the commit down for the quarter. ***The specific reason is our upsell # is coming in very light, as the issues we highlighted last quarter around Keystone (Billing<>RevPro integration) and our Orders project is hurting us – both in terms of customer satisfaction, our ability to sell RevPro, and also in taking up the time of the account team to manage through.***") (emphasis added). This admissible evidence conclusively shows that the misrepresented and omitted facts (*i.e.*, the integration failure and the corresponding sales execution issues) directly and foreseeably caused the dismal outlook and subsequent decline in Zuora's stock.

Dages' opinions do nothing to negate this evidence. Instead, Dages' work yields the unremarkable observation that: (i) Zuora's forecasted FY 2020 cross-sells changed very little between March 2019 (*i.e.*, when the Company had already halted their cross-sell efforts and upselling to Keystone customers) and April/May 2019; and (ii) that executives wrongly believed in March 2019 that they could perhaps make up for the missed cross-sell/upsell opportunities by aggressively pushing RevPro or Billing individually on non-cross-sold customers at the end of the quarter. But if such a loss causation defense were viable, it would nullify any securities suit following a guidance reduction—which plainly is not the law. *See, e.g.*, *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d at 1108 (excluding defendants' expert's testimony regarding loss causation where expert employed incorrect standard).

In addition, Dages' opinions are half-baked. The thrust of any loss causation defense is that "some other fact" foreseeably caused the plaintiff's loss. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). But Dages fails to offer competent testimony on what the "other fact" was that

caused Zuora's stock price decline. While Dages attributes 15% of the guidance reduction to the "Keystone Integration Issues," he did not determine, and therefore does not opine that the remaining 85% is attributable to the purportedly wholly unrelated sales execution issues Tzuo mentioned on the May 30, 2019 earnings call—the only other identified driver for the reduced guidance. Ex. 3 at 52:23-53:19, 137:13-138:9, 142:12-17. The illogic of Dages' methodology is further highlighted by Dages' admissions the sales execution issues Tzuo mentioned are plausible consequences of the Billing-RevPro integration failure, such as hindering sales to Global 2000 customers (*id.* at 117:13-19), and that the limited internal documents actually including a discussion or data on the guidance identify Keystone as the catalyst, as opposed to some unrelated sales productivity issue. *See* Ex. 21 (ZUO_00329887) (2/28/19 impact on guidance slide providing adjustments for Keystone Impact and no mention of sales productivity issues); Ex. 22 (ZUO_00326338) ("Q4'19 Guidance" tab) (same); Ex. 3 at 142:22-144:12, 144:21-147:15.

### 2.    Dages' Opinions Clash with the Law, Damages Experts' Opinions, and Reality

Loss causation and damages in fraud-on-the-market cases depend on a showing that the "share price dropped as a result of ***the market learning of and reacting to*** Defendants' purported fraud." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (emphasis added). But here, Dages exclusively uses internal Zuora documents that were not available to market participants. The internal documents Dages uses include multiple versions of internal forecasts of revenue and expense by product for FY 2020. The level of revenue and expense detail contained in the FY 2020 Plan is far greater than the level of detail contained in Zuora's investor reporting. For example, Zuora generates the forecast for professional services revenue from a capacity model, which inputs include billable headcount, average billing rate, and average utilization rate. Ex. 1, ¶ 30. Investors did not have access to this information. Dages fails to explain how his analysis and calculations reflect what the market learned of and reacted to in response to the disclosures.

Moreover, as Defendants' expert Dr. Ferrell testified, Zuora's stock price declined because of the reduced revenue guidance (*i.e.*, quantitative information) and management's "explanations thereof" (*i.e.*, qualitative information). Ex. 23 at 91:16-22, 61:22-62:7. In explaining the disappointing outlook, Zuora disclosed that its platform and flagship products did not have technical

capabilities it previously represented, leading to significant sales execution issues. Dages' methodology fails to account for this important qualitative information. *See, e.g.*, *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) (material information involves both quantitative and qualitative considerations).

Finally, Dages' suggestion that a damage estimate should focus exclusively on the numerical change to Zuora's revenue guidance for one year ignores that when revenue estimates are reduced for the current year, market participants' expectations for Zuora for future years are impacted as well. Ex. 24 (Lundelius Report), ¶ 18. For example, estimated revenue for FY 2020 was just one input analysts used to estimate Zuora's enterprise value and price target. *Id*. Projected growth rates and revenue multiples were much more critical inputs. *Id.* No analyst employed such a simplistic approach as adjusting the FY 2020 projected financial results, only. *Id.*, ¶ 41. Instead, the analysts adjusted their calculations regarding Zuora's future cash flows by either adjusting their revenue "multiplier" or growth rates, which had a far greater impact on their enterprise value and price targets for Zuora than simply adjusting FY 2020 projections. *Id.*, ¶¶ 45-49. Thus, after the alleged corrective disclosure on May 30, 2019, analysts were not valuing Zuora exclusively on how much of the one-year FY 2020 revenue decline was attributable to the product integration failure and the corresponding sales execution issues. *Id.*, ¶ 50. Analysts were valuing Zuora based on its long-term future prospects. *Id.* Therefore, it is unclear how Dages' percentage applied to FY 2020 guidance can be properly and reliably applied in estimating damages.

## VI.    CONCLUSION

For the above reasons, Lead Plaintiff respectfully submits that the report, testimony, and opinions of Kevin Dages, and any evidence or testimony relying thereon, are inadmissible and should be excluded from summary judgment and at trial.

DATED: December 9, 2022

Respectfully submitted,

*/s/ Steve W. Berman*
Steve W. Berman (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725.3000
Facsimile: (510) 725.3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (708) 628-4966
Facsimile: (708) 628-4950
raffim@hbsslaw.com

Peter A. Shaeffer (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
petersh@hbsslaw.com

*Attorneys for Lead Plaintiff New Zealand Methodist Trust Association*