# Exhibit Q

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
CASEY ROBERTS, Individually and On Behalf Of     :
All Other Similarly Situated,                              :        No. 3:19-cv-03422-SI
                                                          :
                        Plaintiff,                        :
                                                          :
        v.                                                :
                                                          :
ZUORA, INC., TIEN TZUO, and TYLER           :
SLOAT,                                                   :
                                                          :
                        Defendants.                    :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**EXPERT REPORT OF CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**


**Submitted on September 16, 2022**

**TABLE OF CONTENTS**

I.      INTRODUCTION AND ASSIGNMENT ............................................................................. 1

II.     QUALIFICATIONS .......................................................................................................... 1

III.    BACKGROUND ............................................................................................................... 5

IV.     SUMMARY OF MR. DAGES' OPINIONS AND METHODOLOGY ........................... 8

V.      SUMMARY OF FINDINGS AND OPINIONS ............................................................. 11

VI.     Mr. Dages uses a flawed methodology to estimate the percentage decrease to FY
        2020 revenue guidance that was related to product integration issues. ........................... 13

VII.    Mr. Dages improperly assumes Keystone was of little consequence to Zuora. ............... 16

VIII.   Mr. Dages fails to explain how his estimated percentage decrease to FY 2020
        revenue guidance that was related to product integration issues can be properly
        used to calculate damages. .............................................................................................. 19

APPENDIX A: CURRICULUM VITAE

APPENDIX B: MATERIALS CONSIDERED

EXHIBIT 1: SEC FILINGS

EXHIBIT 2: ANALYST COMPARISON

## I.    INTRODUCTION AND ASSIGNMENT

1.    I was retained by counsel for Plaintiffs to respond to conclusions reached by Defendants' expert Kevin Dages in his report dated August 5, 2022 ("Dages Report").

2.    I prepared this analysis in accordance with American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services No. 1.

## II.    QUALIFICATIONS

3.    I am a Certified Public Accountant and am Accredited in Business Valuation and Certified in Financial Forensics by the AICPA.  In addition, while a senior officer of a Financial Industry Regulatory Authority ("FINRA") broker/dealer that served as lead underwriter for securities syndications, I held a FINRA General Securities Principal license (Series 24, 7 and 63) and was a Registered Investment Adviser.  In 1999, I was appointed by the NASDAQ Board of Directors to serve on the NASDAQ Listing Qualifications Panel, the body that reviews the listing and delisting of securities traded on The NASDAQ Stock Market.[1]  My term ended in 2006.

4.    I have over 40 years of experience, including seven years in securities and investment banking in Houston and three years as senior vice president and chief financial officer of a life and health reinsurance carrier in Dallas.  My securities and investment banking experience includes underwriting, portfolio management, derivatives, high-yield bond and securities and commodities market analysis.  I have consulted and/or testified in the areas of the underwriting process, securities market pricing, hedge fund operations, investment suitability, securities fraud, fiduciary duties, compliance and due diligence practices.  I have given testimony before administrative hearings of the Securities and Exchange Commission ("SEC"), in federal and state

---

[1] "NASDAQ" stands for National Association of Securities Dealers Automated Quotations.

courts, at FINRA arbitrations, and before governmental hearings.  I have qualified as an expert in securities trading and valuation, Investment Adviser and Investment Company Act matters, damages, financial analysis, accounting, fiduciary duties and econometrics.

- In an administrative hearing before the SEC, I designed and testified regarding econometric models to determine the impact of securities trading under various market conditions, modeling securities price valuation, event analysis, the impact of institutional investor trading and the role of transfer agents.  In her opinion, SEC Administrative Law Judge Foelak referenced the modeling methodology and cited extensively from my testimony regarding my assessment of the actions that would have been taken by an "economically rational shareholder."[2]  At the hearing, I was qualified as an expert in securities valuation and as an expert in the price behavior of securities sold into thinly traded markets.

- In a similar case brought by the SEC in federal district court in Connecticut against a public company and brokers trading its stock, I testified for defendants about specific alleged matched trades and market maker quotes preceding those trades.  The jury deadlocked on some counts but found for defendants on all others.  In a retrial at which I testified on quote spreads and ability to "mark the close," the jury found for the defendant stockbroker.  Testimony in both cases included market efficiency analyses as demonstrated

---

[2] *In the Matter of WHX Corporation*, Initial Decision, October 6, 2000, available through the SEC's website at http://www.sec.gov/litigation/aljdec/id173cff.htm.

2

by Augmented Dickey Fuller tests of random walk and other measures of efficiency. Testimony in both Florida and Connecticut district courts, as well as subsequent case history, expanded the list of factors to consider when determining whether a security trades in an illiquid market.[3]

- On behalf of an executive of a major equipment supplier to the gaming industry accused of insider trading by the SEC, I prepared an analysis of business plans and public disclosures, as well as published analysts' reports, to determine if inside information was public. In addition, I analyzed market efficiency of the gambling company stock by use of an event study and other metrics, including those metrics established by my testimony in prior cases, to determine materiality. Business plan analysis included assessment of operations and opportunities in the Las Vegas and Macau markets, the latter involving significant evaluation of Asian gambling practices and patterns.

- In connection with regulatory investigations of research published by securities analysts, I evaluated the discounted cash flow and working capital forecasts, including estimates of liquidity, earnings multiples and future funding needs, made by a Salomon Smith Barney analyst, working with Jack Grubman, for telecommunications securities, including equities and distressed high yield bonds, covered by SSB in connection with an NASD arbitration proceeding.

---

[3] A list of factors to consider to determine whether a security traded in an inefficient or illiquid market were developed in *Rose CAMMER, et al. v. Bruce M. BLOOM, et al.*, U.S.D.C. New Jersey, 711 F. Supp. 1264 (1989), also known as the "Cammer Factors."

3

- On behalf of a former CFO of a publicly traded Real Estate Investment Trust ("REIT"), I analyzed materiality of changes to non-GAAP measures published by REITs and securities analysts, as well as materiality of US GAAP restatement changes made to financial statements, under SEC Staff Accounting Bulletin No. 99, *Materiality*, subsequent to the CFO's departure. The materiality assessment included extensive analysis of analysts' reports and securities pricing models.

- On behalf of a corporate defendant, I analyzed the validity of management and analysts' forecasts and their impact on the value of stock prices for a $150 million securities fraud class action suit, including an analysis of accounting and sales data, revenue recognition issues, and determining when management became aware of certain information. Due to findings on accounting issues, Judge Hilton (E.D. Va.) dismissed all accounting claims prior to trial and found for defendants immediately after plaintiffs presented their case.

5.    My curriculum vitae, which lists my publications and testimony, is attached as Appendix A.

6.    The hourly rate that BRG charges for my time is $1,250.  BRG staff have assisted me on this matter, and their billing rates vary from $325 to $810 per hour.  Neither my compensation nor my staff's compensation is contingent on the content of my opinions or the outcome of this litigation.

4

7.    My findings in this matter were reached after my review of the information available and from utilizing the knowledge and expertise I have obtained based on my years of experience.  Please refer to Appendix B for a list of materials considered for this report.

### III.    BACKGROUND

8.    Defendant Zuora, Inc. ("Zuora") is a cloud-based subscription management platform.[4]  Two of Zuora's flagship products during the Class Period in this matter, April 12, 2018 to May 30, 2019, were Zuora Billing ("Billing") and Zuora RevPro ("RevPro").  Billing was "designed specifically for subscription billing" and allowed Zuora's customers "to bill in multiple ways, calculate prorations when subscriptions change, and to group customers into batches for different billing and payment operations."[5]  RevPro was "a revenue recognition automation solution" that enabled Zuora's customers "to group transactions of goods and services into revenue contracts and performance obligations" in accordance with each customer's accounting policies and standards.[6]  Zuora was a private company prior to going public in April 2018, when it sold 12.7 million shares of common stock, at $14 per share, in its initial public offering ("IPO").[7] Plaintiff purchased Zuora common stock during the Class Period.[8]

9.    After becoming public, Zuora was required to start filing quarterly (Form 10-Q) and annual (Form 10-K) financial reports with the SEC, along with "current reports" (Form 8-K)

---

[4] Zuora FY 2019 Form 10-K, p. 2.

[5] Zuora FY 2019 Form 10-K, pp. 3-4.

[6] Zuora FY 2019 Form 10-K, p. 4.

[7] Zuora FY 2019 Form 10-K, p. 37.

[8] Complaint, ¶22.

to announce Zuora's results of operations and financial condition to shareholders.[9]  These SEC filings were certified and signed by Defendants Tien Tzuo, CEO, and Tyler Sloat, CFO.[10]  During the Class Period, Zuora recognized and reported two types of revenue in its SEC filings: subscription revenue, which consisted of "fees for access to, and use of, [Zuora's] products, as well as customer support," and professional services revenue, which consisted of "fees for services related to helping [Zuora's] customers deploy, configure, and optimize the use of [Zuora's] solutions."[11]  Together, subscription revenue and professional services revenue comprised Zuora's total reported revenue.[12]  Zuora's fiscal year-end is January 31; the Dages Report focuses on subscription revenue and total revenue for the year ending January 31, 2020 ("FY 2020").

10.    On March 21, 2019, Zuora filed a Form 8-K to announce its Q4 FY 2019 and FY 2019 financial results, and included a financial outlook for FY 2020 revenue.  Zuora expected subscription revenue for FY 2020 to be between $209.0 million to $211.5 million, and total revenue to be between $289.0 million and $293.5 million.[13]  Zuora revised its FY 2020 revenue guidance on May 30, 2019 when it reported its Q1 FY 2020 financial results, announcing that it now expected subscription revenue for FY 2020 to be between $200.0 million to $206.0 million (decreases of $9 million to the low end of the range and $5.5 million to the high end of the range),

---

[9] https://www.sec.gov/education/smallbusiness/goingpublic/exchangeactreporting; https://www.sec.gov/corpfin/answers/8-k_how_to_read.

[10] Zuora FY 2019 Form 10-K, Exhibits 32.1 and 32.2 (signed certifications pursuant to 18 U.S.C Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002).

[11] Zuora FY 2019 Form 10-K, p. 42.  Zuora Billing generated both subscription revenue and professional services revenue.  Similarly, Zuora RevPro generated both subscription revenue and professional services revenue.

[12] Zuora FY 2019 Form 10-K, p. 63.

[13] March 21, 2019 Zuora Form 8-K, Exhibit 99.1 (press release "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results").

and total revenue to be between $268.0 million and $278.0 million (decreases of $21 million to the low end and $15.5 million to the high end).[14] In summary, the guidance changed as follows:

| FY 2020 Metric | March 21, 2019 | May 30, 2019 | Change |
|---|---|---|---|
| Subscription Revenue range | $209.0MM - $211.5MM | $200.0MM - $206.0MM | ($9.0MM) – ($5.5MM) |
| Subscription Revenue mid-point | $210.25MM | $203.0MM | ($7.25MM) |
| Total Revenue range | $289.0MM - $293.5MM | $268.0MM - $278.0MM | ($21.0MM) – ($15.5MM) |
| Total Revenue mid-point | $291.25MM | $273.0MM | ($18.25MM) |

The difference between the mid-point change in total revenue of $18.25MM and the mid-point change in subscription revenue of $7.25MM is attributed to a decline in professional services revenue of $11.0MM.

11.    On Zuora's earnings call that same day, Mr. Tzuo stated that there were "two execution headwinds" that had resulted in "tempered [revenue] expectations going forward."[15] The first was sales execution issues, which had stemmed from "newer reps [being] less than half as productive than [Zuora's] more experienced reps."[16] The second was the product integration failure between Billing and RevPro, referred to by Mr. Dages as the "Keystone Integration Issues" based on the internal Zuora project in 2018 codenamed "Keystone" intended to build an integration solution,[17] which was hurting Zuora's ability to cross-sell those two products.[18] I have been asked to assume that all the sales execution issues mentioned by management on the earnings call were

---

[14] May 30, 2019 Zuora Form 8-K, Exhibit 99.1 (press release "Zuora Reports First Quarter Fiscal 2020 Results").

[15] May 30, 2019 Earnings Call transcript.

[16] May 30, 2019 Earnings Call transcript.

[17] Complaint, ¶¶7, 79-87.

[18] May 30, 2019 Earnings Call transcript.

7

a result of the product integration failure alleged in the Complaint.[19]  The day after Zuora's earnings call, May 31, 2019, Zuora's stock price fell from $19.90 to $13.99, a decline of nearly 30%.[20]  Plaintiff claims damages due to Zuora's alleged artificially inflated stock price prior to May 31, 2019.[21]

### IV.    SUMMARY OF MR. DAGES' OPINIONS AND METHODOLOGY

12.    Mr. Dages opines that $0.7 million of the downward revision in the guidance for FY 2020 subscription revenue that Zuora provided on May 30, 2019 was attributable to the Keystone Integration Issues and that $2.1 million of the downward revision in the guidance for FY 2020 professional services revenue was attributable to the Keystone Integration Issues.[22]  He then opines that damages "attributable to Zuora's alleged failure to timely disclose the Keystone Integration Issues should take into account my estimate that those issues represented only 15% of Zuora's revision to its revenue guidance on the alleged corrective disclosure date."[23]

---

[19] The documents I have reviewed in reaching my opinions, which are cited throughout this report and included in Appendix B, are consistent with this assumption.  *See also, for example,* Zuora FY 2020 Form 10-K, p. 11 ("Our future revenue growth also depends upon expanding sales and renewals of subscriptions to our solution with existing customers. If our existing customers do not expand their use of our solution over time or do not renew their subscriptions, our revenue may grow more slowly than expected, may not grow at all, or may decline. Our success, in part, is dependent on our ability to cross-sell Zuora RevPro products into our existing Zuora Billing customers. If we experience delays in integration or implementation of these products, revenue from cross-selling may grow more slowly or may not grow at all") and p. 45 ("During fiscal 2020, we saw a decline in the dollar-based retention rate primarily due to the lower cross-sell activity of our Zuora RevPro offering into our existing Zuora Billing customers resulting from product integration challenges and an increase in churn due to some customers renewing with lower transaction volume, business failure, and M&A activity. We may experience fluctuations, including potentially lower rates, as we continue working to improve our overall sales execution"). *See also* ZUO_00001166-192 at 176-177 ▮▮▮

[20] Zuora historical stock prices from Bloomberg ("PX_LAST" for ZUO US Equity).

[21] Complaint, ¶¶17, 22, 262.

[22] Dages Report, ¶13 and Exhibit 12.

[23] Dages Report, ¶13.

13.     For his opinion that $0.7 million of the downward revision to subscription revenue was attributable to Keystone, Mr. Dages first notes that Zuora's May 2019 guidance worksheet reveals that subscription revenue primarily decreased based on data showing that actual bookings in Q1 FY 2020 missed forecasted bookings in Q1 FY 2020 by 23%.[24]  Mr. Dages then attempts to isolate the portion of the 23% miss attributable to RevPro-Billings cross-sales by using sales pipeline data prepared prior to the March 21, 2019 revenue guidance.[25]  From this review, he identifies only five relevant customers ("Cross-Sales Customers"), for whom sales representatives estimated $521,000 bookings that actually realized $230,000, producing a Q1 FY 2020 miss of $291,000.[26]  Mr. Dages then inputs the $291,000 miss into Zuora's May 2019 guidance model to conclude that approximately $700,000 (9%) of the downward revision in the guidance for subscription revenue was attributable to Keystone.[27]

14.     For Mr. Dages' opinion that $2.1 million of the downward revision to professional services revenue was attributable to Keystone, he follows the four steps summarized below.

> 1) He compares a Zuora revenue forecast prepared in March 2019[28] with a Zuora revenue forecast prepared in April/May 2019.[29]  The estimated

---

[24] ZUO_00327212; Dages Report, ¶39 and Exhibit 3.

[25] Dages Report, ¶¶48, 49.

[26] Dages Report, ¶49.

[27] Dages Report, ¶54 and Exhibit 11.

[28] ZUO_00448805.

[29] ZUO_00448806. Mr. Dages refers to this forecast as the May 2019 forecast.  I refer to it as the April/May 2019 forecast because it was created in April (see the last change on the "Changes" tab on 4/30) but used in May.

Keystone impact (i.e., reduction to revenue with the label "Keystone") increased by $221,000 from March to April/May 2019.[30]

2) The Zuora revenue forecast prepared in April/May 2019 also contained a $2,727,000 reduction to RevPro revenue.[31]  Mr. Dages uses 55% of that amount because he uses the sales pipeline to conclude that 55% of the Q1 FY 2020 RevPro bookings miss was related to the five Cross-Sales Customers, and he calculates the professional services impacted by Keystone as $2,727,000 x 0.55 = $1,500,000.[32]

3) The Zuora revenue forecast for professional services prepared in April/May 2019 was $9,233,000 less than the Zuora revenue forecast prepared in March 2019.[33]  The amounts in steps (1) and (2) above equal $221,000 + $1,500,000 = $1,721,000, which comprises 19% of that change ($1,721,000 is 19% of $9,233,000).

4) Mr. Dages then multiplies the decline in professional services revenue guidance of $11.0 million by 19% to conclude that $2,100,000 of the

---

[30] Dages Report, ¶56 and Exhibit 5.

[31] This reduction to forecasted RevPro revenue was listed after the $7,200,000 reduction to forecasted Billing revenue.  *See* Dages Report, Exhibit 5.

Zuora's forecast for professional services revenue is generated from a "capacity model."  Mr. Dages compares the inputs to the March 2019 capacity model with the inputs to the April/May 2019 capacity model.  However, there is no explicit Keystone input to the capacity model.  Instead, he finds that the capacity model calculated decreased revenue projections in April/May 2019 because of a reduction in headcount.  *See* Dages Report, ¶42 and Exhibits 4 and 5.

[32] Dages Report, ¶¶48, 49, 57, and Exhibits 5 and 8.  Exhibit 8 shows that Zuora's RevPro sales representatives estimated Q1 FY 2020 bookings of $1.878 million and actually realized $1.351 million in Q1 FY 2020 bookings, for a miss of $527 thousand.  The Cross-Sales Customers comprised $291 thousand (55%) of the RevPro bookings miss.

[33] Dages Report, Exhibit 5.

downward revision in the guidance for professional services revenue was attributable to Keystone.[34]

## V.   SUMMARY OF FINDINGS AND OPINIONS

15.     Mr. Dages finds that 15% of the decrease to FY 2020 revenue guidance was for product integration issues.  Based on these findings, Mr. Dages then concludes that any estimate of the damages attributable to Zuora's alleged failure to timely disclose the Keystone Integration Issues should take into account his estimate that those issues represented only 15% of Zuora's revision to its revenue guidance on the alleged corrective disclosure date.[35]  Mr. Dages, however, does not specify how exactly any damages estimate should take into account his findings and conclusions.  Instead, Mr. Dages appears to suggest that in calculating investors' damages, no more than 15% of the adverse stock price reaction on the alleged corrective disclosure date can be attributable to the Keystone Integration Issues.

16.     However, in arriving at these findings and conclusions, Mr. Dages employs a flawed methodology.  First, in isolating his Keystone impact to only 15% of Zuora's guidance downgrade, Mr. Dages relied upon the cross-sales projected for only five Zuora customers.[36]  In doing so, Mr. Dages erroneously excludes customers that could not be added to the pipeline because of the Keystone failure and the lack of integration between Zuora's flagship products.  Mr. Dages also excludes customers interested in purchasing only RevPro or Billing, or another Zuora

---

[34] Dages Report, ¶59.

[35] Dages Report, ¶¶13, 61, 62.

[36] Dages Report, ¶¶48, 49, 57 and Exhibit 5.

11

product.[37] This exclusion is also incorrect because Zuora expected Keystone to impact new sales as well.

17.    Second, Mr. Dages' methodology lacks evidence to support his principal assumption that Keystone was of little consequence to Zuora.  For example, Mr. Dages limits his calculations to data about RevPro revenue estimates, while assuming that Keystone Integration Issues had no impact on Billing revenue estimates.[38]  However, Zuora Board of Director ("BoD") meeting materials, Zuora's May 30, 2019 press release and earnings call, and the subsequent analyst research reports identify the broader and longer-term significance of sales and cross-sales opportunities lost to Keystone.[39]

18.    Finally, Mr. Dages' conclusion that any damage calculation must account for his estimate of the percentage of Zuora's revision to its revenue guidance he attributes to the Keystone Integration Issues is flawed.  While I am not opining on issues relating to loss causation or damages beyond the scope of this report, I note that Mr. Dages arrives at his findings and conclusions by using internal Zuora documents that were not available to analysts, or to any market participant for that matter.  Moreover, Mr. Dages' suggestion that any damage estimate should focus exclusively on the numerical change to Zuora's revenue guidance for one year ignores that when revenue estimates are reduced for the current year, analysts' and market participants' expectations for Zuora for future years are impacted as well.  For example, one Zuora analyst not only reduced its FY 2020 revenue estimate, but reduced its projected revenue as far out as FY 2035 by almost

---

[37] Dages Report, ¶49.

[38] Dages Report, ¶¶ 48, 56, 57 and Exhibit 5.

[39] Zuora 00001166-192; May 30, 2019 Zuora Form 8-K, Exhibit 99.1 (press release "Zuora Reports First Quarter Fiscal 2020 Results"); May 30, 2019 Earnings Call Transcript; analyst reports listed in Appendix B.

