SUSAN S. MUCK (SBN 126930)
susan.muck@wilmerhale.com
KEVIN P. MUCK (SBN 120918)
kevin.muck@wilmerhale.com
WILLIAM BRENC (SBN 318544)
william.brenc@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1002

JEREMY T. ADLER (admitted *pro hac vice*)
jeremy.adler@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 295-6417

MELINDA HAAG (SBN 132612)
ROBIN LINSENMAYER (SBN 244656)
ERIKA K. HOGLUND (SBN 327781)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
mhaag@paulweiss.com
rlinsenmayer@paulweiss.com
ehoglund@paulweiss.com

KAREN L. DUNN (admitted *Pro Hac Vice*)
JUSTIN ANDERSON (admitted *Pro Hac Vice*)
JESSICA E. PHILLIPS (*Pro Hac Vice* forthcoming)
JAKE E. STRUEBING (*Pro Hac Vice* forthcoming)
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kdunn@paulweiss.com
janderson@paulweiss.com
jphillips@paulweiss.com
jstruebing@paulweiss.com

AUDRA J. SOLOWAY (admitted *Pro Hac Vice*)
JONATHAN HURWITZ (admitted *Pro Hac Vice*)
JASON A. DRISCOLL (*Pro Hac Vice* forthcoming)
BENJAMIN W. PEROTIN (*Pro Hac Vice* forthcoming)
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 6th Ave.
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
jhurwitz@paulweiss.com
jdriscoll@paulweiss.com
bperotin@paulweiss.com

*Attorneys for Defendants Zuora, Inc.,*
*Tien Tzuo, and Tyler Sloat*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CASEY ROBERTS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZUORA, INC., TIEN TZUO, and TYLER SLOAT,<br><br>Defendants. | Case No.: 3:19-cv-03422-SI<br><br>**DEFENDANTS ZUORA, INC., TIEN TZUO, AND TYLER SLOAT'S NOTICE OF OPPOSITION AND OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF JEFFREY HAGINS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      March 3, 2023<br>Time:     10:00 a.m.<br>Dept.:    Courtroom 1, 17th Floor<br>Judge:   Hon. Susan Illston<br>Date Action Filed:  June 14, 2019 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT OF ISSUES TO BE DECIDED ............................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.  INTRODUCTION ........................................................................................... 1

II.  PLAINTIFFS' THEORY OF FALSITY ........................................................ 4

III.  MR. HAGINS'S EXPERTISE AND OPINIONS ......................................... 7

IV.  LEGAL STANDARD ..................................................................................... 8

V.  MR. HAGINS'S OPINIONS ARE HIGHLY RELEVANT TO EXPLAIN WHY ZUORA'S PRODUCT STATEMENTS WERE NOT FALSE OR MISLEADING ......... 9

    A.  Mr. Hagins's Opinions Are Highly Probative As They Help Refute Key Aspects of Plaintiffs' Theory of Liability ................................................. 9

    B.  Mr. Hagins's Opinions Provide Insight Beyond Common Lay Understanding ......................................................................................... 16

    C.  Mr. Hagins's Opinions Rest on Sufficient Foundation ......................... 17

VI.  THE HIGH PROBATIVE VALUE OF MR. HAGINS'S OPINIONS IS NOT OUTWEIGHED, LET ALONE SUBSTANTIALLY OUTWEIGHED, BY THE DANGER OF CONFUSION ......................................................................... 22

VII.  CONCLUSION ............................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Actuate Corporation* v. *Aon Corporation*,
  2012 WL 2285187 (N.D. Cal. June 18, 2012) .........................................................................19

*Alaska Rent-A-Car, Inc.* v. *Avis Budget Group, Inc.*,
  738 F.3d 960 (9th Cir. 2013) ...................................................................................................23

*S.E.C.* v. *Bankatlantic Bancorp, Inc.*,
  2013 WL 12009694 (S.D. Fla. Nov. 14, 2013).......................................................................23

*Berckeley Inv. Grp., Ltd.* v. *Colkitt*,
  455 F.3d 195 (3d Cir. 2006)....................................................................................................10

*City of Roseville Emps. Ret. Sys.* v. *Sterling Fin. Corp.*,
  963 F. Supp. 2d 1092 (E. D. Wash. 2013) ..............................................................................11

*In re Cloudera, Inc. Sec. Litig.*,
  2022 WL 14813896 (N.D. Cal. Oct. 25, 2022)........................................................................11

*Comet Techs. USA Inc.* v. *XP Power LLC*,
  2022 WL 2442810 (N.D. Cal. Mar. 2, 2022)...........................................................................18

*Dolby Laboratories Licensing Corporation* v. *Adobe*,
  2019 WL 6327210 (N.D. Cal. Nov. 26, 2019) ........................................................................18

*ECD Inv. Grp.* v. *Credit Suisse Int'l.*,
  2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)....................................................................10, 19

*United States* v. *Finley*,
  301 F.3d 1000 (9th Cir. 2002) .................................................................................................16

*Fortune Dynamic, Inc.* v. *Victoria's Secret*,
  618 F.3d 1025 (9th Cir. 2010) .................................................................................................18

*Hangarter* v. *Provident Life & Acc. Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) .......................................................................................17, 18, 20

*United States* v. *Hankey*,
  203 F.3d 1160 (9th Cir. 2000) ..............................................................................................9, 23

*Highfields Cap. I, LP* v. *SeaWorld Ent., Inc.*,
  2022 WL 1037210 (S.D. Cal. Apr. 6, 2022)...........................................................................17

*Krys* v. *Aaron*,
  112 F. Supp. 3d 181 (D.N.J. 2015) ..........................................................................................10

*United States* v. *Mende*,
   43 F.3d 1298 (9th Cir. 1995) ................................................................................9

*Messick* v. *Novartis Pharm. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) ..............................................................................8

*Open Text S.A.* v. *Box, Inc.*,
   2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ........................................................20

*Primiano* v. *Cook*,
   598 F.3d 558 (9th Cir. 2010) ..........................................................9, 16, 17, 23

*Radware, Ltd.* v. *F5 Networks, Inc.*,
   2016 WL 590121 (N.D. Cal. Feb. 13, 2016) .........................................................20

*SAS Inst., Inc.* v. *World Programming Ltd.*,
   125 F. Supp. 3d 579 (E.D.N.C. 2015)..................................................................17

*United States* v. *Schiff*,
   538 F. Supp. 2d 818 (D.N.J. 2008) ...............................................................2, 10

*Schueneman* v. *Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .........................................................................2, 12

*New Jersey* v. *T.L.O.*,
   469 U.S. 325 (1985).............................................................................................23

*S.E.C.* v. *U.S. Env't., Inc.*,
   2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ......................................................10

*United States* v. *Vallejo*,
   237 F.3d 1008 (9th Cir. 2001) ..............................................................................16

*Wochos* v. *Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .....................................................................2, 11, 22

*Zucco Partners, LLC* v. *Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...............................................................................12

**Other Authorities**

Fed. R. Evid. 403 ............................................................................................ *passim*

Fed. R. Evid. 702 ............................................................................................ *passim*

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Court should exclude the expert report and testimony of Jeffrey Hagins under Federal Rules of Evidence 702 and 403.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs' entire case is based on a critically flawed premise about the nature of enterprise software products such as Zuora's.  Plaintiffs claim that Defendants' statements about the "automated" and "integrated" nature of its software platform and products were false or misleading because there was not an immediate and frictionless transfer of all data between two of Zuora's products.  But Zuora never promised that type of integration between its products.  By construing integration in that manner, Plaintiffs offer a false, crabbed definition of "integration" that is inapplicable in the enterprise software industry.

