EXHIBIT 03

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4     CASEY ROBERTS, individually   ) No. 3:19-cv-03422-SI

      and on behalf of all other    )

5     similarly situated,           )

                                    )

6                    Plaintiff,     )

                                    )

7     vs.                           )

                                    )

8     ZUORA, INC., TIEN TZUO, and   )

      TYLER SLOAT,                  )

9     _____)

10

11              CONFIDENTIAL

12

13

14        REMOTE VIDEO RECORDED DEPOSITION OF

15              JEFFREY L. HAGINS

16          Thousand Oaks, California

17          Monday, October 10, 2022

18                  Volume I

19

20

21

22

23    Reported by:

      LISA ANDREASEN

24    CSR No. 9584

25

CONFIDENTIAL

Page 2

1                  UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4       CASEY ROBERTS, Individually   ) No. 3:19-cv-03422-SI

        And On Behalf of All Other    )

5       Similarly Situated,           )

                                       )

6                       Plaintiff,     )

                                       )

7       vs.                            )

                                       )

8       ZUORA, INC., TIEN TZUO, and    )

        TYLER SLOAT,                   )

9       _____)

10

11

12

13

14

15

16          Deposition of JEFFREY L. HAGINS, Volume I, taken

17       on behalf of Plaintiffs, with the witness located in

18       Thousand Oaks, California, beginning at 9:02 a.m. and

19       ending at 5:25 p.m. on Monday, October 10, 2022, before

20       LISA ANDREASEN, Certified Shorthand Reporter No. 9584.

21

22

23

24

25

CONFIDENTIAL

Page 25

```
 1      know, at a high level provide an understanding of

 2      the overall software development process and life

 3      cycle and then discuss, you know, more detail around

 4      enterprise software implementations of same and

 5      integrations.

 6          Q    Was anything else discussed in that call?

 7              MS. MUCK:  Object to form.

 8              THE WITNESS:  Not that I recall.

 9      BY MR. MELANSON:

10          Q    Do you recall what date that call occurred?

11          A    I do not.  No, I'd have to -- I'd have to

12      look at my notes to answer that question, but I

13      believe it was in May or -- May or June of this

14      year.

15          Q    So I'm clear, May or June of this year you

16      had an hour- to two-hour long conversation with

17      Cornerstone and defendants regarding your expert

18      report and understanding of certain topics before

19      you started drafting your report?

20              MS. MUCK:  Object to form.

21              THE WITNESS:  Those topics that I already

22      stated, that's correct.

23      BY MR. MELANSON:

24          Q    During that call, did the defendants

25      provide you a factual background of the case?
```

CONFIDENTIAL

Page 26

```
 1                    MS. MUCK:  Object to form.
 2                    THE WITNESS:  They provided a summary of
 3            the complaint, but we didn't really get into the
 4            facts of what had happened at Zuora or any of that
 5            because it wasn't necessarily going to be
 6            required -- right? -- for me to develop the report
 7            since my assignment is to -- is to touch on the
 8            norms for the industry as a whole.
 9            BY MR. MELANSON:
10                Q    When you mentioned that summary of the
11            complaint that was provided to you, was that a
12            written document?
13                    MS. MUCK:  Object to form.
14                    THE WITNESS:  I have since seen the
15            complaint that was included in the materials that I
16            reviewed, but, no, not at -- not on that call.
17            BY MR. MELANSON:
18                Q    You mentioned the defendants didn't provide
19            you specific details of what was going on at Zuora.
20            Why was that?
21                A    We didn't discuss a reason for it, but,
22            again, my assignment was not to opine on any of the
23            specifics of the case.  So my assumption is that
24            they didn't see a reason to go deep on the facts of
25            the case since I wasn't actually going to opine on
```

CONFIDENTIAL

Page 27

```
 1    the facts of the case.

 2        Q    Did defense counsel or Cornerstone

 3    specifically instruct you not to opine on the facts

 4    of this case?

 5              MS. MUCK:  Object to form.

 6              THE WITNESS:  I don't -- you know, they

 7    gave me an assignment, and I stayed within the

 8    bounds of that assignment.  So no one -- no one

 9    instructed me not to opine on the case, but it

10    wasn't my assignment to opine on the facts of the

11    case.

12    BY MR. MELANSON:

13        Q    During your introductory conversations with

14    Cornerstone and defense counsel, did you inquire

15    whether they wanted you to comment on any specific

16    aspect of this case or what was going on at Zuora?

17        A    I don't recall specifically.  I wouldn't be

18    surprised if I asked if I should opine on, you know,

19    the facts of the case, but I don't really remember.

20        Q    It's your understanding, though, that after

21    your conversations with defense counsel and

22    Cornerstone your assignment was to not opine on any

23    specific going-ons at Zuora during the class period;

24    correct?

25              MS. MUCK:  Object to form.
```

Page 54

1          Q    So you've never provided expert testimony

2      in a bench trial setting before a federal judge?

