# EXHIBIT 02

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASEY ROBERTS, individually     No. 3:19-cv-03422-SI
and on behalf of all other
similarly situated,

                    Plaintiff,

vs.

ZUORA, INC., TIEN TZUO, and
TYLER SLOAT,


                    Defendants.
_____/




                    **CONFIDENTIAL**


          REMOTE VIDEO RECORDED DEPOSITION OF

                STEVEN DAVIDOFF SOLOMON

                San Francisco, California

                Thursday, October 27, 2022

                        Volume I




     Reported by:

     LISA ANDREASEN

     CSR No. 9584

     Job No. 5531712

     PAGES 1 - 161

CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASEY ROBERTS, individually    No. 3:19-cv-03422-SI

and on behalf of all other

similarly situated,

                    Plaintiff,

vs.

ZUORA, INC., TIEN TZUO, and

TYLER SLOAT,

                    Defendants.

_____/

        Deposition of STEVEN DAVIDOFF SOLOMON, Volume I,

taken on behalf of Plaintiffs, with the witness located

in San Francisco, California, beginning at 8:31 a.m. and

ending at 2:25 p.m. on Thursday, October 27, 2022, before

LISA ANDREASEN, Certified Shorthand Reporter No. 9584.

CONFIDENTIAL

Page 38

Q    Do you know if Cornerstone conducted any searches in a database?

A    I don't.

Q    And it's your understanding that Appendix C doesn't list all the documents produced in the litigation; right?

A    I think it would be a very, very, very long list if it did.  This lists the documents that I considered as part of the record, and I deem them sufficient to provide my opinions.  If there's something additional you'd like me to look at, I'm certainly very happy to and reconsider my opinions.

Q    And Appendix C lists all the documents you considered in forming your opinions?

A    No.

Q    So what documents are missing from this appendix that you considered?

A    So, again, I drew on my experience of study, academic study, professional experience and otherwise.  For the documents that I reviewed in the record, these are the ones that are listed, but I drew on my entire experience, which of course includes I read every day.  So it includes all that, also.

Q    So what's the type of reading that you do

CONFIDENTIAL

Page 39

every day that you would have drawn on to provide an opinion in this case?

A    We're really going to do this?  I mean, you know, I'm a professor.  I mean, I read studies.  I read reviews.  I serve on a public board of directors.  I serve on private boards of directors.  I have a company that I've started that does financial analytics.  I read the newspapers.  I read books to my children.  You know, I read everything for my professional background and otherwise, and that encompasses reading the literature on disclosure issues and processes.

I have other cases that I do, including cases for the SEC and DOJ.  So I read those, which also include materials that are relevant to disclosure processes and procedures.  But I've basically spent my life reading.  That's why my eyes are terrible.  They don't look that way, but I have specialized lenses unfortunately, and I need to wear reading glasses, and it's just downhill.

Q    Are there any materials that you received from counsel that you reviewed but you did not consider for purposes of this report?

A    No.  This is -- this is a list of the things that were provided to me and I reviewed.  The

CONFIDENTIAL

Page 40

only things outside of this list that I am aware of that I reviewed that are in the record are the reports that I mentioned before.

Q    The expert reports -- correct? -- just to clarify the record?

A    Yes, that's correct.

Q    And you reviewed the complaint in this case; is that correct?

A    I did.

Q    Did you review it in its -- oh.

A    I believe it's the amended complaint, but yes.

Q    Yes.  If I refer to the complaint, I do mean the amended, the operative complaint that is in the case, but thank you for clarifying.

Did you review the amended complaint in its entirety?

A    I believe so.  I read it, yes.

Q    When you were reviewing the complaint, did you focus on any specific sections?

A    Not that I recall.

Q    And you also reviewed deposition transcripts; correct?

A    I did.

Q    You reviewed the transcript for Karthik

CONFIDENTIAL

Page 63

disclosure through the audit committee on that board.  So it doesn't have the exact name disclosure committee, but I serve as chair of that committee.

Q    And is that company the Social Capital Suvretta Holding Corp that you list in Appendix A?

A    Yes, it's S-u-v-r-e-t-t-a.

Q    And you stopped practicing corporate law in 2004; is that correct?

