# EXHIBIT 01

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASEY ROBERTS, individually     No. 3:19-cv-03422-SI

and on behalf of all other

similarly situated,

                    Plaintiff,

vs.

ZUORA, INC., TIEN TZUO, and

TYLER SLOAT,

                    Defendants.

_____/

REMOTE VIDEO RECORDED DEPOSITION OF

KEVIN DAGES

Cashiers, North Carolina

Friday, October 28, 2022

Volume I

Reported by:

LISA ANDREASEN

CSR No. 9584

Job No. 5531809

PAGES 1 - 239

CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASEY ROBERTS, individually       No. 3:19-cv-03422-SI

and on behalf of all other

similarly situated,

                     Plaintiff,

vs.

ZUORA, INC., TIEN TZUO, and

TYLER SLOAT,

                     Defendants.

_____/

        Deposition of KEVIN DAGES, Volume I, taken on

behalf of Plaintiffs, with the witness located in

Cashiers, North Carolina, beginning at 11:37 a.m. and

ending at 9:23 p.m. on Friday, October 28, 2022, before

LISA ANDREASEN, Certified Shorthand Reporter No. 9584.

CONFIDENTIAL

Page 25

file for this matter?

A    Can you define what you mean by work file.

Q    Well, you testified previously that it's your practice to have, you know, a separate work file for matters.  And you did the same for this    12:16:12 case; correct?

A    Yeah.  I mean, work file maybe sounds too official.  That's why I was asking questions about it.  I'll have manila folders with old hard copy notes and things of that nature related to each    12:16:30 project that I work on, and so that will be there.  But online we have our own, you know, analytics file, if you call it that, that has the raw data, the production sheets and the analysis and any of that stuff.  That's all available online.  So I was    12:16:52 just referring to my folder of hard copy hand notes and things of that nature.

Q    But your hand notes weren't scanned and then put on the digital file that you just described; correct?    12:17:08

A    That's correct.

Q    Okay.  And then, to your knowledge, did -- is it Ms. Milliron's practice to similarly take notes during a telephone conversation with the client?    12:17:28

Page 26

A    I honestly couldn't tell you if she does or not.  Because I think it's very much going to be dependent upon the nature of the discussion and/or the issues that are coming up.  I mean, she may very well just be pulling up her own Excel worksheets and  12:17:48 models and things like that and not writing anything down like I do.

Q    Do you -- do you know if any notes from that conversation is contained in the digital file for this matter?                                12:18:11

A    My notes are not in the digital file.  So they're not in any way scanned or put in or anything like that.  They're just for myself to get through the call.

Q    Do you know if Ms. Milliron to the extent  12:18:28 she took notes if those are contained in the digital file?

A    No, I don't know that.

Q    But that's something that you could check on; correct?                                    12:18:45

A    I can ask, yes.

Q    In addition to Mr. Hildenbrand, is it your testimony that there was another individual from Zuora on the call?

A    Yes, there was one other person I recall on  12:19:05

Page 27

there, but, I mean, we can probably look at the report.  They might be mentioned in there in a footnote or something.  I don't know.

Q    We took a previous break in the deposition; correct?                                                    12:19:35

A    Yes.

Q    Okay.  And during that, you met with counsel; correct?

A    Yeah.  We went off to some side room, I guess.                                                          12:19:46

Q    Okay.  And your previous testimony was that your discussion was with Mr. Hildenbrand.  Now your testimony is that there was one other person that might be mentioned in the report.  Was your memory refreshed from counsel?                                 12:20:00

A    It was -- it was actually more refreshed by you asking me the question, and so when we -- but not enough for me to remember who the person was, just that it was a lady.

Q    During the course of the break, did you    12:20:26 discuss that there was -- with counsel that there was another person on the call?

A    I think I probably mentioned it, but I think that's probably it.

Q    Did counsel tell you who that person was?    12:20:49

CONFIDENTIAL

Page 28

A      No.  If they had, then I would be giving you the name.  So I can try and check on our next break and report back to you, if you'd like.

Q      How long did that call last?

