# EXHIBIT 52

## [REDACTED VERSION]

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____

                              )

CASEY ROBERTS, individually and  )

on behalf of all others       )

similarly situated,           )

                              )

          Plaintiffs,         ) Case No.

                              ) 3:19-03422-SI

       vs.                    )

                              )

ZUORA, INC., TIEN TZUO, and   )

TYLER SLOAT,                  )

                              )

          Defendants.         )

_____

***CONFIDENTIAL TRANSCRIPT***

REMOTE VIDEO DEPOSITION OF ███████████

Tuesday, May 10, 2022

Volume I

Reported Remotely and Stenographically by:

Gail E. Kennamer, CSR 4583, CCRR

Job No. 5208849

Pages 1 - 117

Page 1

VIDEO OPERATOR: Back on the record.    11:29

The time is 11:29 a.m.

BY MR. GUINEY:

Q. Sorry about that.

██████ do you understand that you're still under    11:29 oath?

A. I do.

Q. So I would like to turn your attention now to Paragraph 115.

A. Yes.    11:30

Q. It should be right below the sentence we just discussed.

A. Yes.

Q. Do you see the second sentence of that paragraph?    11:30

A. Yes.

Q. That's the sentence that reads, "CW-4 said that Zuora Central team met with the RevPro team twice a week during the Class Period."

Did I read that correctly?    11:30

A. Yeah.

Q. Did you say that?

A. I don't recall specifically, but what that -- what that would be referring to is that we would meet with the other ZBRs, as we call them, or SDRs. In the normal    11:30

Page 86

world, ZBR and Zuora, and then we would talk about like    11:30 pipeline opportunities.

Q. Do you recall saying something along those lines to plaintiffs?

A. It was -- No. It was a while ago, so I don't.    11:30 I don't recall saying that specifically.

Q. So you mentioned that you would have these ZBR meetings. Were these informal meetings?

A. I do remember that there was an aspect initially that was formal, like where it was once a week. But we    11:31 would all just kind of do our own thing and get together and talk about, you know, if -- if maybe someone on the RevPro team is has some good contacts at any company that I may be working at on Central. But like the conversations I was having with them, there were people at    11:31 my level, non-engineers, and just pipeline builders if you will.

Q. And so it says that you would meet with the RevPro team twice a week. Is that accurate?

A. I don't remember specifically. It was a long    11:31 time. It was a long time ago. There may have been a time where we did that; but to say specifically, it's hard for me to say.

Q. And so the Zuora -- the Zuora Central team would be at these meetings as would the RevPro team. Was anyone    11:32

Page 87

else at these meetings?    11:32

A. Well, it would have been specifically just, like, my team, just strategic accounts team, because RevPro being that it was a little bit more of an expensive option wasn't a fit -- at least initially I don't know how    11:32 it works now -- but at least initially it wasn't really a fit for the other teams. Maybe there would be one or two opportunities that the other teams have, but just by default because of cost, it really only would have been my -- really would have been the team I was working on.    11:32

Q. I see.

So it would be Zuora Central strategic accounts and the RevPro team?

A. Yeah. I mean there was a lot of crossover, or in theory, there was a lot of crossover, right, where they    11:33 are going after similar sized companies that need, you know, revenue recognition, I believe, is the term. And then if there is any crossover, you know, between active pipeline on both sides, that's what we would just try to highlight.    11:33

Q. And so by "crossover," you mean attempting to sell both the Zuora Central product and the RevPro product to the same potential customer at the same time?

A. Yeah. I mean, in a perfect world it doesn't get far along in a sales cycle. Right. We would see that    11:33

Page 88

stuff. You know, I'm sure we'd see it in the CRM or some    11:33 other form that we would use to check. You know, as I have said, there is just like really low-level conversations that I was having and that that team was having, and I'm sure at some point we would just try to    11:33 use any, like, helpful information that we have from those low-level calls to see if maybe, you know, there is a way to re-strategize, put the other team in touch, just stuff, sales strategy.

Q. So moving on to the next sentence, which reads,    11:34 "At those meetings CW-4 observed that the RevPro team was falling short of their projected numbers and that it was clear they were struggling."

Do you see that?

A. Yes.    11:34

Q. Did I read that correctly?

A. Yeah.

Q. Did you say that?

A. I don't recall. I mean, it was a long time ago. I don't recall saying that specifically.    11:34

Q. Do you recall saying that to plaintiffs?

A. I do not.

Q. Do you recall being told this by someone?

A. Being told what you just read in that sentence?

Q. Correct.    11:35

Page 89

23 (Pages 86 - 89)

A. No, not that I can recall.    11:35

Q. So you don't recall anyone ever telling you that the RevPro team was falling short of their projected numbers?

A. Specifically falling short of their projected    11:35 numbers, no.

Q. Did you get the sense that the RevPro team was struggling?

A. Sure.

Q. How so?    11:35

A. Well, I mean, I think the basis of this whole thing here. You know, I think it was pretty -- it's pretty clear that there wasn't traction, I think, on RevPro the way that the purchase and all that stuff made -- seemed like it should be. I wasn't involved in    11:36 any of the acquisition, engineering, denigrations, none of that. But in theory, right, I guess you would assume that, you know, with the recently public company that, you know, they are going to put a lot of marketing and a lot of things are going to go into it, and it's just going to    11:36 be flying. And I don't -- from my recollection, I don't think it was that seamless. So that is my understanding of it. That's -- Yeah.

