# EXHIBIT 56

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CASEY ROBERTS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZUORA, INC., TIEN TZUO, and TYLER SLOAT,<br><br>Defendants. | Case No. 3:19-cv-03422-SI |

**Expert Reply Report of Tavy Ronen, Ph.D.**

**September 16, 2022**

# Table of Contents

I.   Background and Scope of Assignment ....................................................................1

    A.   Opinions in the Class Certification Report ....................................................1

    B.   Opinions in the Ronen Damages Report .........................................................2

    C.   Assignment ....................................................................................................5

II.  Summary of Conclusions ....................................................................................6

III. Assumptions Regarding Liability ........................................................................9

IV.  Economic Correspondence and Price Impact ......................................................10

    A.   Dr. Ferrell Appears to Agree with the Damages Methodology that I
Proposed in the Class Certification Report and Applied in the Ronen
Damages Report ............................................................................................10

    B.   Dr. Ferrell's Claims about the Price Impact of the Misrepresentations
During the Class Period are Misguided ..........................................................11

V.   Confounding Information ....................................................................................17

    A.   Dr. Ferrell Appears to Agree with the Class Certification Report and
with the Ronen Damages Report that Confounding Information
Should Be Removed from the Measurement of Artificial Inflation ...............17

    B.   Dr. Ferrell's Conclusion (or Implication) that the Portion of the May
31, 2019 Price Decline Resulting from the Sales Issues Should be
Removed from the Measurement of Artificial Inflation Is Inconsistent
with the Legal Liability Assumptions Provided to Me ..................................18

    C.   Dr. Ferrell's Contention that It Does Not Make Economic Sense to
Use the Entire Stock Price Decline on May 31, 2019 for Artificial
Inflation Is Flawed ........................................................................................22

VI.  Scaling Artificial Inflation ..................................................................................23

    A.   Dr. Ferrell Mischaracterizes Plaintiff's Product Integration Claims
When Concluding that the Price Impact of the Alleged Wrongdoing
Varied Over the Class Period ........................................................................23

VII. Summary of Replies to the Ferrell Report ..........................................................26

    A.   Economic Correspondence and Price Impact ................................................26

    B.   Confounding Information ..............................................................................27

    C.   Scaling Artificial Inflation ............................................................................28

## I.    BACKGROUND AND SCOPE OF ASSIGNMENT

1.    I have previously submitted two expert reports in this matter.  The first report is dated December 4, 2020 (the "Class Certification Report"), and the second report is dated August 5, 2022 (the "Damages Report" or "Ronen Damages Report").  Both of these reports are incorporated herein by reference.[1]

### A.  Opinions in the Class Certification Report

2.    In the Class Certification Report, I opined:

**Class Certification Opinion 1:** Throughout the Class Period,[2] Zuora common stock traded in an efficient market.  This opinion is based on a set of indicia that economic experts routinely use for assessing market efficiency in securities cases and which have been accepted by courts as indicators of an efficient market.

**Class Certification Opinion 2:** The calculation of damages for violations of Section 10(b) of the Securities Exchange Act (and SEC Rule 10b-5) is subject to a common methodology that can be applied on a class-wide basis.[3]

3.    The Defendants did not dispute my analyses and opinions in the Class Certification Report.  On March 15, 2021, the Court certified the Class.[4]

---

[1]    Unless otherwise specified, all defined terms in the Class Certification Report and the Damages Report have the same meanings in this report.

[2]    In its Order Granting Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, dated March 15, 2021 (the "Class Certification Order"), ECF No. 113, the Court granted Plaintiff's motion to certify the Class and defined the Class as follows: "All persons or entities who purchased or otherwise acquired publicly-traded common stock of defendant Zuora, Inc. during the period from April 12, 2018 to May 30, 2019 and who were damaged." Class Certification Order, p. 2.

[3]    Class Certification Report, ¶ 3.

[4]    Class Certification Order.

B.  Opinions in the Ronen Damages Report

4.    In the Damages Report, I offered the following opinions:[5]

**Damages Opinion 1:** The alleged misstatements and omissions made by Defendants were economically material to investors.  This opinion is based on the following:

(1)    During the Class Period, Defendants acknowledged in their filings with the SEC and on earnings calls with investors that issues pertinent to the allegations would be of concern to investors' evaluation of the Company's financial performance and growth prospects.

(2)    Over the course of the Class Period, commentary by securities analysts also confirms the economic importance of the integration of Zuora's Billing and RevPro products, and that the integration of these products was a key element of: (1) Zuora's growth strategy, including upsells and cross-sells with additional products; (2) sales volume; and (3) ultimately revenue growth.

(3)    An event study analysis of the corrective disclosure made after the close of market on May 30, 2019 demonstrates the materiality of the alleged misrepresentations and omissions.  Zuora's stock price reaction amid high trading volume following the alleged corrective disclosure, along with contemporaneous commentary by securities analysts and the financial press, all support the materiality of the alleged misrepresentations and omissions.

**Damages Opinion 2:** There is economic correspondence between the alleged misrepresentations and omissions that concealed adverse information about Zuora and the revelation of the truth, which when revealed proximately caused losses to investors.  The quantification of the losses to investors can be reliably measured by examining the stock price impact when the market learned the truth about the

---

[5]    Ronen Damages Report, ¶ 14.

allegations.  It was foreseeable that withholding adverse information from investors regarding the product integration failure and corresponding sales execution issues would harm investors when the corrective information came to light.  This opinion is based on the following:

(1)    Analysis of the information disclosed on the alleged corrective disclosure date, including potentially confounding news; and

(2)    Analysis of Zuora's stock price reaction and trading volume following the alleged corrective disclosure and contemporaneous reaction of securities analysts and the financial press to the disclosure.

The corrective information revealing the truth concerning Defendants' alleged misrepresentations and omissions released after the close of market on May 30, 2019 proximately caused the decline of the artificially inflated Zuora stock price. I calculate the excess share price decline of Zuora's common stock on May 31, 2019 (the price impact date) to be $5.53 per share or 27.80% of Zuora's prior day's closing stock price.

