SUSAN S. MUCK (SBN 126930)
susan.muck@wilmerhale.com
KEVIN P. MUCK (SBN 120918)
kevin.muck@wilmerhale.com
WILLIAM BRENC (SBN 318544)
william.brenc@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1002

JEREMY T. ADLER (admitted *pro hac vice*)
jeremy.adler@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 295-6417

MELINDA HAAG (SBN 132612)
ROBIN LINSENMAYER (SBN 244656)
ERIKA K. HOGLUND (SBN 327781)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
mhaag@paulweiss.com
rlinsenmayer@paulweiss.com
ehoglund@paulweiss.com

KAREN L. DUNN (admitted *Pro Hac Vice*)
JUSTIN ANDERSON (admitted *Pro Hac Vice*)
JESSICA E. PHILLIPS (*Pro Hac Vice* forthcoming)
JAKE E. STRUEBING (admitted *Pro Hac Vice*)
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kdunn@paulweiss.com
janderson@paulweiss.com
jphillips@paulweiss.com
jstruebing@paulweiss.com

AUDRA J. SOLOWAY (admitted *Pro Hac Vice*)
JONATHAN HURWITZ (admitted *Pro Hac Vice*)
JASON A. DRISCOLL (admitted *Pro Hac Vice*)
BENJAMIN W. PEROTIN (admitted *Pro Hac Vice*)
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 6th Ave.
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
jhurwitz@paulweiss.com
jdriscoll@paulweiss.com
bperotin@paulweiss.com

*Attorneys for Defendants Zuora, Inc.,*
*Tien Tzuo, and Tyler Sloat*

DEFS.' REPLY IN SUPPORT OF MSJ                    CASE NO.: 3:19-cv-03422-SI

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

CASEY ROBERTS, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

ZUORA, INC., TIEN TZUO, and TYLER SLOAT,

Defendants.

Case No.: 3:19-cv-03422-SI

**DEFENDANTS ZUORA, INC., TIEN TZUO, AND TYLER SLOAT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EVIDENCE**

Date:           March 3, 2023
Time:           10:00 a.m.
Dept.:          Courtroom 1, 17th Floor
Judge:          Hon. Susan Illston
Date Action Filed:  June 14, 2019

---

DEFS.' REPLY IN SUPPORT OF MSJ                                                    CASE NO.: 3:19-cv-03422-SI

**TABLE OF CONTENTS**

**Page**

Table of Authorities .................................................................................................................. ii

I.      INTRODUCTION ........................................................................................................1

II.     PLAINTIFFS FAIL TO PROFFER EVIDENCE CREATING A GENUINE
        DISPUTE OF MATERIAL FACT ON LOSS CAUSATION ...........................................3

        A.      Plaintiffs Do Not Refute That the Corrective Disclosure Described Two
                Separate Headwinds, and Was Interpreted by Analysts as Such. ...........................3

        B.      Plaintiffs Ignore The Undisputed Evidence that the Missed Guidance and
                Forecast Revision Stemmed from Multiple Causes. .................................................4

        C.      Plaintiffs Brazenly Mischaracterize Documents As Showing That the
                Product Integration Delays Caused "All" of Zuora's Sales Execution
                Issues. .....................................................................................................................7

        D.      Plaintiffs Mischaracterize Dr. Ronen's Event Study. ...........................................10

III.    BECAUSE PLAINTIFFS HAVE NO EVIDENCE DISAGGREGATING THE
        FRAUD-RELATED AND NON-FRAUD RELATED CAUSES OF ZUORA'S
        STOCK DECLINE, THEY CANNOT PROVE LOSS CAUSATION ............................11

IV.     THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERT TESTIMONY ...............14

V.      CONCLUSION .........................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker* v. *Seaworld*,
423 F. Supp. 3d 878 (S.D. Cal. 2019)..................................................................................13

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Bos.*,
853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014).........................13, 14

*Caremark, Inc.* v. *Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) ..............................................................................................13

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
544 U.S. 336 (2005).............................................................................................................11

*In re Exec. Telecard, Ltd. Sec. Litig.*,
979 F. Supp. 1021 (S.D.N.Y. 1997)....................................................................................14

*Fener* v. *Operating Eng'r Const. Indus. & Miscellaneous Pension Fund (LOCAL
66),*
579 F.3d 401 (5th Cir. 2009) .........................................................................................11, 12

*Glickenhaus & Co.* v. *Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ...............................................................................................11

*Hsing Hsu* v. *Puma Biotechnology*,
2018 WL 4945703 (C.D. Cal. Oct. 5, 2018)........................................................................14

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) .............................................................................................13

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003) ...............................................................................11

*Nelson* v. *Pima Cmty. Coll.*,
83 F.3d 1075 (9th Cir. 1996) .................................................................................................7

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011)..................................................................................13

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
2011 WL 1842819 (N.D. Cal. May 16, 2011) (Illston, J.)..............................................12, 13

*Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ................................................................................... *passim*

*In re Oracle Corp. Sec. Litig.*,
2009 WL 1709050 (N.D. Cal. June 19, 2009) (Illston, J.), *aff'd* 627 F.3d 376
(9th Cir. 2010)............................................................................................................................12

