# EXHIBIT 3

**CONFIDENTIAL**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CASEY ROBERTS, Individually and On Behalf Of All Other Similarly Situated | : No. 3:19-cv-03422-SI |
| | : |
| | : |
| | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ZUORA, INC., TIEN TZUO, and TYLER SLOAT, | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |
| | : |

**EXPERT REBUTTAL REPORT OF ALLEN FERRELL, PH.D.**

**September 16, 2022**

**CONFIDENTIAL**

I.    **INTRODUCTION AND SUMMARY OF CONCLUSIONS**

A.    Ferrell Report

1.    I submitted a report in the above-captioned litigation on August 5, 2022 ("Ferrell Report"). In that report, I provided my qualifications and set forth and provided the bases for the following principal conclusions:

- To estimate alleged artificial inflation in Zuora's stock price throughout the Class Period, Plaintiff's damages expert must analyze the economic evidence and relate it to Plaintiff's claims. To the extent that Plaintiff alleges that Defendants made alleged misstatements during the Class Period that constituted value-relevant information not previously known to the market, Plaintiff's damages expert must demonstrate that the information had a positive and statistically significant impact on Zuora's stock price to show that the new information was value-relevant and caused inflation to enter the Company's stock price.

- Plaintiff's damages expert also must, at a minimum, reliably analyze and account for the following issues in accordance with the relevant economic evidence:

  o To the extent that the information disclosed on May 30, 2019 about the productivity of Zuora's sales force is unrelated to the integration issue (commonly referred to as "confounding" information), the entire firm-specific price decline on May 31, 2019 cannot be used to measure alleged artificial inflation.

    ▪ The reduction in fiscal year 2020 revenue guidance was negative information that caused Zuora's stock price to decline on May 31, 2019 as recognized by market participants.

    ▪ If any of the reduced revenue guidance is attributable to the sales force productivity issue independent of the integration issue, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information.

    ▪ To remove the portion of the price decline that is attributable to the sales force productivity issue, Plaintiff's damages expert needs to reliably determine the relative portions of the guidance reduction attributed to the integration issue on the one hand and to the sales force productivity issue on the other, and then consider whether and the extent to which the two portions may have affected Zuora's stock price differently. In particular, economic evidence indicates that the value relevance of the guidance reduction due to the integration issue was lower than that of the guidance reduction due to the sales productivity issue.

  o Plaintiff claims that the results of internal tests that I understand were conducted at various times during the Class Period allegedly led the

1

**CONFIDENTIAL**

Defendants to become aware that Zuora's integration project could not deliver the represented RevPro functionality and that sales ultimately were affected. Accordingly, the allegedly corrective information that purportedly could have been disclosed during the Class Period varied across the time period; hence, the price impact of this information likely varied as well prior to the disclosure on May 30, 2019. Under this theory, Plaintiff's expert must consider those variances and assess their impact over time.[1]

2.    In the Ferrell Report, I referenced a report by Tavy Ronen dated December 4, 2020 ("2020 Ronen Report") in which Dr. Ronen opined that the market for Zuora stock was efficient during the Class Period and described a framework to estimate alleged damages in this matter under which she opined that the calculation of alleged damages is subject to a common methodology that can be applied on a class-wide basis.[2] I also explained that I was asked by counsel for Defendants to review, analyze, and respond to Plaintiff's damages expert's opinions and analyses when they become available.

B.   2022 Ronen Report

3.    On August 5, 2022, Plaintiff submitted another report by Dr. Ronen ("2022 Ronen Report"), which I have reviewed and analyzed. Dr. Ronen states that Plaintiff retained her to opine on, among other things:

- "whether investor losses were proximately caused by the alleged misrepresentations and omissions (i.e., 'loss causation') and the quantification of the amount of loss attributable to the revelation of the allegedly misrepresented and omitted facts; [and]

- "the quantification of the artificial inflation per share in Zuora common stock for each day during the Class Period that is attributable to the alleged misrepresentations and omissions."[3]

4.    Dr. Ronen provides a summary of her opinions, including that:

- "The corrective information revealing the truth concerning Defendants' alleged misrepresentations and omissions released after the close of market on May 30, 2019 proximately caused the decline of the artificially inflated Zuora stock price. I calculate the excess share price decline of Zuora's common stock on May 31,

---

[1] Ferrell Report ¶ 15. The Ferrell Report defines capitalized terms and includes my current CV.

[2] Ferrell Report ¶¶ 13, 16. I previously referred to the report Dr. Ronen issued in 2020 as the Ronen Report but, to avoid confusion, I now refer to it as the 2020 Ronen Report.

