# Exhibit E

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASEY ROBERTS, individually ) No. 3:19-cv-03422-SI
and on behalf of all other )
similarly situated, )
                            )
              Plaintiff, )
                            )
vs.                         )
                            )
ZUORA, INC., TIEN TZUO, and )
TYLER SLOAT, )
_____)

CONFIDENTIAL

REMOTE VIDEO RECORDED DEPOSITION OF

JEFFREY L. HAGINS

Thousand Oaks, California

Monday, October 10, 2022

Volume I

Reported by:

LISA ANDREASEN

CSR No. 9584

CONFIDENTIAL

Page 78

I'm going to refer to as Opinion Number 1. Does that work for you?

A   Sure.

Q   Then we'll go to Opinion 1, Opinion 2, Opinion 3, 4 and 5. These enumerated five opinions, 1 through 5, represent a summary of the entirety of the opinions that you've formed in connection with this case; correct?

A   That's correct.

Q   These opinions, opinions 1 through 5, concern norms and practices related to software development, implementation and integration in a general context; right?

A   And more. I believe they talk about early adopter programs, as well, but yes.

Q   When you say yes, you're agreeing it does discuss those topics in a generalized context; correct?

A   Correct.

Q   What assumptions did you make in reaching opinions 1 through 5?

MS. MUCK: Object to form.

THE WITNESS: I think it's fair to say that while I characterize these things as opinions, because that's, you know, what experts do, is they

Page 79

opine, these things also represent just my understanding, my knowledge of the software industry generally even before working on this case. This represents my -- you know, my 42 years of experience in the software industry and, you know, how it -- how it works.

BY MR. MELANSON:

Q   I believe earlier when we were discussing your credentials you even said that in drafting this report you primarily relied upon knowledge and authorities that you were already familiar with; correct?

A   That's correct.

Q   And after putting together the opinions, you relied upon others like Cornerstone to find the specific citations for these authorities you were already familiar with; correct?

A   Correct.

Q   I believe it's also correct that in drafting this report you primarily relied upon your experience and did not review academic materials beyond those that you were familiar with prior to drafting this report. Correct?

A   Correct.

Q   And in drafting this opinion, these

Page 80

opinions 1 through 5, you didn't review or analyze other academic journals or peer reviewed sources that could potentially conflict with the opinions you relied upon; correct?

MS. MUCK: Object to form.

THE WITNESS: I didn't review other sources not listed. For, you know, as to whether they might conflict or not, I don't know. But I didn't review anything other than what I cited.

BY MR. MELANSON:

Q   In forming opinions 1 through 5, it was your understanding that Zuora began working on its productized integration solution, which I'm going to refer to as Keystone, in the beginning of 2018; correct?

A   That's my understanding, yes.

Q   And is it fine that for the rest of the deposition if I use the word Keystone you understand it to mean Zuora's productized integration solution?

A   Sure.

Q   In forming opinions 1 through 5, it was your understanding that as of early 2018, under your understanding of Zuora's planned scope for Keystone, the development of Keystone had not reached a state where Zuora was willing to release the solution in a

Page 81

live environment to all of its customers; correct?

MS. MUCK: Object to form.

THE WITNESS: Say that -- say that one more time with the dates.

BY MR. MELANSON:

Q   In forming opinions 1 through 5, it was your understanding that as early as 2018 under Zuora's planned scope for Keystone as you understood it, the development of Keystone had not reached a state where Zuora was willing to release it to the public in a live environment?

MS. MUCK: Object to form.

BY MR. MELANSON:

Q   Correct?

A   I think you're characterization of the timeline is correct. As to the releasability of Keystone, I don't think that really informed the opinions 1 through 5.

Q   I'm not asking whether it informed opinions 1 through 5. I'm just asking about the factual understanding you have of the case at the beginning of your report for reaching your conclusions. And with respect to that understanding, it's your understanding that in early 2018 under Zuora's planned scope for Keystone, the development of

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

Keystone had not reached a state where Zuora was willing to release it to all of its customers in a live environment. Is that accurate?

A   That is accurate, yes.

Q   In forming opinions 1 through 5, it's your understanding that throughout the class period Zuora had not represented to its customers or the public that those customers could seamlessly export data from Zuora Billing to Zuora RevPro using a Zuora productized integration solution; correct?

A   Again you prefaced that question with in forming your opinions 1 through 5. So whether the rest of it is correct or not, I don't think it informed the opinions.

Q   Okay. Then let's reframe the question with regard to your understanding. Is it your understanding that throughout the class period Zuora had not represented to its customers or the public that they could seamlessly export data from Zuora Billing to Zuora RevPro using a Zuora productized integration solution?

MS. MUCK:  Object to form.

THE WITNESS:  I don't know. I'm not familiar with the entirety of what Zuora may or may not have represented to investors or the public.

Page 83

Again my assignment was to describe industry norms. So I'm not familiar with, you know, the full scope of what they may or may not have represented.

BY MR. MELANSON:

Q   From your review of the materials considered, which included Zuora documentation and deposition transcripts, is it your understanding from the review of those materials that Zuora had not communicated to the public that it could seamlessly export data from Zuora Billing to Zuora RevPro using a Zuora productized integration solution during the class period?

MS. MUCK:  Object to form.

THE WITNESS:  I mean, what's your -- what's your -- it sounds like you're quoting something there with the seamlessly exporting data. If that's a quote from a particular document, I'm happy to comment on it. Because it sounds very -- it sounds similar to things that I have read, but I don't remember their exact context. So if you can give me more context, that might be helpful.

BY MR. MELANSON:

Q   I can provide you a clear explanation if it would help you. One of the contentions in this case is with regard to Keystone and whether -- the

Page 84

productized integration solution of Zuora and whether it could export data from Billing to RevPro. And an issue in the case is the extent there were bugs with that, with that process. So when I use the word seamless, I'm referring to an export process that does not frequently encounter bugs or is not able to do what it is supposed to do.

So I'll ask the question again. From your review of the background materials of this case, which included the deposition transcripts and Zuora provided presentations, is it your understanding that throughout the class period Zuora had not represented to the public that they could seamlessly export data from Zuora Billing to Zuora RevPro using a Zuora productized integration solution?

MS. MUCK:  Object to form.

THE WITNESS:  Again the quote sounds very familiar. I'm not sure if that's something that I read that was in something that was public information or not. But I will say that the term seamless, as an engineer, really has no specific meaning from a software engineering perspective. So generally speaking when I see the word seamless with respect to software, like I discount it as marketing terminology. Because it doesn't actually mean

Page 85

anything.

BY MR. MELANSON:

Q   And when you say it doesn't mean anything, do you mean it doesn't mean anything in a software development context?

A   In a software engineering implementation, development, it doesn't -- it doesn't mean anything from a software perspective.

Q   You're not saying that that term is meaningless to the public; correct?

MS. MUCK:  Object to form.

THE WITNESS:  To the extent that it's used with the general public, I'm not -- I don't think I'm the expert that should comment on that. There's probably somebody else that should. But, you know, from a software perspective, it doesn't have specific meaning.

BY MR. MELANSON:

Q   From your review of the materials provided to you, do you have an understanding as to how Zuora communicated the export process between Zuora Billing and Zuora RevPro to customers throughout the class period?

A   How it? I've seen -- I've certainly seen some documents that I believe were either public

22 (Pages 82 - 85)

CONFIDENTIAL

Page 90

case is -- you know, is small compared to the amount of material that I review every day for my job. So, you know, the amount of information I consume daily is significant. I don't want to -- I don't want to mischaracterize something from my memory. I'd rather look at a specific quote and comment on it.

Q   To that end, you just said that you were sure those kind statements did exist in public documents. How are you sure?

MS. MUCK: Object to form.

THE WITNESS: I mean, I do remember seeing something about quote -- quotes specifically about integration, but I don't remember exactly their exact language so --

BY MR. MELANSON:

Q   When you say -- when you say you remember seeing something about, quote, integration, are you referring to seeing something like that in a public document?

MS. MUCK: Object to form.

THE WITNESS: If I could remember that detail, I could probably answer your question. So I'm not sure where I saw it. I remember seeing -- I've seen certainly characterizations of the integration. Let's look at a specific quote, and

Page 91

I'm happy to comment.

BY MR. MELANSON:

Q   Beyond opinions number 1 through 5, have you opined on any other matters that could potentially be relevant to this case?

