Steve Berman (admitted *pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Lead Plaintiff*
*New Zealand Methodist Trust Association*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASEY ROBERTS, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZUORA, INC., TIEN TZUO, and TYLER SLOAT,<br><br>Defendants. | No. 3:19-cv-03422-SI<br><br>**CLASS ACTION**<br><br>**DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR APPROVAL OF DISTRIBUTION PLAN**<br><br>Hearing Date: November 15, 2024<br>Time: 10:00 a.m.<br>Courtroom: 1, 17th Floor<br>Judge: Hon. Susan Illston |

I, Eric Blow, declare as follows:

1.      I am a Project Manager for Epiq Class Action & Claims Solutions, Inc. ("Epiq").  I am over 21 years of age and am not a party to the above-captioned action (the "Action").[1] The following statements are based on my personal knowledge and information provided by other Epiq employees working under my supervision and, if called on to do so, I could and would testify competently thereto.

2.      Epiq was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement of the Action.  By the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 268) (the "Preliminary Approval Order"), the Court approved the retention of Epiq as Claims Administrator.  Epiq has, among other things: (i) mailed the Notice of Pendency of Class Action and Proposed Settlement, Final Approval Hearing, and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses ("Notice") and the Proof of Claim and Release Form ("claim form") to potential Settlement Class Members and their brokers and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues to maintain a case website (www.ZuoraSecuritiesLitigation.com, the "Settlement Website"), which provides access to copies of the Stipulation, Preliminary Approval Order, Notice, Claim Form, the Order and Final Judgment, and other relevant documents; (iv) caused the Summary Notice to be published in *Investor's Business Daily/Weekly* and transmitted over *PR Newswire* (a national newswire service); (v) provided, upon request, additional copies of the notice packet to potential Settlement Class Members, brokers and other nominees; and (vi) received and processed claims.

3.      On January 16, 2024, the Court entered the following orders:

> Order Approving Class Action Settlement As Amended ("Final Approval Order") (ECF. No. 277);

> Order Approving Plan of Allocation (ECF No. 278);

---

[1] All capitalized terms not otherwise defined herein have the same meaning as set forth in the August 11, 2023 Amended Stipulation and Agreement of Global Settlement (ECF No. 266-1) (the "Stipulation").

> Order Awarding (I) Attorneys' Fees, (II) Reimbursement of Expenses, and (III) Award of Costs and Expenses to Plaintiffs (ECF No. 279); and

4. Epiq has completed the processing of the 33,702 claims received as of October 15, 2024, and hereby submits for Court approval its administrative determinations accepting or rejecting the claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants.

## DISSEMINATION OF THE SETTLEMENT NOTICE

5. Epiq has fully complied with the Court-approved notice plan. To date, Epiq has disseminated a total of 69,864 notice packets to potential Settlement Class Members, as well as brokers and other nominees who may have purchased Zuora common stock on behalf of Settlement Class Members.

## PROCEDURES FOLLOWED IN PROCESSING CLAIMS

6. Under the provisions of the Preliminary Approval Order and as set forth in the Settlement notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed claim form postmarked or electronically submitted no later than December 30, 2023, together with adequate supporting documentation for the transactions and holdings reported therein.  Through October 15, 2024, Epiq has received 33,702 claims.  All have been fully processed. Of those, 21,327 were postmarked or electronically submitted on or before December 30, 2023 (the submission date in the Notice) and 12,375 were postmarked or electronically submitted after that date. *See infra* ¶¶38-40.

7. In preparation for receiving and processing claims, Epiq:  (i) conferred with Lead Counsel to define the project guidelines for processing claims; (ii) created a unique database to store claim form details and images of claim forms and supporting documentation; (iii) trained staff in the specifics of the project so that claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of claimants' identifying and transactional information; and (vi) developed a proprietary "calculation module" to calculate each Authorized Claimant's

DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR APPROVAL OF DISTRIBUTION PLAN - 2                    [NO. 3:19-CV-03422-SI]
010837-11/2846688 V2

share of the Net Settlement Fund based upon the recognized loss formula ("Recognized Loss") detailed in the Court-approved Plan of Allocation set forth in the Settlement Notice.

8.      Settlement Class Members seeking to share in the Net Settlement Fund (as well as banks, brokers, and other nominees acting on their behalves) were directed in the notice packet to submit their claim forms to the post office box address specifically designated for the Settlement or to submit claims online using the Settlement Website, or to submit claims to the Epiq team that handles large electronic claims (the "Securities Team").  Any correspondence received at the post office box was reviewed and, where necessary, appropriate responses were provided to the senders.