$1 billion.[40]  Therefore, it is unclear how Mr. Dages' percentage applied to FY 2020 guidance, whether it be 15% or 85% or something else, can be properly and reliably applied in estimating damages.

### VI.    Mr. Dages uses a flawed methodology to estimate the percentage decrease to FY 2020 revenue guidance that was related to product integration issues.

19.    Mr. Dages limits the impact from Keystone to potential sales to RevPro and Billing Cross-Sales Customers only, and only those potential Cross-Sales Customers listed on a pipeline from March 2019.[41]  Mr. Dages excludes customers that could not be added to the pipeline because of Keystone, and also excludes customers interested in purchasing only RevPro or Billing, or another Zuora product, which is incorrect because Zuora expected Keystone to impact new sales also.[42]  In short, the percentage is low because he screens out all but a few of Zuora's existing customers (for upsells) and potential customers (for new sales) as of March 2019 to identify only five Cross-Sales Customers.

20.    Use of a sales pipeline from March 2019 to conclude that forecasted FY 2020 cross-sells changed very little between March and April/May 2019 is a flawed methodology.  Mr. Dages' approach naively ignores Zuora's strategic goal, since at least 2017 when Zuora acquired RevPro,

---

[40] Morgan Stanley March 22, 2019 analyst report, "4Q19 Results: Inline But Not Enough Against Heightened Expectations," p. 3; Morgan Stanley May 31, 2019 analyst report, "1Q20 Results: A Bump on the Road to Subscription Economy," p. 4.

[41] Dages Report, footnote 37.

[42] *See, for example*, ZUO_00003940-942 at 940 (April 9, 2019 email from Mr. Tzuo: "The headline here is this is a tough bookings quarter. Marc took the commit down for the quarter. The specific reason is our upsell # is coming in very light, as the issues we highlighted last quarter around Keystone (Billing◇RevPro integration) and our Orders project is hurting us – both in terms of customer satisfaction, our ability to sell RevPro, and also in taking up the time of the account team to manage through") (emphasis added); ZUO_00000474-496 at 491 ███████████████████████████████████████████████████████████████████ (emphasis added).

to integrate the two products to be able to cross-sell to all Billings customers.[43]    Robert Hildenbrand, Senior Vice President of Global Services at Zuora, testified that "the integration approach between [Billing and RevPro] generally commenced when we acquired [RevPro in May 2017] because the strategy was to integrate the two products."[44]    The intended consequence of successfully integrating Billing and RevPro was sales opportunities and revenue growth.    For example, the agenda from Zuora's BoD November 2018 meeting states (emphasis added):[45]

The "initial set of customers" did not "go live" in February 2019, and the sales representatives therefore could not "cross sell RevPro without any constraints."    Yet Mr. Dages uses a sales pipeline from March 2019 as the basis for all FY 2020 cross-sale opportunities lost to Keystone. In another example, the February 28, 2019, BoD meeting agenda states that

[46]    Yet Mr. Dages develops a methodology where "cross-sell of RevPro into our existing customer base" was inconsequential to the FY 2020 revenue forecast prepared in March 2019.

---

[43] *See, for example,* Hildenbrand Deposition, March 22, 2022, 20:13-18, 54:2-6, 80:12-24; ZUO_00000474-496 at 491

(emphasis added).    Zuora acquired revenue recognition software provider Leeyo Software Inc., in May 2017 which allowed Zuora to add into its order-to-cash product portfolio Leeyo RevPro, subsequently rebranded as Zuora RevPro (Complaint, ¶35).

[44] Hildenbrand Deposition, March 22, 2022, 20:13-18, 54:2-6. *See also* 80:12-24.

[45] ZUO_00000474-496 at 491.

[46] ZUO_00000906-933 at 906.

14

21.     Even the FY 2020 Plan spreadsheets that Mr. Dages cites, which include internal forecasts of revenue and expense by product for FY 2020, tell a different story than the one he creates.  The spreadsheets show large headcount hiring reductions for professional services from March to April/May 2019 in both the Billing and RevPro segments, signifying that the Keystone work not only impacted the five Cross-Sales Customers but Zuora's entire cross-sell initiative.[47]

| Billable Headcount Reductions from March to April/May 2019 | | | | |
|---|---|---|---|---|
| | Q1 FY 2020 | Q2 FY 2020 | Q3 FY 2020 | Q4 FY 2020 |
| Billing – March | 162 | 183 | 200 | 200 |
| Billing – April/May | 155 | 162 | 176 | 176 |
| Change | (7) | (21) | (24) | (24) |
| | | | | |
| RevPro – March | 75 | 82 | 92 | 102 |
| RevPro – April/May | 75 | 77 | 77 | 77 |
| Change | (0) | (5) | (15) | (25) |

22.     The May 22, 2019, BoD meeting agenda states that █████████

████████████████████████████████████████████

███████ [48]  The agenda went on to say, ████████████████████

████████████████████████ [49]  The "Changes" tab in the April/May 2019 Plan spreadsheet shows that, on April 30, 2019, a change to the Plan's hiring projection was made to reflect "Q2 pause & realistic Q3/Q4 hiring ramp."[50]  Simply put, the Keystone work impacting the five Cross-Sales Customers was delaying the entire cross-sell effort, and the headcount hiring reductions reflected that.  Specifically, given the intentional pause on cross-selling to customers,

---

[47] ZUO_00448805 (tab "HC Summary – Hiring"); ZUO_00448806 (tab "HC Summary – Hiring").

[48] ZUO_00001166-192 at 180.

[49] ZUO_00001166-192 at 180.

[50] ZUO_00448806 (see tab "Changes" and the "HC" tabs); Dages Report, Exhibit 4.

15

Zuora anticipated there was no need to hire as many professional services personnel to cross-sell Zuora's products as previously projected.

**VII.    Mr. Dages improperly assumes Keystone was of little consequence to Zuora.**

23.    A principal assumption underlying Mr. Dages' methodology is that Keystone was of little consequence to Zuora.  For example, Mr. Dages' calculations utilize data for only five Zuora customers at one period in time (Q1 2020).[51]  In another example, in April/May 2019 when Zuora reduced its Plan for professional services revenue by $9.2 million, Mr. Dages omits $7.2 million of that reduction from his analysis and calculations because it impacted Billing revenue instead of RevPro revenue.[52]  In other words, Mr. Dages assumes that Keystone had no impact on Billing revenue.  Mr. Dages' Exhibit 9 provides another example of his principal assumption that Keystone was of little consequence to Zuora.  Mr. Dages first notes that Zuora's estimated subscription revenue was decreased primarily because of data showing that actual bookings in Q1 FY 2020 missed forecasted bookings in Q1 FY 2020 by 23%.[53]  Then Mr. Dages seeks to calculate the Keystone portion of the bookings miss from a subset of the data about the bookings miss: specifically, only the RevPro bookings miss.[54]  In Exhibit 9, Mr. Dages displays the components of the bookings miss between RevPro and all other products.  The RevPro bookings miss was $527,000 and the remaining $3,215,000 bookings miss was attributable to Billing and all other products.  Mr. Dages only evaluates the smaller RevPro bookings miss for

---

[51] Dages Report, ¶48 (Mr. Dages sought "to determine the projected and actual RevPro subscription bookings attributable to RevPro-Billing cross-sales" by reviewing a sales pipeline for Q1 2020).

[52] Dages Report, Exhibit 5.

[53] Dages Report, ¶39.

[54] Dages Report, Exhibit 5.

an amount attributed to Keystone, ignoring the broader and longer-term significance of sales and cross-sales opportunities lost to Keystone.

24.     However, Mr. Dages lacks evidence to support his principal assumption that Keystone was of little consequence to Zuora.  Mr. Dages determines which of the changes in the FY 2020 Plan from March to April/May 2019 were due to Keystone Integration Issues by relying in part on "discussions with Zuora management"[55] after the start of this litigation, the results of which are undisclosed.  Mr. Dages does not explain and it is unclear who in Zuora management he spoke with, what questions were asked, or why these post-litigation statements would be reliable in analyzing guidance changes that happened over three years ago.

25.     Likewise, there are instances in his report where his findings are supported only by statements of "I understand…" without citing the basis for his understanding.  Following are two examples of such assumptions:

- "[T]he May 2019 FY 2020 Forecast made no change to the average billing rate for global services personnel and minimal changes to the RevPro US utilization rates…I understand that the decrease in RevPro US utilization rates for Q1 and Q2 were not the result of Keystone, but instead an effort to bring the RevPro team down to the lower utilization rate for Billing in order to avoid burnout and attrition."[56]

- "Zuora's quantification of the expected impact from the Keystone Integration Issues (i.e., Keystone Impact less Keystone Mitigation Plan)

---

[55] Dages Report, ¶55.

[56] Dages Report, ¶42 and footnote 76.

17

decreased from -$3.379 million in the March 2019 FY 2020 Forecast to -$3.1 million in the May 2019 FY 2020 Forecast (i.e., an increase of $0.279 million)…I understand Zuora intended to mitigate the loss in revenue from the Keystone Integration Issues by shifting [professional] services personnel working on the Keystone project to other billable work."[57]

26.    These examples are consistent with Mr. Dages' significant assumption that Keystone was of little consequence to Zuora, with his assumption that changes to utilization are not related to Keystone and his assumption about why the Keystone impact is not more pervasive in professional services.

27.    In addition, I explained in Section IV above that one of the steps Mr. Dages takes in arriving at his opinion that $2.1 million of the downward revision to professional services revenue was attributable to Keystone was to multiply the April/May 2019 reduction to RevPro revenue of $2,727,000 by 55% because he uses the sales pipeline to conclude that 55% of the Q1 2020 bookings miss was related to the five Cross-Sales Customers.[58]  However, his linking of the 55% reduction from the five Cross-Sales Customers on the Q1 2020 pipeline to the downward revisions in FY 2020 revenue guidance for professional services was based on an assumption about what Zuora's headcount was forecasted to work on (emphasis added):[59]

> As discussed above, in addition to the direct impact on FY 2020 revenue attributable to delays for current Keystone customers, I understand that Zuora's estimates for [professional] services revenues were driven primarily by estimates of the headcount necessary to fulfill implementation services for Zuora's pipeline of subscription bookings.  Therefore, I assume that the 55% reduction in the Q1

---

[57] Dages Report, ¶43 and footnote 79.

[58] Dages Report, ¶¶48, 49, 57, and Exhibits 5 and 8.

[59] Dages Report, ¶57.

> 2020 pipeline of subscription bookings that I estimate was attributable to the Keystone Integration issues [] resulted in a proportional reduction in the FY 2020 forecast for [professional] services revenues…

If headcount was for other services, then Mr. Dages' use of 55% is not supported.  Further, here again Mr. Dages is assuming that the Keystone impact was limited to the five Cross-Sales Customers rather than Zuora's entire cross-sell effort.

28.    Thus, Mr. Dages uses a flawed methodology based on an assumption that Keystone was of little consequnece to Zuora and similarly based on data about only five Cross-Sales Customers.  Mr. Dages' methodology is contradicted by Zuora's long-standing strategic goal of integrating Billings and RevPro to cross-sell to all Billings customers, which was underlying revenue forecasts until the alleged corrective disclosure on May 30, 2019.

## VIII.    Mr. Dages fails to explain how his estimated percentage decrease to FY 2020 revenue guidance that was related to product integration issues can be properly used to calculate damages.

29.    In his report, Mr. Dages concludes that "any estimate of the damages attributable to Zuora's alleged failure to timely disclose the Keystone Integration Issues should take into account my estimate that those issues represented only 15% of Zuora's revision to its revenue guidance on the alleged corrective disclosure date."[60]  While I am not opining on issues relating to loss causation or the calculation of damages beyond the scope of this report, Mr. Dages' conclusion that any damage calculation must account for his estimated percentage decrease to the FY 2020 revenue guidance that was related to product integration issues is based on invalid reasoning.  As a preliminary matter, neither Zuora's May 30, 2019, press release on new guidance nor the transcript from Zuora's earnings call contains an allocation of the decrease to FY 2020

---

[60] Dages Report, ¶13.

19

revenue guidance due to Keystone or any other issue.[61]  Instead, to calculate the 15% decrease to FY 2020 revenue guidance that he attributes to the product integration failure, Mr. Dages uses internal Zuora documents that were not available to market participants.  Market participants are buyers and sellers in the principal, or most advantageous, market for an asset or liability that are independent of each other, knowledgeable, and willing and able to enter into a transaction for the asset or liability.[62]  In this instance, market participants are buyers and sellers of Zuora common stock (i.e., Zuora shareholders such as Plaintiff), informed by research analysts who publish reports available to those buyers and sellers.

30.    Internal documents used by Mr. Dages include multiple versions of the FY 2020 Plan.[63]  The level of revenue and expense detail contained in the FY 2020 Plan is far greater than the level of detail contained in Zuora's investor reporting.  For example, Mr. Dages notes that the forecast for professional services revenue is generated from what Zuora refers to as a capacity model.[64]  Inputs to the capacity model include: product line, geographic location of revenue, number of net work days, billable headcount, average billing rate, and average utilization rate.  In contrast, market participants do not have access to detailed headcount data, billing rates, and utilization rates.  Instead, investors are only cautioned that "professional services revenue is

---

[61] Indeed, no research report issued by analysts covering Zuora at the time of the alleged corrective disclosure attempted to allocate the decrease in guidance between Keystone and any other issue.  When looking at future growth, however, Goldman Sachs did cite Keystone integration as the principal reason to conclude that Zuora management's estimate of "25-30% annual revenue and billings growth … appears increasingly difficult to achieve in light of limited cross-sell opportunity, …." (Goldman Sachs May 31, 2019 analyst report, "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," p. 1).

[62] Accounting Standards Codification, Master Glossary, "Market Participants."

[63] Mr. Dages uses two versions of the FY 2020 Plan, dated March 11, 2019 (ZUO_00329887-899 and ZUO_00448805) and April/May 2019 (ZUO_00448806), as well February 28, 2019 BoD guidance (ZUO_00000906-933).

[64] Dages Report, ¶30.

20

dependent on the amount of billable work actually performed for customers in a period"[65] and "our ability to record professional services revenue can potentially vary based on the number of billable days in the given quarter, which is impacted by holidays and vacations."[66]

31.    Following is a table summarizing the numerous internal Zuora documents Mr. Dages utilizes in his calculations to arrive at his 15%, compared to the documents available to market participants on or before May 30, 2019.  Notably, none of the documents available to market participants included discussion or data allocating the decrease to FY 2020 revenue guidance between Keystone or any other issue.

| Document | Is the document relied on by Mr. Dages? | Is the document available to market participants? | Does the document include discussion or data on impact of integration failure? | Does the document include discussion or data on guidance? |
|---|---|---|---|---|
| Keystone Financial Impact Analysis, 3/11/2019[67] | X | | X | X |
| BoD Meeting Agenda, 2/28/2019[68] | X | | X | X |
| FY'20 GS Plan Comparison, 5/20/2019[69] | X | | X | |

---

[65] Zuora FY 2019 Form 10-K, p. 10.

[66] Zuora FY 2019 Form 10-K, p. 28.

[67] ZUO_00329887-899 (includes information such as updates to the FY 2020 Plan, the dollar impact of Keystone to the FY 2020 Plan and to guidance, and Q1 professional services revenue expected from individual customers).

[68] ZUO_00000906-933 (includes information such as an executive summary from management, internal revenue guidance for Q1 FY 2020 and FY 2020, and detailed financial results from management including data on pipeline (creation, new business, upsell) and acquisitions (new business/upsell bookings)).

[69] ZUO_00407064-074 (includes information such as updates to the FY 2020 Plan and the dollar impact of Keystone to the FY 2020 Plan).

21

| Document | Is the document relied on by Mr. Dages? | Is the document available to market participants? | Does the document include discussion or data on impact of integration failure? | Does the document include discussion or data on guidance? |
|---|---|---|---|---|
| Guidance Excel spreadsheet[70] | X | | X | X |
| Revenue scenarios Excel spreadsheet[71] | X | | | X |
| Revisions to FY 2020 Plan, March 2019[72] | X | | X | |
| Revisions to FY 2020 Plan, April/May 2019[73] | X | | X | |
| CTTP Excel spreadsheet[74] | X | | | |
| Pipeline and closed deals Excel spreadsheet[75] | X | | | |
| RevPro and Billings customer list Excel spreadsheet[76] | X | | | |

---

[70] ZUO_00326338 (includes FY 2020 guidance as of Q4 FY 2019, Q1 FY 2020, and Q2 FY 2020, the dollar impact of Keystone to Q1 FY 2020 and FY 2020 guidance, and a sensitivity analysis).

[71] ZUO_00327212 (includes detailed bookings, churn, and net Annual Recurring Revenue ("ARR") data, four different possible scenarios for those metrics for subscription revenue, professional services revenue, and total revenue, updates to the FY 2020 Plan, and guidance data, including a note that if scenario C is chosen, "there will be a FY reduction of $3M in Sub Rev and $8M in Total Rev").

[72] ZUO_00448805 (includes, among other data, changes to the FY 2020 Plan from January-March 2020, including the dollar impact from Keystone, an expense summary, a capacity model, an Annual Contract Value ("ACV") plan, and bookings data).

[73] ZUO_00448806 (includes, among other data, changes to the FY 2020 Plan from January-April/May 2020, including the dollar impact from Keystone, an expense summary, a capacity model, an ACV plan, and bookings data).

[74] ZUO_00448803 (CTTP refers to "closest to the pin." The spreadsheet includes a CTTP reconciliation plan tracker and numerous tabs with data on closed bookings and open deals).

[75] ZUO_00448808 (includes detailed customer data on closed deals and deals in the pipeline for Q1 FY 2020).

[76] ZUO_00448809 (includes a listing of Billing and RevPro customer names).

| Document | Is the document relied on by Mr. Dages? | Is the document available to market participants? | Does the document include discussion or data on impact of integration failure? | Does the document include discussion or data on guidance? |
|---|---|---|---|---|
| Zuora email chain, August 2018, re: "Zuora for Alro"[77] | X | | | |
| Zuora email chain, May 2019, re: "Q1'20 Preliminary Results"[78] | X | | X | |
| Q1 FY 2020 Pipeline, Acquire, Expand Presentation[79] | X | | X | |
| BoD Meeting Agenda, 5/22/2019[80] | X | | X | X |
| Zuora Q4 FY 2019 Earnings Release, 3/21/2019 | X | X | | X |
| Zuora Q1 FY 2020 Earnings Release, 5/30/2019 | X | X | | X |
| Analyst Research Reports prior to 5/30/2019 | | X | | X |
| Forms 10-K and 10-Q prior to 5/30/2019 | X | X | | |
| Earnings Releases and Call Transcripts prior to 5/30/2019 | X | X | | X |

---

[77] ZUO_00448825-827 (Zuora email chain explaining that Netgear's Zuora subscription is being transferred to a company named Arlo).

[78] ZUO_00205855-859 (Zuora emails discussing Q1 FY 2020 preliminary results, including, among other data, data on bookings, churn, ARR, retention, customers, and headcount, with Mr. Tzuo summarizing that "Q1 [2020] was a complete meltdown").

[79] ZUO_00000992-1040 (includes detailed data on pipeline (growth, new business, upsell), acquire (new business), and expand (upsell and churn)).

[80] ZUO_00001166-192 (includes information such as an executive summary from management, internal revenue guidance for Q2 FY 2020 and FY 2020, and detailed financial results from management including data on pipeline (creation, new business, upsell) and acquisitions (new business/upsell bookings)).

23

32.    Market participants such as Plaintiff did not have access to the detailed information utilized by Mr. Dages, or any information at all prior to May 30, 2019, that disclosed the product integration failure and corresponding sales execution issues.  Exhibit 1, "SEC Filings," provides a summary of Zuora's SEC filings covering FY 2019 and the first quarter of FY 2020 with the revenue components disclosed in each filing.  As Exhibit 1 shows, Zuora filings disclosed total subscription revenue, total professional services revenue, and total revenue; the filings available to market participants did not provide a breakdown of changes in revenue due to the product integration failure, the corresponding sales execution issues, or similar detailed information.

33.    Mr. Dages concludes that certain changes to the FY 2020 Plan related to Keystone "based on discussions with Zuora management and review of documents and data."[81]  However, market participants did not have access to Zuora management or the information in these internal Zuora documents that Mr. Dages relies upon.  Mr. Dages does not explain and it is unclear how these post-litigation discussions with Zuora management and internal documents can be properly used in calculating damages derived from the stock price reaction of market participants after the alleged corrective disclosure.

34.    In addition, in reaching his findings and conclusions, Mr. Dages relies on numerous internal Zuora documents that have an unclear relationship to revenue guidance.  Most of the documents Mr. Dages utilizes are related to the FY 2020 Plan, but changes to the FY 2020 Plan are not equivalent to changes in guidance; for example, professional services revenue in the FY 2020 Plan declined by approximately $9 million from March to April/May 2019 whereas

_____

[81] Dages Report, ¶55 (emphasis added).