Integration of enterprise software products is not like fixing a car, where you can plug in and swap out different parts interchangeably without any additional effort required to make the car run smoothly.  Rather, integration of enterprise software products occurs over time and on a spectrum, as necessary customizations and adaptations better enable the products to exchange data with each other and with the unique systems particular to each business.  And the only way to understand the particular customizations and adaptations required by each business is through a lengthy testing process designed to identify these customer-specific issues.  Indeed, a large team within Zuora—the Global Services department—exists just to help customers navigate this customization process.  People in the enterprise software industry, including customers who purchase enterprise software from companies like Zuora, as well as investors who understand the nature of Zuora's products, recognize that integration necessarily entails this complicated, iterative process.  They understand that challenges, delays, and customizations are inherent to this process.

But a lay jury will not understand any of this—at least not without the help of an expert.  That is why Defendants retained Jeffrey Hagins, a software developer and entrepreneur with over 40 years of experience in the technology industry.  Mr. Hagins's testimony, drawn from his

decades of experience working with software, fills this void by helping explain to the jury why the characterizations underlying Plaintiffs' claims are fundamentally at odds with how the industry understands enterprise software integration and deployment.  Mr. Hagins explains that, within the enterprise software industry, it is well understood that the process of software integration is iterative and time-consuming and that customers testing out early product integrations expect to identify new bugs and issues.  Indeed, as he explains, these setbacks do not suggest that integration is a "failure," as Plaintiffs characterize it; rather, they are an expected and necessary part of the software development process.  These setbacks are the means through which customers identify—and software companies address—the particular requirements unique to each customer's business.  And these explanations, which offer technical insight into a complicated industry like enterprise software and how specialized terms like "integration" are understood within that industry, are precisely the sort of testimony courts rely on experts to provide.  *See, e.g.*, *United States* v. *Schiff*, 538 F. Supp. 2d 818, 845–46 (D.N.J. 2008).

Plaintiffs now seek to deprive the jury of this critically helpful insight by asking the Court to exclude wholesale Mr. Hagins's testimony.  Plaintiffs do not attack Mr. Hagins's expertise in, or qualifications to opine on, enterprise software, nor could they given his 40 plus years of experience as a software developer and entrepreneur.  Instead, Plaintiffs claim his opinions regarding enterprise software development and software implementation and integration are irrelevant to this case.  In doing so, Plaintiffs levy two primary critiques, each of which is wholly unconvincing.

***First***, Plaintiffs argue that Mr. Hagins's opinions should be excluded under Rule 702 because they are not relevant to this case and will not aid the jury in understanding any fact or issue.  But in order to prove that Defendants' statements were false or misleading, Plaintiffs must show "that the actual term[s] used [in the statements] had the distinctive, and false, meaning that Plaintiffs claim."  *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021).  Plaintiffs must also show that Defendants made the statements with "scienter"—with an intent to deceive or defraud, or with deliberate recklessness as to their truth.  *See Schueneman* v. *Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016).  Each of Mr. Hagins's opinions is highly relevant to

refute Plaintiffs' mischaracterization of the terms used in Defendants' public statements, and to refute Plaintiffs' contention that Defendants acted with scienter, by describing the process enterprise software companies undertake in developing new products and explaining how terms of art like "integration" are actually understood by anyone with knowledge of the enterprise software industry. This testimony is not, as Plaintiffs assert, within the common understanding of a lay juror, as it covers a highly technical and specialized area of software development. Nor does the fact that Mr. Hagins offers opinions about industry standards generally and not Zuora specifically render his testimony inadmissible as lacking foundation. Under binding Ninth Circuit caselaw, expert testimony about general industry practices has adequate foundation so long as it is based on sufficient experience within that industry, and there is no additional foundational requirement that an expert connect his opinions to the party in the case. Mr. Hagins's decades of experience in the software industry provide more than sufficient foundation to support his opinions about technical terms and standard practices within the enterprise software industry. Moreover, to the extent Plaintiffs (falsely) suggest that there is *no* evidence tethering Mr. Hagins's industry opinions to Zuora, Defendants proffer that ample testimonial and documentary evidence will connect Mr. Hagins's descriptions of enterprise software development and integration generally to what occurred at Zuora specifically.

**Second**, Plaintiffs contend that Mr. Hagins's testimony should be excluded under Rule 403. This argument is similarly unavailing. The high probative value of Mr. Hagins's testimony is not outweighed, let alone substantially outweighed, by any danger of confusing the issues or misleading the jury. Because Mr. Hagins's testimony helps show why Defendants' statements, properly understood in the context in which they were made, were not false or misleading, his opinions have significant probative value. Moreover, Plaintiffs' assertion that the jury will confuse Mr. Hagins's opinions about general industry norms as applying to Zuora specifically makes no sense in light of Plaintiffs' own repeated emphasis about the *general* nature of Mr. Hagins's testimony, as well as Mr. Hagins's repeated insistence that he does not purport to opine about anything Zuora-specific. This testimony is not the sort of unfairly prejudicial

evidence that Rule 403 was designed to exclude.  Accordingly, the Court should deny Plaintiffs' request to exclude Mr. Hagins's testimony under either Rule 702 or Rule 403.

## II.    **PLAINTIFFS' THEORY OF FALSITY**

Zuora offers an entire set of Software-as-a-Service products for subscription-based businesses.  This enterprise software suite has three relevant components: a Central Platform, which functions as a hub that allows customers to manage the entire subscription sales process; a Connect Marketplace, which offers tools and third-party applications; and a portfolio of five different enterprise software products.  Two of the products in this software suite are Zuora Billing and Zuora RevPro.  Billing helps subscription-based companies bill, invoice, and collect payments on a recurring basis from customers.  RevPro, which Zuora acquired through its purchase of Leeyo, Inc., helps subscription-based companies automate the complex process of recognizing revenue for accounting purposes.  These products can be purchased separately from each other, and, indeed, during the relevant time, only "roughly 20" of Zuora's over 950 customers used both Billing and RevPro products.  Ex. 01 Hildenbrand Dep. 52:7-10.  Many of these joint Billing-RevPro customers transferred data between these two products without any integration assistance from Zuora specifically.  Instead, these customers exchanged data between the two products through manual, custom solutions built by the customers themselves, through third-party products that facilitated the data exchange, or through the BOOMI platform, an existing integration Leeyo had built between Zuora and RevPro.  *See* Ex. 02 Tzuo Dep. 112:11-24 (explaining that prior to the Leeyo acquisition, "[w]e had customers who bought the Leeyo product, RevPro.  We had customers who bought the Billing product, and they were able to integrate the two products to achieve their business functions"); Ex. 01 Hildenbrand Dep. 72:1-5 (explaining that "before Zuora acquired Leeyo, there are -- there were joint Zuora-Leeyo customers in the market and, you know, the products were integrated together for those specific customers"); MSJ Ex. 17 ZUO_00431005 at -007[1] ("There is an existing integration between Zuora and RevPro that was built by Leeyo on the BOOMI platform.").