3          A    That's correct.

4          Q    How many times have you provided expert

5      testimony in any live federal court proceeding?

6          A    I don't know that I've -- none, no.  I'm

7      not a professional expert so --

8          Q    How many times --

9          A    -- none.

10         Q    How many times have you provided live

11     expert testimony in front of a judge or arbiter in a

12     nonjudicial setting?

13         A    Three, I believe.

14         Q    What were those cases briefly?

15         A    Well, that's going to -- you're going to

16     test my memory here because I don't --

17         Q    I'll provide you some structure, then.

18     What were the forums that you provided that live

19     testimony in?

20         A    Well, the International Trade Commission

21     was one, and then there were two arbitrations in

22     front of a panel of three arbiters, but those go

23     back to the cases that I was involved in back, you

24     know, between 2004 and 2007, so quite a while ago.

25     In the last four years, as it says in my résumé,

Page 55

1     really there have only been two -- two cases that
2     got to the point of even a deposition, not testimony
3     but a report and deposition, and that is in 2020 in
4     the matter of Certain Smart Thermostats.  That was
5     in front of the International Trade Commission
6     before an administrative law judge.
7               And then in the case of Vivint v.
8     Alarm.com, that is an ongoing case where I have
9     submitted a report and been deposed, but the trial
10    is not scheduled to happen until sometime next year.
11         Q    In addition to the ITC case and the Vivint
12    case, have you ever provided testimony in a
13    deposition setting in any other case?
14         A    I've been deposed in most of the cases
15    where I worked as an expert, not all because
16    certainly there are -- there have been situations
17    where a case was dismissed before -- you know,
18    before it got to the point where I even wrote a
19    report.  But most of the cases that I've worked on
20    have involved being deposed.
21         Q    To the best of your recollection, how many
22    cases have you been retained in to provide expert
23    testimony?
24         A    Let's see.  Eight.
25         Q    When was the first time you were retained

CONFIDENTIAL

Page 56

1    as an expert?  The year is sufficient.

2        A    Yeah, like 2004.

3        Q    Of those eight times you've been retained

4    to be an expert witness, how many times have you

5    provided a -- have you testified in a deposition

6    setting?

7        A    I think six.  There have been at least two

8    cases that have not -- that have been dismissed or

9    settled before I even wrote a report.

10        Q    And when you provided these numbers, eight

11    times you've been retained as an expert, six times

12    being deposed, do those numbers include just in

13    federal court proceedings, or do they include other

14    types of judicial proceedings?

15        A    No, that includes all types of proceedings.

16        Q    Of the eight times you've been retained as

17    an expert, how many times were you retained in a

18    federal court proceeding?

19        A    I believe two, the Vivint v. Alarm.com

20    case, and then there was a case called Sensormatic

21    v. Wyze, W-y-z-e.  That was also in federal court.

22    That case was dismissed before I wrote my expert

23    report.

24        Q    So you've already mentioned Sensormatic,

25    the Vivint case, a case before the international

CONFIDENTIAL

Page 57

1    trade tribunal and two arbitrations.  In addition to

2    those five cases, I use that term broadly, what

3    other cases have you been retained as an expert in?

4        A    There were other cases that -- in the early

5    2000s that were settled before I ever had to be

6    deposed.

7        Q    For each of these cases in which you were

8    retained as an expert, did your expert opinion

9    pertain to intellectual property such as under

10   patents or trademark law?

11           MS. MUCK:  Object to form.

12           THE WITNESS:  It varied.  There have been

13   three or four -- three or four patent cases, and

14   then the other cases were the ones from the early

15   2000s that were really more breach of contract cases

16   involving software.

17   BY MR. MELANSON:

18       Q    And what did you opine on in your expert

19   reports prepared for those breach of contract

20   purposes?