A    I don't think that's the case.  I mean, I stopped a full-time practicing attorney at Freshfields in 2004, but I've done matters since then for people, and, you know, I have a startup.  I have two startups that I refer to.  I provided legal advice at times to the extent allowed within my license, and I have been retained to do some other things that I guess you would define as practice over the years.

Then to the extent that, again, I said I provide corporate governance advice and otherwise; so I don't know if that's in my capacity as my attorney -- as an attorney.  It's probably not. But, you know, it's something that attorneys do.

Q    So since you stopped practicing law at a corporate law firm, you don't have any experience preparing disclosures on behalf of a public

CONFIDENTIAL

Page 64

company; is that correct?

A    I think since my time at Shearman & Sterling and Freshfields, I haven't represented a company in preparation of their disclosures or assisting them in the preparation of their disclosures.

Q    Okay.

A    I mean, certainly, you know, I'm a director of a publicly traded company, chair of the committee that approves their disclosures.  So I do.  I guess I'm involved in the preparation of that disclosure certainly.

Q    But aside from your work on the board of that publicly traded company, specifically preparing disclosures, you don't have any of that type of experience since 2004?

A    I don't think that's correct, and I'm not sure what you mean.  You know, I regularly speak to people, lecture at conferences.  I speak at director conferences about disclosure and disclosure processes and procedures.  I talk to the SEC about appropriate disclosure processes and procedures.  If you're asking me whether I've prepared or reviewed disclosure for publicly traded companies after Freshfields, the only company would be Social

Page 65

Capital.

Q    Okay.  It's going to be a similar question for earnings releases.  Since you've stopped practicing at a corporate law firm, do you have any experience drafting earnings releases?

A    Yes.

Q    In what context?

A    I'm a director of a public traded company and chair of the audit committee.

Q    Okay.  Aside from -- aside from that role, any other experience drafting earnings releases?

A    Again I have not represented a company since that time as a lawyer in connection with drafting earnings releases.

Q    Since you've left, since you stopped practicing at your law firm, at the law firm and outside of any work you've performed on behalf of a publicly traded company in which you serve on the board, do you have any experience preparing or drafting earnings calls scripts?

A    Since that time, other than my own company, I have not advised as a lawyer a company on preparing or disclosing earnings transcripts.

Q    I'm going to ask a similar question about your experience preparing guidance.  Do you have any

CONFIDENTIAL

Page 74

A    Again I don't know what you mean.
Understand?  I just don't.  I mean, that's an
allegation being made.

Q    Okay.  My --

A    If there any more specifics you'd like to
ask me, I'm happy to understand it.

Q    But you don't disagree that in the
complaint plaintiffs are contending that defendants
misrepresented the integrated nature and
functionality of Zuora's platform from the start of
the class period?

A    Again I haven't memorized the complaint,
but to the extent that you're quoting from the
complaint, I'm aware that they're alleging that,
yes.

Q    Plaintiffs also contend that defendants
repeatedly misrepresented the integrated nature and
functionality of its platform throughout the
entirety of the class period.  Same question.  Do
you have any reason to disagree with -- that
plaintiffs made that contention in the amended class
action complaint?

A    Again I'm not a factfinder here.  I'm here
to give expert witness.  The factfinding is for the
jury.  If your question is, is there a statement in

CONFIDENTIAL

Page 75

the complaint to that effect, if you represent to me, again I haven't memorized it, but I agree with that.

Q   And aside from whether there's a specific statement in the complaint, is there -- do you have any reason to -- to disagree that part of plaintiff's contention in this case is that defendants misrepresented the integrated nature and functionality of Zuora's platform throughout the class period?

A   Again I don't understand the question.  I'm not an independent factfinder.  I'm not here to determine whether the allegations in the complaint are true or not.  I'm here to offer expert witness testimony and the scope of my opinions, which is about disclosure processes and procedures and their relation to middle-market companies, as well as how Zuora management complied with those processes and procedures and the richness of the disclosure environment.  I'm not here to pass on the validity of the allegations in the complaint or to be an independent factfinder.

Q   And I'm not asking whether that allegation is true or false.  What I am asking is:  When you were putting together your report in this case and

Page 76

you were thinking through what the allegations in this case were, did you -- did you read plaintiff's allegations differently than defendants repeatedly misrepresented the integrated nature and functionality of Zuora's platform throughout the class period?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  Can you break that question down.  There's a lot of assumptions in that question, and I think it needs -- I just -- I don't even know what think through means.