A      I don't believe it was that very long.  I      12:21:16 would say maybe a half hour plus or minus.  I'd just have to look to see if I have any notes from it that have timing on it for you.

Q      What was the purpose of the call?

A      Just to confirm that our understanding or      12:21:58 my understanding that we were -- I was -- in the report about certain areas and comments and things of that nature to bounce them off someone from the management team who was familiar with it, and then you get affirmation that it's okay to put it in the      12:22:10 report because that coincides with their understanding of the way the process went.  So you'll see as we go through the report there are a number of different times and there's a reference to, you know, I understand.  Well, the point was to      12:22:25 confirm the I understand to make sure we're okay.

Q      And we'll get to that.  But basically when you -- at various different instances in your report when you state "I understand," you gained that understanding from this call that you believe was in      12:22:42

CONFIDENTIAL

July of 2022?

MR. ADLER:  Objection to form.

THE WITNESS:  Actually I'd probably say it slightly differently.  In other words, it's the understanding came from the documents or, you know, 12:23:00 the data that we were looking at, and the purpose of the call was just to confirm that the -- that my understanding is reasonable and what I was saying was reasonable.  And so it was just bouncing it off him to confirm that.                                  12:23:16

BY MR. GILMORE:

Q    Was there any other purpose for that call?

A    No, sir, that was it.

Q    Other than -- other than Mr. Hildenbrand, did -- I'm sorry.  So was it Mr. Hildenbrand who 12:23:40 confirmed your understanding during that call?

A    Yes.

Q    Did the other individual who you don't know the name, did that -- what role did that person have on this call?                                          12:23:57

A    I'd have to go back through my notes, to whatever extent I have them, and/or talk with Jennifer to just confirm.  There were times that the other participant added some more color or a little, you know, expansion on a point or things of that 12:24:23

CONFIDENTIAL

Page 30

nature, but that was -- confirming with

Mr. Hildenbrand was the primary point of the call.

Q    Do you know what -- which area of Zuora

that other person worked out of?

A    Right now off the top of my head, no.  I    12:24:47

mean, it's in the report, or it's in the notes, and

I'd have to just go and confirm that for you.

Q    During the course of this conversation,

were there any points that you sought to confirm in

which Mr. Hildenbrand corrected your understanding?    12:25:14

A    No, my recall is that it was all his

feedback was confirmatory to allow us to, you know,

complete the drafting of the report and have support

for the other points in there.

Q    Were there -- do you recall from this    12:25:44

conversation any information that Mr. Hildenbrand

expanded on or provided more color to you that you

did not -- that you weren't otherwise serving to

confirm?

A    As we sit here today, I don't -- I don't    12:26:09

recall any areas where your -- to answer your

question, where I believe he added more color or

anything like that.  It was more of a confirmatory

call.

Q    Did defendants' counsel speak during this    12:26:30

CONFIDENTIAL

Page 31

conversation?

    A    Not in terms of weighing in on any issues,

just making the introductions and allowing us to

have a discussion.  That was pretty much it that I

recall.                                        12:27:05

    Q    To your knowledge, did defense counsel take

notes of this conversation?

    A    I don't know.  I have no idea.  Sorry.

    Q    To your knowledge, are any notes or

documents prepared by defense counsel regarding that   12:27:21

conversation on the digital work file that you have

for this matter?

    A    I don't believe so, no.

    Q    And same question for the hard copy file

that you maintain.                             12:27:41

    A    I took that as encompassing everything.  So

same answer, no.

    Q    Okay.  During the course of this

communication, the other person who was on the call

or may or may not have been on the call, do you      12:28:02

recall them clarifying anything in terms of your

understanding?

    A    No.  I mean, the call was helpful, but I

couldn't off the top of my head list for you what

points they each talked about or whether they were    12:28:30

CONFIDENTIAL

Page 198

MR. ADLER:  Yes.

THE WITNESS:  Can I ask how long we're going?

THE VIDEOGRAPHER:  Sorry.  Stand by, please.  This marks the end of Media Number 7 going   07:38:36 off the record at 7:38 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record.  We are back on the record at 7:49 p.m. Eastern, and this marks the beginning of Media   07:49:50 Number 8 in the deposition of Kevin Dages.  Please proceed, Counsel.