Q. Do you recall anyone ever telling you that the RevPro team was struggling?    11:36

Page 90

A. Not that I recall specifically.    11:36

Q. And you mentioned earlier that you would assume that perhaps things would be different at RevPro.

Are you saying that -- Scratch that. Let me rephrase.    11:37

You mentioned in an earlier answer you assumed things would perhaps be different with RevPro.

Is this statement, then, just really you expressing that assumption?

MR. GILMORE: Object to form.    11:37

BY MR. GUINEY:

Q. You can answer.

A. Is it a statement? I mean, I would say -- I don't have any, like, useful technical engineering information from four or five years ago, so I guess it    11:37 could be construed as an assumption based on how you define it. Yeah. So, sure.

Q. And when you said that the RevPro team was struggling, what did you mean by that? In what way were they struggling?    11:38

A. Well, I don't recall saying "struggling" specifically. You know, in hindsight, I think probably -- I think the Zuora Central product was a very, very, very evocable product. It was the basis for the company going public. I would say more from my understanding, you know,    11:38

Page 91

that is its main offering. And my understanding was that    11:38 company-wide it was selling well, and I just don't think that, you know, my opinion or from what I can remember, it wasn't happening on the RevPro side. It just wasn't the -- I think the sales processes ended up being a lot    11:38 different than what was first thought. I wasn't involved in any of that, but I think it may have not just been as smooth as -- you know, it technically should be with the massive product rollout.

I don't know if that answers, I think -- I don't know    11:39 if that answers the question.

Q. That was helpful. Thank you.

Moving on to the next sentence, which reads, "CW-4 stated that the reason sales were short and the team was struggling was that there were technical issues with    11:39 integrating RevPro."

Do you see that?

A. I do.

Q. Did I read that sentence correctly?

A. Yes.    11:39

Q. Do you remember saying that?

A. I'm sure I could have, but it's a long time ago. Not something that I recall.

Q. So you don't recall saying that?

A. No.    11:39

Page 92

Q. Do you recall saying that to plaintiffs?    11:39

A. No. But can I ask a clarifying question?

Q. Sure.

A. So there is an initial question with do I recall saying that and do I recall saying it to plaintiffs. The    11:40 initial question, just so I'm clear, is that you asked me if I have said it, like, to -- like, to anybody to myself separate of plaintiffs? I just want some clarification on that if possible.

Q. I think just by that I mean in general, do you    11:40 recall saying that --

A. Okay.

Q. -- or communicating that.

A. Fair enough.

Q. If I want to clarify, I can; or if I want to get    11:40 more specific, I can.

A. Okay. Thanks.

Q. So just to circle back, you do not recall saying this; is that correct?

A. Correct.    11:40

Q. And more specifically, you do not recall saying this to plaintiffs; is that correct?

A. Correct.

Q. So do you see where it says, the stated reason -- I'm sorry. Strike that.    11:41

Page 93

24 (Pages 90 - 93)

CONFIDENTIAL

The time is 12:37 p.m.        12:38

MR. GUINEY:  So defendants are finished with their questioning for today.

We'd like to than ████ or his time and for answering our questions.        12:38

We reserve the right to schedule a follow-on deposition if necessary as we only used, I believe, half of our time.

For today, we're done.

MR. McMULLEN:  For the record, I'll object to        12:39 extending the deposition unless there is some compelling reason for that which you are not articulating one right now; right?

MR. GUINEY:  Noted.

MR. GILMORE:  For the lead plaintiffs, we have        12:39 no questions at this time.

And I than ████ or his time as well.

THE REPORTER:  Mr. Gilmore, do you need a certified copy?

MR. GILMORE:  I would go with what our standing        12:39 order is.

THE REPORTER:  Do you need a rough?

MR. GILMORE:  I do not.

THE REPORTER:  Thank you.

MR. GUINEY:  For the record, defendants will go        12:39

Page 114

with our standing order as well, and we would like a        12:39 rough.

THE REPORTER:  Thank you.

VIDEO OPERATOR:  This concludes today's videotaped deposition of ████        12:39

We're off the record at 12:39 p.m.

Thank you.

(TIME NOTED: 12:39 P.M.)

Page 115

***

I ████ do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____day of _____, 2022, at_____, _____.
        (City)        (State)

_____████_____    _____

VOLUME I

Page 116

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 19, 2022.

GAIL E. KENNAMER, CSR 4583, CCRR

Page 117

30 (Pages 114 - 117)