**Damages Opinion 3:** The alleged misrepresentations and omissions proximately caused Zuora's common stock price to be maintained at artificially inflated levels throughout the Class Period.  I estimate the level of artificial inflation for each day during the Class Period based on the artificial inflation that was eliminated from the market price of Zuora common stock on the corrective disclosure impact date (May 31, 2019), taking into account whether any change in the level of artificial inflation is necessary over time.[6]

**Figure 1** summarizes total artificial inflation in Zuora's stock price during the Class Period (represented by the maroon line) and also presents the *Dura* limitation to damages (represented by the purple line).  **Appendix B** [to the Ronen Damages

---

[6]    As discussed [in the Ronen Damages Report and further below in this report], my damages model can easily be adjusted to accommodate any changes to the inflation ribbon as determined by the finder of fact.

Report] contains the total artificial inflation after accounting for the *Dura* limitation for each day in the Class Period.[7]

**Figure 1: Zuora Stock Price and Artificial Inflation in Zuora Common Stock
(April 12, 2018 - May 31, 2019)**



**Damages Opinion 4:** Under Rule 10b-5, per share damages (before any statutory limitations) for any Class member are calculated as the difference between (i) artificial inflation in the stock price when the Class member purchased the stock and (ii) artificial inflation in the stock price when the Class member sold the stock. If a Class member bought Zuora common stock when the stock price was artificially

---

[7]   **Figure 1** and **Appendix B** [to the Ronen Damages Report] include a limitation on recoverable damages based on *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2004) ("*Dura*"). It is my understanding that the "*Dura* limitation" is equal to the measure of the excess price change related to the allegations on the price impact date of the corrective disclosure (i.e., the dollar decline due to revelation of the alleged misrepresentations and omissions).

inflated and held through the alleged corrective disclosure on May 30, 2019, the investor was harmed by the amount of artificial inflation per share shown in **Figure 1** above (or in **Appendix B** [to the Ronen Damages Report]) on the purchase date (artificial inflation on the date of sale is zero in this case).[8]  If an investor who purchased Zuora common stock during the Class Period did not hold the stock through the alleged corrective disclosure date, then the investor has zero damages for that particular purchase.

C.  Assignment

5.    On August 5, 2022, Professor Allen Ferrell submitted a report (the "Ferrell Report").  In this report, Dr. Ferrell opined on issues that he believes Plaintiff's damages expert faces in this matter in estimating artificial inflation.[9]  Counsel has asked me to review and evaluate the Ferrell Report in my current report.

6.    Over the course of my assignment, I relied upon various materials which are cited in this report and are listed in **Exhibit 1**.  My conclusions are based on materials that were available to me as of the date of this report.

7.    I understand that discovery in this matter is ongoing, and I reserve my right to amend this report to reflect any new relevant information made available to me, including but not limited to materials that may become available through discovery, reports and depositions of other expert witnesses, as well as future rulings from the Court in this matter.

8.    My qualifications and my remuneration for this matter are set forth in my Damages Report.

---

[8]  In addition, as discussed in Section X [of the Ronen Damages Report], I account for the 90-day period following the end of the Class Period.  I understand that under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff may not recover more than the difference between the purchase price and the mean trading price of the stock during the 90-day lookback period, or rolling average through the date of sale if sold during the lookback period.  *See* 15 U.S.C. § 78u-4(e)(1).

[9]  Ferrell Report, ¶ 14.

## II.    SUMMARY OF CONCLUSIONS

9.    After a careful review of the Ferrell Report, I maintain the opinions set forth in my Damages Report.  I also maintain the opinions set forth in my Class Certification Report, which Dr. Ferrell does not appear to critique.

10.    Based upon my review and evaluation of the Ferrell Report, the assumptions provided to me, materials relevant to this matter, and my professional knowledge and expertise, I have summarized below my responses to the issues raised in the Ferrell Report.

**Assumptions Regarding Liability.**

Several conclusions in the Ferrell Report are predicated on Dr. Ferrell's characterization and interpretation of Plaintiff's allegations, which differ from the allegations in the Complaint as well as the legal assumptions of liability provided to me.  Moreover, Dr. Ferrell's characterization and interpretation of Plaintiff's allegations often contradict Plaintiff's allegations as described by Dr. Ferrell in his report.

**Economic Correspondence and Price Impact.**

Dr. Ferrell appears to agree with the damages methodology I proposed in the Class Certification Report and applied in the Ronen Damages Report.

Dr. Ferrell's claims about the price impact of the alleged misrepresentations and the need to demonstrate that the alleged wrongdoing had a positive and statistically significant impact on Zuora's stock price are misguided.  The alleged misrepresentations and omissions were made from the start of the Class Period and in essence repeated over the course of the Class Period.  Omitted and repeated information would not be expected to cause a statistically significant price reaction.

Dr. Ferrell does not make an affirmative showing of the lack of price impact, and his one example of a misrepresentation during the Class Period repeated prior similar alleged false statements made in the IPO Registration Statement.

The quantification of the losses to investors can be reliably measured by the excess stock price decline on May 31, 2019, of $5.53 or 27.80% of Zuora's prior day's

closing stock price, which is statistically significant at the 1% level and demonstrates price impact when the market learned the truth about the false and misleading statements and omissions.

**Confounding Information.**

Dr. Ferrell appears to agree with the Class Certification Report and with the Ronen Damages Report that confounding information should be removed from the measurement of artificial inflation.

Dr. Ferrell's conclusion (or implication) that the portion of the May 31, 2019 stock price decline resulting from the sales productivity issue should be removed from the measurement of artificial inflation is inconsistent with the legal liability assumptions provided to me. Dr. Ferrell does not make any affirmative determination that the sales productivity issue he refers to is confounding information. Dr. Ferrell's suggestion that the sales execution issues might be confounding information conflicts with his own description of the allegations in the Complaint.

In my Damages Report, I concluded that, based on the legal liability assumptions provided to me, I did not find any confounding information and that no disaggregation of the excess stock price decline was necessary, and I maintain this conclusion.

I disagree with Dr. Ferrell's contention that it does not make economic sense to use the entire stock decline on May 31, 2019 to measure artificial inflation. To the extent Dr. Ferrell's contention excludes the impact of the sales execution issues that were allegedly underlined by the product integration issues, Dr. Ferrell's contention is untethered from the allegations in this case. To the extent Dr. Ferrell's contention is that the sales force productivity issue is independent of the product integration issue, then this contention is untethered from the liability assumptions provided to me. Moreover, because I have been instructed to assume that "all the sales execution issues mentioned by management on the earnings call [after close] on May 30, 2019 were a result of the product integration failure alleged in the

- 7 -

Complaint,"[10] in my opinion, the entire excess stock decline on May 31, 2019 is an appropriate measure of the impact of the allegedly corrective information.