*Pompano Beach Police and Firefighters' Rets.* v. *Las Vegas Sands Corp.*,
732 F. App'x 543 (9th Cir. 2018) ...........................................................................................14

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)....................................................................................13

*Silverman* v. *Motorola*,
798 F. Supp. 2d 954 (N.D. Ill. 2011) .......................................................................................13

*T.W. Elec. Serv., Inc.* v. *Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) .....................................................................................................7

*In re Tesla, Inc. Securities Litigation*,
2022 WL 7374936 (N.D. Cal. Oct. 13, 2022)..........................................................................15

*In re Tesla*,
No. 18-cv-04865-EMC, Dkt. No. 671 .....................................................................................15

*In re Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) .........................................................................................12, 14

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.   INTRODUCTION**

Plaintiffs' entire argument rests on the implausible proposition that "*all*" of Zuora's company-wide, systemic sales challenges disclosed on the May 30, 2019 earnings call—and thus the *entirety* of the Q1 FY20 earnings miss and reduced full-year outlook—were caused by delays in the Keystone integration project, an early beta testing program not available for general release that affected only a small handful of customers (out of Zuora's 950+ customer base) who used both the Billing and RevPro products.  Opp. at 11 (emphasis added).[1]  But Plaintiffs do not raise a disputed issue of material fact for trial.  Plaintiffs indisputably have  failed as a matter of law to disaggregate and establish the loss attributed to the alleged fraudulent conduct.  And notwithstanding their repeated misstatements of the record, the evidence is unequivocal that the earnings miss and reduced forecast announced on May 30 had non-fraud-related causes.

Under settled Ninth Circuit precedent, to prove loss causation, Plaintiffs were required to disaggregate the impact of the alleged fraud from the impact of confounding, non-fraud related information.  *See Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013).  Having failed to conduct that required disaggregation, Plaintiffs instead posit that Keystone was the "sole" reason for the quarterly miss and reduction in guidance.  But they do not back that up with *any* actual analysis of the quarterly miss and reduction in guidance—whether expert or otherwise.  Instead, they attempt to substantiate their theory by selectively quoting from and mischaracterizing cherry-picked documents from the entirety of the class period, including blatantly misquoting one document.  None of this (mischaracterized) evidence raises a triable issue of fact as to loss causation.

As Defendants' motion establishes, the alleged May 30 "corrective" disclosure identified two reasons for the Q1 FY20 earnings miss and reduced full-year outlook: (1) "sales execution" challenges (unrelated to the alleged fraud), described as low productivity from new sales reps, and; (2) delays in integrating Billing and RevPro, delaying the company's ability to "cross-sell"

---

[1] "Opp." refers to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and to Exclude Evidence filed on January 27, 2023.  *See* Dkt. No. 219. "Opp Ex." refers to the corresponding exhibit filed in support.  "MSJ" refers to Defendants' Motion for Summary Judgment and to Exclude Evidence, filed on December 9, 2022.  *See* Dkt. No. 185.  "MSJ Ex." refers to the corresponding exhibit filed in support.

DEFS.' REPLY IN SUPPORT OF MSJ               1               CASE NO.: 3:19-cv-03422-SI

these products (the subject of the alleged fraud).  Plaintiffs do not—and cannot—dispute that two reasons were disclosed on May 30, or that securities analysts—whose coverage directly reflects the market's reaction—understood there to be two reasons.  Plaintiffs also do not dispute, as they cannot, that Ninth Circuit law requires them to offer reliable evidence disaggregating the impact of fraud-related disclosures from disclosures of non-fraud related, confounding information.  Plaintiffs acknowledge, as well, that their experts have failed to conduct a disaggregation here.

In an attempt to avoid summary judgment, Plaintiffs argue that Keystone was the "sole" reason for the quarterly miss and guidance reduction, and resort to selectively quoting from and mischaracterizing the record.  For example:

- Plaintiffs myopically zero in on snippets of documents suggesting that integration challenges delayed cross-selling of Billing and RevPro, ignoring that, on the whole, these documents show that integration-related challenges were only one small portion of Zuora's sales issues.  Plaintiffs do not even attempt to quantitatively prove that cross-selling affected the entirety of the sales issues and the corresponding guidance reduction, as required for loss causation.  Nor could they, because Defendants' expert showed through sales records that at least 85% of the guidance reduction was based on developments unrelated to Keystone.  And this makes sense, given that most of Zuora's customers are Billing-only prospects who, by definition, are not trying to integrate Billing with RevPro.

- Plaintiffs cite Exhibit 9 three times for the proposition that CEO Tzuo "describ[ed] Keystone as the 'sole reason' for the booking shortfall."  Opp. at 21 n.6; *see also id.* at 10, 15.  But that email does not include the words "sole reason" that Plaintiffs purport to quote; in fact, it discusses both Keystone and ▓▓▓▓▓▓▓▓▓▓ unrelated to Keystone that impacted revenue.