[3] 2022 Ronen Report ¶ 3.

CONFIDENTIAL

2019 (the price impact date) to be $5.53 per share or 27.80% of Zuora's prior day's closing stock price."

- "The alleged misrepresentations and omissions proximately caused Zuora's common stock price to be maintained at artificially inflated levels throughout the Class Period. I estimate the level of artificial inflation for each day during the Class Period based on the artificial inflation that was eliminated from the market price of Zuora common stock on the corrective disclosure impact date (May 31, 2019), taking into account whether any change in the level of artificial inflation is necessary over time."[4]

Regarding the latter opinion, Dr. Ronen concludes that the level of alleged artificial inflation over time did not change and it is measured as a constant 27.8% of Zuora's stock price on each day of the Class Period.[5]

5.      Dr. Ronen states that she was "instructed to assume that all the reasons provided by Zuora management for lowered guidance for fiscal year and second quarter of 2020 are subsumed in the information that Zuora failed to disclose to the market [and] that all the sales execution issues mentioned by management on the earnings call on May 30, 2019 were a result of the product integration failure alleged in the Complaint."[6] She asserts that her "damages model can easily be adjusted to accommodate any changes to the inflation ribbon as determined by the finder of fact."[7]

C.  Assignment and Summary of Conclusions

6.      I was asked by counsel for Defendants to review, analyze, and respond to the above opinions in the 2022 Ronen Report. The materials I have considered in preparing this report are listed in **Appendix A**.

7.      Based on my review and analysis of these materials, as well as my general background and expertise, I have concluded that Dr. Ronen's analysis and calculation of alleged inflation in Zuora's stock price are fundamentally flawed and unreliable. As discussed more fully below, Dr. Ronen's analysis and calculation are flawed and unreliable for the following

---

[4] 2022 Ronen Report ¶ 14.

[5] 2022 Ronen Report ¶¶ 95-96. Dr. Ronen recognizes that recoverable alleged damages cannot exceed the amount of the loss purportedly caused by the alleged corrective disclosures. *Id.* ¶ 14 n.7.

[6] 2022 Ronen Report ¶ 39.

[7] 2022 Ronen Report ¶ 14 n.6 (emphasis added).

3

**CONFIDENTIAL**

reasons:

- Dr. Ronen's analysis of the amount of the price decline on May 31, 2019 that she opines is related to the alleged misstatements and omissions rests entirely on her statistical event study result and her unfounded assumption that the integration issue was the sole cause of the sales productivity issue.

  o A statistical event study analysis by itself does not support her assumption.

  o Her assumption is inconsistent with the economic evidence, including Zuora's public statements and market commentary, as well as internal documents and information that I understand were analyzed by Defendants' expert Kevin Dages.

- Dr. Ronen ignores Plaintiff's own claims and the economic evidence she cites in her report that are inconsistent with her assertion that alleged artificial inflation was constant throughout the Class Period.

- Dr. Ronen's estimate of alleged inflation in the Zuora stock price is unsupported, fundamentally flawed and unreliable, i.e., not reasonable. A reasonable estimate of purported inflation based on Plaintiff's allegations, assuming liability, would be a fraction of the May 31, 2019 excess price decline and would increase over the course of the Class Period. I provide an illustrative example below.

I elaborate upon and provide the bases for my conclusions in the remainder of this report.

## II.    DR. RONEN'S ANALYSIS OF ALLEGED INFLATION IS FUNDAMENTALLY FLAWED AND UNRELIABLE

8.    Dr. Ronen's analysis of alleged inflation is fundamentally flawed and unreliable because she does little more than assume her conclusions that all of the excess price decline on May 31, 2019 was caused by information that Defendants allegedly misstated and failed to disclose, and that the amount of alleged inflation was simply a constant 27.8% of Zuora's stock price throughout the Class Period.[8]  Dr. Ronen not only disregards economic evidence that contradicts her assumptions, but she also ignores how Plaintiff's claims have evolved in the almost three-year period since the Complaint was filed; indeed, she does not include any discovery materials or even Plaintiff's interrogatory responses among the materials she relied upon in the course of her assignment.[9]

---

[8] 2022 Ronen Report ¶¶ 14 & 95-96.