A   Well, I go into detail on items 1 through 5 in the subsequent sections. 1 through 5 here in Section -- in Paragraph 10 are summaries, as you said. So I do go into more detail about all these things in the remainder of the report.

Q   Beyond opinions 1 through 5, though, and the details that are included further on in your report, do you offer any other opinions that are potentially relevant to this case?

A   I'm not offering any other opinions other than what's in the report. That's -- I do not.

Q   In your report, you don't opine on what an average investor understood about software development generally during the class period; correct?

A   That is correct.

Q   And you don't claim to be an expert on what average investors understood about software development; correct?

A   That's correct.

Page 92

Q   You don't intend for your opinion on the average investor's understanding about software to be relied upon by a jury for that purpose; correct?

MS. MUCK: Object to form.

THE WITNESS: Sorry. Can you ask that one again.

BY MR. MELANSON:

Q   You don't intend for your opinions 1 through 5 in your report to be relied upon by the jury for the purpose of understanding what an average investor understood about software development; correct?

A   That's correct.

MS. MUCK: Object to form.

THE WITNESS: That's correct.

BY MR. MELANSON:

Q   And you don't intend your opinions 1 through 5 to be relied upon by the jury for the purpose of understanding what a reasonable investor understood about software development during the class period; correct?

MS. MUCK: Object to form.

THE WITNESS: That's correct, outside of the scope of my assignment.

///

Page 93

BY MR. MELANSON:

Q   In your report, you don't opine on what an average investor understood about Zuora's products including Keystone during the class period; correct?

MS. MUCK: Object to form.

THE WITNESS: Correct.

BY MR. MELANSON:

Q   You don't claim to be an expert in the field of what a reasonable investor understood about Zuora's products including Keystone during the class period?

A   Correct.

Q   You don't intend for your opinion to be relied upon by the jury for the purpose of understanding what a reasonable investor understood about Zuora's products including Keystone during the class period. True?

MS. MUCK: Object to form.

THE WITNESS: Correct.

BY MR. MELANSON:

Q   In opinions 1 through 5, you don't opine on the functionality of Zuora's products including Keystone during the class period?

A   That's correct.

MS. MUCK: Object to form.

24 (Pages 90 - 93)

CONFIDENTIAL

Page 98

development, enterprise software implementation and integration, they can come to their own conclusions about whether a particular delay was uncharacteristic or not.

Q    But you yourself offer no explicit opinion upon the reasonableness of any actual cause for Keystone's delay during the class period; correct?

MS. MUCK:  Object to form.

THE WITNESS:  That's correct.

BY MR. MELANSON:

Q    In your report, you don't opine on any actual complaints or concerns Zuora received from Keystone early adopters; correct?

MS. MUCK:  Object to form.

THE WITNESS:  That's correct.

BY MR. MELANSON:

Q    You don't claim to be an expert on any actual complaints or concerns Zuora received from Keystone early adopters during the class period; correct?

A    That's correct.

Q    And you don't intend for your opinion to be relied upon by the jury for the purpose of understanding the actual complaints or concerns Zuora received from Keystone early adopters during

Page 99

the class period; correct?

MS. MUCK:  Object to form.

THE WITNESS:  I think similar to my -- to the previous question, by understanding industry norms with respect to early adopter programs, the jury can form their own opinions about the character of the specifics of what happened at Zuora.

BY MR. MELANSON:

Q    Beyond understanding just general norms, though, you don't intend for your opinion to be relied upon by the jury for the purpose of understanding in an expert capacity the actual complaints or concerns Zuora received from Keystone early adopters.  True?

A    That's correct.

MS. MUCK:  Object to form.

BY MR. MELANSON:

Q    In your report, you don't opine on what specific knowledge concerning Keystone or any Zuora employee knew or should have known during the class period; correct?

A    That's correct.

Q    You don't claim to be an expert on what specific knowledge concerning Keystone any Zuora employee knew or should have known during the class

Page 100

period; correct?

A    That's correct.

Q    And, again, beyond providing context about a software development integration in a general context, you don't intend for your opinion to be relied upon by the jury for the purpose of understanding what specific knowledge concerning Keystone any Zuora employee knew or should have known during the class period; correct?

MS. MUCK:  Object to form.

THE WITNESS:  Correct.

BY MR. MELANSON:

Q    In your report, you don't offer any opinion regarding any Zuora employee's specific mental state while making statements regarding Keystone during the class period, do you?

A    Correct, I do not.

Q    And you don't claim to be an expert in the field of understanding any Zuora employee's specific mental state when making statements during the class period about Keystone; correct?

A    Correct.

Q    And, again, you don't intend for your opinion to be relied upon by the jury for the purpose of understanding any Zuora employee's

Page 101

specific mental statement while making statements about Keystone during the class period; correct?

MS. MUCK:  Object to form.

THE WITNESS:  Correct.

BY MR. MELANSON:

Q    In your report, you don't opine on any Zuora employee's specific mental state in not disclosing information concerning the current development state of Keystone to the public during the class period; correct?

A    That's correct.

Q    You don't claim to be an expert in the field of understanding any Zuora employee's specific mental state in not disclosing information concerning the current development state of Keystone during the class period; correct?

MS. MUCK:  Object to form.

THE WITNESS:  Correct.

BY MR. MELANSON:

Q    You don't intend for your opinions 1 through 5 to be relied upon by the jury for the purpose of understanding any Zuora employee's specific meant state in not disclosing information concerning the current development state of Keystone to the public during the class period; correct?

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

MS. MUCK: Object to form.

THE WITNESS: Correct.

BY MR. MELANSON:

Q    So let's talk then about what is in your report starting with Opinion Number 1. There you begin to say that software development by its nature is complicated; correct?

A    I do.

Q    We'll go on to talk about the specific -- further details provided in support of that opinion in a moment. For now, though, in offering Opinion Number 1, you're again just opining on software development processes in a generalized context; correct?

A    That's correct.

Q    You aren't opining in Opinion Number 1 on the specific software development issues that Zuora experienced during the class period; right?

A    Correct.

Q    Specifically you aren't opining that the specific software development issues Zuora experienced during the class period were routine; correct?

A    I'm not opining one way or the other about what happened at Zuora.

Page 103

Q    In Opinion Number 1, you aren't opining that the specific software development issues Zuora experienced during the class period were pervasive; correct?

A    Correct, I'm not opining. I'm not characterizing what happened at Zuora in any way in Opinion Number 1.

Q    And to that end, you also aren't opining in Opinion Number 1 that the specific software development issues Zuora experienced during the class period were common; correct?

A    That's correct.

Q    You aren't opining in Opinion Number 1 that the specific software development issues Zuora experienced during the class period were discoverable only with testing and realistic environments of customers; correct?

A    Sorry, I don't think Opinion Number 1 really even covers that even generally.

Q    So if I can direct your attention to Line 3 of -- actually Line 5. My mistake.

A    Oh, I see. Yep.

Q    There you say in a general context that significant problems during the development of new software products are common and such problems

Page 104

frequently surface only when products are tested or used in realistic environments. Did I accurately read that?

A    Correct. Yes.

Q    And that opinion is offered in a generalized context; correct?

A    Correct. And relative to literally every software development project that I've been involved in for the last on 42 years that's been a true statement.

Q    In offering that statement, you're not also opining that the specific software development issues Zuora experienced during the class period were discoverable only with testing in realistic environments with customers; correct?

A    I'm opining that in general software -- the full scope of software issues and their underlying defects are only discoverable when products are tested in a realistic environment.

Q    I understand you're talking about the full scope of product defects in a generalized context when you're offering Opinion Number 1. In a specific context, though, you're not saying that all software problems are only discoverable in a realistic environment; correct?

Page 105

A    I mean that's -- that would be -- you know, for me to make that kind of closed statement that there's no such thing in the history of software that has not required testing in a realistic environment, you know, I can't. I can't make that statement, but, you know, by and large the -- you know, every software project I've ever been involved in or been aware of needed to be tested in a realistic environment with real data in order to fully uncover issues and their root causes.

Q    And, again, I appreciate the opinion with respect to uncovering all problems in a realistic environment. I'm talking about the case's specific defects within the context of my question. So maybe I'll ask my question a different way, and we can return to this.

In the context of software development, are certain defects identifiable prior to testing in a realistic environment --

A    Sure.

Q    -- with customers?