### PROCESSING PAPER AND ONLINE CLAIM FORMS

9.      Of the 33,702 claim forms received by Epiq through October 15, 2024, 2,228 were paper claim forms or claim forms submitted through the Settlement Website.  Once received, paper claim forms and accompanying supporting materials were opened and prepared for scanning.  This process included unfolding documents, removing staples, copying nonconforming sized documents, and sorting documents.  This manual task of preparing the paper claim forms once they are received is laborious and time-intensive.  Once prepared, the paper claim forms were scanned into a database together with all submitted documentation.  Each paper and online claim form was assigned a unique identifying claim number.  The information from each claim form—including the claimant's name, address, account number/information from their supporting documentation, as well as the purchase/acquisition transactions, sale transactions, and holdings listed on the claim form—was entered into the database developed by Epiq to process claims submitted for the Settlement.  Next, the documentation provided by each claimant in support of their claim form was reviewed to determine: (i) whether the claimant traded in Zuora common stock during the Settlement Class Period; (ii) whether the transaction information entered on the claim form was supported by the documentation; (iii) that the claimant did not have any additional trades not reflected on their claim form; (iv) that the name of the claimant matched the information on the trade documentation, or that additional documentation was provided to support any name changes; and (v) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the claim form.

10. In order to process the claims, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within the claims. The appropriate codes were assigned to the claims as they were processed. For example, where a claim form was submitted by a claimant who did not have any eligible transactions in Zuora common stock during the Settlement Class Period (*e.g.*, the claimant purchased Zuora common stock only before or after the Settlement Class Period), that claim would receive a defect code that denoted ineligibility. Similar defect codes were used to denote other ineligible conditions, such as duplicate claims. These message codes would indicate to Epiq that the claimant is not eligible to receive any payment from the Net Settlement Fund with respect to that claim unless the deficiency was cured in its entirety.

11. Because a claim may be deficient only in part, but otherwise acceptable, Epiq utilized certain transaction-specific defect codes—codes that were only applied to specific transactions within a claim. For example, if a claimant submitted a claim form which, in addition to having eligible documented purchases, also listed shares that were transferred into the account without providing supporting documentation demonstrating that the transferred shares had been purchased during the Settlement Class Period, that transfer transaction would receive a transaction-specific defect code. That code indicated that the shares transferred into the account were not eligible, unless the defect was cured; however, the claim was otherwise eligible for payment based on the other transactions. Thus, even if the transaction-specific deficiency was never cured, the claim could still be partially accepted.

## PROCESSING ELECTRONICALLY FILED CLAIM FORMS

12. Of the 33,702 claim forms received by Epiq through October 15, 2024, 31,474 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by, or on behalf of, institutional investors who may have hundreds or thousands of transactions during the Settlement Class Period. Rather than provide reams of paper requiring data entry, the institutional investors or their representatives filing Electronic Claims on their behalf, submit a file to Epiq, via email or mail, so that Epiq may electronically upload all transactions to its proprietary database developed for the Settlement.

DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR APPROVAL OF DISTRIBUTION PLAN - 4                    [NO. 3:19-CV-03422-SI]
010837-11/2846688 V2

13. As noted in paragraph 8 above, Epiq maintains a team that coordinates and supervises large electronic claims submitted by institutional investors, the Securities Team. In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the sender. If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

14. Once the file was loaded, the Electronic Claims were coded to identify them as Electronic Claims and message codes were applied to denote any deficiencies or ineligible conditions that existed within them. These message codes are similar to those applied to paper and online claims. In lieu of manually applying message codes, the Securities Team performed programmatic reviews of the Electronic Claims to identify deficiency and ineligibility conditions (such as, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Settlement Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

15. The review process also included confirming that all Electronic Claims were accompanied by a signed claim form, which serves as a "Master Proof of Claim Form" for all accounts referenced in the electronic file submitted. For any Electronics Claims for which a Master Proof of Claim Form was not provided, Epiq contacted the institutional filers whose electronic files were missing information to obtain the required information. This ensures that all claims are submitted by properly authorized representatives of the claimants.

16. Finally, at the end of this process, Epiq performed various targeted reviews of the Electronic Claims. Specifically, Epiq used criteria such as the calculated Recognized Loss amounts and other criteria to flag a sampling of electronic filers in order to request additional information, such as that specific purchases, sales, and holdings selected by Epiq be documented with confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by claimants does not contain inaccurate information. As set forth in ¶¶ 32-35 below, Epiq also performed additional quality assurance reviews.