24

professional services revenue in the guidance declined by $11 million.[82]  Of the documents Mr. Dages reviewed to determine what percentage of the guidance change was due to the product integration failure, the only potentially relevant internal documents would be the five internal documents that include a discussion or data on the guidance given (identified in the table above), two of which were BoD meeting agendas.[83]  The five documents are also listed here, with a brief description of what the document contains related to revenue guidance:

- Keystone Financial Impact Analysis, 3/11/2019: The presentation included the "Keystone Impact" on the Q1 FY 2020 and FY 2020 revenue guidance discussed in the February 28, 2019, BoD meeting agenda (an estimated $1.0 million decrease to FY 2020 subscription revenue guidance and $4.5 million decrease to FY 2020 total revenue guidance).[84]

- BoD Meeting Agenda, 2/28/2019:

  [85]

- Guidance Excel spreadsheet: The spreadsheet included the same "Keystone Impact" on Q1 FY 2020 and FY 2020 revenue guidance as the Keystone

---

[82] ZUO_00448805; ZUO_00448806; March 21, 2019 Zuora Form 8-K, Exhibit 99.1 (press release "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results"); May 30, 2019 Zuora Form 8-K, Exhibit 99.1 (press release "Zuora Reports First Quarter Fiscal 2020 Results").

[83] ZUO_00329887-899; ZUO_00000906-933; ZUO_00326338; ZUO_00327212; ZUO_00001166-192.

[84] ZUO_00329887-899 at 895. Note: the Keystone Impact to guidance in the presentation is under ASC 605. The presentation then converts the guidance to ASC 606.

[85] ZUO_00000906-933 at 913. Note: the guidance presented is under ASC 605.

Financial Impact Analysis presentation (an estimated $1.0 million decrease to FY 2020 subscription revenue guidance and $4.5 million decrease to FY 2020 total revenue guidance), as well as an additional $1.5 million "other adjustment" to FY 2020 total revenue guidance.[86]

- Revenue scenarios Excel spreadsheet: The spreadsheet included Q1-Q2 FY 2020 and FY 2020 revenue guidance based on different possible scenarios for bookings, churn, and ARR.  The guidance shown, which appears to be mid-point guidance under scenario C, reports FY 2020 subscription revenue guidance of $206 million and total revenue guidance of $282 million. A note in the spreadsheet indicates that if scenario C is ultimately chosen, "there will be a FY [2020] reduction of $3M in Sub Rev and $8M in Total Rev."[87]

- BoD Meeting Agenda, 5/22/2019: ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[86] ZUO_00326338. Note: the Keystone Impact to guidance in the presentation is under ASC 605. The presentation then converts the guidance to ASC 606.

[87] ZUO_00327212 (see tabs "Whiteboard," "Sub Revenues," and "Total Revenues").



35.     Based on my review of these documents, however, nothing in the above documents contradicts the May 30, 2019, press release and earnings call, which attribute the change in guidance to the product integration failure and the corresponding sales execution issues ("Keystone Impact"). Specifically, the breakout in these documents of the topics that caused a decrease in FY 2020 revenue guidance includes the Keystone Impact and the already publicly known change in accounting standards for revenue recognition (the switch from ASC 605 to ASC 606).[89]

36.     The BoD is the governing body of a company and supervises the activities of the company to protect the interests of shareholders. The BoD at Zuora was made up of those charged with governance at Zuora: the CEO (Mr. Tzuo, Chairman of the BoD), the CFO (Mr. Sloat), and six other directors.[90] Therefore, the most relevant internal documents to review to determine why revenue guidance decreased would be those that documented the rationale and decisions made by those charged with governance, i.e., the BoD meeting agendas.[91]

---

[88] ZUO_00001166-192 at 166-167 and 172.

[89] *See* ZUO_00326338 (guidance spreadsheet, which provides a walkthrough of changes in guidance from February 28, 2019 to revised guidance. The walkthrough includes adjustments for Keystone Impact, ASC 606 Impact, and "Other Adj"), ZUO_00329887-899 at 895 (Impact on Guidance slide, which also provides the walkthrough of changes in guidance from February 28, 2019 to revised guidance, with adjustments for Keystone Impact and ASC 606 Impact), and ZUO_00000906-933 at 912-913

[90] Zuora FY 2020 Form 10-K, Signatures page.

[91]

27



[92]

[93]

37.    

Mr. Dages states: "The documents that I have reviewed are consistent with the assumption that the Keystone Integration Issues would not have affected Zuora's ability to attract new customers, or to retain or 'up-sell' product to existing customers that were interested only in its Billing or RevPro products."[94]  That assumption was important to Mr. Dages' position that documents he reviewed "indicate that the Keystone Integration Issues affected only the small subset of Zuora's customer base,"[95] an assumption precedent to his reliance on only five Cross-Sales Customers.  However, in contradiction to the product integration failure not affecting Zuora's ability to retain or "up-sell" product, [96]

[92] ZUO_00001166-192 at 166-167.

[93] ZUO_00001166-192 at 176-177.

[94] Dages Report, ¶19.

[95] Dages Report, ¶19.

[96] ZUO_00001166-192 at 174.



which undermines Mr. Dages' conclusion.

38.    Finally, even if Mr. Dages' estimations had any relevance, a percentage change to revenue guidance in one year does not alone drive significant changes to models used by research analysts following Zuora. Market participants can only rely on publicly available information, including the SEC filings discussed above, and analyst research reports to make investment decisions. Research analysts perform research on particular publicly traded companies, such as Zuora, and provide market participants with investment recommendations on the securities of those companies, such as Zuora common stock, through the research reports they publish.[97]

39.    Analyst research reports covering Zuora stock usually included the calculation of a price target ("PT"), which is an analyst's projection of a security's future price, one at which an analyst believes a stock is fairly valued. This PT largely depends on the analyst's estimated Enterprise Value ("EV") of Zuora, which is a measurement of the total value of a company. PTs are calculated by dividing EV by the number of outstanding shares. By comparing their calculated PT to Zuora's then-current price on the market, the analysts following Zuora made buy, sell, or hold recommendations.

---

[97] https://www.sec.gov/divisions/marketreg/securitiesanalysts.htm; https://www.sec.gov/tm/reportspubs/investor-publications/investorpubsanalystshtm.html.

40.     EV is most often calculated by analysts using either an earnings multiple methodology, or a discounted cash flow methodology ("DCF").  Under the earnings multiple method, EV is calculated by multiplying the base year estimated revenues by a "multiplier" derived from those of other similar public companies, adjusted to account for their perception of the specific level of risk of Zuora's future cash flows.  Under the DCF method, the EV depends on the future cash flows using projected cash flows and a growth rate, discounted back to the measurement date.

41.     Neither of these methods, which were used by analysts following Zuora, employed such a simplistic approach as adjusting only the FY 2020 projected financial results.  Instead, the analysts adjusted their calculations regarding Zuora's future cash flows by either adjusting the "multiplier" or growth rates, which had a far greater impact on their EVs and PTs than simply adjusting FY 2020 projections.

42.     A Zuora BoD presentation noted that six financial services companies were researching and reporting on Zuora during this time: Jefferies, Canaccord Genuity, FBN Securities, Morgan Stanley, Needham, and Goldman Sachs.[98]  I reviewed all research reports issued by these analysts between Zuora's IPO in 2018 and June 2019.[99]  Notably, after the alleged corrective disclosure on May 30, 2019, analysts did not allocate changes in estimated revenue due to the product integration failure, the corresponding sales execution issues, or anything else when describing their changes to estimated EV and PT.

---

[98] ZUO_00000665-748 at 690.

[99] The analyst research reports that I reviewed are listed in Appendix B.

30

43.    EVs and PTs were calculated by these analysts covering Zuora using either a revenue multiple method, a DCF method, or both.  Zuora analysts then considered these PTs for Zuora common stock in making buy/sell/hold recommendations.  While estimated revenue for FY 2020 was an input that Zuora analysts used for estimating EV and PT, it was only one input.  Other much more critical inputs included growth rates and revenue multiples, which are inputs that take into account future prospects.  As explained below, some analysts calculated PT by using a revenue multiple with FY 2021 estimated revenue as the base year revenue; the measure at the focus of Mr. Dages' analyses, FY 2020 revenue, was not even part of those analysts' formula to derive PT.

44.    For example, Needham's research reports detail how Zuora's disclosure on May 30, 2019 impacted Needham's PT on Zuora's stock.  Needham published Zuora research reports on November 30, 2018, March 20, 2019, and May 31, 2019 (among others).  In its March 20, 2019, report, Needham calculated Zuora's PT by multiplying FY 2020 estimated total revenue of $299,138,000 by a multiplier of 10.0x, plus net cash of $161 million, to arrive at an EV of approximately $3.15 billion.  Dividing this by Zuora shares outstanding produced a PT for Zuora common stock of $30.[100]  Needham explained: "Our prior target was 8.5x our FY20 revenue estimate.  We raised our multiple to reflect our expectation that revenue growth can accelerate to a long-term rate of 30%."[101]  In sum, based on its optimistic view of the Company's future revenue growth, Needham increased its estimate of Zuora's EV by changing its revenue multiple from 8.5x on November 30, 2018 to 10.0x on March 20, 2019, right before Zuora published its original FY

---

[100] Needham March 20, 2019 analyst report, "4Q Preview: Sustained Secular Trends to Power 4Q Upside."

[101] Needham March 20, 2019 analyst report, "4Q Preview: Sustained Secular Trends to Power 4Q Upside," p. 4.

31

2020 revenue guidance on March 21, 2019. Needham's increased multiple and its predicted 30% long-term growth rate was available to market participants making investment decisions.

45.     Similarly, in Needham's May 31, 2019, report, which was published the day after Zuora announced its revised FY 2020 revenue guidance due to Keystone, Needham slashed its multiplier from 10.0x to 5.5x, based on the dramatically increased risks associated with the announced product integration issues. Needham calculated Zuora's PT by multiplying its FY 2021 estimated total revenue of $313,310,000 (note Needham was no longer using FY 2020 estimated total revenue) by a reduced revenue multiple of 5.5x, plus net cash of $313 million, to arrive at an EV of approximately $2 billion. Dividing this by Zuora shares outstanding produced a PT for Zuora common stock of $18, which was a significant reduction from Needham's previous PT of $30.[102] Needham explained: "Our prior target was 10x our previous FY20 revenue estimate. We lowered the valuation multiple because of the longer time-frame and to reflect concerns regarding the sales leadership changeover."[103] In sum, Needham decreased its estimate of Zuora's PT by changing its revenue multiple from 10.0x in March 2019 to 5.5x in May 2019, after Zuora published revised FY 2020 revenue guidance. Needham did not rely on the non-public information forming the basis of Mr. Dages' opinions in arriving at its EV and PT for Zuora. Likewise, Needham's slashing of the multiplier from 10.0x to 5.5x resulted from its estimation of the risks related to Zuora's future financial results (i.e., beyond FY 2020) based upon the product integration issues.

---

[102] Needham May 31, 2019 analyst report, "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy."

[103] Needham May 31, 2019 analyst report, "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," p. 5.

32

46.     Further, Needham's May 31, 2019, research report provided no allocation or breakdown of the topics that decreased estimated FY 2020 revenue.  I reviewed multiple other Zuora analyst research reports, including from Jefferies, Morgan Stanley, Goldman Sachs and Canaccord Genuity,[104] and found that none of these other analysts provided revenue breakdowns that were any more detailed than Needham's.  See Exhibit 2, "Analyst Comparison," that compares March 21/March 22, 2019 (post-Q4 FY 2019 and FY 2019 financial results, and post-original FY 2020 revenue guidance) analyst revenue estimates for FY 2020, FY 2021 (when available), revenue multiples, EVs, and PTs to those same metrics in the analysts' first research reports on or after the alleged corrective disclosure on May 30, 2019.  Exhibit 2 demonstrates the lack of detailed breakdowns in revenue changes, as well as the significant percentage changes to revenue multiples that drove down EV and PT on or after May 30, 2019.  As Exhibit 2 shows, the percentage changes to FY 2020 revenue estimates were small compared to the material percentage changes to revenue multiples, EV, and PT; this underscores the fact that market participants understood Zuora's disclosures as having a much larger impact than one year of revenue.  Finally, Exhibit 2 shows that for analysts who used future FY 2021 revenue estimates in their calculations, those estimates declined on or after May 30, 2019, as well, which demonstrates that the change to FY 2020 guidance was only a part of, but by no means the entire explanation of, the consideration by analysts to adjust PTs and EVs.

47.     Morgan Stanley's research reports further demonstrate the irrelevance of Mr. Dages' conclusions.  These reports detail that the one-year decline in the FY 2020 revenue estimate

---

[104] FBN Securities also published Zuora analyst reports, but FBN did not disclose their formula to arrive at PT. FBN arrives at its PT using a "sum of the parts" methodology, which values Zuora by determining what its aggregate divisions would be worth if they were spun off or acquired by another company.

also impacted Morgan Stanley's FY 2021 and FY 2022 revenue estimates. Following is a table taken from Morgan Stanley's May 31, 2019, report summarizing the revenue changes between Morgan Stanley's March 22, 2019, report and its May 31, 2019, report:[105]

**Exhibit 1:** Model Changes

| ($ Millions, Except Per-Share Data) | FY17 | FY18 | FY19 | 4/19 | 7/19E | 10/19E | 1/20E | FY20E | FY21E | FY22E |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ASC 606 Update | | | | | | | | |
| New Subscription Rev | 89.8 | 122.4 | 164.9 | 47.3 | 48.9 | 52.1 | 55.9 | 204.2 | 249.5 | 305.4 |
| YoY Growth | 31.7% | 36.2% | 34.8% | 31.8% | 19.6% | 20.8% | 24.2% | 23.8% | 22.2% | 22.4% |
| Old Subscription Rev | 89.8 | 120.4 | 168.8 | 46.3 | 51.2 | 54.8 | 57.8 | 210.1 | 265.8 | 330.1 |
| YoY Growth | 31.7% | 34.0% | 40.2% | 28.3% | 23.5% | 23.2% | 23.7% | 24.5% | 26.5% | 24.2% |
| % Change | 0% | 2% | -2% | 2% | -4% | -5% | -3% | -3% | -6% | -7% |
| New Total Revenue | 113.0 | 171.0 | 235.2 | 64.1 | 66.6 | 70.1 | 74.3 | 275.1 | 329.2 | 398.6 |
| YoY Growth | 22.6% | 51.3% | 37.6% | 22.1% | 15.0% | 14.2% | 17.1% | 17.0% | 19.7% | 21.1% |
| Old Total Revenue | 113.0 | 167.9 | 235.2 | 64.0 | 71.3 | 76.2 | 79.5 | 291.0 | 363.4 | 448.3 |
| YoY Growth | 22.6% | 48.6% | 40.1% | 23.6% | 23.5% | 23.6% | 24.1% | 23.7% | 24.9% | 23.4% |
| % Change | 0% | 2% | 0.0% | 0% | -7% | -8% | -7% | -5% | -9% | -11% |

The metrics boxed in red show that Morgan Stanley reduced its FY 2020 subscription revenue and total revenue estimates by $5.9 million (3%) and $15.9 million (5%), respectively, thus lowering the year-over-year ("YoY") growth estimates. This decline caused Morgan Stanley's estimated revenue in future periods, and the resulting YoY growth estimates, to decline even further:

- Morgan Stanley reduced its FY 2021 subscription revenue and total revenue estimates by $16.3 million (6%) and $34.2 million (9%), respectively.

- Morgan Stanley reduced its FY 2022 subscription revenue and total revenue estimates by $24.7 million (7%) and $49.7 million (11%), respectively.

48.    By lowering the YoY growth estimates, the compound annual growth rate ("CAGR") used in Morgan Stanley's DCF models declined from 19% to 18%, which caused

---

[105] Morgan Stanley May 31, 2019 analyst report, "1Q20 Results: A Bump on the Road to Subscription Economy," p. 6.

Morgan Stanley's projections of revenue through FY 2035 to decline from $4.1 billion to $3.2 billion.[106] This then translates to a decline in the revenue multiple from 7.3x to 6.0x.[107] This is a clear example demonstrating how a decline in revenue guidance for one year has repercussions for estimated revenue in future periods.

49.     As another example, Goldman Sachs included a similar table in its May 31, 2019, report, where it lowered not only FY 2020 revenue estimates, but FY 2021 and FY 2022 as well:[108]

**Exhibit 2: Estimate Revisions**
$ in millions, except per share data

| $ millions | F2Q19E Old | New | Delta | FY20E Old | New | Delta | FY21E Old | New | Delta | FY22E Old | New | Delta |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subscription | $51.6 | $48.5 | -6% | $209.2 | $200.2 | -4% | $255.2 | $238.0 | -7% | $305.9 | $280.0 | -8% |
| YoY | 24% | 19% | | 24% | 21% | | 22% | 19% | | 20% | 18% | |
| Professional services | $20.0 | $18.4 | -8% | $81.0 | $74.1 | -9% | $95.4 | $80.0 | -16% | $109.2 | $86.4 | -21% |
| YoY | 23% | 8% | | 22% | 5% | | 18% | 8% | | 14% | 8% | |
| Total revenue | $71.6 | $66.9 | -7% | $290.2 | $274.3 | -5% | $350.6 | $318.0 | -9% | $415.1 | $366.4 | -12% |
| YoY | 24% | 15% | | 23% | 17% | | 21% | 16% | | 18% | 15% | |

Goldman Sachs also noted that it was lowering its "out year revenue growth assumptions in our DCF" and lowered the CAGR in its DCF models from 17% in March 2019 to 11%.[109]

50.     Thus, after the alleged corrective disclosure on May 30, 2019, analysts were not valuing Zuora exclusively on how much of the one-year FY 2020 revenue decline was attributable to the product integration failure and the corresponding sales execution issues. Analysts were

---

[106] Morgan Stanley March 22, 2019 analyst report, "4Q19 Results: Inline But Not Enough Against Heightened Expectations," p. 3; Morgan Stanley May 31, 2019 analyst report, "1Q20 Results: A Bump on the Road to Subscription Economy," p. 4.

[107] Morgan Stanley March 22, 2019 analyst report, "4Q19 Results: Inline But Not Enough Against Heightened Expectations," p. 3; Morgan Stanley May 31, 2019 analyst report, "1Q20 Results: A Bump on the Road to Subscription Economy," p. 4.

[108] Goldman Sachs May 31, 2019 analyst report, "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," p. 5.

[109] Goldman Sachs March 22, 2019 analyst report, "Solid Q but subscription revenue guidance a bit light," p. 5; Goldman Sachs May 31, 2019 analyst report, "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," pp. 1, 5.

valuing Zuora based on its long-term future prospects, and analysts' research reports were available to market participants to make investment decisions. Therefore, it is unclear how Mr. Dages' percentage applied to FY 2020 guidance, whether it be 15% or 85% or something else, can be properly and reliably applied in estimating damages.

51.    If new information should come to my attention, I may revise or update this report.


Charles R. Lundelius, Jr.                          September 16, 2022

## Curriculum Vitae



**CHARLES R. LUNDELIUS, JR.**
BERKELEY RESEARCH GROUP, LLC
1800 M Street, NW, Second Floor
Washington, DC 20036

Direct: +1 202 480 2684
clundelius@thinkbrg.com

Charles Lundelius, CPA/ABV/CFF is the Managing Director of BRG's Capital Markets Accounting Practice, specializing in regulation of and securities trading by broker-dealers, investment advisers, hedge funds, insurance companies and banks and commodities trading by futures commission merchants. He consults with and provides expert testimony on behalf of clients in the areas of:

- securities, commodity futures and investment management,
- valuation and investment banking, and
- insurance.

Specific engagements for each area are listed on the following pages.

As an expert witness over the past thirty years, Mr. Lundelius has testified in over seventy different cases.  When the United States Securities and Exchange Commission ("SEC") identified key cases it brought relating to the 2007 financial crisis, Mr. Lundelius had testified or was asked to testify in three of those matters.[1]  Also, among Mr. Lundelius' more notable consulting engagements, the SEC Inspector General asked Mr. Lundelius to lead the team investigating the SEC's failure to uncover the Madoff Ponzi scheme.

Mr. Lundelius is a Certified Public Accountant and is Accredited in Business Valuation and Certified in Financial Forensics by the American Institute of Certified Public Accountants.  In addition, while a senior officer of a Financial Industry Regulatory Authority ("FINRA") broker/dealer that served as lead underwriter for securities syndications, Mr. Lundelius held a FINRA General Securities Principal license (Series 24, 7 and 63) and was a Registered Investment Adviser.  In 1999, Mr. Lundelius was appointed by the NASDAQ Board of Directors to serve on the NASDAQ Listing Qualifications Panel, the body that reviews the listing and delisting of securities traded on The NASDAQ Stock Market.[2]  His term ended in 2006.

---

[1] SEC Enforcement Actions Addressing Misconduct That Led to or Arose From the Financial Crisis, http://www.sec.gov/spotlight/enf-actions-fc.shtml.
[2] "NASDAQ" stands for National Association of Securities Dealers Automated Quotations.