---

[1] "MSJ Ex." refers to the corresponding exhibit filed in support of Defendants' Motion for Summary Judgment and to Exclude Evidence, filed on December 9, 2022.  See Dkt. No. 185.

1    Despite these integration capabilities, Zuora began developing an additional internal

2    project called "Keystone" to better facilitate the transfer of data from Billing to RevPro.  Zuora

3    launched Keystone with an early adopter program for a small group of customers willing to test

4    its functionality.  *See* MSJ Ex. 18 ZUO_00430709 at -713–715 (stating "we are currently in

5    [Zuora Early Adopter Program] mode" and identifying 5 enrolled customers and 5 customers in

6    the RevPro pipeline).  But, as noted, the majority of the small group of joint Billing-RevPro

7    customers were not part of the Keystone project.  And of course, Zuora's 930+ other customers

8    who were not using both Billing and RevPro had no need for any sort of integration between

9    these two products.

10    After Zuora's stock price dropped in 2019 when Zuora announced it was reducing its

11    previously issued revenue guidance due in part to delays in the integration project for Billing and

12    RevPro, Plaintiffs brought this suit for securities fraud.  The gravamen of Plaintiffs' Complaint[2]

13    is that Defendants' statements about the functionality of Zuora's entire enterprise software

14    platform were false or misleading because Billing and RevPro did not have seamless, out-of-the-

15    box data integration.  For example, Plaintiffs identify as false or misleading the statement that

16    "the Zuora platform was architected specifically for dynamic, recurring subscription business

17    models, and acts as an ***intelligent subscription management hub*** that ***automates and***

18    ***orchestrates the entire subscription order-to-cash process***, including billing and revenue

19    recognition."  Compl. ¶ 171 (emphasis altered) (citing a series of Zuora press releases).[3]  And

20    Plaintiffs' theory is that these statements relating to Zuora's platform and the "automation" and

21    "intelligent" management of the "entire subscription order-to-cash process" were false or

22    misleading because Billing and RevPro were not fully "integrated" in the sense that data could

23    automatically and seamlessly flow between these two products as soon as they were launched.

24    *See* Pls.' Opp'n to Mot. to Dismiss at 11, Dkt. No. 67 (arguing that when "Defendants repeatedly

25    marketed Zuora's platform and applications as a functioning, combined solution . . . they used

26    terms synonymous with integration, or phrases and illustrations creating the false impression that

---

[2] "Complaint" and "Compl." refer to Plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws filed on November 8, 2019.  *See* Dkt. No. 60.

[3] *See also, e.g.*, Compl. ¶¶ 160, 162, 166, 168, 174, 178–84, 189, 191–94, 202, 207–08, 214, 225–26, 231, 235–37.

Zuora's solution connected Billing and RevPro"); *id.* (arguing Defendants' statements falsely represented "that customers using the Zuora Central Platform, together with Zuora Billing and Zuora RevPro, are able to integrate the data between two models [RevPro or Billing] through automation"); *see also, e.g.*, Compl. ¶ 59 (alleging Defendants "omitted to disclose a fundamental technical challenge adversely impacting its Central platform . . . . Specifically, customers using Zuora Billing and Zuora RevPro could not successfully ***integrate*** the data from both systems") (emphasis added).

In support of this theory that there was an "integration failure," Pls.' Opp'n to Mot. to Dismiss at 1, Dkt. No. 67, Plaintiffs make certain allegations regarding the Keystone project, which serviced only a tiny subset of Zuora's customer base. Plaintiffs allege that Keystone was "incredibly laborious, time and resource intensive" and required "touch up work manually," Compl. ¶ 78, and that customers testing the Billing-RevPro integration as part of the Keystone early adopter program faced "'a ton' of challenges" and "provided Zuora with negative feedback." *Id*. ¶¶ 90–91; *see also* Pls.' Opp'n to Mot. to Dismiss at 4, Dkt. No. 67 (Plaintiffs arguing that "[c]ustomers using Billing and RevPro were unable to integrate and reconcile the data from both systems" because "Zuora's customers either needed to export the data from Billing and import it to RevPro manually for revenue recognition, or develop their own customized integration that ingests the required data from Billing into RevPro").

Plaintiffs' theory thus rests on a particular definition of "integration" in Zuora's industry, namely that Zuora's statements relating to "automation" and "intelligent" management of its entire subscription platform hub actually suggested full "integration" of all its software products; that "integration" in fact meant out-of-the-box complete and seamless data transfer between Zuora Billing and Zuora RevPro; that the need to do manual touch-up work as part of this process meant that "integration" was a "failure"; that the existence of complaints from customers in Keystone's early adopter program who were testing the Billing-RevPro integration solution similarly meant that integration had "failed"; and that these integration issues constituted a "fundamental technical challenge adversely impacting [Zuora's] Central platform and related software application products." Compl. ¶ 59. To demonstrate that Zuora's public statements

1  were false or misleading, Plaintiffs must establish that their understanding of integration is

2  correct.

3  **III.    MR. HAGINS'S EXPERTISE AND OPINIONS**

4          Defendants' expert Jeffrey Hagins helps refute Plaintiffs' definition of integration as it

5  pertains to enterprise software.  Mr. Hagins is a highly experienced software developer,

6  technology entrepreneur, and executive with 42 years of experience in the technology industry.

7  Expert Report of Jeffrey Hagins ("Hagins Rep.") ¶¶ 1, 3.[4]  He has served as the Chief

8  Technology Officer of seven different technology companies, the Chief Information Officer and

9  founder of multiple companies, and the Chief Executive Officer of one company.  *Id.* ¶¶ 1, 4–5;

10  App. A at 1–2.  Mr. Hagins has worked as a software developer, software engineering manager,

11  consulting engagement manager, hardware engineering manager, and data center operations

12  manager.  *Id.* ¶ 4.  He has "personally worked on more than a dozen software integration

13  projects," including in management positions.  *Id.* ¶ 6.  He currently serves as the founder and

14  technology partner at a strategic advisory firm focused on helping customers with digital

15  business transformations, as well as in the capacity of an investor and board advisor for various

16  technology companies.  *Id.* ¶ 1; App. A at 1–3.  Mr. Hagins holds eight different patents, which

17  relate in part to automation and integration of software systems.  *Id.* App. A at 3–4.  And

18  Mr. Hagins has been asked to provide expert testimony in eight different legal proceedings,

19  including twice in federal cases, and twice in the last four years.  Ex. 03 Hagins Dep. 55:21-24,

20  56:16-23; *see also* Hagins Rep. ¶ 6, App. A at 2.  No court has ever questioned Mr. Hagins's

21  expertise or excluded his opinions.  Nor do Plaintiffs challenge Mr. Hagins's qualifications as an

22  enterprise software expert.