21       A    Well, there's, I think, a lot of -- a lot

22   of things.  It's hard to remember back that far, but

23   typically looking at the -- you know, the contracts

24   in those cases and opining on, you know, both

25   whether the vendor had met their performance

1       the subject of a motion to exclude?

2           A    I don't know.  I mean --

3           Q    Is it fair to say --

4           A    -- I wouldn't -- I wouldn't be surprised.

5       Right?  I mean, I think it's very common for

6       opposing counsel to move to exclude an expert's

7       testimony.  So I'd be stunned if that weren't the

8       case.

9           Q    But you don't know right here today?

10          A    But I do not know.

11          Q    I'd like to direct your attention to

12      Appendix B of your expert report.

13          A    Okay.

14          Q    So earlier in the first segment we were

15      discussing under a different topic your general

16      process for preparing for this deposition and

17      drafting your expert report.  During that

18      conversation, you mentioned that you reviewed the

19      complaint in this action.  Is that accurate?

20          A    Correct.

21          Q    Did you review the complaint in its

22      entirety?

23          A    I don't know that I read -- no, I'm sure I

24      did not read it in its entirety.  I skimmed through

25      it at a high level and read some sections but not

Page 62

```
 1    others.
 2          Q    Why did you skim through it at a high
 3    level?
 4          A    Because my assignment wasn't to opine on
 5    any of the facts of what actually happened at Zuora
 6    during the class period.  So I really was only
 7    reviewing these documents for context that might,
 8    for example, tell me of a particular aspect of
 9    industry norms that I should discuss in my report,
10    such as integration.
11          Q    In reviewing specific sections of the
12    complaint, were you provided any direction from
13    defense counsel or Cornerstone?
14          A    No, none.
15          Q    So you yourself selected which parts to
16    skim and which parts not to skim?
17          A    I did.
18          Q    And in this skimming exercise, you weren't
19    interested in the specific ongoings of Zuora during
20    the class period?
21          A    I was interested in the activities under --
22    that were relevant to the case, again such as
23    enterprise software implementations or
24    integrations -- right? -- as two things that
25    surfaced in my general review of these documents,
```

CONFIDENTIAL

Page 63

```
 1        and that's one of the reasons I knew to talk about

 2        enterprise software implementations and

 3        integrations.

 4             Q    So you aren't an expert in federal

 5        securities laws, and you didn't review the complaint

 6        in its entirety.  You skimmed it.  How did you

 7        determine what was relevant to the case?

 8                  MS. MUCK:  Object to form.

 9                  THE WITNESS:  Across all of these

10        documents, I looked for references to different

11        aspects of software development and implementation

12        to get a high-level sense about what topics should

13        be discussed with respect to industry norms.

14        Certainly there are many aspects of software

15        development and software engineering that I did not

16        discuss -- right? -- in my report, and so I relied

17        on these documents to tell me which parts of the

18        software development or implementation life cycle

19        were at issue in the case so that I would know to

20        talk about those topics.

21        BY MR. MELANSON:

22             Q    So I understand what you did to review for

23        the report and what you actually put in the report,

24        but my question was a little different.  My question

25        was:  How did you determine what is or wasn't
```

Page 95

1          Q    You don't intend for your opinion to be

2     relied upon by the jury for the purpose of

3     understanding the propriety, accuracy or

4     completeness of Zuora's statements to the public

5     including any about Keystone during the class

6     period; correct?

7               MS. MUCK:  Object to form.

8               THE WITNESS:  Correct.

9     BY MR. MELANSON:

10         Q    In your report, you don't opine about the

11    sufficiency of Zuora's disclosures to the public or

12    to Zuora's customers during the class period;

13    correct?

14              MS. MUCK:  Object to form.

15              THE WITNESS:  That's correct.

16    BY MR. MELANSON:

17         Q    In your report and here and now, you don't

18    claim to be an expert on the sufficiency of Zuora's

19    disclosures to the public during the class period;

20    correct?

21         A    Correct.

22         Q    You don't intend for your opinion to be

23    relied upon by a jury for the purposes of

24    understanding the sufficiency of Zuora's disclosures

25    to the public during the class period; correct?

1            MS. MUCK:  Object to form.

2            THE WITNESS:  That's correct.

3    BY MR. MELANSON:

4        Q    In your report, you don't opine on the

5    actual causes for delays in Keystone's development;

6    correct?