BY MR. SHAEFFER:

Q    Okay.

A    Can we break it down and go through it so I can answer it fully.

Q    Let's do that.  So you reviewed --

A    Thank you.  Sorry to interrupt, but thank you.

Q    Yeah.  You reviewed the amended class action complaint in this case; correct?

A    Yes.

Q    And you understand that plaintiffs are making specific allegations in the complaint concerning statements made by defendants in this case; correct?

Page 85

case-by-case basis.  I just -- I just -- I assumed that -- I think I need to take it on a case-by-case basis.  I can't really answer that question on a broad basis like that.  If there's a particular section of my report you'd like to go to, to the extent that I knew that facts were disputed, my opinions didn't rely on them.  So I guess I assumed that.

Q    Your opinion is that Zuora's practices and processes for preparing disclosures were robust and well designed and comparable to custom and practices utilized by middle-market capitalization companies; is that correct?

A    Yes.  That's a summary of my ultimate opinion, yes.

Q    And in Footnote 2 of your report, you define a middle market capitalization company as a publicly traded company with a market capitalization of 1 billion to $10 billion; is that correct?

A    Well, I utilize the definition used by the national center for the middle-market, and that definition is between 1 billion and 10 billion.  And it's also in accord with my general understanding of what a middle-market company is based upon my experience and review of the market literature, as

CONFIDENTIAL

Page 86

well as academic study.

Q    Your report does not list the number of publicly traded companies that fall under your definition of middle-market capitalization company; is that correct?

A    It does not contain a number.

Q    Do you know how many publicly traded companies meet that definition of middle-market capitalization companies?

A    I don't.  I don't know the exact number.

Q    Okay.  Do you think it's over 500?

A    Probably.

Q    Over a thousand?

A    Probably 500 to a thousand, but I couldn't say for certain either way.

Q    Okay.  To reach your conclusion in Opinion 1, you reviewed evidence regarding Zuora's disclosure process; correct?

A    I reviewed the record that I considered to arrive at my opinions, yes.

Q    And that record included documents describing Zuora's disclosure process?

A    Yes, in part.  I mean, they were the disclosure process.  So the reason for this report is just in part to provide a description of that

process.

Q    So there wasn't one document that entailed Zuora's disclosure process; is that correct?

A    Well, their disclosure process was extensive and robust.  It involved many elements including various committees, the charters and how they acted under and the various other documents related to that process.

Q    And in coming -- in reaching your the conclusion contained in Opinion 1, you compared Zuora's disclosure process and you -- with the customs and practices of middle-market capitalization companies; is that correct?

A    In general what I did is I used an accepted methodology, which is utilized in both cases and academic study, which was to look at the disclosure processes and procedures of Zuora and whether they were comparable and in accord with customary and usual practices of middle-market companies.  That's one portion of my report, yes.

Q    Can you show me in your report where you identify this accepted methodology that you just described?

A    I'm not really sure what you mean by that.

Q    I guess you testified that you relied on a

methodology; right?

    A    I said I utilized a methodology in looking at comparable middle-market capitalization companies that I've utilized before in other cases, that I've utilized with the SEC that's an accepted methodology and study that I've utilized in my academic study or otherwise and that's been utilized in other cases that I have not been a part of.

    Q    Is there anywhere in your report where you state explicitly that you're utilizing a commonly accepted methodology?

    A    I don't know what you mean by that.  I don't -- I don't have a section where I say commonly or otherwise, but I'm testifying to that, and it is.

    Q    So I asked this before, but I don't think I got a direct -- direct answer.  So I'm going to try asking it again.  As part of your review of Zuora's record, was there a single document provided to you that outlined Zuora's practices and processes for preparing disclosures?

            MS. LEWIS:  Objection.  Form.

            THE WITNESS:  Again I'd just refer back to my prior testimony.  I think I did answer that.  There's no one document that exists that I know of.

    ///

CONFIDENTIAL

Page 89

BY MR. SHAEFFER:

Q    Your report does not define the specific set of middle-market capitalization companies that you examined; correct?

A    Incorrect.

Q    Can you point me to where you define a specific set of middle-market capitalization companies that you examined?

A    Sure.  Footnote 2.

Q    So you -- so Footnote 2 where it states that a middle-market capitalization company is a company that has a market capital between 1 billion and $10 billion, that's a specific set of middle-market capitalization companies that you examined?