BY MR. GILMORE:

Q    Yes.  Mr. Dages, can you please turn back to Exhibit 313.  That was the spreadsheet 327212.   07:49:59 Are you with me?

A    Yes.  313; correct?

Q    Correct.  It's an Excel spreadsheet.  This is the one that --

A    Yes, sir.                                07:50:30

Q    Yeah.  Can you hit on the white board tab.

A    Yes.

Q    Do you see where on the white board tab it says, "Q2, we are already expecting to do less than what consensus is.  The guidance we will provide   07:50:45

CONFIDENTIAL

Page 199

will be a reduction"?  Do you see that?

      A    Yes.

      Q    Who wrote that?

           MR. ADLER:  Objection to form.

           THE WITNESS:  I actually don't know.    07:50:58

BY MR. GILMORE:

      Q    Okay.  Do you know when that was written?

           MR. ADLER:  Objection to form.

           THE WITNESS:  No.

BY MR. GILMORE:                                      07:51:13

      Q    It then goes on to state, the fiscal --

"FY," the fiscal year, "is a little less unknown.

Right now we're looking at Scenario C.  If we do C,

there will be a FY reduction of 3 million in sub rev

and 8 million in total rev.  If we guide to that,    07:51:30

then it's implied we will accelerate a bit."  Do you

see that?

      A    Yes, sir.

      Q    Who wrote that?

           MR. ADLER:  Objection to form.           07:51:43

           THE WITNESS:  I don't know.

BY MR. GILMORE:

      Q    Can you take a look at your report

specifically Paragraph 44 on Page 21.  You state,

"As demonstrated in Exhibit 3, management took its    07:52:14

CONFIDENTIAL

Page 200

FY 2020 forecast of 205.7 million, Scenario D."  Do

you see that?

     A    Yeah.  The first part of the sentence, yes.

     Q    What is your basis for saying management

selected Scenario D?                                    07:52:39

     A    Sorry, I'm just going to Exhibit 3 now.

It's first laid out in the -- in that Exhibit 3

detail, and you can see the buffer and the sum of

the buffer is three-quarters of the way down the

page.                                                  07:53:48

     Q    Yeah.  And so you say, "As demonstrated in

Exhibit 3, management took its fiscal year 2020

forecast of 205.7 million, Scenario D, and provided

a buffer of negative 2.7 million to arrive at a

midpoint of 203.0 million for the fiscal year 2020    07:54:05

subscription revenue guidance and a range of 200 to

206 million.  Based on the FY 2019 fiscal year 2020

forecast for fiscal year 2020 global services

revenue of 74.1 million summarized in Exhibit 5,

Zuora issued fiscal year 2020 global service revenue   07:54:30

guidance with a range of 68 million to 72 million on

May 30th, 2019."  So what is your basis for saying

that management selected the Scenario D in the sub

revenue spreadsheet?

     A    One, because the numbers play out, but,      07:54:49

CONFIDENTIAL

Page 201

two, I thought there was also -- when we talked

about it, wasn't there a footnote in the text of the

report about Scenario D?

Q    Well, like did you -- did you confirm with

Zuora management that Zuora management selected        07:55:18

Scenario D?

A    Yeah, that's why I'm going back to the

report, so we can -- the cite that I was thinking

about is at the bottom of -- at the end of

Footnote 81 in which we just clearly lay out about     07:56:51

Scenario D, but I don't see -- I don't have a cite

here linked to any other document than the one

we're -- you know, that we were looking at, the

Excel.

Q    And you did not confirm verbally or in        07:57:15

writing or otherwise that management selected the

Scenario D from the sub revenue tab; correct?

MR. ADLER:  Objection to form.

THE WITNESS:  So that piece we did.

Because when we were going back and forth on the       07:57:30

forecast, that was one of the things that we

confirmed with the management team.

BY MR. GILMORE:

Q    With Mr. Hildenbrand on the call on

August 4th?                                            07:57:41

Page 202

A    Yes.

Q    So Mr. Hildenbrand confirmed that in preparing the guidance Zuora management selected Scenario D?