**Scaling Artificial Inflation.**

In opining about the need for scaling the inflation ribbon, Dr. Ferrell mischaracterizes Plaintiff's product integration claims. In my Damages Report, I concluded that because the alleged misrepresentations and omissions concerning the failure of product integration and its related consequences did not change during the Class Period, I found no economic basis to believe that the financial implications of the wrongdoing would have been different than that determined using the Constant Percentage method of inflation, and I maintain this conclusion. If the alleged wrongdoing that was disclosed on May 30, 2019 had been revealed earlier in the Class Period, it is reasonable to conclude that the market would have similarly interpreted the impact on the financial performance and growth prospects of Zuora.

Dr. Ferrell's reference to the differences between what could have been disclosed over time relative to the final corrective disclosure is misguided. Dr. Ferrell conflates the alleged misrepresentations about Zuora's product functionality and integration with its internal attempts at fixing the lack of integration. The allegation is not that Defendants misrepresented their attempts at fixing the product integration issue, as Dr. Ferrell claims. Rather, the allegation is that Defendants misrepresented to the market that their two flagship products were integrated when they were not.

11.    I provide the bases and explanations for my conclusions in the remainder of this report.

---

[10]    Ronen Damages Report, ¶ 39.

### III.    ASSUMPTIONS REGARDING LIABILITY

12.    I explained in the Damages Report that my opinions are predicated on the assumption that "Plaintiff will ultimately prevail on issues of liability and that the Defendants will be found liable for the misstatements and omissions that are alleged by Plaintiff."[11]  I outlined the legal assumptions of liability provided to me by Counsel for use in my analyses related to damages as follows:

> I have been instructed to assume that Zuora should have disclosed the alleged misrepresentations and omissions during the Class Period.  I have also been instructed to assume that all the reasons provided by Zuora management for lowered guidance for fiscal year and second quarter of 2020 are subsumed in the information that Zuora failed to disclose to the market.  Further, I have been asked to assume that all the sales execution issues mentioned by management on the earnings call on May 30, 2019 were a result of the product integration failure alleged in the Complaint.[12]

13.    I further noted that I had made "no independent assessment of the issues of liability in this case."[13]  It is my understanding that, as a damages expert, my role is to opine on issues related to damages based on the legal assumptions of liability provided to me.[14]

14.    As discussed in the following sections, several conclusions in the Ferrell Report are predicated on Dr. Ferrell's characterization and interpretation of Plaintiff's allegations, which differ from the allegations in the Complaint as well as the legal assumptions of liability outlined above.  Moreover, as I discuss below, Dr. Ferrell's

---

[11]    Ronen Damages Report, ¶ 38.

[12]    Ronen Damages Report, ¶ 39.

[13]    Ronen Damages Report, ¶ 4.

[14]    *See, e.g., Sancom, Inc. v. Qwest Communications Corp*, 683 F. Supp. 2d 1043, 1068 (D.S.D. 2010) ("And, it is well-settled that a damages expert like Canfield can testify as to damages while assuming the underlying liability" (citing *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) ("A damages model would, of course, be necessarily consistent with liability, or necessarily assume liability.")).

characterization and interpretation of Plaintiff's allegations often contradict Plaintiff's allegations as described by Dr. Ferrell in his report.

## IV.    ECONOMIC CORRESPONDENCE AND PRICE IMPACT

A.  Dr. Ferrell Appears to Agree with the Damages Methodology that I Proposed in the Class Certification Report and Applied in the Ronen Damages Report

15.    Dr. Ferrell states that "to estimate per-share damages in securities litigation cases, an economist must analyze the economic evidence and relate it to plaintiffs' allegations."[15]  Dr. Ferrell appears to agree with the methodology that I described in the Class Certification Report and applied in the Ronen Damages Report, wherein I established economic correspondence between the information in the corrective disclosure and the alleged misrepresentations and omissions and their foreseeable economic consequences. In Section VIII of my Damages Report, titled "Loss Causation and Artificial Inflation," I included an analysis of: (a) the corrective disclosure on May 30, 2019; (b) economic correspondence; (c) confounding information; and (d) truth-on-the-market issues. I concluded this section as follows:

> The discussion above illustrates that there is an economic correspondence between the alleged misrepresentations and omissions that concealed adverse information about Zuora and the revelation of the truth, which when revealed proximately caused losses to investors.  The quantification of the losses to investors can be reliably measured by the excess stock price decline of $5.53 or 27.80% of Zuora's prior day's closing stock price when the market learned the truth about the false and misleading statements and omissions.  It was foreseeable that withholding adverse information from investors regarding the product integration failure and corresponding sales execution issues would harm investors when the corrective information came to light.[16]

---

[15]  Ferrell Report, ¶ 17.

[16]  Ronen Damages Report, ¶ 87.

16.    Thus, it appears that Dr. Ferrell and I agree on the methodology to establish economic correspondence and estimate per share damages.

B.    Dr. Ferrell's Claims about the Price Impact of the Misrepresentations During the Class Period are Misguided

17.    Dr. Ferrell quotes from my Class Certification Report: "In general, losses that result from the revelation of the truth are manifested when the alleged wrongdoing is revealed through corrective disclosure(s) that eventually bring the alleged misrepresentations and omissions to light."[17]  Dr. Ferrell does not dispute this commonly accepted and widely used methodology for assessing losses in securities litigation.

18.    Dr. Ferrell raises purported "issues that arise when applying Dr. Ronen's methodology to estimate alleged artificial inflation in this case"[18]  and states that "[t]o the extent that Plaintiff alleges that Defendants made materially false or misleading statements during the Class Period that contained value-relevant information not previously reflected in Zuora's stock price," I must "demonstrate that the statements had a positive and statistically significant impact" and caused inflation to enter Zuora's stock price.[19] Dr. Ferrell then provides a single example to illustrate his point:

> For example, I understand that Plaintiff alleges that Defendants made materially false or misleading statements in a Twitter post on June 5, 2018.  If the information in that Twitter post was not previously reflected in Zuora's stock price, Plaintiff's expert would have to demonstrate that the Twitter post had a positive and statistically significant price impact to demonstrate that the statements in the Twitter post caused inflation to enter the Company's stock price.[20]

19.    Dr. Ferrell's claim about the requirement to show statistically significant stock price reactions when the alleged misrepresentations and omissions were made by the Company is misguided because the alleged misrepresentations and omissions were made

---

[17]   Ferrell Report, ¶ 16 (quoting Class Certification Report, ¶ 89).