- Plaintiffs relegate Zuora's missed deal with ▓▓ to a footnote, *see* Opp. at 21 n.6, even though it was indisputably unrelated to Keystone and by itself accounted for 44% of the Q1 FY20 miss (which alone disproves Plaintiffs' theory that Keystone caused all sales execution issues and that no disaggregation was necessary).  Indeed, as Defendants' expert explained, the majority of that quarter's forecasted customer deals that fell through were Billing-only deals.

- Finally, Plaintiffs resort to a new and unsubstantiated claim that all of the sales execution challenges were "fabricated." Opp. at 20. There is not a shred of evidence for this conspiracy theory. Nor would it make any sense for a company to make up and describe a fake problem to the market that required substantial time and effort to resolve, including by replacing the company's President and Head of Sales. Such speculation cannot defeat summary judgment.

In sum, under controlling law, Plaintiffs' failure to produce *any* evidence disaggregating the impact of the alleged fraud from non-fraud-related information warrants summary judgment against them. For similar reasons, Plaintiffs' experts should be excluded.

## II.   PLAINTIFFS FAIL TO PROFFER EVIDENCE CREATING A GENUINE DISPUTE OF MATERIAL FACT ON LOSS CAUSATION

### A.   Plaintiffs Do Not Refute That the Corrective Disclosure Described Two Separate Headwinds, and Was Interpreted by Analysts as Such.

Plaintiffs do not—and cannot—refute that the product integration and sales execution headwinds were expressly disclosed to the market as separate issues, and that analysts understood them as two independent problems. *See* MSJ at 9–10. This necessarily means that the stock drop damages calculated by Plaintiffs' expert ($5.53 per share) reflects the market's valuation of all information, both fraud and non-fraud related, disclosed on May 30, 2019.

While Plaintiffs attempt to conflate the information contained in the May 30 corrective disclosure (Opp. at 4–5), Tzuo could not have been clearer that there were "2 execution headwinds" that impacted Q1 FY20 performance and tempered future expectations: "First," issues related to "sales execution," as "newer [sales] reps were less than half as productive" as "experienced reps," requiring "training and experience oversight to help them ramp and close new busines[s]"; and "[s]econd," that "the product integration for [Billing and RevPro] products is taking longer than expected," delaying the company's "ability to cross-sell" these two products. MSJ Ex. 01 at 1–2. Tzuo's description of the solutions to these two problems and their timelines further underscored their separateness: Tzuo identified "3 key changes" "[o]n the sales execution side"—putting "newer [sales] reps under [] more experienced managers," "revamping" the sales "pipeline process," and changing "sales leadership" by replacing Zuora's

President and Head of Sales Marc Diouane—which would "take time to become effective." *Id.* at 2. By contrast, as to the "[s]econd" issue "on the product integration side," Zuora had "made a course correction" requiring only a "a short term delay" with resolution "by the end of Q3." *Id.* Nothing about this explanation suggested that these "2 execution headwinds" were intertwined. *Id.* at 1. Even Plaintiffs' own expert, Dr. Ronen, acknowledges that the sales execution and product integration issues disclosed on the call were distinct. *See* MSJ Ex. 36 Ronen Rep. ¶ 78.

Plaintiffs also attempt to dismiss contemporaneous analyst coverage as irrelevant, contending that analysts "merely summarized" Tzuo's statements and "did not have access to Zuora's internal documents." Opp. at 18. But analyst commentary is direct and highly relevant evidence of how the market understood Zuora's disclosure, as Plaintiffs' own expert concedes. *See* Ronen Rep. ¶¶ 45–46, 62–71 (looking to analyst commentary to determine how market understood Zuora's announcements). Plaintiffs concede that the market took Tzuo at his word when he described the downward revision as stemming from two separate causes (*see* Opp. at 18)—which necessarily means that the May 30–31 stock decline reflects the market's valuation of *both* disclosed problems, not just product integration. Further, Plaintiffs do not dispute Defendants' showing that analysts were *more* concerned with the sales execution issues than the integration issues. *See, e.g.,* MSJ Ex. 29 at 1 ("We are more concerned with the sales issue that our experience says require changes in sales leadership and nearly 12 months to correct.").

**B.     Plaintiffs Ignore The Undisputed Evidence that the Missed Guidance and Forecast Revision Stemmed from Multiple Causes.**

Despite Plaintiffs' myopic focus on the Keystone beta project throughout their opposition (and the case as a whole), they do not dispute the evidence that this beta test related to a very small portion of Zuora's business, and ignore numerous contemporaneous internal documents showing that missed guidance stemmed from problems unrelated to Keystone.

To begin, Plaintiffs' unsupported assertion that *all* sales execution issues stem from the isolated Keystone beta project delays defies logic. Plaintiffs do not dispute that during the class period RevPro represented a small fraction of Zuora's business and only a handful of RevPro customers were part of the Keystone beta test program. As shown in Defendants' motion, only

about 20 of Zuora's over 950 customers used both Billing and RevPro; RevPro accounted for only 13.2% of Zuora revenue; and only about 5 customers were invited to test Keystone as part of a limited, early access beta program for software integration. *See* MSJ at 4, 6. In view of these facts, Plaintiffs cannot logically contend that challenges in the isolated Keystone beta project caused the *entirety* of the disclosed, company-wide sales issues.