[9] 2022 Ronen Report ¶ 6 & Exhibit 1.  I understand that, during discovery, Plaintiff did not request information regarding, or inquire into, pertinent information necessary to analyze the causes of the price

CONFIDENTIAL

A. Dr. Ronen's Use of Statistical Event Study Analysis Results

9.    To begin with, Dr. Ronen relies substantially on the result of her statistical event study analysis for May 31, 2019, the trading day following the alleged corrective disclosure that was made after the market closed on May 30, 2019.[10]  Among other things, she uses the result of her statistical event study of the May 31, 2019 decline in Zuora's stock price as the measure of both the loss caused by the alleged misstatement and omissions on this date and the amount of alleged artificial inflation on each day of the Class Period.[11]  However, such event study analyses cannot establish loss causation attributable to alleged misstatements and omissions or the appropriate amount of daily alleged inflation during the Class Period by themselves.  In particular, statistical event study analyses cannot determine the cause of a price decline when there are multiple negative pieces of new information disclosed at the same time, and thus cannot determine whether the new information "corrects" prior alleged misstatements and omissions, or that the price change measures the value of the purportedly corrective information.

10.    To understand why, it is important to understand what a statistical event study does and does not do.  A company's stock price can move due to many reasons, including due to factors that affect the entire market, the industries in which the company operates, and/or the company alone.  An event study takes into account the effect of contemporaneous market and industry factors on a stock price change (or "return") by estimating the "excess" price change (sometimes referred to as a "firm-specific return," "residual return," or "abnormal return") net of these factors.[12]  In this way, an event study attempts to disaggregate the effect of market and industry news on a stock's return from that of other factors.

---

decline on May 31, 2019 and evaluate the potential impacts of the integration issue and the sales execution issue on Zuora's financial performance and guidance for Zuora's FY 2020 ending January 31, 2020.

[10] 2022 Ronen Report ¶¶ 41, 55, 60, & 84.  For the purposes of the 2022 Ronen Report, Dr. Ronen does not use her event study model to analyze any date other than May 31, 2019.

[11] 2022 Ronen Report ¶¶ 95-96.  She also claims that her event study analysis for May 31, 2019 "establishes the causal link between the alleged misstatements and omissions and the resulting economic loss suffered by investors" and "demonstrates the materiality of the alleged misrepresentations and omissions."  *Id.* ¶¶ 14(3) & 55.

[12] This is typically done by 1) estimating the relationship between changes in a company's stock price and changes in the performance of relevant market and industry indices, 2) using the relationship and the actual performance of these indices on the day in question to calculate an expected return, and 3) subtracting the expected return from the actual return to derive the residual return.

**CONFIDENTIAL**

11.    Stock prices can move for reasons unrelated to news, in other words there is normal, random daily movement in the price of many stocks.  Therefore, it is important to test whether the excess return is of a sufficient magnitude to be considered "statistically significant," i.e., significantly different from zero at conventional levels of significance, such that it is unlikely to be due to chance.

12.    However, an event study model that produces a statistically significant excess return does not determine the causes of the excess return.  If a firm-specific price change is statistically significant, all that the statistical event study has established is that the residual movement could be caused by new information on that day.  But that is not the end of the analysis when several different pieces of new, firm-specific information are released on the same day at the same time.  Under such circumstances, an event study showing a statistically significant firm-specific-price decline by itself cannot establish which piece, or pieces, of new information caused or contributed to the price decline, or that any of the price decline was caused by any specific piece of new information and was thus value relevant, nor can a statistical event study analysis provide a method to disaggregate the effects of one piece of information as compared to others and determine the extent to which each piece may or may not have contributed to the price decline.

13.    Company-specific factors can impact a security's price following a public disclosure for many reasons that do not support allegations that value relevant information was misstated or improperly omitted and caused investor losses, including the timely disclosure of information, the materialization of known risks, and the disclosure of information that is unrelated to the allegations.  Consequently, it is a mistake to conclude that a finding of statistical significance by itself proves anything other than that the totality of the newly-disclosed company-specific information impacted a security's price.