A    Absolutely. Defect -- generally speaking the software development project -- process rather seeks to identify and remove defects throughout the entire process; so including the developer

27 (Pages 102 - 105)

CONFIDENTIAL

Page 114

then. As an issues list grows over time in mathematical terms to infinity -- I'm trying to say away from mathematical terms should there be non-math people on the call -- do the odds that there are more than one defect on the defect list increase?

MS. MUCK: Object to form.

THE WITNESS: Not necessarily, and I think it would really depend greatly on the nature of the software, what kind of software it is and where -- where in a software architecture that defect actually lives. Meaning a defect high up in an architecture in, for example, a user interface that a user might actually be using in a browser or other application, a defect in a user interface tends to be isolated just to the user interface. One defect may actually equate to one issue if it's in a user interface.

But a defect lower down in middle ware or other software that is used by other software may manifest itself in many different ways. Right? And so it's not -- that's not something that's knowable in the abstract. Right? You really have to understand the details of the specific defect of where it lives.

Page 115

BY MR. MELANSON:

Q    And, again, I'm not asking about knowable in the abstract. I'm talking about probabilities, which considers that it could be relating to a singular defect. It could also be relating to multiple defects.

So I'll ask the question again just to make sure I understand your opinion. As an issues list grows larger and larger, does the odds that there's more than one defect in a software development process increase?

MS. MUCK: Object to form.

THE WITNESS: It certainly doesn't decrease. Right? So I guess I would accept generally that the odds generally have to go up as you have more issues. The odds of there being more defects probably increase, but I have not seen any research or studies that characterize that.

BY MR. MELANSON:

Q    Have you done any research or studies on the correlation between issues and defects?

A    I have not done any formal research on it, no. This is, you know, an opinion that really stems from my own personal experience. Because a lot of the research that's out there, some of which I did

Page 116

cite, really is research about defect density. Right? How many defects are in or were in a product as opposed to issue reporting and ultimate relationship to defects. It's actually a hard thing to research because that information typically isn't public. Even for open source software, you don't necessarily have the data that you need to do that type of analysis.

Q    Those sources that you did rely upon, then, did they opine that, as a defects list grows or becomes more complex, it's more likely to take more time to complete a software project?

A    A defect list or an issue list?

Q    Defect list.

A    Yeah. I mean, certainly the more defects, the more time it takes to resolve them, but what you don't know is how much time it takes to resolve an individual or specific defect. It could be minutes. It could be hours. It could even require a complete -- a complete rewrite of a particular piece of code in order to resolve the defect.

Q    And, again, you yourself have done no regression analysis comparing the time it takes to resolve an issue list to defects present in the software development project; correct?

Page 117

A    That's correct. Because it's actually not -- it's actually not helpful. Right? It doesn't help. It doesn't help you make decisions as a software development manager to really know that. Because at the end of the day, all you can do is work on issues in order of their importance to the business. Right? So whether the top ten issues with regard to severity, whether the top ten issues have a common defect or not isn't relevant from a prioritization perspective. Those are the top ten issues, and you work them in order, in the order typically that the customer defines as their priorities. And if things turn out that the top ten issues have one defect, then, you know, good for you. You resolved ten issues very quickly. If ten issues have ten defects, then it will take you longer to resolve them. But really you work on those things in order of severity as defined by the customer.

Q    Going back to your opinion, then, where again you stated the severity or quantity of problems during the development of new software does not directly correspond to the amount of time and effort needed to resolve those problems, is it more accurate to say that the severity or quantity of

CONFIDENTIAL

Page 158

viable product version of the productized integration solution for Billing and RevPro that is Keystone?

MS. MUCK:  Object to form.

THE WITNESS:  I don't have a specific understanding of when or even if that occurred.

BY MR. MELANSON:

Q   Is it your understanding that a minimal viable product version of Keystone was completed at the beginning of the class period in this case?

MS. MUCK:  Object to form.

THE WITNESS:  Obviously they had something that they were implementing -- right? -- with those early adopter customers.  The reason I say I don't have an understanding, beyond the fact that it wasn't my assignment, is that generally speaking there are -- there's the impression of the MVP, meaning what the company thinks the MVP requirements are, and then what the actual MVP requirements are when customers start using the software.  It's not uncommon, again generally in the software industry, for a company to have a definition of MVP and then test that with early adopter customers and realize that their own understanding of the MVP requirements were flawed, and then they're adding capabilities in

Page 159

order to meet the customers' definition of an MVP. So the reason I say I don't know when or if it happened is because had -- in any context if a software company has a real MVP, they might choose to make that generally available.  And my understanding is that Keystone was never made generally available.  So I don't know that they ever met a real MVP definition.

BY MR. MELANSON:

Q   And just to clarify, it's your understanding that Keystone was never made generally available during the class period in this case; correct?

MS. MUCK:  Object to form.

THE WITNESS:  Well, my understanding is that Keystone was ultimately redesigned and given a new name called K2 and that at some point Zuora made the integration generally available, but I don't know what they were calling it at that point.

BY MR. MELANSON:

Q   And by this new integration, are you referring to K2?

A   Correct.

Q   So to clarify the timeline, it's your understanding that prior to the re-architecture of

Page 160

Keystone into K2, Zuora had not generally released an MVP version of its productized integration solution, Keystone, to the public; correct?

MS. MUCK:  Object to form.

THE WITNESS:  That was my understanding.

BY MR. MELANSON:

Q   And it's your understanding that at some time after the re-architecture to K2, Zuora may have or may not have released a version -- an MVP version of Keystone; correct?

A   That I -- that I have no knowledge of.  It simply wasn't part of my assignment or even part of the background information that I reviewed to understand what was ultimately released.

Q   Returning back to Paragraph 70, then, in the second sentence you write, "Although the productized integration may resemble an off-the-shelf integration product, I understand it" it being the productized integration product "was a software development project with the added complication that Zuora was designing the product for multiple other enterprises with disparate use cases."  Is that an accurate reflection of the sentiment of Paragraph 70?

A   It is.

Page 161

Q   Why does it matter for the purposes of this case that Zuora's integration product resembled or did not resemble an off-the-shelf integration product?

A   Well, because it's -- my understanding is that in and of itself that integration was configurable and customizable to meet customer needs similar to the rest of Zuora's products.  As enterprise software, they were able to tailor that to meet the customer needs without writing new code. So in and of itself the productized integration was -- in the way that I've characterized in my report, it was enterprise software.

Q   Okay.  But I'm not asking whether it was enterprise software or not.  In your report, you make very limited findings about Zuora specifically. That's been a common theme of this deposition.  But here in Paragraph 70 you are stating one of your very few findings as to Zuora specifically, and you find or you state that it's your opinion that the productized integration may resemble an off-the-shelf integration product, but it was actually a software development project.  So why is this opinion relevant for the jury in this case?

A   Well, the --

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

MS. MUCK: Object to form.

THE WITNESS: The two things are unrelated. What I say is I understand it was a software development project, meaning they were building software to integrate the two systems or two products, with the added complication that they weren't building it to meet a fixed set of use cases. Right? But they were building something that could be configured or customized to specifically meet different customer needs with regard to the integration. So it's --

BY MR. MELANSON:

Q    Is it your -- sorry. Go ahead.

A    So it's relevant in the sense that my understanding from the limited documents that I've seen is that you didn't just flip a switch and turn it on, but rather you had to go through an implementation process to implement the integration just as you go through an implementation process to implement other aspects of Zuora, that there was always going to be a professional services involvement or team involvement in such an implementation.

Q    I want to get to your understanding for that in a second, but I just want to make sure I'm

Page 163

clearly understanding you. Is it or is not your understanding that Zuora was -- that Zuora's Keystone product, the feature, was intended to be an out-of-the-box or, as you framed it, an off-the-shelf product?

MS. MUCK: Object to form.

THE WITNESS: Again it was outside the scope of my assignment to -- to really develop a deep understanding here, but from what I've -- from the documentation I've seen, the implication is that it wasn't an off-the-shelf product. It still required configuration and customization for each customer prior to testing and go live.

MR. MELANSON: So why don't we take our lunch break here. Let's go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 4. Off the record at 1:15 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 1:51 p.m. This is the beginning of Media Number 5.

BY MR. MELANSON:

Q    Welcome back, Mr. Hagins. Before the break, we were talking a little bit about Zuora Keystone's solution and off-the-shelf integration

Page 164

products. Just so we can align to be on the same page again, what is your understanding of an off-the-shelf product or an off-the-shelf integration product?