**EXCLUDED PERSONS**

17.     Epiq reviewed all claims to ensure that they were not submitted by or on behalf of persons and entities excluded from the Settlement Class as set forth in the Stipulation,[2] to the extent that the identities of such persons or entities were known to Epiq.

**ADDITIONAL COMPLEXITIES ENCOUNTERED IN CLAIMS PROCESSING**

18.     Many of the claims Epiq received were deficient or ineligible for one or more reasons. They were therefore subjected to the additional processing, correspondence, and telephonic communications described in the sections below entitled "The Deficiency Process for Paper and Online Claims" and "The Deficiency Process for Electronic Claims."

19.     During the processing of claims, Epiq also encountered "non-conforming" claims, which, in general, require significantly more work than ordinary claims because of the information contained in or missing from the claims or the manner in which the claims were completed. Non-conforming claims can include, among other conditions, claim forms with missing pages or without a name or address, claim forms that are blank but submitted with documentation for Epiq to complete, and claim forms that are so materially deficient as to make what is being claimed unrecognizable.

---

[2] Excluded from the Settlement Class are: (i) Defendants; (ii) members of the immediate family of Defendants; (iii) any person who was an officer or director of Zuora; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) Defendants' liability insurance carriers; (vi) any affiliates, parents, or subsidiaries of Zuora; (vii) all Zuora plans that are covered by ERISA; and (viii) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such. Notwithstanding the foregoing and for the avoidance of doubt, the Settlement Class shall not exclude any "Investment Vehicles," defined as any investment company, or pooled investment fund or separately managed account (including, but not limited to, mutual fund families, exchange traded funds, funds of funds, private equity funds, real estate funds, hedge funds, and employee benefit plans) in which the Underwriter State Action Defendants, or any of them, have, has, or may have a direct or indirect interest, or as to which its affiliates may serve as a fiduciary or act as an investment advisor, general partner, managing member, or in any other similar capacity but in which any of the Underwriter State Action Defendants, alone or together with its, his, or her respective affiliates, is not a majority owner or does not hold a majority beneficial interest. Also excluded from the Settlement Class is any Settlement Class Member that validly and timely requests exclusion in accordance with the requirements set by the Court. Stipulation ¶ H; *see also* Preliminary Approval Order ¶ 6; Final Approval Order ¶ 6.

## THE DEFICIENCY PROCESS FOR PAPER AND ONLINE CLAIMS

20.     Of the 2,228 paper and online claims (claims submitted through the Settlement Website) received as of December 30, 2023, 1,056, or approximately 47% of them, were incomplete or had one or more defects or conditions of ineligibility, such as the claim form not being signed, the claim not being properly documented, or the claim form indicating no eligible transactions in Zuora common stock during the Settlement Class Period.  A significant portion of Epiq's efforts in handling a claims administration involve claimant communications so that all claimants have a sufficient opportunity to cure any deficiencies and file a complete claim.  The "Deficiency Process," which involved contacting claimants and responding to inquiries from claimants either by telephone or email, was intended to assist them in properly completing their otherwise deficient submissions so that they would be eligible to participate in the Settlement.

21.     If a claim was determined to be defective or ineligible, a *Notice of Deficient Claim Form Submission* ("Deficiency Notice") was sent to the claimant describing the defect(s) or condition(s) of ineligibility in their claim and what was necessary to cure any "curable" defect(s) in the claim.  The Deficiency Notice advised the claimant that the submission of the appropriate information and/or documentary evidence to complete the claim had to be submitted within twenty (20) days of the date of the letter.  The Deficiency Notice further advised that if the appropriate information was not submitted in this timeframe, the claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured.  The Deficiency Notice further advised claimants that if they desired to contest the administrative determination, they were required to submit within 20 days of the date of the Deficiency Notice a written statement to Epiq requesting Court review of the determination and setting forth the basis (with supporting documentation) for their request.  Attached hereto as **Exhibit A** is an example of the Deficiency Notice.

22.     Claimants' responses to the Deficiency Notices were scanned into Epiq's database and associated with the corresponding claim form.  The responses were then carefully reviewed and evaluated by Epiq's team of processors.  If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the claim.