Mr. Lundelius has over 40 years of experience, including 7 years in securities and investment banking in Houston and 3 years as senior vice president and chief financial officer of a life and health reinsurance carrier in Dallas. Mr. Lundelius' securities and investment banking experience includes underwriting, portfolio management, derivatives, high-yield bond and securities and commodities market analysis. He has consulted and/or testified in the areas of the underwriting process, securities market pricing, hedge fund operations, investment suitability, securities fraud, fiduciary duties, compliance and due diligence practices. He has given testimony before administrative hearings of the SEC, in federal and state courts, at FINRA arbitrations, and before governmental hearings. Mr. Lundelius has qualified as an expert in securities trading and valuation, Investment Adviser and Investment Company Act matters, damages, financial analysis, accounting, fiduciary duties and econometrics.  Also, while working for major, international accounting firms over several years, Mr. Lundelius served as an auditor of financial institutions, including broker-dealers, banks and thrifts, in the practice of public accountancy.

In his capacity as insurance company chief financial officer ("CFO"), Mr. Lundelius' duties included managing the company's bond investment portfolio, financial forecasting, and regulatory reporting. In addition, Mr. Lundelius' firm participated in the National Association of Insurance Commissioners' pilot study that led to the implementation of risk-based capital measurement in the insurance industry. Concurrent with his service as insurance company CFO, Mr. Lundelius was also CFO of one of the largest managing general agencies in the U.S., writing in excess of $40,000,000 in new premium business annually, and served as trustee of the firm's self-directed 401k pension plan.  Mr. Lundelius also served on the board of directors of the life and health insurance company and the boards of several insurance marketing firms.  In his present role as a consultant, Mr. Lundelius has analyzed finite reinsurance issues relating to various SEC and criminal investigations.

In 2003, Mr. Lundelius authored *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*, peer-reviewed and published by the AICPA, which has been used as a textbook in academic and professional courses.  The second edition of the book was released in July, 2010.

Volunteering with not-for-profit organizations, Mr. Lundelius has served on finance and audit committees overseeing financial reporting, internal control, investment management and policy, and operational issues.  For a major Episcopal Church congregation in Washington, DC, Mr. Lundelius analyzed investment objectives and operating cash requirements to develop long-term investment policy, as well as processes to monitor performance.  For another congregation, as chair of the finance committee, Mr. Lundelius analyzed internal control, supervised the change in accounting systems, revised administrative and investment policies, and updated budgeting processes.  Currently, under appointment by the Episcopal Diocese of Washington, Mr. Lundelius now serves as the Chair of the Diocesan Audit Committee, overseeing internal control for the multi-million dollar operating budget for the diocese and its endowment funds.  Mr. Lundelius also has served on the Diocesan Finance Committee and as a seminar instructor to church treasurers on Not-For-Profit accounting and internal



control issues, and he has consulted with the diocese on audit and accounting issues relating to diocesan financial statements.  In addition, in 2021, Mr. Lundelius published a teacher's guide and classroom manual for confirmation in the Episcopal Church and an accompanying student reference book.[3]

## Securities, Commodity Futures and Investment Management Expertise

In the areas of securities and commodity futures transactions, investment management and related regulatory regimes, Mr. Lundelius has:

*Securities Transactions and Regulation*

- On behalf of the SEC's Office of Inspector General, assisted in the investigation of the failure of the SEC to uncover the Madoff Ponzi scheme.  Mr. Lundelius led a team of securities experts that interviewed SEC examinations staff and reviewed examinations work papers, policies and procedures and related documents.  His work was cited by the Inspector General throughout the IG's report of investigation,[4] and his team issued a separate report of recommendations to improve operations at the SEC Office of Compliance Inspections and Examinations.[5]  Mr. Lundelius supervised the analysis of purported trading volume on behalf of investors by comparison of trading reported by Bernard L Madoff Investment Securities LLC ("BMIS") to FINRA and NSCC,[6] as well as securities positions held at DTC,[7] and he developed findings relating to how the SEC could have detected Madoff's fictitious trades.  Mr. Lundelius and his team also developed recommendations for improvement of SEC broker-dealer and investment adviser examinations.  In his written testimony before the US Senate Committee on Banking, Housing and Urban Affairs, the Inspector General said Mr. Lundelius and his team brought specialized experience:

> … including expertise in complex financial fraud investigations, securities-related inspections and examinations, hedge fund operations, cash flow analysis and valuations, market regulation rules, market structure issues, accounting fraud,

---

[3] The teacher's guide was titled *Did Not Our Heart Burn Within Us?* and the reference was titled *Then Opened He Their Understanding*.

[4] Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, August 31, 2009, http://www.sec.gov/news/studies/2009/oig-509.pdf.

[5] Review and Analysis of OCIE Examinations of Bernard L. Madoff Investment Securities, LLC, SEC OIG Report No. 468, September 29, 2009, https://www.sec.gov/oig/reportspubs/468.pdf.

[6] "NSCC" is the National Securities Clearing Corporation, a subsidiary of the Depository Trust & Clearing Corporation ("DTCC"), which provides clearing, settlement, risk management, central counterparty services and a guarantee of completion for certain transactions for virtually all broker-to-broker trades involving equities, corporate and municipal debt, American depositary receipts, exchange-traded funds, and unit investment trusts.

[7] "DTC" is the Depositary Trust Company, another subsidiary of DTCC, which effects "book-entry" changes to ownership of the securities. DTC provides securities movements for NSCC's net settlements, and settlement for institutional trades (which typically involve money and securities transfers between custodian banks and broker/dealers), as well as money market instruments.



investment suitability, the underwriting process and compliance and due diligence practices.[8]

- With regard to investment advisers who recommended investments in Madoff funds, was qualified as an expert in investment adviser due diligence and testified in multiple arbitrations on the fiduciary duties of advisers.

- On behalf of KPMG LLP, was qualified in international arbitration as an expert in auditing standards, investment fund operations and forensic accounting.  Mr. Lundelius testified regarding the legitimate and illegitimate operations of BMIS, materiality of compliance with trading directives and the presumed findings of auditors had those auditors performed extended procedures at BMIS as a service organization during the audits of funds that invested with Madoff.  Testimony included the roles of NSCC, DTC and London Stock Exchange in securities clearance, the role of primary dealers in trading and custody of US Treasury securities, and OTC options trading in Europe.

- On behalf of PricewaterhouseCoopers Canada and PricewaterhouseCoopers Netherlands, testified regarding auditing standards under both US Generally Accepted Auditing Standards ("US GAAS") [9] and International Standards on Auditing ("ISA")[10] relating to audits of funds that invested with BMIS.  Areas of testimony included the regulatory framework for broker-dealers and investment advisers, the auditors' role related to internal control and assessing materiality under US Generally Accepted Accounting Principles ("US GAAP"),[11] materiality of compliance with trading directives, and how the Madoff fraud was perpetrated.

- On behalf of the SEC, assisted in the investigation of alleged use of odd-lot non-agency mortgage-backed securities ("MBS") by a major fixed income fund manager to increase returns on its total return Exchange-Traded Fund.  Analysis included determination of size, liquidity, quantity and trading patterns of odd-lot MBS, as well as impact of odd-lot values on fund returns during the early stages of the fund.  Analysis also included review of auditor work papers relating to valuation of financial instruments.  The fund manager settled by admitting alleged infractions.

- On behalf of Metropolitan West Securities, a unit of Wells Fargo, analyzed the operations of a broker-dealer subsidiary of a bank holding company with regard to sale of Structured Investment Vehicle (SIV-lite) Asset Backed Commercial Paper to an insurance company. Analysis included a detailed evaluation of the capital structure and vintages of the SIV-lite as

---

[8] Written Testimony of H. David Kotz, Inspector General of the Securities and Exchange Commission, Before the US Senate Committee on Banking, Housing and Urban Affairs, September 10, 2009.
[9] Generally Accepted Auditing Standards in the United States are promulgated by the Public Company Accounting Oversight Board for SEC registrants and by the Auditing Standards Board of the AICPA for non-registrants.
[10] International Standards on Auditing are issued by the International Auditing and Assurance Standards Board.
[11] "US GAAP" are the Generally Accepted Accounting Principles for the United States promulgated by the Financial Accounting Standards Board.

4



well as liquidation and wind-down procedures, evaluations by Nationally Recognized Statistical Rating Organizations, and broker due diligence procedures.  With regard to suitability, analysis included evaluations under the Exchange Act of 1934, Investment Advisers Act of 1940, Federal Reserve Board Regulation R, FINRA regulations and California Insurance Code requirements.

- On behalf of Wells Fargo & Company, testified at a FINRA arbitration regarding investment suitability, adviser fiduciary duties, and securities-backed lines of credit ("SBLOCs").  Analysis included use of margin under FRB Regulation T, SBLOCs under Regulation U and bank brokerage operations under Regulation R.  Testimony on fiduciary duties included evolution of SEC standards contained in regulations and publications from the Division of Investment Management.  Mr. Lundelius also assessed customer sophistication based on emails and text messages between the customer and the broker's registered representative.

- On behalf of regional wirehouse firms, assessed validity of short positions taken in the process of underwriting Private Investment in Public Equity Securities ("PIPEs") offerings.  Analyses included compliance with short selling rules prior to PIPEs issuance, liquidity of PIPEs markets, and valuation of related securities.

- On another PIPEs matter in which the SEC alleged inflated share prices created excess compensation for an investment manager, evaluated the impact of PIPE offerings and equity lines of credit on issuer stock price, Rule 144 considerations, and valuations of securities issued.

- Testified on behalf of a private equity fund regarding appropriateness of investments in PIPEs and equity lines of credit.

- While serving on the NASDAQ Listing Qualifications Panel, evaluated multiple financing proposals by listed firms attempting to increase capital utilizing PIPEs, equity lines of credit, and similar vehicles.

- Testified at NASD[12] enforcement proceeding regarding commissions relating to allocations of Hot IPO[13] shares brought by NASD Department of Enforcement (DOE) against Ken Langone's broker-dealer, Invemed Associates, with regard to Rule 17a-5 broker accounting and books and records requirements.  Mr. Lundelius' testimony included opinions on US GAAP, US GAAS, and SEC rules and staff accounting bulletins dealing with revenue recognition, materiality and financial statement presentation.   Mr. Lundelius also analyzed the impact of DOE's enforcement positions on aspects of the underwriting process such as commission rate

---

[12] The National Association of Securities Dealers, Inc. ("NASD") was the predecessor self-regulatory organization to FINRA.

[13] An IPO is a corporation's first offering of stock to the public. A "Hot IPO" or hot issue is one in which the stock immediately trades at a premium in the aftermarket because there is greater public demand for the stock than there are available shares.



structures and the distribution of securities to hedge funds and small investors.  NASD Panel returned a decision in favor of Mr. Langone.  In an unrelated matter, the Supreme Court of the United States cited the *Invemed* decision with regard to reasonableness of securities fees and commissions from customers who received Hot IPO allocations.[14]

- On behalf of an individual investor in a FINRA arbitration, prepared analysis of risk exposure due to portfolio concentrations in limited number of securities using margin debt.  Case was successfully settled.

- On behalf of a broker-dealer, analyzed churning claims by investor who aggressively traded in his account, with turnover in excess of 24:1, while maintaining numerous other accounts at other firms which had little turnover.  Case was successfully settled.

- On behalf of an individual investor, analyzed churning claims related to fixed income trades, including holding periods of treasury and corporate bonds, fees and markups by the broker-dealer and applicable FINRA rules.  Case was successfully settled.

- On behalf of a group of individual investors, analyzed churning claims related to fixed income trades, including holding periods of treasury and corporate bonds, fees and markups by the broker-dealer and applicable FINRA rules.  Analysis also included evaluation of "trading away claims for sale of unauthorized securities by broker representatives.

- At arbitration, testified as to propriety of closing trading windows for corporate insiders and the materiality impact on stock price, using share-trading models, had the windows remained open for an executive wishing to exercise stock options; in addition, analyzed damages using Black-Scholes, variable prepaid forward and share valuation models.

- On behalf of an executive of a major equipment supplier to the gaming industry accused of insider trading by the SEC, prepared an analysis of business plans and public disclosures, as well as published analysts' reports, to determine if inside information was public.  In addition, Mr. Lundelius analyzed market efficiency of the gambling company stock by use of an event study and other metrics, including those metrics established by his testimony in prior cases, to determine materiality.  Business plan analysis included assessment of operations and opportunities in the Las Vegas and Macau markets, the latter involving significant evaluation of Asian gambling practices and patterns.

- In federal district court in San Jose, qualified as an expert in accounting relating to the auditing and accounting for share-based payments in a stock option backdating claim brought against the former CFO of Maxim Integrated.[15]  Mr. Lundelius opined on documentation standards

---

[14] *Credit Suisse Securities (USA) LLC FKA Credit Suisse First Boston LLC, et al. v. Glen Billing, et al.,* 551 U.S. 264 (2007).

[15] The court ruled that Mr. Lundelius could not opine on "whether Maxim's granting process complied with GAAP" because he had not reviewed the testimony of two witnesses.  (*SEC v. Carl Jasper*, U.S. Dist. Ct., N.D. California, No. C 07-06122, Order Re:  Motions *in Limine*, March 31, 2010).  However, the court noted that "Mr. Lundelius does not [intend to] opine

6



under US GAAS and accounting for options under US GAAP, including valuation and materiality.  He also opined regarding duties of a CFO of a public company, how a company prepares its financial statements and how Maxim's compensation structure compared to others.

- In federal district court for the Southern District of New York, qualified as an expert in auditing standards in a criminal proceeding involving a former KPMG partner accused of obtaining advance notice of Public Company Accounting Oversight Board ("PCAOB")[16] audit inspections. Testimony included assessment of changes made to audit work papers after the report release date for audits of publicly traded banks and financial services firms and adequacy of documentation for credit loss provisions. Relevant PCAOB standards included *AS 1001 – Responsibilities and Functions of the Independent Auditor, AS 1105 – Audit Evidence, AS 1215 – Audit Documentation, AS 2201 – An Audit of Internal Control Over Financial Reporting that is Integrated with an Audit of Financial Statements, AS 2501 – Auditing Accounting Estimates, AS 2502 Auditing Fair Value Measurements and Disclosures, AS 2601 – Consideration of an Entity's Use of a Service Organization, AS 2801 – Subsequent Events, AS 2901 – Consideration of Omitted Procedures After the Report Date, AS 2905 – Subsequent Discovery of Facts Existing at the Date of the Auditor's Report,* and *AS 4101 – Responsibilities Regarding Filings Under Federal Securities Statutes*.

- Assisted New York Stock Exchange specialist firms Van Der Moolen and LaBranch with interpretation of Exchange Rules during the Exchange's investigation of specialist interpositioning and best execution violations.  Engagements included analysis of trading systems and matching alleged violations identified by the Exchange with trade records from the specialists, examining for evidence of front-running and latency of trade execution.  Scope of the engagements involved millions of trades.

- In testimony in federal district court in Florida, refuted stock manipulation charges by SEC through analysis of the stock's illiquid market and share price movements at the time the issuer and promoters made news announcements.  Mr. Lundelius discussed measures of random walk, such as Augmented Dickey Fuller tests, bid-ask spread, and stock price reaction to news entering the market.  In his opinion, Senior Judge Gonzalez cited numerous statistics from Mr. Lundelius' testimony and report.[17]

- In a similar case brought by the SEC in federal district court in Connecticut against a public company and brokers trading its stock, testified for defendants about specific alleged matched trades and market maker quotes preceding those trades.  The jury deadlocked on some counts

---

whether and how the [option granting] process was actually performed and thus it was not necessary for him to review the employees' deposition transcripts."

[16] The PCAOB issues audit standards for publicly traded companies listed on US stock exchanges.  The PCAOB also inspects auditors of those public companies as well as auditors of broker-dealers.

[17] *Securities and Exchange Commission v. David Gane, et al.*, 2005 U.S. Dist. LEXIS 607; 18 Fla. L. Weekly Fed. D 401, at 35-37.



but found for defendants on all others.  In a retrial at which Mr. Lundelius testified on quote spreads and ability to "mark the close", the jury found for the defendant stockbroker.  Testimony in both cases included market efficiency analyses as demonstrated by Augmented Dickey Fuller tests of random walk and other measures of efficiency.  Testimony in both Florida and Connecticut district courts, as well as subsequent case history, expanded the list of factors to consider when determining whether a security trades in an illiquid market.[18]

- Before International Chamber of Commerce International Court of Arbitration, testified regarding liquidity and market efficiency of Blackstone stock utilizing metrics established in previous case decisions.

- Further to stock manipulation claims relating to the 2010 Flash Crash, advised high frequency traders on issues relating to regulation, policy and economic issues.

- Consulted for defendants in a criminal action brought by the New York Attorney General against a securities broker and a promoter charged with selling fraudulent and unsuitable investments.  On separate matters brought by the Manhattan District Attorney's office and the Office of the U.S. Attorney, consulted on IPO share allocations, marking the close and no-net-sales issues relating to brokers charged with stock manipulation and "pump and dump" schemes.

*Commodity Futures Trading and Regulation*

- On behalf of the National Futures Association ("NFA"), led the investigation of the failure of NFA auditors to detect fraud at Peregrine Financial Group, Inc.  The investigation analyzed audit standards and the regulatory and operational aspects of futures commission merchants, especially United States Commodity Futures Trading Commission ("CFTC") Regulations 1.14, 1.15 for risk assessment, CFTC Regulations 1.20, 1.25 and 30.7 for segregated and secured funds and CFTC Regulation 1.17 for net capital.   The investigation also included examination of NFA and Joint Audit Committee[19] procedures and an assessment of material compliance with those procedures.  The investigation produced a report of findings[20] and a report of recommendations[21] for NFA.

- On behalf of Jon Corzine and others, testified regarding the scope of CFTC Regulation 1.16 and the role of independent accountants in protecting customer funds at MF Global, Inc., a

---

[18] A list of factors to consider to determine whether a security traded in an inefficient or illiquid market were developed in *Rose CAMMER, et al., v. Bruce M. BLOOM, et al.*, U.S.D.C. New Jersey, 711 F.Supp. 1264 (1989), also known as the "Cammer Factors".

[19] The Joint Audit Committee is a representative committee of the audit and financial surveillance departments of U.S. futures exchanges and regulatory organizations, including representatives of the NFA and other self-regulatory organizations as well as representatives of the CFTC.

[20] Report of Investigation:  Analysis of the National Futures Association's Audits of Peregrine Financial Group, Inc., http://www.nfa.futures.org/news/BRG/report_of_investigation.pdf .

[21] Recommendations Report:  Analysis of the National Futures Association's Audits of Peregrine Financial Group, Inc., http://www.nfa.futures.org/news/BRG/final_recommendations_report.pdf .



CFTC-registered futures commission merchant and a SEC-registered broker-dealer.  Analysis included application of CFTC regulations for both segregated and secured funds, and the calculation of required minimum balances for both, the availability and use of excess funds, and the interaction of FINRA rules with CFTC regulations.

- On behalf of a major investment bank, determined the compliance of a major futures commission merchant with accounting and valuation covenants in credit facilities.  Analysis included assessment of CFTC and NFA regulatory requirements, applicable US GAAP standards, and reporting requirements.  Commodities trading separate accounts and investments in commercial paper and futures positions were also assessed, as well as operations of a related global investment fund.

- Relating to a separate futures commission merchant, analyzed the corporate governance and financial reporting for offshore commodities pools, including trading operations, position management and reporting.   Mr. Lundelius consulted on third party administrator functions and duties for hedge funds, especially for foreign funds based in the Cayman Islands.

- On behalf of a futures commission merchant subject to CFTC Order, served as independent third-party reviewer, approved by the CFTC, to assess measures implemented to correct CFTC findings of inadequate supervisory procedures (Regulation 166.3) and inadequate credit and concentration risk policies and controls.  Analyses consisted of detailed examinations of position limits and credit limits and the operation of related controls.[22]

*Investment Management and Regulation*

- On behalf of the US Department of the Interior, analyzed investment practices relating to funds held in trust for Indian Nations, including adequacy of documentation, suitability of investments, and adherence to the Prudent Investor Act.  Mr. Lundelius was qualified in Federal Claims Court as an expert in prudence of trust fund investments, accounting and auditing of trusts, fiduciary duties and trust fund management.

- On behalf of The Reserve Fund, as part of settlement negotiations with the SEC, prepared a comprehensive cost allocation study to assess the profitability of the investment adviser and related distribution and management entities within the fund complex.  In an action brought by the SEC, Mr. Lundelius testified as to damages incurred when The Reserve Fund, holding three trillion dollars of assets under management, broke the buck in September, 2008, including assessment of investor earnings and asset recoveries.  In a ruling on motions in that case, Judge Gardephe stated that Mr. Lundelius was "qualified by training and experience" to offer

---

[22] In the Matter of FC Stone LLC, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, CFTC Docket No. 13-24, May 29, 2013.

9



opinions and that he considered Mr. Lundelius' report "in connection with the parties' arguments about the disgorgement remedy sought in the complaint".[23]

- On behalf of a fund manager during an SEC Wells Process, submitted an affidavit that evaluated fund returns in accordance with Global Investment Performance Standards,[24] after allocating costs to appropriate categories, including organization costs.  Analysis also involved valuation of an early-stage pharmaceutical start-up firm.