23          In his report, Mr. Hagins applies his decades of experience in the software industry to

24  offer testimony on "industry norms and practices related to software development, enterprise

25  software, and software implementation and integration."  Hagins Rep. ¶ 7.  His opinions, in brief,

26  are as follows:

27

28  [4] The Hagins Report was filed as Exhibit 1 to Plaintiffs' Motion to Exclude the Expert Testimony of Jeffrey L. Hagins.  *See* Dkt. No. 193-2.

- <u>Opinion 1</u>: Software development is not a defined process, as complete software requirements cannot be understood prior to development.  It is expected that significant defects will arise throughout the development process—primarily when the products are being tested in real environments.  Such problems do not indicate that a product under development will not meet customer needs.  Nor does the severity or quantity of such problems directly correspond to the amount of time or effort needed to solve them.

- <u>Opinion 2</u>: This is especially true with respect to enterprise software development because enterprise software customers have varied and idiosyncratic needs that are particular to their businesses.  Enterprise software providers generally adapt their products to address these various needs, instead of asking customers to adapt their businesses to the software.  This makes testing new enterprise software products particularly challenging.

- <u>Opinion 3</u>: Enterprise software customers often do not fully understand the features they need (known as "use cases" or "requirements") until they test software.  It is typical for customers to discover new use cases during implementation, rendering implementation a time-consuming and uncertain process.

- <u>Opinion 4</u>: Customers who participate in early adopter programs for enterprise software know that they are working with relatively untested software.  Indeed, the purpose of these early adopter programs is to identify and address use cases that could not be detected before customer use.

- <u>Opinion 5</u>: Participants in early adopter programs typically raise complaints when they identify defects.  From the standpoint of an enterprise software company, such complaints are not inconsistent with the belief that the software will ultimately succeed in addressing customer needs.

*See id.* ¶ 10.

These opinions, drawn from decades of experience in the software industry, contradict Plaintiffs' position on the meaning of integration and their theory of why Zuora's statements were false.  Most notably, Mr. Hagins's testimony shows that Plaintiffs' understanding of product "integration" as an immediate and automatic event, rather than an iterative and delay-prone process, is not a view shared by those within the enterprise software industry itself.

## IV.    <u>LEGAL STANDARD</u>

Plaintiffs ask the Court to exclude Mr. Hagins's opinions under Federal Rules of Evidence 702 and 403. Pls.' Mot. to Exclude at 1.[5]  Rule 702 allows an expert to testify based on "knowledge, skill, experience, training, or education" if that expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Courts must apply Rule 702 "with a 'liberal thrust' favoring

---

[5] "Pls.' Mot. to Exclude" refers to Lead Plaintiffs' Notice of Motion and Motion to Exclude Expert Testimony of Jeffrey L. Hagins, filed on December 9, 2022. *See* Dkt. No. 193.

admission." *Messick* v. *Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)).  Under Rule 702 "[t]he relevancy bar is low, demanding only that the evidence 'logically advances a material aspect'" of the dispute. *Id.* (quoting *Daubert* v. *Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).  "Expert opinion testimony is relevant" so long as it "has a valid connection" to the case. *Primiano* v. *Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States* v. *Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

Rule 403 permits a court to "exclude relevant evidence" only when "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  This rule is "an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." *United States* v. *Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (quoting *United States* v. *Patterson*, 819 F.2d 1495, 1505 (9th Cir. 1987)).  Its function is thus "limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States* v. *Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quoting *United States* v. *Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983)).

## V.   MR. HAGINS'S OPINIONS ARE HIGHLY RELEVANT TO EXPLAIN WHY ZUORA'S PRODUCT STATEMENTS WERE NOT FALSE OR MISLEADING

### A.   Mr. Hagins's Opinions Are Highly Probative As They Help Refute Key Aspects of Plaintiffs' Theory of Liability

In their motion to exclude, Plaintiffs primarily contend that the Court should exclude Mr. Hagins's opinions because they "offer no insights or relevant context as to any fact of consequence" and therefore lack probative value.  Pls.' Mot. to Exclude at 6.  Plaintiffs are wrong.  Mr. Hagins's opinions strike at the heart of Plaintiffs' theory of falsity, and thus have significant probative value.  As discussed above, the central thrust of Plaintiffs' theory is that various statements regarding Zuora's "automated" and "centralized" software platform were false or misleading because there was an integration failure between Billing and RevPro, as evidenced, Plaintiffs say, by delays and setbacks with the Keystone integration project.  *See*

*supra* Section II. This theory is grounded in a fundamental misunderstanding about how enterprise software works, and an acontextual view of how product integration occurs in the enterprise software industry.

In securities fraud cases, courts regularly allow expert witnesses to opine on industry norms that shed light on how an industry operates and how an industry understands terms and concepts used in statements alleged to be false or misleading. The District of New Jersey's decision in *United States* v. *Schiff*, a securities fraud prosecution against the executive of a biopharmaceutical company for allegedly making misstatements and material omissions about the company's sales practices, is instructive. 538 F. Supp. 2d at 845–46. In *Schiff*, the defendant proffered an expert to testify, among other things, that the government's securities fraud charges "reflec[t] certain misunderstandings about the distribution of pharmaceutical products and the nature of the relationship that manufacturers have with wholesalers." *Id.* at 845. The government sought to exclude this testimony, making many of the same arguments that Plaintiffs do here. *See id.* at 845–46. The court rejected the government's arguments, recognizing that "courts routinely admit testimony from industry experts related to the business practices in those industries," and holding that the expert's opinions were admissible because the "testimony will be helpful to the jury in understanding the sales practices at issue in this case and how those practices fit into the custom and practice of the pharmaceutical industry." *Id.* at 846; *see also ECD Inv. Grp.* v. *Credit Suisse Int'l.*, 2017 WL 3841872, at *17 (S.D.N.Y. Sept. 1, 2017) (admitting expert testimony in securities case "that industry custom and practice dictate" the meaning of the term "hedging" in a share lending agreement based on the court's conclusion that "the definition of 'hedging' is not a legal term but rather a contract term to whose interpretation industry trade practice is plainly relevant"); *Krys* v. *Aaron*, 112 F. Supp. 3d 181, 193 (D.N.J. 2015) (finding that an expert's testimony regarding "common customs and practices in the securities industry" was "plainly relevant and this background information may prove infinitely helpful to the jury in unpacking the intricacies of this complex litigation"); *Berckeley Inv. Grp., Ltd.* v. *Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (finding that "background testimony" from "experienced former counsel for the SEC with expertise in offshore securities transactions"

provided "important context which will aid the jury"); *S.E.C.* v. *U.S. Env't, Inc.*, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (permitting securities industry expert to testify regarding the "practices and usage" of the securities trade in order to help jury evaluate whether certain trading patterns were irregular).