7        A    That's correct.

8        Q    You don't claim to be an expert on the

9    actual causes for Keystone's -- for delays in

10   Keystone's development; correct?

11       A    That's correct.

12       Q    And you don't intend for the jury to rely

13   upon your opinion for the purpose of understanding

14   the actual causes for Keystone's delay; correct?

15           MS. MUCK:  Object to form.

16           THE WITNESS:  That's correct.  I only -- I

17   only intend for the jury to understand, again, the

18   scope of my assignment -- right? -- the industry

19   norms and practices with regard to development of

20   enterprise software, implementation and integration.

21   BY MR. MELANSON:

22       Q    And that's those norms in a generalized

23   context; correct?

24           MS. MUCK:  Object to form.

25           THE WITNESS:  That's correct.

```
 1        BY MR. MELANSON:
 2            Q    In your report, you don't opine on the
 3        reasonableness of any specific cause for Keystone's
 4        delay during the class period; correct?
 5                 MS. MUCK:  Object to form.
 6                 THE WITNESS:  That's correct.
 7        BY MR. MELANSON:
 8            Q    You don't claim to be an expert on the
 9        reasonableness of any specific cause for Keystone's
10        delay during the class period; correct?
11            A    That's correct.
12            Q    And you don't intend for your opinion to be
13        relied upon by the jury to be -- understand the
14        reasonableness of any specific cause for Keystone's
15        delay during the class period; correct?
16                 MS. MUCK:  Object to form.
17                 THE WITNESS:  I think -- I think by
18        understanding the industry norms, the jury can form
19        their own -- their own opinion about the
20        reasonableness.  So to that extent, my report is a
21        tool for them to use to form their own opinions.
22        BY MR. MELANSON:
23            Q    How so?
24            A    Because if they understand the industry
25        norms with regard to, you know, software
```

1    issues and the time required to resolve those

2    issues.

3        Q    And just so I'm clear, when you're saying

4    there's no relationship, you aren't saying -- you

5    aren't just saying that there isn't a one-to-one

6    relationship.  You're saying there's no correlation

7    whatsoever between severity and time taken to

8    resolve; correct?

9        A    That's correct.

10        Q    And that's in a general context; correct?

11        A    Correct.

12        Q    Is that a universal principle?

13        A    I would take it as such, yes, that in

14    general in software that issues are not the same as

15    defects.  Defects refer to the underlying root cause

16    and that a particular customer or tester for that

17    matter could discover hundreds of issues that all

18    relate back to a single defect, a single root cause,

19    and that the severity of those issues has no bearing

20    on the level of complexity of solving the defect.

21    So the defect could be literally, you know, changing

22    one character in the code, and it makes everything

23    work, or it could be something that requires

24    significant rework or re-architecture.  There's

25    no -- there is no relationship between the two.

1          Q    So let's break that down a little bit more,
2     then.  Are you opining that the number of issues
3     that arise during the software development process
4     has no relationship to the amount of time or effort
5     needed to resolve those issues?
6               MS. MUCK:  Object to form.
7               THE WITNESS:  That's exactly what I'm
8     opining, yes.
9     BY MR. MELANSON:
10         Q    Are you opining that as an issues list gets
11    longer there's no indication of the relationship
12    between the amount of time it would take to resolve
13    an issues list?
14         A    That's correct.  And I can maybe best
15    characterize it with an example.  I've been involved
16    in enterprise software implementation projects where
17    the customer had an issue list that was 500 items
18    long and was ready to cancel the implementation
19    project entirely, and I asked them to prioritize the
20    top ten issues.  And we resolved the top ten issues,
21    and almost all of the other 500 have gone away.
22    Because all of the issues were stemming from defects
23    that were manifesting themselves as multiple issues,
24    and so fixing the top ten defects actually resolved
25    most of the issues.  So there's no -- there's no

1    correlation.  You can't know just by looking at an

2    issue list that's 500 issues long whether you're

3    talking about, you know, 500 defects or whether

4    you're talking about 5 defects.  It's not -- it's

5    not a knowable thing.

6        Q    So I want to make sure we're not conflating

7    things here because you used two different words.

8    In that opinion, you talked about correlation, so

9    the correlation between the number of issues and

10   number of defects, and then you talked about the

11   predictability of looking at either of those lists

12   and knowing how long it would take to resolve

13   problems.