A    Of course.  That's the definition of a middle-market capitalization company as defined.  So you're looking at those comparable companies, and you're aggregating them on a comparable basis, which is, again, it's what practitioners do.  When you draft disclosure, you draw on your disclosure of your comparable set, and you look at what you can bring in the market for that comparable set, and you draft the disclosure on that basis.

Q    So your comparable set that you examined in

CONFIDENTIAL

Page 90

this case was every middle-market capitalization company?

A    So I draw on my experience and study of middle-market capitalization companies and reading disclosure for them, representing them, speaking with them, the advice that I give from my service on the middle-market center and that comparable data set and my views of that data set.

Q    But you don't identify a single middle-market capitalization company in your report; right?

A    Well, Zuora is a middle-market capitalization company.

Q    I guess aside from Zuora.

A    I don't know what you mean by that.  I mean, I talk about middle-market capitalization companies.  I list them.  I'm drawing on the whole universe.  I don't -- I don't understand that question frankly.

Q    You don't understand my question if whether you identified another middle-market capitalization company aside from Zuora?

A    Yeah, I don't understand it.

Q    So I'm asking --

A    Are you saying did I name another one?  I

Page 91

mean, there are certain middle-market capitalization companies named in my report.  My appendices contains companies where I've given this exact same type of opinion that are middle-market capitalization companies.  I think I refer to my SEC report, which does a similar methodology of looking at comparable companies.  So, again, it's a -- and I'm not sure if that was a middle-market company or not.  I need to double check but --

Q    So aside from a list of your prior testimony in Appendix C, do you identify or name a middle-market capitalization company anywhere else in your report?

A    I'm not sure why I would.  It's not relevant.  You don't need a list when you're looking at comparable companies.  When I'm drafting disclosure or looking at this in an academic setting, I don't say this is the whole list of companies.  It's not what you do in a report, and it's not what I've done in my prior reports with disclosure practices and procedures.  It's not what I do when I talk to the SEC about these issues.  I guess to the extent that you're saying did I list out a list of 500 company names, I did not do that.

Q    So you did not take any steps to select

Page 92

middle-market capitalization companies in Zuora's industry when you were making this comparison between their disclosure practices and the practices of other middle-market capitalization companies; is that correct?

MS. LEWIS:  Object to the form.

THE WITNESS:  I don't know what you mean by select.  Can you be more specific, please.

BY MR. SHAEFFER:

Q    So you compared Zuora's practices and processes for preparing disclosures with the practices and processes of middle-market capitalization companies; right?

A    That's one of the things I did, yes.

Q    And when you were making that comparison between Zuora and middle-market capitalization companies, you didn't take any step to limit the middle-market capitalization companies that you were comparing Zuora with to those companies that are in Zuora's industry; is that right?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  I did not do the comparison on an industry basis.

BY MR. SHAEFFER:

Q    Okay.  I'm going to ask a similar question.

CONFIDENTIAL

Page 93

When you were comparing Zuora's practices and processes for preparing disclosures with those of middle-market capitalization companies, you didn't take any steps to limit the comparative companies to those that had been public for less than one year; is that correct?

MS. LEWIS:  Object to the form.

THE WITNESS:  Again that's not how you do it.  It's just not how you look at disclosure. Disclosure is a corporate governance issue.  There's not an industry standard for disclosure.  Corporate governance and disclosure goes across all companies. So I didn't deem it relevant to look at it that way. I'm consistent with how I've applied the methodology in the past and how all others look at this methodology.

MR. SHAEFFER:  Can the court reporter repeat my question, please.

(Record read.)

MS. LEWIS:  I'll repeat my objection as to form.

BY MR. SHAEFFER:

Q    You didn't do that.  Am I correct, Professor Solomon?

A    I'm not really sure what you mean by the

question honestly.  It's a compound question and contains multiple elements.  Again I didn't do a comparison of where I segmented out middle-market companies that were public by a year.  It was all middle-market capitalization companies.  To the extent that disclosure processes evolve over time, in my experience, it did include those companies.

Q    Could you just clarify what you didn't understand about my last question.

A    No.  I mean, I just gave you an answer, and I didn't understand it.  And so I'm not sure how I can clarify what I didn't understand.  I didn't understand the question.  If you want to ask a follow-up question based upon my answer, I'm happy to.  If you want to ask the question again, I'm happy to reconsider it.  But I'm not here to give you known, unknowns.  I just can't do that.  But if you want to ask it again, I'm happy to pick it apart and see where the exact issues are.