MR. ADLER:  Objection to form.                    07:57:56

THE WITNESS:  Correct.  We were looking at that tab with the column, and he pointed us to that, confirmed that column.

BY MR. GILMORE:

Q    So it was your understanding that           07:58:06 Mr. Hildenbrand was involved in the development of the guidance?

MR. ADLER:  Objection to form.

THE WITNESS:  That he had input, yes, to it.                                                       07:58:20

BY MR. GILMORE:

Q    And I see that in the sub revenue tabs the midpoint of 203 that you've mentioned is in Cell M53.  Do you see that?

A    Sorry.  I'm going back to the Excel now.     07:58:43 What -- I beg your pardon.  What was the exhibit tab that we're looking at here?

Q    Yeah, it's Exhibit 313, the sub revenue tab, and I see that the range -- or excuse me, the midpoint of 203 that you mention in your report is   07:59:05

CONFIDENTIAL

Page 203

mentioned in Cell M53.  Do you see that?

        A    Yes.  M53 has the 203 there, yes.

        Q    However, if you go further below, the range

of 200 to 206 appears to be in cells M65 and N65;

correct?                                                07:59:46

            MR. ADLER:  Objection to form.

            THE WITNESS:  Yeah, with Row 67 adding

those two divided by two and arriving at the same

203.  Yes.

BY MR. GILMORE:                                         08:00:09

        Q    So the way I understand, these formulas

take the 203 million and add or subtract 3 to arrive

at the 200 low end and the 206 high end of the

range.  Correct?

        A    Yeah.  There you're looking at Row 65, and    08:00:25

the formulas that are in Column M and N show you

exactly that.  Yes, sir.

        Q    And there are no labels, though, in the

spreadsheet for the 200 and the 206; correct?

            MR. ADLER:  Objection to form.              08:00:43

            THE WITNESS:  No, given they're reference

points, you can tell it's a plus or minus 3 on

Cell M53, which was the 203.

BY MR. GILMORE:

        Q    And you assume that this was the guidance    08:01:01

CONFIDENTIAL

Page 204

range, the 200 to 206; correct?

          MR. ADLER:  Objection to form.

          THE WITNESS:  I think we actually describe

that in one of the footnotes as being the source for

it, yes.                                              08:01:18

BY MR. GILMORE:

     Q    And then did you gain that understanding

through your discussions with Mr. Hildenbrand?

          MR. ADLER:  Objection to form.

          THE WITNESS:  I think we confirmed it as    08:01:27

part of the confirmation points.

BY MR. GILMORE:

     Q    Where does the 3 come from that is added

and subtracted from the 203 and 206 range?

          MR. ADLER:  Objection to form.             08:01:46

          THE WITNESS:  I don't know that I know the

source of the exact three.

BY MR. GILMORE:

     Q    There's no explanation in this spreadsheet

for the minus three or plus three; right?           08:02:02

          MR. ADLER:  Objection to form.

          THE WITNESS:  Correct.

BY MR. GILMORE:

     Q    And you do not clarify where that three

came from in your discussions with Mr. Hildenbrand;  08:02:19

CONFIDENTIAL

Page 205

correct?

MR. ADLER:  Objection to form.

THE WITNESS:  Correct.  We did not get to that level of detail, correct.

MR. GILMORE:  Can I have Tab 18 marked next    08:02:36 in order.

(Exhibit 318 was marked for identification.)

BY MR. GILMORE:

Q    Mr. Dages, I'm showing you what's been    08:03:21 marked as Plaintiff's Exhibit 318, a document entitled Fiscal Year '20 GS Plan Comparison May 20, 2019.

A    Yes, sir.

Q    You reference this document in your report    08:03:35 at Page 20, Footnote 80.  Are you with me at Footnote 80?

A    Yes, I'm reading Footnote 80 right now.

Q    Let me read that into the record.  It states, "As of May 20th, 2019, it appears that    08:04:19 management was proposing street guidance of 70 to 72 million based on the May 2019 fiscal year 2020 forecast of 74.1 million."  And then you cite to what we've marked as Plaintiff's Exhibit 318 at the Bates label ending at 66, which should be Page --    08:04:44