[18]   Ferrell Report, ¶ 16.

[19]   Ferrell Report, ¶ 17.

[20]   Ferrell Report, ¶ 17 (footnote omitted).

from the start of the Class Period and in essence were repeated during the course of the Class Period. Omitted and repeated information would not be expected to cause a statistically significant price reaction, as I explain below.

20. *First*, in this case, the allegations relate to the misrepresentations and omissions of facts. Plaintiff alleges that "[u]nbeknownst to investors, Defendants materially misrepresented the functionality of its solution in the Registration Statement and omitted to disclose a fundamental technical challenge adversely impacting its Central platform and related software application products. Specifically, customers using Zuora Billing and Zuora RevPro could not successfully integrate the data from both systems."[21] These alleged misrepresentations and omissions were made from the start of the Class Period.[22]

21. An event study analysis can, under certain circumstances, be used to quantify the effect on the stock price of an affirmative misrepresentation on the date on which it is made. An example of such an affirmative misrepresentation would be if an announcement were made that additional gold had been discovered in a mine (an alleged misrepresentation) when no additional gold was expected to be found. The additional gold announcement might be expected to cause a positive stock price reaction. However, such an analysis would be irrelevant in this case where the alleged misrepresentations and omissions concern the concealment of a material fact. The concealment or omission of an alleged wrongdoing will not cause a significant price reaction because the concealed information is not publicly disclosed.[23]

---

[21] Ronen Damages Report, ¶ 33 (citing Complaint, ¶ 59).

[22] *See, e.g.*, Complaint, ¶¶ 178-188.

[23] *See, e.g.*, Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law*, 35:1, 2009, pp. 159-168 at 163-164 (footnotes omitted) ("It is widely recognized and understood that one would not expect to observe a price reaction to an omission because of the nature of an event. By definition, an omitted fact is not disclosed to the market. An event study is designed to quantify the effect of *disclosed* information, not undisclosed information. It is an oxymoron to have an event study of an omitted piece of information. Consequently, it is incorrect and improper to use an event study to analyze or quantify the effect of information that was alleged to

22.   Furthermore, the Complaint alleges numerous instances when the misrepresentations and omissions were in essence <u>repeated</u> throughout the Class Period.[24]

---

have been omitted by plaintiffs.  On this point, NERA economist David Tabak notes that:

'[O]ne would not expect the stock price to move when defendants did not make a statement, so there is no reason to examine the stock price at the time of an alleged omission.  An alternative way of showing the effect of the omission is by examining the stock price when the information was finally disclosed . . .'").

*See also* David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, Third Edition, ed. by Roman L. Weil, Michael Wagner and Peter Frank, Wiley, 2001 stating that an event study is designed to quantify the effect of disclosed information, not undisclosed information.

[24]   The Complaint alleges misrepresentations and omissions made in the IPO Registration Statement, such as: (i) Complaint, ¶ 178 ("Architected specifically for dynamic, recurring subscription business models, our solution functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition.  Our cloud-based software solution is the new system of record for subscription businesses."); (ii) Complaint, ¶ 180 ("Defendants stated that Zuora's solution 'functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process and is architected specifically for dynamic subscription business models.'"); and (iii) Complaint, ¶ 182 ("Defendants further claimed that Zuora's 'solution enables customers to successfully … [b]ill accurately with automated invoices that reflect everything from up-to-date proration and plan changes to usage-based billing,' while concurrently '[a]ccount for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time.'").

These misrepresentations and omissions in the IPO Registration Statement were repeated during the Class Period, for example: (i) Complaint, ¶ 159 ("Throughout the Class Period, Defendants published numerous false or misleading statements on Zuora's website about how Zuora could offer a robust, single system of record for subscription businesses to manage their monetization strategies, billing terms, customer payment and collection, and revenue recognition."); (ii) Complaint, ¶ 168 ("Throughout the Class Period, Zuora's Facebook page also emphasized how Zuora Central was the "#Subscription Economy platform" or "Subscription Order-to-Revenue Platform" that allowed a company to run its "dynamic order-to-cash platform on one central platform…"); and (iii) Complaint, ¶ 171 ("For example, numerous Zuora press releases during the Class Period contained the following description of Zuora and emphasized the integrated nature of Zuora's offerings:

- 13 -

The repetition of information also will not cause a significant price reaction because it is not new information.[25]

23.    *Second*, as I stated in my Damages Report, the Complaint alleges that Zuora's misrepresentations and omissions regarding the integration of its flagship products began as early as the filing of its IPO Registration Statement.[26,27]    I understand that the misrepresentations and omissions made <u>after the IPO</u> in essence relate to the same misrepresentations and omissions made in the IPO.   Thus, the alleged misrepresentations and omissions made <u>after the IPO</u> would not constitute new, value relevant information that would cause inflation to enter Zuora's stock price.    Instead, the alleged misrepresentations and omissions made <u>after the IPO</u> acted to maintain the level of artificial inflation that was in Zuora's stock price.    That is, the price impact of the alleged misrepresentations and omissions were impounded in Zuora's stock price at the start of the

---

> Zuora® provides the leading cloud-based subscription management platform that functions as a system of record for subscription businesses across all industries.  Powering the Subscription Economy®, the Zuora platform was architected specifically for dynamic, recurring subscription business models and acts as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-cash process, including billing and revenue recognition …).

[25]  It appears Dr. Ferrell would agree that repeated information is not new, value relevant information and thus would not cause a significant price reaction.  The Ferrell Report states: "In an efficient market … disclosures of new information that are relevant to a company's value would be expected to cause a statistically significant reaction in the company's stock price; otherwise, the information is either already reflected in the stock price (and therefore is not new) or it is not value-relevant."  Ferrell Report, ¶ 17.

[26]  For example: "According to the Complaint, '[u]nbeknownst to investors, Defendants materially misrepresented the functionality of its solution <u>in the Registration Statement</u> and omitted to disclose a fundamental technical challenge adversely impacting its Central platform and related software application products.  Specifically, customers using Zuora Billing and Zuora RevPro could not successfully integrate the data from both systems.'  The Complaint alleges that 'Defendants <u>knew of the integration failure between Zuora Billing and RevPro before and throughout the entirety of the Class Period</u>, based on their knowledge of failed internal and external implementation projects.'"  Ronen Damages Report, ¶¶ 33-34 (emphasis added).