To the contrary, the undisputed evidence shows that a very large part of the quarterly miss resulted from sales problems unrelated to Keystone. The single largest deal that fell through was a deal with ████ for the Billing product alone—the loss of which by itself accounted for 44% of the quarter's miss. *Id.* at 11–12. Indisputably, this deal in no way related to Keystone. Ex. 01 Diouane Dep. 138:4–139:4, 147:2-4. Plaintiffs have no response, relegating ████ to a footnote and citing an April 9, 2019 email that does not mention ████. *See* Opp. at 21 n.6. But the absence of any discussion of ████ in the April 9 email is unsurprising, because, as Plaintiffs fail to acknowledge, the email was sent *before the* ████ *deal fell through*. *See* MSJ Ex. 34 ZUO_00448808. Plaintiffs thus cannot dispute that the ████ deal failure, and 44% of the Q1 FY20 miss, had nothing to do with Keystone—which alone disproves that Keystone accounted for "all" Zuora's sales issues. Opp. at 11.

Similarly, the evidence establishes that Zuora's May 30 announcement to replace Diouane—the Company's President and Head of Sales—had no connection to Keystone. Plaintiffs makes the unsupported assertion that "Zuora's replacement of Diouane as head of sales . . . w[as] related to the integration failure." Opp. at 22. But the evidence Plaintiffs cite does not remotely support that claim. Plaintiffs point to complaints about Keystone from ████ and ████—customers in the 5-customer Keystone beta project—including a September 2018 email between Diouane and ████ negotiating outstanding bills. *See* Opp. at 22 (citing Ex. 19 ZUO_00255415). But this email provides no support for the proposition that Tzuo fired Diouane eight months later for Keystone-related reasons, much less blamed his Head of Sales for an engineering problem. To the contrary, Tzuo's internal communications around the time Diouane was fired state the opposite: Tzuo concluded, after ████████████████████ ████████ that the ████████████████████████████ and ████████████

███████████████████████████████ MSJ Ex. 23 ZUO_00004218 at -218–19.

The contemporaneous evidence thus dispositively shows that the Company was grappling with multiple challenges. So, Plaintiffs fall back on unsupported speculation that the disclosed non-Keystone sales execution issues were entirely "fabricated." Opp. at 20. They assert that Tzuo invented a "story" about sales issues out of whole cloth and fired Diouane as a scapegoat because Tzuo needed a "narrative" to hide the extent of the problems with the Keystone project. *Id.* There is not a shred of evidence to support this conspiracy theory, and Plaintiffs have never pleaded this claim. The "evidence" Plaintiffs cite is an email from Tzuo discussing the poor quarterly results and asking, rhetorically, ████████████████████████████████ ███████████████ *Id.* (citing Ex. 37 ZUO_00004218). Plaintiffs ignore that the document, far from proposing a false narrative, describes Tzuo's concerns with both the Keystone integration issues *and* the sales execution issues. Opp. Ex. 37 ZUO_00004218 at -219 (lamenting that ███████ ████████████████████████████████████████████████████████).

And this document is consistent with numerous other internal Zuora documents analyzing the reasons for the Q1 FY20 miss and reduced annual guidance. *See* MSJ at 10–12. On May 22, 2019, for example, Tzuo explained to the Company's Board of Directors that reducing the future guidance stemmed from ████████████████████████████████████████ ███████████ and cited as key examples sales-related issues such as low productivity of new sales representatives. Ex. 02 ZUO_00306058 at -058–59. Tzuo further explained that while the ████████████████████████████████ have hurt earnings to some degree, when ███████ ██████ there are systemic sales issues that will require ████████████████████████ of the Company. *Id.* at -060. Similarly, Tyler Sloat's May 21, 2019 internal analysis highlighted that the productivity of new sales representatives was "substantially weaker" in Q1 of FY20 than the previous year, leading to poor sales results. MSJ Ex. 31 ZUO_00329160 at -160.

Moreover, Plaintiffs' newly minted theory makes no sense. If, as Plaintiffs assert, Zuora was facing headwinds only from the Keystone product integration delays, it would be senseless to tell the market about a second, fake problem that would take longer to resolve. Indeed, it is clear that even Plaintiffs do not take this farfetched theory seriously. If they truly believed that

Zuora's May 30 statements regarding sales execution issues were part of a fraudulent cover-up, they would have alleged so in the Complaint, identified those false statements in their interrogatory responses, or confronted witnesses with this theory during depositions.