14.    Therefore, a finding of a negative and statistically significant residual return that coincides with a purported corrective disclosure does not establish that the disclosure corrected a prior alleged misstatement or omission, that the stock's price was artificially inflated beforehand, or that the disclosure in the presence of confounding information is responsible for any part of the price decline (i.e., caused the loss).  After potentially corrective disclosures have been identified, any positive results of a statistical event study are merely the starting point of a loss

**CONFIDENTIAL**

causation analysis from which the background and context need to be analyzed to determine whether the observed price movement, or some portion of it, was in fact caused by the correction of the alleged misstatements and omissions and can be used to measure alleged artificial inflation over time.[13]

B. Dr. Ronen's Assumption that the Sales Productivity Issue Resulted from the Integration Issue

15.    Dr. Ronen's crucial assumption that "*all* the reasons provided by Zuora management for lowered guidance for fiscal year and second quarter of 2020 are subsumed in the information that Zuora failed to disclose to the market [and] that *all* the sales execution issues mentioned by management on the earnings call on May 30, 2019 were a result of the product integration failure alleged in the Complaint"[14] allows her to avoid difficult issues regarding the economic evidence in this matter and rely entirely on the result of her statistical event study analysis to estimate the amount of alleged inflation in the Company's stock price throughout the Class Period.  Based on her convenient and completely unsupported assumption, she concludes that "no disaggregation of the excess stock price decline is necessary" because she "did not find any confounding information that was not accounted for in [her] analysis," and that the *entire* excess price decline on May 31, 2019 of $5.53 (27.8%) "is attributable to the alleged false and misleading statements and … reflects the level of artificial price inflation removed on May 31, 2019 from Zuora's share price that was proximately caused by the revelation of the truth …."[15, 16]  However, Dr. Ronen's assumption is inconsistent with publicly available economic evidence, including Company statements and market commentary, as well as internal documents and information that I understand was analyzed by Defendants' expert Kevin Dages.

---

[13] Dr. Ronen at least in part agrees because she states that "[i]f confounding information is identified and is determined to be material, then the portion of the excess price decline related to the confounding information would be separated from the portion of the price decline caused by the disclosure of corrective information."  2022 Ronen Report ¶ 79.

[14] 2022 Ronen Report ¶ 39 (emphasis added).

[15] 2022 Ronen Report ¶ 84.

[16] After noting that the reported 1Q 2020 non-GAAP net loss per share disclosed along with the allegedly corrective information was better than the consensus estimate, Dr. Ronen claims that "this generally positive news cushioned the overall excess price decline."  2022 Ronen Report ¶ 82.  However, she provides no analysis to support her speculation, instead acknowledging that this information may have been "neutral" news.  *Id.*

CONFIDENTIAL

16.     Based on her assumption, Dr. Ronen simply disregards the Company's statements which clearly indicate that there were two distinct "execution headwinds" in the quarter caused by two different issues that had separate solutions and resolution timelines.  As she acknowledges, Mr. Tzuo explained in the May 30, 2019 conference call that the product integration issue was due to Zuora being "really focused on ASC 606," that it "didn't really have time and the resources to focus on the integrations between [Billing and RevPro] until after the 606 [wave] was complete," and when it did focus on the integration, it "went down one direction that proved to be a dead end" before "we course corrected."[17, 18]  Dr. Ronen also acknowledges that Mr. Tzuo provided an entirely different reason for the sales execution issue, namely that "we've been expanding our strategic sales teams and have hired a number of talented salespeople over the past year" and that "newer reps were less than half as productive than our more experienced reps."[19, 20]

17.     Dr. Ronen further acknowledges that Zuora described separate and distinct solutions for each issue, which were expected to be resolved over different timelines.  She explains that Mr. Tzuo stated that to address the sales execution issue, "the Company:  (1) had 'realigned our strategic account organization and placed many of the newer reps under our more experienced managers;' (2) was 'revamping our pipeline process;' and (3) making a 'change in our sales leadership,'" and that to address the integration issue, Mr. Tzuo was "confident" that the "course correction" put the integration issue "on the right track."[21]  Mr. Tzuo also stated that

---

[17] 2022 Ronen Report ¶ 63.

[18] I understand that when Mr. Tzuo stated that "we went down one direction that proved to be a dead end," he was referencing the integration project known as "Keystone," and that when he said "we course corrected," he was referring to the integration project known as "K2."

[19] 2022 Ronen Report ¶ 58.

[20] Consistent with this explanation, analysts at Morgan Stanley noted that other companies have also faced sales execution problems due to inexperienced salespeople:  "What we have seen from other companies in the past, when there is a large influx of new sales people, there is an accompanying wave of promotions into management of people who may not be fully ready to assume those responsibilities.  This tends to manifest in poor opportunity qualification and overstatement of anticipated pipeline close rates, which go unchecked by the inexperienced new sales managers." "1Q20 Results: A Bump on the Road to Subscription Economy," Morgan Stanley, May 31, 2019.  Moreover, as I explained in the Ferrell Report, the sales productivity issue was a known risk.  Ferrell Report ¶ 20.