A    Well, an off-the-shelf integration -- maybe drop the word product since, as we've discussed, my meaning of that is that you pay for it. But an off-the-shelf integration, a good example of that would be an email client that you use on your phone. It integrates with an email server according to an industry standard and doesn't -- you know, you configure it a little bit to tell it your -- you know, your user name and your password to get it set up, but then it just works. Right? There's no other configuration required to make it work. So that I think -- by extension I would say that's an off-the-shelf integration. You kind of point it, point it in the right direction, and then everything just works.

Q    So in your opinion or in your understanding, an off-the-shelf integration is a product -- using that term very loosely, no definition of whether you have to pay for it or not -- but a product that works with none or minimal customization after installing it or opening it;

Page 165

correct?

A    I'd say no customization and minimal configuration.

Q    And for clarity, what is the distinction between customization and configuration?

A    Well, you're configuring -- to use my email example again, you're configuring it simply by -- simply by telling it your email address and your password. Without that information, that email client on your phone can't function. So it needs that information. That's configuration.

Customization would go deeper -- right? -- and actually control or affect the way in which the product behaves, which generally isn't the case with a consumer -- piece of consumer software but is the case with enterprise software where you can customize it to meet specific customer needs.

Q    Is it your understanding that an off-the-shelf solution is the same as an out-of-the-box solution?

A    I would generally use those terms synonymously, yes.

Q    And in Paragraph 70 of Plaintiff's Exhibit 301, your expert report, you begin by saying, "The productized integration that is

42 (Pages 162 - 165)

CONFIDENTIAL

Page 178

team.

So it's a nuance, but it's how I interpret this, is that, you know, they're not -- they're not having to tackle new customer requirements because they've already learned how to meet all these different use cases.

BY MR. MELANSON:

Q    Upon reviewing this slide, Page -- Slide -- or Page 36 of Plaintiff's Exhibit 302, it's still your opinion that Keystone as originally envision by Zuora in March 2018 was not intended to be an off-the-shelf or out-of-the-box product?

A    That's correct.

Q    Now I'd like to direct your attention what's been marked as Plaintiff's Exhibit 303.

(Exhibit 303 was marked for identification.)

BY MR. MELANSON:

Q    This is a -- let me know when it's open in front of you.

A    Sure.  Okay.

Q    This is a Power Point titled Keystone Overview for Revpro GS dated June 2018; correct?

A    Correct.

Q    This is a document with Bates number Zuora

Page 179

336645; correct?

A    Correct.

Q    This is a document that you reviewed prior to drafting your expert report in this case; correct?

A    I believe so, yes.

Q    The fact you cite this expert report in your expert opinion; correct?

MS. MUCK:  Object to form.  Can you read back the question, please.  I think you referred to this as an expert report, Mr. Melanson.

MR. MELANSON:  Thank you.  I'll clarify the question.

BY MR. MELANSON:

Q    Mr. Hagins, you cite to Plaintiff's Exhibit 303 in your expert report; correct?

A    That's correct.  I believe I do that in the background section.

Q    Specifically you cite Plaintiff's Exhibit 303 in the background section of your report discussing the factual background for Keystone; correct?

A    That's correct.

Q    If I can direct you to your report very quickly, on Page 5, Footnote 15 --

Page 180

A    I see it.

Q    -- in your report you cite to this document, Plaintiff's Exhibit 303, to support a statement you make describing the integration product Keystone, describing it as being comprised of a collection of micro-services that extracts the bookings and billing data from Zuora Billing, transforms data to convert it into RevPro, a compliant format, and finally loads it into RevPro. Is that accurate?

A    It is.

Q    You go on to cite Plaintiff's Exhibit 303 in your expert report to also support the contention that customers who use the integration product would then be able to interact with the integration to schedule and manage it through an intuitive user interface.  Is that correct?

A    That's correct.

Q    And in that sentence I just read, you, in fact, quote from the Power Point for part of that sentence.

If I can direct your attention back to the Power Point now, Plaintiff's Exhibit 303, specifically to the page ending in Bates number 47 --

Page 181

A    I have it.

Q    -- this is a slide titled Comprehensive Data Required to Recognize ASC 606 Compliant Revenue is Delivered by the Out-of-the-Box Integration; correct?

A    Correct.

Q    This is a Zuora Power Point presentation discussing a Keystone overview for RevPro GS; correct?

MS. MUCK:  Object to form.

THE WITNESS:  Correct.

BY MR. MELANSON:

Q    So in this exhibit, Plaintiff's Exhibit 303, which you reviewed prior to drafting your expert report, on Page 47, or page ending in Bates number 47, Zuora refers to Keystone as an out-of-the-box integration; correct?

MS. MUCK:  Object to form.

THE WITNESS:  I see that.  I don't know if I -- yes.  I'm assuming that refers to Keystone. But, yes, I see the out-of-the-box terminology.

BY MR. MELANSON:

Q    And below the title of the slide ending -- on the page Bates numbered ending in 47 there's a graphic between two screens on the left-hand side

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

showing Ongoing Orders, Ongoing Billing, Ongoing Usage and on the right-hand side showing ZUORA REVPRO; correct?

A    I see that, yes.

Q    In the middle of the slide on page ending in Bates number 47 of Plaintiff's Exhibit 303 in red text there are the words Out of the box integration with a red arrow connecting Billing with RevPro; correct?

A    Okay.

MS. MUCK:  Object to form.

BY MR. MELANSON:

Q    So, again, here Zuora in June 2018 is referring to Keystone as an out-of-the-box integration; correct?

MS. MUCK:  Object to form.

THE WITNESS:  It's unclear whether they're referring to Keystone in its totality is out of the box or -- I mean because certainly some of the software is, quote, out of the box; otherwise, there wouldn't be any software at all.  Right?  So some of the software and some of the capabilities are out of the box capabilities -- right? -- that are hard coded in the software.  That doesn't mean that you don't still need some configuration and

Page 183

customization to address the full scope of customer requirements.  So I would expect that some of the integrations were out of the box because they applied to all customers, and others needed -- still needed customization or configuration.

BY MR. MELANSON:

Q    Are there any words on this slide which refer to integration efforts not covered by the out-of-the-box terminology in this slide?

MS. MUCK:  Object to form.

THE WITNESS:  Sorry.  I'm looking.  Not specifically, no.

BY MR. MELANSON:

Q    So that description you just provided in which you stated that this only refers to certain integrations and not all integrations, what's the basis for that assumption from this presentation before you?

MS. MUCK:  Object.  Objection to form.  Do you want him to read the entire -- entire presentation?  You refer to a presentation, Mr. Melanson.

MR. MELANSON:  What we can -- what we can do is, if the witness wants to take a break, we can take a break, and he can review the entire

Page 184

presentation, if that would satisfy him, or he can provide the basis for the answer provided based off the information he had at the time.

THE WITNESS:  I think I would like to take a minute and review it.

MR. MELANSON:  Okay.  Why don't we go off the record.

THE VIDEOGRAPHER:  This is the end of Media Number 5.  Off the record at 2:18 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 2:29 p.m.  This is the beginning of Media Number 6.

BY MR. MELANSON:

Q    Mr. Hagins, we were discussing Plaintiff's Exhibit 303.  We took a 10- or 15-minute break so you could familiarize yourself with the document; correct?

A    Correct.

Q    During that break, you were placed in a breakout room with defense counsel during your review of the document; correct?

A    I was.

Q    When you were in that breakout room, did you have any conversations with defense counsel

Page 185

about this deposition?

A    No, not really.  We were all in the breakout room, but we really didn't talk other than them to just ask me, you know, did I have what I needed.

Q    So I just want to be clear because you say you didn't really talk.  The only conversation you had with defense counsel in the breakout room was regarding whether you had the materials you needed to review the exhibit; correct?

A    Correct.

Q    Does that also --

MS. MUCK:  I actually left the room to eat my lunch.

THE WITNESS:  Right.

BY MR. MELANSON:

Q    And just to wrap that line of questioning, did defense counsel refer you to any pages or slides in the Power Point presentation during the breakout session?

A    They did not.

Q    So we were discussing Plaintiff's Exhibit 303, a Power Point presentation dated June 2018, entitled Keystone Overview for Revpro GS.  Specifically we were discussing an image on page

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

ending in Bates number 47 in which Zuora described an out-of-the-box integration. Correct?

A    Correct.