**THE DEFICIENCY PROCESS FOR ELECTRONIC CLAIMS**

23. Of the 31,474 Electronic Claims received from institutional investors or their authorized representatives, 22,391, or approximately 71%, were deficient or ineligible. Epiq used the following process to inform Electronic Claim filers that their electronic submissions were deficient. Each filer was sent an email attaching a report ("Transaction Report"), which listed the specific claims that were deficient or ineligible, along with a list of the specific portions of the claims that were deficient or ineligible. With respect to the Electronic Claims, the Transaction Reports:

(a) were sent electronically to filers who submitted deficient or ineligible Electronic Claims;

(b) identified individual transactions and entire Electronic Claims that were found to be deficient or ineligible so that the filer had the opportunity to correct the deficient condition or contest the determination of ineligibility;

(c) stated that any deficient transactions or Electronic Claims that remain uncured, as well as any transactions or Electronic Claims that were identified as ineligible, would be rejected;

(d) notified the filer that, within twenty (20) days, it could request that the Court review Epiq's administrative determinations if it wished to contest the rejection of any transactions or Electronic Claims; and

(e) provided Epiq's contact information if the filer had any questions or required assistance.

24. Samples of the email and the Transaction Report are attached hereto as **Exhibits B** and **C**, respectively.

25. Responses to Transaction Reports were reviewed by Epiq's Securities Team, scanned and/or loaded into Epiq's database, and associated with the corresponding Electronic Claim. If the response corrected the defect(s) or affected the Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the Electronic Claim.

DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR APPROVAL OF DISTRIBUTION PLAN - 8                    [No. 3:19-cv-03422-SI]
010837-11/2846688 V2

## CLAIMANTS WHO SOUGHT JUDICIAL REVIEW OF DISPUTED CLAIMS

26.     As noted above, claimants who received Deficiency Notices were advised that they had the right to contest Epiq's administrative determinations of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. *See* Stipulation ¶ 4.9. More specifically, such persons were advised in the Deficiency Notices or the Transaction Reports that if they disputed Epiq's determinations, they had to provide a statement of reasons indicating the grounds for contesting the rejection, along with supporting documentation. *Id*.

27.     Epiq received six (6) requests for Court review of Epiq's administrative determinations. In an attempt to resolve the disputes without the Court's intervention (*see* Stipulation ¶6.8), Epiq attempted to contact the claimants requesting Court review in order to answer all of their questions, fully explain Epiq's determination of their claims' status, and facilitate the submission of missing information or documentation where applicable. As a result of these efforts, claimants for four (4) of the six (6) claims for which Court review had been requested have since either cured their claims' deficiencies or retracted their request for Court review. At present, there are two (2) claimants whose request for Court review remains. Attached hereto as **Exhibit D** are the pending requests for Court review (which includes a copy of the disputed claim form with its supporting documentation). All documentation has been redacted to protect confidential information and information not related to transactions in Zuora common stock.

28.     Claim No. 518 (**Exhibit D-1**) is recommended for partial acceptance because Epiq had to separate the original claim due to claiming both IRA and individual accounts together. The claimants IRA claim is correctly processed but has no Recognized Loss due to selling of shares before the only corrective disclosure on May 30, 2019. The claimants Individual claim does have Recognized Loss and is in good standing. As noted in the claim form, claimants are required to submit genuine and sufficient documentation for all transactions. Documentation may consist of, among other things, copies of brokerage confirmation slips, monthly brokerage account statements, or an authorized statement from your broker containing the transactional and holding information found in a broker confirmation slip or account statement. Epiq sent a Deficiency Notice informing

the claimant that supporting documentation was not provided for the identified transactions and therefore those transactions would be excluded from the claim. The claimant responded to the Deficiency Notice objecting to the request for additional documentation, stating that unless a favorable response was received from the claims administrator, they would contact the Court directly. Epiq followed up with the claimant via email to detail and explain Epiq's determination. The claimant did not, to the best of our knowledge, further contact the Court or respond to Epiq's written explanation. Although the claimant did not request that Epiq submit its claim determination for Court review, we are presenting the claim herein out of an abundance of caution.

29.    Claim No. 591 (**Exhibit D-2**) is not recommended for partial acceptance because it was determined that the claim is showing as no Recognized Loss based on the Plan of Allocation, on page 13 of the Notice. As noted in the claim form, claimants are required to submit genuine and sufficient documentation for all transactions. Documentation may consist of, among other things, copies of brokerage confirmation slips, monthly brokerage account statements, or an authorized statement from your broker containing the transactional and holding information found in a broker confirmation slip or account statement. Epiq sent a Deficiency Notice informing the claimant that supporting documentation was not provided for the identified transactions and therefore those transactions would be excluded from the claim. The claimant responded to the Deficiency Notice objecting to the request for additional documentation, stating that unless a favorable response was received from the claims administrator, they would contact the Court directly. Epiq followed up with the claimant via email to detail and explain Epiq's determination. The claimant did not, to the best of our knowledge, further contact the Court or respond to Epiq's written explanation. Although the claimant did not request that Epiq submit its claim determination for Court review, we are presenting the claim herein out of an abundance of caution.