- Testified, relating to an insurance claim, regarding the operations of a broker-dealer distributor within TIAA-CREF Individual & Institutional Services, Inc., a major fund complex.  Testimony included analysis of servicing agreements and FOCUS reports, tracing fee reimbursements and accounting for proprietary gains and losses due to delayed transactions.  Specific areas reviewed included *Brokers and Dealers Investments*, ASC 940-320-35; *Risks and Uncertainties*, ASC 270-10;[25] *Auditing Accounting Estimates, Including Fair Value Accounting Estimates, and Related Disclosures*, AU-C Section 540; SEC Staff Accounting Bulletin No. 99, *Materiality*; Section 22(e), and Rules 22c-1(a) and 2a-4(a) of the Investment Company Act.

- On behalf of a pension plan, assessed the development of investment recommendations by a major registered investment adviser, including application of ERISA standards, relating to an index arbitrage strategy utilizing an unaudited intermediary.  Mr. Lundelius analyzed operational due diligence performed by the adviser as well as subsequent correspondence between the adviser and the SEC and US Department of Labor.

- At a criminal trial in US District Court, was qualified as an expert in accounting, pension plans and business valuation and testified on regulations relating to operations of registered investment advisers with regard to underwritings by affiliates and the related securities and ERISA requirements for pension fund clients, including SEC and US Department of Labor rulings.  Testimony also included assessment of internal control and financial and securities reporting requirements under both the Investment Company Act and the Investment Advisers Act of 1940.

- On behalf of a $7 billion AUM investment adviser and under order from the SEC[26] as SEC-approved Independent Consultant to examine compliance with Sections 204(a), 206(2) and 206(4) of the Investment Advisers Act of 1940 and Rules 204-2(a)(12), 206(4)-2(a) and 206(4)-(7) thereunder, reviewed:

  - Internal control over financial reporting

---

[23] Transcript of proceedings in United States District Court, Southern District of New York, before Hon. Paul G. Gardephe, March 28, 2012.

[24] Global Investment Performance Standards ("GIPS") are promulgated by the CFA Institute and are used measure and report investment portfolio performance.

[25] "ASC" refers to the Accounting Standards Codification implemented in the United States by the Financial Accounting Standards Board in 2009.  References to pre-codification financial accounting standards in this *curriculum vitae* have been updated to current ASC references.

[26] https://www.sec.gov/litigation/admin/2011/34-64442.pdf.

- Best execution, trade allocation and compliance reporting
- Investor reporting, accuracy of answers to due diligence questionnaires, and timeliness of fund audits
- Trade monitoring, risk exposure, and controls over use of inside information, cherry-picking, and front-running
- Segregation of duties and functions for related broker-dealer
- Compliance policies and procedures, including Rule 206(4)-(7) reporting

Additional work was performed to determine if there was evidence of insider trading during the period from 2006 – 2008 and to analyze the controls over insider trading.  In addition, pursuant to review of Rule 206(4)-(7), the SEC required assessment of policies and procedures for all issues listed above as well as progress reports on the implementation of remediation to any deficiencies.  Two reports were filed with the SEC's Enforcement Division in Los Angeles.  In addition, Mr. Lundelius held face-to-face meetings with compliance personnel of major brokerages whose customers invested with the investment adviser regarding the impact of the SEC Order, investment manager changes and controls improvements.

- Analyzed portfolio investments, on behalf of a pension plan, for lack of diversification under ERISA as alleged by Department of Labor, incorporating portfolio research findings on time diversification of money with Prudent Investor standards. DOL settled under favorable terms after Mr. Lundelius' presentation of findings to opposing counsel in the Office of Solicitor.

- On behalf of pension fund customer, reviewed broker/dealer due diligence procedures for real estate direct participation programs and suitability of those programs for pension fund investment, analyzing asset allocation and fund investment policies and valuing the investment interests in each real estate entity.  Case was successfully settled.

- On behalf of Fifth Third Bank, testified regarding the obligations of a private equity investment adviser when recommending investment in a premium finance lender for life settlements. Testimony included failures in due diligence with regard to internal control significant deficiencies and material weaknesses cited by auditors.  Analysis also included forensic tracing of expense and revenue frauds to those internal control deficiencies and weaknesses.

- At FINRA arbitration, testified, as an expert on corporate governance and fiduciary standards, on behalf of Charles Schwab & Co. regarding the appropriate governance structure and board fiduciary duties with respect to investment selection and monitoring by a not-for-profit entity that invested in a Ponzi scheme.

- In a separate matter on behalf of Charles Schwab & Co., testified at FINRA arbitration regarding the appropriate governance structure and board fiduciary duties with respect to investment selection and monitoring by a property and casualty insurance carrier.  Testimony included role of investment committee, investment advisers, and board oversight.

11



- On behalf of a registered investment adviser, testified at trial in California State Court on portfolio management, fiduciary duties, and damages relating to a long/short strategy fund. Jury returned a favorable verdict.

- In connection with regulatory investigations of research published by securities analysts, evaluated the discounted cash flow and working capital forecasts, including estimates of liquidity, earnings multiples and future funding needs, made by a Salomon Smith Barney analyst, working with Jack Grubman, for telecommunications securities, including equities and distressed high yield bonds, covered by SSB in connection with an NASD arbitration proceeding.

- In connection with a large accounting internal investigation, analyzed derivatives transactions and financial models of Freddie Mac, a major originator of mortgage bond structured securitizations and a primary dealer in treasury bonds utilizing one of the most comprehensive hedging operations in the financial services industry. Areas of investigation included extensive interviews of trading and accounting personnel, evaluation of accounting issues, assessment of bond trading systems, financial analysis of derivative transactions (impact on duration, convexity and swaption valuation using Black-Scholes), *ASC 320 - Investments* classification, issues relating to SEC Staff Accounting Bulletin No. 99, *Materiality,* and determination of economic rationale for transactions.  As part of this analysis, Mr. Lundelius also extensively reviewed and recomputed Value at Risk measurements incorporating findings from the internal investigation.

- Analyzed insider trading activities of Section 16 officers in class action and criminal prosecution matters, including valuation of vested and non-vested options, interaction with short-swing profit rule, tax implications, and SEC Rule 144 and other restrictions.

- On behalf of Lucent, analyzed damages alleged by seller due to decline in Lucent restricted stock received as payment for firm acquired by Lucent, including the timeliness of the process for removing restrictions under Rule 144.   Damages analysis included ability of seller to hedge by use of option, costless collar, variable prepaid forward and other strategies.

- Before International Chamber of Commerce International Court of Arbitration, testified on damages suffered due to alleged failure of Blackstone to implement sales of stock held by a former partner.  Analysis included assessment of market conditions and development of sales program models under different assumptions.

- Analyzed complex derivative transactions (including Black-Scholes and Convenience Yield analyses) intended as cash flow hedges, under ASC 815 – *Derivatives and Hedging,* for energy commitments made by major utilities with regard to an earnings restatement and an SEC investigation.   In addition, while employed by a major accounting firm, Mr. Lundelius advised auditors of an international electric power company on accounting issues.



- Analyzed auditing and disclosure of derivative transactions of Safety-Kleen, a major landfill and waste disposal firm, including assessment of accounting treatment of swaptions and other instruments.

- In administrative hearing before the SEC, designed and testified regarding econometric models to determine the impact of securities trading under various market conditions, modeling securities price valuation, event analysis, the impact of institutional investor trading and the role of transfer agents. In her opinion, SEC Administrative Law Judge Foelak referenced the modeling methodology and cited extensively from Mr. Lundelius' testimony regarding his assessment of the actions that would have been taken by an "economically rational shareholder".[27]  At the hearing, Mr. Lundelius was qualified as an expert in securities valuation and as an expert in the price behavior of securities sold into thinly traded markets.

- On behalf of several high-net worth investors, investigated alleged misuse of insurance products, SEC Rule 144 offerings and master limited partnerships by family office operations at Merrill Lynch, Morgan Stanley, and major bank trust companies.  Mr. Lundelius' engagements included the suitability of these products, including product liquidity and pricing.  Estate planning was a significant issue in each case, involving the use of grantor trusts, charitable remainder trusts and other estate planning vehicles.

- For an ultra-short mutual fund, provided opinions regarding the industry practice and regulatory framework for a mutual funds' communications with the public, and the process by which communications with the public are created, reviewed, and approved.[28]  Also, Mr. Lundelius analyzed risk-return characteristics of structured finance products in the portfolio and assessed liquidity and the impact of redemptions on net asset value ("NAV").

- On behalf of a major fund administrator, analyzed the flow of transactional data for a master-feeder fund structure into and out of the NAV package ("NAV Pak") provided to investment advisers.  The analysis included assessment of NAV Pak data used to prepare financial statements for the funds under U.S. GAAP, including accounting for redemptions under *Financial Services – Investment Companies*, ASC 946-20-25, including reclassification from equity to redemptions payable.

- On behalf of a mutual fund president, filed an affidavit based on analysis of market timing transactions, disclosure of constraints on those transactions and the impact they had on fund operations.  Analyzed fund Class A, B and C share issues, including impact on investment performance.

---

[27] *In the Matter of WHX Corporation*, Initial Decision, October 6, 2000, available through the SEC's web site at http://www.sec.gov/litigation/aljdec/id173cff.htm.
[28] *Securities and Exchange Commission v. Kimon P. Daifotis, et al.,* U.S. Dist., ND Ca., No. C 11-00137 WHA, Order Granting In Part and Denying In Part Motion to Exclude Expert Opinion of Charles R. Lundelius, June 7, 2012.



- On behalf of a major mutual fund sponsor and administrator, reviewed fee structure and operational controls, including NAV calculations and sales charges for the fund complex.

- On behalf of another mutual fund, consulted on NAV calculations relating to valuation and accounting issues.

- On behalf of UBS PaineWebber, testified at NASD arbitration regarding a novel concept of broker liability for allegedly recommending the wrong type of investment adviser for a wrap account, opining on classifications of investment styles used by fund managers.  NASD panel found in favor of UBS.

<em>Internal Control and Supervisory Procedures</em>

- On behalf of the former COO of Countrywide Financial Corporation, analyzed the internal control structure at Countrywide, including specific audit, credit and loan loss committees at both the management and board levels, and assessed compliance with the COSO[29] *Internal Control - Integrated Framework* and Auditing Standards 2 and 5.  In two separate expert reports, Mr. Lundelius analyzed the due diligence process for mortgage loan securitization at Countrywide, including extensive analysis of specific procedures performed, and tied those procedures to disclosures in offering materials.  All reports assessed whether the COO could have reasonably relied upon corporate internal control for the information received.

- On behalf of Hank Greenberg and Howie Smith relating to charges brought by the New York Attorney General, testified regarding internal control and assessed compliance with the COSO *Internal Control - Integrated Framework* at American International Group relating to reinsurance treaties and consolidation of special purpose entities.  The assessment included analysis of transfer of risk, the development of accounting guidance relating to special purpose entities ("SPEs") from 1990 – 2002, issues relating to SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99"), and review of the organizational and reporting structure at AIG.  In a separate defamation case brought by Hank Greenberg against Elliott Spitzer, analyzed the 2005 restatement of AIG financial statements from 2000 – 2004.  Analysis included extensive review of audit work papers over the entire period, assessment of internal control under Mr. Greenberg and by his successors, and evaluation of the propriety of each restatement item under SAB 99.

- On behalf of Jon Corzine and others, testified regarding internal control at MF Global Holdings, Ltd., prior to bankruptcy.  Testimony included analysis of the control environment under the COSO *Internal Control - Integrated Framework*, and the analytical work performed by

---

[29] "COSO" stands for Committee of Sponsoring Organizations of the Treadway Commission.



independent accountants, CME Group,[30] the Federal Reserve,[31] and outside consultants.  The analysis specifically looked at entity-level controls at the holding company level in detail to determine materiality of those controls to segregation of funds.

- On behalf of the SEC, testified in Administrative Hearing regarding COSO control environment, human resources and corporate governance standards relating to retention by a public company of a CFO who was subject to a bar by the Public Company Accounting Oversight Board.  Administrative Law Judge Elliot cited extensively from Mr. Lundelius' report[32] and expert testimony in his Initial Decision,[33] including Mr. Lundelius' opinion on the materiality of effectiveness of Internal Control over Financial Reporting.[34]  Subsequently, the U.S. Supreme Court ruled that SEC administrative law judges were subject to the Appointments Clause of the U.S. Constitution,[35] and that decision resulted in a new trial.  Mr. Lundelius testified in the second trial, and Administrative Law Judge Grimes quoted from Mr. Lundelius' testimony and report in his Initial Decision.[36]

- On behalf of a sales executive at a software development firm, applied the COSO *Internal Control - Integrated Framework* to determine the scope of improper revenue recognition due to a tone at the top that allowed the use of side agreements that were hidden from auditors.  The forensic analysis included determination of personnel with knowledge of the side agreements and assessment of their roles in sales, finance and accounting.  Analysis also included examination of the role of the CFO and failures to implement proper Internal Control over Financial Reporting.

- As a consultant to a major publicly traded security firm responding to inquiries from the SEC, prepared an analysis of materiality of accounting errors under SAB 99.

- On behalf of a major California-based financial institution, analyzed the operations of a broker-dealer subsidiary of a bank holding company, including supervision of the processes used by registered representatives to assess investment suitability.  Mr. Lundelius also analyzed the intersection of banking and broker-dealer regulations, particularly Federal Reserve Board Regulation R and FINRA regulations.

- On behalf of an individual customer, testified on supervisory procedures relating to registered representative/insurance salesman who misappropriated customer funds while cashing out

---

[30] CME Group Inc., the holding company and parent of the Chicago Mercantile Exchange and other exchanges, was the Designated Self-Regulatory Organization for MF Global, Inc., the futures commission merchant subsidiary of MF Global Holdings, Ltd.

[31] MF Global Holdings, Ltd., was a primary dealer for the New York Federal Reserve Bank.

[32] Available at https://www.sec.gov/litigation/apdocuments/3-16386-event-34.pdf.

[33] Initial Decision, dated Dec. 21, 2015, found at https://www.sec.gov/litigation/apdocuments/ap-3-16386.xml.

[34] In the Matter of Traci J. Anderson, CPA, Timothy W. Carnahan, and Cyios Corporation, Initial decision, December 21, 2015, p.18, available at https://www.sec.gov/alj/aljdec/2015/id930ce.pdf.

[35] *Lucia v. SEC*, 138 S. Ct. 2044 (2018).

[36] Initial Decision, dated Jan. 10, 2020, found at https://www.sec.gov/litigation/apdocuments/ap-3-16386.xml.



various insurance policies, opining on the intersection of insurance and securities regulations relating to supervision.

- On behalf of a senior vice president of a regional broker/dealer, opined at NASD arbitration on turnover calculations used to determine churning of investor accounts.

- Testified for and consulted with investor/plaintiffs at NASD arbitration regarding stock trading manipulation scheme, broker/dealer compliance and supervisory procedures, and damages to investors, including ability to trade in a thin market and the value of shares sold into that market.

- Consulted with hedge funds and prime brokers regarding accounting policies, trading controls, personnel changes, risk management and due diligence procedures. Work in this field has included detection and assessment of inappropriate investment strategies ("style drift") as well as establishing monitoring controls over short selling, margin accounts and risk exposure.


*Real Estate Investment Trusts*

- On behalf of a nine-billion-dollar hedge fund, constructed the accounting systems, procedures and policies for the initial public offering ("IPO") of a Real Estate Investment Trust ("REIT"), including internal control and valuation mechanisms.

- In a FINRA Department of Enforcement action, on behalf of a leading broker-dealer marketer of non-listed public REITs, analyzed the suitability of the REIT offerings, valuation of the REIT units transacted in tertiary markets and appropriate disclosures of REIT unit values and performance in customer account statements. Analysis included review of filings with FINRA Corporate Financing Department and analysis of communications with the public and reasonable basis suitability standards.

- On behalf of a former CFO of a publicly traded REIT, analyzed materiality of changes to non-GAAP measures published by REITs and securities analysts, as well as materiality of US GAAP restatement changes made to financial statements, under SEC Staff Accounting Bulletin No. 99, *Materiality,* subsequent to the CFO's departure. The materiality assessment included extensive analysis of analysts' reports and securities pricing models.


*Hedge Funds and Private Equity*

- Testified, on behalf of Lynn Tilton, in SEC Administrative Proceeding regarding a private equity fund structured as a Collateralized Loan Obligation. Testimony included discussion of private equity industry standards and valuation guidelines used to assess collateralized debt obligations, representing investments in distressed portfolio companies, for purposes of impairment and fair value. Analysis also included the procedures used for impairment and valuation by fund personnel and related internal control, as well as due diligence procedures employed by investors. SEC Administrative Law Judge Foelak found that Mr. Lundelius had



"extensive experience in public and forensic accounting" and qualified him as an expert in those fields.  Judge Foelak ruled in favor of Ms. Tilton.[37]

- Testified in a separate matter on behalf of Lynn Tilton in NY Supreme Court regarding claims made by Norddeutsche Landesbank Girozentrale and Hannover Funding Company LLC regarding book and tax differences in capital gains, interest recognition and financial reporting relating to Collateralized Loan Obligation holdings in portfolio companies.  The jury returned a verdict for Tilton.

- Testified, on behalf of Yorkville Advisors, regarding the SEC's alleged violations by the investment adviser of fair value accounting standards under US GAAP.  Analysis included investor due diligence procedures, internal control standards, evaluated under COSO *Internal Control – Integrated Framework* standards, in place at the investment adviser, the scope of audit tests performed under US GAAS, and requirements under both *Statement of Financial Accounting Standards No. 157* and *Fair Value Measurements*, ASC 820-10-35.  With regard to the latter, analysis also included application of US Private Equity Valuation Guidelines.  Fifteen different investment positions were at issue, including investments in manufacturing, technology, oil and gas, and other industries.  After the judge limited the testimony of the SEC's valuation expert, the SEC moved to dismiss the complaint.

- Also on behalf of Yorkville Advisors, testified in a Tax Court matter regarding the impact of Australian insolvency proceedings on value of convertible debt held by YA Global Investments.  Analysis included assessment of voluntary administration procedures, deed of company arrangements, and valuation of the fund's interest in the insolvency process.

- With regard to the debt and equity structure of a hedge fund, reviewed financial reporting and internal accounting records to determine treatment of subordinated debt of Bermuda and Cayman feeder investors.  Mr. Lundelius also assessed accounting for redemption requests, fund leverage, and materiality of financial statement disclosures, as well as the calculations of fees and profit sharing.

- Testified on behalf of Dutchess Capital Management and the private equity fund's offshore Cayman Islands feeder relating to appropriateness of investments by the master fund in ten portfolio companies and the performance of those companies during the 2008 financial crisis.  Analysis included investor due diligence and assessment of characteristics under ASC 915 - *Development Stage Entities* and PCAOB *AS 2415 –Consideration of an Entity's Ability to Continue as a Going Concern*.  Valuations were assessed under standards of the Private Equity Industry Guidelines Group and ASC 820 – *Fair Value Measurement*.

- On another private equity fund matter in which the SEC alleged inflated share prices created excess compensation for an investment manager, evaluated the impact of PIPE offerings and

---

[37] *In the Matter of Lynn Tilton, et al.*, Initial Decision, September 27, 2017, available through the SEC's web site at https://www.sec.gov/alj/aljdec/2017/id1182cff.pdf.



equity lines of credit on issuer stock price, Rule 144 considerations, and valuations of securities issued.   Analysis included assessment of illiquid markets on lines of credit and valuations, and investor due diligence.  In a related matter, Mr. Lundelius testified on behalf of the private equity fund regarding appropriateness of investments in PIPEs and equity lines of credit.

- On behalf of a major hedge fund administrator, opined on the appropriate treatment of redemption requests under US GAAP at the master and feeder fund levels, in particular, *ASC 480 - Distinguishing Liabilities from Equity*.  Mr. Lundelius assessed the role of a hedge fund administrator and its calculation of net asset values for fund investors.

- At an international arbitration, assessed fiduciary duties of GPS Partners, an investment adviser, to clients invested in proprietary hedge funds, including reporting and governance standards of Cayman Islands and Switzerland.  Issues also included portfolio management, investor due diligence and suitability of recommendations.

- On behalf of a major business development corporation (a publicly traded private equity fund), assessed SEC claims of improper valuations of early stage portfolio companies.  Analysis included assessment of bankruptcy probabilities, valuation models and financial disclosures, as well as fair value standards under US Private Equity Valuation Guidelines and US GAAP.

- On behalf of investors in private equity funds invested in special purpose entities registered in the British Virgin Islands, analyzed the investment presentations and due diligence standards for portfolios of life settlement contracts and other assets to assess breaches of fiduciary duties of the managing director and chief investment officer.

- On behalf of CIBC Oppenheimer, testified at NASD arbitration as to the impact actions taken by a hedge fund's prime broker had on portfolio performance, including analysis of margin calls and the effect of share dispositions in thinly traded markets, as well as damages calculations.

*Securities Class Actions*

- Investigated accounting issues related to the bankruptcy of Global Crossing on behalf of the Special Committee of the Board of Directors, specifically reviewing fair values and revenue recognition of asset exchanges, classification of operating vs. capital (or sales-type) leases, and impact on financial reporting and debt covenants.

- On behalf of a corporate defendant, analyzed the validity of management and analysts' forecasts and their impact on the value of stock prices for $150 million securities fraud class action suit, including analysis of accounting and sales data, revenue recognition issues, and determining when management became aware of certain information. Due to findings on accounting issues, Judge Hilton (E.D. Va.) dismissed all accounting claims prior to trial and found for defendants immediately after plaintiffs presented their case.