Expert testimony regarding industry-specific terms and concepts is all the more important in cases involving complex technology. Words may have specific usages in the software and technology industry that do not necessarily align with common understandings of that term. In this case, the key term "integration" has a specific usage within the enterprise software industry that may differ from its usage in common parlance. Plaintiffs' theory of falsity is premised on an incorrect understanding of this term as used in the enterprise software context.

Accordingly, in a case like this, which deals with industry-specific technological terms, Plaintiffs must provide "sufficient facts to establish that the actual term used [in the statement] had the distinctive, and false, meaning that Plaintiffs claim." *Wochos*, 985 F.3d at 1194. As a result, a plaintiff's failure to demonstrate that a public statement had the particular meaning that the plaintiff alleges renders it false or misleading is fatal to their claim. In *Wochos* v. *Tesla*, for example, the Ninth Circuit affirmed the dismissal of security fraud claims where the plaintiff had asserted that Tesla's public statements that it had begun installation of "manufacturing equipment" implied the installation of "*automated* equipment," and that Tesla's statements that it had made "50 production cars" implied that those cars had been made on a "*fully automated* production line." *Id.* at 1193–94. The court held that the plaintiff had failed to provide "sufficient facts to establish that the actual term[s] used" by Tesla in this context (*i.e.*, "manufacturing equipment" and "production cars") in fact "had the distinctive, and false, meaning that Plaintiffs" claim they had (i.e., "*automated* equipment" and "*fully automated* production line"). *Id.*; *see also In re Cloudera, Inc. Sec. Litig.*, 2022 WL 14813896, at *8 (N.D. Cal. Oct. 25, 2022) (holding claims based on statements regarding "cloud-native" products fail where plaintiffs did not "explain what it meant to have 'cloud-native' products or 'cloud-native' architecture' at the time [defendants] made the challenged statements"), *appeal filed* No. 22-16807, Nov. 23, 2022; *see also City of Roseville Emps. Ret. Sys.* v. *Sterling Fin. Corp.*, 963

F. Supp. 2d 1092, 1121 (E. D. Wash. 2013) (holding plaintiffs failed to show falsity as to statements that banking practices were "safe and sound" because plaintiffs failed to provide "an established definition of this phrase or indicate that use of the phrase in the banking sector has a universal and well-understood meaning"), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).

In addition to proving that Defendants' statements had the particular false or misleading meaning that Plaintiffs claim, Plaintiffs must also prove that Defendants made the statements with scienter: with an intent to deceive or defraud, or with deliberate recklessness as to their truth. *See Schueneman.*, 840 F.3d at 705. This requires Plaintiffs to show that the statements were made intentionally or knowingly, or with "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the [defendant] must have been aware of it." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *Hollinger* v. *Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)).

Here, each of Mr. Hagins's opinions is relevant to refute Plaintiffs' theory that Defendants' statements had the false or misleading meaning that Plaintiffs claim. And his opinions are also relevant to rebut Plaintiffs' scienter allegations that "Defendants *knew* or *recklessly disregarded* the fact that Billing and RevPro were not integrated at the times they touted Zuora's platform and applications as a functioning, combined solution." Pls. Mot. to Exclude at 6 (emphasis added). Specifically, Mr. Hagins contextualizes the meaning of Defendants' statements and the process of developing Keystone by describing the process enterprise software companies undertake in developing new products and features and shedding light on how terms like "integration" and "automation" are actually understood in the enterprise software industry. Mr. Hagins's opinions illustrate how the integration process in this industry is inherently iterative, continuous, and complicated—integration is not, as Plaintiffs suggest, an automatic, yes-or-no concept.

*First*, Mr. Hagins opines that software development is a complicated, iterative process by nature, requiring developers to adopt a "flexible approach" in addressing new requirements and software defects brought to the developer's attention through customer feedback. Hagins Rep.

¶ 20.  Mr. Hagins also makes clear that the discovery of new issues during this development process does not necessarily suggest foundational defects in the software, and that the number of issues that arise also does not necessarily correlate to the amount of time needed to resolve those issues.  *Id.* ¶ 79.  This serves to directly rebut Plaintiffs' theory that Zuora's public statements about the functionality of its platform and products were misleading because of the supposed defects and issues in the Keystone development and implementation cycle.  Rather, as Mr. Hagins explains, the process of identifying and correcting bugs and responding to new customer requests is an ordinary and expected part of developing any software or feature.  This opinion also rebuts Plaintiffs' allegation that because certain Zuora executives may have been "apprised of the integration problem" with Keystone, they acted with scienter when making the allegedly misleading public statements.  Compl. ¶ 93.  Mr. Hagins's opinion helps show that the information passed to executives regarding defects, delays, or customer requests during the Keystone integration project would not have been abnormal or cause for alarm.

*Second*, Mr. Hagins opines that enterprise software requires a high level of customization and adaptability because customers have varied and idiosyncratic use cases that are particular to their business.  Hagins Rep. ¶ 10.  He explains that because of this, a truly out-of-the-box integration would not be possible.  Rather, implementation "would always require configuration or customization so that the integration layer, the service in between, would actually know what to do with that data."  Ex. 03 Hagins Dep. 199:13-16.  Mr. Hagins's opinions and testimony help contextualize Zuora's statements regarding the integration of its products.  Specifically, in the Complaint, Plaintiffs repeat *ad nauseum* the allegation that the existence of certain "customized integrations" or manual processes that were required to integrate Zuora Billing and Zuora RevPro rendered Zuora's statements misleading.  *See, e.g.*, Compl. ¶¶ 163, 165, 167, 169, 173, 175.  Mr. Hagins's opinion and testimony refute this allegation.  In the context of the enterprise software industry, Mr. Hagins explains, Zuora's statements about integration, automation, or useability could not be understood as promising that there would be *no* customization or manual processes needed to address the idiosyncratic use cases of different customers.  Nor would a reasonable investor understand Zuora's statements in that manner.

*Third*, Mr. Hagins opines that enterprise software customers typically do not understand all of their requirements for a particular software product until they test it, meaning that they often discover software-related issues only once they begin testing. *See* Hagins Rep. ¶ 27.  The result is that, only after completing a lengthy customization, configuration, and testing process will enterprise software customers be able to experience the true value of the software. *Id.* ¶ 50.  The relevance of this opinion is obvious.  Plaintiffs allege that certain customer delays and complaints during the Keystone integration process demonstrate that Zuora's public statements regarding the "automation" of its products and the ability of Billing and RevPro to function in tandem were false. *See, e.g.*, Compl. ¶ 173.  Mr. Hagins's opinion that enterprise software integrations are often lengthy and complicated—and necessarily so, to address the evolving requirements that customers discover only once they begin implementing the software—helps rebut this central aspect of Plaintiffs' theory.  This opinion also refutes Plaintiffs' claim that Defendants acted with scienter when making statements regarding the capabilities of Zuora's products.  Because, as Mr. Hagins explains, the implementation process for enterprise software requires customization and testing, Defendants' awareness of customer-specific issues arising during this process would not have necessarily led them to question the ultimate functionality of Zuora's software.