14            So I want to again make clear, you keep

15   going back to your opinion that there's no

16   correlation between the number of issues on a list

17   and the time it would take to solve that list.  Is

18   that still an accurate representation of your

19   opinion?

20       A    Correct.  Yes.

21       Q    And your understanding for that opinion is

22   that a number of issues could relate to a singular

23   defect; correct?

24       A    Correct.  And any experienced software

25   executive will know this.  They'll have seen

CONFIDENTIAL

Page 111

1    projects that have a huge number of issues, you

2    know, come together very quickly once a small number

3    of root cause defects were resolved.

4        Q    But just as if a number of issues can

5    relate to one defect, they can also relate to many

6    defects; correct?

7        A    Many issues could relate to many defects,

8    yes.  One issue is not going to relate to many

9    defects.  Right?  The many-to-one relationship is

10   the inverse of that.  One defect can have many

11   issues.  But, yes, many issues could result from

12   many defects.  There's no direct correlation.

13       Q    Is it your opinion that as the number of

14   defects rise in a software development project that

15   there's no correlation to the amount of time it

16   would take to resolve all defects with the software

17   development project?

18            MS. MUCK:  Object to form.

19            THE WITNESS:  Resolution of defects is a

20   function of a number of different factors, including

21   the complexity of the code involved, developer --

22   the developer's own skill set, you know, the

23   experience and skills of the individual developer

24   assigned to fix that defect, the amount of time that

25   it actually takes to identify the defect.  One of

1      bracket called Keystone integration services in the

2      middle?  Correct?

3          A    Correct.

4          Q    And you are citing to the fact -- in

5      Keystone integration services, the word services, is

6      that referring to the service provided by the

7      software in Keystone itself or some different

8      source?

9              MS. MUCK:  Object to form.

10             THE WITNESS:  I believe it's referring to

11     the service provided by Keystone itself.

12     BY MR. MELANSON:

13         Q    So this graphic is describing services done

14     by Keystone on data from Zuora Billing to configure

15     it for purposes of Zuora RevPro, in your opinion;

16     correct?

17         A    That's correct.

18         Q    And from that information, you're inferring

19     that Keystone could not be out of the box; correct?

20         A    Not just from this, no.  From the totality

21     of everything that I've pointed to, I'm saying that

22     the behavior of the integration service itself was

23     data driven.  Right?  It was -- it was -- it did

24     different things based on how these templates and

25     these mappings were used that the software did

CONFIDENTIAL

Page 199

```
 1    different things.

 2        Q    Is it your opinion, then, that Zuora could

 3    never provide an out-of-the-box integration between

 4    Billing and RevPro as you understand the term

 5    out-of-the-box integration to mean?

 6            MS. MUCK:  Object to form.

 7            THE WITNESS:  Fundamentally if you allow on

 8    the one side Zuora Billing, if you allow customers

 9    to add custom fields and then you need to use those

10    customs fields in RevPro but you don't know what

11    they mean, then that's correct.  It would not be

12    possible to provide a truly out-of-the-box

13    integration.  It would always require configuration

14    or customization so that the integration layer, the

15    service in between, would actually know what to do

16    with that data.

17            Because I could add a custom field called

18    bananas, and you have no idea what that means, but

19    it means something to me as a customer.  Right?  So

20    what do I do with a custom field called bananas?

21    Well, you do what -- you do what in this case what

22    the mapping templates tell you to do with it.

23    BY MR. MELANSON:

24        Q    Does that opinion you just expressed

25    regarding whether Zuora could ever offer a truly
```

CONFIDENTIAL

Page 200

1       out-of-the-box integrator between Billing and RevPro

2       hold true if a custom field, for example one titled

3       bananas, was one that was commonly used by some but

4       not all of Zuora's customers?

5           A    So I build -- I build software like this,

6       you know, all the time.  It's part of what we do as

7       a business.  We build data-driven software, software

8       that is configurable and customizable.  And I can

9       say that in my experience, even if there are common

10      use cases, common fields -- in this example, maybe

11      bananas is a common field, and you can know what

12      that means -- but you don't hard code the solution

13      for that.  You leave it flexible.  You leave it

14      configurable and customizable because you could be

15      wrong.  And so, you know, the goal, as I say in my

16      report at the very beginning, the goal with

17      enterprise software is to have software that is

18      configurable and customizable to meet the customer

19      where -- where they are.  You don't want to have --

20      you don't want them to have to change something to

21      meet -- to meet the software.  You want the software

22      to adapt to their needs.