Q    You said you didn't understand my question. I wanted to see why you didn't understand the question, but if you're not able to identify that, we can move on.

A    I mean, if you want to ask the question again, I'm happy to try.  I think I gave you the

CONFIDENTIAL

Page 95

answer that you want.  I gave you an answer.  So this is going to be a long day, but I blocked it all off.  So let's just keep going.

Q    Me, too.

A    You can reask the question, or you can ask another question.

Q    When you were comparing Zuora's practices and processes for preparing disclosures with the practices and processes of middle-market capitalization companies for preparing disclosures, you did not take any steps to remove from that analysis any companies that had been alleged to have committed securities fraud; is that correct?

MS. LEWIS:  Objection to form.

THE WITNESS:  No, it's not correct.

BY MR. SHAEFFER:

Q    How is that not correct?

A    So, again, I'm drawing on the whole middle-market capitalization companies, and I'm drawing on those that included those that, I guess, ultimately committed securities fraud.  I mean, companies are accused of these issues all the time, and it's very rare for there to be a complete resolution of them.  And I'm drawing on companies that are currently public for a short period of time

CONFIDENTIAL

Page 96

and a longer period of time.  And so I'm aware of

all these issues when I'm looking at the disclosure

here.  And so it's not necessary to exclude them,

but I'm aware of them, and I'm aware of those

issues.

Q    In reaching your conclusion in Opinion 1,

you did not review disclosure practices and

processes for any middle-market capitalization

companies aside from Zuora; is that correct?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  Again that's incorrect.  I've

drawn on almost 30-year experience of reviewing

disclosures of middle-market capitalization

companies and my other background and experience in

dealing with middle-market capitalization companies.

BY MR. SHAEFFER:

Q    Well, I understand your experience.  But in

the process of drafting this report and coming to

this opinion, did you review specific documents

relating to the practices and processes of

middle-market -- of any specific middle-market

capitalization company aside from Zuora?

A    It's the same answer.  I'm sorry.  Maybe

I'm not -- maybe if you could reask the question a

different way if I'm not giving you the answer you

want.  But the way you're asking it, it's the same answer.

Q  You've testified about your experience working with middle-market capitalization companies. My question is:  Specifically related to your work on this opinion and when you were reaching this opinion that's included in this report that you've provided in this case, did you consider any specific documents relating to the disclosure practices and processes of middle-market capitalization companies aside from Zuora?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  It's the same answer.  Yes, of course I've been reviewing documents constantly throughout my career and background and advising on these issues and lecturing on these issues.  So the way that you're asking the question, of course I have.

BY MR. SHAEFFER:

Q  Did you list any of those documents in the materials that you considered in Appendix C?

A  They're not listed on Appendix C because they're part of my background and experience.

Q  I just want to make sure I understand your testimony before I move on.  In reaching the opinion

CONFIDENTIAL

Page 114

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record.  The time is 12:42 p.m.

BY MR. SHAEFFER:

Q   Mr. Solomon, we're back on the record.  And do you understand that you're still under oath?

A   I do.

Q   All right.  Could we go back to Paragraph 102 of your report that's on Page 39.

A   Okay.  I don't think we ever looked at this paragraph before.

Q   Okay.  In this paragraph you wrote, "Product-Related statements were occasionally made through Twitter by the Marketing Department.  Since this channel is not a place for investor disclosure, the process of publishing from the Zuora Twitter account was also fundamentally different from other periodic and voluntary disclosures without the involvement and approval of upper management parties across different business units within Zuora."  Did I read that correctly?

A   Yes.

Q   So in support of that statement, you cited in Footnote 218 your interview of Tyler Sloat; is that correct?

A    Yes, that's the cite on 218 of the interview with Tyler Sloat, but I'm also drawing on my review of the record.

Q    Okay.  So you only cited to the interview with Tyler Sloat, but you're also relying on what you reviewed in the record.  Did I get that right?

A    Yeah.  I mean, this is not a sixth grade book report.  This is where you have to cite every single principle or even a law review article where they make you cite things like the sun is out.  I have 500 citations in here, and the citation here stands for that, but I'm also drawing on my review of the record and my background and experience, also.