[27]  Complaint, ¶¶ 178-188.

Class Period and maintained throughout the Class Period until Defendants disclosed the alleged truth on May 30, 2019.[28]    Therefore, any suggestion that it is necessary to affirmatively show inflation entering Zuora's stock price on any later dates during the Class Period is misguided.[29]

24.    *Third*, I note that Dr. Ferrell does not make an affirmative showing of the lack of price impact.  Instead, he simply points to one example to claim that:

> Plaintiff's expert would have to demonstrate that the Twitter post had a positive and statistically significant price impact to demonstrate that the statements in the Twitter post caused inflation to enter the Company's stock price.[30]

---

[28]    As I explained in the Damages Report, the only variation to the inflation ribbon reflects the use of Constant Percentage method to calculate inflation.  Ronen Damages Report, ¶ 95.

[29]    I stated in the Ronen Damages Report: "Plaintiff alleges that from the start of the Class Period Defendants made false and misleading statements about the functionality and integration of Zuora's principal offerings, Zuora Billing and Zuora RevPro, that resulted in sales execution issues."  Ronen Damages Report, ¶ 92.

[30]    Ferrell Report, ¶ 17.

25.    But, the June 5, 2018 Zuora Twitter post that Dr. Ferrell references[31] repeated prior similar alleged false statements made in the April 2018 IPO Registration Statement.[32] Thus, one would not expect that the repeated alleged false statement on June 5, 2018 would cause a significant positive stock price reaction.[33]

26.    *Fourth*, Dr. Ferrell does not criticize my measurement of the excess stock price decline on May 31, 2019 of $5.53 or 27.80% of Zuora's prior day's closing stock price, which is statistically significant at the 1% level and demonstrates price impact when the market learned the truth about the alleged misrepresentations and omissions.  As I stated in my Damages Report, "losses that result from the alleged wrongdoing are manifested when the alleged wrongdoing is revealed through corrective disclosure(s) that eventually

---

[31]    The Complaint ¶ 164 alleges the Twitter post was a false or misleading statement "regarding a 'seamless order-to-revenue' process."  Specifically, the Twitter post stated "Don't underestimate the complexity of revenue recognition.  The deep dark depths are very, very complex!  Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process!"  The Complaint ¶ 165 alleges: "This statement [the Twitter post] was false and misleading.  In truth, as discussed above, there was no Zuora + RevPro integration let alone a solution Zuora offered 'for a seamless order-to-revenue process.'  To the contrary, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems."  The allegations in Complaint ¶¶ 164-165 in essence repeat the same alleged false and misleading statements in the IPO Registration Statement (Complaint ¶ 185 alleges: "The statements in the Registration Statement as alleged in paragraphs 178-184 above were false and misleading.  In truth, as described above, Zuora's solution (i) could not automate and orchestrate the entire subscription order-to-cash process, including billing and revenue recognition; (ii) did not concurrently offer automated billing and efficient accounting features; (iii) did not connect or integrate the represented billing and revenue recognition functions; (iii) could not singularly handle the customer acquisition to financial records close process; (iv) could not enable customers to successfully bill accurately with automated invoices while concurrently account for revenue, comply with the latest revenue recognition rules, close books faster, orchestrate subscription transactions, and process revenue in real-time; … In particular, customers using both Zuora Billing and Zuora RevPro were unable to integrate the data between the two systems.").

[32]    Complaint, ¶¶ 178-188.

[33]    Dr. Ferrell did not discuss any empirical results related to June 5, 2018.  I note that Appendix A to the Ronen Damages Report shows that there was a positive stock price movement on June 5, 2018 that was not statistically significant at the 5% level.

bring the alleged misrepresentations and omissions and their foreseeable consequences to light."[34]  Thus, "[t]he quantification of the losses to investors can be reliably measured by the excess stock price decline [on May 31, 2019] of $5.53 or 27.80% of Zuora's prior day's closing stock price when the market learned the truth about the false and misleading statements and omissions."[35]

27.    For the reasons outlined above, Dr. Ferrell's claims about the price impact of the misrepresentations and the need to demonstrate that the alleged wrongdoing had a positive and statistically significant impact on Zuora's stock price are misguided.  The quantification of the losses to investors can be reliably measured by the excess stock price decline on May 31, 2019 of $5.53 or 27.80% of Zuora's prior day's closing stock price when the market learned the truth about the false and misleading statements and omissions.

## V.    CONFOUNDING INFORMATION

A.  <u>Dr. Ferrell Appears to Agree with the Class Certification Report and with the Ronen Damages Report that Confounding Information Should Be Removed from the Measurement of Artificial Inflation</u>

28.    Dr. Ferrell and I both appear to agree that material, confounding information should be removed from the measurement of artificial inflation.[36,37]

---

[34]  Ronen Damages Report, ¶ 52 (footnote omitted).

[35]  Ronen Damages Report, ¶ 87.

[36]  In the Ronen Damages Report, I stated: "If confounding information is identified and is determined to be material, then the portion of the excess price decline related to the confounding information would be separated from the portion of the price decline caused by the disclosure of corrective information.  In other words, only the portion of the stock price decline related to the alleged wrongdoing would be included in the measurement of artificial inflation."  Ronen Damages Report, ¶ 79.  *See also* Class Certification Report, ¶ 89.

[37]  Dr. Ferrell states: "First, as Dr. Ronen acknowledges, Plaintiff's damages expert must reliably 'pars[e] and separate[e] the amount of the price movement due to the alleged fraud from the amount of the price movement due to nonfraudulent disclosures'; such disclosures are commonly referred to as 'confounding information.'"  Ferrell Report, ¶ 19, citing to my Class Certification Report.

B. Dr. Ferrell's Conclusion (or Implication) that the Portion of the May 31, 2019 Price Decline Resulting from the Sales Issues Should be Removed from the Measurement of Artificial Inflation Is Inconsistent with the Legal Liability Assumptions Provided to Me

29. Dr. Ferrell appears to state (or else he implies) that the portion of the May 31, 2019 stock price decline attributable to the sales issue should be removed from the measure of artificial inflation:

> *If any* of the reduced revenue guidance is attributable to the sales force productivity issue *independent* of the integration issue, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information.[38]

30. Below, I address Dr. Ferrell's conclusion (or implication) about treating the sales execution issue as confounding information.