Plaintiffs cannot survive summary judgment based on this rank speculation. As the Ninth Circuit has made clear, "mere allegation and speculation do not create a factual dispute for . . . summary judgment," *Nelson* v. *Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996), and to defeat summary judgment, "the nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed," *T.W. Elec. Serv., Inc.* v. *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**C.      Plaintiffs Brazenly Mischaracterize Documents As Showing That the Product Integration Delays Caused "All" of Zuora's Sales Execution Issues.**

To further support their misguided assertion that Keystone delays caused "all" sales issues, Plaintiffs devote pages to internal emails and discussions about challenges with the handful of customers that participated in the limited Keystone beta project—ignoring the nearly 1,000 customers that did not participate in this project, did not use both Billing and RevPro, and, like ██████, did not even have a proposal for RevPro and were not forecasted to be prospects for cross-selling in FY20. Plaintiffs simply conclude—without quantifying the supposed cross-selling opportunities at all—that *all* sales issues related to Keystone cross-selling delays.[2]

This is a red herring. There is no dispute that Keystone delays and decreased cross-selling opportunities were *part* of the reason for Zuora's quarterly miss and guidance reduction. That is exactly what Tzuo said on the May 30 call. But the financial impact on Zuora's forecast is quantifiable. Indeed, Defendants' expert, Mr. Dages, analyzed the extent to which Zuora revised its forward-looking guidance based on the Keystone-related delays and resulting impacts on cross-selling opportunities and concluded that the Keystone issues were responsible for at most 15% of that impact. *See* MSJ at 14. Likewise, Zuora's internal sales records (on which

---

[2] Defendants do not endeavor here to address every way in which Plaintiffs mischaracterize evidence, focusing on the documents that Plaintiffs cite to argue that the downward revision was caused entirely by Keystone—the only issue relevant to Defendants' motion. While Plaintiffs cite the January EComm meeting videos as evidence of Tzuo's scienter, *see* Opp. at 8, the videos show ████████████████████████████████████████████████████████████

Dages relies) show that certain customers were joint RevPro/Billing opportunities, while others were not. *See* MSJ Ex. 16 Dages Rep. ¶¶ 45–54. Plaintiffs do not grapple with these records, or ask an expert to perform any disaggregation analysis at all—they instead just assume without showing that every aspect of Zuora's FY forecast was impacted by the limited Keystone project.

Plaintiffs also seek to bolster this assumption by misquoting internal documents. Most egregiously, in three instances, citing Exhibit 9, Plaintiffs tell this Court that Tzuo told the Board that the Keystone integration delays and resulting sales execution issues were the "sole" reason for Zuora's failure to meet its Q1 FY20 booking target. Opp. at 10, 15, 21 n.6 (citing Ex. 9 ZUO_00003940). But the word "sole" is not used by Tzuo—it was inserted by Plaintiffs. Rather, Tzuo explains to the Board that Zuora had a ███████████ noting (a) ██████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ and (b) then explaining the larger systemic issues, including the need for ████████████████████████████████████ ██████████████████████████████████████████████████████ and ████████████████████████████████████████████████████████ Opp. Ex. 9 ZUO_00003940 at -940–41. Leaving no room for doubt, Tzuo concludes: ████████████ ██████████████████████████████████ not Keystone cross-selling issues. *Id.* at -941. Moreover, this April 9 email is from three weeks before the end of the quarter, and thus could not reflect all that the Company understood about the reasons for its earnings miss.

Plaintiffs similarly mischaracterize the record by focusing myopically on references in documents to sales challenges posed by Keystone, while ignoring statements in the very same documents identifying other, non-Keystone related sales issues. Thus, Plaintiffs cite internal notes from a May 8, 2019 meeting debriefing the quarter's miss, and focus on a reference to the "Beta" nature of Keystone in a section of the notes relating to "RevPro." *See* Opp. at 10 (citing Ex. 39 ZUO_00367778). But they ignore multiple *other* issues identified in the same document regarding RevPro, including sales turnover ("[Account Executives] are leaving, new AEs need to be hired"). Opp. Ex. 39 ZUO_00367778 at -788. Plaintiffs also ignore that the section of the document addressing the earnings miss for the Billing product—the much larger part of Zuora's

business—makes no mention of Keystone, instead attributing the poor quarter to sales issues such as "people [having] a hard time closing deals in Q1." *Id.* at -782. Plaintiffs similarly mischaracterize a March 2019 email from Robert Hildenbrand to Marc Diouane. Plaintiffs cite a statement in the email that "Keystone is the #1 technology risk" that will have a "possible impact on sales side (poor referencability)." *See* Opp. at 9 (quoting Ex. 11 ZUO_00119066). But the exclusive focus of the email is "deployment"—*i.e.*, the installation of software for *existing customers*—as distinct from the sales process through which Zuora acquires *new* customers. And even with regard to that narrow issue, the email lists Keystone as the *third* of three issues that Zuora needed to address, the first two of which (blueprint phase of deployments and recruiting client managers) having nothing to do with Keystone. *See* Opp. Ex. 11 ZUO_00119066 at -066.

Plaintiffs also misconstrue March 2019 emails between Tzuo and Diouane in which Tzuo asks Diouane about the Q1 forecast. Plaintiffs cite one line of Diouane's response—"[u]psell looking very light mainly due to a very low RevPro cross sell (intentionally slowing it down due to K2)," Opp. at 9 (citing Ex. 33 ZUO_00270902)—and fail to mention that the first two lines of the response highlight the risk of losing the ▮▮▮ deal, which was entirely unrelated to Keystone.