[21] 2022 Ronen Report ¶ 59.  Dr. Ronen notes that "Mr. Tzuo also stated that Mr. Marc Diouane would step down from his current role as President and would 'stay on for the near term as an adviser as we search for a replacement.'"  *Id.* ¶ 59 n.70.

CONFIDENTIAL

the integration issue would be "a short-term delay" that would be "resolved by the end of Q3."[22] In contrast, he explained that the resolution of the sales execution issue would "take time to become effective."[23]

18.    Zuora's statements, its proposed solutions to the two issues, and the different timelines under which it expected to resolve the issues all indicate that the sales execution issue was separate and distinct from the integration issue.  Dr. Ronen fails to reference *anything* – publicly available or otherwise – to explain how "all the sales execution issues mentioned by management on the earnings call on May 30, 2019" possibly could be "a result of the product integration failure alleged in the Complaint" as she assumes.

19.    For example, Dr. Ronen does not provide any commentary by analysts or other market participants that even suggests the sales productivity issue was caused by the integration issue.  Instead, analysts she cites discussed the integration issue and sales productivity issue as separate issues.[24]  In particular, Dr. Ronen's report includes the following quote by analysts at Needham:  "'We expect fixing the product issues is straightforward and will just require time, but we are more concerned with the sales issues that our experience says require changes in sales leadership and nearly 12 months to correct.'"[25, 26]

---

[22] 2022 Ronen Report ¶ 59.

[23] Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST at 5.

[24] *See*, e.g., "F1Q20: Shy Guide," Jefferies Research, May 31, 2019, cited in 2022 Ronen Report ¶ 69, which states "ZUO highlighted two execution issues this quarter - sales execution and RevPro integration challenges" *and* "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy" Needham & Company, May 31, 2019, cited in 2022 Ronen Report ¶ 71, which states "[t]he company highlighted two new issues."

[25] 2022 Ronen Report ¶¶ 70-71; "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," Needham & Company, May 31, 2019.  I also included this quote in my report to demonstrate that analysts recognized the distinction in timing between the resolution of the integration and sales productivity issues.  Ferrell Report ¶ 21.

[26] As another example of how analyst commentary Dr. Ronen selects is inconsistent with her opinion when taken in context, note that in discussing commentary by research analysts regarding the integration issue, she refers to "an analyst from Jefferies" who, during the May 30, 2019 conference call, supposedly "expressed surprise and wanted to know how the two products could not be integrated even two years after the acquisition of Leeyo."  2022 Ronen Report ¶ 62.  However, the report that this analyst published the next day states that "[w]e continue to believe that ZUO will grow at a rate of at least 25-30% over the next 5-10 years on the back of the Subscription Economy," called the reduced guidance "prudent," and

**CONFIDENTIAL**

20.    Moreover, as I explained in the Ferrell Report, "[i]f any of the reduced revenue guidance is attributable to the sales force productivity issue independent of the integration issue, then the entire firm-specific price decline cannot be used to measure alleged artificial inflation because it overstates the value of the allegedly misstated information."[27]  I understand that Defendants' expert Kevin Dages examined internal documents and information, including supporting documents for Zuora's revenue guidance, and opines that 15 percent of the Company's reduction in its guidance for FY 2020 total revenues was due to the product integration issue.  Consequently, non-public evidence contradicts Dr. Ronen's baseless assumption.

21.    For all of the reasons above, Dr. Ronen's opinions that "no disaggregation of the excess stock price decline is necessary" and the entire excess price decline on May 31, 2019 of 27.8% ($5.53) "is attributable to the alleged false and misleading statements" are fundamentally flawed and unreliable.

C.    Dr. Ronen's Assumption that Alleged Inflation Was Constant Throughout the Class Period

22.    Dr. Ronen claims that "[b]ecause the alleged misrepresentations and omissions concerning the failure of product integration and its related consequences did not change during the Class Period, [she] find[s] no economic basis to believe that the financial implications of the wrongdoing would have been different than that determined using the Constant Percentage method of inflation," which she defines as "presum[ing] that the percent of the stock price that is accounted for by inflation does not vary when there are no additional misrepresentations or corrective disclosures."[28]  But her claim disregards, and is inconsistent with, Plaintiff's allegations and the economic evidence.  As explained above, Dr. Ronen merely assumes away evidence; she similarly turns a blind eye to Plaintiff's allegations.

23.    As I explained in the Ferrell Report, Plaintiff claims that the Defendants became aware of the extent of the integration issue and its consequences during the Class Period.  In

---

maintained its "Buy" recommendation.  "F1Q20: Shy Guide," Jefferies Research, May 31, 2019.  Dr. Ronen quotes this report in ¶ 69 of her report but ignores this commentary.