Q    And in discussing that topic, you stated that the word out-of-the-box integration possibly referred to certain types of integration but excluded others; correct?

A    Correct.

Q    And before the break I asked you where in the slide does it indicate that the out-of-the-box integration was not intended to cover certain integrations; correct?

A    Correct.

Q    So I'll repeat that question again. Where in this slide mentioning an out of box -- out-of-the-box integration between Billing and RevPro does Zuora indicate that the integration is not intended to cover certain integration aspects?

A    And it's not referenced on this slide, but it is referenced elsewhere in the presentation.

Q    Where specifically in the presentation?

A    Well, several places. First of all, in the slide, the very next -- yeah, the very next slide ending in 48 there's a mention that it's flexible enough to support all your data extraction and

Page 187

selection needs. So the implication there is that there is some configuration or customization to meet specific needs.

Q    I -- I -- we'll get to all your answers. I just want to make sure we're going at a speed which I can understand it and the court reporter can understand it. So the first example was on Page 48. Where on 48 are you referring to?

A    The very last sentence, "It's flexible enough to support all of your data extraction and selection need for either of the ASC 606 adoption methods."

Q    And here in that sentence you've identified, the last sentence on page ending 48, "It's" in your understanding refers to a out-of-the-box integration system referenced by Zuora?

MS. MUCK:  Object to form.

THE WITNESS:  I mean, it's referring to the integration at large at this point, I believe. But, yes, then it's saying how flexible -- that there is flexibility in meeting specific requirements.

BY MR. MELANSON:

Q    It's your understanding in this section on this page that the flexibility of the product

Page 188

indicates it's not an out-of-the-box integration?

MS. MUCK:  Object to form.

THE WITNESS:  Well, as I previously said, out of the box refers to what the software does out of the box. Right? And so there are some things that the software may have done without configuration or customization. There are other things that it might only do with additional configuration or customization.

In this context, I take the term flexible, the phrase flexible enough, together with all the other things that I'm going to touch on in this presentation to mean that it wasn't all out of the box, that there was configuration and customization required.

BY MR. MELANSON:

Q    So, again, before we get -- I understand there are other portions of this document that you claim to support your interpretation. But here you're construing flexible to mean customization and configuration, though it's not in that sentence explicitly?

MS. MUCK:  Object to form.

THE WITNESS:  Yes. Correct.

///

Page 189

BY MR. MELANSON:

Q    Before we move on to another page, I'll refer to you the third paragraph on 48. Here it again -- we'll start actually with Page -- Paragraph 1. It begins by saying, "You've seen how flexible & powerful is Zuora's Subscription Order Management. When you've --" you being you have -- "an Order Management Application that offers so much flexibility, it more often than not creates unique challenges on the revenue recognition front." Did I read that correct so far?

A    You did.

Q    The second paragraph it goes on to say, "Now, the best in class Zuora Subscription Order Management and Billing is fully integrated with the best in class Zuora's RevPro Revenue Management Product." Correct?

A    Correct.

Q    So according to this presentation from June 2018, Zuora is representing that at this point in time Zuora Billing and Zuora RevPro is fully integrated; correct?

MS. MUCK:  Object to form.

THE WITNESS:  I see that. I see that here, yes. That doesn't change my assertion that fully

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

integrated doesn't -- can't mean that there is customization or configuration required.

BY MR. MELANSON:

Q    And in the next paragraph right after it says full integrated Zuora goes on to say, "You can now leverage the Out of the box Integration to send the essential Bookings and Billings data downstream."  Correct?

A    Correct.

Q    But you still maintain that a fully integrated software system is not an out of the box -- does not involve an out-of-the-box integration; correct?

MS. MUCK:  Object to form.

THE WITNESS:  That's correct as -- if we can continue, I'll show you why.

BY MR. MELANSON:

Q    Where else in this presentation does it support your -- your understanding of the out-of-the-box integration language used by Zuora?

A    Skipping down to the slide ending in -- sorry, it's a ways down -- collectively slides -- the one ending in 59 and the one ending in 60, but let's start with 60.  This is this slide showing how custom fields from Zuora Billing are mapped onto

Page 191

specific data types in RevPro.  And this is a very common enterprise software pattern where customers were able to take a specific object, like an order in this case, and add additional fields to that out-of-the-box object in Zuora Billing.  Because they need to store additional data onto the order that Zuora doesn't support out of the box.  And some of that information in this example is now important to RevPro.  So there's a mapping process by which you can map the fields from Zuora Billing onto the data model for RevPro.

And then skipping down to -- sorry, I'm searching for it -- oh, then going down to slide -- the slide ending in 66, there's then a discussion about how different things can be -- can be bundled into templates that relate to both the mapping and also the querying of data that's referenced in that comment on flexibility above.

So taken all together, it tells me that that integration -- that, quote, productized integration that sits in between was -- that its behavior was governed by these templates and these data mappings in order to specifically address custom fields and other customizations that had been made on both sides.  And then --

Page 192

Q    Mr. Hagins, can I refer you back --

MS. MUCK:  Did you finish your answer?  Please let him finish his answer.

THE WITNESS:  Well, then finally the real -- the architectural --

BY MR. MELANSON:

Q    Well, I want to be clear.  Are you moving on to a different slide for --

A    Correct.

Q    Okay.  So before you move on to a different slide, I want to address the slides that have already been presented.  We'll get to the next slide, I assure you.

Back onto Slide 60, when you were discussing a slide with the title How Custom Fields are Mapped, you refer to as a basis for your understanding of why the out-of-the-box integration still required customization is the presence of custom fields within Zuora; correct?

A    Correct.

Q    And that's Zuora versus Zuora Billing?

A    That's correct.

Q    On this slide, does it indicate that there are custom fields required for the Zuora integrator?

MS. MUCK:  Object to form.

Page 193

THE WITNESS:  Ask that again.

BY MR. MELANSON:

Q    On this slide that you referenced titled How the Custom Fields are Mapped on Page 60 of Exhibit 303, is there any indication of custom fields needing to be created in a productized integration solution?

A    I mean it's -- it's -- it's the reverse.  It's the fact that the productized integration has to be aware of the custom fields and how they map from Zuora to RevPro.  And this is showing the creation of a template in RevPro that is going to influence the behavior of that integration.  So we're creating its configuration or customization.  Either term is kind of a applicable here.  You're creating a template in RevPro that governs that mapping, and then the productized integration is using that as its instructions on how to behave.  Without it, it wouldn't know how to map the data from one system to another.  So it's having to be told how to map the data.

Q    And does that configuration, like you normally describe, or is that customization?

A    The two terms are frequently used, you know, almost interchangeably.  I would call it

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

configuration, but you know --

Q    I'll ask the question differently, then. Because we discussed the differences between customization and configuration earlier. And correct me if I'm wrong, but you defined customization as a developer coming in and creating a new solution for a problem. Whereas configuration in the context of your email example was me putting in my email address and credentials. Is that a fair understanding of a difference between customization and configuration?

A    No. I think I said that configuration is typically simple, like putting in your email credentials. Whereas customization is typically more -- more complicated. And that's why this is kind of a fuzzy area. Because if you look at the mapping of one field, you know, from Zuora Billing to Zuora RevPro as shown on this slide, taken all by itself you might call that mapping of a single field configuration. But if you look at the totality of all the customizations in Zuora and how they need to map onto RevPro data, that's -- that starts to be nontrivial, and I would call that customization.

Q    In your preparation for this expert opinion, did you review the totality of the

Page 195

architecture between Zuora and Billing -- Zuora Billing and Zuora RevPro and the integration between them?

A    Sorry. Did I review the totality of that architecture?

Q    Yeah.

A    No, because reviewing the totality of that architecture would mean that I actually reviewed the source code. There's no other -- there is no other way to fully understand software. You have to look at the code, and I have not done that.

Q    Is it your understanding from looking at Slide 60 that using an out-of-the-box integrator a Zuora customer couldn't by themselves configure the software to link a custom field in Zuora Billing that was previously known about with a custom field in RevPro?

A    No, it doesn't necessarily mean that. In enterprise software generally, many companies do their own customization and configuration if they have people with the right skill set.

Q    And just to clarify, earlier you mentioned that the templates were existing in Zuora RevPro. When you're referring to the templates or when Zuora is referring to templates within the slide, Slide 60

Page 196

of Plaintiff's Exhibit 303, are they referring to data mapping templates in RevPro, or are they referring to data mapping templates in the productized integration solution?