**LATE BUT OTHERWISE ELIGIBLE CLAIM FORMS**

30.    Through October 15, 2024, Epiq received 10,662 claims that were postmarked after the December 30, 2023 claim-submission deadline established by the Court. Epiq has fully processed these claims. Of the late claims, 4,242 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). The Recognized Loss amount for the 4,242

DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR APPROVAL OF DISTRIBUTION PLAN - 10                    [NO. 3:19-CV-03422-SI]
010837-11/2846688 V2

Late But Otherwise Eligible Claims represents a very modest share of the total Recognized Losses being recommended. Epiq has not rejected any claim solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these late but otherwise eligible claims. To the extent they are eligible but for the fact that they were late, they are recommended herein for payment.

31. However, there must be a final cut-off date after which no more claims will be accepted so that there may be a proportional calculation of and distribution from the Net Settlement Fund. Accordingly, and in consultation with Lead Counsel, Epiq recommends that no claim form received after July 30, 2024 be eligible for payment.

**QUALITY ASSURANCE**

32. An integral part of all of Epiq's settlement administration projects is its *quality assurance* reviews. These reviews are also labor intensive and time consuming. Specifically, Epiq's personnel worked throughout the entire claims administration to ensure that claims were processed properly; that deficiency and ineligibility message codes were properly applied to claims; that deficiency notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

33. In support of the work described above, Epiq staff designed, implemented, tested, and reviewed the following programs for this claims administration: (i) data entry screens that store claim information (including all transactional data included in each claim and in any supporting documentation), attach message codes, and, where necessary, apply text to denote conditions existing within the claim; (ii) screens for the analysts to review images of the claim form and any supporting documentation provided; (iii) programs to load and analyze transactional data submitted electronically for all Electronic Claims (a load program converts the data submitted into the format required by the calculation program, and an analysis program determines if the data is consistent and complete); (iv) a program to compare the claimed transaction prices against the reported market prices of Zuora stock to confirm that the claimed transactions were within an acceptable range of the reported market prices; (v) a calculation program to analyze the transactional data for all claims and calculate the Recognized Loss based on the Court-approved Plan of Allocation; and (vi)

programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible claims.

34.     Epiq's Securities Team also performed a final quality control check once all of the accepted claims were processed, Deficiency Notices were mailed, and responses to Deficiency Notices were processed and reviewed, to ensure the correctness and completeness of all of the processed claims prior to Epiq preparing its final reports to Lead Counsel.  Here, in connection with this *quality assurance* wrap-up, Epiq:  (i) confirmed that the claims that are being recommended for approval have no message codes denoting ineligibility; (ii) confirmed that claims that are being recommended for rejection have message codes denoting ineligibility; (iii) confirmed that all claims requiring Deficiency Notices were sent such notices; (iv) performed a sample review of deficient claims; (v) reviewed a sampling of claims with high Recognized Loss amounts to confirm Epiq's determinations; (vi) sampled claims that had been determined to be ineligible, including those with no Recognized Loss calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (vii) retested the accuracy of the loss calculation program.

35.     As part of its due diligence in processing the claims, Epiq also conducted a *questionable claim-filer* search of all paper/online claims and Electronic Claims submitted in the Settlement as follows.  Epiq maintains a database of known questionable filers ("Questionable Claim Filer").  This database contains names, addresses, and aliases of individuals who have been investigated by government agencies for fraudulent claim filing, as well as the names and contact information compiled from previous settlements that Epiq has administered where fraudulent claims were received.  Epiq updates the database on a regular basis.  The database for the Settlement was searched for all individuals identified in our Questionable Claim Filer database.  Epiq performed searches based on name, alias, address, and city/zip code.  In addition, all of Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including for claims submitted by claimants not previously captured in our database as Questionable Claim Filers.  Processors are instructed to flag claims as "Questionable Claims" where appropriate and to route them to the Project Manager and Securities Team for review.

Five (5) Questionable Claims were identified; those claims were rejected, and the claimants have not disputed the rejection of the claims.

### RECOMMENDATIONS FOR APPROVAL AND REJECTION

36.      Epiq has completed the processing of 33,702 claims and has determined and is recommending to the Court that 10,254 be accepted in whole, and 23,448 be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Court-approved Plan of Allocation.

37.      A list of the claims and Epiq's recommendations as to their disposition is contained in the Administrator's Report attached hereto as **Exhibit E**.