## Valuation and Investment Banking Expertise

As to valuation, due diligence and investment banking, Mr. Lundelius has:

### *Securities Valuations*

- On behalf of the founder of Tinder, Sean Rad, and his team members, in their suit against IAC and Match, testified as to the value of Tinder for purposes of assessing damages to plaintiffs' stock options.  The valuation involved assessment of cash flow models exceeding 200 spreadsheets, the determination of comparable firms in the high-growth, high-tech sector, and assessment of appropriate beta and discount rates.  The case settled for $441 million immediately after Mr. Lundelius testified.

- Testified, on behalf of Lynn Tilton, in SEC Administrative Proceeding regarding a private equity fund structured as a Collateralized Loan Obligation.  Testimony included discussion of private equity industry standards and valuation guidelines used to assess collateralized debt obligations, representing investments in distressed portfolio companies, for purposes of impairment under *ASC 310 – Receivables and ASC 326 Financial Instruments – Credit Losses* and fair value under *ASC 820 – Fair Value Measurement*.  Testimony also included discussion of the development of impairment and fair value standards over time, as well as the link between private equity valuation guidelines and fair value under US GAAP.

- In a separate matter on behalf of Lynn Tilton, calculated out-of-pocket damages related to alleged fraudulent misrepresentations by MBIA Inc. and MBIA Insurance Corp.  Engagement included collateral valuations and waterfall analysis at liquidation under various scenarios, as well as disclosures made by MBIA in SEC and statutory filings.  Mr. Lundelius also analyzed the ability of Patriarch to liquidate collateral portfolio companies and related timing and amount of dispositions.  The case settled soon after Mr. Lundelius' testimony.

- On behalf of the SEC, assisted in the investigation of alleged use of odd-lot non-agency mortgage-backed securities ("MBS") by a major fixed income fund manager to increase returns on its total return Exchange-Traded Fund.  Analysis included the determination of odd-lot exit prices under *ASC 820 – Fair Value Measurement,* compared to values of round lots, using Level 2 inputs from thinly traded markets.

- On behalf of Canadian Imperial Bank of Commerce, analyzed fair value accounting for MBS swaps from the perspective of the counterparties:  for CIBC, Canadian Institute of Chartered Accountants Accounting Handbook *Section 3855 Financial Instruments – Recognition and Measurement, IAS 39 Financial Instruments – Recognition and Measurement,* and *IFRS 13 Fair Value Measurement*;[38] for the counterparty, Cerberus Capital Management, *ASC 820 – Fair*

---

[38] "IFRS" are the International Financial Reporting Standards promulgated by the International Accounting Standards Board ("IASB").  IFRS consists of statements issued by the IASB and International Accounting Standards ("IAS") issued by its predecessor.



*Value Measurement*, including the role of "conservatism" in fair value. Mr. Lundelius opined on materiality of different values of synthetic notionals in the swaps and on required representations to auditors under US GAAS.

- With regard to a hedge fund investing in small capitalization stocks, assessed market liquidity of convertible securities, including assessment of investment banking functions performed by affiliates of the hedge fund manager. Mr. Lundelius also opined on valuations of securities and determined whether markets for those securities were active in accordance with *ASC 820 - Fair Value Measurement*.

- Consulted with publicly traded and privately held institutional investors on valuation of and accounting for auction-rate securities, mortgage-backed securities, credit default swaps and other alternative investment products, including analysis of market liquidity and impact of that liquidity on fair value under IFRS, US GAAP and insurance Statutory Accounting Principles.[39] Drawing upon federal district court decisions, including those cases in which Mr. Lundelius testified, Mr. Lundelius was able to establish whether the markets were active and allowed for orderly transactions.

- On behalf of a US investment adviser affiliate of a major European insurance carrier, evaluated accounting for investments and management stock options under *IAS 39 – Financial Instruments: Recognition and Measurement, IAS 40 – Investment Property,* and *IFRS 2 – Share Based Payment*. Analysis included valuation of the investment adviser and related stock options.

- On behalf of two major European insurance carriers, evaluated investment classifications under *IAS 32 – Financial Instruments Presentation, IAS 39 – Financial Instruments: Recognition and Measurement, IAS 40 – Investment Property,* and *IFRS 7 – Financial Instruments: Disclosures*. Additionally, Mr. Lundelius analyzed insurance risks under *IFRS 4 – Insurance Contracts* for reinsurance contracts and ceding agreements.

- On behalf of a major European financial institution, evaluated claims by the SEC regarding timely reporting of goodwill impairment under *IAS 36 - Impairment of Assets*. Analysis involved assessment of allocation of goodwill to cash generating units and the fair value of those units, in addition to assessment of SEC Staff Accounting Bulletin No. 99, *Materiality*. Other issues involved application of *IFRS 3 – Business Combinations, IFRS 5 – Non-current Assets Held for Sale and Discontinued Operations, IFRS 8 – Operating Segments,* and *IAS 39 – Financial Instruments: Recognition and Measurement*.

- On behalf of Hank Greenberg and Howie Smith relating to charges brought by the New York Attorney General, valued the investment made by an affiliate of American International Group in a special purpose entity. Analysis included assessment of loss development for the book of

---

[39] Statutory Accounting Principles ("SAP") are the primary authoritative statutory accounting practices and procedures promulgated by the National Association of Insurance Commissioners in the United States.



business ceded to the SPE as well as application of accounting rules for other than temporary impairment in accordance with *ASC 320-10-35 - Investments – Debt and Equity Securities.* In a separate defamation case brought by Hank Greenberg against Elliott Spitzer, analyzed the 2005 restatement of AIG financial statements from 2000 – 2004. Mr. Lundelius led a team of CPAs who performed an extensive review of audit work papers over the entire five-year period, including accounting positions taken by AIG management under Mr. Greenberg and by his successors relating to derivatives, covered calls, dollar roll transactions, hedge funds, foreign exchange and other issues, and evaluation of the propriety of each restatement item. The analysis consisted of assessments under US GAAP and Canadian GAAP and under US GAAS and International Standards on Auditing.

- Testified at FINRA hearing on damages relating to raiding of the high-yield securities trading unit of Gleacher, a publicly traded broker-dealer, including determination of value of the entire unit and value of registered representatives and other personnel using both market comparables and discounted cash flow methodologies, as well as event analysis of Gleacher stock trading before and after the raid. The FINRA Panel awarded damages to Gleacher of $17.8 million.

- On behalf of Wells Fargo Advisers ("WFA"), testified as to damages resulting from the raid of an entire branch office in Arkansas. The scope of work included valuing the branch as if it had been sold and as if it had been retained by WFA. Damages also included assessment of unjust enrichment of the respondent firm.

- Valued multi-office broker-dealers and individual branch offices of AG Edwards and Advest regarding alleged raiding of registered representatives. Valuation included alleged loss of investment advisory clients and confidential information resulting from alleged interference in broker employment agreements.

- Valued and testified regarding multiple-representative day-trading operations within E*Trade in NASD arbitration. In a separate matter, valued a day-trading unit within E*Trade relating to alleged improper contract termination. Valuation also addressed alleged loss of reputation due to the contract termination.

- Valued investment advisory unit of regional broker-dealer in alleged client theft matter. Assets valued included alleged loss of client lists, trade secrets and other confidential information resulting from alleged interference by investment managers that organized the departure of key investment advisory personnel.

- Analyzed and valued electronic bond trading systems for antitrust claim, including the role of institutional investors, dealers and brokers in the trading of fixed income investments.



BRG
Berkeley Research Group

*Securities Due Diligence*

- On behalf of Metropolitan West Securities, a unit of Wells Fargo, analyzed investment suitability of a structured investment vehicle (SIV) and related due diligence exercised by the bank's broker in a securities lending services program when investing funds deposited by stock borrowers under that program.  Investments included asset-backed commercial paper issued prior to the Financial Crisis.  Mr. Lundelius evaluated application of the Institutional Investor Exemption of FINRA Rule 2111(b) and assessed the broker's credit approval, monitoring and compliance procedures.  Further, Mr. Lundelius analyzed liquidity and damages scenarios related to residential mortgage-backed securities held by the SIV.

- On behalf of an individual investor, investigated the failure of a registered investment adviser to perform adequate due diligence relating to investments in a Ponzi scheme, including failure to register as a broker-dealer and failure to report payments from Ponzi scheme promoters.

- Consulted with hedge funds of funds regarding due diligence procedures for prospective fund managers.

- On behalf of CIBC Oppenheimer, testified at NASD arbitration on investment due diligence procedures utilized to screen and monitor hedge funds, including development of relevant NASD standards and analysis of files, personnel testimony, emails and memoranda.

- Testified in Florida State Court on investment due diligence procedures and findings relating to capital financing of a property and casualty insurance carrier, including statutory accounting financial forecasts, surplus deficiencies and regulatory constraints. Mr. Lundelius was qualified as an expert in insurance company financing and acquisition due diligence.

- As an investment banker, structured underwritings of securities offerings for Blockbuster and Precision Tune franchises, including development of accounting and cash flow forecasts, review of franchise agreements and assessments of markets to value financial interests sold to investors.

- As basis for other investment banking underwritings, valued numerous businesses and business units in the following fields: biotechnology and medical diagnostics, real estate, oil & gas, environmental remediation, wholesale and retail distribution of consumer products, office and industrial construction, automotive and motorcycle dealerships, and service firms. Investment vehicles utilized included public offerings, private placements and master limited partnerships.

- Performed due diligence investigations of direct investment programs involving real estate, oil & gas, food processing, biotechnology and medical diagnostics for a major wirehouse and other broker/dealer clients and valued restricted stock and illiquid debt and equity investments related to those programs.

22



*Other Due Diligence and Valuation Matters*

- Testified in Florida state court as an expert in post-acquisition disputes regarding alleged fraud in financial reporting of the purchase of a manufacturing division by a Tier One automotive manufacturer and supplier.  Analysis involved extensive investigation of accounting reserves (*ASC 450 – Contingencies*) for acquisitions made by the seller to allegedly hide losses as well as quantification of damages due to alleged underperformance hidden by fraudulent accounting.

- On behalf of Hewlett Packard Enterprises, testified at arbitration regarding accounting treatment (under *ASC 840 - Leases*) of thousands of leases transferred in a Reverse Morris Trust business combination.  Work involved assessment of lease quantities under various scenarios and asset/liability determinations.  In addition, consulted on enterprise value calculations made by the parties during the merger process.

- Regarding a separate Reverse Morris Trust business combination involving major government defense contractors, evaluated the revenue recognition of customer advances and progress payments for government contractors.  Analysis included tax reporting under *Rev. Proc. 2004-34, Changes in accounting periods and in methods of accounting*[40] as well as financial reporting under *ASC 912 - Contractors – Federal Government*.

- Testified in federal district court as damages expert in copyright infringement suit against publisher on issues involving marketing of copyright matter, direct mail advertising, and profitability.

- Testified in federal bankruptcy proceeding regarding the allocation of purchase price to intellectual property and goodwill for assets sold by debtor, a software developer of supply chain management systems.

- Testified in federal tax court regarding value of an interest in insolvency in an Australian mining company.  Mr. Lundelius was qualified as an expert in valuation in that matter.

- On behalf of a municipality, analyzed damages from alleged government interference in debt collection efforts by a major operator of health and fitness centers.  On behalf of a major fitness celebrity, determined damages due to alleged breach of contract by a national chain of diet centers.

- On behalf of a student loan origination firm, calculated damages due to alleged servicing failures, including debt collection operations.  On behalf of a regional bank, assessed damages due to alleged servicing failures on multiple consumer loan portfolios.  For both engagements, portfolios of student and consumer loans aggregated to more than $800,000,000.  In a separate

---

[40] Revenue Procedures are issued by the U.S. Dept. of the Treasury Internal Revenue Service to provide guidance in the implementation of income tax regulations.



matter, after the collapse of a student loan originator, analyzed liability and damages relating to securitizations with over $400,000,000 of loan pools.

- On behalf of a regional bank, assessed dealer reserve chargebacks due to loan chargeoffs for a mortgage loan originator.  Work involved evaluating minimum reserves required and performance of loans assigned to the bank.

- On behalf of Resolution Trust Corporation, documented fraudulent lending within real estate mortgage portfolio of failed thrift, analyzing failures to follow lending policies and procedures.

- On behalf of major sports stadium association, preformed due diligence and valuation of multiple hotel properties, including franchises and luxury properties.

- Valued biotechnology patent utilizing offers in restricted stock from various early-stage biotechnology firms.

- Applied Capital Asset Pricing Model to intellectual property litigation for a $60 million polyethylene process patent claim asserted by one Fortune 50 company against two other Fortune 50 companies, including regression analyses of intermediate product values, and determined the basis for an antitrust counterclaim.

- Valued semiconductor technology, including forecasts of product development life cycles and performed R&D cost analyses for patent infringement claim by a European information technology firm against a supplier to major automotive manufacturers.

- Served as expert witness on behalf of a software development firm to assess damages, determine counterclaim under software licensing agreement and value software in suit filed by a nationwide provider of multiple listing services to real estate agents.

- Testified in federal district court on behalf of multinational food processing and distribution firm regarding damages resulting from alleged breach of exclusive territory agreement with distributor.

## Insurance Expertise

When numerous investigations by US and foreign regulators focused on finite reinsurance treaties, bid rigging and other insurance issues, Mr. Lundelius was called upon to assist in the analysis of auditing issues, risk transfer, and internal control.  In the course of serving on several investigations, both in the US and in Europe, Mr. Lundelius has reviewed hundreds of reinsurance treaties in both the property and casualty and life and health segments covering workers' compensation, life, casualty and other risks worldwide.

Among his specific engagements, Mr. Lundelius:



- On behalf of Hank Greenberg and Howie Smith relating to charges brought by the New York Attorney General, testified regarding compliance with the COSO *Internal Control - Integrated Framework* at American International Group ("AIG") relating to reinsurance treaties and consolidation of special purpose entities.  The assessment included analysis of transfer of risk, including *ASC 450 – Contingencies* and *ASC 944-20-15 - Reinsurance* and *SSAP 62R - Property and Casualty Reinsurance*.[41]  Analysis also included review of loss development and disclosures in AIG affiliate property and casualty statutory filings, especially Schedule P.  In a separate defamation case brought by Hank Greenberg against Elliott Spitzer, analyzed the 2005 restatement of AIG financial statements from 2000 – 2004.  Analysis included extensive review of audit work papers over the entire period, assessment of risk transfer and other accounting positions taken by AIG management under Mr. Greenberg and by his successors, and evaluation of the propriety of each restatement item.

- On behalf of Global Bankers Insurance Group ("GBIG"), testified in New York Supreme Court regarding the bidding process for the sale of Lincoln Benefit Life Insurance Company and the representations made by GBIG relating to its bid.  Assessment included extensive forensic analysis of discussions with regulators in five states and the financial condition of GBIG carriers.  As to damages, Mr. Lundelius and his team analyzed actuarial cash flow projections used in the bidding process.  Mr. Lundelius was qualified as an expert in Statutory Accounting Principles and acquisition due diligence under the Insurance Holding Company System Regulatory Act.  In his opinion in this matter, Justice Ostrager cited Mr. Lundelius' testimony on several issues, accepted his findings on regulatory disclosure, and accepted his findings on cash flow forecasts.[42]

- On behalf of Companion Property and Casualty Insurance Company, an affiliate of Blue Cross-Blue Shield, testified regarding the operation and due diligence of fronting carriers, including reinsurance and reserve credit trusts.  Analysis also included valuation requirements of the trusts and standards required under ASC 820 – *Fair Value Measurement* and SSAP 100 - *Fair Value Measurements.*

- On behalf of Metropolitan West Securities, a unit of Wells Fargo, analyzed investment suitability of Structured Investment Vehicle (SIV-lite) Asset Backed Commercial Paper and related due diligence regarding collateral for securities loaned by California's State Compensation Insurance Fund ("SCIF").  Investments included asset-backed commercial paper issued prior to the Financial Crisis.  Evaluation included ability of SCIF to absorb losses through analysis of California Insurance Code restrictions on investments and requirements for investment approval, as well as assessment of Risk-Based Capital and other insurance reporting issues.

---

[41] An "SSAP" is a Statement of Statutory Accounting Principles for insurance companies domiciled or licensed in the United States.

[42] Decision After Trial, *GBIG Holdings, Inc., et al. v. Resolution Life L.P., et al.*, Index No. 653258/2019, May 12, 2021.

- On behalf of a major, publicly traded European insurance carrier, analyzed the claims made by an internal audit whistleblower relating to hedging and segregation of duties. Analysis included assessment of macro-hedging strategy and internal control requirements under the COSO *Internal Control - Integrated Framework* and Auditing Standard 5. In addition, Mr. Lundelius reviewed actuarial analyses, financial statements prepared under US GAAP and IFRS, and filings with US Department of Labor and the UK Prudential Regulatory Authority.

- On behalf of Lynn Tilton, analyzed the statutory filings of MBIA Insurance Corp., a monoline bond insurance carrier, and the SEC filings of its parent, MBIA, Inc.

- On behalf of a regional financial institution, testified, in Florida State Court, on investment due diligence procedures and findings relating to capital financing of a property and casualty insurance carrier that the Florida Office of Insurance claimed could have been rehabilitated. Mr. Lundelius reviewed statutory accounting financial forecasts, underwriting practices, forecast surplus deficiencies and assessed regulatory constraints. Mr. Lundelius was qualified as an expert in insurance company financing and acquisition due diligence under the Insurance Holding Company System Regulatory Act.

- On behalf of a regional accounting firm, testified, in Texas State Court, regarding auditing and accounting issues relating to a workers' compensation carrier that the Oklahoma Insurance Department claimed was insolvent. Mr. Lundelius analyzed audit work papers and programs, underwriting and case reserve practices, reinsurance and regulatory examinations. Mr. Lundelius was qualified as an expert in auditing and forensic accounting, and his testimony also covered damages as a result of deepening insolvency involving valuation of the carrier on various dates.

- Consulted with a major health insurance company licensed in all US jurisdictions regarding prompt-pay requirements under workers' compensation statutes, including detailed analysis of underwriting, claims operations and reserves. Analyses also covered financial reporting and disclosures in SEC filings and discussions with insurance regulators.

- Filed an expert report to calculate restitutionary damages for a putative class of employers that purchased a certain workers compensation insurance product from Applied Underwriters. Analysis included assessment of product components, rate filings, National Council on Compensation Insurance data, and insurance company cost of capital.

- Was retained as an expert in reinsurance and solvency issues related to the collapse of Reliance Insurance, a major workers' compensation property and casualty carrier that was the subject of a criminal investigation. As part of his work, Mr. Lundelius analyzed statutory and US GAAP financial statements and assessed issues related to auditing, internal control, accounting for reinsurance treaties and deposits, including *ASC 944-20-15 - Reinsurance* and *SSAP 62R - Property and Casualty Reinsurance*, and analyzed changes to risk-based capital.



- Has consulted on the structuring of finite reinsurance contracts and has been engaged by major US and European carriers to assess finite reinsurance arrangements, related to various SEC and regulatory investigations, involving US GAAP and Statutory Accounting Principles, foreign GAAP (Bermuda, France, Ireland, UK and Switzerland) and International Financial Reporting Standards.  His work has included conducting internal investigations of treaty negotiations with insurance brokers and counterparties, risk transfer analyses among captives and affiliates, and assessment of auditing and accounting practices and associated internal control, including *SSAP 61 - Life, Deposit-Type and Accident and Health Reinsurance* and *SSAP 62R - Property and Casualty Reinsurance*, as well as *ASC 944-20-15 -Reinsurance* and *IFRS 4 - Insurance Contracts*.

- Advised on restructuring of bank credit facilities for major reinsurer and its offshore special purpose reserve credit trusts for Regulation XXX, including review of *ASC 825 - Financial Instruments* and *SSAP 27 - Disclosure of Information about Financial Instruments* disclosures. Analysis involved assessment of subprime and other illiquid instruments and determination of market values under both GAAP and Statutory Accounting Principles.

- Advised on strategic decisions relating to runoff for a $13 billion life and health reinsurer, including assessment of regulatory restrictions imposed by US, Bermudan, Irish, British and Cayman regulators, liquidity and cash flow forecasting, and US risk-based capital requirements and related capital requirements in foreign jurisdictions.  The engagement also involved extensive analysis of special purpose vehicles, including *ASC 810-10 - Consolidation – Variable Interest Entities* and *ASC 860 - Transfers and Servicing* issues, as well as *ASC 825 - Financial Instruments* and related *SSAP 27 - Disclosure of Information about Financial Instruments*.

- With regard to life settlement acquisitions by a major insurance carrier from an industry leading originator, evaluated transfer of risk with regard to Lender Protection Insurance Coverage ("LPIC") related to premium financing.  The evaluation included analysis of LPIC claims history, *ASC 450 – Contingencies,* and related salvage and subrogation issues.

- On behalf of Fifth Third Bank, testified regarding the obligations of a private equity investment adviser when recommending investment in a premium finance lender for life settlements. Testimony included assessment of impact of alleged structural flaws in life settlement underwriting.  Analysis also included evaluation of required rates of return for life settlement investors.