Mr. Hagins's *fourth* and *fifth* opinions describe the purpose and expectations of early adopter programs in enterprise software development.  He explains how critical these programs are to most software businesses and how they are "even more critical to enterprise software companies because of the nature of enterprise software in which customer requirements are met through configuration and customization." Hagins Rep. ¶ 86.  He clarifies that customers who "enroll[] in an EAP [early adopter program] do[] so with the expectation that there will be more problems with the EAP version of the product." *Id.* ¶ 87.  He also explains that early adopter customers "tend to complain loudly and vociferously" as a means of getting more attention from the software company and having their needs prioritized, even when their problems are not severe.  Ex. 03 Hagins Dep. 232:4-5.  It is therefore "typical that participants in early adopter programs identify defects and raise complaints or concerns," and the existence of such concerns

"is not inconsistent with a belief that the software will ultimately be successful in addressing customer needs." Hagins Rep. ¶ 10.

Mr. Hagins's opinions regarding early adopter programs give the jury critical context to understand the interactions between Zuora and those Keystone early adopter customers. Plaintiffs portray the back-and-forth Zuora had with these customers, in which customers identified certain issues with the Keystone implementation, as contradicting Zuora's public statements about the functionality of its products and evincing scienter on the part of Zuora's executives. But Mr. Hagins makes clear that in the normal course of enterprise software development, identification of issues by early adopter customers is neither unusual nor a cause for concern. His opinions help demonstrate that Zuora's work with early adopter customers does not contradict any of its public statements.

Mr. Hagins's opinions also help show that even if Zuora executives were aware of customer complaints, it does not mean they acted with scienter in making public statements about the functionality of Zuora's products because customer challenges during an early adopter program are both expected and necessary. Plaintiffs claim this routine customer feedback is some significant red flag Zuora management ignored when making their public statements. *See, e.g.*, Compl. ¶ 177. But as Mr. Hagins's opinions and testimony make clear, Plaintiffs' portrayal fundamentally misunderstands the purpose of an early adopter program, which is to help test an early stage product that customers understand "may be 'buggy' and prone to more malfunctions than a general availability release." Hagins Rep. ¶ 87. Unsurprisingly, a robust back-and-forth with customers about their needs, the problems they see with the product, and the difficulties they are having with implementation is not demonstrative of scienter, but rather evidence of an early adoption program working as intended. *See, e.g.*, Hagins Rep. ¶ 10; Ex. 03 Hagins Dep. 232:4-6.

Because each of these opinions will "help the trier of fact to understand the evidence or to determine a fact in issue"—namely, that Plaintiffs have an incorrect understanding of the industry terms used in Defendants' product statements, and that these statements, properly understood, are not false or misleading or made with an intent to deceive—they are highly

probative and easily clear the low relevancy bar set by Rule 702.  *See Primiano*, 598 F.3d at 565

(evidence is relevant if it "has a valid connection to the pertinent inquiry").  The Court should

accordingly reject Plaintiffs' request to exclude Mr. Hagins's testimony on this basis.

**B.    Mr. Hagins's Opinions Provide Insight Beyond Common Lay Understanding**

Plaintiffs next argue that the Court should exclude Mr. Hagins's testimony because his

opinions "pertain to factual matters that are easily understood by a layperson without the aid of

expert testimony," and that this Court can simply assume that jurors within the Northern District

of California "already understand" how enterprise software development works.  Pls.' Mot. to

Exclude at 6, 7.  As should be clear from the above description of Mr. Hagins's testimony, this

assertion is divorced from reality and Plaintiffs offer no support for their assumptions about what

jurors in this District would know.

"To be admissible, expert testimony must [] address an issue beyond the common

knowledge of the average layman."  *United States* v. *Vallejo*, 237 F.3d 1008, 1019 (9th Cir.

2001); *see also* Fed. R. Evid. 702(a) (expert may testify when their "scientific, technical, or other

specialized knowledge will help the trier of fact").  Mr. Hagins's testimony does just that.  He

draws on decades of experience in the technology industry to provide in-depth descriptions about

the intricacies of enterprise software development.  As detailed above, Mr. Hagins explains the

industry context around the concept of "integration," the function and nature of early adopter

programs, how customers in early adopter programs identify and assess "use cases," and how

enterprise software companies assess and understand customer use cases during the product

implementation process.

These insights go far beyond the common knowledge of an average juror—even one in

this District.  The Ninth Circuit has observed that courts "must be cautious not to overstate the

scope of the average juror's common understanding and knowledge."  *United States* v. *Finley*,

301 F.3d 1000, 1013 (9th Cir. 2002).  And the Ninth Circuit "case law recognizes the importance

of expert testimony [even] when an issue appears to be within the parameters of a layperson's

common sense, but in actuality, is beyond their knowledge."  *Id.*  District courts within the Ninth

Circuit have thus permitted experts to testify about a concept as basic as the fact that a company

"derives value from its brand," because even though "[t]he general notion that brands are important appears to be common sense . . . it may not be common knowledge to the average juror." *Highfields Cap. I, LP* v. *SeaWorld Ent., Inc.*, 2022 WL 1037210, at *16 (S.D. Cal. Apr. 6, 2022). Mr. Hagins's testimony about the technical world of software integration and enterprise software development easily clears this low bar. *See, e.g.*, *SAS Inst., Inc.* v. *World Programming Ltd.*, 125 F. Supp. 3d 579, 588 (E.D.N.C. 2015) (finding it "doubtful" that party "can mount a serious challenge to the helpfulness" of expert opinion regarding the details of software development "because its subject matter is technical in nature and outside the common knowledge of the average juror").

Plaintiffs' argument to the contrary is particularly unconvincing here, given that Plaintiffs ask this Court to assume not only that enterprise software development is understood by lay people *generally*, but that—by virtue of geography alone—all jurors in this District *specifically* possess some heightened knowledge around software development. *See* Pls.' Mot. to Exclude at 7. Plaintiffs provide no factual support or legal authority for the Court to make this assumption, and the Court should reject Plaintiffs' invitation to do so.

### C.    Mr. Hagins's Opinions Rest on Sufficient Foundation

Plaintiffs also attack Mr. Hagins's opinions 2, 3, 4, and 5—regarding early adopter programs and the typical process through which enterprise software customers identify use cases and enterprise software companies address those use cases—as "lack[ing] foundation" on the basis that Mr. Hagins does not connect these opinions to Zuora's platform and products specifically. Pls.' Mot. to Exclude at 7–9. But Plaintiffs' argument fundamentally misunderstands the law of expert testimony.

As the Ninth Circuit has explained, to satisfy Rule 702's requirements, a "trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano*, 598 F.3d at 564 (quoting *Daubert*, 509 U.S. at 597). As to the former requirement, an expert's "significant knowledge of and experience within" an industry can provide the "minimal foundation of knowledge, skill, and experience required in order to give expert testimony on the practices and norms of" companies within that industry. *Hangarter* v.

*Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quotations and emphasis omitted); *see also* Fed. R. Evid. 702 advisory committee notes to 2000 amendment ("[n]othing in this [rule] is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony").  In other words, expert testimony about general industry practices has adequate foundation so long as it is based on sufficient experience and expertise within that industry. There is no additional foundational requirement that the expert connect his or her opinions to the particular company that is party to the case.