23          And that is distinctly different than other

24      types of business software where -- you know,

25      software for small businesses, for example, the

1          A     Correct.

2          Q     In stating Opinion 5, you are not opining

3     that complaints and concerns Zuora received from its

4     early adopter customers during the class period

5     related to its products, including Keystone, were

6     not actually indicative of whether Keystone

7     Version 1 would address customer needs; correct?

8          A     That's correct.

9          Q     From the standpoint of an enterprise

10    software company, you're not opining within

11    Opinion 5 that the existence of complaints or

12    concerns relating to software in an early adopter

13    program is consistent with the belief that the

14    software currently addresses customer needs;

15    correct?

16              MS. MUCK:  Object to form.

17              THE WITNESS:  I kind of think I lost the

18    thread on that one.  Can you repeat it.

19    BY MR. MELANSON:

20         Q     Sure.  In Opinion 5, you are not opining

21    that from the standpoint of an enterprise software

22    company the existence of complaints or concerns

23    relating to software in an early adopter program is

24    consistent with the belief that the software will

25    currently address customer needs; correct?

1              MS. MUCK:  Object to form.

2              THE WITNESS:  I'm still getting lost on

3        exactly what you're asking.  My apologies.

4        BY MR. MELANSON:

5        Q    I'll frame it a little bit differently,

6        then.  In the last sentence of Opinion 5, you opine

7        that the existence of complaints or concerns related

8        to software in early adopter programs is not

9        inconsistent with the belief that software will

10       ultimately be successful in addressing customer

11       needs; correct?

12       A    Correct.

13       Q    So my question is trying to address the

14       opposite scenario.  From the standpoint of an

15       enterprise software company, is the existence of

16       complaints or concerns relating to software in an

17       early adopter program consistent with a belief that

18       the software currently addresses customer needs?

19             MS. MUCK:  Object to form.

20             THE WITNESS:  I mean it's not.  Because

21       they're probably wouldn't be complaints if it

22       currently addressed their needs.  Right?  All I'm

23       really saying here is that CIOs, which are the

24       customers in this case, the chief information

25       officer for your -- the customer company, CIOs know

1      very well that, you know, the old adage that the

2      squeaky wheel gets the grease is alive and well when

3      it comes to enterprise software.  So when there

4      starts to be problems, CIOs tend to complain loudly

5      and vociferously in order to get more attention from

6      the vendor to their issues.  Because they want you

7      to give them preferential treatment.  Right?  And so

8      in and of itself the existence of complaints,

9      especially in an early adopter program, doesn't

10     necessarily, you know, mean anything.  It's not a

11     where there's smoke there's fire kind of situation.

12             It may mean there's problems.  It may mean

13     the software isn't going to work for that customer,

14     but it's not -- it doesn't necessarily mean that at

15     all.  Right?  In fact, most of these early adopter

16     customers that I've been involved with on both sides

17     ultimately go on to successfully implement the

18     software.  Right?  So complaints and concerns from

19     your customers don't mean anything other than I want

20     more attention from the vendor.

21     BY MR. MELANSON:

22         Q    It also means complaints -- complaints from

23     customers also means that the software isn't

24     currently working, though, at that time ; correct?

25         A    Correct.

1              MS. MUCK:  Object to form.

2         BY MR. MELANSON:

3              Q     You mentioned that a ratio or proportion of

4         early adoption programs you worked on have

5         eventually gone on to be successful despite customer

6         complaints; correct?

7              A     That's correct.

8              Q     What percentage of early adoption programs

9         have you worked on that did not go on to be

10        successful in the presence of customer complaints?

11             A     I mean, I can't -- I don't -- I don't

12        actually recall any at the moment.  Typically the

13        complaints get resolved.  Right?  The vendor puts

14        the energy into the -- into the implementation and

15        resolves the issues.

16             Q     Generally speaking are there early adopter

17        programs that don't succeed in addressing customers'

18        complaints in putting out a minimal viable product?

19             MS. MUCK:  Object to form.

20             THE WITNESS:  I think more generally there

21        are enterprise software implementations that don't

22        succeed, whether they're early adopter or not.

23        Right?  There are -- especially in the world of ERP

24        software, ERP is infamous for, you know, failed ERP

25        implementations where a vendor and a customer will