Q    Okay.  Understood.  Sitting here today, can you recall any other particular documents from the record that would support that statement?

A    Sure.  So I think the record shows that it was subject to a different policy, which was the corporate communications policy.  If you look at the Tzuo deposition, he talks about it as a marketing prospect.  Generally speaking if Twitter is going to be used for investor disclosure, it's marked as a Reg FD channel, which was not the case here, and in general you would see it used for those purposes.

But that's from my record and drawing on anything else that I've reviewed that that's not the case here.

Q    So how would a Twitter account for any public company be marked as -- was it an FD account? Is that how you described it?

A    Regulation FD.

Q    Regulation FD.  How would -- how would a public company identify that its Twitter account --

A    So there's a long history here.  I can go into it.  But basically, after some issues involving Netflix and otherwise and Twitter and some -- a case that was brought that went nowhere, I remember speaking to Reed Hastings about this, the SEC just said that, for purposes of Reg FD -- I don't know if you know what Reg FD is, but under Regulation FD, essentially when you disclose material information, you can't do it selectively.  So the idea was that, if you're disclosing information to analysts that are material, you have to simultaneously disclose that to everyone.  And so if you're disclosing things that are material for purposes of investors via Twitter, you need to -- generally the SEC has said that that needs to be marked as a Reg FD channel, and you can put that on your website or in

your disclosure or elsewhere.

Q    Would there be any indication on a Twitter account that it's a Regulation FD site?

A    There might be, but I don't -- I don't know.  I mean, there might be, but it's not -- it's not always done that way.  It's generally on where investors go, which is the IR page or the public disclosures of the SEC, is my experience.

Q    Based on your review when you were preparing this report, do you have any reason to believe that Zuora's Twitter policy was not followed during the class period?

A    I didn't look either way.  I saw nothing that made me believe that it was or wasn't.  That's not really what I'm talking about here.  I'm talking about the corporate communications policy, its implementation, and I'm talking about whether this is a Reg FD channel.

Q    So related to that, in Paragraph 103 of your report, you do state, "To my knowledge, Zuora never stated that social media sites were a source of investor disclosure or could otherwise be utilized for Regulation FD purposes."  Did I read that correctly?

A    Yes.

CONFIDENTIAL

Page 118

Q    To your knowledge, Zuora never stated that its social media sites should not be utilized by investors in making investment decisions; is that right?

A    Well, they certainly had disclosure in earnings releases and otherwise that you should read all their disclosures and their SEC filings.  I don't know if there's a specific statement that was made like that on Twitter.  I don't know either way.

Q    Not only made on Twitter, but you're not aware of that type of statement being made in other disclosures that Zuora made?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  Yeah, I think it's the same answer, or you'd have to break the question down. We can go through it.

BY MR. SHAEFFER:

Q    So my understanding is that you're not aware that Zuora stated on its Twitter account that its Twitter account should not be utilized by investors in making investment decisions.  Is that correct?

A    It wouldn't be customary to do that, and I'm not aware that they have done that.

Q    Okay.  So in Zuora's S-1 filing that took

CONFIDENTIAL

Page 128

integrate acquired businesses and technologies
successfully or to achieve the expected benefits of
such acquisitions.  We may acquire or invest in
additional companies, which may divert our
management's attention, result in additional
dilution to our stockholders and consume resources
that are necessary -- necessary to sustain our
business."  Did I read that correctly?

        A    Yes.

        Q    Now, hypothetically if another company in
Zuora's industry included a risk factor that
discussed the risks of integration in similar terms
as what we just read in Paragraph 111, would it
still be your opinion that Zuora's risk factors were
part of the disclosures that provided a rich source
of information for investors?

                MS. LEWIS:  Objection.  Form.

                THE WITNESS:  I can't even begin to answer
that.  I mean, you'd have to look at their entire
disclosure and processes.  And just because they're
both providing a rich source of disclosure doesn't
mean that one isn't.  Again, this is disclosure that
directly is related to the risk of integrating Zuora
RevPro.  And if other -- other companies use that
disclosure, it doesn't mean that this is not

CONFIDENTIAL

Page 129

providing a rich source of information.  The other thing is you're just taking out one point in my whole report in my Opinion 2.  So I would just look at the Opinion 2 which encapsulates -- encapsulates my entire review of Zuora's disclosure and how it was generated from Zuora's processes and procedures in the environment that are based.