31. First, I find that Dr. Ferrell does not make any affirmative determination that the sales productivity issue he refers to is confounding information, rather merely states that "to the extent"[39] and "if any"[40] of the sales productivity issue "is unrelated to the integration issue" (*i.e.*, confounding), "then the entire firm-specific decline cannot be used to measure alleged artificial inflation."[41,42]

---

[38] Ferrell Report, ¶ 20 (footnotes omitted and emphasis added).

[39] The Ferrell Report states: "*To the extent* that the information disclosed on May 30, 2019 about the productivity of Zuora's sales force *is unrelated to the integration issue* (commonly referred to as "confounding" information), the entire firm specific price decline on May 31, 2019 cannot be used to measure alleged artificial inflation." Ferrell Report, ¶ 15 (emphasis added).

[40] The Ferrell Report states: "*If any* of the reduced revenue guidance is attributable to the sales force productivity issue *independent of the integration issue*, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information." Ferrell Report, ¶ 20 (emphasis added and footnote omitted).

[41] Ferrell Report, ¶¶ 15, 20.

[42] Dr. Ferrell refers to the Dages Report as "address[ing] the portion of the reduced guidance that could be attributed to the integration issue." Ferrell Report, footnote 40.

32.    Further, Dr. Ferrell's implication that the sales issues revealed on May 30, 2019 might be confounding information is inconsistent with the Plaintiff's allegations and the legal liability assumptions provided to me as described in the Ronen Damages Report (Sections V and VI) and Section III above.

33.    In my Damages Report, I examined "whether some portion of the $5.53 excess stock price decline on May 31, 2019 might be attributed to some other Zuora-specific information unrelated to the wrongdoing (*i.e.*, not related to the product integration or sales execution claims)."[43]  Based on my analysis, I concluded:

> Zuora attributed the reduced 2Q 2020 and FY 2020 outlook and the lower 1Q 2020 reported revenue to two factors: (i) the product integration for the Billing and RevPro software products; and (ii) sales execution issues.  According to the assumptions provided to me (*see* Section VI [of the Ronen Damages Report]), both of these factors directly relate to Plaintiff's allegations of false and misleading statements regarding the product integration and sales execution claims.
>
> Thus, I did not find any confounding information that was not accounted for in the analysis above and, therefore, conclude that no disaggregation of the excess stock price decline is necessary.[44]

34.    I note that Dr. Ferrell attributes the entire stock price decline on May 31, 2019 to Zuora's reduced FY 2020 guidance[45] and states that there were only "…two factors that led to Zuora's reduction in fiscal year 2020 revenue guidance"[46] – the product integration issues and sales execution issues.[47]  Thus, it appears that Dr. Ferrell and I are in agreement about the causes of the May 31, 2019 stock price decline (*i.e.*, the disclosure of product

---

I understand that Plaintiff has engaged Mr. Charles Lundelius, Jr. as an expert to respond to the Dages Report.

[43]    Ronen Damages Report, ¶ 80.

[44]    Ronen Damages Report, ¶¶ 83-84.

[45]    Ferrell Report, ¶ 19.

[46]    Ferrell Report, ¶ 20.

[47]    Ferrell Report, ¶¶ 9, 20.

integration and sales execution issues).  Therefore, the difference in our opinions is not due to a difference in the analysis of the May 30, 2019 disclosure; rather it is due to the difference in assumptions of liability.  As I explained in the Ronen Damages Report[48] and above in Section III, as a damages expert, my analysis is contingent on the liability assumptions provided to me.

35.    I also note that while Dr. Ferrell suggests the sales executions issues might be confounding, this suggestion conflicts with his own description of the allegations in the Complaint, which state that the sales execution issues were caused by the integration failure.  For example, Dr. Ferrell states:

> Plaintiff alleges that Defendants "concealed the existence of significant technical challenges that prevented the successful integration of Zuora's two core products [Billing and RevPro], ultimately *resulting in reduced revenue growth, missed sales, and waning demand* for Zuora's platform and applications."  Plaintiff claims that "Defendants' misrepresentations about the functionality and configuration of Zuora's principal offerings inflated the price of Zuora's common stock until Defendants' disclosure of *the integration failure resulted in sales execution issues and disappointing financial performance and outlook*, causing the stock price to plummet."  …
>
> Plaintiff claims that "[t]he artificial inflation created by Defendants' alleged misrepresentations and omissions regarding the functionality of Zuora's solution and demand for the Company's solution *was removed from Zuora's share price in direct response to information revealed in disclosures* that took place on May 30, 2019" when "Defendants disclosed the *integration failure and sales execution issues* … [and] … further disclosed the diminished demand for its products by reporting a larger loss, reduced revenue growth, and reducing guided revenues for the entire fiscal year 2020."[49]

36.    It is my understanding that, as a damages expert, my role is to opine on issues related to damages, based on the legal assumptions of liability provided to me.  The

---

[48]   *See*, *e.g.*, Ronen Damages Report, ¶¶ 38-39, 83-84.

[49]   Ferrell Report, ¶¶ 11-12 (footnotes omitted and emphasis added).

ultimate determination of whether any of the price decline is unrelated to the allegations will be made by the finder of fact. If Dr. Ferrell is suggesting that, if the finder of fact were to determine that only a portion of the price decline is related to the allegations,[50] I agree with him that the portion of price decline used for inflation would be adjusted accordingly. In my Damages Report, I explained such a scenario:

> My quantification of the alleged fraud and non-fraud related components of the $5.53 per share excess price decline in Zuora's common stock on May 31, 2019 may be modified should further development of the record indicate that any part of the disclosures concerning the product integration and sales execution issues are (or are not) related to the alleged misrepresentations and omissions. For example, if a portion of the excess price decline (say $\alpha$) is found by the finder of fact to be related to the alleged wrongdoing, then $\alpha$ times $5.53 would represent the price response to the alleged misrepresentations and omissions.[51]

37.    Dr. Ferrell also claims that "the sales force productivity issue was a known risk because it was disclosed in the Prospectus and market participants were aware of it."[52] The *disclosed* sales risk, however, was untethered from the product integration failure because the allegation is that the market was led to believe that Zuora's flagship products were already integrated as of the start of the Class Period. Accordingly, any *boilerplate disclosure* by Zuora of sales force risk prior to the corrective disclosure on May 30, 2019 is unrelated to the sales execution issues announced that day which I have been asked to assume were caused by the product integration issues (*see* Section III above).