Finally, Plaintiffs cite a lengthy May 22, 2019 memo to Zuora's Board that Plaintiffs assert ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opp. at 21 (citing Ex. 40 ZUO_00001166). As with the other documents Plaintiffs cite, they focus on the few mentions of Keystone in the 27-page document, while ignoring that the memo on the whole, far from showing that Keystone was the sole driver of the earnings miss, illustrates that Keystone was only one of several problems, and not even the most important. The memo begins by explaining that a ▮▮▮▮▮▮▮ of the quarter's miss showed that it resulted from ▮▮▮▮▮▮▮▮▮▮ as Zuora was ▮▮▮▮ ▮▮▮▮▮▮▮ requiring major changes ▮▮▮▮▮ such as ▮▮▮▮▮ making ▮▮▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮▮ ▮▮▮▮ Opp. Ex. 40 ZUO_00001166 at -1166; *see also id.* at -1177 (▮▮▮▮▮

████████████████████████). Consistent with the explanation Tzuo provided to investors on May 30, *and* the way the market interpreted Zuora's disclosure, Plaintiffs' documentary evidence reinforces that the Keystone integration delay was only one reason for the reduction in guidance.

### D.    Plaintiffs Mischaracterize Dr. Ronen's Event Study.

Plaintiffs assert that Dr. Ronen's analysis distinguishes between losses caused by the alleged fraud and losses caused by non-fraud-related information, arguing "Dr. Ronen's methodology included a ***thorough*** assessment of whether company-specific confounding information was released," and that "Dr. Ronen sought to identify and examine ***all*** potentially confounding company-specific information . . . and analyze and assess the stock-price impact of any such information." Opp. at 2, 12 (emphasis added). This argument, however, is based on the presumption that permeates Plaintiffs' opposition that all sales execution issues across the entirety of Zuora's business relate to Keystone. Dr. Ronen did *not* propose any methodology to disaggregate the impact on the stock price of the multiple headwinds disclosed on May 30. *See* MSJ at 13–14. Instead, Plaintiffs told Dr. Ronen "to assume that all the sales execution issues . . . were a result of the product integration failure alleged in the Complaint." Ronen Rep. ¶ 39. Dr. Ronen did not investigate or test this assumption, or even opine on whether it was reasonable. *See* MSJ at 13. This means that her conclusions regarding loss causation—including that she "did not find any confounding information . . . [and] that no disaggregation of the excess stock price decline [wa]s necessary"—were based upon untested assumptions provided to her regarding what qualified as confounding information. Ronen Rep. ¶ 84.

Plaintiffs' assertion that Defendants "do not dispute" Dr. Ronen's methodology and that Defendants' expert "did not criticize" her event study is wrong. Opp. at 13. It ignores Defendants' showing that Dr. Ronen's opinions are "unreliable and unhelpful," MSJ at 22, and Dr. Ferrell's conclusion that Dr. Ronen's analysis "is fundamentally flawed and unreliable," Ex. 03 Expert Rebuttal Rep. of Dr. Allen Ferrell ¶ 8. Nor do Defendants "concede," as Plaintiffs say, "that a substantial portion of the [stock] drop was attributable to the disclosed product integration failure." Opp. at 16. To the contrary, Defendants' damages expert Mr. Dages concluded that—at most—15% of the guidance reduction could be attributed to delays with the Keystone beta

(including impacts on cross-selling).  MSJ Ex. 16 Dages Rep. ¶ 13.

### III.   BECAUSE PLAINTIFFS HAVE NO EVIDENCE DISAGGREGATING THE FRAUD-RELATED AND NON-FRAUD RELATED CAUSES OF ZUORA'S STOCK DECLINE, THEY CANNOT PROVE LOSS CAUSATION

The absence of evidence disaggregating losses caused by the alleged fraud from losses caused by confounding, non-fraud related factors is fatal at summary judgment.  *See* MSJ at 15–20.  As the Supreme Court made clear in *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005), securities plaintiffs can recover only for "those economic losses that misrepresentations actually cause," not for losses caused by "firm-specific facts, conditions, or other events" unrelated to the fraud.  *Id.* at 343, 345.  Under binding Ninth Circuit caselaw, to prove loss causation where, as here, "there are a tangle of factors" affecting a price decline, Plaintiffs' "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Nuveen*, 730 F.3d at 1123.[3]

This disaggregation requires a reliable event study.  "[A]bsent an event study or similar analysis, Plaintiffs cannot eliminate that portion of the price decline . . . which is unrelated to the alleged wrong." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003).  It is not "enough for a loss-causation expert to offer a conclusory opinion"—or an opinion based on an unfounded assumption—"that no firm-specific, nonfraud related information affected the stock price"; the expert must "account for the extent to which firm-specific, nonfraud related information may have contributed to the decline." *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 421–22 (7th Cir. 2015).  Indeed, in *Household,* the Seventh Circuit reversed a plaintiffs' jury verdict and remanded for a new trial because their damages expert "did not adequately account for the possibility that firm-specific, nonfraud related information may have affected the decline in [] stock price." *Id.* at 423.