[27] Ferrell Report ¶ 20.

[28] 2022 Ronen Report ¶¶ 90, 95 & 96.

CONFIDENTIAL

particular, Plaintiff alleges that Zuora's executives "determined that Keystone could not deliver the represented functionality for RevPro" and decided to "abandon the [Keystone] project in favor of a separate technological approach internally called the K-2 Project" only after the integration "failed internal tests and tests on customers" during the Class Period.[29]  Plaintiff further alleges that the integration issue "*ultimately* result[ed] in reduced revenue growth, missed sales, and waning demand for Zuora's platform and applications."[30]  Plaintiff also alleges that "Defendants disclosed the integration failure" in the alleged corrective disclosure on May 30, 2019.[31]  Hence, even accepting Plaintiff's allegations as true as Dr. Ronen does,[32] the information that the Company disclosed on May 30, 2019 could not have been disclosed at the beginning of the Class Period or, for that matter, during other portions of the Class Period prior to the alleged "failed internal tests and tests on customers."[33]  Instead, what Defendants could have disclosed prior to the alleged "failed internal tests and tests on customers" under Plaintiff's own claims was that the Keystone integration was still undergoing testing and that there was a risk that such testing could identify integration issues that could "ultimately result[]" in negative consequences for Zuora's financial performance.  Dr. Ronen ignores that, all else equal, the price impact of a disclosure of a risk of an adverse event occurring is lower than a disclosure of the materialization of that risk.[34]

24.    Moreover, Dr. Ronen fails to consider how the context in which the alleged corrective disclosure took place changed over time and affected its valuation impact. Specifically, she claims that "if the alleged wrongdoing that was disclosed on May 30, 2019 were revealed earlier in the Class Period, it is reasonable to conclude that the market would have

---

[29] Lead Plaintiff New Zealand Methodist Trust Association's Responses and Objections to Defendants' Second Set of Interrogatories at 34 & Ferrell Report ¶ 24.  Although Plaintiff discusses the "failed internal tests and tests on customers" in its Responses and Objections to Defendants' Second Set of Interrogatories, Dr. Ronen did not include those interrogatory responses on the list of materials that she relied upon in forming her opinions.

[30] Complaint ¶ 1 (emphasis added).

[31] Complaint ¶ 259.

[32] 2022 Ronen Report ¶ 4.

[33] Ferrell Report ¶ 24.  I discuss this well-understood "equivalent disclosure" issue in ¶ 18 of the Ferrell Report.

[34] To the extent that there are any other issues that would have affected the price impact of an earlier Class Period disclosure, Dr. Ronen fails to address those as well.

CONFIDENTIAL

similarly interpreted the impact on the financial performance and growth prospects of Zuora."[35] Dr. Ronen opines that her claim "is supported by analyst commentary throughout the Class Period that emphasized the importance of product integration to Zuora's growth prospects."[36] However, she disregards analyst commentary she cites in her report that is inconsistent with her claim. As Dr. Ronen reports, analysts at Canaccord Genuity stated on May 30, 2019:

> We suggested in our preview that the path to redemption for ZUO would be through a quarter or two of boringly, no drama quarters. While most of the guide down was zero margin services, as Bill Parcels said, a team "Is only as good as its record", and at this point, Zuora has delivered a losing season. We understand that things change, but when you have just come off a confusing quarter, it is expected to have de-risked guidance for anything short of a meteor strike that destroys humanity. Zuora failed to do so and the stock deserved the 29% after-hours beat down.[37]

These analysts also referred to the context of the disclosure as "an anger selling environment."[38] But this environment did not exist before the prior "confusing quarter," the financial results of which were disclosed after the market closed on March 21, 2019.[39] Consequently, to the extent that the "anger selling environment" caused a "deserved … beat down" and amplified the price decline on May 31, 2019, the price impact of the allegedly corrective information would have been lower had it been disclosed prior to the March 21, 2019 disclosure and Dr. Ronen's "constant" inflation assumption is fundamentally flawed and unreliable for this additional reason.

25.    For all of the reasons above, Dr. Ronen's claim that alleged inflation was "constant" during the Class Period is fundamentally flawed and unreliable.