MS. MUCK:  Object to form.

THE WITNESS:  I believe they're referring to templates in RevPro that are used by the productized integration solution.

BY MR. MELANSON:

Q    So you mentioned that in addition to the slides we previously discussed there was another -- other indicia in this presentation that supported your conclusion or opinion that Zuora is not an out-of-the-box -- or Keystone is not an out-of-the-box solution. What other indicia in this Power Point presentation support your opinion?

A    If you look at -- sorry, I'm scrolling back up now to find it -- the slide ending in 49.

Q    So scrolling up?

A    Scrolling up to the slide ending in 49. It's actually the very next slide after the -- two slides after the one we were originally looking at, and it's the one that shows the Zuora Central to RevPro integration architecture. And what I get out of this architecture and the fact that it has an

Page 197

integration service sitting in between the two products is actually that specifically that they wanted to put something in between that would accomplish the mapping, the data conversion, the customizations. Because if that wasn't needed, they would simply have had Zuora Billing push data straight into RevPro. But it's not that simple. Right? And so they architected it in a way that allowed them to use, for example, these data mapping templates in RevPro as a way of instructing the behavior of the conversion or the integration service that sits in between. Like if you don't need -- if you don't need to make those types of conversions or make it flexible, you would simply take Zuora and plug it straight into RevPro and have one push data into the other. But they chose not to do that, and that is an indication there's a lot more going on here.

Q    I just want to understand that a little bit more from a lay person perspective. So on this slide, Plaintiff's Exhibit 303 Page ending in 49, are you referring support for your opinion that Keystone was not an out-of-the-box product to this graphic where it shows Zuora Billing on the left side and Zuora RevPro on the right side and a

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

bracket called Keystone integration services in the middle?  Correct?

A    Correct.

Q    And you are citing to the fact -- in Keystone integration services, the word services, is that referring to the service provided by the software in Keystone itself or some different source?

MS. MUCK:  Object to form.

THE WITNESS:  I believe it's referring to the service provided by Keystone itself.

BY MR. MELANSON:

Q    So this graphic is describing services done by Keystone on data from Zuora Billing to configure it for purposes of Zuora RevPro, in your opinion; correct?

A    That's correct.

Q    And from that information, you're inferring that Keystone could not be out of the box; correct?

A    Not just from this, no.  From the totality of everything that I've pointed to, I'm saying that the behavior of the integration service itself was data driven.  Right?  It was -- it was -- it did different things based on how these templates and these mappings were used that the software did

Page 199

different things.

Q    Is it your opinion, then, that Zuora could never provide an out-of-the-box integration between Billing and RevPro as you understand the term out-of-the-box integration to mean?

MS. MUCK:  Object to form.

THE WITNESS:  Fundamentally if you allow on the one side Zuora Billing, if you allow customers to add custom fields and then you need to use those customs fields in RevPro but you don't know what they mean, then that's correct.  It would not be possible to provide a truly out-of-the-box integration.  It would always require configuration or customization so that the integration layer, the service in between, would actually know what to do with that data.

Because I could add a custom field called bananas, and you have no idea what that means, but it means something to me as a customer.  Right?  So what do I do with a custom field called bananas?  Well, you do what -- you do what in this case what the mapping templates tell you to do with it.

BY MR. MELANSON:

Q    Does that opinion you just expressed regarding whether Zuora could ever offer a truly

Page 200

out-of-the-box integrator between Billing and RevPro hold true if a custom field, for example one titled bananas, was one that was commonly used by some but not all of Zuora's customers?

A    So I build -- I build software like this, you know, all the time.  It's part of what we do as a business.  We build data-driven software, software that is configurable and customizable.  And I can say that in my experience, even if there are common use cases, common fields -- in this example, maybe bananas is a common field, and you can know what that means -- but you don't hard code the solution for that.  You leave it flexible.  You leave it configurable and customizable because you could be wrong.  And so, you know, the goal, as I say in my report at the very beginning, the goal with enterprise software is to have software that is configurable and customizable to meet the customer where -- where they are.  You don't want to have -- you don't want them to have to change something to meet -- to meet the software.  You want the software to adapt to their needs.

And that is distinctly different than other types of business software where -- you know, software for small businesses, for example, the

Page 201

software dictates to the customer how they need to do things.  Right?  Enterprise software is different, and you don't want to hard code it.  Even if you think you know the answer, you don't want to hard code that into the product because you could be wrong.

Q    I now understand that a lot of your construction about the terms within this document we're referring to, Plaintiff's Exhibit 303, is based off your experience in the field and seeing these types of problems and terms.  Correct?

A    Correct.

Q    Can you identify in this document where it sufficiently explains the construction of those terms as you know them based off your experience?

MS. MUCK:  Object to form.

THE WITNESS:  I'm sorry.  Which?  Which terms are we talking about?

BY MR. MELANSON:

Q    Out-of-the-box integration and flexibility.

MS. MUCK:  Object to form.

THE WITNESS:  If you're asking can I identify in this document where does it sufficiently explain those to a lay person, no.  I don't think it does.  But to someone with 42 years of software

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

architecture experience I know. I understand what I'm seeing here. Because all of these things taken together -- right? -- the use of the term flexibility, the architecture itself, the data mapping and the use of templates all have, you know, meaning to me as a software architect.

BY MR. MELANSON:

Q   I might return to this topic in a bit, but I need some time to digest it to be honest. Why don't I move on to a different portion of your report.

Still in Paragraph 70, I want to understand. You referenced disparate use cases specifically in the last sentence of Paragraph 70 of your report on Page 27. Again this is Plaintiff's Exhibit 301. You state, "Although the productized integration may resemble an off-the-shelf integration product," that's what we were just discussing, "I understand it was a software development project with the added complication that Zuora was designing the product for multiple other enterprises with disparate use cases." I want to focus -- did I read that correctly?

A   You did.

Q   So I want to focus on technology, and there

Page 203

are multiple enterprises. I want to focus on the disparate use cases aspect of that opinion.

What is the basis for your understanding as expressed in that last sentence of Paragraph 70 in Plaintiff's Exhibit 301 that Zuora's customers, the enterprises, had disparate use cases?

A   Well, I mean, that's covered in Paragraph 71 actually, this idea that -- you know, the citation in Paragraph 71 that said that, according to a Zuora presentation as of August 2018, an integration [sic] of Zuora's Keystone productized integration addressed 90 percent of the use cases identified by ███ but only 70 percent of the use cases identified by ██████ . That tells me that there are -- you know, that the use cases from different customers are overlapping or intersecting sets, that they have some use cases that are common but others that may be distinct to their business.

Q   Beyond just reviewing the presentation cited in Paragraph 71, did you apply any scientific method to reach the conclusion that Zuora's customers may have had disparate use cases?

A   I did not.

Q   So I've just published as Exhibit 11 a document Bates numbered 422115. Let me know when

Page 204

you're able to open that up.

A   42 -- oh, I got it. Yeah.

Q   So this is a document that was previously used in this deposition cycle, which is why it's been marked and already admitted as Plaintiff's Exhibit 11. This document is a Power Point presentation entitled RevPro CEO Offsite from September 2018; correct?

A   Correct.

Q   Exhibit 11 bears the Bates number Zuora 422115; correct? I'll repeat that slower for the court reporter. It was Exhibit 11 bears the Bates number 422115. Correct?

A   Correct.

Q   And this presentation, Exhibit 11, is what you were citing to in your expert report at Paragraph 11 for examples of Zuora customer use cases; correct?

A   Give me a second to look at Paragraph 11. Can you point me to the specific reference?

Q   Sorry. Paragraph 71 cites to Exhibit 11.

A   Got it. Paragraph 71. Yes, that is correct.

Q   It cites to a page ending in Bates Number 31 of Exhibit 11. Let me know when that's in

Page 205

front of you, as well.

A   It is.

Q   So in Paragraph 71, you contend that the implementation of Zuora's productized integration solution, Keystone, would not work the same way for all customers; correct?

A   That's right.

Q   And to support that contention in Paragraph 71 of your report, you cite Exhibit Number 11, which states on page ending Bates number 31 that as of August 2018, Keystone was estimated to cover 70 percent of the use cases for ██████ , 80 percent of the use cases for ███ and ████ and 90 percent of the use cases for ██ . Is that accurate?

A   That's correct.

Q   Now, in preparing your report and conducting your analysis, you didn't perform analysis on any of these use cases specifically; correct?