     **A.**     **Timely Eligible Claims and Late but Otherwise Eligible Claims Recommended for Approval**

38.      For the *Timely Eligible Claims* and *Late But Otherwise Eligible Claims*, Epiq has determined and is recommending that 10,254 claims should be accepted.  The claims recommended for acceptance represent total Recognized Losses of $169,225,144.97 under the Court-approved Plan of Allocation.  Of that total, $ 149,771,697.08 is for *Timely Eligible Claims* and $ 19,483,447.89 is for *Late But Otherwise Eligible Claims*.

39.      **Exhibit E-1**, entitled "Timely Eligible Claims," lists all timely filed accepted/recommended claims and states their Recognized Loss amounts.  **Exhibit E-2**, entitled "Late But Otherwise Eligible Claims," lists all late-filed accepted/recommended claims and states their Recognized Loss amounts.  For privacy reasons, **Exhibits E-1** and **E-2** provide only the claimant's claim number and Recognized Loss amount (no names, addresses, Taxpayer ID, or Social Security or Social Insurance Numbers are disclosed).

40.      According to the Court-approved Plan of Allocation, each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Fund based on their Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants.

     **B.**     **Rejected Claims**

41.      The 23,448 wholly rejected claims are recommended to the Court for rejection for the following reasons:

### Summary of Rejected Claims

| Reason for Rejection | Number of Claims |
|---|---|
| No Eligible Purchases During the Settlement Class Period | 2,608 |
| Claim Did Not Result in a Recognized Loss | 9,617 |
| Deficient Claim with Condition of Ineligibility Never Cured | 146 |
| Duplicate Claim | 204 |
| Claim Withdrawn/Voided by Request | 10,873 |
| **TOTAL** | **23,448** |

42.    **Exhibit E-3**, entitled "Rejected Claims," lists all wholly rejected claims, and states the reason for their rejection.  For privacy reasons, **Exhibit E-3** provides only the claimant's claim number and reason for rejection (no names, addresses, Taxpayer ID, or Social Security or Social Insurance Numbers are disclosed).

### FEES AND DISBURSEMENTS

43.    Epiq agreed to be the Claims Administrator in exchange for payment of its fees and expenses, which are paid pursuant to the Stipulation.  To date, Epiq has incurred $453,198.71for its work performed on behalf of the Class, including its estimate of fees and expenses to complete the Initial Distribution.  Attached hereto as **Exhibit F** is a copy of a compilation of Epiq's invoices from April 2023 through September 2024, as well as its estimate to complete the initial distribution.

44.    Epiq was engaged in this matter after a formal and competitive bidding process conducted by Lead Counsel.  For each case in which Epiq provides an estimate, we utilize our standard unit pricing and hourly rates (time and material) as well as assumptions based upon our prior experience in similar cases about the number of notice packets and expected claims, the types and number of claim forms and claim files submitted (paper, website, and electronic), and the time that will be required for the work.

45.    Based upon our more than 20 years of experience, Epiq estimated it would mail 73,000 notice packets and receive approximately 18,250 claims (2,000 paper and website claims and 16,250 Electronic Claims).  Instead, Epiq mailed 69,864 notice packets and received 33,702

claims: 2,228 paper and online claims, and 31,474 Electronic Claims submitted by institutional investors. This represents approximately a 70% claims rate based on the total claims received compared to the total number of Notice Packets sent.

46.     The increase in the volume of paper and online claims led to additional manual review of the documentation provided in support of the claims as well as additional quality assurance and quality control work. *See supra* ¶¶ 9-11 (describing the processing of paper and online claims).

47.     Electronic Claims are typically submitted by institutional investors who may have hundreds, thousands, or even millions of transactions. Importing these files takes programming time and additional quality control/review procedures to confirm the data in these fields were imported correctly. *See supra* ¶¶ 12-16 (describing the processing of Electronic Claims). Epiq's initial estimate assumed that we would receive 30 files. However, Epiq received over five times as many files: 164 files with approximately 1,740,000 transactions. The increase in the volume of electronic submissions by institutional investors led to additional manual review of the electronically submitted claims to ensure that the data within the spreadsheets was in a format Epiq was able to load into the database as well as additional quality assurance and quality control work. This also created additional outreach to the institutional investors to fix or provide new electronic submissions to conform to Epiq's standard format. *See supra* ¶¶ 12-16.

48.     Included in Epiq's fees is hourly time spent by Epiq's project management team, business analysts, and data analysts, as described below:

- **Project Managers** oversee and are responsible for all aspects of a settlement administration at Epiq. They work closely with all internal departments to ensure desired outcomes and serve as our clients'/counsel's day-to-day contact on all administration deliverables. The Project Manager worked closely with Lead Counsel during this administration.