- On behalf of a major property and casualty insurance carrier's US operations, consulted on bid rigging and market conduct investigations by numerous state insurance commissions.

- On behalf of Charles Schwab & Co., testified at FINRA arbitration regarding the appropriate governance structure and board fiduciary duties with respect to investment selection and monitoring by a property and casualty insurance carrier.  Analysis included assessment of interaction between the NAIC Model Investment Act and company-specific controls over



investing, role of the NAIC SVO[43] in accordance with the Purposes and Procedures Manual of the NAIC Investment Analysis Office, permissible investments and investment disclosures on Schedule D of NAIC filings, and impact of investing on profitability and surplus.

- On behalf of several carriers, testified regarding the operations of the broker-dealer distributor within a major fund complex relating to a professional liability insurance claim.  Testimony included analysis of investment and brokerage industry terms and practices relating to delayed transactions.

- With regard to sales of insurance products to wealthy families, determined suitability relative to alternative investments.

- On behalf of major health insurer, consulted on unlocking of *ASC 944-20 -Insurance Activities* reserves, including discussions with SEC staff in the Office of Chief Accountant, and advised on *ASC 825 - Financial Instruments* and *SSAP 27 - Disclosure of Information about Financial Instruments* issues.

- On behalf of a major health insurance carrier, analyzed classifications and disclosures of investments under *SSAP 27 - Disclosure of Information about Financial Instruments* and directed negotiations with NAIC SVO on re-classification of securities.

- Has conducted internal investigations of corporate officers relating to existence of reinsurance side agreements, documentation of risk transfer analyses, and violations of auditing standards and internal control.

Previously, Mr. Lundelius served as CFO of a life and health insurance carrier that reinsured books of business placed with major insurance companies.  As CFO, the scope of duties Mr. Lundelius performed included the following:

- Valuation of books of business and insurance company operating units for purposes of financial reporting and capital acquisition.

- Negotiation of reinsurance treaties and surplus debenture financing.

- Management of variable life and annuity investment products through captive sales force.

- Development of integrated financial and regulatory forecasting systems, including re-scoping of general ledger and chart of accounts.

- Management of and financial reporting for government bond investment portfolio.

- Participation in the NAIC pilot study for implementation of risk-based capital adequacy standards.

- Implementation of product line profitability reporting systems.

---

[43] "NAIC SVO" is the Securities Valuation Office of the National Association of Securities Commissioners in the United States.

28



- Design of hierarchical agent commission and debit advance systems.

- Discussions with auditors and SEC regarding applications of GAAP, including *ASC 450 – Contingencies*, *ASC 944-20 - Insurance Activities,* especially *ASC 944-20-05 - Long Duration Contracts and Reinsurance*.

- Managing the audit process, internal audit and auditor inquiries.

- Translation of actuarial data and projections into financial and regulatory formats.

- Interaction with regulators, investment bankers and commercial lenders.

- Financial management of underwriting and claims functions.


**Publications and Selected Speeches**

- "Financial Firm Spotlight – Enforcement and Regulatory Developments for Asset Managers, Broker-Dealers, Hedge Funds and More", Securities Enforcement Forum West 2020, panelist, May 12, 2020.

- "How to Respond to the SEC's Increased Focus on Valuations and Impairments", Practising Law Institute, co-presenter, June 24, 2019.

- "Hedge Fund Innovation and Regulatory Enforcement", presentation before faculty and students at the Freeman School of Business, Tulane University, October 23, 2017.

- "SEC's Non-GAAP Guidance Should Be Withdrawn", *CFO.com*, May 18, 2017.

- Panelist, *Key Issues Facing Boards of Directors:  New SEC Enforcement Initiatives and Corporate Governance Risks*, April 5, 2017.

- "SEC's Expanded Use of Administrative Proceedings:  How an Expert Can Help", *Westlaw Journal Derivatives*, Vol. 20, Issue 15, June 20, 2014.

- *IFRS Conference* sponsored by the New York State Society of Certified Public Accountants Foundation for Accounting Education, Inc., panelist, October 22, 2013.

- *"Expert Witnesses:  Dos and Don'ts of Complex Securities Enforcement Cases"*, panelist, Berkeley Research Group seminar, October, 31 2013.

- "SEC Guidance on Reg FD for Social Media Communication", *Corporate Compliance Insights*, May 29, 2013, co-authored with Karina Bjelland.

- Hedge Fund Regulation Conference, speaker, London, United Kingdom, November 22, 2010.

- "Hedge Fund Disclosure:  The Best Defense for an Industry Under Siege", by Adam Cohen with contribution from Charles Lundelius, *FTI Journal*, Spring 2010, Issue 2.

- "Keeping Track of Funds To Avoid Getting Sued and Other Nasty Things", presentation at the Treasurers Workshop sponsored by the Episcopal Diocese of Washington, December, 2008.



- "Insurers Face Repercussions of New Accounting Options", *National Underwriter Property & Casualty*, December 10, 2007, co-authored with Mark Radke and John Pruitt of Dewey & LeBoeuf, LLP.

- Presentation and panel discussion at the International Reinsurance Summit, Bermuda, June 8, 2007, on reinsurance investigations and auditing procedures involving side agreements and other issues.

- "Risk Analyses Unique to Emerging Markets," *Financier Worldwide*, March, 2007.

- "Reinsurance Accounting Issues," Presentation for Practicing Law Institute *Reinsurance Law and Practice* seminar, October 7, 2005.

- "Where to find fraud in closely held companies", *The Practicing CPA*, November 2003 [adaptation of Chapter 5 of *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*].

- "Disclosing Guesswork," *The National Law Journal*, September 8, 2003.

- "Balance sheet becomes breeding ground for fraud", Journal of Accountancy, May 2003 [adaptation of Chapter 4 of *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*].

- *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*, a book published by the American Institute of Certified Public Accountants, first edition 2003, second edition 2010.

- "Risk Management and the Audit Committee," (co-author) *The Corporate Board*, September/October 2002

- Before the American Institute of CPAs' National Conference on Fraud:

  October 31, 2002 - "CPA's Role in Securities Litigation"

  October 2, 2003 - "Forensic Accounting Case Studies"

- "Reducing the Risk of Financial Statement Fraud," Chapter 10 of *The CPA's Handbook of Fraud and Commercial Crime Prevention*, American Institute of Certified Public Accountants, March 2001.

- Presentation on financial reporting issues at the Eastern Region Fraud Conference, November 3, 2000.

- "Post Reform Act Standards for Pleading and Proving Scienter," seminar sponsored by Deloitte & Touche LLP and Kirkpatrick & Lockhart LLP, October 19, 1999.

- "How Much Is A Stock Worth?" article in *Hearsay* (published by Deloitte & Touche LLP), May 1999.



- "Beyond SAS 82: International Issues in Fraud & Forensic Accounting," before the faculty and students of the University of Virginia McIntire School of Commerce, October 21, 1998.

## Certifications

Certified Public Accountant since 1982

Accredited in Business Valuation since 2002

Certified in Financial Forensics since 2008

AICPA IFRS Certificate Program - 2015

COSO Internal Control Certificate Program - 2016

## Professional Affiliations

American Institute of Certified Public Accountants since 1983

Beta Alpha Psi Honorary Accounting Fraternity - 1978

Beta Gamma Sigma Honorary Business Fraternity - 1980

## Education

M.B.A. with a concentration in Finance, Tulane University, 1980

B.S. in Commerce with a major in Accounting, University of Virginia, 1978

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 1**

| Year | Case | Court/Agency | Case or Docket No. | Party Represented | Deposition | Trial/Hearing |
|---|---|---|---|---|---|---|
| 2022 | Wells Fargo Advisors, LLC, v. Raymond James Financial Services, Inc., *et al.* | Financial Industry Regulatory Authority | 20-02796 | Claimants | | 3 |
| 2018 and 2022 | Norddeutsche Landesbank Girozentrale and Hannover Funding Company LLC v. Lynn Tilton; Patriarch Partners, LLC; *et al.* | Supreme Court of the State of New York – New York County | 651695/2015 | Defendants | 1 | 1 |
| 2017 and 2021 | Lynn Tilton and Patriarch Partners XV, LLC, v. MBIA, Inc. and MBIA Insurance Corporation | Supreme Court of the State of New York – Westchester County | 68880/2015 | Plaintiffs | 1 | 1 |
| 2021 | Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce | Supreme Court of the State of New York – New York County | 653911/2015 | Defendant/Counterclaim-Plaintiff | 1 | |
| 2021 | Sean Rad, *et al.*, v. IAC/Interactive Corp, *et al.* | Supreme Court of the State of New York – New York County | 654038/2018 | Plaintiff/Counterclaim-Defendant | 1 | 1 |
| 2021 | Securities and Exchange Commission v. Mack and Blaney | U.S. Dist. Ct., Minnesota | 19-cv-918 | Defendant Blaney | 1 | |
| 2021 | Southland National Insurance Corporation, in rehabilitation, *et al.* v. Academy Association, Inc., *et al.* | North Carolina Superior Court | 19 CVS 013093 | Defendant | 1 | |
| 2020 | Paul C. Schorr IV and BG/BLK-1 LP v. The Blackstone Group, Inc, *et al.* | ICC International Court of Arbitration | 25390/MK/PDP | Claimants | | 1 |
| 2020 and 2021 | GBIG Holdings, Inc. v. Resolution Life L.P., *et al.* | Supreme Court of the State of New York – New York County | 650575/2019 653258/2019 | Plaintiffs/Counterclaim Defendants | 1 | 1 |
| 2020 | YA Global Investments, LP, et al. v. Commissioner of Internal Revenue | US Tax Court | 14546-15 | Petitioners | 1 | 1 |
| 2019 | Maurice R. Greenberg v. Eliot L. Spitzer | Supreme Court of the State of New York – Putnam County | 1436/2013 | Plaintiff | 1 | |
| 2015 and 2019 | In the Matter of Cyios Corporation, *et al.* | United States Securities and Exchange Commission | 3-16386 | SEC Division of Enforcement | | 2 |

Appendix A
**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 2**

| Year | Case | Court | Case No. | Role | | |
|------|------|-------|----------|------|---|---|
| 2019 | United States of America v. David Middendorf, *et al.* | U.S. Dist. Ct., S.D. New York | 18 CRIM 036 | Defendant | | 1 |
| 2019 | DXC Technology Company v. Hewlett Packard Enterprise Company | International Institute for Conflict Prevention & Resolution | | Defendant | 1 | 1 |
| 2018 | Christopher and Lori Davis v. Wells Fargo Advisers, LLC; Wells Fargo Bank, N.A.; Wells Fargo & Company | American Arbitration Association | 01-14-0001-6223 | Respondents | | 1 |
| 2017 | Companion Property and Casualty Insurance Company v. U.S. Bank National Association | U.S. Dist. Ct., South Carolina | 3:15-1300-JMC | Plaintiffs | 1 | |
| 2017 | Securities and Exchange Commission v. Yorkville Advisors, LLC, *et al.* | U.S. Dist. Ct., S.D. New York | 12 CIV 7728 | Defendants | 2 | |
| 2017 | Nina Investments, LLC, v. Fifth Third Bank, *et al.* | Circuit Court of Cook County, Illinois | 2012 L 007547 | Defendants | 1 | |
| 2016 | In the Matter of Lynn Tilton; Patriarch Partners, LLC; *et al.* | United States Securities and Exchange Commission | 3-16462 | Respondents | | 1 |
| 2016 | TIAA-CREF Individual & Institutional Services, Inc., *et al.* v. Illinois National Insurance Company, *et al.* | Delaware Superior Court (New Castle) | N14C-050178-JRJ(CCLD) | Defendants | 1 | |
| 2016 | Cannonball Fund, Ltd., *et al.*, v. Dutchess Capital Management, LLC, *et al.* | Commonwealth of Massachusetts | Civil Action No. 11-2307 | Defendants | 1 | |
| 2016 | International Fidelity Insurance Company v. Charles Schwab & Co., Inc. | Financial Industry Regulatory Authority | 14-02620 | Respondents | | 1 |
| 2015 | In re MF Global Holdings, Ltd., Investment Litigation | U.S. Dist. Ct., S.D. New York | 1:11-cv-07866 | Defendants | 1 | |
| 2015 | Gleacher & Company Securities, Inc. v. Robert W. Baird & Co. Incorporated, *et al.* | Financial Industry Regulatory Authority | 13-00608 | Claimants | | 2 |
| 2014 | [Individual] v. Jackson National Life Insurance Co. and Prudential, PLC. | U.S. Dept. of Labor | 2013-SOX-00047 | Respondents | | 1 |
| 2014 | The People of the State of New York v. Maurice R. Greenberg and Howard I. Smith | Supreme Court of the State of New York – New York County | 401720/05 | Defendants | 1 | |
| 2014 | Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, *et al.* | U.S. Dist. Ct., Massachusetts | 11-cv-10414-MRP | Respondents | 1 | |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 3**

| 2014 | Hillcrest Children's Center, *et al*. v. Charles Schwab & Co., Inc. | Financial Industry Regulatory Authority | 13-00664 | Respondents | | 1 |
|------|------|------|------|------|------|------|
| 2014 | Acument Global Technologies, Inc., *et al*. v. Towers Watson & Co., *et al*. | U.S. Dist. Ct., S.D. New York | 1:12-cv-00506-LLS | Plaintiffs | 1 | |
| 2014 | Pasha Anwar, *et al*. v. Fairfield Greenwich Limited, *et al*. | U.S. Dist. Ct., S.D. New York | 09-cv-118 | Defendants | 1 | |
| 2013 | Pine Street Associates, L.P. v. Southridge Partners, L.P., Southridge Capital Management, LLC, and Southridge Advisors, LLC | Supreme Court of the State of New York, County of New York | 652109/2010 | Respondents | 1 | |
| 2013 | Eastham Capital Appreciation Fund LP, et al., v. KPMG LLP | International Institute for Conflict Prevention & Resolution | | Respondents | | 1 |
| 2013 | Texas A&M Foundation v. Strategic Investment Management, L.P. and Strategic Investment Partners, Inc. | American Arbitration Association | 16 148 Y 00396 10 | Claimants | | 1 |
| 2013 | Anders and Elizabeth Hejlsberg, derivatively on behalf of Cornerstone Alternative Fixed Income Fund, L.P., as a Limited Partner, v. Cornerstone Portfolio GP, LLC, Keith J. Schafer, Robert Trenner, Kenneth Hart and Cornerstone Advisors, Inc. | American Arbitration Association | 75-512-Y-000062-12 JMLE | Claimants | 1 | |
| 2012 | Securities and Exchange Commission v. Southridge Capital Management LLC, Southridge Advisors LLC, and Stephen M. Hicks | U.S. Dist. Ct., Connecticut | 3:10-cv-01685 | Defendants | 1 | |
| 2012 | Securities and Exchange Commission v. Kimon P. Daifotis and Randall Merk | U.S. Dist. Ct., N.D. California | CV-11-cv-137 | Defendants | 1 | |
| 2012 | State Compensation Insurance Fund v. Metropolitan West Securities LLC; Wachovia Bank, N.A.; *et al.* | U.S. Dist. Ct., N.D. California | CV 09 2959 JSW (EDL) | Defendants | 1 | |
| 2011 | Securities and Exchange Commission v. Lisa C. Berry | U.S. Dist. Ct., N.D. California | C-07-04431 RMW | Defendant | 1 | |
| 2011 | Securities and Exchange Commission v. R. Brooke Dunn and Nicholas P. Howey | U.S. Dist. Ct., Nevada | 2:09-CV-02213-PMP-LRL | Defendant | 1 | |
| 2011 | Securities and Exchange Commission v. Reserve Management Company, Inc., Resrv Partners, Inc., Bruce R. Bent, Sr. and Bruce R. Bent II | U.S. Dist. Ct., S.D. New York | 09 Civ. 4346 (PGG) | Defendants | 1 | |
| 2011 | Hampton Investments, Ltd.; Oakdale Investments, Ltd.; Seacliff Investments, Ltd.; and Stephen Finlay v. GPS | American Arbitration Association | 50512 T 00097 10 | Defendants | | 1 |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 4**

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | Partners, LLC; GPS New Equity Fund (Cayman), Ltd.; and GPS Income Fund (Cayman), Ltd. |  |  |  |  |  |
| 2010 | Elliot Horowitz v. Gardner Lewis Asset Management | California Superior Court for the County of Los Angeles | BC406551 | Defendants | 1 | 1 |
| 2009 - 10 | Securities and Exchange Commission v. Carl W. Jasper | U.S. Dist. Ct., N.D. California | CV 07-6122 | Defendant | 1 | 1 |
| 2008 | Charles O. Bradley Trust, et al., v. Zenith Capital, LLC, *et al.* | U.S. Dist. Ct., N.D. California | C 04 2239 JSW (EMC) | Plaintiffs | 1 |  |
| 2008 | Kim Holland, Insurance Commissioner of the State of Oklahoma, as Receiver of Petrosurance Casualty Company, v. Murrell, Hall, McIntosh & Co., PLLP, *et al.* | District Court – 44th Judicial District, Dallas County, Texas | 04-01687-B | Defendants | 3 | 1 |
| 2006 | Steven Maass v. E*Trade Professional Trading, LLC, *et al.* | Financial Industry Regulatory Authority | 03-01763 | Respondents |  | 1 |
| 2006 - 8 | Securities and Exchange Commission v. Competitive Technologies, Inc., *et al.* | U.S. Dist. Ct., Connecticut | 3:04-cv-1331-JCH | Defendants | 1 | 2 |
| 2005 - 6 | The Osage Nation and/or Tribe of Indians of Oklahoma v. The United States of America | Federal Claims Ct. | 99-550 & 00-169 L | Defendant | 1 | 1 |
| 2005 - 6 | Breed Technologies, Inc. v. AlliedSignal, Inc. | FL Cir. Ct., 10th Dist. | G-99-2478 | Plaintiff | 3 | 2 |
| 2005 | In re: Galaxy Computer Services, Inc. | U.S. Dist. Ct., E.D. Va. | CA 1:2004CV1036 | Plaintiff |  | 1 |
| 2005 | National Association of Securities Dealers Department of Enforcement v. Invemed Associates, LLC | Financial Industry Regulatory Authority | Disciplinary Proceeding No. 030014 | Respondent |  | 1 |
| 2005 | Jo Ann Oster, et al. v. CIBC World Markets Corp., *et al.* | Financial Industry Regulatory Authority | 03-07585 | Respondents |  | 1 |
| 2004 | National Rural Electric Cooperative Association, et al. v. Breen Capital Services Corporation, *et al.* | U.S. Dist. Ct., New Jersey | 2:00cv00722 | Plaintiffs | 1 |  |
| 2004 | United States of America v. Nathan A. Chapman, Jr. | U.S. Dist. Ct., Maryland | WDQ-03-0301 | Defendant |  | 1 |
| 2004 | Securities and Exchange Commission v. David Gane, *et al.* | U.S. Dist. Ct., S.D. Florida | 03-61553-CIV-Seitz/Bandstra | Defendants | 1 | 1 |
| 2004 | Mountain States Mutual Casualty Company v. UBS PaineWebber, Inc. | Financial Industry Regulatory Authority | 02-05813 | Respondent |  | 1 |
| 2003 | Hermann Holdings, Ltd., et al. v. Lucent Technologies | U.S. Dist. Ct., N.D. | 3:01-CV-0625-G | Defendant | 1 |  |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Inc. | Texas | | | | |
| 2003 | In re:  The Receivership of Dealers Insurance Company | Second Judicial Circuit Court, Leon County, Fl. | 94-4009-A | Defendant | 1 | 1 |
| 2002 | In re:  SpaceWorks, Inc. | U.S. Bankruptcy Court, Md. | 01-17875-PM | Unsecured Creditors | 1 | 1 |
| 2001 | InterVest Financial Services, Inc. v. Bear Stearns Co., Inc., *et al.* | U.S. Dist. Ct., E.D. Pa. | 99-CV-5463 | Defendants | 1 | |
| 2001 | Carabetta v. Novadigm, Inc., *et al.* | American Arbitration Association | 74 160 01455 00 AD1 | Plaintiff | 1 | 1 |
| 2000 | Bennett v. Wheat First Union, *et al.* | Financial Industry Regulatory Authority | 99-02219 | Claimant | | 1 |
| 1999 | Helman v. Mendelson, *et al.* | Circuit Court of Maryland for Montgomery County | CA 195927 cons 195925 | Plaintiff | 1 | |
| 1999 | In the Matter of WHX Corporation | United States Securities and Exchange Commission | 3-9634 | Respondent | | 1 |
| 1999 | American Federal Savings Bank v. Harry L. Leavy | Circuit Court of Maryland for Montgomery County | 167641–V | Plaintiff | | 1 |
| 1998 | Berliner Specialty Distributors v. Conopco a/k/a Good Humor-Breyers Ice Cream | U.S. Dist. Ct., E.D. Va. | 98-143-A | Defendant | 1 | 1 |
| 1998 | Associated Financial Group v. Chevy Chase Bank | U.S. Dist. Ct., E.D. Va. | 2:97 CV 985 | Defendant | 1 | |
| 1997 | White v. Cahoon and Anchor National, *et al.* | U.S. Dist. Ct., N.D. Miss. | 4:95 CV 374-B-B | Plaintiff | 1 | |
| 1997 | Powter v. Nutri/System L.P. *et al.* | U.S. Bktcy. Ct., C.D. Cal. | LA 95-10009-SB | Plaintiff | 1 | |
| 1997 | Weiner, *et al.* v. Dickinson & Co., *et al.* | Financial Industry Regulatory Authority | 95-04047 | Claimants | | 1 |
| 1996 | Robinson v. R&R Publishing, Inc. | U.S. Dist. Ct., D.C. | 95-CA-00833 | Plaintiff/ Cross-Defendant | | 1 |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 6**

| 1996 | Frank W. Griswold, III, *et al*. v. The United States of America | U.S. Dist. Ct., M.D. Fla. | 93-565-CIV-T-23A | Defendant | 1 | |
| 1995-1996 | In the Matter of Lend Lease Trucks, Inc. | Pennsylvania Department of Revenue and Board of Finance and Revenue | 421919 MCRT | Petitioner | 1 | 1 |
| 1995 | Simos v. Metzger Construction Co. and Sub-Zero Freezer Co. | 125th Judicial Dist. Ct. of Harris Co., Tex. | 91-016216 | Plaintiff | | 1 |
| 1994 | Forman Brothers, *et al.,* v. The Law Firm of Graham & James, *et al.* | Superior Ct. for the District of Columbia | CA 92-7919 | Defendants | 1 | |
| 1994 | Stoneman v. Stoneman | Henrico Co., Va. Cir. Ct. | CH-91- 001234 | Plaintiff | 1 | * |
| 1994 | Ace Sign v. Southwestern Bell Yellow Pages, Inc. | 58th Judicial Dist. Ct., Jefferson Co., Tex. | A-137,152 | Defendant | 1 | |
| 1993 | UST Services, Inc., v. Southwestern Bell Yellow Pages, Inc. | 234th Judicial Dist. Ct., Harris Co., Tex. | 91-055806 | Defendant | 1 | |
| 1992-1994 | Tele-A-Call Answering Service v. Southwestern Bell Yellow Pages, Inc. | 122nd Judicial Dist. Ct., Galveston Co. Tex. | 90CV0917 | Defendant | 1 | 1 |

* Deposition testimony entered at trial.