Indeed, "courts within the Ninth Circuit have commonly allowed 'industry standards' testimony when supported by relevant experience." *Comet Techs. USA Inc.* v. *XP Power LLC*, 2022 WL 2442810, at *2 (N.D. Cal. Mar. 2, 2022).  And the Ninth Circuit itself regularly affirms the admissibility of such testimony.  *See, e.g.*, *Hangarter*, 373 F.3d at 1015, 16 (holding an expert's "twenty-five years' experience working for insurance companies and as an independent consultant" provides the "minimal foundation . . . required in order to give expert testimony on the practices and norms of insurance companies" (quotations and emphasis omitted)); *Fortune Dynamic, Inc.* v. *Victoria's Secret*, 618 F.3d 1025, 1043 (9th Cir. 2010) (holding district court abused its discretion by excluding expert testimony about "standard practice[s] in the advertising and marketing industry" because expert's "forty years of experience" in that industry "strongly sugges[t] that he is familiar with what companies within the industry do").

This is particularly true where, as here, the testimony is proffered to shed light on the meaning of industry-specific words or concepts.  For example, in *Dolby Laboratories Licensing Corporation* v. *Adobe*, a dispute over software licensing agreements, the court admitted the portions of two expert's opinions "which [we]re based on [the expert's] industry expertise" and which provided insight into "the product certification process generally" and how terms like "consumer" and "professional" were understood "in the software industry."  2019 WL 6327210, at *3, 4 (N.D. Cal. Nov. 26, 2019).  The court in *Dolby* further held that, "notwithstanding his lack of industry experience," one of the proffered experts "ha[d] the requisite expertise to address industry customs and practices based on his study of the industry, including his

examination of academic resources and publicly-available third-license agreements." *Id.* at *4. Similarly, in *Actuate Corporation* v. *Aon Corporation*, another software contract dispute, the court permitted expert testimony "on the meaning of the term 'CPU' in the software licensing and computer hardware industry" because this was "proper expert testimony on industry custom to aid in the interpretation of an ambiguous term." 2012 WL 2285187, at *1 (N.D. Cal. June 18, 2012). The court also held that an expert's experience teaching university-level software courses, serving for eight years as CEO and founder of a software company, and consulting on issues related to software license agreements "qualified [him] to discuss, generally, the development of computer processors" and "how the term CPU would have been understood in the context of software license agreements." *Id.* at *3.[6]

Similarly, here, Mr. Hagins's decades of experience provides adequate foundation to support his testimony regarding custom in the software development industry. Mr. Hagins's opinions cover "industry norms and practices related to software development, enterprise software, and software implementation and integration." Hagins Rep. ¶ 7. His expertise in this area comes from 42 years of experience in the technology industry, including serving as Chief Executive Officer, Chief Technology Officer, and Chief Information Officer of multiple companies; holding roles as a software developer, software engineering manager, consulting engagement manager, hardware engineering manager, and data center operations manager; working on over a dozen software integration projects, in both management and consulting positions; and advising and investing in technology companies. *Id.* ¶¶ 1–6, App. A. Further, Mr. Hagins repeatedly explained how this experience and expertise serves as the basis for his opinions in this case. For example, when questioned about his opinion that there is no direct relationship between the number of issues that arise during the software development process and the amount of time needed to resolve those issues, Mr. Hagins referenced a software implementation project he worked on where he resolved a list of nearly 500 customer issues

---

[6] Courts outside the Ninth Circuit have reached similar results. *See, e.g.*, *ECD Inv. Grp.*, 2017 WL 3841872, at *17 (holding, in securities fraud case, that expert may testify "that industry custom and practice dictate that whenever [the term] 'hedging' is referred to in [certain] context[s] . . . , market participants understand that" term in a certain way, and further holding that expert need not support this interpretation "with extrinsic evidence" but could instead "rely on his experience in financial capital markets").

simply by addressing 10 of them.  *See* Ex. 03 Hagins Dep. 109:10–110:5.  And when questioned about his opinion that complaints from enterprise software customers in early adopter programs are not inconsistent with the belief that the software will ultimately address customer needs, Mr. Hagins referenced his experience as a Chief Information Officer and explained that CIOs "tend to complain loudly and vociferously" even when problems are not severe because they know that by doing so they are more likely to receive immediate support and attention.  *Id.* at 231:13–232:11.

In addition, Mr. Hagins supplements his own expertise by citing relevant industry sources and treatises.  *See, e.g.*, Hagins Rep. ¶ 27 n.36 (citing Steve McConnell, *Code Complete: A Practical Handbook of Software Construction*, Second Edition, (Redmond, WA: Microsoft Press, 2004)); *id.* ¶ 81 n.75 (citing Kenneth S. Rubin, *Essential Scrum: A Practical Guide to the Most Popular Agile Processes*, (Upper Saddle River, NJ: Addison-Wesley, 2013)).  Mr. Hagins's "significant knowledge of and experience within" the enterprise software industry thus provides the "minimal foundation of knowledge, skill, and experience required in order to give expert testimony on the practices and norms of" that industry.  *Hangarter*, 373 F.3d at 1016 (emphasis and quotations omitted).[7]

To the extent that Plaintiffs' foundational challenges to Mr. Hagins's testimony rest on the (false) assumption that there is *no* evidence tethering this testimony to Zuora specifically, Defendants proffer that other witnesses will connect Mr. Hagins's descriptions of enterprise software development and integration generally to what occurred at Zuora and with Keystone

---

[7] For substantially the same reasons, Plaintiffs are wrong that Mr. Hagins's opinions constitute "improper *ipse dixit.*" Pls.' Mot. to Exclude at 8.  As explained, Mr. Hagins bases his opinions on extensive experience in the technology industry.  And to the extent there was any remaining confusion, Mr. Hagins repeatedly clarified during his deposition how that experience informed his opinions.  As "[t]he Supreme Court [has] clearly stated[,] . . . 'an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'"  *Radware, Ltd.* v. *F5 Networks, Inc.*, 2016 WL 590121, at *20 (N.D. Cal. Feb. 13, 2016) (quoting *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 156 (1999)).  Indeed, as to "non-scientific testimony," such as Mr. Hagins's here, "reliability depends heavily on the *knowledge and experience of* the expert, rather than the methodology or theory behind it."  *Hangarter*, 373 F.3d at 1017 (quotation omitted; emphasis in original).  Plaintiffs' primary citation to the contrary, *Open Text S.A.* v. *Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015), is inapposite.  There, the court excluded testimony from a damages expert purporting to offer a royalty rate calculation because the expert did not "spell[] out the steps she took to go from the data to the royalty rate opinion," and instead used a "black box" calculation that prevented the jury from seeing "how the data drives the conclusion."  *Id.* (quotations omitted).  That is a far cry from the situation here, where an expert in a particular industry utilizes his extensive knowledge and experience of that industry to opine on general industry norms and understandings.