BY MR. SHAEFFER:

Q    Can we go to Paragraph 122.

A    Okay.

Q    I'd ask that you maybe just take a minute to review this, this paragraph, because I'm going to be asking you some specific questions about it.

A    Okay.  (Witness reviewing document.)  Okay.

Q    Okay.  So in Paragraph 122, you are discussing Zuora's 10-K filed on April 18, 2019; is that correct?

A    In general, yes.

Q    In that paragraph, you wrote about the developments within Zuora prior to filing that 10-K; is that correct?

A    I mean, it is what it is, but essentially I talk about Zuora's internal examination.

Q    Okay.  So just to make sure we're on the same page, specifically you wrote, "Prior to this

CONFIDENTIAL

Page 130

filing, Zuora had undertaken an internal examination of the integration issues related to Zuora Billing and RevPro including issues around delays and customer complaints."  Did I read that correctly?

A    Yes.

Q    Okay.  And you base this statement on your reading of Zuora's documents; right?

A    The entirety of the record, but for these purposes, I cite a number of email chains in Footnote 251, or at least the entirety of the record that was considered in my Appendix C.

Q    Just so I understand, aside from the documents that you're citing in Footnote 251, it's also your testimony that you're relying on the entirety of the record that you reviewed when putting together this report?

A    I mean, it's my testimony that I just gave. I think you're rephrasing it.

Q    Well, I just want to --

A    I mean -- sorry.

Q    No, no.  You can finish.

A    I mean, we addressed this prior to the lunch break.  I gave you a similar answer.

Q    I don't remember that specific discussion in this context.  But, I guess, am I correct to say

CONFIDENTIAL

Page 131

that in Footnote 251 you cite several emails from the record, but it was not your intention to show that that's all that you're relying upon in support of the statement I just read in Paragraph 122?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  I don't know what the question is there.  Can you -- can you rephrase it or restate it, please.

BY MR. SHAEFFER:

Q    So you previously testified that this isn't a sixth grade book report.  Do you remember saying that?

A    I think you're paraphrasing it, but you're referring to the testimony prior to the lunch break that I just referenced two questions ago when you said you didn't understand my answer.

Q    Okay.  I think -- I don't recall that being before the lunch break.  I thought that was after, but now I understand.  We're on the same page.

A    Yeah, I apologize if it --

Q    Yeah.  Okay.  So I'm glad we clarified that.  So it's my understanding based on your prior testimony that, when you are identifying documents in a footnote that you're relying upon in support of a statement, you're not putting down every document

CONFIDENTIAL

Page 151

I'm bringing my background and experience to bear in bringing about my opinions.  I mean, background and experience always comes into play.  I think you have to be more specific.  I'm just not sure what you're getting at.

Q    So when you bring your background and experience into play, that includes when you reviewed emails within Zuora that were part of the record given to you in this case; correct?

A    Again I don't know how to answer that.  I mean, you know, I'm looking at the record and utilizing the record, the undisputed record, to arrive at my opinions.  And so to the extent that I need to draw my experience or background, I do so in giving my report and opinions.  I don't really understand the question frankly.

Q    So I'm really just trying to understand how your background aids in reviewing documents from the record in this case.  And with respect to your statements regarding factual matters in this case, you have answered that you have based your statements about the record on your review of documents and your background experience.  I'm trying to understand that last part, how your background experience helps you opine and discuss

CONFIDENTIAL

Page 152

factual matters in this case.

A    Again, I don't understand the question. I'm not here to determine what the facts.  I'm not here to determine the law.  I'm not here to take the role of the judge or the jury.  What I'm doing here is I'm giving opinions on disclosure processes and procedures and comparing them to middle-market companies and then looking at Zuora's disclosures and their alignment with their own practices and procedures in the information provided.  So I'll do a similar performance with respect to guidance.  In giving those opinions, I'm drawing on my background and experience.  I mean, I just -- you know, if -- when we're talking about there's a term that says emerging growth company, I know what it is because of my background and experience.  I mean, if my ten-year-old is reading a comic book, they're drawing on their background and experience to know that it's fantasy.  So I just -- I hope they do. And so maybe it's science fiction.

So I just -- I think you're asking a really, really broad question, and, again, I'm not determining the facts to the extent that I'm relating facts or taking a view of the facts.  It's based upon my review of the record that's set forth

on Appendix C.  And I think you're asking such a broad question it's sort of consuming the whole point.