---

[50]    "If any of the reduced revenue guidance is attributable to the sales force productivity issue independent of the integration issue, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information." Ferrell Report, ¶ 20 (footnote omitted).

[51]    Ronen Damages Report, ¶ 85.

[52]    Ferrell Report, ¶ 20 (footnotes omitted).

C. Dr. Ferrell's Contention that It Does Not Make Economic Sense to Use the Entire Stock Price Decline on May 31, 2019 for Artificial Inflation Is Flawed

38.    Dr. Ferrell contends that it does not make "economic sense" to use the entire May 31, 2019 stock price decline "to measure the price impact of the allegedly corrective information about the Billing and RevPro integration issue…"[53]  However, to the extent, Dr. Ferrell's contention excludes the impact of the sales execution issues that were allegedly caused by the product integration issues, such a contention is untethered from the allegations in this case.  As discussed above, Plaintiff's allegations and the legal liability assumptions provided to me include both the product integration and the sales execution claims.  To the extent that Dr. Ferrell's contention is that the sales force productivity issue is independent of the product integration issue, then this premise is untethered from the liability assumptions given to me.

39.    Moreover, because I have been instructed to assume that "all the sales execution issues mentioned by management on the earnings call [after close] on May 30, 2019 were a result of the product integration failure alleged in the Complaint,"[54]  in  my opinion, the entire excess stock price decline on May 31, 2019 is an appropriate measure of the impact of the allegedly corrective information.  Thus, I disagree with Dr. Ferrell's contention that it does not make economic sense to use the entire excess stock price decline to measure artificial inflation.

40.    Furthermore, Dr. Ferrell's contention that the product integration issue "affected relatively few customers and was seen as a comparatively short-term, fixable issue"[55] is an opinion about the liability in this case and appears to contradict Plaintiff's allegations that the integration issues "caused serious sales execution problems, and ultimately resulted in reputational damage and reduced demand for all of Zuora's products."[56]  As a damages expert, as I noted in the Ronen Damages Report, I have "made

---

[53]   Ferrell Report, ¶ 23 (footnote omitted).

[54]   Ronen Damages Report, ¶ 39.

[55]   Ferrell Report, ¶ 23.

[56]   Complaint, ¶ 88.  *See also* Complaint, ¶¶ 210, 212, 218, 223, and 229.

no independent assessment of the issues of liability in this case,"[57] and that "I assume that Plaintiff will ultimately prevail on issues of liability and that the Defendants will be found liable for the misstatements and omissions that are alleged by Plaintiff."[58]

## VI.    SCALING ARTIFICIAL INFLATION

A. <u>Dr. Ferrell Mischaracterizes Plaintiff's Product Integration Claims When Concluding that the Price Impact of the Alleged Wrongdoing Varied Over the Class Period</u>

41.    Dr. Ferrell claims that the price impact of the alleged wrongdoing varied over the Class Period and that this variation must be incorporated into the inflation ribbon:

> Because the price impact of the alleged misrepresentations or omissions regarding the results of the internal tests through which "Defendants determined that Keystone could not deliver the represented functionality for RevPro," as well as any negative consequences on Zuora's sales, did vary throughout the Class Period under Plaintiff's claims, Plaintiff's expert must incorporate this variation when estimating the "inflation ribbon" over the Class Period.[59]

> Defendants became aware of the extent of the Billing and RevPro integration issue and its consequences during the Class Period;[60] and that

> …the certainty of their results [of attempts at product integration] could not have been disclosed at the start of the Class Period.[61]

42.    In opining about the need for scaling the inflation ribbon, Dr. Ferrell mischaracterizes Plaintiff's allegations.    The allegation is not that Defendants misrepresented their attempts at fixing the product integration issue, as Dr. Ferrell claims.

---

[57]    Ronen Damages Report, ¶ 4.

[58]    Ronen Damages Report, ¶ 38.

[59]    Ferrell Report, ¶ 25.

[60]    Ferrell Report, ¶ 24.

[61]    Ferrell Report, ¶ 24.

Rather, the allegation is that Defendants misrepresented to the market that their two flagship products were integrated when they were not.

43.     The alleged misrepresentations and omissions concerning the lack of product integration and its related consequences did not change during the Class Period, as Dr. Ferrell claims.  Furthermore, Plaintiff alleges that Defendants could have disclosed the lack of product integration at the start of the Class Period.[62]

44.     Dr. Ferrell's claims regarding Defendants' attempts at fixing the product integration issue also ignore and contradict his own description of Plaintiff's allegations concerning the misrepresentations and omissions about the lack of product integration from the start of the Class Period.[63]

45.     In my Damages Report, I considered "whether the economic effect of the alleged misrepresentations and omissions changed over the course of the Class Period such that it would require further adjusting (or scaling) the level of artificial inflation."[64]  I concluded:

> Because the alleged misrepresentations and omissions concerning the failure of product integration and its related consequences did not change during the Class Period, I find no economic basis to believe that the financial implications of the wrongdoing would have been different than that determined using the Constant Percentage method of inflation discussed above.  Stated differently, if the alleged wrongdoing that was disclosed on May 30, 2019 were revealed earlier in the Class Period, it is reasonable to conclude that the market would have similarly interpreted the impact on the financial performance and growth prospects of Zuora.[65]

---

[62]  Complaint, ¶¶ 6, 66.

[63]  Dr. Ferrell's own description of Plaintiff's allegations included alleged "misrepresentations about the functionality and configuration of Zuora's principal offerings" and that "Defendants knew both before and throughout the entirety of the Class Period of Zuora's platform's inability to integrate RevPro successfully."  Ferrell Report, ¶ 11 (emphasis added and footnotes omitted) (citing to the Complaint).

[64]  Ronen Report, ¶ 96.

[65]  Ronen Report, ¶ 96.