Thus, as the Ninth Circuit has explained, a court should grant "summary judgment for the defendants where the plaintiffs' expert's theories of loss causation could not distinguish between

---

[3] *See also Fener* v. *Operating Eng'r Const. Indus. & Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009) (plaintiff must show that it was the fraud-related statement, "not other unrelated negative statements," causing the price decline) (quotations omitted).

loss attributable to the alleged fraud and loss attributable to non-fraud related news and events." *Nuveen*, 730 F.3d at 1123 (quotation omitted).  This Court has followed this standard before (and been affirmed when doing so) when awarding summary judgment to defendants in securities cases.  *See In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *4 (N.D. Cal. May 16, 2011) (Illston, J.), *aff'd* 730 F.3d at 1121–23; *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *17 (N.D. Cal. June 19, 2009) (Illston, J.), *aff'd* 627 F.3d 376 (9th Cir. 2010).

The same result is warranted here.  As explained, the alleged corrective disclosure and subsequent stock drop resulted from two causes that impacted Zuora's revenue.  Plaintiffs' loss causation expert, Dr. Ronen, failed to disaggregate these two factors because she assumed, on Plaintiffs' instruction, that all of the information released on the May 30 earnings call was non-confounding.  This was not, as Plaintiffs contend, simply an assumption "that Plaintiffs will ultimately prevail on all issues of liability."  Opp. at 11.  This would only be true if Plaintiffs' case were premised upon false statements relating both to Keystone and non-Keystone sales execution issues affecting Zuora's entire business—which Plaintiffs have never alleged.  Plaintiffs cannot avoid their obligation to produce "evidence that . . . reasonably distinguish[es] the impact of [misrepresentations] from other economic factors" by simply instructing their loss causation experts to assume that no disaggregation is necessary.  *Nuveen*, 730 F.3d at 1123; *see also Fener*, 579 F.3d at 410 (explaining that expert event study based on "incorrect assumption" that a press release contained only one disclosure and not three separate disclosures, and which accordingly showed "only how a stock reacted to the *entire bundle* of negative information," "cannot be used to support a finding of loss causation") (quotations omitted).

Plaintiffs wrongly assert that this crucial shortfall in Dr. Ronen's analysis goes only to the amount of damages Plaintiffs may recover and not to their burden of proving loss causation.  Opp. at 16.  Not so.  It is a "fatal flaw" to "fai[l] to present evidence suggesting that the declines in price were the result of the revelation of the truth and not some other factor."  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 11343 (10th Cir. 2009)).  Without evidence of disaggregation, "there is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss," much less how to allocate damages.  *Id.* (quotation omitted); *see*

*also Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 726 (11th Cir. 2012).  Plaintiffs attempt to distinguish these cases by arguing that Dr. Ronen's analysis "identified and analyzed any potential confounding factors," Opp. at 17, but, as shown, Dr. Ronen simply assumed that sales issues were not confounding.  Her event study suffers from the same methodological flaws as the expert reports in cases where courts granted summary judgment for defendants on loss causation.  *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190–195 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014); *In re Nuveen Funds*, 2011 WL 1842819, at *7–11; *In re Williams*, 558 F.3d at 1140–43.

Plaintiffs also misstate the governing legal standard.  They assert that, to win at summary judgment, it is Defendants who "must 'establish that, as a matter of undisputed fact, the depreciation in the value of [Zuora's stock] could not have resulted from the alleged false statement or omission.'"  Opp. at 15 (quoting *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011)).  None of the cases Plaintiffs cite support this erroneous view.  *See* Opp. at 15–16.  The relevant portion of four cases do not even address the obligation to disaggregate confounding information in establishing loss causation.  And three[4] of these cases rely on the fourth case—a 1997 out-of-circuit case, *Caremark, Inc.* v. *Coram Healthcare Corp.*, 113 F.3d 645 (7th Cir. 1997)—decided before the Supreme Court issued its 2005 controlling decision in *Dura*.  Moreover, *Caremark* was a motion to dismiss ruling, and its loss causation summary judgment language is dicta.  Ninth Circuit cases applying *Dura* make clear that *Plaintiffs* have the burden of establishing loss causation.  *See, e.g.*, *Nuveen*, 730 F.3d at 1119–23.

The other cases Plaintiffs cite only prove this further.  In *Baker* v. *Seaworld*, 423 F. Supp. 3d 878 (S.D. Cal. 2019), the court recognized that the outdated standard on which Plaintiffs rely is inconsistent with Ninth Circuit law on loss causation, and rejected the argument by plaintiffs there—identical to the one Plaintiffs make here—that to win on summary judgment "Defendants must establish that the depreciation in the value of [the plaintiff's] stock could not have resulted from the alleged misstatements or omissions."  *Id.* at 929 (explaining that plaintiffs' proposed summary judgment standard was inconsistent with the Ninth Circuit's ruling in *Pompano Beach*

---

[4] *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996 (S.D. Cal. 2011); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010); *Silverman* v. *Motorola*, 798 F. Supp. 2d 954 (N.D. Ill. 2011)