D.  Implications of Dr. Ronen's Fundamentally Flawed and Unreliable Analysis

26.    As explained above, Dr. Ronen's estimate of alleged inflation during the Class Period is fundamentally flawed and unreliable because, among other things, she does not attempt to identify the portion of the stock price decline attributable to the alleged misstatements and

---

[35] 2022 Ronen Report ¶ 96.

[36] 2022 Ronen Report ¶ 96.

[37] 2022 Ronen Report ¶ 67 (emphasis in original).

[38] "Another drama-filled quarter," Canaccord Genuity, May 30, 2019.

[39] "Zuora Reports Record Fourth Quarter and Full Year 2019 Results," *Business Wire*, March 21, 2019 (4:10 PM).

CONFIDENTIAL

omissions and does not consider what information Defendants actually could have disclosed throughout the Class Period and how the market would have reacted to that information. Accordingly, Dr. Ronen's estimate of alleged inflation is unreasonable.

27.    If the finder of fact determines that the Defendants are liable, a reasonable estimate of damages would first account only for the portion of the decline in Zuora's price on May 31, 2019 that was due to the integration issue.  While the fact finder may be able to reach a range of reasonable conclusions regarding this issue based on the evidence presented at trial, I understand that Defendants' expert Kevin Dages opines that the integration issue was responsible for only 15 percent of Zuora's May 30, 2019 revision to its total revenue guidance for the fiscal year ending January 31, 2020.  Therefore, assuming Mr. Dages' calculation regarding the guidance revision is accurate, and that any additional disclosures had a small (if any) impact on the Company's stock price on May 31, 2019,[40] it would be reasonable to reduce the 27.8% ($5.53) excess price decline that Dr. Ronen measures on May 31, 2019 by 85% (= 1 minus the 15% calculated by Mr. Dages).  Doing so results in an estimate of the price decline attributable to the integration issue of 4.2% ($0.83).[41]

28.    However, the above calculation assumes the value relevance of the guidance

---

[40] As Dr. Ronen acknowledges, news articles attributed the price decline after the May 30, 2019 disclosure to the reduced guidance and analysts "substantially lowered their price targets for the Company" due to the lowered guidance and the explanations for it.  2022 Ronen Report ¶¶ 66 & 74.  She also acknowledges that the quarterly financial results announced on May 30, 2019 were mixed (*id.* ¶ 82); the revenue miss was so small that analysts described it as "in-line" with expectations (*see*, e.g., "ZUO: Sales Execution and RevPro Headwinds Hurt Near-Term Growth – Lowering PT to $20," FBN Securities, May 31, 2019 ("For the FQ1/April quarter, ZUO reported revenue of $64.1M (+22% Y/Y and in line with consensus of $64.15M).") & "Zuora (ZUO) F1Q20: Shy Guide," Jefferies, May 31, 2019 ("Total revenue of $64.1M (22% yoy growth) was in line with Street estimates of $64.2M.").  Moreover, although it appears that Zuora disclosed the lack of integration for the first time on May 30, 2019, the only analyst Dr. Ronen cites to illustrate this disclosure (Jefferies) did not subsequently change his opinion of the Company or its prospects (other than to acknowledge the lowered guidance).  *See supra* ¶ 19 n.26.  Accordingly, the economic evidence indicates that other than the guidance revision and the explanations for it, the disclosures on May 30, 2019 were not value relevant.

[41] Although not stated explicitly in her report, Dr. Ronen's estimate of alleged inflation on each day of the Class Period appears to be the minimum of $5.53 and 27.8% of the closing stock price on that day.  2022 Ronen Report ¶¶ 99 ("… it is my opinion that the Constant Percentage method [which assumes alleged inflation is a constant percentage of the daily price] best reflects the economic value of the harm to investors in this matter.") & 103 ("It is my understanding that the damages for the retained shares would be limited to the excess price decline on May 31, 2019 or $5.53 per share….").  Consequently, if the price impact of the alleged corrective information was lower, presumably the limitation on alleged damages she employs also would be lower by a proportional amount.

**CONFIDENTIAL**

reduction due to the integration issue was equivalent to the guidance reduction due to the sales execution issue. As I explained in the Ferrell Report, economic evidence I reviewed indicates that the value relevance of the guidance reduction due to the integration issue was less than that of the guidance reduction due to the sales productivity issue, hence a proportional allocation that assigns 15% of the May 31, 2019 price decline to the integration issue likely overstates its price impact.[42] Consequently, it would be reasonable to assign a measure of the price decline attributable to the disclosure of the integration issue that is lower than 4.2% ($0.83).