A   That's correct.

Q   You primarily relied upon the percentage of use cases covered in this report to reach the conclusion that Zuora's customers had disparate use cases; correct?

52 (Pages 202 - 205)

CONFIDENTIAL

Page 210

JIRA backlog by a factor of "X", which needs to be defined elsewhere; correct?

A    Correct.

Q    So here from Zuora's perspective in terms of when it can release the product, when it can have Keystone exit LA, it was a criterion that the backlog of JIRA be reduced?

MS. MUCK:  Object to form.

THE WITNESS:  Correct.  I mean, it was an idea at this point.  It hadn't been yet made a criteria since it didn't have a specific measurement of how much it needed to be reduced, but yes.

BY MR. MELANSON:

Q    So in Zuora's mind as of this presentation, the length of the JIRA backlog dictated to a certain degree when Keystone would exit LA; correct?

MS. MUCK:  Object to form.

THE WITNESS:  Correct.  And that's not at all uncommon that software companies put some kind of specific measure on, you know, when to release software that relates to, you know, the backlog, especially as it relates to defects.

BY MR. MELANSON:

Q    In expressing the opinion that Zuora's customers had disparate use cases, did you perform

Page 211

any analysis comparing Zuora customers' specific uses for Zuora products during the class period?

A    I did not.  That was not -- not part of the assignment.

Q    Did you do any research reviewing materials on what use cases Zuora's customized integrator covered during the class period in preparing your opinions?

A    I did not.

Q    Did you research the significance of any specific use cases of Zuora's customers with respect to Billing, RevPro or Keystone during the class period in preparing your opinions?

A    Again that was outside the scope of my assignment; so no.

Q    So here today you have no understanding of the specific use cases making up the 70 percent covered by Keystone for ▮▮▮▮ as reflected on Page 31 of Exhibit 11?

A    That's correct.

Q    And you have no understanding of the 30 percent of use cases not covered by Keystone for ▮▮▮▮ as of the August release as reflected in this document, Plaintiff's Exhibit 11?

A    Correct.  My only understanding is that, if

Page 212

▮▮▮▮ -- if ▮▮ had 90 percent use case coverage and ▮▮▮▮ had 70 percent, that by definition the 20 percent delta had to be different.

Q    Disparately different?

MS. MUCK:  Object to form.

BY MR. MELANSON:

Q    Do you understand the question?

A    I mean disparate simply means different from customer to customer.

Q    So when you use the word disparate within the context of your report at Paragraph 70, you just meant different use cases; correct?

A    Correct.

Q    You weren't intending to attach any connotation or inference to the use of the word disparate as used in your Paragraph 70 of your report?

A    Yeah.  Well, I think to me the word disparate means unique.  Right?  Not in common. Right?  And so, you know, when I look at these percentages, I can't tell.  For example, perhaps 70 percent of the use cases that were met at ▮▮▮▮ maybe those are in common with ▮▮▮▮ ▮▮▮▮.  But certainly there's some that are not.  Because that's -- because, otherwise,

Page 213

▮▮ wouldn't be at 90 percent.  Right?  If all these use cases were common, they would all have the same number here, but they don't.  So that tells me that there's at least some percentage of these use cases that are disparate, meaning unique.  It doesn't mean that they don't apply to more than one customer. Right?  It means that they're not common to all customers.

Q    And in this chart on Slide -- I mean on Page Number 31, you can't say the absolute magnitude of use cases for every customer; correct?

A    Correct.

Q    You just see percentages on this slide on Exhibit 11?

A    That's right.

Q    So it's possible from the data, with the limited data in this chart, that the reason why ▮▮▮▮ only has 70 percent of use cases covered and ▮▮ only has 90 percent of use cases covered is because ▮▮▮▮ just has more use cases than ▮▮; correct?

A    That doesn't change, I think, the interpretation of the numbers that they're not the same from customer to customer, but you're right. The relative number of use cases at ▮▮▮▮ could

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

be -- could be larger, right. [REDACTED] could actually have implemented more use cases at that 70 percent than [REDACTED] did at its 90 percent, but there's still a difference in use cases. Otherwise, the numbers would be the same.

Q   So just to clarify as to the common understanding for your report, when you're using the term disparate in the context of Paragraph 70, you only mean to convey that customers using Keystone during the class period as represented in this chart just had differences in their use cases; correct?

A   Correct.

MS. MUCK: Object to form.

BY MR. MELANSON:

Q   And in saying that in the context of your answers today that customers had unique use cases, you are not conveying that a certain customer stood alone but merely that at least one other customer currently using Keystone at the time did not share that use case; correct?

A   That's correct.

Q   And again with respect to the [REDACTED] and [REDACTED], you have no understanding of the 80 percent of use cases covered by Keystone with respect to those customers; correct?

Page 215

A   That's also correct.

Q   Similarly you have no understanding based off of your review of the materials provided to you of the 20 percent of cases not covered by Keystone at this point in time, August 2018; correct?

A   Correct.

Q   In a similar vein, you have no understanding whether the uncovered use cases for any of the customers listed on this slide in Plaintiff's Exhibit 11 on Page 31, those customers being [REDACTED], you have no understanding of whether any of the uncovered use cases were mission critical for those customers?

MS. MUCK: Object to form.

THE WITNESS: That's -- that's true.

BY MR. MELANSON:

Q   If a solution can't address a critical requirement for a customer, does it matter, at least from the customer's perspective, whether the solution covers 80 percent other of its use cases?

MS. MUCK: Object to form.

THE WITNESS: If a solution can't address a mission critical requirement, then, no, it may not matter. The solution may not be viable if the customer's definition of mission critical is real,

Page 216

is true.

BY MR. MELANSON:

Q   To phrase that in a more general context, then, if a software or feature can't address a mission critical requirement that is accurately understood by a customer, it doesn't matter what percentage of other use cases already covered if the mission critical use case is not covered?

A   Well, in enterprise software implementations, the failure to meet a mission critical requirement can be addressed in a number of ways. One, the customer could choose to not move forward with the implementation at all. They could say, no, we don't want the product. Two, in many cases, this is where a professional services team comes in to actually implement, help implement a custom software solution to address that that use case is not being addressed by the product. Or, three, the customer might actually choose to change their business processes to match what the software can do. So all three of those are viable options in the situation where the software can't meet a mission critical requirement.

Q   Is that list of three viable options when a software can't meet a mission critical environment

Page 217

an exhaustive list?

A   No, I'm sure there are probably others. That's just what comes -- comes to mind in the things that I've seen and experienced.

Q   What other options come to mind at this exact moment for you?

A   None at the moment. I'm just allowing for the possibility that there could be others.

Q   If I can refer you to Page 143 of Exhibit 11 --

A   143.

Q   Correct, to a slide titled Keystone Integration Product Roadmap & Timeline.

A   I am there.

Q   Here again is a road map and timeline for Keystone -- correct? -- broken down by phases 1 through 3?

A   Correct.

Q   We see here for Phase 3 the plan for the fourth quarter of 2018; correct?

A   Correct.

Q   And according to this slide on Page 143 of Exhibit 11, Zuora represents that using Keystone integration as of Phase 3 in the fourth quarter of 2018 customers will be able to process most use

55 (Pages 214 - 217)

Page 222

Q   In offering Opinion 3, again you are opining on the understanding of enterprise software customers in a generalized context; correct?

A   I am.

Q   In offering Opinion 3, you are not opining that all enterprise software customers do not fully understand the features they need on all software projects; correct?

MS. MUCK:  Object to form.

THE WITNESS:  That's correct.  But, you know, enterprise software, I would refer back to my earlier kind of discussion about software in general being something that customers don't necessarily fully understand their needs until they start to use it and that that was the reason for Agile development and its emergence in the early 2000s.

BY MR. MELANSON:

Q   In offering Opinion 3, you are not opining that Zuora customers in particular do not fully understand the features they needed from Zuora or Zuora products during the class period; correct?

A   That's correct.

Q   You are not opining in Opinion 3 or elsewhere that Zuora customers actually discovered new cases for Zuora, new use cases for Zuora

Page 223

software during the class period; correct?

A   Certainly I've seen documents, or maybe it was on some of the videos that I saw, that did talk about the discovery of new use cases as a result of testing with real data.

MR. MELANSON:  I just want to pause for a second.  I'm getting occasionally a lag in the sound and video quality for Mr. Hagins.  Is anyone else getting that?