- **Project Coordinators** assist the Project Manager on the details of the administration. Project Coordinators are akin to paralegals or associates at law firms, working on detailed analyses of data, claims, report requirements,

responding to client requests, coordinating with internal departments, reviewing claims processing guidelines, developing scripting for toll-free call lines, providing weekly reporting on case metrics, and, as needed, communicating directly with counsel or claimants.

- **Business Analysts** (on the Securities Team) are a vital component of the Epiq Securities Team. They are responsible for many of the quality assurance aspects of the administration, including developing and testing the programming of the proprietary "calculation module" to calculate Recognized Losses pursuant to the Court-approved Plan of Allocation and the data integrity review conduct on Electronic Claims. Epiq Business Analysts have routine contact with third-party filers, nominees, and custodians to facilitate the submission and processing of Electronic Claims and to obtain additional information from those entities as needed.

- **Data Analysts** assist with ensuring that claimant data is imported into and maintained in the case database of record at Epiq. They assist in developing and running calculations to pay claimants and performing automated fraud and claim reviews to ensure claims processing integrity. They also assist in pulling together regular and *ad hoc* reports requested by counsel.

49. Epiq's estimate for project management fees was based on the previously described assumptions about number of notice packets and claim forms and type of claim forms (paper, online, or electronic). Epiq received both more paper and online files than it estimated (2,000 estimated versus 2,228 received) and significantly more Electronic Claim files than estimated (16,250 estimated versus 31,474 received). Thus, significantly more project management fees were and will be incurred.

50. As a result of Epiq's efforts as described above, Epiq's actual fees were higher than the original estimate of $275,000. Epiq believes that we performed the administration thoroughly and accurately, and successfully assisted Settlement Class members as much as possible to ensure fair treatment of the entire Class. As this was a time and materials proposal, we respectfully request

that the Court approve our fees and expenses of $453,198.71for payment from the Net Settlement Fund for work performed and to be performed through the initial distribution. Epiq has not thus far been paid for its invoiced work. Should the estimate of fees and expenses to conduct the Distribution of the Net Settlement Fund exceed the actual cost, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants.

51. The Notice advised banks, trustees, brokerage firms, or other nominees that, "[r]egardless of whether you choose to complete the mailing yourself or elect to have the mailing performed for you, you may obtain reimbursement for reasonable costs actually incurred or expected to be incurred in connection with the forwarding of the Notice Packet and which would not have been incurred but for the obligation to forward the Notice Packet, upon submission of appropriate documentation to the Claims Administrator." Accordingly, Epiq has received invoices from nominees in the total of $16,769.60. Epiq has covered these costs and accordingly requests approval to pay this amount from the Settlement Fund at this time.

52. These fees and expenses are in line with similar sized securities class action administrations that we have handled. *See*, *e.g.*, *In re HD Supply Holdings, Inc. Securities Litigation* Case No. 1:17-cv-02587-ELR ((N.D. Georgia) (62,095notices mailed; 38,158 claims received; fees of $424,351.25); *The Police Retirement System of St. Louis v. Granite Construction, Inc., et al,* Case No. 3:19-cv-04744-WHA (N.D. Cal.) (59,903 notices mailed; 33,969 claims received; fees of $416,148.19); *Rayonier Securities Litigation*, Case No. 3:14-cv-01395-TJC-JBT (222,291 notices mailed; 52,691 claims received; fees of $694,295.81).

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

53. Should the Court concur with Epiq's determinations concerning the accepted and rejected claims, including the *Late But Otherwise Eligible Claims*, Epiq recommends the following distribution plan (the "Distribution Plan"):

(a)    Epiq will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting the payments previously allowed and requested herein (and after deducting Epiq's unpaid fees and expenses further incurred or expected to be incurred in connection

DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR APPROVAL OF DISTRIBUTION PLAN - 17          [NO. 3:19-CV-03422-SI]
010837-11/2846688 V2

with administering the Settlement, and after the payment of any actual or expected Taxes, costs of preparing appropriate tax returns, and escrow fees) as follows:

(i)    Epiq will calculate award amounts to all Authorized Claimants by calculating their *pro rata* share of the Net Settlement Fund in accordance with the Plan of Allocation, including the claims noted in ¶ 37 above.

(ii)    Epiq will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro rata* share of the Net Settlement Fund, as calculated under subparagraph (a)(i) above, is less than $10.00.  Such claimants will not receive any distribution from the Net Settlement Fund and Epiq will send letters to those Authorized Claimants advising them of that fact.