**Appendix B: Materials Considered**

**Bates-Numbered Documents**

- BoD Materials
    - ZUO_00000474-496
    - ZUO_00000512-517
    - ZUO_00000906-933
    - ZUO_00000941-946
    - ZUO_00001166-192
    - ZUO_00001208-213
    - ZUO_00001230-248
    - ZUO_00001282-310
    - ZUO_00002740-792
    - ZUO_00447327-397
    - ZUO_00447597-628
- Other Documents
    - ZUO_00000192-226
    - ZUO_00000665-748
    - ZUO_00000749-802
    - ZUO_00000803-853
    - ZUO_00000854-905
    - ZUO_00000992-1040
    - ZUO_00002195-200
    - ZUO_00002381-383
    - ZUO_00002424-429
    - ZUO_00002600-603
    - ZUO_00003083-092
    - ZUO_00003598-602
    - ZUO_00003803-804
    - ZUO_00003940-942
    - ZUO_00004218-222
    - ZUO_00004603-611
    - ZUO_00004784-790
    - ZUO_00004837-839
    - ZUO_00024539-573
    - ZUO_00044914-915
    - ZUO_00116115-117
    - ZUO_00117568-572
    - ZUO_00117646-647
    - ZUO_00119066-067
    - ZUO_00119879
    - ZUO_00120450-451
    - ZUO_00121424
    - ZUO_00123750-752

1

**Appendix B: Materials Considered**

- ZUO_00123831-838
- ZUO_00175506-508
- ZUO_00177352
- ZUO_00190949-951
- ZUO_00205855-859
- ZUO_00214503-505
- ZUO_00249589-591
- ZUO_00268033-035
- ZUO_00268127-135
- ZUO_00268172-178
- ZUO_00270902
- ZUO_00274106-108
- ZUO_00274711-714
- ZUO_00302598-599
- ZUO_00303088
- ZUO_00326338
- ZUO_00327212
- ZUO_00329160-161
- ZUO_00329887-899
- ZUO_00334341-353
- ZUO_00335717-737
- ZUO_00354485-554
- ZUO_00403093-195
- ZUO_00407064-074
- ZUO_00422115-170
- ZUO_00448803
- ZUO_00448804
- ZUO_00448805
- ZUO_00448806
- ZUO_00448807
- ZUO_00448808
- ZUO_00448809
- ZUO_00448810
- ZUO_00448811-822
- ZUO_00448823-824
- ZUO_00448825-827
- ZUO_V_000033
- ZUO_V_000036
- ZUO_V_000045
- ZUO_V_000048
- ZUO_V_000061
- ZUO_V_000067

2

**Appendix B: Materials Considered**

**Deposition Transcripts**

- Marc Diouane Deposition Transcript, May 5, 2022, and Exhibits
- Robert Hildenbrand Deposition Transcript, March 22, 2022, and Exhibits
- Karthik Ramamoorthy Deposition Transcript, March 24, 2022, and Exhibits
- Tyler Sloat Deposition Transcript, April 22, 2022, and Exhibits
- Tien Tzuo Deposition Transcript, April 27, 2022, and Exhibits

**Case Documents**

- *In the matter between Casey Roberts, Individually and On Behalf Of All Other Similarly Situated, v. Zuora, Inc., Tien Tzuo, and Tyler Sloat, Case No. 3:19-cv-03422-SI, United States District Court, Northern District of California*
    - Consolidated Amended Class Action Complaint, filed November 8, 2019
    - Expert Report of Tavy Ronen, Ph.D., August 5, 2022
    - Expert Report of Kevin Dages (and native excel exhibits), August 5, 2022

**Analyst Research Reports**

- Canaccord Genuity
    - May 7, 2018
    - June 1, 2018
    - June 5, 2018
    - August 30, 2018
    - November 29, 2018
    - March 18, 2019
    - March 21, 2019
    - April 2, 2019
    - May 30, 2019
    - June 6, 2019
    - August 28, 2019
    - December 5, 2019
- Jefferies
    - May 7, 2018
    - May 31, 2018
    - June 1, 2018
    - July 11, 2018
    - August 30, 2018
    - August 31, 2018
    - November 29, 2018
    - November 30, 2018

3

**Appendix B: Materials Considered**

- March 21, 2019
- March 22, 2019
- April 16, 2019
- May 30, 2019
- May 31, 2019
- Morgan Stanley
  - May 7, 2018
  - June 1, 2018
  - June 7, 2018
  - August 31, 2018
  - October 12, 2018
  - November 30, 2018
  - December 18, 2018
  - March 18, 2019
  - March 22, 2019
  - May 31, 2019
- Needham
  - November 30, 2018
  - December 20, 2018
  - January 15, 2019
  - March 20, 2019
  - April 24, 2019
  - May 31, 2019
  - June 6, 2019
  - August 29, 2019
  - December 6, 2019
  - March 13, 2020
  - May 28, 2020
  - June 4, 2020
  - September 3, 2020
  - December 4, 2020
  - March 12, 2021
- FBN Securities
  - October 16, 2018
  - November 30, 2018
  - March 22, 2019
  - May 31, 2019
  - August 29, 2019
  - December 9, 2019
- Goldman Sachs
  - May 6, 2018
  - May 31, 2018
  - August 29, 2018

4

**Appendix B: Materials Considered**

- o  August 30, 2018
- o  February 13, 2019
- o  March 22, 2019
- o  May 31, 2019
- o  June 5, 2019
- o  August 29, 2019
- o  December 6, 2019

**Public Filings**

- All Zuora public filings, including:
  - o  FY 2019 – FY 2022 Form 10-Ks
  - o  Q1 FY 2019 – Q1 FY 2023 Form 10-Qs
  - o  Form S-1, filed on April 10, 2018
  - o  Form 8-Ks and Press Releases, including:
    - ▪ "Zuora Announces Pricing of Initial Public Offering," April 11, 2018
    - ▪ "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results," March 21, 2019
    - ▪ "Zuora Reports First Quarter Fiscal 2020 Results," May 30, 2019
    - ▪ "Zuora Reports Second Quarter Fiscal 2020 Results," August 28, 2019
    - ▪ "Zuora Reports Third Quarter Fiscal 2020 Results," December 5, 2019
    - ▪ "Zuora Reports Fourth Quarter and Full Year Fiscal 2020 Results," March 12, 2020
  - o  Earnings Call transcripts, including:
    - ▪ May 31, 2018
    - ▪ August 30, 2018
    - ▪ November 29, 2018
    - ▪ March 21, 2019
    - ▪ May 30, 2019
    - ▪ August 28, 2019
    - ▪ December 5, 2019

**Other Materials**

- https://www.sec.gov/education/smallbusiness/goingpublic/exchangeactreporting
- https://www.sec.gov/corpfin/answers/8-k_how_to_read
- https://www.sec.gov/divisions/marketreg/securitiesanalysts.htm
- https://www.sec.gov/tm/reportspubs/investor-publications/investorpubsanalystshtm.html
- Bloomberg
- Accounting Standards Codification

All other materials cited in the report.

5

**Exhibit 1: SEC Filings**

| Zuora's FY 2019-2020 Revenue (*in thousands*) | | | | | | |
|---|---|---|---|---|---|---|
| | Subscription | | Professional Services | | Total | |
| | Quarterly | YTD | Quarterly | YTD [8] | Quarterly | YTD |
| **Q1 FY 2019 (4/30/2018) [1]** | $ 35,889 | $ 35,889 | $ 16,559 | $ 16,559 | $ 52,448 | $ 52,448 |
| **Q2 FY 2019 (7/31/2018) [2]** | 40,877 | 76,766 | 16,970 | 33,529 | 57,847 | 110,295 |
| **Q3 FY 2019 (10/31/2018) [3]** | 43,083 | 119,849 | 18,273 | 51,802 | 61,356 | 171,651 |
| **Q4 FY 2019 (1/31/2019) [4]** | 44,956 | 164,805 | 18,382 | 70,184 | 63,338 | 234,989 |
| **Q1 FY 2020 (4/30/2019) [5]** | 47,311 | 47,311 | 16,798 | 16,798 | 64,109 | 64,109 |
| **FY 2020 guidance (3/21/2019) [6]** | | 209,000 - 211,500 | | 80,000 - 82,000 | | 289,000 - 293,500 |
| **FY 2020 guidance (5/30/2019) [7]** | | 200,000 - 206,000 | | 68,000 - 72,000 | | 268,000 - 278,000 |

[1] Zuora's FY Q1 2019 10-Q was on filed on June 13, 2018. Adjusted amounts due to Zuora's adoption of Accounting Standards Update 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("ASC 606") are shown in the table from Zuora's FY Q1 2020 10-Q, filed on June 11, 2019 (p. 3).

[2] Zuora's FY Q2 2019 10-Q was filed on September 12, 2018. Adjusted amounts due to Zuora's adoption of ASC 606 are shown in the table from Zuora's FY Q2 2020 10-Q, filed on September 13, 2019 (p. 3).

[3] Zuora's FY Q3 2019 10-Q was filed on December 13, 2018. Adjusted amounts due to Zuora's adoption of ASC 606 are shown in the table from Zuora's FY Q3 2020 10-Q, filed on December 16, 2019 (p. 3).

[4] Zuora's FY 2019 10-K was filed on April 18, 2019. Adjusted amounts due to Zuora's adoption of ASC 606 are shown in the table from Zuora's FY 2020 10-K, filed on March 31, 2020 (p. 55).

[5] Zuora FY Q1 2020 10-Q, filed June 11, 2019 (p. 3).

[6] Zuora 8-K, March 21, 2019, Exhibit 99.1 (press release "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results").

[7] Zuora 8-K, May 30, 2019, Exhibit 99.1 (press release "Zuora Reports First Quarter Fiscal 2020 Results").

[8] To determine the FY 2020 guidance range for professional services revenue, I subtracted the subscription revenue guidance ranges from the total revenue guidance ranges in Zuora's March 21, 2019 and May 30, 2019 press releases.

**Exhibit 2: Analyst Comparison**

*(Revenue estimates and EV in thousands)*

| | Needham [1] | Jefferies [2] | Morgan Stanley [3] | Canaccord [4] | Goldman Sachs [5] |
|---|---|---|---|---|---|
| Methodology Used | Revenue multiple | DCF | DCF | Projected CF | Revenue multiple/DCF |
| **March 21-22, 2019 (after Q4 FY 2019 and FY 2019 financial results)** | | | | | |
| FY 2020 Subscription Revenue Estimate | $ 210,754 | $ 215,600 | $ 210,100 | $ 211,500 | $ 209,200 |
| FY 2020 Professional Services Revenue Estimate | $ 80,466 | $ 79,400 | $ 80,900 | $ 82,000 | $ 81,000 |
| FY 2020 Total Revenue Estimate | $ 291,220 | $ 295,000 | $ 291,000 | $ 293,500 | $ 290,200 |
| FY 2021 Total Revenue Estimate | | $ 373,000 | $ 363,400 | $ 361,000 | $ 350,600 |
| Revenue Multiple to arrive at PT | 10.0 | 9.4 | 7.3 | 10.0 | 6.5 |
| EV | $ 3,073,200 | $ 2,773,000 | $ 2,652,820 | $ 2,862,000 | $ 2,900,000 |
| PT | $ 30 | $ 35 | $ 22 | $ 28 | $ 18 |
| **On or after May 30, 2019** | | | | | |
| FY 2020 Subscription Revenue Estimate | $ 202,913 | $ 203,400 | $ 204,200 | $ 201,200 | $ 200,200 |
| FY 2020 Professional Services Revenue Estimate | $ 70,846 | $ 69,900 | $ 70,900 | $ 70,800 | $ 74,100 |
| FY 2020 Revenue Estimate | $ 273,759 | $ 273,300 | $ 275,100 | $ 272,000 | $ 274,300 |
| FY 2021 Total Revenue Estimate | $ 313,310 | $ 341,900 | $ 329,200 | $ 321,500 | $ 318,000 |
| Revenue Multiple to arrive at PT | 5.5 | 8.5 | 6.0 | 6.8 | 4.5 |
| EV | $ 2,036,205 | $ 2,300,000 | $ 1,975,200 | $ 2,322,000 | $ 2,300,000 |
| PT | $ 18 | $ 29 | $ 16 | $ 18 | $ 13 |
| **Change** | | | | | |
| FY 2020 Subscription Revenue Estimate | $ (7,841) | $ (12,200) | $ (5,900) | $ (10,300) | $ (9,000) |
| FY 2020 Professional Services Revenue Estimate | $ (9,620) | $ (9,500) | $ (10,000) | $ (11,200) | $ (6,900) |
| FY 2020 Total Revenue Estimate | $ (17,461) | $ (21,700) | $ (15,900) | $ (21,500) | $ (15,900) |
| FY 2021 Total Revenue Estimate | | $ (31,100) | $ (34,200) | $ (39,500) | $ (32,600) |
| Revenue Multiple to arrive at PT | (4.5) | (0.9) | (1.3) | (3.2) | (2.0) |
| EV | $ (1,036,995) | $ (473,000) | $ (677,620) | $ (540,000) | $ (600,000) |
| PT | $ (12) | $ (6) | $ (6) | $ (10) | $ (5) |
| **% Change** | | | | | |
| FY 2020 Subscription Revenue Estimate | -3.72% | -5.66% | -2.81% | -4.87% | -4.30% |
| FY 2020 Professional Services Revenue Estimate | -11.96% | -11.96% | -12.36% | -13.66% | -8.52% |
| FY 2020 Total Revenue Estimate | -6.00% | -7.36% | -5.46% | -7.33% | -5.48% |
| FY 2021 Total Revenue Estimate | | -8.34% | -9.41% | -10.94% | -9.30% |
| Revenue Multiple to arrive at PT | -45.00% | -9.57% | -17.81% | -32.00% | -30.77% |
| EV | -33.74% | -17.06% | -25.54% | -18.87% | -20.69% |
| PT | -40.00% | -17.14% | -27.27% | -35.71% | -27.78% |

**Exhibit 2: Analyst Comparison**

**[1]**

March 22, 2019 analyst report: ("We derive our price target for Zuora using an EV/revenue valuation methodology as we believe this methodology allows for consistent comparison across Software-as-a-Service (SaaS) companies. SaaS companies like Zuora have historically traded at 2-10x forward-year revenue multiples. We believe Zuora, with a top-quartile revenue growth rate, should be valued at a premium to the group on CY20 (FY21) estimates; thus we derive our **$30 price target** by applying an EV/revenue multiple of **10x to our FY20 revenue estimate** and adding net cash of $161 million"). Needham did not report EV so I calculated an estimated EV: (FY 2020E revenue of $291,220,000 * revenue multiple of 10x) + $161,000,000 cash = $3,073,200,000.

May 31, 2019 analyst report: ("We derive our price target for Zuora using an EV/revenue valuation methodology as we believe this methodology allows for consistent comparisons across Software-as-a-Service (SaaS) companies. SaaS companies like Zuora have historically traded at 2-10x forward-year revenue multiples. We believe Zuora, with a top-quartile revenue growth rate, should be valued at a at a discount to the group on CY20 (FY21) estimates due to its sales execution issues; thus we derive our **$18 price target** by applying an EV/revenue multiple of **5.5x to our FY21 revenue estimate** and adding net cash of $313 million"). Needham did not report EV so I calculated an estimated EV: (FY 2021E revenue of $313,310,000 * revenue multiple of 5.5x) + $313,000,000 cash = $2,036,205,000.

**[2]**

March 22, 2019 analyst report: ("DCF-based **price target of $35** implies **19.4x EV/F2020E (next fiscal year) subscription revenue**"). I show Jefferies' EV/FY 2020E total revenue multiple of **9.4x** in the table above because all other multiples in the table are based on total revenue. Jefferies' reported EV was "NM" so I calculated an estimated EV: FY 2020E total revenue of $295,000,000 * revenue multiple of 9.4x = $2,773,000,000.

May 31, 2019 analyst report: ("DCF-based **price target of $29** implies **17.0x EV/F2020E subscription revenue**"). I show Jefferies' EV/FY 2020E total revenue multiple of **8.5x** in the table above because all other multiples in the table are based on total revenue.

**[3]**

March 22, 2019 analyst report: ("...which supports our DCF-based **$22 one-year PT** after applying terminal growth rate of 3.0% and discounting back at WACC of 10.8% over a 15-year horizon. Our PT implies **7.3x EV/CY20 [FY21] Sales** and 0.30x growth adjusted, a discount to the SaaS peer group average of 0.37x"). Morgan Stanley did not report EV so I calculated an estimated EV: FY 2021E revenue of $363,400,000 * revenue multiple of 7.3x = $2,652,820,000.

May 31, 2019 analyst report: ("...which supports our DCF-based **$16 one-year PT** after applying terminal growth rate of 3.0% and discounting back at WACC of 10.8% over a 15-year horizon. Our PT implies **6.0x EV/CY20 [FY21] Sales** and 0.33x growth adjusted, a discount to the SaaS peer group average of 0.32x"). Morgan Stanley did not report EV so I calculated an estimated EV: FY 2021E revenue of $329,200,000 * revenue multiple of 6.0x = $1,975,200,000.

**[4]**

March 21, 2019 analyst report: ("The fundamentals didn't change, so our **price target didn't change from $28**. This target implies a **10x EV/revenue multiple applied to our potentially conservative C2020 [FY2021] estimate of $361M** plus approximately $120M in prospective net cash and assumes ~130M fully diluted shares outstanding").

May 30, 2019 analyst report: ("We are **lowering our price target by $10 from $28 to $18**. This target implies a **6.8x EV/revenue multiple applied to our C2020 [FY2021] estimate of $322M** plus approximately $124M in prospective net cash and assumes ~128M fully diluted shares outstanding").

*Note  Canaccord derives a PT by using a multi-scenario internal rate of return calculated from projected cash flows.*

**[5]**

March 22, 2019 analyst report: ("Our **$18 12-month price target** is derived from an 85%/15% blend of our fundamental value of $17 and our theoretical M&A value of $26. Our fundamental value of $17 is based on a 50%/50% weighting of a target EV / Sales multiple ($19 fair value) and DCF ($15 fair value). **For EV/Sales, we apply a 6.5x target multiple to our SNTM revenue estimate of $340mn**. Our target multiple is at a discount to the median multiple of 8.8x for software peers in the 20%-30% top line growth bucket. [] For our DCF, we estimate a 10-year sales CAGR (CY19A-CY29E) of 17%, long-term EBIT margins of 21%, a WACC of 10.9%, and a terminal multiple of 11.2x EV/FCF").

May 31, 2019 analyst report: ("We remain Sell-rated on ZUO and lower our 12-month **price target to $13** (was $18). Our price target is based on an 85/15 blend of fundamental ($12 FV) and theoretical M&A ($20 FV). Our fundamental target is based on the equal weight of **EV/Second NTM sales** ($13 FV) and a DCF analysis ($11 FV). Our **EV/Sales multiple of 4.5x** (down from 6.5x) compares to the <20% growth cohort average of 6.2x. [] Our 10-year DCF assumes a sales CAGR of 11%, long-term EBIT margins of 20%, a WACC of 11%, and a terminal multiple of 11.2x EV/FCF").

2 of 2