---

1   specifically.  Numerous witnesses testified in depositions that the Keystone process was

2   consistent with the sorts of technical implementation issues that Mr. Hagins opines are routine

3   with enterprise software.  For example, Tien Tzuo, founder and CEO of Zuora, explained that

4   identification of additional use cases by the Keystone deployment team during early customer

5   testing of Keystone was not unusual, as "it's not atypical for engineering projects at this point in

6   the development to uncover things that have to be worked on."  Ex. 02 Tzuo Dep. 164:3-6; *see*

7   *also, e.g.*, *id.* at 164:22-24 (explaining "that it's typical in this phase of an engineering

8   deliverable that they're working out things that they see").  Marc Diouane, President of Zuora

9   during the relevant time period, explained that Keystone experienced "all those normal

10  challenges in the process of launching new product" that enterprise software companies running

11  early adopter programs expect.  Ex. 04 Diouane Dep. 91:2-8; *see also, e.g.*, *id.* 82:2-5

12  (explaining that identifying risks for customers participating in the Keystone early adopter

13  program was "very common to all software development companies" and "[n]othing unusual"

14  "in terms of new product developments").  And Robert Hildenbrand, Zuora's Senior Vice

15  President of Global Services, further explained that, beyond Keystone, implementation schedules

16  getting pushed back during any individual "deployment project" is "not an unusual occurrence."

17  Ex. 01 Hildenbrand Dep. 138:12-14.  In addition, Defendants proffer that other witnesses and

18  documentary evidence will explain the specific process Zuora followed to integrate its systems

19  and how that related to Keystone specifically.

20      In sum, Mr. Hagins's testimony about enterprise software has adequate foundation as it is

21  grounded in his extensive experience and expertise within that industry.  He need not connect his

22  testimony to what occurred at Zuora specifically, as ample other evidence will make that

23  connection at trial.  There is thus no basis to exclude Mr. Hagins's testimony for failing to satisfy

24  the requirements of Rule 702, and the Court should deny Plaintiffs' motion.[8]

25

26  ---

[8] Ironically, after spending pages of their motion challenging Mr. Hagins's opinions for not being Zuora-specific,

27  Plaintiffs then identify "give-or-take-six instances" in which Mr. Hagins "arguably links his general opinions to
    something specific to Zuora."  Pls.' Mot. to Exclude at 10.  Plaintiffs then immediately fault Mr. Hagins for

28  "provid[ing] no support" for these Zuora-specific "conclusions."  *Id.*  The explanation for this is as simple as it is
    obvious: Mr. Hagins provides no "support" for Zuora-specific "conclusions" because he does not purport to offer
    *any* opinions about Zuora's processes specifically.  *See infra* Section VI.

**VI.    THE HIGH PROBATIVE VALUE OF MR. HAGINS'S OPINIONS IS NOT OUTWEIGHED, LET ALONE SUBSTANTIALLY OUTWEIGHED, BY THE DANGER OF CONFUSION**

Plaintiffs also contend that the Court should exclude Mr. Hagins's opinions under Federal Rule of Evidence 403. *See* Pls.' Mot. to Exclude at 11–12. Plaintiffs are wrong. The high probative value of Mr. Hagins's opinions is not outweighed—let alone "substantially outweighed"—by a danger of confusing the issues, misleading the jury, or wasting time. Fed. R. Evid. 403.

Plaintiffs' Rule 403 arguments are largely a rehash of their flawed Rule 702 arguments, namely, that because Mr. Hagins offers testimony relating to software development *generally* and not Zuora *specifically* the jury will be confused about what this case is about. *See* Pls.' Mot. to Exclude at 11. But, as explained above, a critical issue in this case is whether Defendants' statements about its platform in fact "had the distinctive, and false, meaning" relating to the "integration" of Zuora Billing and RevPro that Plaintiffs allege those statements had. *Wochos*, 985 F.3d at 1194. Mr. Hagins's testimony goes directly to that central issue by helping to show why Plaintiffs' understanding of "integration" is flawed and why Defendants' public statements, properly understood in the enterprise software context, were not false or misleading or made with intent to deceive.

Nor is there any support for Plaintiffs' assertion that Mr. Hagins's opinions about general industry practices "may readily be misunderstood by some jurors as specifically applying to Zuora." Pls.' Mot. to Exclude at 11. As Plaintiffs themselves repeatedly emphasize in their Motion, Mr. Hagins offers opinions only about industry standards generally, *not* about Zuora's practices specifically. *See, e.g.*, *id.* at 3, 6. Indeed, Mr. Hagins himself repeatedly affirms during his deposition that his assignment "was not to opine on any of the facts of what actually happened at Zuora," and that he "only intend[s] for the jury to understand . . . the industry norms and practices with regard to development of enterprise software, implementation, and integration . . . in a generalized context." Ex. 03 Hagins Dep. 62:4-5, 96:16-20; *see also id.* at 26:22-23 (stating "my assignment was not to opine on any specifics of the case"). A jury will have no

1   problem understanding this distinction between testimony about industry practices generally and

2   testimony about Zuora's practices specifically.[9]

3       At bottom, Plaintiffs ask this Court to exclude Mr. Hagins's testimony because it does not

4   draw each and every connection necessary to disprove any aspect of Plaintiffs' case. *See, e.g.*,

5   Pls.' Mot. to Exclude at 11 ("Given that Hagins's opinions do not concern practices specific to

6   Zuora or subscription software providers, but rather purported norms in the software industry

7   generally, their probative value is limited at best" (internal quotations omitted)).  But, as the

8   Ninth Circuit has recognized, "[r]eliable expert testimony need only be relevant, and need not

9   establish [or refute] every element that the plaintiff must prove, in order to be admissible."

10  *Primiano*, 598 F.3d at 565; *see also New Jersey* v. *T.L.O.*, 469 U.S. 325, 345 (1985) ("[I]t is

11  universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove

12  the ultimate fact in issue.").  Nor is this the appropriate ground on which to exclude evidence

13  under Rule 403, whose "function is limited to excluding matter of scant or cumulative probative

14  force, dragged in by the heels for the sake of its prejudicial effect."  *Hankey*, 203 F.3d at 1172;

15  *see also Alaska Rent-A-Car, Inc.* v. *Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)

16  ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude

17  opinions merely because they are impeachable.").

18      Because Mr. Hagins's testimony has high probative value and presents little (if any)

19  danger of confusion, the Court should not exclude it under Rule 403.

20  **VII.    <u>CONCLUSION</u>**

21      For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude the expert

22  report and testimony of Mr. Hagins.

23  Dated:   January 27, 2023

24                                     By:   */s/ Melinda Haag*
                                           Melinda Haag
25                                         *Attorneys for Defendants Zuora, Inc., Tien*
26                                         *Tzuo and Tyler Sloat*

27  _____
[9] Moreover, any concern about the role and limits of Mr. Hagins's testimony can be addressed through an
28  appropriate curative instruction at trial.  *See S.E.C.* v. *Bankatlantic Bancorp, Inc.*, 2013 WL 12009694, at *11 (S.D.
    Fla. Nov. 14, 2013) (stating "[party] may seek an appropriate curative instruction to alleviate its concerns regarding
    the weight the jury may place on [expert's] opinion").