Q    Okay.  So why don't we go back to Paragraph 130.

A    Sure.

Q    So in Paragraph 130 you wrote, "During 2018 Zuora describes Zuora Billing and Zuora RevPro as separate business segments and did not suggest that integration between the two flagship products was a key factor of growth for Zuora at that time."  You wrote that in your report; right?

A    Yes.

Q    So when you determined that during 2018 Zuora did not suggest that integration between the two flagship products was a key factor of growth for Zuora at that time, how did your background and experience help you reach that determination?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  Again it's so vague I can't even answer that.  I mean, based upon my review of the disclosure, I'm reaching this sentence and opinion.  In the interest of making this go -- I don't think it's going to go any faster frankly, but in the interest of making this line of questioning

CONFIDENTIAL

Page 154

go faster, again this is based upon the factual record.  But I always -- I mean, just like you draw on your legal background to ask a question or to read a legal document, I'm drawing on my background and who I am and where I am and upon the methodology, but this sentence is based upon my review of the record that's set forth in Appendix C.

MR. SHAEFFER:  I would actually like to go off the record for a minute.

MS. LEWIS:  Fine here.

THE VIDEOGRAPHER:  Going off the record, the time is 2:01 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record, the time is 2:20 p.m.

BY MR. SHAEFFER:

Q    Mr. Solomon, we're back on the record.  Do you understand you're still under oath?

A    I do.

Q    Okay.  In your experience as a former corporate lawyer and current law school professor, are you aware whether the SEC has pursued 10b-5 fraud-based securities claims against large publicly traded companies?

MS. LEWIS:  Objection.  Form.

CONFIDENTIAL

Page 155

THE WITNESS:  I just -- I just -- I mean, the SEC pursues 10b5 claims against large capitalization companies.

BY MR. SHAEFFER:

Q    So in your experience, large publicly traded companies generally have robust and well-designed disclosure processes; is that correct?

MS. LEWIS:  Objection to form.

THE WITNESS:  I wouldn't say that.  I'm saying there are customs and practices among large-market capitalization companies that tend to be similar.  There may be companies that don't meet those customs and practices that are less than that, and there are companies that do more.

BY MR. SHAEFFER:

Q    You are not opining here today that the mere fact of a robust and well-designed process for preparing disclosures means a public company cannot be liable for 10b-5 securities fraud claims; is that correct?

MS. LEWIS:  Objection.  Form.

THE WITNESS:  I think it's a factor that's taken into account.  I think it's less likely that a company is going to have a 10b-5 issue if they have robust disclosure processes and procedures.

CONFIDENTIAL

Page 156

BY MR. SHAEFFER:

Q    But the mere fact that a company has a robust -- or has robust and well-designed practices and processes for preparing disclosures does not mean a publicly traded company cannot be liable for 10b-5 securities fraud claims?

A    I think it depends on the facts and circumstance.  I mean, 10b5 has an intent factor, and to the extent that you have a scienter factor, to the extent that you have processes and procedures that are robust, it mitigates the finding of a scienter case since they are reasonably relying on those.  So I'd need to know the facts and circumstances.

Q    I understand you want to know other facts and circumstances, but does the fact, the mere fact standing alone, that a publicly traded company has robust and well-designed practices and processes for preparing disclosures means that company cannot commit a 10b-5 securities fraud?

MS. LEWIS:  Same objection.

THE WITNESS:  Again, I think if you're saying it's a possibility, I agree with that.  But it's something that you need to take into account in terms of the elements.  So it's a factor and

CONFIDENTIAL

**Page 157**

something that you look at and can be decided by the judge or jury as a factor to take into account.

MR. SHAEFFER:  You know, I think that's all the questions I have today, but I reserve the right if you're asked any questions of your counsel to have a reply.

MS. LEWIS:  No questions from us.

THE VIDEOGRAPHER:  This completes today's deposition.  We are going off the record.  Time is 2:25 p.m.

THE REPORTER:  Okay.  Any rough drafts?

MS. LEWIS:  Yes, please, we will take one.

THE REPORTER:  Okay.  Mr. Shaeffer?

MR. SHAEFFER:  No, I think just our standing order, which I don't think we've been getting rough drafts.

(TIME NOTED:  2:25 p.m.)