46.    Dr. Ferrell also introduces the concept of "equivalent disclosure" to refer to the differences between what Defendants purportedly could have disclosed over time relative to the final corrective disclosure:

> [T]o use a price decline to estimate alleged artificial inflation in securities litigation as Dr. Ronen describes, it is crucial that the disclosure of allegedly corrective information actually corrects the alleged misstatement and does not reveal information that could not have been known and disclosed at the time of the misstatement. Otherwise, the price reaction to the disclosure does not measure the value of the misstatement because it measures the value of different information….[66]

47.    Dr. Ferrell's reference to the differences between what could have been disclosed over time relative to the final corrective disclosure is misguided. Dr. Ferrell is again conflating the alleged misrepresentations about product functionality and integration with internal attempts at fixing the lack of integration. As discussed, the allegation is not that Defendants merely misrepresented their attempts at fixing the integration issue. Thus, "not reveal[ing] information that could not have been known and disclosed at the time of the misstatement"[67] is irrelevant. The allegation concerns misrepresentations about product integration — the lack of which was allegedly known to Defendants from the start of the Class Period. Thus, I do not find Dr. Ferrell's arguments for the need to scale artificial inflation to accord with the allegations I have been asked to assume and, therefore, I maintain the conclusions in my Damages Report.

48.    Specifically, on May 30, 2019, to the surprise of the market, Zuora disclosed that its flagship products were not integrated and that the Company was working towards the goal of integrating the products.[68] Mr. Tzuo noted on the conference call on May 30,

---

[66]  Ferrell Report, ¶ 18 (emphasis added).

[67]  Ferrell Report, ¶ 18.

[68]  For example, an analyst from Jefferies expressed surprise and wanted to know how the two products could not be integrated even two years after the acquisition of Leeyo: "I mean you bought Leeyo 2 years ago. So like it's hard -- like how can it not be integrated? How could that be slowing things down right now?" "Q1 2019 Zuora Inc Earnings Call – Final," CQ FD Disclosure, May 30, 2019, p. 8.

2019 that "on the product integration side, [Zuora had] made a course correction in [its] approach," and that he was confident that the Company was on the "right track" in its efforts to integrate the two flagship products.[69]   The Company also disclosed the sales execution issues and lowered its guidance.  As mentioned previously, I have been asked to assume that all the sales execution issues mentioned by management on the earnings call on May 30, 2019 were a result of the product integration failure alleged in the Complaint.  Plaintiff alleges that Zuora could have made a similar (or equivalent) disclosure at the start of the Class Period.  Thus, I maintain my conclusion that if the alleged wrongdoing that was disclosed on May 30, 2019 had been revealed earlier in the Class Period, it is reasonable to conclude that the market would have similarly interpreted the impact on the financial performance and growth prospects of Zuora.[70]

## VII.   SUMMARY OF REPLIES TO THE FERRELL REPORT

A.  Economic Correspondence and Price Impact

49.   The Ferrell Report concludes:

> To estimate alleged artificial inflation in Zuora's stock price throughout the Class Period, Plaintiff's damages expert must analyze the economic evidence and relate it to Plaintiff's claims.  To the extent that Plaintiff alleges that Defendants made alleged misstatements during the Class Period that constituted value-relevant information not previously known to the market, Plaintiff's damages expert must demonstrate that the information had a positive and statistically significant impact on Zuora's stock price to show that the new information

---

[69]   "Q1 2019 Zuora Inc Earnings Call – Final," CQ FD Disclosure, May 30, 2019, pp. 2-3.

[70]   As I noted in the Damages Report, "[n]evertheless, should the finder of fact determine that the stock price impact of the alleged misrepresentations and omissions changed over the Class Period (beyond that determined by the Constant Percentage method of inflation discussed above), the level of artificial inflation on each day of the Class Period can be adjusted based upon any measure deemed appropriate by the finder of fact.  The damages methodology discussed in Section X [of the Ronen Damages Report] would be unaffected by any potential scaling of the artificial inflation and any adjustment would be applied in the same way for all Class members."  Ronen Damages Report, ¶ 98.

was value-relevant and caused inflation to enter the Company's stock price.[71]

50.    I have addressed the above conclusion in the Ferrell Report related to economic correspondence and price impact in Section IV above.

B.    Confounding Information

51.    The Ferrell Report concludes:

> Plaintiff's damages expert also must, at a minimum, reliably analyze and account … [t]o the extent that the information disclosed on May 30, 2019 about the productivity of Zuora's sales force is unrelated to the integration issue (commonly referred to as "confounding" information), the entire firm specific price decline on May 31, 2019 cannot be used to measure alleged artificial inflation….[72]

52.    I have addressed the above conclusion in the Ferrell Report related to confounding information in Section V above.

---

[71]    Ferrell Report, ¶ 15.

[72]    Ferrell Report, ¶ 15.

- 28 -

C.  Scaling Artificial Inflation

53.    The Ferrell Report concludes:

Plaintiff claims that the results of internal tests that I understand were conducted at various times during the Class Period allegedly led the Defendants to become aware that Zuora's integration project could not deliver the represented RevPro functionality and that sales ultimately were affected. Accordingly, the allegedly corrective information that purportedly could have been disclosed during the Class Period varied across the time period; hence, the price impact of this information likely varied as well prior to the disclosure on May 30, 2019. Under this theory, Plaintiff's expert must consider those variances and assess their impact over time.[73]

54.    I have addressed the above conclusion in the Ferrell Report related to scaling artificial inflation in Section VI above.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 16th day of September 2022,

_____

Tavy Ronen, Ph.D.

---

[73]  Ferrell Report, ¶ 15.

**Exhibit 1**
**Materials Relied Upon**

## COURT AND LEGAL DOCUMENTS

Expert Report of Tavy Ronen, Ph.D. dated December 4, 2020; including all materials cited therein.

Expert Report of Tavy Ronen, Ph.D. dated August 5, 2022; including all materials cited therein.

Expert Report of Allen Ferrell Ph.D. dated August 5, 2022.

Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed in *Casey Roberts, et al. v. Zuora, Inc. et al.*, No. 3:19-cv-03422-SI, (N.D. Cal. Nov. 8, 2019).

Order Granting Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, dated March 15, 2021, ECF No. 113.

*Sancom, Inc. v. Qwest Communications Corp*, 683 F.Supp. 2d 1043, 1068 (D.S.D. 2010).

## EARNINGS CALL TRANSCRIPT

Q1 2019 Zuora Inc Earnings Call Transcript, CQ FD Disclosure, May 30, 2019.

## ACADEMIC PAPERS AND BOOKS

David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, Third Edition, ed. by Roman L. Weil, Michael Wagner and Peter Frank, Wiley, 2001.

Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law*, 35:1, 2009, pp. 159-168.

## MISCELLANEOUS

15 U.S.C. § 78u-4(e)(1).

All other specific materials and information otherwise described or set forth in the body of this Report.