*Police and Firefighters' Rets.* v. *Las Vegas Sands Corp.,* 732 F. App'x 543, 546 (9th Cir. 2018), where the court "affirm[ed] the district court's grant of summary judgment . . . because *the plaintiffs* did not submit evidence to establish a causal connection between the fraud and the loss"). Likewise, in *Hsing Hsu* v. *Puma Biotechnology*, 2018 WL 4945703 (C.D. Cal. Oct. 5, 2018), the court explained that, "[t]o survive summary judgment on their securities fraud claims, *Plaintiffs*"—not Defendants—"must provide some evidence showing that the alleged corrective disclosures . . . played a substantial factor in causing their economic loss." *Id.* at *9 (quotations omitted; emphasis added). Thus, Ninth Circuit law is clear: "summary judgment for the defendants" is warranted "where," as here, "plaintiffs' expert's theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events." *Nuveen*, 730 F.3d at 1123 (quotations omitted).

**IV.     THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERT TESTIMONY**

Plaintiffs' arguments against the exclusion of their experts under *Daubert* are equally unavailing. Plaintiffs argue that the flaws in their experts' analyses go only to weight and not admissibility. Opp. at 24–25. But to be admissible, expert testimony must be reliable, and to be reliable, a damages expert's event study "must control for confounding factors, i.e., other industry- or company-specific information released to the market unrelated to the alleged fraud." *Bricklayers*, 853 F. Supp. 2d at 190. Plaintiffs' own expert, Dr. Ronen, agreed that to "reliably calculate[e] the level of artificial inflation" one must "examine whether some portion of the . . . stock price decline . . . might be attributed to some other Zuora-specific information unrelated to the wrongdoing." Ronen Rep. ¶ 80. As Defendants explained, *see* MSJ at 21–22, "[a]n event study that fails to" do this work of "disaggregat[ing] the effects of confounding factors must be excluded." *Bricklayers*, 853 F. Supp. 2d at 190. Courts thus frequently exclude as unreliable opinions of damages experts that fail to distinguish between fraud-related and non-fraud related causes of a stock drop. *See, e.g.*, *In re Williams*, 558 F.3d at 1142; *Bricklayers*, 853 F. Supp. 2d at 190–92; *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997).

Plaintiffs ignore all of these cases, instead citing just *In re Tesla, Inc. Securities Litigation*, 2022 WL 7374936, (N.D. Cal. Oct. 13, 2022). *See* Opp. at 24–25. Plaintiffs' reliance

on *Tesla* is misplaced. There, the court denied a motion to exclude testimony from a loss causation expert who failed to disaggregate the front-end, inflationary price effect[5] of two sentences in an Elon Musk tweet. *In re Tesla*, 2022 WL 7374936, at *10–11. Although the court found that Tesla "ha[d] a point" that the expert's methodology was flawed, the court denied the motion for reasons that do not apply here: *First*, there was a "basis in the record" to support the expert's assumption that the two sentences formed "an interwoven bundle"; the statements "concerned the same topic" and Musk said that "he intended for the tweets to be read together." *Id.* Here, the two headwinds were not an "interwoven bundle," and were presented by Tzuo as separate. *Second*, the *Tesla* court found that the confounding truthful sentence (the impact of which the expert did not isolate), was *not* new information to the public, so likely did not affect the stock price. *Id.* Here, Plaintiffs do not argue that the sales execution problems, earnings miss and forecast revision were disclosed before May 30. *Third*, the court considered that "neither party articulated a method" to disaggregate the effects of the confounding information. *Id.* at *12. Here, Defendants' damages expert *did* propose a method of disaggregation—a method that Dr. Ronen herself endorses. *See* MSJ Ex. 42 Ronen Class Cert. Rep. ¶ 89. And finally, the *Tesla* court found that Tesla had not "identif[ied] any specific potential cause of stock movement" that the expert failed to address, and that the expert thoroughly considered "whether Tesla's stock price may have been impacted by contemporaneous disclosure of other Tesla-specific" confounding information. *In re Tesla*, 2022 WL 7374936, at *10, 12. Nothing could be further from the case here, where Defendants have identified a clear cause of the stock drop—sales execution issues—that Dr. Ronen failed to address, and Dr. Ronen's analysis of whether confounding information affected the decline was decidedly *not* thorough, as she simply assumed that all sales issues were not confounding.

## V.    CONCLUSION

The Court should grant Defendants' motion for summary judgment and to exclude the expert reports and testimony of Dr. Ronen and Mr. Lundelius.

---

[5] The damages analysis in *Tesla* was distinct from Dr. Ronen's, as the expert there used a front-end inflation analysis coupled with a "leakage theory" damages model. The issue in *Tesla* was thus whether the expert had disaggregated the inflationary impact of an allegedly truthful sentence made in tandem with an allegedly untruthful statement—which were presented together on the verdict form. *See In re Tesla*, No. 18-cv-04865-EMC, Dkt. No. 671 at 2.

Dated:    February 17, 2023

By: */s/ Melinda Haag*
Melinda Haag

*Attorneys for Defendants Zuora, Inc., Tien Tzuo and Tyler Sloat*