29.     Moreover, and again assuming the finder of fact determines that the Defendants are liable, a reasonable estimate of damages would need to consider what information the Defendants could have disclosed throughout the Class Period, and what impact that information would have had on Zuora's stock price. In particular, as discussed above and based on Plaintiff's own allegations, what Defendants could have disclosed at the beginning of the Class Period was the risk that the adverse outcome disclosed on May 30, 2019 could materialize, which all else equal would have had a lower price impact than when it did materialize. The period over which only the risk could have been disclosed will depend on evidence I assume will be presented at trial as well as applicable law.

30.     If the finder of fact, for example, were to determine that 1) the probability that integration issues and their potential consequences could materialize was 25% at the beginning of the Class Period and did not change until the alleged "failed internal tests and tests on customers" were completed, 2) the first day on which Defendants had a duty to disclose the test results was March 21, 2019 (the date of the Company's Q4 2019 earnings call), and 3) the appropriate portion of the excess price decline on May 31, 2019 related to Plaintiff's allegations is 4.2% ($0.83), then a reasonable estimate of alleged damages would need to take these determinations into account when calculating alleged inflation in Zuora's stock price during the

---

[42] Ferrell Report ¶¶ 21-23 (referencing, e.g., the shorter timeframe to fix the integration issue relative to the sales productivity issue and that market participants understood that Zuora had not focused on cross-selling). In addition, prior to the May 30, 2019 disclosure, analysts at Arete opined that they "do not expect [RevPro] to be a material sales driver for the next three years." "Zuora: Just a Click Away," Arete, March 12, 2019.

**CONFIDENTIAL**

Class Period.[43]  Therefore, prior to March 21, 2019 (the assumed first day full disclosure regarding the materialization of the risk could have occurred), the 4.2% ($0.83) would have to be reduced by 75% (i.e., 1 minus the 25% probability assumed above).  Accordingly, under this example, alleged inflation in Zuora's stock price from the beginning of the Class Period on April 12, 2018 through March 20, 2019 would be 1.1% ($0.21) – i.e., 25% of 4.2% ($0.83) – and the full 4.2% ($0.83) thereafter.

31.    I reserve the right to supplement the opinions discussed in the Ferrell Report and this rebuttal report in response to any opinions that Dr. Ronen, or any other experts retained by Plaintiff in this matter, may express in a rebuttal expert reports or during deposition or trial testimony.

Allen Ferrell

September 16, 2022

---

[43] I am using these potential determinations for illustrative purposes only.  The finder of fact may, for example, conclude that there was a different likelihood that issues would arise with the integration, or that a duty to disclose such issues arose on a different date.  However, the methodology discussed in this report would be the same regardless of the likelihood that the integration would arise or the date on which Defendants had a duty to disclose such issues.

CONFIDENTIAL

## Appendix A

## Materials Considered

### Case-Related Documents

1. Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed November 8, 2019.
2. Lead Plaintiff New Zealand Methodist Trust Association's Responses and Objections to Defendants' Second Set of Interrogatories, April 4, 2022.
3. Expert Report of Tavy Ronen, Ph.D., dated December 4, 2020.
4. Expert Report of Tavy Ronen, Ph.D., dated August 5, 2022.
5. Expert Report of Allen Ferrell, Ph.D., dated August 5, 2022.
6. Expert Report of Kevin Dages, dated August 5, 2022.

### Conference Call Transcript

1. Zuora, Inc. NYSE: ZUO FQ1 2020 Earnings Call Transcripts, Thursday May 30, 2019 5:00 PM EST.

### Analyst Reports

1. "Zuora:  Just a Click Away," Arete, March 12, 2019.
2. "Another drama-filled quarter," Canaccord Genuity, May 30, 2019.
3. "ZUO: Sales Execution and RevPro Headwinds Hurt Near-Term Growth – Lowering PT to $20" FBN Securities, May 31, 2019
4. "Sales and Cross-Sell Challenges Weigh on Outlook; Remain Sell," Goldman Sachs, May 31, 2019.
5. F1Q20: Trader Preview," Jefferies Research, May 31, 2019.
6. F1Q20: Shy Guide," Jefferies Research, May 31, 2019.
7. "1Q20 Results:  A Bump on the Road to Subscription Economy," Morgan Stanley Research, May 31, 2019.
8. "Sales Execution and Product Integration Sink FY20 Estimate, Downgrade to Buy," Needham & Company, May 31, 2019.

### News Article

1. "Zuora Reports Record Fourth Quarter and Full Year Fiscal 2019 Results," *Business Wire*, March 21, 2019 (4:10 PM).