THE REPORTER:  Yes.  And I think if he moves a little bit closer, that will take care of the problem.

THE WITNESS:  Okay.

THE REPORTER:  Thank you.

MR. MELANSON:  The other possibility I was considering, is your cell phone near any router right now?

Okay.  We'll try with this, and if it becomes an issue, we'll raise it again.

THE WITNESS:  It's probably not me.  Because I have dual redundant gigabit internet to the house so that, if one fails, the other one takes over.  So it's not usually me when there's issues.

BY MR. MELANSON:

Q   So you mentioned that you saw in the

Page 224

materials you reviewed the discovery of new cases for Zuora products, new use cases for Zuora products.  Is it your understanding that it was the customers or Zuora that were discovering these new use cases during the class period?

A   That's a fair point.  I don't know which.

Q   In a similar vein, in offering the opinions in Opinion 3 and elsewhere, you are not opining that the discovery of new use cases caused Zuora specific implementation of its software and products and features during the class period to be time consuming; correct?

A   Correct.

Q   In the context of Opinion Number 3, you describe the JIRA issue process, and we already discussed that a little bit today.  So just to cut to the point a little bit more, you talk within that subject about mission critical issues.  Can you provide your general understanding -- do you have a general understanding of whether Zuora's customers had any mission critical issues with respect to Keystone that went unresolved during the class period?

A   No, I don't know that I do.  I can't recall.

Page 225

Q   Let's move on to Opinion Number 4.  There you opine that participants in early adopter programs know they are working with software that has yet to be rigorously tested.  In fact, the purpose of early adopter programs for software companies is to identify and address software defects in additional use cases that will only be fully understood when an enterprise attempts to use the product.  Is that an accurate description of Opinion Number 4?

A   It is.

Q   In the context of Opinion Number 4, what do you mean by the phrase rigorously tested?

A   Well, software testing refers to a variety of different activities that include both manual that are human-based testing of the software, as well as automated testing.  And it's typical, although, you know, not necessarily required, but typical that companies offer early adopter access even while they are still doing their own more exhaustive, all the various different types of testing of the product, specifically because they view early adopter usage of the product to actually be, you know, a form of testing.  So it's very common that companies are doing their final testing

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

at the same time that early adopters are trying to use the software.

Q   So in the context of Opinion 4, then, when you're using the term rigorously to modify testing, you simply mean to convey that the software developer hasn't done exhaustive testing on the software; correct?

A   I mean to convey that -- yes, that the software developer hasn't necessarily completed all of their own testing and quality activities.

Q   When you say that participants know they're working with software that hasn't been rigorously tested, does that mean that the participants know that they are working with software that might not work?

A   Sure.  I mean, in the industry broadly, early adopter programs and beta software programs, which generally have the same meaning, absolutely mean that you could run into things that don't work or run into bugs or defects that cause a particular feature not to work.

Q   When you say that participants know software hasn't been rigorously tested prior to the early adopter program, do the participants know or believe that use cases have been tested internally

Page 227

but not externally on actual customers?

A   I can't speak to, you know, what everyone knows about early adopters.  Certainly I make some of these statements because I've been an early adopter of software many times.  And I think you would say that absolutely you would expect that the vendor, the software vendor has -- you wouldn't expect that they have done no testing.  You would expect that they have tested the features of the software but not necessarily with real customers and real customer data.  And that is where, you know, defects can arise, where the vendor might have tested software, you know, independently using a suite of test information, but then you test it with a real customer and real data and you find -- you find additional defects.

Q   Have you ever been a participant or involved in an early adopter program concerning software that's similar to Zuora Billing or Zuora RevPro?

A   I mean, I've been an early adopter of enterprise software but nothing that was -- that is specific to subscription-based billing and revenue recognition.

Q   Have you ever been involved in the early

Page 228

adoption of an integrator between two products developed and sold by a singular company?

A   No, I don't believe I have.

Q   Do participants in early adopter programs expect that a developer has used the in-development program internally as a pseudo customer to the extent it uses those services?

MS. MUCK:  Form.

THE WITNESS:  I don't know that I would say that that is an expectation of early adopters, no. Early adopters are doing so typically because they want access to a specific feature or capability that they need, that there's some business pressure for them to get sooner rather than later, and that's what pushes them to be early adopters.  I don't think I've ever in my -- in my experience as an early adopter, I've never -- I don't remember ever asking the vendor whether they used -- were already using the software themselves.

BY MR. MELANSON:

Q   In a scenario where a software developer is also a customer for its own software and is developing a new feature for that software, do early adopter -- early adoption participants generally expect that the developer has tested the feature

Page 229

that is subject to the early adoption program?

MS. MUCK:  Object to form.

THE WITNESS:  I think customers of early adopter programs generally expect that software has been tested at some level before an early adopter program whether the -- whether the vendor is a user or not.

Q   Let me put it a different way.  Would a participant in an early adopter program expect the software developer to disclose that it itself is not going to use a feature that's subject to an early adoption program even though it's a customer for that market and could use that feature?

A   I don't really have any experience with situations like that to be able to comment one way or the other.

Q   In Opinion 5, you opine that it is typical that participants in early adopter programs identify defects and raise complaints or concerns.  From the standpoint of an enterprise software company, the existence of complaints or concerns relating to software in such an early adopter program is not inconsistent with the belief that the software will ultimately be successful in addressing customer needs; correct?

58 (Pages 226 - 229)

CONFIDENTIAL

Page 282

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken remotely by me at the time herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  October 21, 2022

*Lisa Andreasen*
LISA ANDREASEN
CSR No. 9584, RPR

Page 283

William Brenc, Esq.
william.brenc@wilmerhale.com
             October 21, 2022
RE:   Roberts, Casey v. Zuora, Inc.
   10/10/2022, Jeffrey L. Hagins (#5518500)
   The above-referenced transcript is available for review.
   Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
   The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

   Return completed errata within 30 days from receipt of testimony.
   If the witness fails to do so within the time allotted, the transcript may be used as if signed.

             Yours,
             Veritext Legal Solutions

Page 284

Roberts, Casey v. Zuora, Inc.
Jeffrey L. Hagins (#5518500)
             E R R A T A   S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____  _____
Jeffrey L. Hagins                  Date

Page 285

Roberts, Casey v. Zuora, Inc.
Jeffrey L. Hagins (#5518500)
             ACKNOWLEDGEMENT OF DEPONENT
   I, Jeffrey L. Hagins, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____
Jeffrey L. Hagins                  Date
*If notary is required
             SUBSCRIBED AND SWORN TO BEFORE ME THIS
             _____ DAY OF _____, 20___.

             _____
             NOTARY PUBLIC

72 (Pages 282 - 285)

## CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me with the exception of the changes and corrections indicated by me in the attached deposition errata sheet.

_____
Jeffrey Hagins

WITNESS:    Jeffrey Hagins

DATE:       October 10, 2022

MATTERS:    *Roberts v. Zuora, Inc., et al.*, No. 3:19-cv-03422-SI (N.D. Cal.)

## **ERRATA SHEET**

| Page: Line(s) | Language from Transcript | Correction | Reason for Change |
|---|---|---|---|
| 6:25 | "plaintiffs" | "plaintiff" | Typographical error |
| 13:14 | "cost period" | "class period" | Typographical error |
| 13:15 | "would regard to" | "with regard to" | Typographical error |
| 43:17 | "And LifeEase" | "And at LifeEase" | Typographical error |
| 46:6 | "serving" | "surveying" | Typographical error |
| 47:7 | "100,000" | "$100,000" | Typographical error |
| 82:5 | "In forming" | "Informing" | Typographical error |
| 82:11–12 | "in forming" | "informing" | Typographical error |
| 105:23–24 | "process rather seeks" | "process rather -- seeks" | Typographical error |
| 114:19 | "middle ware" | "middleware" | Typographical error |
| 129:2 | "there | "their" | Typographical error |
| 137:13 | "actually has" | "actually has to have" | Typographical error |
| 148:24–25 | "Smart Things" | "SmartThings" | Typographical error |
| 182:18–19 | "is out of the box" | "as out of the box" | Typographical error |
| 189:7 | "you being" | "you've being" | Typographical error |
| 197:20 | "lay person" | "layperson's" | Typographical error |
| 201:24 | "lay person" | "layperson" | Typographical error |
| 231:21 | "they're probably" | "there probably" | Typographical error |
| 252:2 | "it's" | "its" | Typographical error |