(iii)    After eliminating claimants who would have received less than $10.00, Epiq will re-calculate the *pro rata* share of the Net Settlement Fund for remaining Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in subparagraph (a)(i) above ("Distribution Amount").

(iv)    In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED WITHIN 60 DAYS OF ISSUE DATE."[3]

---

[3] Authorized Claimants will be informed that, if they do not cash their distribution checks within the 60 days from the mail date (as indicated on the check) (*see* Final Approval Order ¶ 20(c)), or they do not cash reissued checks within 60 days of the mailing of such reissued check (as indicated on the check) (*see* Final Approval Order ¶ 20(d)), their checks will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be re-allocated to other Authorized Claimants.  For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses through reasonable methods.  Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address.  In the event an Authorized Claimant loses or damages their check, or otherwise requires a new check, Epiq will issue replacements.  Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate.  Additional outreach is performed by claims specialists on all returned wires or any high-value uncashed checks.  For all checks, Epiq will void the initial payment prior to re-issuing a payment.  In order to not delay further distributions to Authorized Claimants who have timely cashed their checks, Epiq's outreach program described in the preceding sentences shall end 30 days before the initial void date.  Requests for reissued checks in connection with a second distribution and any subsequent distributions (if one or both is required) will be handled in the same manner.

DECLARATION OF ERIC BLOW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR APPROVAL OF DISTRIBUTION PLAN - 18                    [No. 3:19-CV-03422-SI]
010837-11/2846688 V2

(v)    Authorized claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit all recovery from the Settlement.  The funds allocated to all such stale-dated checks will be available to be re-distributed to other Authorized Claimants in the second distribution, if appropriate, as discussed below.  Similarly, Authorized Claimants who do not cash their second or subsequent distributions (should such distributions occur) within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(b)    After Epiq has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up efforts described in footnote 3, then, if Lead Counsel, in consultation with Epiq, determines that it is cost-effective to do so, Epiq will conduct a second distribution of the Net Settlement Fund in which any unclaimed amounts remaining in the Net Settlement Fund after the Initial Distribution—after deducting Epiq's unpaid fees and expenses further incurred or expected to be incurred in connection with administering the Settlement for which it has not yet been paid (including the estimated costs of such second distribution), and after the payment of any actual or expected Taxes, costs of preparing appropriate tax returns, and escrow fees—will be distributed to all Authorized Claimants in the Initial Distribution who cashed their Initial Distribution check and would receive at least $10.00 from such additional distribution based on their *pro-rata* share of the remaining funds.

(c)    In order to allow a final distribution of any funds remaining in the Net Settlement Fund after completion of a second distribution, whether by reason of returned funds, tax refunds, interest, uncashed checks, or otherwise:

(i)    If Lead Counsel, in consultation with Epiq, determines that such redistributions will be cost-effective, Epiq will conduct a further distribution of the Net Settlement Fund, in which all funds remaining in the Net Settlement Fund—after deducting Epiq's unpaid fees and expenses incurred or expected to be incurred in connection with administering the Settlement (including the estimated costs of such distribution), and after the payment of any actual or expected Taxes, the costs of preparing appropriate tax returns, and any escrow fees—will be distributed to

Authorized Claimants who cashed their second distribution checks in an equitable and economic fashion. Additional re-distributions, after deduction of actual and expected costs and expenses as described above and subject to the same conditions, may occur thereafter until Lead Counsel, in consultation with Epiq, determines that further re-distribution is not cost-effective. Subsequently, and as set forth in the Plan of Allocation and Stipulation and if the Court so approves, the unclaimed balance will be contributed to a non-sectarian, non-profit Section 501(c)(3) organization. Lead Plaintiff will propose such organization for Defendants' consent and for final determination by the Court. *See* Stipulation ¶ 4.15.

(d)     No new claim forms nor adjustments to claim forms, which would result in an increased Recognized Loss amount, may be accepted after July 30, 2024. Should an adjustment be received those results in a lower Recognized Loss amount, that adjustment will be made and the Recognized Loss amount will be reduced accordingly.

(e)     Unless otherwise ordered by the Court, one year after the second distribution, Epiq will destroy the paper copies of the claim forms and all supporting documentation, and one year after all funds have been distributed, Epiq will destroy electronic copies of the same.

## CONCLUSION

54.     Epiq respectfully submits this declaration in support of Lead Plaintiff's motion for approval of the distribution plan.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 15, 2024 in Louisville, KY.

_____
Eric Blow